UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ZACK K. DE PIERO, | Civil Case No. _____ |
| PLAINTIFF, | |
| vs. | DATE: June 15, 2023 |
| PENNSYLVANIA STATE UNIVERSITY, NEELI BENDAPUDI, MARGO DELLICARPINI, ABRAHAM AMORÓS, DANIEL J. DELLIGATTI, DAVID M. KLEPPINGER, DANIEL A. ONORATO, TERRENCE M. PEGULA, STANLEY I. RAPP, EDWARD "TED" B. BROWN, III, ALVIN F. DE LEVIE, BARRY J. FENCHAK, CHRISTA A. HASENKOPF, ANTHONY P. LUBRANO, JOSEPH "JAY" V. PATERNO, ALICE W. POPE, BRANDON D. SHORT, STEVEN B. WAGMAN, RANDALL E. BLACK, DONALD W. CAIRNS, VALERIE L. DETWILER, LYNN A. DIETRICH, M. ABRAHAM HARPSTER, CHRIS R. HOFFMAN, MARK H. DAMBLY, ROBERT E. FENZA, NAREN K. GURSAHANEY, WALTER C. RAKOWICH, MARY LEE SCHNEIDER, RICHARD S. SOKOLOV, TRACY A. RIEGEL, JULIE ANNA POTTS, MATTHEW W. SCHUYLER, In their official capacities, and DAMIAN FERNANDEZ, MARGO DELLICARPINI, LILIANA NAYDAN, CARMEN BORGES, ALINA WONG, LISA MARRANZINI, FRIEDERIKE BAER, and ANEESAH SMITH, in their official and individual capacities, | |
| DEFENDANTS. | |

1

**COMPLAINT AND JURY DEMAND**

Plaintiff Zack K. De Piero sues Defendants for the violation of his civil rights, First Amendment rights, and rights under the Pennsylvania Human Relations Act due to Defendants' discrimination against him on the basis of race and retaliation against him for exercising his right to speak freely on matters of public concern, namely by condemning Defendants' race-based dogma and discrimination.

## I.   THE PARTIES

1.   Zack K. De Piero is a resident of Bucks County, Pennsylvania. At all times relevant to this Complaint, De Piero was an Assistant Teaching Professor of English and Composition with an appointment in the English Department and Writing Program of Penn State Abington.

2.   Pennsylvania State University ("Penn State") is a public institution of higher education created by the Pennsylvania Legislature in 1855 and operates under a "charter" that consists of various Legislative Acts and decrees of the Court of Common Pleas of Centre County, and is governed by a Board of Trustees. Penn State maintains campuses throughout the state of Pennsylvania, including Plaintiff's former employer at Penn State Abington in Montgomery County, Pennsylvania.  Penn State receives federal funding.

## A.  The "Trustee Defendants"

3.   The following Defendants are the Trustees of Pennsylvania State University and are being sued in their official capacities only and are referred to in this Complaint collectively as the "Trustee Defendants."

4.   The Trustee Defendants as constituent members of the Board of Trustees have ultimate responsibility for the supervision of Defendant Penn State and its administrators,

faculty, and staff; the Trustee Defendants have ultimate responsibility to ensure that Penn State's rules, policies, and procedures are faithfully followed and that Penn State abides by the law.

5.      Abraham Amorós is Director of Operations, PA Municipal League and a Trustee of Penn State.

6.      Daniel J. Delligatti is President and Owner/Operator, M & J Management and a Trustee of Penn State.

7.      David M. Kleppinger is Chairman Emeritus of McNees Wallace and Nurick LLC, and Vice Chair of the Board of Trustees of Penn State.

8.      Daniel A. Onorato is Executive Vice President and Chief Corporate Affairs Officer, Highmark Health and a Trustee of Penn State.

9.      Terrence M. Pegula is CEO, Buffalo Bills, Buffalo Sabres, and JKLM Energy, LLC and a Trustee of Penn State.

10.     Stanley I. Rapp is Senior Partner, Greenlee Partners, LLC and Trustee of Penn State.

11.     Edward "Ted" B. Brown, III is President and CEO, KETCH Consulting, Inc. and Trustee of Penn.

12.     Alvin F. de Levie is an Attorney and Founder, Law Offices of Alvin F. de Levie and Trustee of Penn State.

13.     Barry J. Fenchak is a Registered Investment Advisor and Securities Principal and Trustee of Penn State.

14.     Christa A. Hasenkopf is Director, Air Quality Life Index (AQLI) and Air Quality Programs, Energy Policy Institute, University of Chicago and Trustee of Penn State.

15. Anthony P. Lubrano is President, A.P. Lubrano and Company, Inc. and Trustee of Penn State.

16. Joseph "Jay" V. Paterno, Jr. is president President, Blue Line 409 and Trustee of Penn State.

17. Alice W. Pope is a Retired Associate Professor, Department of Psychology, St. John's University and Trustee of Penn State.

18. Brandon D. Short is the Executive Director and Portfolio Manager, PGIM Real Estate and Trustee of Penn State.

19. Steven B. Wagman is a National Healthcare Business Leader, Siemens Industry, Inc. – Smart Infrastructure Division and Trustee of Penn State.

20. Randall "Randy" E. Black is CEO and President, First Citizens Community Bank and Trustee of Penn State.

21. Donald W. Cairns is the Owner/Operator, Cairns Family Farm and Trustee of Penn State.

22. Valerie L. Detwiler is Senior Vice President, Senior Commercial Banker, Reliance Bank and Trustee of Penn State.

23. Lynn A. Dietrich is a Retired Professional Engineer (PE) and Trustee of Penn State.

24. M. Abraham Harpster is Co-Owner, Evergreen Farms, Inc. and Trustee of Penn State.

25. Chris R. Hoffman is President, Pennsylvania Farm Bureau and Trustee of Penn State; on information and belief Chris R. Hoffman resides in the Commonwealth of Pennsylvania.

