**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ZACK K. DE PIERO,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **PENNSYLVANIA STATE UNIVERSITY,** | **NO. 23-2281** |
| **MARGO DELLICARPINI, DAMIAN** | |
| **FERNANDEZ, LILIANA NAYDAN,** | |
| **CARMEN BORGES, ALINA WONG,** | |
| **LISA MARRANZINI, FRIEDERIKE** | |
| **BAER AND ANEESAH SMITH,** | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Zack De Piero, a white man, was a writing professor at the Abington campus of Pennsylvania State University ("Penn State"). He became profoundly uncomfortable with how his colleagues and superiors talked about race in the workplace. De Piero made his feelings known, both to university administrators and in the press, and alleges that he was disciplined in response. He eventually quit his job. In this suit, he claims: (1) racial discrimination and hostile work environment, in violation of Title VI and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; (2) interference with his right to contract and to the "equal benefit" of the laws on the basis of his race, in violation of 42 U.S.C. § 1981; (3) retaliation for speech protected by the First Amendment of the United States Constitution, in violation of 42 U.S.C. § 1983; and, (4) violation of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S. § 951 *et seq.*. Defendants move to dismiss De Piero's Amended Complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). For the reasons stated below, Defendants' Motion to Dismiss will be granted in part and denied in part.

**I.    BACKGROUND**

De Piero received a PhD in Education from the University of California, Santa Barbara in

2017 and began working at Penn State Abington as a non-tenure-track Assistant Teaching Professor of English and Composition in 2018.  Penn State Abington holds itself out as "the most diverse campus within" the Penn State system "and the only majority minority campus."  Each semester, De Piero taught a first-year writing course called Rhetoric and Composition and a mix of upper-level writing courses like Writing for the Social Sciences.

### A.  Training on Race at Penn State Abington

The facts set forth herein are taken from Plaintiff's Amended Complaint, plausible and non-conclusory allegations from which the Court is obligated to take as true at this stage in the litigation.  *Rivera v. Monko*, 37 F.4th 909, 917 (3d Cir. 2022) (citation omitted).  De Piero describes a series of university-sanctioned professional development meetings and comments from supervisors that addressed racial issues in sweeping, absolute terms.  First, he alleges that Defendants instructed him to incorporate race into his grading.  De Piero's supervisor, Defendant Liliana Naydan, Chair of the English Department, emailed him and two white colleagues in early 2019, telling them that "racist structures are quite real in assessment . . . .  For me, the racism is in the results if the results draw a color line."  To avoid being tarred as a racist, then, De Piero alleges that he had to discard his own race-neutral grading rubric and instead "penalize students academically on the basis of their race."

According to De Piero, this atmosphere only became more heated after the murder of George Floyd in May 2020.  Amidst the mass protest movement that erupted that summer, Defendant Damian Fernandez, then-Chancellor of Penn State Abington, "called all faculty and staff" to join a "Conversation on Racial Climate" on Zoom.  Defendant Alina Wong, Assistant Vice Provost for Educational Equity, hosted the event.  De Piero "experience[d] discomfort" when, in a discussion about the scope of systemic racism, Wong "led the faculty in a breathing exercise in which she instructed the 'White and non-Black people of color to hold it just a little

longer—to feel the pain.'"  Over the next few days, a colleague told De Piero that "resistance to wearing masks" to prevent the spread of COVID-19 was "more likely" to happen "in classrooms taught by women and people of color" and to be "led by white males."  Also, Defendant Aneesah Smith, Director of Diversity, Equity, and Inclusion, sent an email to all employees "calling on white people" to "feel terrible," about their "own internalized white supremacy," and to "hold other white people accountable."

De Piero further alleges that he then had to sit through three more events that singled out white instructors.  First, Naydan and another professor led one of a series of monthly professional development meetings, which, as a full-time member of the writing faculty, De Piero was "expected to attend."  In the workshop, which was on "multiculturalism," the facilitators presented examples of problematic comments that a teacher could make to a student; every hypothetical faculty member was white.  Next, in a training video called "White Teachers Are a Problem," the training's facilitator intimated that "white colleagues" should feel like "the problem."  The facilitator encouraged viewers to "feel uncomfortable" about race.  Naydan and another colleague had hyped the video repeatedly.  Third, Naydan "imposed" on the writing faculty a "presentation and dialogue about critical race theory and antiracism" that attacked "race neutrality, equal opportunity, objectivity, colorblindness, and merit" and condemned "white self-interest."

2021 brought more of the same.  At an "Antiracism pedagogy meeting" in early January, Naydan said that she was "thinking about grading as an antiracist act," which De Piero took to mean that teachers "must apply different grading standards on the basis of race."  That spring, the department put on another training presentation about "White Language Supremacy" as well.

