**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ZACK K. DE PIERO, | CIVIL ACTION NO: |
| Plaintiff, | No. 2:23-cv-02281 |
| v. | |
| PENNSYLVANIA STATE UNIVERSITY and DAMIAN FERNANDEZ, MARGO DELLICARPINI, LILIANA NAYDAN, CARMEN BORGES, ALINA WONG, LISA MARRANZINI, FRIEDERIKE BAER, and ANEESAH SMITH, in their official and individual capacities, | |
| Defendants. | |

**DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Defendants The Pennsylvania State University, Liliana Naydan, Carmen Borges, Alina Wong, Friederike Baer, and Aneesah Smith (collectively "Defendants"),[1] by and through their undersigned counsel, respectfully move for an order granting summary judgment in Defendants' favor on all claims asserted against them in Plaintiff's First Amended Complaint in the above-captioned matter. The grounds for Defendants' motion are set forth in the accompanying memorandum of law.

---

[1] On September 10, 2024 the parties filed a Stipulation of Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) agreeing to the voluntary dismissal of defendants Damian Fernandez, Margo DelliCarpini, and Lisa Marranzini, with prejudice. *See* Dkt. No. 49. Judge Beetlestone signed the stipulation on September 13, 2024 and defendants Fernandez, DelliCarpini, and Marranzini were dismissed from this action with prejudice. *See* Dkt. No. 50.

Respectfully submitted,

Date: October 21, 2024                          **SAUL EWING LLP**

By: */s/ James A. Keller*
     James A. Keller, Esq., ID No. 79855
     Matthew J. Smith, Esq., ID No. 314157
     Amy L. Piccola, Esq., ID No. 208888
     Carolyn M. Toll, Esq. ID No. 326050
     Centre Square West
     1500 Market Street, 38th Floor
     Philadelphia, PA, 19102-2186
     T: (215) 972-1964
     James.Keller@saul.com
     Matthew.Smith@saul.com
     Amy.Piccola@saul.com
     Carolyn.Toll@saul.com

     *Attorneys for Defendants The Pennsylvania
     State University, Liliana Naydan, Carmen
     Borges, Alina Wong, Friederike Baer, and
     Aneesah Smith*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ZACK K. DE PIERO, | CIVIL ACTION NO: |
| Plaintiff, | No. 2:23-cv-02281 |
| v. |  |
| PENNSYLVANIA STATE UNIVERSITY, et al, |  |
| Defendants. |  |

## ORDER

**AND NOW**, this day of _____, 2024, upon consideration of Defendants' The Pennsylvania State University, Liliana Naydan, Carmen Borges, Alina Wong, Friederike Baer, and Aneesah Smith (collectively "Defendants")[1] motion for summary judgment, memorandum of law in support of their motion, and any response and reply thereto, **IT IS ORDERED** that Defendants' motion is **GRANTED** as follows:

1. Defendants' motion for summary judgment is **GRANTED**; and

2. All claims against Defendants are **DISMISSED WITH PREJUDICE**.

## BY THE COURT:

_____

Hon. Wendy Beetlestone

---

[1] On September 10, 2024 the parties filed a Stipulation of Dismissal pursuant to FRCP 41(a)(1)(A)(ii) agreeing to the voluntary dismissal of defendants Damian Fernandez, Margo DelliCarpini, and Lisa Marranzini, with prejudice. *See* Dkt. No. 49. On September 12, 2024, the Court signed the Order dismissing those individuals. *See* Dkt. No. 50.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ZACK K. DE PIERO,

    Plaintiff,

v.

PENNSYLVANIA STATE UNIVERSITY, et al,

    Defendants.

CIVIL ACTION NO: 2:23-cv-02281

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

**Page**

SUMMARY OF UNDISPUTED MATERIAL FACTS..................................................... 3

QUESTION PRESENTED........................................................................................... 3

LEGAL STANDARD.................................................................................................. 3

ARGUMENT .............................................................................................................. 4

   I.   Defendants are Entitled to Summary Judgment on Plaintiff's Hostile Work Environment Claims ................................................................................................................. 5

      A.   De Piero's claim fails in the first instance because he cannot show that he suffered intentional discrimination because of his race......................................................... 6

      B.   De Piero cannot show that the complained-of conduct was severe or pervasive........... 13

         1.   De Piero cannot prove that the alleged conduct was severe....................................... 13

         2.   De Piero cannot prove that the alleged conduct was pervasive................................. 16

         3.   Even if construed as "trainings," the Writing Program meetings do not support De Piero's hostile environment claims. ................................................................................. 18

      C.   De Piero cannot show detrimental effect to his employment......................................... 20

      D.   De Piero cannot show that the complained-of conduct would have detrimentally affected a reasonable person in like circumstances. ................................................................... 22

      E.   De Piero cannot show respondeat superior liability against Penn State. ...................... 23

         1.   De Piero's allegations of discrimination by a supervisor fail.................................... 23

         2.   De Piero's allegations of discrimination by his co-workers fail. .............................. 25

      F.   De Piero's putative Section 1981 and PHRA claims against the Individual Defendants fail as a matter of law for additional reasons.......................................................................... 27

   II.   Plaintiff's Putative Claim For Punitive Damages Against the Individual Defendants Fail As a Matter of Law. ...................................................................................................................... 28

CONCLUSION............................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Alers v. City of Philadelphia*, 919 F. Supp. 2d 528 (E.D. Pa. 2013) ...............................20

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996)..............................16

*Anderson v. Boeing Co.*, 694 F. App'x 84 (3d Cir. 2017) ...............................................6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................4

*Atkinson v. Lafayette Coll.*, 460 F.3d 447 (3d Cir. 2006) ................................................6

*Barbosa v. Tribune Co.,* No. CIV.A. 01-CV-1262, 2003 WL 22238984 (E.D. Pa. Sept. 25, 2003) .................................................................................................................16

*Brooks v. CBS Radio, Inc.*, 342 F. App'x 771 (3d Cir. 2009) .........................................6

*Caso v. Luzerne Cnty.*, No. 3:13-CV-02253, 2015 WL 1951610 (M.D. Pa. Apr. 28, 2015) ........28

*Castleberry v. STI Grp.*, 863 F.3d 259 (3d Cir. 2017)..................................................13

*Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005)......................................11, 12, 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................4

*Chislett v. NYC Department of Education et al.*, No. 1:21-cv-09650-JLRSN, 2024 WL 1118852 (S.D.N.Y March 14, 2024), *appeal filed* (2d Cir. Apr. 15, 2024).....................................19, 20

*De Piero v. Pennsylvania State Univ.*, 711 F. Supp. 3d 410 (E.D. Pa. 2024) ...................... passim

*Dean v. Philadelphia Gas Works*, No. CV 19-4266, 2021 WL 2661485 (E.D. Pa. June 28, 2021) .................................................................................................23, 24, 25, 26, 27

*Foley v. Drexel University*, No. CV 22-1777, 2024 WL 3540445 (E.D. Pa. July 25, 2024) ...........................................................................................4, 6, 12, 13, 16, 17

*Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170 (3d Cir. 2014) ................................15

*Griffin v. Harrisburg Prop. Servs., Inc.*, 421 F. App'x 204 (3d Cir. 2011)...........................25, 27

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993).........................................................23

*Hightower v. Easton Area Sch. Dist.*, 818 F. Supp. 2d 860 (E.D. Pa. 2011), *as amended* (Oct. 3, 2011) ..................................................................................................12, 20

*Hunter v. Trustees of Univ. of Pennsylvania*, No. CV 20-2334, 2021 WL 1424710 (E.D. Pa. Apr. 15, 2021) ...............................................................................13, 24

ii

*Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100 (3d Cir. 2009) ..................... 25

*Iadimarco v. Runyon*, 190 F.3d 151 (3d Cir. 1999) ........................................................... 6

*Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403 (3d Cir. 1999) ..................................... 6

*Kaucher v. Cty. of Bucks*, 455 F.3d 418 (3d Cir. 2006) ..................................................... 4

*McDonald v. Santa Fe Rail Transp. Co.*, 427 U.S. 273 (1976) ..................................... 5, 6

*Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639 (E.D. Pa. 2012), *aff'd*, 565 F. App'x 88 (3d Cir. 2014) ..................................................................................................... 28

*Mufti v. Aarsand & Co.,* 667 F. Supp. 2d 535 (W.D. Pa 2009) ..................................... 7, 13

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ....................................... 13

*Nesmith v. Catalent USA Packaging, LLC,* No. CV 21-5594, 2023 WL 3997955 (E.D. Pa. June 14, 2023) (Beetlestone, J.) .................................................................................... 12, 20