4

26.     Mark H. Dambly is President, Pennrose Properties, LLC and Trustee of Penn State.

27.     Robert E. Fenza is a Retired Chief Operating Officer, Liberty Property Trust and Trustee of Penn State.

28.     Naren K. Gursahaney is the Retired President, CEO and Director, ADT Corporation and Trustee of Penn State.

29.     Walter C. Rakowich is the Retired Chief Executive Officer, Prologis and Trustee of Penn State.

30.     Mary Lee Schneider is the Former President and CEO, SG360° and Trustee of Penn State.

31.     Richard S. Sokolov is the Vice Chairman, Simon Property Group and Trustee of Penn State.

32.     Tracy A. Riegel is the Former Project Manager, The Vanguard Group and Trustee of Penn State.

33.     Julie Anna Potts is President and CEO, North American Meat Institute and Trustee of Penn State.

34.     Matthew W. Schuyler is the Chief Brand Officer, Hilton and Chair of the Board of Trustees.

**B.  The "Individual Defendants"**

35.     The following individual Defendants are sued in their individual and official capacities:

36.     Defendant Margo DelliCarpini is the Chancellor of Penn State Abington.

37.     Defendant Damian Fernandez served as Chancellor of Penn State Abington and held ultimate authority for the supervision of all Penn State Abington administrators, faculty, and staff.

38.     Defendant Liliana Naydan at all relevant times was employed by Penn State as an Associate Professor of English and acted as Plaintiff's Direct Supervisor and Chair of the English Department and Writing Program Coordinator.

39.     Defendant Carmen Borges at all relevant times was employed by Penn State as Associate Director of the Affirmative Action Office ("AAO").

40.     Defendant Alina Wong at all relevant times was employed by Penn State as Assistant Vice Provost for Educational Equity.

41.     Defendant Lisa Marranzini at all relevant times was employed by Penn State as a Human Resources Representative.

42.     Defendant Friederike Baer at all relevant times was employed by Penn State as the Division Head of Arts & Humanities at Penn State Abington.

43.     Defendant Aneesah Smith at all relevant times was employed by Penn State as the Director of Diversity, Equity, and Inclusion at Penn State Abington.

44.     Neeli Bendapudi is the acting President of The Pennsylvania State University.

## II.   JURISDICTION AND VENUE

45.     This action arises under the laws of the United States, under the First and Fourteenth Amendments to the United States Constitution and 42 USC §§ 1983 and 1988, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000-e et seq., and 42 USC § 1981.

46.     This Court has original jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested damages pursuant to 28 USC

§ 1343; the requested declaratory relief pursuant to 28 U.S.C. § 2201-02; and costs and attorneys' fees under 42 U.S.C. § 1988.

47.     This Court has supplemental jurisdiction over all state law claims pursuant to 28 USC § 1367(a).

48.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants are residents of the State in which this district is located and the acts described in this Complaint occurred in this district.

III.   FACTS

A. De Piero's Qualifications as an English Teacher, Writing Professor, and Education Researcher

49.     De Piero is 40 years old and his race is "white."

50.     De Piero is the son of a first-generation immigrant to the United States from Italy, Enzo De Piero, whose fellow immigrants were actively discriminated against upon their arrival on the shores of this country as both "dark" skinned Italians and as Catholics. This instilled in De Piero a life-long commitment to treating all Americans equally on the basis of race, sex, national origin, and other ascribed characteristics. De Piero firmly believes that individuals should be judged by the content of their character, not by the color of their skin.

51.     De Piero graduated from James Madison University in 2005.

52.     Since that time, De Piero has exclusively worked in the field of education, often serving underprivileged communities, many of them disproportionally made up of historically disadvantaged minorities.

53.     From 2005 through 2008, De Piero worked his way through graduate school as a substitute teacher, while pursuing his Masters in Education at Temple University in Philadelphia, Pennsylvania, where he eventually earned his teaching certification.

54.     In December 2009, De Piero earned a Masters in Education along with Instructional I Certification for teaching secondary English (grades 7-12).

55.     From 2009 – 2011, De Piero taught English and Language Arts in the Philadelphia School District and dedicated himself to teaching in inner-city schools labeled "high risk" and "persistently dangerous."

56.     In December 2012, De Piero enrolled in the Language, Literacy, and Composition Studies program of the University of California, Santa Barbara to pursue a Ph.D. in Education. De Piero enrolled in a specialized track, "Teaching and Learning."

57.     During his Ph.D. studies, De Piero worked as a Writing Center Director at Antioch University Santa Barbara, while also working as a Teaching Assistant at UC Santa Barbara in the Communication Department and Writing Program.

58.     De Piero successfully completed his dissertation, titled "Reading Like a Writer, Teaching Like a Reader: Guiding Students Towards 'Good Reading' in First-Year Composition" and UC Santa Barbara conferred his Ph.D. in August 2017.

59.     Starting in 2018, De Piero began a full-time position at Penn State University - Abington College, in Abington, Pennsylvania.

60.     With a "4-4" teaching load, meaning teaching four courses each semester, De Piero's courseload was heavy for a university professor. Nonetheless, De Piero carved out time to publish peer-reviewed scholarship in two academic journals: Higher Education Research and Development (December 2018) and Journal of College Literacy and Learning (February 2019). This went above and beyond Penn State Abington's expectations for professors who teach required first- and second-year writing courses.

61.     As an active scholar, De Piero also presented his research at conferences while working at Penn State. He shared his research at the Conference on College Composition and Communication (CCCC) and American Education Research Association (AERA).

**B. Penn State Targets De Piero on Account of his Race**

62.     Penn State hired De Piero as a non-tenure-track Assistant Teaching Professor of English and Composition with an appointment in the English Department and Writing Program of Penn State Abington in August 2018 for a $52,008 salary.

63.     Penn State required De Piero to teach four courses a semester, primarily consisting of the required first-year writing course, ENGL 015 Rhetoric and Composition, and second-year writing courses like ENGL 202A Writing for the Social Sciences and ENGL 202D Business Writing.

64.     At the conclusion of each academic year, De Piero volunteered to teach writing courses during in the summer session, many of which were geared toward underrepresented minorities, and he did so even after the spring semester of 2019, two weeks after the birth of his daughter.

65.     Out of the twenty undergraduate Penn State locations across Pennsylvania, Penn State Abington describes itself on its website as "the most diverse campus within the University and the only majority minority campus."

66.     At all relevant times, Defendant Naydan was directly responsible for supervising De Piero as Chair of the English Department and Writing Program.

67.     The English Department and Writing Program of Penn State Abington were housed under the Division of Arts and Humanities, whose division head was Defendant Baer.