### B.  De Piero Reports His Concerns

In April 2021, unhappy with the school's "'antiracist' dogma," De Piero told Defendant

Friederike Baer, Division Supervisor at Penn State, that Naydan's conduct made him feel that he had been harassed.  He asked that training sessions focused on anti-racism be stopped immediately.  De Piero filed a report alleging racial harassment with the Pennsylvania Human Relations Commission ("PHRC") the same month and filed a bias report with Penn State's Affirmative Action Office ("AAO") a few months later.

Defendant Carmen Borges, Associate Director of the AAO, asked to meet with De Piero to discuss his bias report.  At that meeting, she responded to De Piero's concern that he had been made to feel "humiliated, disgraced, harassed, and discriminated against," by telling him that "[t]here is a problem with the white race" and he should "broaden [his] perspective."  "Until you get it," she told De Piero, he should continue to attend anti-racism workshops.  By November 2021, Borges had resolved De Piero's initial complaint and had decided that no further action would be taken.  She concluded that the "White Teachers are a Problem" training, "while it may be offensive to [him], does not constitute discrimination towards you as an individual and does not rise to a violation of the University's Non-Discrimination policy."

Days after his first meeting with Borges, De Piero took his complaints public.  He published an opinion piece that was circulated in multiple Pennsylvania media outlets via Gannett Publishing in which he "expressed concern that race-based curricula would actually exacerbate student achievement gaps by lowering standards and focusing attention away from teaching key academic skills" while risking "potential psychological effects on young children."  Inconsistent with Penn State's regular practice, and despite De Piero's request, the school did not include this article in the bi-monthly "News from Sutherland" newsletter, which publicizes faculty "achievements."  "On information and belief," De Piero alleges that Defendant Margo DelliCarpini, Penn State's Chancellor, cut any reference to the article out after the newsletter's

publisher had included it in an earlier draft.

Throughout the second half of 2021, race-focused trainings continued.  Naydan co-led another remote training that October focused on "white privilege," which included a required reading titled "The Myth of the Colorblind Writing Classroom: White Instructors Confront White Privilege in Their Classrooms."  After the training "accused white faculty of 'unwittingly reproduc[ing] racist discourses and practices in our classrooms,'" De Piero protested that he felt targeted based on his race.  He also asked for specific examples of what it meant to "reproduc[e] racist discourses."  Naydan and De Piero both expressed their discomfort with their interaction.

### C.  De Piero Leaves the School

Naydan and her co-facilitator subsequently filed a complaint against De Piero for bullying and harassment.  Again, Borges fielded the complaint.  At a meeting with De Piero, she pointed out that Naydan's choice of content for the training was protected speech and chided him for using "intimidating body language."  Borges refused De Piero's repeated requests for further information about the precise nature of Naydan's complaints.  In December 2021, Borges sent De Piero a letter in which she concluded that he "had bulled and harassed his colleagues during the meeting by asking questions that challenged Penn State's race-based orthodoxy."  Around this time, De Piero filed a second complaint with the PHRC and with the Equal Employment Opportunity Commission ("EEOC").

After Borges resolved Naydan's complaint, Baer and Defendant Lisa Marranzini, Penn State's Human Resources Representative, met with De Piero "to discuss the university's findings that he was a 'bully' and harassed his colleagues by asking questions that hurt their feelings." He forwarded to them his PHRC and EEOC complaints and explained that he felt he had been harassed, discriminated against, and retaliated against based on his race.  They issued him a "Performance Expectations Notice" which stated that he had "caused significant disruption to the

meeting" and that his behavior was "not becoming of a faculty member at our College and is not acceptable."  "[F]uture repeat of such conduct as was exhibited" that October, they warned, "may result in disciplinary action."

De Piero received his next annual performance review in June 2022.  Although in previous years he had received an "excellent" teaching rating, this time it was "very good."  The component of his review relating to his service to the school, which had always been rated "very good," was now "fair to good."  Specifically noted in the review was De Piero's interaction with Naydan in the October 2021 training, describing his behavior as "aggressive, disruptive, unprofessional and in opposition to the University's Values Statement."

That August, De Piero resigned from his position at Penn State.  In his resignation email, he expressed his view that Penn State "must strongly reconsider whether its recent emphasis on so-called 'antiracist' programming ultimately has students' best interests in mind, from their academic training to their psychological well-being."  After his resignation, Defendant Melinda Kennedy, a human resources representative at Penn State, had him return his salary for the previous month.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

When analyzing a motion to dismiss, the complaint must be construed "in the light most

favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). A court may dismiss a claim with prejudice if an amendment could not cure a deficiency. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). On the other hand, where, as here, one amended pleading already has been filed, further amendment may be allowed "only with the opposing party's written consent or the court's leave which leave should be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2).