*O'Connor v. City of Newark*, 440 F.3d 125 (3d Cir. 2006) ........................................... 13

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) ................................. 12

*Perry v. Harvey*, 332 F. App'x 728 (3d Cir. 2009) ........................................................ 12

*Phillips v. SEPTA*, No. 16-0986, 2018 WL 827440 (E.D. Pa. Feb. 12, 2018) .............. 16

*Rivers v. Roadway Exp., Inc.*, 511 U.S. 298 (1994) ...................................................... 29

*Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604 (E.D. Pa. 2001) ................................. 15

*Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490 (E.D. Pa. 2010) ....... 4

*Shannon v. Cherry Creek Sch. Dist.*, No. 20-CV-03469, 2022 WL 4819537 (D. Colo. July 12, 2022) ...................................................................................................................... 18, 19

*Sharpe v. Primex Garden Ctr.*, No. CV 23-4843, 2024 WL 3161755 (E.D. Pa. June 25, 2024) ...... ................................................................................................................ 6, 16, 17

*Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061 (3d Cir. 1996) ............... 29

*Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68 (3d Cir. 2003) ........................... 16

*Stephenson v. City of Philadelphia*, CIV.A. No. 05-1550, 2006 WL 1804570 (E.D. Pa. June 28, 2006), *aff'd*, 293 F. App'x 123 (3d Cir. 2008) ....................................................... 16

*Suero v. Motorworld Auto. Grp., Inc.*, No. 3:16-CV-00686, 2017 WL 413005 (M.D. Pa. Jan. 31, 2017) ...................................................................................................................... 29, 30

*Sullivan v. Newburgh Enlarged Sch. Dist.*, 281 F. Supp. 2d 689 (S.D.N.Y. 2003)......................19

*Ullrich v. U.S. Sec'y of Veterans Affairs.*, 457 F. App'x 132 (3d Cir. 2012) ...............................22

*Vitt v. City of Cincinnati*, 250 F. Supp. 2d 885 (S.D. Ohio 2002), *aff'd*, 97 F. App'x 634 (6th Cir. 2004) ..............................................................................................................................18

*Washington v. Se. Pennsylvania Transp. Auth.,* No. CV 19-4213, 2021 WL 2649146 (E.D. Pa. June 28, 2021)..................................................................................................................15, 16

*Williams v. Aramark Campus LLC*, No. CV 18-5374, 2020 WL 1182564 (E.D. Pa. Mar. 12, 2020) ..................................................................................................................................................28

**FEDERAL STATUTES**

42 U.S.C. § 1981........................................................................................................... passim

42 U.S.C. § 2000e......................................................................................................... passim

42 U.S.C. § 1983........................................................................................................... passim

Federal Rule of Civil Procedure 41 ...............................................................................3

Federal Rule of Civil Procedure 56 ............................................................................3, 4

**STATE STATUTES**

43 P.S. § 951 ................................................................................................................ passim

18 Pa. Cons. Stat. §§ 5703, 5704 .................................................................................1

After the murder of George Floyd on May 25, 2020, entities across America facilitated important and sometimes difficult dialogues about race in America. These discussions were particularly fulsome at institutions of higher education, where intellectual debate and disagreement is not just accepted, but expected. The Abington campus of The Pennsylvania State University ("PSU-Abington") was no exception. During the relevant timeframe, the vast majority of these discussions occurred over Zoom.

Plaintiff Zack De Piero, a white male, was a PSU-Abington Writing Program professor. De Piero was a regular voluntary participant in meetings and discussions about race at PSU-Abington, actively read pertinent materials, would request the materials if he missed a discussion, and on one occasion, even asked whether his students could attend a talk by an outside speaker regarding race in academia.

Apparently, this was all a façade. De Piero was surreptitiously recording many of these Zoom meetings (and one-on-one Zoom and telephone discussions with his colleagues); would have his wife observe these meetings, unannounced, off camera;[1] and as early as June 5, 2020 – just eleven days after George Floyd's murder – started a steady stream of demeaning messages to friends outside of Penn State about those who were facilitating these discussions. For example, after his first and only "interaction" with her on June 5, 2020, De Piero determined that Defendant Alina Wong was a "piece of shit Asian lady," and he immediately announced that he was on a

---

[1] De Piero's recordings violate the Pennsylvania Wiretap Act, which prohibits intentional interception of any oral or electronic communication without the consent of all parties involved. 18 Pa. Cons. Stat. §§ 5703, 5704(4). De Piero intentionally recorded several meetings with Baer, Naydan, Borges, and other Writing Program faculty, without obtaining consent from any of the participants. (*SUMF* ¶¶ 156, 161, 178-82, 208-10, 232-38, 285). With regard to each of the meetings that De Piero illegally recorded, the participants expressed that they did not know they were being recorded and they had an expectation that the meeting was private and limited to the few invited participants only, including several private one-on-one meetings. (*SUMF* ¶¶ 161, 183, 211, 234-38, 286). Make no mistake - De Piero's deception was intentional. For example, after secretly recording one of his private meetings with Borges, De Piero wrote to his friend, "the jokes [*sic*] on her:  I recorded it. And I sent it to my new lawyer, who is taking me on as a 'public interest' case[.]"  (*SUMF* ¶ 222).

mission to "get" her (*SUMF* ¶ 73) – a mission he has now carried out by naming Wong as a defendant in a federal lawsuit. Or, to use De Piero's own words to his friend Joshua Bullock: "I wanna take this cunt [Wong] out." (*SUMF* ¶ 75).

In short, De Piero immediately, viscerally, and profanely had a negative reaction to any discussions of race at PSU-Abington from day one.[2] So while Defendants can all but guarantee that De Piero's opposition filing will reference this Court's suggestion that "a constant drumbeat of essentialist, deterministic, and negative language" could give rise to liability, De Piero was subjectively, uniquely, and unreasonably exercised from the first tap of the canvas. Looking at it charitably, it may be that De Piero genuinely found this important and reflective period in American history not intellectually interesting and challenging, but instead unwelcome and disturbing. De Piero is entitled to his opinion on whether these discussions were valuable, although his insistence on repeatedly demeaning people of color and women in expressing those opinions is beyond the pale.[3] For current purposes, the dispositive point is that De Piero's subjective, reflexive, and outlier viewpoint is not evidence of a hostile environment, and it is not nearly enough for his legal claims to survive summary judgment.

Defendants The Pennsylvania State University ("Penn State"), Liliana Naydan, Carmen Borges, Alina Wong, Friederike Baer, and Aneesah Smith (Naydan, Borges, Wong, Baer, and Smith are referred to collectively as the "Individual Defendants," and collectively with Penn State,

---

[2] De Piero was also looking for a new job as early as June 17, 2020. (*SUMF* ¶ 87) (De Piero texting his friend on June 17, 2020 "I started looking up new jobs today. Sucks"). De Piero also was already talking to a lawyer about suing Penn State in June 2020. (*SUMF* ¶ 71).

[3] Including, among many others detailed in Defendants' Statement of Undisputed Material Facts, calling Defendant Aneesa Smith (who is Black) and others who support diversity initiatives – or, as De Piero calls it, an "extremely divisive race, essentially so-called antiracism campaign" – "freaks" and "animals," and referring to Defendant Liliana Naydan as a "crazy woke cunt." *See, e.g.*, *SUMF* ¶¶ 74-83, 99-106, 172-73, 211, 316. Defendants apologize for the coarse language, but it is De Piero's own language, and the best window into his true perspective on the very people he is accusing of discrimination.

as "Defendants"), by and through their undersigned counsel, therefore respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56, and seek dismissal of this Civil Action with prejudice.[4]

## SUMMARY OF UNDISPUTED MATERIAL FACTS

As required by the Court's Policies and Procedures, Defendants have separately filed a Statement of Undisputed Material Facts ("*SUMF*") contemporaneously with this Memorandum and motion, with supporting exhibits, declarations, and deposition testimony, cited to and attached where appropriate. The facts set out in the *SUMF* are hereby incorporated by reference, and all citations in this Memorandum are made to the *SUMF*, rather than to the direct evidence, unless specifically indicated.

## QUESTION PRESENTED

Should the Court grant Defendants' Motion for Summary Judgment and enter judgment in favor of Defendants on the only remaining claims[5] in this lawsuit: De Piero's claims of hostile work environment stated under Title VII (Count One), Section 1981 (Count Two), and the Pennsylvania Human Rights Act ("PHRA") (Count Five)? **[Suggested Answer – Yes.]**

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). A dispute is "genuine only if there is a sufficient evidentiary basis" on which a reasonable factfinder could find for the non-moving party, "and a factual dispute is material only if it might affect the

---

[4] On September 10, 2024, the parties filed a Stipulation of Dismissal pursuant to FRCP 41(a)(1)(A)(ii) agreeing to the voluntary dismissal of defendants Damian Fernandez, Margo DelliCarpini, and Lisa Marranzini, with prejudice. *See* Dkt. No. 49. On September 12, 2024, the Court signed the Order dismissing those individuals. *See* Dkt. No. 50.