68.     Almost immediately upon beginning his employment at Penn State, Defendants pressured De Piero to conform to their political viewpoints.

69.     In or around September 2018, at the end of a monthly professional development session and approximately one month into De Piero's appointment at Penn State, Defendant Naydan displayed an app on her cell phone to the participants of the meeting. The app revealed all of her phone contacts' registered political affiliation. Naydan then loudly expressed concern and disbelief that Plaintiff was not a registered Democrat. (In fact, he was a registered independent.) Exposing De Piero's political affiliation (or lack thereof) in the presence of several other faculty members made De Piero feel extremely uncomfortable.

70.     The Individual Defendants quickly began to peddle and enforce a race-based ideology in addition to imposing other forms of political orthodoxy and race-based dogma.

71.     One of the chief race-based principles that Defendants sought to enforce concerned student performance. Defendants instructed De Piero that outcomes alone — regardless of the legitimacy of methods of evaluation, mastery of subject matter, or intentions — demonstrate whether a faculty member's actions are racist or not.  Defendants call this "social justice" and "antiracism." At the core of their ideology, Defendants discriminate twofold on the basis of race. First, Defendants' bigotry manifests itself in low expectations. They do not expect black or Hispanic students to achieve the same mastery of academic subject matters as other students and therefore insist that deficient performance must be excused. Accurate assessment of abilities, if it happens to show disparate performance among different racial groups, is therefore condemned as "racist."  econd, Defendants' bigotry manifests itself in overt discrimination against students and faculty who **do apply** consistent standards, especially white faculty.

72.     Defendant Naydan expressed this corrosive race-based ideology on March 29, 2019, when she emailed Plaintiff and two other white faculty members that "racist structures are quite real in assessment and elsewhere regardless of the good intentions that teachers and

scholars bring to the set-up of those structures. For me, the racism is in the results if the results draw a color line."

73.     In other words, if consistent standards yielded disparate outcomes on the basis of race, no matter how objective the standards, Defendant Naydan and all Defendants counted this as evidence of "racism," which Defendant Naydan attributed to De Piero as the embodiment of "white supremacy."

74.     Given Naydan's supervisory relationship to Plaintiff and the fact that Penn State Abington is a "majority minority" campus, this philosophy put immense strain on De Piero. Penn State pressured De Piero to ensure consistent grades for students across "color line[s]," otherwise his actions would demonstrate racism and he would be condemned as a racist.

75.     The logic of Defendants' demands required that De Piero also penalize students academically on the basis of race. If, for example, students from East Asia or the Indian subcontinent excelled over other minority groups (who often had the same, if not lighter skin color), De Piero was asked to penalize them in order to equalize outcomes on the basis of race.

76.     De Piero rejects this race-based and racist approach to teaching and evaluation. De Piero had developed an assessment methodology designed to foreground the writing process so that all students, regardless of race, can achieve success if they put in timely work. In De Piero's mind, such an approach evens the playing field for all students, so that everybody can be successful in the writing classroom, irrespective of their educational background or racial identity.

77.     Following the tragic murder of George Floyd in May 2020, the Defendants' "antiracist" activism reached a new fever pitch. Then-chancellor of Penn State Abington Damian

Fernandez called all faculty and staff to attend a "Conversation on Racial Climate" about "the current racial justice movement, the tragic death of George Floyd and others."

78.     The conference took place on June 5, 2020 over Zoom. This presentation was led by the Assistant Vice Provost for Educational Equity, Defendant Alina Wong, whom Fernandez praised as a "caring advocate for social justice."

79.     Defendant Wong instructed the faculty as a captive audience on the subject of "systemic racism," which at Penn State means a straightforward, facile association of police brutality with white supremacy and white privilege.

80.     Wong expressed her intention to cause Penn State's white faculty to "feel the pain" that George Floyd endured. Apparently, at Penn State, the only acceptable method to right historical wrongs is to visit additional "pain" on other racial groups.

81.     Wong declared that "black men and women" as well as "the black trans and queer folks [are] killed by police supremacy, by white supremacy." Wong identified white faculty as somehow privileged because they could "breathe" while George Floyd could not.

82.     Wong identified "those of us with privileged racial identities" who "need to sit in it longer," and she led the faculty in a breathing exercise in which she instructed the "White and non-Black people of color to hold it just a little longer — to feel the pain." De Piero and other faculty were thus singled out, caused to experience discomfort, and feel "the pain" on the basis of their skin color.

83.     As an officer of Penn State, Defendant Wong encouraged illegal activity such as looting, stating, "There's been a disruption, I think, in all of our lives. And what I'm interested in doing is staying in the disruption—and actually, disrupting more—because I think that's what we

haven't seen and that's what we haven't done […] What we call looting, I think of as just getting what you're due."

84.     The following morning, on June 16, 2020, Assistant Teaching Professor of English, Charles Archer, hectored De Piero about "history and white male privilege." Archer asserted that resistance to wearing masks "is also more likely to be led by white males and in classrooms taught by women and people of color."

85.     Later that week, an example of Penn State's race-based harassment was evident in an email from Defendant Aneesah Smith. Defendant Smith is the Director of Diversity, Equity, and Inclusion at Penn State Abington, and she holds herself out as "Queer, Christian, Cisgender, woman of color who is OUT and proud in all aspects of her life" with "over 12 years in Social Justice Advocacy & Activism."[1]

86.     On June 19, 2020, Defendant Smith sent an email to all Penn State Abington faculty, staff, and administrators, instructing all Penn State employees that "Black and Brown people are calling on white people" to "stop being afraid of your own internalized white supremacy." Smith instructed white employees to "Stop talking" while simultaneously directing members of the white Penn State community to "hold other white people accountable." Smith promoted a hostile environment on the basis of race by instructing Penn State's white employees to "feel terrible."

87.     In an August 3, 2020 email to all writing faculty, Defendant Naydan promoted race-based "Black Linguistic Justice," issuing directives to "assure that black students can find success in our classrooms" and to "assure that all students see that white supremacy manifests itself in language and in writing pedagogy."

---

[1] See https://www.aneesahsmith.com/

13

88.     Naydan is and was the administrative supervisor of Penn State Abington's Writing Program. Naydan instructed her writing faculty to teach that white supremacy exists in language itself, and therefore, that the English language itself is "racist" and, furthermore, that white supremacy exists in the teaching of writing of English, and therefore writing teachers are themselves racist white supremacists.