**III.      DISCUSSION**

**A.  Title VII, Section 1981, and the PHRA**

Title VII of the Civil Rights Act of 1964 makes it illegal to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The PHRA makes it unlawful "[f]or any employer because of the [employee's] race . . . to . . . discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract . . . ." 43 Pa. C.S. § 955(a). And, Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts." 42 U.S.C. § 1981(a). Because the same framework is used to evaluate employment discrimination claims brought under Title VII, Section 1981, and the PHRA, *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999); *Branch v. Temple Univ.*, 554 F. Supp.3d 642, 648 (E.D. Pa. 2021), the Court addresses these claims together, with one exception discussed *infra* in Section III.B. De Piero alleges that Defendants violated these statutes in two separate ways: (1) by treating him differently from his non-white colleagues ("disparate treatment"); and, (2) by "creat[ing] a racially hostile environment" ("hostile work environment").

### i. Disparate Treatment

To establish the *prima facie* case of employment discrimination, a plaintiff must show: (1) that he was "a member of a protected class;" (2) that he was qualified for his position; (3) that he "suffered an adverse employment action;" and, (4) that adverse employment action "occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

Defendants argue that De Piero's disparate treatment claim must be dismissed because he resigned from his job at Penn State, and, thus, did not suffer an adverse employment action. De Piero disagrees, arguing that, under the circumstances, his resignation constituted a constructive discharge. "Employee resignations and retirements are presumed to be voluntary." *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999) (citation omitted). That means "the onus is on" De Piero "to produce 'evidence to establish that the resignation . . . was involuntarily procured.'" *Judge v. Shikellamy Sch. Dist.*, 905 F.3d 122, 125 (3d Cir. 2018) (quoting *Leheny*, 183 F.3d at 228). Such resignations become constructive discharges when an employer has "permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001) (quotation omitted); *see also Goss v. Exxon Off. Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984).[1] Threats of discharge, suggestions to resign or retire, demotions, reductions in pay or benefits, involuntary transfers to less desirable positions, alterations in responsibilities, and "unsatisfactory job evaluations" can also suggest a constructive discharge. *Clowes v. Allegheny*

---

[1] However, separately proving that a plaintiff was subjected to a hostile work environment is not a sufficient condition for a constructive discharge. *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316 n.4 (3d Cir. 2006) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992))).

*Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993), *cert. denied*, 510 U.S. 964 (1993); *see also Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169-70 (3d Cir. 2013).  Furthermore, "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option."  *Clowes*, 991 F.2d at 1161 (citations omitted).

De Piero argues he was constructively discharged because: (1) his "job responsibilities were radically altered" when he "was required to grade on the basis of race;" (2) "his annual performance reviews were downgraded;" (3) he "was sanctioned" for objecting to the race-conscious trainings he attended; and, (4) Penn State clawed back his July 2022 paycheck.  But viewed in the light most favorable to De Piero, for the reasons set forth below, "under any reasonable reading of the [Amended C]omplaint," he was not constructively discharged.  *Fowler*, 578 F.3d at 210.

First, De Piero's allegations regarding changes to his grading rubric cannot support treating his resignation as a constructive discharge.  In the Amended Complaint, De Piero alleges that Naydan instructed him to consider race as part of the grading process twice: first in March 2019, when she emailed him and said that "racist structures are quite real in assessment . . . regardless of the good intentions that teachers and scholars bring to the set-up of those structures, and again in January 2021, when, at an "[a]ntiracism pedagogy" meeting, she said, "I'm thinking about grading as an antiracist act."  Based on these comments, De Piero alleges that "Penn State pressured [him] to ensure consistent grades for students across 'color line[s],'" which he argues "radically altered" his job responsibilities.

But neither of Naydan's comments warrant a conclusion that De Piero was constructively discharged.  With respect to the March 2019 comment, it is implausible that De Pietro would have felt compelled to resign from his job because of a discussion he had three-and-a-half years

earlier, particularly given that nothing in the Amended Complaint can be construed to allege that, at that time, he was required by Penn State to incorporate race into his grading decisions.  *See McWilliams v. W. Pa. Hosp.*, 717 F. Supp. 351, 355 (W.D. Pa. 1989) (citations omitted) ("[T]here must be at least some relation between the occurrence of the discriminatory conduct and the employee's resignation.").  And, although Naydan was De Piero's direct supervisor, the second comment was purely aspirational—that she was "thinking about grading as an antiracist act."  She included no requirement then, or subsequently, that a student's race enter into his grading decisions.  Such statements do not amount to changes in one's job responsibilities.  Indeed, far more dramatic alterations have not amounted to constructive discharges.  *See, e.g.*, *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1081-82 (3d Cir. 1992) (management's threat to remove plaintiff journalist "from her long-time courthouse beat" was insufficient to support a constructive discharge).