[5] On January 11, 2024, the Court issued an Opinion and Order dismissing the remainder of De Piero's claims in response to Defendants' Motion to Dismiss. De Piero did not amend to replead any claims that this Court dismissed without prejudice.

outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). The reviewing court must view all evidence in the light most favorable to the non-movant; however, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010). The non-moving party "'may not merely deny the allegations in the moving party's pleadings; instead [he] must show where in the record exists a genuine dispute over a material fact' . . . Thus, summary judgment is 'put up or shut up' time for the non-moving party." *Foley v. Drexel University*, No. CV 22-1777, 2024 WL 3540445, at *3 (E.D. Pa. July 25, 2024) (Beetlestone, J.). The non-moving party must adduce evidence on which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Under Rule 56(c), summary judgment is required "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is mandated here.

## ARGUMENT

In denying Defendants' motion to dismiss De Piero's hostile work environment claims, this Court noted: "[w]hether there is any merit to his claims is an inquiry for another day, but for now, he has stated a plausible claim for a hostile-work environment based on race. . . ." *De Piero v. Pennsylvania State Univ.*, 711 F. Supp. 3d 410, 424 (E.D. Pa. 2024). The Court went on to state:

> To be clear, discussing in an educational environment the influence of racism on our society does not necessarily violate federal law. In allowing De Piero's hostile work environment claim to proceed, the Court does not contemplate that it is, or should be, the norm to maintain a workplace dogmatically committed to race-blindness at all costs. To do so would "blink [at] both history and reality in ways too numerous to count." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600

U.S. 181, 385 (2023) (Jackson, J., dissenting). Training on concepts such as "white privilege," "white fragility," implicit bias, or critical race theory can contribute positively to nuanced, important conversations about how to form a healthy and inclusive working environment. Indeed, this is particularly so in an educational institution. And placing an added emphasis on these issues in the aftermath of very real instances of racialized violence like the murder of George Floyd does not violate Title VII, Section 1981, or the PHRA. But the way these conversations are carried out in the workplace matters: When employers talk about race-any race, *McDonald v. Santa Fe Rail Transp. Co.*, 427 U.S. 273, 278-79, 286-87 (1976)-with a constant drumbeat of essentialist, deterministic, and negative language, they risk liability under federal law.

*De Piero*, 711 F. Supp. 3d at 424. The issue previewed by this Honorable Court has now been called to question. As alluded to above, De Piero surely will respond to this motion by claiming the discussion of race at Penn State after George Floyd's murder was a "constant drumbeat," a phrase he has worked in to discovery and public press appearances at every opportunity. The undisputed facts, however, are that discussions about race at PSU-Abington in light of George Floyd's murder were occasional, almost entirely voluntary, and not perceived to be discriminatory by any other faculty member within the Writing Program – other than Zack De Piero. De Piero's case should be dismissed, with prejudice.

## I.   **Defendants are Entitled to Summary Judgment on Plaintiff's Hostile Work Environment Claims.**

De Piero asserts a claim of hostile work environment in violation of Section 1981, Title VII, and the PHRA. Title VII and the PHRA make it unlawful for an employer to discriminate against its employee on the basis of race with respect to compensation or terms, conditions, or privileges of employment. 42 U.S.C. 2000e-2(a); 43 P.S. § 951. Likewise, Section 1981 requires employers to grant "[a]ll persons" the same rights that are "enjoyed by white citizens." 42 U.S.C. 1981(a), (c). Title VII and Section 1981 "are not limited to discrimination against members of any particular race . . . [and Title VII and Section 1981] proscribe racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites." *See*

*McDonald*, 427 U.S. at 278-79; *Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999); *Sharpe v. Primex Garden Ctr.*, No. CV 23-4843, 2024 WL 3161755, at \*4 (E.D. Pa. June 25, 2024). Hostile work environment claims under Section 1981, Title VII, and the PHRA are subject to the same analysis. *See Anderson v. Boeing Co.*, 694 F. App'x 84, 86 n.4, 88–9 (3d Cir. 2017); *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999); *see also Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006). To establish a hostile work environment in violation of these laws, De Piero must show: (1) he suffered intentional discrimination because of his race, (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *Anderson*, 694 F. App'x at 88-9; *Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 775 (3d Cir. 2009); *Foley*, 2024 WL 3540445, at \*3.

De Piero has failed to adduce sufficient evidence to establish any of these elements of a hostile environment claim, let alone all of them.

### A. De Piero's claim fails in the first instance because he cannot show that he suffered intentional discrimination because of his race.

De Piero at no time was required to attend any of the Zoom meetings about which he complains. (*SUMF* ¶¶ 26, 63, 145, 150, 155, 194-95). De Piero voluntarily attended the meetings, completed any related reading, and even recorded the meetings – and his faux outrage about the content was apparently not enough to keep him from taking these steps over and over again. (*SUMF* ¶¶ 69, 135, 156, 171, 232). In one instance, when De Piero could not make a presentation (on November 13, 2020), he actually asked for a recording to be made, and when no such recording was available, De Piero affirmatively sought out a copy of a recording of the presentation from another source outside of Penn State. (*SUMF* ¶¶ 148-54).

6

Of course, the discussions and materials about race and teaching were not directed just to De Piero, and not just to white faculty, and none of this was unique to Penn State. The invites and emails were addressed to all Writing Program faculty, and sometimes to all faculty at PSU-Abington, but always to some other broad category of recipients. (*SUMF* ¶¶ 63, 84-85, 95, 107, 120, 133, 143, 155, 194-95, 227). At no time were any of these complained-of communications directed specifically to Zack De Piero.

"The proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the] treatment [of plaintiff] was attributable to [his race]." *Mufti v. Aarsand & Co.,* 667 F. Supp. 2d 535, 545 (W.D. Pa 2009). A reasonable factfinder could not make such a determination here. De Piero cannot point to any criticism, statement, or insinuation of discrimination directed at him by Defendants. The evidence De Piero will likely point to is unavailing.

In the Amended Complaint, De Piero claims that Naydan articulated a "corrosive race-based ideology" on March 29, 2019, when she emailed De Piero and two other white faculty members that "racist structures are quite real in assessment and elsewhere. For me, the racism is in the results if the results draw a color line." (App.1902 at ¶ 41). As with everything else mentioned by De Piero, this email – which was part of a longer amicable dialogue about race in academia, and whether certain student outcomes suggest a history of structural racism biased against students of color – was directed to three faculty members (all white), not just De Piero, and is discussing Naydan's personal view ("for me") about these issues; it is not even discussing PSU-Abington. (*SUMF* ¶ 37). Second, the passage relied upon by De Piero says nothing about De Piero himself or the white race, nor anything similar. (*SUMF* ¶ 39). Finally, nobody other than De Piero has complained about Naydan's personal comments that were expressed in that communication.

De Piero likely will also claim that he was targeted by what he calls a "Racism and Writing Assessment" Professional Development ("PD") meeting in November 2020. In anticipation of that PD meeting, Writing Program faculty were invited to watch a video interview of a non-PSU instructor, Dr. Asao Inoue, titled: "White Teachers are a Problem: A Conversation with Asao Inoue."[6] As with everything about which De Piero has complained, the video and the related reading were disseminated to <u>all</u> Writing Program faculty, regardless of their race, without any requirement that any faculty watch the video, complete the reading, or attend the meeting. (*SUMF* ¶¶ 120, 123, 133-36). De Piero voluntarily elected to (1) review the video; (2) read the text; and (3) attend the meeting. (*SUMF* ¶¶ 135, 137). In his Amended Complaint, De Piero alleges that somehow he was also condemned for "teaching while white" during this meeting. (App.1908 at ¶¶ 70-71). This is false. There is zero evidence that De Piero was subjected to any discrimination during that meeting, let alone a comment of that type. When asked directly under oath if Naydan condemned him for teaching while white during that meeting or at *any* time, De Piero pivoted away from that November 2020 PD meeting, and instead pointed to an August 3, 2020 email

---

[6] Inoue is a professor of Rhetoric and Composition in the College of Integrative Sciences and Arts at Arizona State University. His research focuses on antiracist and social justice theory and practices in writing assessments. He is the 2019 Chair of the Conference on College Composition and Communication ("CCCC") and has been a past member of the CCCC Executive Committee, and the Executive Board of the Council of Writing Program Administrators. At that time, Inoue was a well-known, highly regarded, and highly in demand speaker on topics of racism in academia. (*SUMF* ¶¶ 115-16).