89.     In an email dated August 12, 2020, Defendant Naydan endorsed a Penn State colleague's view that "reverse racism isn't racism." In doing so, Naydan expressed her view that racism practiced against white faculty and students is legitimate.

90.     This racially hostile environment intensified over the course of 2020.

91.     On or around October 2020, Defendant Naydan and Assistant Teaching Professor of Applied Linguistics Grace Lee-Amuzie led a professional development meeting on "multiculturalism."

92.     Penn State held monthly professional development meetings for the Writing Program, which all full-time writing faculty are expected to attend. Similarly, Penn State holds monthly professional development meetings for the English Department, which all full-time English faculty are expected to attend.

93.     Defendant Naydan and Lee-Amuzie presented supposed examples of "racist" comments faculty supposedly make to students. All of the offending instructors in their examples were white. Supposedly racist comments made by white professors included asking students where they are from or inquiring about their native languages. Naydan's and Lee-Amuzie's examples presented white instructors as ignorant of and insensitive to students' multicultural backgrounds merely by virtue of expressing interest in their backgrounds.

94.     Empirical data actually demonstrates that over 80% of Latinos and a nearly equal percentage of African Americans respond, "That is not offensive" when presented with the questions, "Where are you from."[2] But at Penn State, "anti-racism" means punishing white people for asking questions that most Americans consider part of everyday human decency in conversation.

95.     On or around August 2020, Defendant Naydan emailed the writing faculty with a monthly "training" agenda for the 2020-2021 academic year. A presentation for an October meeting was captioned, "White Teachers are a Problem."

96.     Penn State full-time writing lecturer Stephen Cohen sent an email on October 6, 2020 to all writing program faculty, telling them to watch a video instructing them that "White Teachers Are a Problem." Cohen and Defendant Naydan called for faculty to view the video as some bizarre training exercise.

97.     Defendants again harassed De Piero on October 27, 2020 when Cohen sent a follow-up email to the writing program faculty reminding everyone to watch the video, "White Teachers Are a Problem," which targeted instructors on the basis of race.

98.     The featured speaker of the supposedly instructional video, Asao Inoue, had very recently made disparaging public comments "About White Language Supremacy." Inoue's racially disparaging commentary included:

> White people can perpetuate White supremacy by being present. You can perpetuate White language supremacy through the presence of your bodies in places like this. That feels unfair to say so bluntly, doesn't it? You perpetuate White language supremacy in your classrooms because you are White and stand in front of students [...] Your body perpetuates racism.

---

[2] See https://freeblackthought.substack.com/p/the-best-microaggression-training; https://freeblackthought.substack.com/p/the-best-microaggression-training.

99.     In the "White Teachers are a Problem" video imposed on Penn State faculty, Inoue associated "white supremacy" with all the evils of the world. In targeting those whom he called his "white colleagues," Inoue says "it fucking sucks and hurts and is hard to be the problem." Inoue emphasized the importance of making others "feel uncomfortable" on the basis of race.

100.    At one point in the so-called "training" video, an interviewer asks, "I see the violence in the street. I'm correcting grammar. I don't see how they're connected." Inoue responds that "white English . . . kills people of color, right? […] The fight against racism and white supremacy is not an either/or thing. The iron cage of racism that I was trying to explain in the talk and white supremacy have many interconnected bars."

101.    At Penn State, this means that the mere presence of a person with "white" skin speaking or teaching English to students is somehow "White language supremacy in your classroom." At Penn State, the race-based dogma meant that teachers like De Piero were "racist" simply by virtue of teaching while "white."

102.    The Individual Defendants, including but not limited to Naydan, condemned faculty in general and De Piero specifically for teaching while "white." At Penn State, condemning faculty on the basis of race counts as demonstrating a commitment to "antiracism."

103.    On October 22, 2020, the Interim Division Head for Arts and Humanities, David Ruth – De Piero's interim division supervisor at the time – emailed all faculty to attend an upcoming "Arts and Humanities as Activism event" that endorsed race-based ideologies that targeted De Piero and others on the basis of the color of their skin. The presentation was led by Dr. Aja Martinez.

104.     This harassment continued on November 7, 2020, when Lee-Amuzie and Defendant Naydan imposed the "presentation and dialogue about critical race theory and antiracism" by Dr. Aja Martinez on the writing faculty. Martinez also hawked race-based theories condemning white people for no other reason than they spoke or were simply present while being "white."

105.     Defendant Naydan followed up: "I've read much of Dr. Martinez's work, which has helped me immensely with my thinking about antiracism and writing pedagogy. I imagine you'll appreciate her insights as much as I do."

106.     And again on November 16, 2020, Defendant Naydan circulated Aja Martinez's racist teachings throughout the writing faculty, stating, "In case you missed Aja Martinez's talk on counterstory, I'm attaching materials from her talk for you here."

107.     This supposed "scholarship" identifies "objective research" as a "narrative of white privilege," indicating that any black person dedicated to objective research is somehow also "racist" and inferior. While true racial imperialists have always advocated that people of color are incapable of objectivity, at Penn State this racist orthodoxy has now become the rule under the banner of "antiracism."  The only difference is that Penn State's bizarre brand of "antiracism" condemns qualities like "objectivity" as "white supremacy," and purports to celebrate people of color for being incapable of objective thought. The common denominator at Penn State and among all Defendants is the promotion of pejorative stereotypes on the basis of race, which have created a hostile environment not only for De Piero but for all faculty and students.

108.     Martinez's presentation condemned "race neutrality, equal opportunity, objectivity, colorblindness, and merit."  This was coupled with further condemnation of "white

elites" and "white self-interest," which traditional standards of scholarship supposedly uphold based on unbiased neutrality, objective merit, and equal opportunity regardless of race.

109.    On January 11, 2021, Professor Marissa Nicosia emailed all full-time English faculty about an "Antiracist pedagogy" meeting the following week. Nicosia stated, "As we've discussed in previous meetings, antiracist pedagogical practices effect all aspects of teaching — text selection, assignment design, assessment, in-class activities, classroom policies, and beyond."