Next, De Piero points to his June 2022 performance review, which suggested that his performance had slipped from previous years.  But receiving marks of "very good" instead of "excellent" and "fair to good" instead of "very good" cannot turn a resignation into a constructive discharge.  In *Clowes* itself, the Third Circuit noted that "merely receiv[ing] ratings of 'fair'" is not the same thing as being "given unsatisfactory job evaluations."  991 F.3d at 1161.  De Piero's "very good" and "fair to good" marks simply are not low enough to be an objective basis for being coerced into resigning.  *Cf. Mayo v. Bangor Area Sch. Dist.*, 2013 WL 3716533, at *12 (E.D. Pa. July 16, 2013) (declining to treat a resignation as a constructive discharge even though the plaintiff had received "unsatisfactory" marks on a job evaluation because those marks were the result of the plaintiff "not complying with her reporting requirements").

Although De Piero alleged that Defendants "sanctioned" him—by Borges's finding that

he "had bullied and harassed his colleagues" and by a "Performance Expectations Notice" from Marranzini and Baer that De Piero's conduct "caused significant disruption to the meeting" and was "not becoming of a faculty member"—these allegations do not support his contention that he was constructively discharged.  At no point was he threatened with termination or any change in his employment conditions or was there any suggestion that he resign.  *Clowes*, 991 F.2d at 1161.  Moreover, as De Piero describes it, the "Performance Expectation Notice" gave him another chance: In case of any "future repeat of such conduct," there "may" be "disciplinary action."

Neither does Penn State's claw back of De Piero's July 2022 salary after he resigned support his contention that he was constructively discharged. Actions by employers that follow a resignation cannot be the basis for treating it as a constructive discharge because, by definition, they cannot have formed part of the "working conditions" that were "so intolerable that a reasonable employee would be forced to" leave their job.  *Goss*, 747 F.2d at 887; *see also Mandel*, 706 F.3d at 169.

In sum, based on *Clowes* and its progeny, De Piero has not pleaded sufficient allegations to clear the high bar that the Supreme Court and the Third Circuit have set for converting otherwise voluntary resignations into constructive discharges.  Even if De Piero genuinely believed that he had no choice but to leave his job, "an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge." *Mandel*, 706 F.3d at 169 (citation omitted).  Objectively, viewing the Amended Complaint in the light most favorable to him, however, conditions had not gotten so intolerable for De Piero that Penn State coerced him into resigning as a matter of law.  Therefore, he did not suffer an adverse employment action that can be a basis for his disparate treatment claims under Title VII, Section 1981, and the

PHRA, and the Amended Complaint will be dismissed without prejudice with respect to this theory of liability.[2]

### ii. Hostile Work Environment

De Piero has, however, plausibly alleged that he was subjected to a race-based hostile work environment while at Penn State.  Therefore, Defendants' Motion to Dismiss will be denied on this theory of liability.

Title VII (along with the PHRA and Section 1981) renders employers liable for harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *see also Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009).[3] To succeed on his hostile work environment claim, Plaintiff must show that: (1) he suffered intentional discrimination because of his protected status; (2) "the discrimination was severe or pervasive;" (3) it "detrimentally affected" him; and, (4) it "would detrimentally affect a reasonable person in like circumstances." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Mandel*, 706 F.3d at 167).  To determine employer liability, the plaintiff also must show that *respondeat superior* liability exists.  *Mandel*, 706 F.3d at 167 (quotation omitted).  Penn State argues that De Piero cannot satisfy the "severe or pervasive" element of this cause of action.[4]  De Piero responds that his department's discussions of "antiracism,"

---

[2] Because De Piero has not sufficiently alleged an adverse employment action, the Court will not address Defendants' argument that the Amended Complaint "fails to allege that he was treated differently from similarly situated non-white individuals"—*i.e.*, even if De Piero did suffer an adverse employment action, it did not take place under circumstances that give rise to an inference of intentional discrimination.

[3] This theory of liability does not require proof of a separate adverse employment action, *Spencer*, 469 F.3d at 316, so the fact that De Piero resigned from his position at Penn State has no bearing on whether Penn State is liable on this theory.

[4] By only contesting this element. Defendants waive any argument in favor of dismissal based on the other elements

"white supremacy," "white privilege," and other concepts relating to discussions of race on campus, all of which "repeatedly singl[ed] out and demean[ed] faculty members on the basis of race," subjected him to a hostile work environment.