As explained in the associated article and transcript for the video, the title "White Teachers are a Problem" is a literary reference to author W.E.B. Du Bois's famous book <u>The Souls of Black Folk</u>. (*See* App.1945 at ¶ 64; App.2301). As the article explains:

> [W]here Inoue call white teachers 'the problem[,]' . . . [he] is alluding here to the famous passage in *The Souls of Black Folk* where W.E.B. Du Bois describes being or feeling constantly asked as a Black man, 'How does it feel to be a problem?' The use of the term 'problem' exists and must be understood, then, in historical and literary context, which complicates it. Also, as he told me in our conversation, 'Provocative statements and claims get us to this point right now. They get us to talking about white supremacy . . .' So for white people to be a 'problem' does not mean we are *bad*. (He specifically says many of us are *good*.)

*Id*.

Naydan sent to all Writing Program faculty where she shared a publicized statement from a non-Penn State organization. (*SUMF* ¶ 137). Specifically, De Piero testified: "[t]here is an e-mail titled 'Black Linguistic Justice,' where she says, 'Be sure that students see that white supremacy manifests itself in language and in writing pedagogy in the teaching of writing.'" (App.229, Pl. Dep. 229:6-15). This reference to a statement by a third party, which Naydan shared with everyone in the Writing Program (not just De Piero), does not reference De Piero, let alone condemn him, and it nowhere says that De Piero is or should be critiqued for "teaching while white." (*SUMF* ¶ 107). At most, the email Naydan forwarded articulates a third-party organization's view that certain structural components of academia may be influenced by a history of structural racism in our country. De Piero may disagree, but receiving an email articulating this comment is hardly a "hostile environment."

De Piero may also complain about a presentation given by Inoue to PSU-Abington faculty in April 2021. That session, of course, was directed to a broad group of faculty – not just to De Piero. (*SUMF* ¶¶ 193-95). Moreover, when in early April 2021 PSU-Abington professor Dr. Grace Lee-Amuzie sent an email with a flyer about Inoue's presentation, De Piero not only engaged, but suggested to Naydan, Cohen, and Lee-Amuzie that students be permitted to attend the session. (*SUMF* ¶ 196). Finally, De Piero does not point to a single discriminatory remark that was addressed to him (or anyone) during this presentation.

On October 18, 2021, the Writing Program hosted a meeting by Zoom to discuss an article titled "The Myth of the Colorblind Writing Classroom: White Instructors Confront White Privilege in Their Classrooms." (*SUMF* ¶¶ 227, 231). De Piero will likely complain about this, too. The noted article was not written by anyone at Penn State. (*SUMF* ¶ 229). Writing Program faculty were invited to "read [the article] if they wanted to read it and if they wanted to engage with it."

(*SUMF* ¶ 228). Only a handful (six) of Writing Program instructors attended this voluntary meeting. (*SUMF* ¶ 239). De Piero voluntarily read the material. He voluntarily attended the meeting. (*SUMF* ¶ 232). Naydan began the meeting by stating that "anyone who does not feel comfortable talking about any of this does not have to be here by any means." (*SUMF* ¶ 240). De Piero stayed for the duration of the meeting.

During the meeting, De Piero pressed Naydan and Lee-Amuzie for their interpretation of a quote in the material, and continued to challenge Naydan and Lee-Amuzie in a way they (and others) found to be unprofessional, disruptive, and confrontational. (*SUMF* ¶¶ 245-48, 251-52, 255-56, 258, 260-63). Perhaps believing that the best defense is a good offense, De Piero suggests that actually *he* was the one mistreated during this meeting. (*SUMF* ¶¶ 241, 250). Even if De Piero subjectively felt that way, critically, for current purposes, is that De Piero does not and cannot identify any remark or statement that was directed to De Piero based on his race at the meeting.

De Piero likely will also claim that Wong discriminated against him when she invited white and non-Black employees to "hold their breath a little longer" during a discussion about George Floyd's murder on June 5, 2020 ("June 5 Conversation"). All PSU-Abington faculty and staff were invited to attend the June 5 Conversation, and De Piero voluntarily attended. (*SUMF* ¶ 63, 69). At the June 5 Conversation, Wong gave introductory remarks, noting that several victims of police violence stated: "I can't breathe." (*SUMF* ¶ 64). Against this backdrop, Wong suggested that "breathing has become a privilege." (*SUMF* ¶ 65). She asked meeting participants to "[c]ollectively, together [hold their breath in solidarity—similar to a moment of silence]. Hold it in for as long as you can." (*SUMF* ¶ 67). She then invited white and non-Black people of color to hold it "a little bit longer to feel the pain just a little bit, knowing that it's nowhere near the pain, ***it's metaphorical at best***." (*SUMF* ¶ 67). To recap, no one at Penn State required De Piero, or

anyone, to attend this meeting at all, let alone participate in the "breathing exercise." De Piero was not singled out in any way during the meeting.

Finally, De Piero will likely point to several emails that he received and claim that these are somehow evidence of race discrimination. He is wrong. The emails are not directed at De Piero, do not single him out, and do not express any racist remark, statement, or insinuation at all. De Piero is particularly preoccupied with a 2020 "Juneteenth" email from DEI Director Aneesah Smith. As noted above, though, that email was sent to **all** PSU-Abington Faculty on June 19, 2020 – within weeks of George Floyd's murder – at a particularly painful and sensitive moment in time for race relations in this country. (*SUMF* ¶ 95). The email, from someone specifically tasked with discussing and improving diversity efforts at PSU-Abington, suggested ways in which all recipients of the email can celebrate Juneteenth and seek to improve the status of race relations in our country, including by "holding other white people accountable." (*SUMF* ¶ 96-98; App.2176-2178, Pl. Dep. Ex. # 22). Smith's email also states: "Stop being afraid of your own internalized white supremacy." (*SUMF* ¶ 98; App.2176-2178). While De Piero latches on to this last phrase, (1) it was not directed to him in particular; (2) it is not discriminatory on its face; and (3) under any and every reasonable and objective construction, this was intended to get people's attention at a time in our country when there was widespread frustration about the state of race relations.

In *Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005), the Third Circuit affirmed the lower court's decision to grant the employer's motion for directed verdict on plaintiff's hostile work environment claim based on race. In doing so, the Court found that the plaintiff failed to provide evidence of intentional discrimination because he could not show that discriminatory comments were **actually directed at him**; rather the comments were directed at other people. The Court stated: "[w]e note first that no racist comment, written or spoken, was ever directed at [the

plaintiff] himself." *Id.* at 263. The Court further held that, "[a]s a threshold matter, [the plaintiff] cannot meet the first element of the hostile work environment claim under Title VII . . . *solely* by pointing to comments that were directed at other individuals." *Id.* (emphasis in original); *see Nesmith v. Catalent USA Packaging, LLC,* No. CV 21-5594, 2023 WL 3997955, at *6 (E.D. Pa. June 14, 2023) (Beetlestone, J.) (granting summary judgment in defendant's favor, reasoning that hostile work environment claim was based on two events which plaintiff was not involved in); *Hightower v. Easton Area Sch. Dist.*, 818 F. Supp. 2d 860, 879 (E.D. Pa. 2011), *as amended* (Oct. 3, 2011) (granting summary judgment to defendant, reasoning that comments about plaintiff that were not made to plaintiff cannot be considered directed to plaintiff to satisfy the first prong). Similarly, generalized statements related to race, like those De Piero complains about—the use of phrases like "white supremacy" and "white privilege"—without more, do not support a hostile work environment claim. *See Perry v. Harvey*, 332 F. App'x 728, 731 (3d Cir. 2009) (affirming summary judgment in defendant's favor, holding that supervisor "refer[ring] to men of color as being dumb and useless" could not sustain a hostile work environment claim).

In sum, Title VII does not set forth " a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). De Piero's differing views on race do not transform his working environment into a hostile one. De Piero was not harassed because of his race. He just did not agree with the discussion topics around race that popped up occasionally over about 18 months of his 48 months of employment at PSU-Abington, with which he voluntarily engaged at every opportunity.

No reasonable jury could find that De Piero has met the first element of a hostile environment claim. *Foley*, 2024 WL 3540445, at *3. This alone requires dismissal of his claims.