110.    In her opening remarks for the January 19, 2021 "Antiracism pedagogy" meeting, Nicosia announced her passionate belief in "antiracism or antiracist pedagogy."  Nicosia characterized "antiracism" as "a subset of equity pedagogy."

111.    Defendant Naydan noted in that meeting, "I'm thinking about grading as an antiracist act."  By this, Defendant Naydan meant that Defendants, including but not limited to Defendant Naydan, must apply different grading standards on the basis of race; moreover, Defendants discouraged grading students equally regardless of race as somehow an overt act of "racism."

112.    Throughout the winter months of 2021 and through spring 2021, Defendant Naydan as well as Cohen and Lee-Amuzie again recruited the race-ideologue Inoue — previously presented in the "White Teachers of a Problem" training video — to deliver a "White Language Supremacy" presentation, in coordination with Penn State's "antiracist" dogma.

113.    Meanwhile, Penn State maintained a "Diversity, Equity, and Inclusion" webpage with a so-called "Antiracism" tab. Here, Penn State further disseminated racist tirades against white faculty and students on the basis of their race, with articles, books, and presentations such as:

- "Dismantling the white supremacy embedded in our classrooms"

- "White Rage: The unspoken truth of our nation's divide"

- "White immunity: Working through the pitfall of privilege discourse"

- "White people, enough: A look at power and control."

- "What white colleagues need to understand."

- "White Fragility"

- "White Rage"

- "Me and White Supremacy"

### C. DePiero Reports Racial Discrimination to his Supervisor and Initiates a PHRC Complaint; Penn State Retaliates by Finding Him Guilty of "Bullying"

114.    On April 15, 2021, De Piero disclosed numerous racially discriminatory incidents involving Defendant Naydan to Defendant Friederike Baer. Baer asked De Piero whether he had a problem with Defendant Naydan's actions.

115.    De Piero made clear to Defendant Baer that he felt *harassed* because of his racial background.  Defendant Baer asked De Piero, "That's a powerful word, so I want to be clear — that is how you felt?" De Piero confirmed and repeated that Defendants' racially discriminatory training meetings for the writing faculty should stop immediately.

116.    That same month (April 2021), Plaintiff filed a report of the racial harassment at Penn State with the Pennsylvania Human Relations Commission ("PHRC"). Yet the race-based harassment at Penn State continued.

117.    In September 2021, De Piero received a "Resources for Reporting Wrongdoing" to "Report Bias" from the official email account of Penn State president. De Piero filed a complaint or "Bias Report" with Penn State's Affirmative Action Office ("AAO") about the racially discriminatory incidents dating back to the previous year.

118.    On September 17, 2021, Defendant Borges, the Associate Director of the Penn State Affirmative Action Office, requested a meeting based on De Piero's Bias Report.

119.    A few days after Borges's initial email to De Piero, on September 20, 2021, Defendant Naydan emailed all writing faculty demanded yet another "White Privilege" training meeting scheduled for October 18, 2021. Plaintiff realized the discriminatory content in training materials would likely continue indefinitely, despite his request to Defendant Baer that Penn State stop harassing him and similarly situated faculty on the basis of race.

120.    When De Piero met with Defendant Borges on September 22, 2021, to discuss his "Bias Report," she told De Piero that "There is a problem with the white race." De Piero disclosed that he felt humiliated, disgraced, harassed, and discriminated against. Borges instructed De Piero to "broaden your perspective" and "be an academician." She instructed De Piero to continue attending so-called "antiracist" workshops "until you get it." Borges also provided a phone number for De Piero to seek mental health support.

121.    On October 4, 2021, De Piero published an opinion piece in several Pennsylvania media outlets associated with Gannett Publishing (*Bucks County Courier Times* and *Go Erie*), expressing concerns about how overt race discrimination was being peddled at Penn State. De Piero expressed concern that race-based curricula would actually exacerbate student achievement gaps by lowering standards and focusing attention away from teaching key academic skills in favor of focus on immutable ascribed characteristics based on race. De Piero also criticized the potential psychological effects on young children.

122.    Ordinarily at Penn State Abington, when faculty attract attention in the media, this is announced through an institution-wide, bi-monthly memo called the "News from Sutherland."

All staff, faculty, and administrators receive the News from Sutherland, which highlights Penn State faculty achievements.

123.    On October 18, 2021, per the protocol provided by Penn State, De Piero reached out to Penn State's communication specialist, Regina Broscious. De Piero informed Broscious about his publication and requested its inclusion in the next "News from Sutherland" memo.

124.    When it wasn't featured, De Piero reached out again to Broscious on November 8, 2021 to inquire why. Broscious acknowledged receiving De Piero's opinion piece and having added to a draft of it to the News from Sutherland. However, when the memo was sent to Defendant Chancellor DelliCarpini, the decision was made to censor De Piero's improper thoughts and viewpoints. On information and belief, Defendant DelliCarpini made the decision to cut out De Piero's published opinion piece from the campus newsletter.

125.    Continuing with Penn State's racial harassment of De Piero, Defendant Naydan and Lee-Amuzie led a "white privilege" meeting for the writing faculty based on required reading titled "The Myth of the Colorblind Writing Classroom: White Instructors Confront White Privilege in Their Classrooms."

126.    De Piero attended this so-called "training" meeting on October 18, 2021. Defendant Naydan and Lee-Amuzie presented four excerpts, the first of which accused white faculty of "unwittingly reproduc[ing] racist discourses and practices in our classrooms."

127.    De Piero objected that, given the title of the so-called training session and the fact that he is a white writing instructor, he felt singled out and targeted in the meeting. De Piero expressed his concern that he was accused of "reproduc[ing] racist discourses and practices in our classrooms," which, obviously, he was not. De Piero asked for examples of what this meant, and what it meant to bring "equity" into his classroom.

128.    Soon thereafter, Naydan stated that the conversation was leaving her "feeling uncomfortable." De Piero agreed, stating, "I feel uncomfortable too. I've felt uncomfortable for the last year and a half. But I'm also feeling confused because I thought our goal was to have 'uncomfortable conversations.'"

129.    Lee-Amuzie then opined about her daughter's hair, referring vaguely to a "white standard of beauty," and then mentioned that this is all about understanding our "identity."