In the context of a hostile work environment case, there is a distinction to be made between "severe" and "pervasive" harassment. "[S]ome harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry*, 863 F.3d at 264. Hostile work environment claims alleging pervasive harassment are designed to remedy "the cumulative effect of a thousand cuts," and acts "which are not individually actionable" but "may be aggregated to make out a . . . claim." *O'Connor v. City of Newark*, 440 F.3d 125, 127-28 (3d Cir. 2006). Whether a series of alleged incidents constitutes pervasive harassment is a circumstance-specific question: the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees work performance" are all relevant to whether the discrimination the employee suffered was sufficiently "severe" or "pervasive." *Castleberry*, 863 F.3d at 264 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Penn State points to a few out-of-circuit district court cases that reject hostile work environment claims brought by white plaintiffs relating to anti-racism trainings like the ones De Piero attended. *Young v. Colo. Dep't of Corr.*, 2023 WL 1437894 (D. Colo. Feb. 1, 2023); *Shannon v. Cherry Creek Sch. Dist.*, 2022 WL 4364151 (D. Colo. Sept. 21, 2022); *Vitt v. City of Cincinnati*, 250 F. Supp.2d 885 (S.D. Ohio 2002), *aff'd*, 97 F. App'x 634 (6th Cir. 2004). Quite

---

of De Piero's hostile work environment claim. *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994), *cert. denied*, 513 U.S. 946 (1994) (citations omitted) ("An issue is waived unless a party raises it in its opening brief . . . .").

apart from the fact that none of these cases has precedential value, none is persuasive.  Two of

these cases were resolved after discovery on motions for summary judgment, so their analysis is

not particularly relevant to resolving a case at this early stage in litigation.  *Shannon*, 2022 WL

4364151 at *1; *Vitt*, 250 F. Supp.2d at 888.  And the third is distinguishable.  In *Young*, the

plaintiff alleged that facilitators of a series of mandatory trainings "made sweeping negative

generalizations regarding individuals who are white" and encouraged him to review additional

reading materials that "contain[ed] outright support for forms of invidious race discrimination

masquerading as 'anti-racist' literature."  2023 WL 1437894, at *1-2.  The district court

dismissed the hostile work environment claim because the plaintiff had failed to "actually allege

any specific facts describing the nature, contents, or frequency of the mandatory training" or

identify which additional reading materials he reviewed.  *Id.* at *7.

De Piero's allegations are more specific: he was obligated to attend conferences or

trainings that discussed racial issues in essentialist and deterministic terms—ascribing negative

traits to white people or white teachers without exception and as flowing inevitably from their

race—in June 2020, October 2020, November 2020, January 2021, and October 2021.  His

Amended Complaint contains at least some discussion of the content of each such meeting; in

June 2020, in the aftermath of the murder of George Floyd, "Wong expressed her intention to

cause Penn State's white faculty to 'feel the pain' that [he] endured;" in a "breathing exercise,"

Wong told "White and non-Black people of color to hold [their breath] just a little longer—to

feel the pain;" that October, Naydan, De Piero's supervisor, co-led a professional development

meeting on multiculturalism that included "supposed examples of 'racist' comments" where

every hypothetical perpetrator was white; the following month included an event called "Arts

and Humanities as Activism," where De Piero alleges the facilitator "condemn[ed] white people

14

for no other reason than they spoke or were simply present while being 'white,'" including by "condemn[ing] . . . 'white elites' and 'white self-interest;'" Naydan endorsed that training's message repeatedly; in January 2021, at an "antiracism pedagogy" meeting, Naydan spoke of race conscious grading; and, finally, in October of that year, Naydan and her co-facilitator led another training, which included an excerpt that "accused white faculty" of 'unwittingly reproduc[ing] racist discourses and practices in our classroom." It was, according to Naydan's co-facilitator, "about a group."

De Piero also documents emails and interpersonal interactions from this time period, including a comment by a colleague "that resistance to wearing masks 'is . . .more likely to be led by white males,'" an email from Smith "instructing Penn State's white employees to 'feel terrible,'" messages from Naydan including one encouraging him to "assure that all students see that white supremacy manifests itself in language and in writing pedagogy," and multiple emails urging him to watch a video titled "White Teachers Are a Problem." And when De Piero went to Borges to air his concerns, she told him that "[t]here is a problem with the white race." De Piero simply did not "get it," so, according to Borges, he should continue to attend more workshops and trainings until the message sunk in.