**B.      De Piero cannot show that the complained-of conduct was severe or pervasive.**

Even if he could show that he suffered race-based discrimination at work (he cannot), De Piero next must adduce evidence that his workplace was so "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his employment] and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). "Severe" and "pervasive" harassment are two distinct types of harassment. "[S]ome harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). In some circumstances, a single racial slur can support a hostile work environment claim. *Id* at 265. But in other cases, plaintiffs seek to remedy "the cumulative effect of a thousand cuts," and acts "which are not individually actionable . . . may be aggregated to make out a . . . claim." *O'Connor v. City of Newark*, 440 F.3d 125, 127-28 (3d Cir. 2006). The "harassment" alleged by De Piero is neither.

**1.      De Piero cannot prove that the alleged conduct was severe.**

"The Third Circuit has vindicated hostile work environment claims predicated on severe harassment **only in cases involving substantially [] serious misconduct**, such as the use of racial slurs or sexual harassment and assault." *Foley*, 2024 WL 3540445, at *10 (emphasis added); *Caver*, 420 F.3d at 262. ("[O]ffhanded comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment.); *see Mufti,* 667 F. Supp. 2d at 545 (Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment."); *Hunter v. Trustees of Univ. of Pennsylvania*, No. CV 20-2334, 2021 WL 1424710, at *8 (E.D. Pa. Apr. 15, 2021) (Beetlestone, J.) (granting summary judgment in favor of defendant, holding that a criticism of an employee that: relied on a racial trope about angry Black women,

13

calling plaintiff "low" and "low down dirty," and joking that plaintiff's son would likely need to be bailed out of jail someday, was insufficient to prove a hostile work environment).

In the Court's Opinion in this case denying Defendants' Motion to Dismiss in part, the Court accepted – as it of course was required to do at that stage – De Piero's as-pled contention that the Writing Program's "discussions of 'antiracism,' 'white supremacy,' 'white privilege,' and other concepts relating to . . . race on campus, all of which [allegedly] 'repeatedly singl[ed] out and demean[ed] faculty members on the basis of race' subjected him to a hostile work environment." *De Piero*, 711 F. Supp. 3d at 422. The Court reasoned that "De Piero's allegations [were] specific: he was obligated to attend conferences or trainings that discussed racial issues in essentialist and deterministic terms—ascribing negative traits to white people or white teachers without exception and as flowing inevitably from their race" *Id.* at 423.

These allegations, however, were proven by discovery to be exaggerated at best, if not flat-out untrue.[7] As detailed above, neither De Piero nor any other faculty member was "singled out" by group meetings or mass emails. Nor was De Piero "obligated" to attend voluntary PD discussions for Writing Program faculty. Instead, De Piero chose to do so.

---

[7] By way of just one example, De Piero alleges that Borges, Associate Director of AAO, discriminated against him when Borges allegedly told De Piero during a September 22, 2021 meeting that "[t]here is a problem with the white race." (App.1912 at ¶ 89; App. 1920-1921 at ¶¶ 136, 138). De Piero has repeated this allegation throughout this lawsuit and in the media (indeed, the Court relied in part on this allegation when it denied Defendants' Motion to Dismiss Plaintiff's hostile work environment claims), but De Piero's own illegal recording of his meeting with Borges proves that his allegation is untrue and she **never** made that statement. (*SUMF* ¶¶ 213-15). The record also shows that De Piero misrepresents and takes Borges's other statements out of context, including that he "need[ed] to get beyond that" – "that" being the "White Teachers are a Problem" video. The recording makes it clear that Borges was saying that De Piero needed to set aside the provocativeness of the title and try to understand Inoue's full perspective and full story. (*SUMF* ¶¶ 287-88).

In fact, the record reveals that Borges actually told De Piero on at least *seven* different occasions during that September 22, 2021 meeting that he is free to have his own opinions and perspectives, he is free to express his disagreements and views, and he does not have to agree with any of Naydan's or others' views about race. (App.2444 at 18:41-18:45, 18:56-19:08, 25:09-26:12, 27:37-27:58, 30:10-20). Further, Borges confirmed to De Piero "you would not be terminated because of your disagreements. That's not, no. You have a right to disagree. You have a right to your opinion." (*Id*. at 31:41-31:51).

Moreover, De Piero did not attend a Writing Program "training" of any kind. Instead, he attended discussions about relevant topics on race, where he was free to not attend, stay for only part of the discussion, or leave at any time if he was uncomfortable. As this Court has recognized, "discussing in an educational environment the influence of racism on our society does not necessarily violate federal law. In allowing De Piero's hostile work environment claim to proceed, the Court does not contemplate that it is, or should be, the norm to maintain a workplace dogmatically committed to race-blindness at all costs. . . placing an added emphasis on [concepts such as white privilege, white fragility, implicit bias, or critical race theory] in the aftermath of very real instances of racialized violence like the murder of George Floyd does not violate [state and federal law]." *De Piero*, 711 F. Supp. 3d at 424. Surely Penn State was entitled to have discussions about race in America, and De Piero engaged with these discussions at every opportunity.

In any event, even if these incidents were somehow construed to be race-based harassment, De Piero cannot prove that any of the complained-of conduct was sufficiently severe to amount to a hostile work environment. De Piero has not alleged that he was subjected to any actionable severe conduct. *See*, *e.g.*, *Washington v. Se. Pennsylvania Transp. Auth.,* No. CV 19-4213, 2021 WL 2649146, at *25 (E.D. Pa. June 28, 2021) (granting summary judgment to defendant holding that overhearing jokes about someone being "mulatto," the "N-word" several times and "light skin privilege" were not sufficiently severe); *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173-74 (3d Cir. 2014) (granting summary judgment to defendant, holding that name calling in a meeting was not severe conduct); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 607-08, 611 (E.D. Pa. 2001) (granting summary judgment to defendant holding that supervisor's "constant and unremitting negative comments and evaluations" based at least in part on plaintiff's race, reference

to black community as a "baby factory," statements that blacks are incapable of thinking analytically, and warning the plaintiff, who was black, not to talk to white women was not severe); *c.f. Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (identifying a hostile work environment based on evidence that, for eight years, defendant's employees "made inherently racist remarks" on a daily basis).

### 2.   *De Piero cannot prove that the alleged conduct was pervasive.*

Absent being the subject of severe discrimination, De Piero must prove that the conduct he complains of was "pervasive." *See Sharpe*, 2024 WL 3161755, at *8 (Beetlestone, J.) (dismissing hostile work environment claim, holding that comments to plaintiff "do not clear the high bar that the Third Circuit has set for pervasive harassment"); *Foley*, 2024 WL 3540445, at *10-11 (holding that comments made over a decade were not pervasive) (*citing Ali v. Woodbridge Twp. Sch. Dist., 957 F.3d 174, 182 (3d Cir. 2020)* (holding that four comments over a one year period is not pervasive)); *Washington*, 2021 WL 2649146, at *25-26 (granting summary judgment for defendant, holding that discriminatory harassment was not pervasive where it did not occur "on a daily or even weekly basis"); *Phillips v. SEPTA*, No. 16-0986, 2018 WL 827440, at *6 (E.D. Pa. Feb. 12, 2018) (six remarks and discriminatorily suggestive conduct "on multiple occasions" by co-workers insufficient to establish second prong of a hostile work environment claim); *Stephenson v. City of Philadelphia*, CIV.A. No. 05-1550, 2006 WL 1804570, at *11-12 (E.D. Pa. June 28, 2006) (nine sporadic incidents over nineteen months insufficient to establish second prong), *aff'd*, 293 F. App'x 123 (3d Cir. 2008); *Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 75-76 (3d Cir. 2003) (not precedential) (two racist comments in six months did not constitute a hostile work environment); *Barbosa v. Tribune Co.,* No. CIV.A. 01-CV-1262, 2003 WL 22238984, at *4-5 (E.D. Pa. Sept. 25, 2003) (seven specific comments during eighteen months of employment insufficient to establish the second prong of a Title VII claim).

16

De Piero complains that, over his four years at Penn State, he (1) was "required" to attend seven meetings that discussed race, (2) received a handful of emails that used the terms "white fragility" and "white supremacy", and (3) was invited to a single, all-campus meeting where Wong encouraged white people and non-Black people to hold their breath longer to feel the pain. De Piero was not required to attend any of the sessions—he voluntarily attended each session by Zoom. (*SUMF* ¶¶ 26, 63, 145, 150, 155, 194-95). De Piero was not required to do anything in response to the emails he received. De Piero was one of dozens or, in some cases, hundreds of recipients of these messages. (*SUMF* ¶¶ 63, 84-85, 95, 107, 120, 133, 143, 155, 194-95, 227).