130.    Commenting on the training "White People Are a Problem," Lee-Amuzie said, "it's about a group." De Piero responded, "I'm a member of that group — if it's not about me, then who is it about?" Lee-Amuzie responded, "We're in an ecosystem where fish are dying," among other bizarre statements, apparently demeaning people of color as dying fish.

131.    At no time during the "White Instructors Confront Their White Privilege" meeting did De Piero speak in an uncivil or hostile manner. He did not raise his voice. He did not use insulting language to address Defendant Naydan or Lee-Amuzie.

132.    But because De Piero challenged Penn State's racist orthodoxy ascribing "racism" to all white people, along with other deficient and demeaning characteristics, simply because of the color of their skin, Defendant Naydan and Lee-Amuzie filed a bullying and harassment complaint against De Piero after he dared to ask questions.

133.    On October 27, 2021, De Piero met with the Associate Director of the Penn State Affirmative Action Office, Carmen Borges, for a second time — this time, to discuss Naydan and Lee-Amuzie's retaliatory complaints against him.

134.    Borges informed De Piero that Naydan's decision to showcase the "White Teachers are a Problem" video was protected speech and De Piero "need[ed] to get beyond that."

135.    But De Piero's objection to these race-based training modules was not protected speech in the eyes of Penn State.

136.    Borges informed De Piero that he had used intimidating body language at the meeting. De Piero reminded Borges that the meeting was on Zoom and detailed various facts: he was seated the entire time, he did not point his finger in the camera, he did not raise a fist, he did not gesture about wildly, he did not raise his voice, he did not use profanity, he did not insult anybody, and he did not intentionally interrupt anybody.

137.    All Borges could offer in response was to inform De Piero that "It was not appropriate for you to ask for examples" of how to bring equity into his classroom. Borges then accused De Piero of failing to understand "professional judgment calls."

138.    Following the meeting, De Piero requested information associated with the complaints made against him. The nature of those complaints and the precise charges and allegations against De Piero were kept secret from him by Defendant Borges, who refused to provide this information to De Piero despite repeated requests.

139.    Meanwhile, Defendant Borges sent De Piero a complaint conclusion letter, dated November 12, 2021, based on his initial Bias Report that was sent to the Penn State Affirmative Action Office on September 2021. While citing the "White Teachers are a Problem" training, Defendant Borges stated that "The particular topic for academic discussion, while it may be offensive to you, does not constitute discrimination towards you as an individual and does not rise to a violation of the University's Non-Discrimination policy." At Penn State, it is perfectly acceptable to harangue faculty (as well as students and staff) on the basis of race for being white, but it is "bullying" to ask questions about it at a meeting.

140.    In the formal complaint conclusion letter, Defendant Borges also made clear that Defendant Naydan had compiled the so-called "training" materials as an official statement of Penn State policy because it was "made in collaboration with Program faculty and Campus administration in line with the Campus Strategic Plan."

141.    Approximately one month later (December 10, 2021), Defendant Borges sent a second complaint conclusion letter, this time addressing Defendant Naydan and Lee-Amuzie's allegations that De Piero had hurt their feelings when he asked questions in a training seminar attacking "White Instructors" for "White Privilege in Their Classrooms."  Defendant Borges determined that Plaintiff had bullied and harassed his colleagues during the meeting by asking questions that challenged Penn State's race-based orthodoxy.

**D.  De Piero Files his Second Complaint with the PHRC and EEOC**

142.    On December 21, 2021, De Piero filed a second complaint with governmental agencies, outlining additional incidents of racial discrimination and harassment at Penn State as well as, now, retaliation.

143.    Meanwhile, Defendant Lisa Marranzini, Penn State's Human Resources Representative, and Defendant Baer insisted on meeting with De Piero to discuss the university's findings that he was a "bully" and harassed his colleagues by asking questions that hurt their feelings. The meeting was scheduled for January 13, 2021.

144.    On January 11, 2021, two days prior to meeting with his division supervisor and a Human Resources representative, De Piero sent them both of his PHRC and his EEOC complaints filed in April 2021 and then December 2021. De Piero reported in his email to Defendants that he was being discriminated against on the basis of race, being harassed, and being retaliated against for reporting racial discrimination and harassment.

145.    Neither Defendant Baer nor Defendant Marranzini cared about that.

146.    De Piero requested that the meeting be recorded. Defendant Baer refused. She did not want Penn State's race-based dogma to be recorded.

147.    Following the meeting, Defendant Marranzini and Defendant Baer issued a formal Performance Expectations Notice that stated, "Your colleagues' accounts of what transpired in that meeting reflect poorly on you, as you caused significant disruption to the meeting. This conduct is not becoming of a faculty member at our College and is not acceptable."

148.    Penn State officially warned De Piero that any "future repeat of such conduct as was exhibited in the meeting on October 18," meaning dissenting from Penn State's race-based dogma, "may result in disciplinary action."

149.    At Penn State, a Performance Expectations Notice is defined as a "sanction" in Penn State's policy AD91, Discrimination and Harassment and Related Inappropriate Conduct.

150.    The Affirmative Action Office's findings of "bullying" and the Human Resource Office's Performance Expectations Notice remain a part of De Piero's employment record at Penn State.

151.    This was not the end of Defendants' harassment of De Piero. On June 8, 2022, Defendant Baer emailed Plaintiff with his annual performance review.

152.    De Piero's service to the University included advising undergraduate students, serving as an elected faculty senator, and serving as the appointed division representative to the Academic Integrity Committee. Yet Penn State rated De Piero's service component of his work as only "fair to good," equivalent to a 2 out of 5 on a 5-point scale. Before, De Piero had always been rated "very good," or 4 out of 5. His prior "excellent" teaching rating was also downgraded to "very good."

153.    The university's condemnation of De Piero for dissenting during the October 18, 2021 training condemning "White Instructors" and "White Privilege in Their Classrooms" was again criticized in his performance review. The performance review described De Piero's exercise of protected speech at a public university as "aggressive, disruptive, unprofessional and in opposition to the University's Values Statement" — once again identifying Penn State's race-based dogma, masquerading as "antiracism," as official policy, from which no dissent is allowed.

154.    De Piero's negative performance review was clearly retaliation for his protected speech and for his complaints of racial harassment both internally and with the EEOC and PHRC.