Taken together, these allegations plausibly amount to "pervasive" harassment that, at least on a motion to dismiss, passes muster. *Castleberry*, 863 F.3d at 264. De Piero's case looks less like *Young* or other similar cases where the plaintiff failed to plead the specificity and pervasiveness necessary to state a hostile work environment claim, *Young*, 2023 WL 1437894, at *7; *Maron v. Legal Aid Soc'y*, 605 F. Supp.3d 547, 562-64 (S.D.N.Y. 2022); *Shannon*, 2022 WL 4364151, at *12, and is closer to the plausible claim analyzed in *Diemert v. City of Seattle*, 2023 WL 5530009, at *1-4 (W.D. Wash. Aug. 28, 2023), in which a white plaintiff alleged that

he had to attend anti-racism trainings that segregated employees based on race and declared "that all white people have white privilege and are racist" and that "white people are like the devil" and "racism is in white people's DNA." *Id.* at *1-2. True, some of the allegations in *Diemert*, including one instance where a defendant "chest bumped" the plaintiff and "got in his face," go beyond what De Piero says happened here, *id.* at *2, but in both cases, "it is clear on the face of [the] complaint that, beyond any problems [the plaintiff] may have had with [the trainings], he alleges his co-workers and supervisors verbally . . . assaulted him because of his race. And that he was the target of potentially offensive comments and other abusive actions, also because of his race," *id.* at *4. "Whether there is any merit to his claims is an inquiry for another day, but for now, he has stated a plausible claim for a hostile-work environment based on race . . . ." *Id.*

To be clear, discussing in an educational environment the influence of racism on our society does not necessarily violate federal law. In allowing De Piero's hostile work environment claim to proceed, the Court does not contemplate that it is, or should be, the norm to maintain a workplace dogmatically committed to race-blindness at all costs. To do so would "blink [at] both history and reality in ways too numerous to count." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 385 (2023) (Jackson, J., dissenting). Training on concepts such as "white privilege," "white fragility," implicit bias, or critical race theory can contribute positively to nuanced, important conversations about how to form a healthy and inclusive working environment. Indeed, this is particularly so in an educational institution. And placing an added emphasis on these issues in the aftermath of very real instances of racialized violence like the murder of George Floyd does not violate Title VII, Section 1981, or the PHRA. But the way these conversations are carried out in the workplace matters: When employers talk about race—any race, *McDonald v. Santa Fe Rail Transp. Co.*,

16

427 U.S. 273, 278-79, 286-87 (1976)—with a constant drumbeat of essentialist, deterministic, and negative language, they risk liability under federal law.

For the reasons set forth above, Defendants' Motion to Dismiss will be denied with respect to his hostile work environment theory of liability pressed under Title VII, Section 1981, and the PHRA.

### B.  Section 1981's Equal Benefit Clause

De Piero also alleges discrimination under the "equal benefit" clause of Section 1981, which guarantees "[a]ll persons within the jurisdiction of the United States . . . the full and equal benefit of all laws and proceedings for the security of persons and property."  42 U.S.C. § 1981(a).  As amended in 1991, the statute emphasizes that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."  *Id.* § 1981(c).  As discussed below, that cause of action is not available against Penn State because it is a state entity.  And the operative Complaint fails to plausibly allege the necessary but-for causation for such a claim to survive.

#### i. Penn State

De Piero argues that Penn State's "system of campus adjudicatory offices, including the AAO, which punished [him] for asking simple questions critical of Penn State's state-sanctioned racial dogma" violated Section 1981's "equal benefit" clause separate and apart from its infringement on his contractual rights.

The Supreme Court has held "that the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units . . . ."  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989). The Third Circuit has reaffirmed *Jett*'s holding even after Congress added § 1981(c)'s guarantee against "impairment" of the rights that Section 1981 protects committed "under color of State

17

law."  42 U.S.C. § 1981(c); *see McGovern v. City of Philadelphia*, 554 F.3d 114, 120-21 (3d Cir.

2009).  Moreover, it is well established that Penn State is a state actor.  *Am. Future Sys., Inc. v.*

*Pa. State Univ.*, 752 F.2d 854, 861 n.24 (3d Cir. 1984); *see also Henderson v. Pa. State Univ.*,

2022 WL 838119, at *4-5 (M.D. Pa. Mar. 21, 2022).  Therefore, because De Piero's "equal

benefit" claim references only Section 1981, and not Section 1983, it does not state a cause of

action and must be dismissed.[5]

### ii. The Individual Defendants

And as pressed against the Individual Defendants, De Piero has failed to state a claim for

violation of the equal benefit clause.  A plaintiff proceeding under Section 1981 must plausibly

allege "that, but for race, [he] would not have suffered the loss of a legally protected right."

*Comcast Corp. v. Nat'l Ass'n of Af. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  But the

Amended Complaint alleges that Defendants punished De Piero for, in his words, his "dissent

from its official race-based dogma," not because he is white.[6]  *See Wright v. Reed*, 2021 WL

912521, at *4 (E.D. Pa. Mar. 10, 2021) (citations omitted) ("Plaintiffs' allegations fail to

plausibly suggest that Burkett and Johnson would not have suffered the harm they did *but for* the

fact that they are African American.").  De Piero's Section 1981 claim thus will be dismissed

against the Individual Defendants as well.