Importantly, and as has been noted, most of these messages and meetings occurred in the aftermath of George Floyd's murder during a time when, contextually, these discussions were happening all across the country. (*SUMF* ¶ 61). In fact, despite Sabira De Piero's surreptitious attendance at many of these same voluntary Zoom meetings her husband voluntarily attended and now complains about, Ms. De Piero testified that she does not think it is wrong to have these types of discussions at a university; in fact, these types of discussions were also happening at her employer at the time and she did not find them offensive. (*SUMF* ¶ 61). Ms. De Piero also observed that in this same time frame, one of her best friends attended a "white accountability group meeting" at her own higher education employer, Mills College in California. (*SUMF* ¶ 61).

In total, De Piero complains about a dozen interactions related to race over his 48 months of employment at PSU-Abington, all of which were in a group context. Discussions of race, to which De Piero could opt in or opt out, is not harassment at all. It surely is not "pervasive." *Foley*, 2024 WL 3540445, at *10-11; *Sharpe*, 2024 WL 3161755, at *8 (Beetlestone, J.).

### 3.     Even if construed as "trainings," the Writing Program meetings do not support De Piero's hostile environment claims.

Courts considering the impact of "anti-racist trainings" have determined that they do not clear the bar of severe or pervasive harassment. At the motion to dismiss stage, this Court declined to consider two cases that Defendants cited that rejected hostile work environment claims brought by white plaintiffs related to anti-racism training, because those cases were decided at the summary judgment stage. In light of the present procedural posture of this case, Defendants renew their reference to those cases. In other words, even if the voluntary PD meetings are construed as "mandatory trainings" (which they were not), De Piero's claim still fails.

In *Vitt v. City of Cincinnati*, 250 F. Supp. 2d 885, 887, 890 (S.D. Ohio 2002), *aff'd*, 97 F. App'x 634 (6th Cir. 2004), for example, the Sixth Circuit affirmed the District Court's grant of summary judgment in favor of an employer on plaintiff's hostile work environment claim under Title VII. The Court concluded that:

> [The] plaintiff was subjected to, at most, mere offensive utterances, and the facts show that her work performance did not suffer unreasonably. Her performance evaluations were not materially affected, and she continued to receive raises and step-up in pay for meeting expectations. The alleged 'brow-beating meetings' [*i.e., trainings*] are not at all clearly linked to race, and Plaintiff admitted under deposition testimony that her supervisor Ms. Nicholes was viewed by another African American employee as difficult to work for because she was threatened by any woman that is intelligent or assertive or stands up for herself. The Court finds that an interpersonal conflict existed between Plaintiff and Ms. Nicholes, but that Plaintiff has not shown that alleged behavior by Ms. Nicholes was connected to or motivated by racial animus. Plaintiff never suffered physical threats or physical humiliation. Explicit references to race that could arguably be construed as offensive were infrequent in the time line of communication between Plaintiff and her co-workers.

*Vitt*, 250 F. Supp. 2d at 890 (emphasis added); *see also Shannon v. Cherry Creek Sch. Dist.*, No. 20-CV-03469, 2022 WL 4819537, at *12 (D. Colo. July 12, 2022) (holding that antiracist trainings were not sufficiently severe or pervasive to amount to a hostile work environment), *report &*

*recommendation adopted*, No. 20-CV-3469, 2022 WL 4364151 (D. Colo. Sept. 21, 2022), *aff'd*,
No. 22-1304, 2023 WL 6232403 (10th Cir. Sept. 26, 2023).

More recently, in *Chislett v. NYC Department of Education et al.*, No. 1:21-cv-09650-
JLRSN, 2024 WL 1118852 (S.D.N.Y March 14, 2024), *appeal filed* (2d Cir. Apr. 15, 2024), the
court granted summary judgment in favor of the defendants on the plaintiff's Section 1983 hostile
work environment claim.[8] In *Chislett,* the plaintiff alleged that, as a result of a department policy
that focused on race in its hiring decisions, she was required to attend implicit bias trainings which
"exacerbated" a workplace that was already "racially charged." *Id.* at 2. The plaintiff, a white
woman, specifically alleged that her employer mandated trainings in which instructors stated
"white colleagues must take a step back and yield to colleagues of color," "[t]here is white toxicity
in the air, and we all breathe it in," and speakers talked about "white supremacy." *Id.* at *2. The
plaintiff also claimed that these trainings instructed "that racial equity required focusing 'equitable
strategies and interventions' regarding Black students instead of white students" and "blamed
current Caucasian employees for racial disparities in society." *Id.* at *3, 10. Much like De Piero,
the plaintiff in *Chislett* argued that (1) defendant's direction that implicit bias trainings be
conducted, (2) discussions during the trainings, and (3) the resulting conversations of the plaintiff's
colleagues, which the plaintiff witnessed, all combined to result in a hostile work environment.

The *Chislett* court held that the plaintiff failed to set forth any evidence to support her
argument, pointing out that "hostile work environment claims are meant to protect individuals
from abuse and trauma that is severe." *Id.* at *10 (citation omitted). The Court explained that
plaintiff was unable to demonstrate that these training sessions "went far beyond the noble goal of
addressing systemic racism." *Id*. Moreover, the court held that contemporaneous statements and

---

[8] Section 1983 claims are analyzed the same as a Section 1981 claims under the Title VII framework. *Sullivan v. Newburgh Enlarged Sch. Dist.*, 281 F. Supp. 2d  689, 708 (S.D.N.Y. 2003).

comments made by colleagues during the training sessions do not form the basis of a hostile work environment claim: "[t]hat the Department's diversity trainings provided a forum to talk about race does not mean that, when a particular training results into a heated back-and-forth, the words exchanged are pursuant to an official policy of the municipality." *Id*.

*Chislett* is very analogous to the current case, except the trainings there actually were trainings, and were truly mandatory. As summary judgment was appropriate in *Chislett*, it is even more appropriate here.

### C.     De Piero cannot show detrimental effect to his employment.

Even if he could prove intentional discrimination (he cannot), and even if he could prove that this discrimination was severe or pervasive (he cannot), De Piero's hostile environment claim fails because he cannot provide evidence that he was detrimentally affected by any purported discrimination. *Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 546-47 (E.D. Pa. 2013); *see also Nesmith,* 2023 WL 3997955, at *6-7 (Beetlestone). His resignation from Penn State does not constitute such evidence – as this Court previously held in this matter, "De Piero has not pleaded sufficient allegations to clear the high bar that the Supreme Court and the Third Circuit have set for converting otherwise voluntary resignations into constructive discharges." *De Piero*, 711 F. Supp. 3d 421.

De Piero may instead argue that (1) his "job responsibilities were radically altered" when he "was required to grade on the basis of race;" (2) "his annual performance reviews were downgraded;" (3) he "was sanctioned" for objecting to the race conscious trainings he attended; and, (4) Penn State clawed back his July 2022 paycheck. (*See* Dkt. No. 24, p. 17.). However, De Piero's allegations are unsupported by competent facts of record and are not enough to support a hostile environment claim. *See Hightower*, 818 F. Supp. 2d at 879 (explaining that a reasonable

jury may not find that plaintiff's work environment was altered as result of two comments with possible racial overtones). These allegations will be addressed in turn.

First, De Piero may allege that Naydan instructed him to consider race as part of the grading process in March 2019 and in January 2021; specifically, that "Penn State pressured [him] to ensure consistent grades for students across 'color line[s],'" which he argues "radically altered" his job responsibilities. (App.1903 at ¶ 43). As detailed above, this allegation is based on a single email which De Piero wildly misconstrues, and there is no evidence that De Piero actually did anything differently regarding how he graded students in his courses—even if he felt pressure to do so. (*See SUMF* ¶¶ 165-69).

De Piero may also cite to his June 2022 performance review as evidence of some sort of negative job impact. In that June 2022 performance review, Penn State mentioned Plaintiff's conduct toward Naydan and Lee-Amuzie at the October 18, 2021 meeting, and ultimately graded his teaching as "very good" and his service rating as "fair to good." (*SUMF* ¶ 306). Even if these ratings were somehow disappointing to De Piero, they could hardly be construed as "negative." In fact, De Piero remained employed, was re-upped to work again for the 2022-2023 Academic Year, and *received a pay raise*. (App.2552. Pl. Dep. Ex. #51; App.0314, Pl. Dep. 314:9-13). There was no negative impact to De Piero's employment from that June 2022 performance review.