155.    Not only was Penn State deliberately indifferent to the racially hostile environment for De Piero, Penn State actively treated *De Piero* as the problem, suggesting mental health treatment and disciplining him for bullying when he dared to complain. As a result, De Piero's only option to escape the hostile environment was to leave Penn State. This constructive termination occurred on August 2, 2022.

156.    In De Piero's resignation email, he wrote "[T]he University must strongly reconsider whether its recent emphasis on so-called "antiracist" programming ultimately has students' best interests in mind, from their academic training to their psychological well-being." He also added, "I envisioned a long, productive career at Penn State as a composition instructor and educational researcher, but the experiences of the past 2+ years have taught me that, at Penn State, I'm unable to stand up for essential principles — for civil rights, for workers' rights, or for educational excellence — without professional penalties being imposed. I will now turn my attention to advocating for these principles from outside the Penn State University system."

157.    Upon learning of De Piero's constructive discharge, Melinda Kennedy, a Penn State Regional Human Resources Strategic Partner, forced De Piero to return the full amount of his July salary, $3,386.77 even though De Piero had fulfilled all of his professional obligations during July, including meeting with advisees.

158.    Plaintiff's constructive termination has caused him financial, emotional, and reputational harm.

## CAUSES OF ACTION

**COUNT 1:**   **Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000-e et seq.**
**(Penn State)**

159.    Plaintiff Zack De Piero here incorporates all previous paragraphs as if completely set forth in this paragraph.

160.    Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual because of his race. Title VII applies equally to all races and forbids all racial discrimination, as Chief Justice John Roberts has instructed, "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race."

161.    Defendant Penn State believes it knows better, however. Penn State has implemented a university-wide policy and so-called "strategic plan," euphemistically labeled "antiracism," in which it singles out white employees for harassment and discrimination under the label of "white privilege," "white supremacy," and other racial stereotypes that attribute negative values and characteristics to employees, including but not limited to Zack De Piero, based upon the color of their skin rather than the content of their character.

162.    Penn State's race-based dogma not only demeans and humiliates white employees, but it is also equally corrosive toward black employees and other employees of color, whom Penn State celebrates by portraying them as somehow incapable of eloquent writing,

incapable of doing math, incapable of objectivity, incapable of individuality, and incapable of many other acquired traits that Penn State's official policy deems innate characteristics of "white supremacy."

163.    Penn State disallows any dissent from its official race-based dogma and sanctions or otherwise punishes those like De Piero who speak out and object to its race-based dogma.

164.    Penn State's race-based dogma created a racially hostile environment in which it became impossible for De Piero to do his work.

165.    De Piero was asked to engage in illegal racial discrimination as a requirement of his job when he was instructed to ensure consistent grades for students across "color line[s]."

166.    The writing department in which De Piero taught was permeated with racial insult directed at white faculty, including, but not limited to, asking white faculty to participate in "training" where they were asked to hold their breath longer than black faculty in order to "feel the pain"; telling white faculty to "stop talking"; telling white faculty to "Hold other white people accountable"; and telling white faculty that "white teachers are a problem."

167.    De Piero was also individually singled out for ridicule and humiliation because of the color of his skin. When he complained about the continuous stream of racial insult directed at white faculty in the writing department, the director of the Affirmative Action Office told him that "There is a problem with the white race," that he should attend "antiracist" workshops "until you get it," and that he might have mental health issues.

168.    De Piero was forced to work in an abusive environment that became so intolerable that only his resignation qualified as a fitting response. He was constructively terminated and discharged.

169.    Penn State's disciplinary and grievance procedures were not available to De Piero when he complained about Penn State's race-based harassment and discrimination. He was informed that these disciplinary and grievance procedures were not available to him because of his race, which is white. He was specifically told by Defendant Borges that white people are the problem.

170.    By contrast, when De Piero voiced objections to Penn State's race-based dogma, Defendant Naydan, among others, complained to the AAO bureaucrats that he was "bullying" and "harassing" *them* because he objected to Penn State's race-based dogma.

171.    Whereas Penn State and its AAO bureaucrats, including Defendant Borges, rejected De Piero's complaint of racial discrimination, the same AAO bureaucrats acted immediately to discipline and punish De Piero.

172.    Defendants Naydan, Borges, Baer, and Marranzini, among others, also retaliated against De Piero for daring to dissent from Penn State's racist dogma.

173.    Despite being aware of direct discrimination against De Piero, Penn State did nothing and failed to ameliorate the discrimination against De Piero in any way.

174.    Because of Defendant Penn State's illegal discrimination, De Piero has suffered direct and indirect damages in an amount to be determined at trial.

175.    Defendants' conduct was motivated by evil motive and intent, namely to discriminate on the basis of race, and involved reckless or callous indifference to De Piero's federally protected civil rights. Defendants' conduct was undertaken in the face of the known, perceived risk that their actions violated federal law.

176.    Plaintiff Zack De Piero has exhausted his administrative remedies and his right to sue letter is attached to this complaint. See **Exhibit A**.

**COUNT 2:   42 USC § 1981**
**(Trustee Defendants (official capacity), Defendants Borges, Baer, and Naydan**
**(individual capacities))**

177.    Plaintiff incorporates paragraphs 1 through 158 as if fully set forth herein.

178.    42 U.S.C. §1981 is a civil rights statute prohibiting racial discrimination. Section

1981 states in relevant part:

> All persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties,
> give evidence, and to the full and equal benefit of all laws and proceedings for
> the security of persons and property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes, licenses, and exactions of
> every kind, and to no other.

42 U.S.C. § 1981(a).  And further:

> The rights protected by this section are protected against impairment by
> nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(c).

179.    42 U.S.C. §1981's "equal benefit" clause prohibits discrimination that does not

involve contractual relationships.

180.    The Supreme Court instructs that 42 U.S.C. § 1981 applies equally to white

persons and not only to historically disadvantaged minorities. *McDonald v. Santa Fe Trail*

*Transport. Co*., 427 U.S. 273, 295-96 (1976).  "[T]he provision was meant, by its broad terms, to

proscribe discrimination in the making or enforcement of contracts against, or in favor of, any

race." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23, 123 S. Ct. 2411, 2430 (2003).