---

[5] True, as De Piero points out, the Third Circuit has held in decades past "that § 1981 is not confined to contractual matters when a governmental entity is involved.  Racially motivated misuse of governmental power falls within the ambit of its 'equal benefit' and 'like punishment' clauses."  *Hall v. Pa. State Police*, 570 F.2d 86, 91 (3d Cir. 1978); *see also Mahone v. Waddle*, 564 F.2d 1018, 1028-29 (3d Cir. 1977).  Cases like *Mahone* and *Hall* do not, however, accurately and completely reflect contemporary decisions in that both cases were decided prior to the Supreme Court's announcement that sub-state government units may be subject to liability under Section 1983 but not under Section 1981.  *Monell v. Dep't of Soc. Servs. of Cty. of N.Y.*, 436 U.S. 658, 690-91 (1978).

[6] For this reason, even if De Piero were to proceed against Penn State under Section 1983, the allegations of his Amended Complaint would not be sufficient to survive a motion to dismiss.

### C.  Title VI

De Piero's claim that Penn State violated Title VI of the Civil Rights Act of 1964, which "provides that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance,'" *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 271 (3d Cir. 2014) (quoting 42 U.S.C. § 2000d), will also be dismissed for the following reasons.

Although the Amended Complaint alleges that "Penn State receives federal funding," it does so with no explanation as to the purposes for which such funding is received.  Such allegations are necessary here because Congress has expressly barred Title VI's use in labor and employment cases "except where a primary objective of the Federal financial assistance is to provide employment."  42 U.S.C. § 2000d-3; *see Burks v. City of Philadelphia*, 950 F. Supp. 678, 683 (E.D. Pa. 1996).  Absent allegations "(1) that a primary objective of the federal funding defendant receives is to provide employment, or (2) that the employment discrimination complained of necessarily causes discrimination against the intended beneficiaries of the federal funding," *Fields v. Am. Airlines, Inc.*, 2021 WL 4306021, at *16 (E.D. Pa. Sept. 22, 2021) (quoting *Rogers v. Bd. of Educ. of Prince George's Cnty.*, 859 F. Supp.2d 742, 750 (D. Md. 2012)), Plaintiff's Title VI claim cannot proceed.  Therefore, it will be dismissed without prejudice.

### D.  First Amendment Retaliation

De Piero also alleges that DelliCarpini, Naydan, Borges, Marranzini, and Baer retaliated against him for engaging in speech that he argues is protected by the First Amendment, specifically: (1) his complaint to Baer alleging race-based harassment; (2) his multiple PHRC and EEOC complaints; (3) his bias report to the AAO; (4) his further statements to Borges that

19

he felt "humiliated, disgraced, harassed, and discriminated against" by the facilitators of the anti-racism trainings that he attended; (5) his op-ed criticizing what he saw as race-based changes to curricula, which Chancellor DelliCarpini allegedly "suppressed;" (6) his final complaint to Baer and Marranzini that he felt harassed and discriminated against on the basis of his race; and, (7) his "challenge[], in front of the whole faculty of 'Penn State's racist orthodoxy ascribing "racism" to all white people'" at one of the anti-racism trainings.  All of this speech, he argues, "related to a matter of public concern, namely, whether it is appropriate to ascribe negative characteristics to a group of individuals based purely on the color of their skin."  Because De Piero has failed to plausibly allege a cognizable retaliatory act related to constitutionally protected speech, his Section 1983 claim will be dismissed.

To prevail on a First Amendment retaliation claim, a plaintiff must show: (1) that his statement was constitutionally protected; (2) that "the defendant engaged in 'retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights;'" and, (3) a "causal link . . . between the constitutionally protected conduct and the retaliatory action." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Palardy v. Twp. of Millburn*, 906 F.3d 76, 80-81 (3d Cir. 2018)); *see also Flora v. County of Luzerne*, 776 F.3d 169, 174 (3d Cir. 2015) (citation omitted).  When it comes to public employees, their speech is protected by the First Amendment only if three conditions are met.  First, a "threshold inquiry" is whether the plaintiff "spoke as a citizen or a public employee, and as such, whether [his] speech was either 'ordinarily within the scope of [his] duties,' or simply relating to those duties."  *Javitz v. County of Luzerne*, 940 F.3d 858, 865 (3d Cir. 2019) (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)); *see Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  The speech also must have "involved a matter of public concern."  *Flora*, 776 F.3d at 175 (quoting *Hill v. Borough of*

*Kutztown*, 445 F.3d 225, 241-42 (3d Cir. 2006)).  And, finally, the government must have lacked

"'an adequate justification for treating the employee differently from any other member of the

general public' as a result of the statement he made."[7]  *Id.*

Two alleged retaliatory events are at issue here: (1) DelliCarpini's decision "to censor"

De Piero's op-ed by declining to circulate it in the "News from Sutherland" memo; and,

(2) Naydan's "bullying" accusation, which was sustained by Borges and led Marranzini and Baer

to issue a "Performance Expectations Notice" for speaking out at Naydan's October 2021

training.[8]

On the former, De Piero points to no caselaw to support the proposition that simply

declining to signal-boost an already-published piece of protected speech would be "sufficient to

deter a person of ordinary firmness from exercising his constitutional rights."  *Baloga*, 927 F.3d

at 752 (quotation omitted).  Not every action by an employer rises to the level of retaliation.