Moreover, no reasonable jury could find that De Piero "was sanctioned" for objecting to the race conscious trainings he attended. First, the meetings De Piero is referring to were not "training." Second, to the extent De Piero attempts to argue that his June 2022 performance review service rating of "fair to good" was somehow a "sanction" (it is not), De Piero cannot show that it affected his employment, as discussed above. Third, the note in the June 2022 performance review about the October 18, 2021 meeting made it clear that it was not his objection to the *content* of the

meeting that was at issue, but instead, his "*conduct* during [the] meeting," i.e., what certain individuals present perceived to be aggressive, disruptive, and unprofessional behavior. (*SUMF* ¶ 306).

Finally, Penn State's claw back of a portion of De Piero's salary – because he resigned so late in the game that he was already paid for dates in the Fall 2022 semester he ultimately did not work – cannot have amounted to a detrimental effect on his employment, since he was no longer employed by Penn State at that time and had voluntarily left. (*SUMF* ¶ 12) (De Piero agreeing to refund University any part of salary not earned but paid to him); *c.f. De Piero*, 711 F. Supp. 3d at 421 (actions by employers that follow a resignation cannot form part of intolerable working conditions).

In sum, for a little over a year, De Piero repeatedly, voluntarily, and knowingly engaged in discussions and materials about race. When he could not attend meetings on these topics, he sought out recordings. He built a library of surreptitious recordings of others discussing race. All along, De Piero kept working, and was re-hired for the 22/23 Academic Year when, to Penn State's great surprise, he voluntarily quit just before the start of the Fall 2022 semester and moved to a different educational institution (Northampton County Community College) where he is earning a higher salary. (*SUMF* ¶¶ 308-12). Any "impact" on De Piero's workplace was entirely of his own doing.

### D. De Piero cannot show that the complained-of conduct would have detrimentally affected a reasonable person in like circumstances.

De Piero also cannot show that the meetings discussing race which he voluntary attended "would have detrimentally affected a reasonable person in similar circumstances." It is not enough that "the employee subjectively perceives [the work environment] as abusive or hostile[.]" *Ullrich v. U.S. Sec'y of Veterans Affairs.*, 457 F. App'x 132, 140 (3d Cir. 2012). The conduct must be severe or pervasive enough "to create an *objectively* hostile or abusive work environment—an

environment that a reasonable person would find hostile or abusive[.]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (emphasis added).

We need not speculate as to whether the information that somehow offended De Piero would have detrimentally affected a reasonable person in like circumstances, because we know exactly how it impacted *actual* people in *identical* circumstances. Many of De Piero's white colleagues in the Writing Program testified that they did not ever feel discriminated against by PSU-Abington on the basis of their race. (*SUMF* ¶¶ 322-23). These faculty members also testified that they have never felt discriminated against on the basis of their race as a white person in any Diversity, Equity, and Inclusion presentation or meeting or any Arts & Humanities presentation or meeting, nor did they recall ever receiving an email from Penn State that was discriminatory toward them as white people. (*SUMF* ¶ 323). Moreover, many of De Piero's white colleagues also testified that they never felt during their employment at Penn State that they could not express their views or support of or against any topic relating to race, racism, discrimination, antiracism, or diversity, equity, and inclusion at Penn State. (*SUMF* ¶¶ 324-25)*.* The PD meetings and emails De Piero alone complains of simply did not create an *objectively* hostile or abusive work environment to support De Piero's hostile environment claim.

### E.   De Piero cannot show *respondeat superior* liability against Penn State.

Finally, even if he could credibly prove the four other elements of a hostile work environment claim under Title VII, Section 1981, or the PHRA – and he cannot – De Piero cannot demonstrate the final element: *respondeat superior* vicarious liability.

#### 1.   De Piero's allegations of discrimination by a supervisor fail.

"Where a plaintiff claims a supervisor is responsible for harassing conduct, an employer is strictly liable for [the] supervisor's actions '[i]f the … harassment culminates in a tangible employment action.'" *Dean v. Philadelphia Gas Works*, No. CV 19-4266, 2021 WL 2661485, at

*8 (E.D. Pa. June 28, 2021) (citations omitted). A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassign[ing] with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (citation omitted). "'[I]f no tangible employment action is taken,' an employer may escape liability for a supervisor's conduct 'by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.'" *Id.* (citations omitted).

The relevant person for this inquiry is Friederike Baer. At all relevant times, Baer supervised De Piero and was responsible for preparing De Piero's performance reviews. (*SUMF* ¶¶ 16-17, 20-21). Baer, however, did not engage in any harassing conduct towards De Piero at all. While unclear from the Complaint, De Piero may suggest that Baer discriminated against him during his 2022 Performance Evaluation by rating him slightly lower than past reviews in the "service" area. That rating can hardly be considered evidence of race discrimination, when this rating on its face was related to the finding by Penn State's AAO that De Piero engaged in unprofessional conduct toward two of his colleagues. (*SUMF* ¶ 306). Second, there is no evidence that this slightly lower rating resulted in a tangible employment action. De Piero was not fired after his 2022 Performance Evaluation, nor did he have any changes in responsibilities or benefits. To the contrary, his contract was renewed again for the 2022-2023 Academic Year and he received a pay raise – yet soon after signing his new contract, he voluntarily resigned. (App.2552; App.0314, Pl. Dep. 314:9-13; *SUMF* ¶ 311). In sum there was no tangible employment action resulting from Baer delivering a candid and overall positive review to De Piero, and certainly no race discrimination as a result. *Dean*, 2021 WL 2661485, at *13; *Hunter*, 2021 WL 1424710, at *8.

**2.       *De Piero's allegations of discrimination by his co-workers fail.***

Where the alleged harasser is a co-worker, the employer is not automatically liable. *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). Rather, "employer liability . . . exists only if [(1)] the employer failed to provide a reasonable avenue for complaint or . . . [(2)] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Dean*, 2021 WL 2661485, at *9; *Griffin v. Harrisburg Prop. Servs., Inc.*, 421 F. App'x 204, 207–08 (3d Cir. 2011). An employer "knew or should have known" about a hostile environment if management-level employees or an employee who has administrative responsibility for receiving complaints had actual or constructive knowledge about the existence of a hostile environment, including when "an employee provides management level personnel with enough information to raise a probability of [a hostile environment] in the mind of a reasonable employer." *Huston*, 568 F.3d at 105. Management-level status means that the employee must "have a mandate generally to regulate the workplace environment"…or "the authority to hire, fire, or discipline" plaintiff. *See Griffin*, 421 F. App'x at 209.

As with Baer, De Piero cannot show that any of his co-workers named in this action engaged in harassing behavior towards him. While De Piero will surely focus on Liliana Naydan in his response, the fact is that Naydan was a non-supervisory co-worker of De Piero. She played no part in evaluating Writing Faculty, and did not provide reviews of student teaching evaluations for full-time faculty members. (*SUMF* ¶¶ 19-21). Moreover, there is no evidence that Naydan, even as De Piero's co-worker, discriminated against De Piero based on race, as described fully above.

De Piero may also allege that Wong discriminated against him as it relates to the "June 5 Conversation." Wong was a non-supervisory co-worker of De Piero, and De Piero does not and could not contend otherwise. As fully set forth above, even as his co-worker, there is also no

evidence that Wong discriminated against De Piero, because at no time did she direct any discriminatory remark to De Piero or compel participation in the June 5 Conversation.

De Piero may allege that Borges, Associate Director of AAO, discriminated against him. Borges was a non-supervisory co-worker of De Piero, and De Piero does not and cannot contend otherwise. Moreover, as detailed above, even viewed as a co-worker, Borges did not engage in any subjectively or objectively discriminatory conduct against De Piero. (*SUMF* ¶¶ 287-88).[9]

Finally, while it is not clear if he is even focused on her, DEI Director Aneesah Smith was also a non-supervisory co-worker of De Piero, and, as detailed above, she engaged in no discriminatory conduct toward De Piero. (*SUMF* ¶¶ 96-98; App.2176-2178).

Moreover, even if De Piero could prove that Naydan, Wong, Borges, and/or Smith discriminated against him -- which he cannot -- Penn State may only be held liable on a *respondeat superior* theory for their purported discriminatory conduct if Penn State failed to provide a reasonable avenue for De Piero to complain, or Penn State knew or should have known of the harassment and failed to take prompt and appropriate remedial action. Neither is the case here.

At all relevant times, Penn State maintained a reasonable avenue for employees to bring complaints of discrimination on the basis of race. Penn State also took prompt action regarding De Piero's claims of harassment by immediately investigating his claims.