181.    Defendants have announced that it is the so-called "strategic plan" of Penn State

to discriminate against employees (among others), including De Piero, because of the color of

their skin, which is white. In consequence, Defendants discriminated against De Piero in

contract, in particular but without limitation, his employment contract with Penn State.

182.    Penn State, Defendant Borges, Defendant Baer, and Defendant Naydan, without limitation, acted to deprive De Piero of the equal protection of Penn State's policies and procedures when he submitted a complaint of racial discrimination to the AAO office.

183.    Likewise, Defendants deprived De Piero of the equal protection of Penn State's policies and procedures when complaints were submitted against him. He was found responsible and disciplined for supposed "bullying" and "harassment" — which consisted of nothing more than objecting to Penn State's race-based dogma in such a way that hurt Defendant Naydan's feelings — without proper notice or an opportunity to defend himself.

184.    Defendants deprived De Piero of his benefits under his employment contract with Penn State when they individually and collectively and acting as his supervisors forced him into a constructive termination.

185.    Defendant's conduct was motivated by evil motive and intent, namely to discriminate on the basis of race, and involved reckless or callous indifference to federally protected rights of De Piero.

186.    Because of Defendant Penn State's illegal discrimination, De Piero has suffered emotional harm and direct and indirect damages in an amount to be determined at trial.

**COUNT 3:   Title VI of the Civil Rights Act of 1964 (42 U.S.C. §2000d et seq.)**
**(Penn State)**

187.    Plaintiff incorporates paragraphs 1 through 158 as if fully set forth herein.

188.    Penn State receives federal funding.

189.    Penn State subjected Plaintiff to direct discrimination and a hostile environment on the basis of race.

190.    Defendants have expressly propagated announced policies to make white people feel uncomfortable and have singled out white employees, including De Piero, for having "white

privilege," "white fragility," and "white supremacy" among other noxious stereotypes based on nothing more than skin color.

191.    Defendants' propagation of racial stereotypes is equally offensive and obnoxious to people of color.  Penn State instructs that qualities and characteristics such as writing eloquently, mastering mathematics, individualism, thinking objectively, among others, are somehow the badges of "white supremacy," as if people of color are incapable of possessing such characteristics unless they have somehow been hoodwinked by white people.

192.    Defendants' conduct was motivated by evil motive and intent, namely to discriminate on the basis of race, and involved reckless or callous indifference to federally protected rights of De Piero.

193.    As a direct and proximate result of Penn State's racist dogma, discrimination, and hostile environment, De Piero was constructively terminated.

194.    Because of Defendant Penn State's illegal discrimination, De Piero has suffered direct and indirect damages in an amount to be determined at trial.

**<u>COUNT 4:</u>  42 USC § 1983**
**First Amendment Retaliation**
**(Board of Trustees (official capacity), Defendants DelliCarpini, Naydan, Borges, Marranzini, Baer (official and individual capacities))**

195.    Plaintiff incorporates paragraphs 1 through 158 as if fully set forth herein.

196.    De Piero engaged in constitutionally protected speech and was subjected to an adverse employment action as a result.

197.    De Piero's speech related to a matter of public concern, namely, whether it is appropriate to ascribe negative characteristics to a group of individuals based purely on the color of their skin.

198.    As a result of his constitutionally protected speech, De Piero was found responsible for "bullying" and was given a warning that remains in his employment file at Penn State and has the continued potential to limit his future employment prospects.

199.    The Individual Defendants' conduct was motivated by evil motive and intent, namely to discriminate on the basis of race, and involved reckless or callous indifference to federally protected rights of De Piero.

200.    The maintenance of this disciplinary warning in De Piero's employment file is an ongoing violation of his First Amendment rights.

201.    Due to Defendants' suppression of his protected speech, De Piero suffered an adverse employment consequences in his constructive termination.

202.    This disciplinary warning was an adverse employment action that would dissuade a person of ordinary firmness from exercising their First Amendment rights.

203.    Because of Defendant Penn State's illegal discrimination, De Piero has suffered direct and indirect damages in an amount to be determined at trial.

### COUNT 5:   Pennsylvania Human Relations Act, 43 P.S. § 951
### (All Defendants)

204.    Plaintiff incorporates paragraphs 1 through 158 as if fully set forth herein.

205.    The Pennsylvania Human Relations Act, 43 P.S. § 951, prohibits discrimination in employment on the basis of, among other things, race, color, and ancestry.

206.    As set forth more fully in paragraphs Counts 1-4 of this Complaint, Defendants subjected De Piero to a racially hostile environment, demanded that he engage in racial discrimination as part of his job, and retaliated against him when he complained about it.

207.    The Individual Defendants exercised authority over De Piero as supervisors and may be held liable for their direct acts of discrimination as well as for their failure to take action to prevent discrimination by Penn State and Penn State Abington.

208.    Because of Defendants' illegal discrimination, De Piero has suffered direct and indirect damages in an amount to be determined at trial.

209.    Plaintiff Zack De Piero has exhausted his administrative remedies and his right to sue letter is attached to this complaint.  See **Exhibit B**.

## PRAYER FOR RELIEF

Plaintiff Zack De Piero respectfully prays that this Court provide the following relief:

i.    Declare Penn State in violation of Title VI and Title VII of the Civil Rights Act of 1964, in violation of 42 USC § 1981, due to discrimination on the basis of race;

ii.    Declare all Defendants in violation of the First Amendment to the United States Constitution as applied to the Commonwealth of Pennsylvania through the Fourteenth Amendment to United States Constitution;

iii.    Declare all defendants in violation of the Pennsylvania Human Relations Act, 43 PA Stat. §§ 951-963;

iv.    Order Defendants to expunge any and all disciplinary records from Plaintiff De Piero's personnel file;

v.    Order Defendants to pay direct and indirect damages in an amount to be proven at trial;

vi.    Order the Individual Defendants to pay punitive damages under 42 USC § 1983, 42 USC § 1981, and Title VII; and

vii.    Order Defendants to pay Plaintiff De Piero's reasonable attorneys fees and costs under 42 USC § 1988(b) and 43 PA Stat. § 962(c.2);

viii.    all Order such other legal and equitable relief as the Court finds just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Respectfully submitted,

/s/ Samantha K. Harris

Samantha K. Harris
ALLEN HARRIS PLLC
PO Box 673
Narberth, PA 19072
610-634-8258
sharris@allenharrislaw.com