Although the threshold is "very low," *O'Connor*, 440 F.3d at 128, the retaliatory act must "be

more than *de minimis* or trivial," *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (quotation

omitted).  "[C]ourts have declined to find that an employer's actions have adversely affected an

employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts

were criticism, false accusations, or verbal reprimands."  *Id.* (quoting *Suarez Corp. Indus. v.*

---

[7] The parties dispute whether *Garcetti* and its progeny provide the right test because the Supreme Court there declined to "decide whether [its] analysis . . . would apply in the same manner to a case involving speech related to scholarship or teaching."  547 U.S. at 425.  The Third Circuit has addressed this dictum, conceding in a footnote that "[t]he full implications" of the Court's statement "are not clear."  *Gorum v. Sessoms*, 561 F.3d 179, 186 n.6 (3d Cir. 2009).  Based on this footnote, De Piero urges the Court to forego applying *Garcetti* and instead determine whether his speech was protected by applying the traditional *Pickering-Connick* balancing test.  *Connick v. Myers*, 461 U.S. 138, 143-44 (1983); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 569 (1968).  Because the implications of *Garcetti*'s dictum do not affect the disposition of De Piero's claim, the Court will not reach this issue.

[8] The Amended Complaint does not allege that the "Performance Expectations Notice" was issued in response to any other conduct by De Piero.

*McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)); *see also McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (citations omitted) ("[N]ot every critical comment—or series of comments—made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights."). DelliCarpini's alleged retaliatory conduct does not even rise to the level of critical comments or reprimands. Thus, it cannot form the basis of a First Amendment retaliation claim.

And because the speech that it allegedly punished was not constitutionally protected, the "Performance Expectations Notice" cannot either. The First Amendment only protects speech by public employees that "involve[s] a matter of public concern." *Flora*, 776 F.3d at 175 (quotation omitted). Speech that "addresses only the employee's own problems . . . even if those problems brush . . . against a matter of public concern by virtue of that employee's public employment . . . merely is a personal grievance" and does not receive First Amendment protection. *De Ritis v. McGarrigle*, 861 F.3d 444, 455 (3d Cir. 2017) (internal quotation marks and citation omitted). Thus, in *De Ritis*, a public defender's out-of-court statements to other attorneys expressing concern that he was being targeted for bringing too many cases to trial instead of having his clients plead guilty merely related to his employment, *id.* at 455-56 ("*I'm being punished.*" "Apparently, *I'm* taking too many cases to trial." "Judge Kenney thinks *I'm* telling too many defendants they can have trials."), but his conversations with the County Solicitor and the Chairman of the County Council "express[ing] concern for individuals other than himself" were not "confine[d] . . . to his own employment situation," instead "discussing the rights of criminal defendants generally," *id.* at 456, so they implicated a matter of public concern.

Applying those principles, De Piero's comments to Naydan at the anti-racism training did

not, as pled, involve a matter of public concern.  To be clear, it cannot seriously be questioned that the underlying issue that gave rise to De Piero's statements—how to address racial inequality in the classroom—is a matter of public concern.  But the Amended Complaint describes De Piero airing fundamentally personal grievances towards Naydan and her co-facilitator.  He "objected that, given the title of the so-called training session and the fact that he is a white writing instructor, he felt singled out and targeted in the meeting."  This made him "uncomfortable," and he explained that he had "felt uncomfortable for the last year and a half" about the discourse about race in the department.  He was worried that "*he* was [being] accused of 'reproduc[ing] racist discourses and practices in [the] classroom[]" (emphasis added).  Although he asked for "examples" of "what it meant to bring 'equity' into his classroom," De Piero's concerns track the more personal complaints that the Third Circuit in *De Ritis* held merely "brush[ed] . . . against" a matter of public concern and thus constitute "merely a personal grievance."  *Id.* at 455 (internal quotation marks and citation omitted).  Any discipline he allegedly faced in response to his conduct, then, cannot sustain a First Amendment retaliation claim.

For the reasons stated above, De Piero's Amended Complaint fails to plausibly allege that he was retaliated against for his protected speech, so his Section 1983 claim will be dismissed.

## IV.        CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss.   An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____

WENDY BEETLESTONE, J.