There can be no reasonable debate on these points because De Piero *actually filed* an internal complaint in September 2021 against Naydan, and Penn State's AAO investigated and responded. (*SUMF* ¶ 202). *Dean*, 2021 WL 2661485, at *13 (holding that there was no basis for

---

[9] In fact, the record reveals that Borges actually told De Piero on at least *seven* different occasions that he is free to bring his own opinions and perspectives, he is free to express his disagreements and views, and he does not have to agree with any of Naydan's or others' views about race. (App.2444 at 18:41-18:45, 18:56-19:08, 25:09-26:12, 27:37-27:58, 30:10-20). Further, Borges confirmed to De Piero "you would not be terminated because of your disagreements. That's not, no. You have a right to disagree. You have a right to your opinion." (*Id*. at 31:41-31:51).

employer liability where employer provided a "reasonable avenue for complaint" about non-supervisory co-worker, which plaintiff utilized when he reported co-worker's conduct to which management promptly responded by investigating conduct). While the AAO determined there was not sufficient evidence to substantiate an allegation of discrimination, that is of no moment. (*SUMF* ¶ 293). The result need not be the result De Piero wanted; the question is whether Penn State through the AAO took adequate remedial action, which it did pursuant to its policy. *Griffin*, 421 F. App'x at 209. In sum, no *respondeat superior* liability may attach against Penn State.

In light of the foregoing and the undisputed material facts of this case, De Piero's purported hostile work environment claims pursuant to Title VII, Section 1981, and PHRA fail as a matter of law in all respects. Accordingly, Defendants are entitled to summary judgment on De Piero's only remaining claims in Count One, Count Two, and Count Five.

### F.   De Piero's putative Section 1981 and PHRA claims against the Individual Defendants fail as a matter of law for additional reasons.

This section is presented strictly in the alternative. If the Court for some reason does not dismiss all hostile environment claims against all Defendants, it should nonetheless dismiss De Piero's hostile environment claims under Section 1981 (Count 2) and the PHRA (Count 5) as asserted against the Individual Defendants. These claims fail as a matter of law for additional reasons.

An individual employee may be held liable for a violation of Section 1981 where the employee intentionally caused an infringement of rights protected under Section 1981, *i.e.,* the right to contract. Here, De Piero must have adduced evidence that an Individual Defendant intentionally violated the law in a way that interfered with his contract at Penn State—which he

has not and cannot for all of the reasons set forth above.[10] De Piero's Section 1981 claim against the Individual Defendants fails as a matter of law for this reason, too. *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 649 (E.D. Pa. 2012), *aff'd*, 565 F. App'x 88 (3d Cir. 2014) (granting summary judgment to individual defendants on Section 1981 individual liability claim).

As it relates to the PHRA, this Court need not even reach De Piero's claim of liability against the Individual Defendants because De Piero has not established (or even really pursued) an underlying violation of the PHRA by Penn State. *See Caso v. Luzerne Cnty.*, No. 3:13-CV-02253, 2015 WL 1951610, at *18 (M.D. Pa. Apr. 28, 2015) (granting summary judgment in favor of defendant where there is no primary violation of the PHRA). If De Piero had pursued this claim – which he has not – he would have to plead and establish with competent evidence that individual defendants are liable on an "aiding and abetting" theory under the PHRA. *Williams v. Aramark Campus LLC*, No. CV 18-5374, 2020 WL 1182564, at *10 (E.D. Pa. Mar. 12, 2020) (granting motion to dismiss on plaintiff's claim of aiding and abetting liability against individual defendants explaining "'[f]or liability to be imposed on an aiding and abetting theory, []there must be a cognizable predicate offense,' *i.e.* a violation by the employer of the PHRA"). De Piero has done neither of these things. There is no basis to hold any Individual Defendant liable in this case.

## II. **Plaintiff's Putative Claim For Punitive Damages Against the Individual Defendants Fail As a Matter of Law.**

This section is also stated strictly in the alternative, as the Court need not reach the question of damages.

---

[10] Furthermore, Plaintiff's claims against several Individual Defendants are based on scarce, isolated allegations that are insufficient to support a hostile work environment claim. For example, his entire claim against Defendant Smith is based on a single e-mail she circulated to the entire campus in recognition of the Juneteenth federal holiday. (App.1905 at ¶ 55). Additionally, his entire claim against Defendant Wong is based on her alleged statements during a single voluntary Zoom meeting in the aftermath of the George Floyd murder on June 5, 2020. (App.1904 at ¶ 47).

De Piero's Amended Complaint seeks punitive damages solely against the "Individual Defendants" "under 42 USC § 1983, 42 USC § 1981, and Title VII." App.1926, "Prayer for Relief", vi." As an initial matter, the Court already dismissed De Piero's Section 1983 claim with prejudice, (Dkt. No. 32), and De Piero's Title VII claim is alleged solely against Penn State, not the Individual Defendants, so any putative request for punitive damages under those statutes fails. Moreover, as detailed above, De Piero's claims of a hostile work environment under Title VII and Section 1981 fail as a matter of law.

Should the Court not dismiss this case entirely, it must at least dismiss De Piero's claim for punitive damages against the Individual Defendants.[11] Under Title VII, individual employees may not be held liable for violations of Title VII. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir. 1996). "Congress did not contemplate that [punitive] damages would be assessed against individuals who are not themselves the employing entity." *Id.* (reversed and remanded on other grounds).

To be held liable for punitive damages under Section 1981, De Piero must prove that the Individual Defendants "[were] personally involved in the discrimination . . . and [that] they intentionally caused [an infringement of plaintiff's] section 1981 rights, or [that] they authorized, directed, or participated in the alleged discriminatory conduct." *See Suero v. Motorworld Auto. Grp., Inc.*, No. 3:16-CV-00686, 2017 WL 413005, at *7 (M.D. Pa. Jan. 31, 2017) (citation omitted). Section 1981's prohibition against racial discrimination applies to the making and enforcement of contracts, including the termination of an employment contract. *See Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 302 (1994). "Punitive damages in [a civil rights action] [may

---

[11] De Piero's Amended Complaint does not purport to seek punitive damages against Penn State. Nonetheless, to the extent he somehow seeks punitive damages against Penn State, any such claim should similarly be dismissed with prejudice for all the same reasons discussed herein.

be available] when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Suero*, 2017 WL 413005, at *10 (citation omitted).

De Piero cannot prove that he was discriminated against, and that is dispositive as to his claim for punitive damages under Section 1981 against the Individual Defendants. He also cannot prove that there was any interference with his contractual rights as set forth under Section 1981— that is, at all relevant times De Piero continued to be employed by Penn State, with no changes to the terms and conditions of his employment. De Piero resigned—which this Court has already concluded that "De Piero has not pleaded sufficient allegations to clear the high bar that the Supreme Court and the Third Circuit have set for converting otherwise voluntary resignations into constructive discharges." *De Piero*, 711 F. Supp. 3d 421. Finally, there is zero evidence that the Individual Defendants were "motivated by evil motive or intent," or acted with "reckless or callous indifference to the federally protected rights of others."

De Piero's request for punitive damages fails as a matter of law. *Suero*, 2017 WL 413005.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants respectfully request that this Court grant summary judgment in their favor, and dismiss Plaintiff's Civil Action in its entirety, with prejudice.

Respectfully submitted,

Date: October 21, 2024

**SAUL EWING LLP**

*/s/ James A. Keller*
James A. Keller, Esq., ID No. 79855
Matthew J. Smith, Esq., ID No. 314157
Amy L. Piccola, Esq., ID No. 208888
Carolyn M. Toll, Esq. ID No. 326050
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA, 19102-2186

T: (215) 972-1964
James.Keller@saul.com
Matthew.Smith@saul.com
Amy.Piccola@saul.com
Carolyn.Toll@saul.com

*Attorneys for Defendants Pennsylvania State University, Liliana Naydan, Carmen Borges, Alina Wong, Friederike Baer, and Aneesah Smith*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ZACK K. DE PIERO,

    Plaintiff,

v.

PENNSYLVANIA STATE UNIVERSITY, et al,

    Defendants.

CIVIL ACTION NO: 2:23-cv-02281

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2024, Defendants' Motion for Summary Judgment was filed with the Clerk of the Court by using the CM/ECF system. I certify that the following counsel of record are registered as ECF filers and that they will be served by the CM/ECF system:

**Michael Thad Allen, Esq.**
Allen Harris PLLC
PO Box 404
Quaker Hill, CT 06375
860-325-5001
mallen@allenharrislaw.com

**Samantha K. Harris, Esq.**
Allen Harris PLLC
PO Box 673
Narberth, PA 19072
267-304-4538
samantha@mudrickzucker.com
*Attorneys for Plaintiff*

Dated: October 21, 2024

         */s/ James A. Keller*
         James A. Keller, Esq., ID No. 79855