**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ZACK K. DE PIERO, | CIVIL ACTION NO: |
| Plaintiff, | No. 2:23-cv-02281 |
| v. | |
| PENNSYLVANIA STATE UNIVERSITY, et al, | |
| Defendants. | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**[1]

Pursuant to Federal Rule of Civil Procedure 56, Local Rule of Civil Procedure 7.1, Your Honor's Policies and Procedures, and the Court's January 23, 2024 Order in this case (ECF Doc. 34), The Pennsylvania State University (the "University"), Liliana Naydan, Carmen Borges, Alina Wong, Friederike Baer, and Aneesah Smith (collectively "Defendants"), by and through their undersigned counsel, submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment, filed herewith.[2]

I.   **Penn State Abington's Writing Program and De Piero's Hiring.**

  A.   **De Piero is Hired by Penn State Abington.**

1.   The University is a state-related institution of higher education and instrumentality of the Commonwealth organized and existing under the Not for Profit Corporation Laws of Pennsylvania. The University maintains campuses throughout the Commonwealth of

---

[1] Counsel for both parties have stipulated to the authenticity of the documents in the Joint Appendix.

[2] On September 10, 2024 the parties filed a Stipulation of Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) agreeing to the voluntary dismissal of defendants Damian Fernandez, Margo DelliCarpini, and Lisa Marranzini, with prejudice. *See* Dkt. No. 49. Judge Beetlestone signed the stipulation on September 13, 2024 and defendants Fernandez, DelliCarpini, and Marranzini were dismissed from this action with prejudice. *See* Dkt. No. 50.

Pennsylvania, including the Penn State Abington campus which is located in Montgomery County, Pennsylvania. (App.1934).

2.      In late 2017, Plaintiff Zack De Piero, then a lecturer in the University of Pennsylvania's Critical Writing Program, applied for a position as an Assistant Teaching Professor of English Composition at Penn State Abington. (App.1973-1978).

3.      Penn State Abington offered De Piero the position in March 2018 with "a base salary of $52,000 for a 36-week contract (paid out over 12 months with full-year benefits)." (App.1981-1982, Pl. Dep. Ex. # 5).

4.      De Piero accepted the position and was appointed as an Assistant Teaching Professor of English Composition at Penn State Abington on April 4, 2018. (App.1983-1984, Pl. Dep. Ex. # 4).

5.      De Piero's appointment was a Fixed Term 1 appointment (36-week contract paid out over 12 months) with a yearly salary of $52,008.00. (App.1983-1984).

6.      De Piero's appointment required that he teach four courses in the Fall semester and four courses in the Spring semester. (App.1983-1984).

7.      Summer teaching was "not part of the job requirement," (App.52, Pl. Dep. 52:8-11), though faculty did have the opportunity to teach one or two courses during the summer pending enrollment and demand. (App.1981, Pl. Dep. Ex. # 5).

8.      De Piero began teaching at Penn State Abington in the Writing Program on August 15, 2018. (App.1983-1984).

9.      De Piero was approved for a second year as an Assistant Teaching Professor for a period of employment of July 1, 2019 to June 30, 2020. He maintained the salary of $52,008.00 for 36 weeks of service paid in monthly installments. (App.1985, Pl. Dep. Ex. # 9).

10.     On May 22, 2020, De Piero received his appointment at Penn State Abington for the period July 1, 2020 to June 30, 2021. His salary increased to $53,424.00. (App.1986, Pl. Dep. Ex. # 26).

11.     On March 31, 2021, De Piero received an appointment at Penn State Abington for the period July 1, 2021 to June 30, 2022. His salary remained at $53,424.00 per year. (App.1987, Pl. Dep. Ex. # 38).

12.     In connection with each of his appointments, De Piero agreed to refund the University any part of his annual salary that was paid and unearned at the time of termination:

> In accepting this appointment, you agree to abide by the regulations in force throughout your employment with respect to: . . . the procedure whereby you agree to refund the University any part of your annual salary that has not been earned but paid to you, when your service with the University terminates. Information regarding these policies can be found in the University policy manual, available online at https:///policy.psu.edu/.

(App.1984; App.1985; App.1986).

13.     The Memorandum of Personal Service in his appointment letters exclusively sets forth the terms of De Piero's employment by Penn State Abington. (App.96, Pl. Dep. 96:8-18).

**B.      Writing Program Structure During De Piero's Tenure.**

14.     Defendant Dr. Friederike Baer has served as the Division Head of Arts and Humanities at Penn State Abington since November 2018. (App.1341, Baer Dep. 12:8-11; App.1832, Baer Decl. at ¶ 1).

15.     From July 1, 2020 to January 4, 2021, Baer served as Interim Associate Dean and, during that period, Dr. David Ruth served as Interim Division Head of Arts and Humanities. (App.1370, Baer Dep. 41:2-7).

16.     In her role as Division Head, Baer supervised all Writing Program faculty, including De Piero. (App.1360, Baer Dep. 31:11-19; App.460, 467, Rigilano Dep. 16:15-19,

23:12-13; App.990-991, Naydan Dep. 22:16-23:7; *see also* App.1988 (identifying Baer as De Piero's Supervisor); App.1832-1833, Baer Decl. at ¶¶ 3, 5).

17.     Among other responsibilities, Baer completed annual reviews for all full-time faculty. (App.1342, Baer Dep. 13:16-21; App.1832-1833, Baer Decl. at ¶¶ 3, 7).

18.     From 2014 through July 2019, Defendant Liliana Naydan was an Assistant Professor of English in the Writing Program and from July 2019 through the present she has served as an Associate Professor of English in the Writing Program. From 2014 through June 2022, Naydan also served as the Writing Program Coordinator. (App.985-986, 988, Naydan Dep. 17:18-18:9, 20:2-13; App.1836-1837, Naydan Decl. at ¶¶ 1, 4-5).

19.     As Writing Program Coordinator, Naydan did not have supervisory responsibilities, played no part in evaluating full-time Writing Program Faculty, and did not provide reviews of student teaching evaluations for full-time Writing Program and English Program faculty. (App.1833, Baer Decl. at ¶¶ 8-9; App.1837, Naydan Decl. at ¶¶ 8-10; App.1376, 1522-1523, Baer Dep. 47:17-19, 193:22-23, 194:4 ("[T]he faculty do not report to Lila"); App.473-474, Rigilano Dep. 29:14-30:2; App.2245-2246 (confirming to a colleague that Interim Division Head Ruth confirmed that "Program chairs don't make FT1 contract decisions.")).

20.     Referencing Naydan, De Piero himself acknowledged, "I need to put on my big boy pants and realize that she isn't our boss. . . . I think it's the division head [Baer]. I don't think she [Naydan] has firing/non-retention power at her disposal." (App.2242).

21.     Other faculty members in the Writing Program at Penn State Abington also agree and have testified that Baer, not Naydan, is their supervisor and Naydan does not have any supervisory authority over their positions as faculty members in the Writing Program. (App.1842, Esposito Decl. at ¶¶ 3-4; App.1845, Rigilano Decl. at ¶¶ 4-5; App.1849, Cohen Decl. at ¶¶ 4-5;

App.1853, Lee-Amuzie Decl. at ¶¶ 4-5).

  **C. Writing Program Professional Development Meetings.**

  22. As part of her role as Program Coordinator, Naydan led approximately three optional professional development meetings per semester (approximately six meetings per academic year). (App.1944 ¶ 62; App.468, Rigilano Dep. 24:10-22; App.1838, Naydan Decl. at ¶ 11).

  23. Naydan solicited topics for the meetings from Writing Program faculty. If faculty members wished to propose the topics for the meeting, they were able to do so. When no faculty members proposed a topic for the meeting, Naydan selected the topic. (App.1028, Naydan Dep. 60:12-20; App.1838, Naydan Decl. at ¶¶ 16-17; App.1846, Rigilano Decl. at ¶ 12; App.1850, Cohen Decl. at ¶ 11; App.1854, Lee-Amuzie Decl. at ¶ 11).

  24. The professional development meetings were not "training sessions," but were "more like discussions." (App.585-586, Rigilano Dep. 141:23-142:1; App.1838, Naydan Decl. at ¶ 15).

  25. No one tracked faculty members' attendance at the professional development meetings and no one reports who attends the meetings to the faculty members' supervisor, the Division Head of Arts & Humanities. (App.1031, Naydan Dep. 63:1-3; App.613, Rigilano Dep. 169:6-8; App.1838, Naydan Decl. at ¶ 14; App.1833, Baer Decl. at ¶ 14; App.1846, Rigilano Decl. at ¶ 9; App.1850, Cohen Decl. at ¶ 9; App.1854, Lee-Amuzie Decl. at ¶ 8).

  26. In fact, attendance at the meetings was entirely voluntary and faculty members were free to attend some, all, or none of the sessions. (App.1030, 1112-1113, Naydan Dep. 62:10-13, 144:23-145:1; App.1838, Naydan Decl. at ¶¶ 12-13; App.1833, Baer Decl. at ¶¶ 11-12; App.1945, ¶ 65; App.1845, Rigilano Decl. at ¶¶ 7-8; App.1850, Cohen Decl. at ¶¶ 7-8; Esposito Decl. at ¶ 6; App.1854, Lee-Amuzie Decl. at ¶ 7; App.67, Pl. Dep. 67:19-23 (acknowledging that he never

received written direction declaring the meetings mandatory)).

27.    And, in fact, faculty members took advantage of the flexibility to attend, or not attend, the meetings. (App.472, Rigilano Dep. 28:8-13; App.67, Pl. Dep. 67:19-23; App.1846, Rigilano Decl. at ¶ 10; App.1850, Cohen Decl. at ¶ 10; App.1843, Esposito Decl. at ¶ 8; App.1854, Lee-Amuzie Decl. at ¶ 9).

28.    When asked if "every other faculty member attend[ed] every writing faculty session?" De Piero replied "No." (App.70, Pl. Dep. 70:12-15).

29.    Further, while materials are sometimes distributed for review in connection with certain Writing Program professional development meetings, those materials are provided for discussion, and faculty are not required to review those materials let alone agree with any content or opinions expressed therein. (App.1838, Naydan Decl. at ¶ 18; App.1846, Rigilano Decl. at ¶ 13; App.1850, Cohen Decl. at ¶ 12)

30.    There is no professional advantage to those who attend the meeting in terms of service to the University; there is likewise no professional disadvantage to not attending the meetings. (App.1360-1361, Baer Dep. 31:20-32:4 (explaining that Writing Program meetings are not considered as part of faculty evaluations); App.1030-1031, Naydan Dep. 62:20-63:6; App.1834, Baer Decl. at ¶ 15; App.1838, Naydan Decl. at ¶ 19).

31.    According to Dr. Matthew Rigilano—who, like De Piero was an Assistant Teaching Professor in the Writing Program at Penn State Abington—the meetings did not count as service to the University, and he has never put his record of attendance in his evaluations. (App.472, Rigilano Dep. 28:2-7; App.1846, Rigilano Decl. at ¶ 11; *see also* App.1361, 1588-1589, Baer Dep. 32:2-4, 259:23-260:6 (noting that reviews don't look at participation in Writing Program meetings because they don't count as "service") *see also* App.1990-1991 (showing attendance at meeting is

not a category or topic discussed during annual review)).

32.     Likewise, other faculty members in the Writing Program agree and testified that attendance at the Writing Program professional development meetings do not count as service to the University for purposes of their evaluations. (App.1842, Esposito Decl. at ¶ 7; App.1854, Lee-Amuzie Decl. at ¶ 10).

## II.     De Piero's Tenure in Penn State Abington's Writing Program.

### A.     2019 Spring and Fall Semesters in the Penn State Abington Writing Program.

33.     De Piero and Naydan maintained a collegial relationship through 2019. (App.72, 97, Pl. Dep. 72:9-13, 97:13-19; App.1090, Naydan Dep. 122:19-21; App.1992, Pl. Dep. Ex. # 10, Naydan Dep. Ex. # 6).

34.     On February 15, 2019, Naydan asked De Piero if he would co-present with her at Abington Academy, a teaching and learning conference that Penn State Abington faculty hold for students every August. De Piero replied to "count [him] in, 110%." (App.1993-1996, Pl. Dep. Ex. # 6).

35.     In preparation for the joint presentation, Naydan sent De Piero prior presentations that she had done for Abington Academy to review. One of the presentations was titled "Respecting Identity In Student Writing," which included topics of "race, class, nationality and linguistic heritage." (App.1997, Pl. Dep. Ex. # 7).

36.     De Piero agrees that race, class, nationality and linguistic heritage are identities to be respected in student writing, "[w]ithout question." (App.79-80, Pl. Dep. 79:21-80:5).

37.     In March 2019, De Piero, Naydan, and two other Writing Program faculty members, Stephen Cohen and Matthew Rigilano, exchanged a series of emails discussing an article

from *Inside Higher Education* and an ongoing dialogue on the Writing Program Administration[3]

listserv involving a professor in rhetoric, Dr. Asao Inoue. (App.1998-2004, Pl. Dep. Ex. # 8).

38.     De Piero shared his thoughts on Inoue with his colleagues:

> So check it out: I draw on Inoue's work quite a bit; his scholarship is usually there,
> somewhere, sprinkled into almost all of the stuff I write/think about, and I agree
> with most of what he says – but not *everything* and I think *that's OK*.

He continued to voice dissatisfaction with Inoue's viewpoint on "antiracist writing assessment"

and concluded his email by saying "I hope I didn't upset anybody with anything I said here."

(App.2002-2003, Pl. Dep. Ex. # 8).

39.     In direct response to this email, Naydan wrote "Zack, I so very much appreciate

your message. Like you, I think the conversation on the listserv has been totally insane." Naydan

continued:

> I personally think that racist structures are quite real in assessment and elsewhere
> regardless of the good intentions that teachers and scholars bring to the set-up of
> those structures. For me, the racism is in the results if the results draw a color line.
> But that notion didn't always make sense to me. And there are ways in which I still
> sometimes struggle with it when I hear colleagues of color struggle with it because
> the designation of racism is ideally supposed to do inclusive, anti-racism work. So
> I get your struggle with the idea Zack, and I think it's frustrating that it feels like
> such a challenging thing to talk about.

(App.2001).

40.     De Piero did not express any disagreement with Naydan's language, either in this

email thread or offline. (App.92-93, Pl. Dep. 92:18-93:9).

41.     Instead, De Piero replied later and thanked Naydan for her response, adding that

"[i]t seems to me that a common refrain in our exchanges is something to the tune of: open,

respectful dialogue can go a long way towards coming together, alleviating tensions, disrupting

---

[3] De Piero described the Writing Program Administration as an organization of writing researchers and teachers.
(App.81, Pl. Dep. 81:13-21).

preconceptions, bridging misunderstandings, etc." (App.2001).

42.     Despite his post hoc characterization of Naydan's email as calling a teacher or faculty member racist (App.1902-1903 at ¶¶ 41-43), De Piero cannot identify where Naydan says that a teacher is racist or the results of teaching are racist. Rather, De Piero takes issue with the sentence in the email stating that "[r]acist **structures** are quite real in assessment and elsewhere." (App.90-92, Pl. Dep. 90:23-92:15).

43.     De Piero nominated Naydan to be on a search committee for Penn State Abington's next Chancellor, specifically complimenting the fact that Naydan "frequently puts students' identities/backgrounds at the forefront of her thinking," commenting that "that's so important because it trickles into other consequential areas like course enrollments, assessments and related academic initiatives." (App.1992; App.99-100, Pl. Dep. 99:15-100:1 (explaining he was "complimenting some of the values [that Naydan] brings to her position.")).

44.     To this day, De Piero agrees that "it is important to put students' identities and backgrounds at the forefront of [his] thinking as a faculty member." (App.99-100, Pl. Dep. 99:15-100:1).

**B.      The Penn State Abington Writing Program in 2020.**

**1.      De Piero Accused of Discrimination By a Student in Spring 2020.**

45.     In late February 2020, De Piero suspected that one of his students violated Penn State's academic integrity policy and accordingly filed an Academic Integrity allegation against the student. (App.2005, Pl. Dep. Ex. # 11).

46.     Upon receipt of the allegation, the student emailed Naydan and Eva Beth Klein, the then Director of Academic Services at Penn State Abington, accusing De Piero of unprofessionalism, discrimination, and retaliation. (App.2006-2007, Pl. Dep. Ex. # 11).

47.     De Piero replied to the student's accusation by saying it was "absolutely ridiculous"

and attached "[t]he entire history of [his] communication [with the student]." (App.2008, Pl. Dep. Ex. # 11).

48.     Although the allegation does not provide details, and does not mention race, after De Piero learned that the student, who identifies as Black, accused him of discrimination, he *assumed* that the student's allegation was a charge of racism. (App.103-104, Pl. Dep. 103:18-104:11).

49.     In response to De Piero's email, Naydan emailed Baer and Eric Ingersoll, the Chair of the Academic Integrity Committee at the time, writing, "Zack De Piero [] recently discovered that one of his students plagiarized and began the process of formally filing the plagiarism form. In turn, the student retaliated by accusing Zack of discrimination." (App.2008, Pl. Dep. Ex. # 11).

50.     Naydan also informed De Piero that Baer wished to meet with the student and Naydan to discuss the allegation of discrimination. (App.2010, Pl. Dep. Ex. #11).

51.     In response, De Piero expressed his belief that the student should be reprimanded for making the allegations against De Piero. (App.2010; *see also* App.106, Pl. Dep. 106:14-22 ("I don't think it's appropriate for students to, without basis whatsoever – to claim that teachers are engaging in discrimination, unless they have absolute belief and evidence of the existence thereof.").

52.     Specifically, De Piero wrote to Naydan:

I believe that there should also be a third outcome from this meeting, and I'd like you to extend this to Friederike [Baer] when you talk to her about it. If/when it turns out that his accusations were completely baseless, I think that there should be some kind of formal reprimand. You shouldn't be allowed to casually accuse someone of discrimination and if it turns out that it was nonsense, well, oh well. Discrimination is a super, super-serious charge. If I was discriminatory, I should be kept out of classrooms permanently. Ditto for any teacher. I mean, It's CRAZY to me that he said that. . . I think there needs to be another step here about how making a baseless accusation like that is entirely unacceptable. Really, that/this is a career-threatening charge. The more I think about this, the more I feel violated.

(App.2010).

53.     At his deposition, De Piero confirmed that he agrees with each of the following

statements:

- Discrimination is a "super, super-super serious charge;"

- You should not be allowed to casually accuse someone of discrimination;

- Accusing someone of discrimination is a career-threatening charge;

- Making allegations of discrimination calls someone's personal and professional integrity into question;

- When baseless, accusing someone of discrimination could be dangerously defamatory;

- If you accuse someone of discrimination in a public forum, it is even more harmful;

- It could be harmful, dangerously defamatory, and career threatening to accuse someone of discrimination on a call-in radio show and the most watched news opinion show in America. This could be a super-super serious thing to do to somebody.

(App.108-113, Pl. Dep. 108:3-113:9).

54.     In advance of the March 5, 2020 meeting with Baer and Naydan, De Piero emailed

them and said:

> The questions that I'd like to discuss involve next steps in this case and consideration for protecting myself and other faculty against other incidents like this. I feel violated here--truly violated and appalled. The feeling gets worse each day. The phrase "being discriminated against by Mr. De Piero" has been ringing through my head in the week since [the student] wrote that in response to my notification that I filed a plagiarism report. That isn't right, and it shouldn't be OK -- *nobody* should be able to make disparaging, baseless, completely off-base accusations like that. When I was a teacher in the Philadelphia School District, I experienced some pretty brutal moments from students: a shooting threat, a racist slur, a homophobic slur, and a punch to my face that nearly landed. As I reflect on all of that now, [the student's] accusation of discrimination feels like the worst of all those incidents.

(App.2013, Pl. Dep. Ex. # 12). In other words, De Piero believed that an accusation of discrimination was worse than a school shooting threat and worse than a punch to his face.

55.    Thereafter, Baer and Naydan informed De Piero that the student's allegation was *not* about racism, but about discrimination based on *age*, as the student was an older student. (App.1101-1102, Naydan Dep. 133:24-134:2).

56.    Ultimately, there was no finding against De Piero for discrimination and the student accepted the allegation of plagiarism. (App.2015).

## 2.    Spring and Summer 2020: Transition to Remote Learning and the Aftermath of George Floyd's Murder.

57.    In March 2020, Penn State Abington, like many institutions of higher education, made the decision to transition to entirely online, remote learning for the Spring 2020 semester due to the COVID-19 pandemic. (App.117, Pl. Dep. 117:14-18).

58.    On May 25, 2020, George Floyd was murdered in Minneapolis by a police officer. (App.117-118, Pl. Dep. 117:22-118:3).

59.    A few days after the murder of George Floyd, on June 1, 2020, Naydan sent an email to the Writing Program about resources regarding anti-racism, writing, "I'm writing to share some more resources with you in case you happen to have energy right now for them. (and, for whatever it's worth, I understand entirely if you don't. These are hard times.)" (App.2016, Pl. Dep. Ex. # 13).

60.    De Piero confirmed that he did *not* think the list of resources provided by Naydan was mandatory to read. (App.119, Pl. Dep. 119:15-19).

61.    Discussions about racism were happening throughout the country, and, specifically, at institutions of higher education. *See* App.1655-1658, Sabira De Piero Dep. 17:13-18 (agreeing with same), 17:22-18:4 (noting that these discussions were happening at her employer), 19:18-

20:3 (explaining that a friend who worked at Mills College participated in a "white accountability group meeting," something that did not offend her); App.2017, Sabira De Piero Dep. Ex. # 2 ("Good thing is that the white accountability group meeting went well")).

62.　De Piero himself acknowledged that "whatever your views, that incident [George Floyd's murder] opened up discussions about race, the use of force by police and related topics throughout the country." (App.118, Pl. Dep. 118:4-9; *see also* App.2019-2020, Pl. Dep. Ex. # 14 (acknowledging that (1) the protests occurring in the aftermath of George Floyd's murder were responding to, among other things, "systemic injustice against black Americans;" and (2) "not everybody suffers from racial discrimination--and yes, that's awful. And yes, something needs to be done."); App.122, Pl. Dep. 122:12-17 ("in general terms, yes. I acknowledge that there has been [system injustice against Black Americans], yeah.")

### a.　June 5, 2020 "Conversation on Racial Climate."

63.　Consistent with steps being taken by institutions across the country, shortly after the murder of George Floyd, on June 5, 2020, Penn State University hosted an optional Zoom meeting for all faculty and staff titled "Conversation on Racial Climate" co-facilitated by faculty and leadership at Penn State Abington and Defendant Dr. Alina Wong, the University's then-Assistant Vice Provost for Educational Equity (hereafter, the "June 5 Conversation"). (App.2027 ("Please join the campus community to engage in an open dialogue about the current racial justice movement, the tragic death of George Floyd and others, and ongoing actions. This Zoom meeting will be an opportunity to support each other, and to learn from and with each other."); App.1857-1858, Wong Decl. at ¶¶ 4-5 (testifying that "[t]he June 5 Conversation was entirely voluntary and was offered as an opportunity for the campus community to engage in an open dialogue about the current racial justice movement, the tragic deaths of George Floyd and others, and to provide an opportunity to support and learn from and with each other")).

64.     During the June 5 Conversation, Wong gave introductory remarks, speaking about the Black men and women who were killed by police violence, and specifically, that three of the last words of some of these individuals who were killed was "I can't breathe." (App.2028 at 3:08-3:43; App.1858, Wong Decl. at ¶ 7).

65.     Having provided this important context, Wong suggested that "breathing has become a privilege," and:

> Like breathing, a privilege, it happens and we benefit from it whether we want it or not. We have to choose to hold our breath and that is what we are doing today in honor of George Floyd, Daniel Ellis, and Eric Garner. . . We are choosing to hold our breaths for those who can no longer breathe. . . . When we hold our breaths, there will come a time when we want to release. We want the relief. We, need the oxygen and the mechanics that go along with breathing. And I just ask us to think about who can exhale? Who can release and who can find that release? It's a challenge for all of us today, and especially for white and non-black people of color, is to hold our breaths just a little bit longer to not give into our privilege to not give in to our ability to release to exhale. To give just a bit more air to black communities so that they can have another breath.

(App.2028 at 4:40-6:16).

66.     Wong did not instruct or demand that white people participating in the June 5 Conversation hold their breath longer than Black people. This was a collective, communal exercise with metaphorical aspects held via Zoom. (App.1858, Wong Decl. at ¶ 8)

67.     Wong asked the meeting participants to "move forward with intention and care and solidarity and so with that, let us take a breath. Collectively, together. Hold it in for as long as you can. Again I invite those of us who are white and non-black people of color to hold it just a little bit longer to feel the pain just a little bit, knowing that it's nowhere near the pain, ***it's metaphorical at best***, so let's do that now." (App.2028 at 7:24-8:06).

68.     A link to a recording of the June 5 Conversation was circulated to the Penn State Abington community on June 8. (App.2029).

14

69.    De Piero attended and recorded (via "screen capture video recording") the June 5 Conversation so he could save it for his own records. (App.139-140, Pl. Dep. 139:15-140:10).

70.    On June 9, 2020, De Piero texted another Penn State Abington Writing Program faculty member, Dr. Stephen Cohen, to say that if Penn State Abington wanted to "do right by [its] marginalized students, slash their tuition by 80 percent. Ask [University President] Barron and the football coach to cough up half of their combined $10 million a year. That could do the trick." (App.2031, Pl. Dep. Ex. # 17, Lombardo Dep. Ex. # 3; *see also* App.144, Pl. Dep. 144:4-13 (confirming that "marginalized students" meant those who were "not white, were black, were Hispanic, were Latino, all that kind of stuff.")).

71.    De Piero texted Cohen again the following day saying that he had spoken with a lawyer about litigating with Penn State:

> Alright…talked to my lawyer, who is an uncle, and he advised to just lay low, document what happened, if/when they fire my ass, then at that point, consider civil litigation if there's reason to believe it was politically motivated. And by "politically motivated," ya know, me calling for justice through nonviolent means. Sigh.

(App.2031). This was just sixteen days after George Floyd's murder.

72.    De Piero also texted with his friend, Steve Basinfelder (who he refers to as "Snarky") about the June 5 Conversation. (App.2042-2049, Pl. Dep. Ex. # 18).

73.    De Piero attempted to share the recording of the June 5 Conversation with "Snarky," saying,

> [This is] a recording of the Penn State zoom healing session they had last week. The one where whitey had to hold his breath longer than everybody else. The ***piece of shit Asian lady*** who facilitated the meeting said something At [*sic*] the 53 or 57 minute mark that totally set me off all over again yesterday. I didn't hear her say at [*sic*] the first time when I was in the live meeting. It's unbelievable. About looting.

(App.2042 (emphasis added)).

74.    De Piero continued on to comment,"[t]hey are trying to create a world in which

there is never NOT racism [a]nd a lot of these freaks think that only whitey can be racist… so it becomes a do-no-wrong thing." (App.2048; App.159, Pl. Dep. 159:1-8 (explaining that the "freaks" he was referring to were "folks thumbing the race essentialist drumbeat at Penn State.")).

75.     De Piero also spoke to his friend Josh Bullock about the June 5 Conversation, sending Bullock a link to a website for finding a whistleblower attorney and writing, "***I wanna take this cunt out***." (App.2135, Pl. Dep. Ex. # 16 (emphasis added); *see also* App.165, Pl. Dep. 165:13-16 (confirming he was referring to Wong when using the word "cunt")).

76.     During this same period, De Piero filed a complaint with the Pennsylvania Office of Inspector General ("OIG") about a comment Wong made during the June 5 Conversation about looting. (App.2145-2149). After he submitted this Complaint, he received a call from an Inspector General who informed him that the complaint was outside of the OIG's jurisdiction. (App.154-155, Pl. Dep. 154:19-155:12).

77.     De Piero informed Snarky about the OIG complaint via text message on June 9, 2020, writing:

> A PSU Main Park administrator who co-facilitated this healing meeting said…
>
> I want us to stay in this state of disruption
>
> In fact, I want us to be more disruptive
>
> And now I qupte [*sic*]
>
> "What some people call looting…I call it getting their due"
>
> So you know what I'm doing now?
>
> About to call PA's "Office of State Inspector General" to call that cunt out and get whistleblower protection

(App.2044; *see also* App.157 Pl. Dep. 157:6-11 (confirming he was using the word "cunt" to refer to Wong).

78.     De Piero also sent a copy of his Government Fraud Complaint Form to Bullock,

writing:

> It's that unbelievable
>
> A fucking Penn State ADMINISTRATOR said that
>
> ***That fucking cunt*** is saying that supported by TAXPAYERS' DOLLARS. ACTUAL MONEY

(App.2135 (emphasis added)).

79.     De Piero continued on to tell his friend: "But here's this ***piece of shit bitch*** saying: fuck up more people's shit." (App.2136; *see also* App.167, Pl. Dep. 167:7-9 (confirming that he was referring to Wong when using the phrase "piece of shit bitch") (emphasis added)).

80.     Today, De Piero stands by his use of profane language to describe Wong, saying, "whatever I said there ['piece of shit bitch'] stands." (App.168, Pl. Dep. 168:12-13).

81.     On June 5, 2020, Snarky shared an article with De Piero titled "Rebuttal to Brown Univ.'s Letter Decrying Pervasive Racism in U.S." De Piero replied that the professor, who is Black, will get pushback but "[a]mplify that 1000 times if a white professor wrote that. Also really worth considering for anybody outside academia: the vast majority of college professors don't have security of employment. There's a fear of speaking out, and if you don't heed to the walk [*sic*] mob, you'll probably lose your job. See me!" (App.2040).

82.     Snarky replied: "Yeah man. It's one thing when you're a prominent black tenured professor (an especially eloquent one, at that), but Whitey McAdjunct doesn't have the wiggle room to voice his opinion." (App.2040).

83.     De Piero never spoke to Wong about his feelings on the June 5 Conversation. In fact, he's never directly spoken to Wong about anything. (App.140, Pl. Dep. 140:11-16).

#### b.   *June 2020 Email Exchange with Charles Archer.*

84.     On June 16, 2020, Charles Archer, Assistant Teaching Professor of English, wrote an email to Writing Program faculty discussing the return to campus and students wearing masks.

In this email exchange, Archer wrote:

> Thank you, all, for your wisdom and your willingness to talk, exchange ideas, and share readings. It's amazing to be a part of this group, and I'm grateful for that every day. I myself had the honor of marrying a history-major-turned-social worker, and Leslie is more than happy to school my a** on history and white male privilege at any time . . .
>
> . . .
>
> Meanwhile, like you, I'm looking forward to seeing how fall 2020 at Abington campus will play out. Like you, I'm also concerned about it, and I have no idea how the logistics of masks, glass panels, and social distancing is supposed to work in our classrooms and hallways. One can already see a mile away that there will be some who resist wearing masks, etc. Such resistance is also more likely to be led by white males and in classrooms taught by women and people of color.

 (App.2150, Pl. Dep. Ex. # 20).

85.    While this email was not sent just to him, and does not mention his name at all, De Piero said he felt "hectored" by this message.[4] De Piero never had any personal or direct conversation with Archer about the email. (App.162, 174-176, Pl. Dep. 162:15-20, 174:22-175:20, 175:22-176:3).

86.    De Piero did, however, have a discussion with his friend Snarky about the email from Archer. On June 16, 2020, De Piero texted his friend:

> This 1 ***fucking loser*** telling everybody that whitey is gonna infect minority profs… and invoking "white male privilege" in the same email
>
> Talk about a racist
>
> You did. Great line!
>
> And here's another crazy thing….
>
> And im [*sic*] gonna say like a crazy conspiracy theorist saying this but its [*sic*] true…

---

[4] In his Amended Complaint, De Piero alleged that "on June 16, 2020, Assistant Teaching Professor of English, Charles Archer, hectored De Piero about 'history and white male privilege.' Archer asserted that resistance to wearing masks 'is also more likely to be led by white males and in classrooms taught by women and people of color.'" (App.1905, Amended Complaint at ¶ 53).

If these people think theyre [*sic*] so motherfucking woke and they're so committed to education + equity and all that… Then tell me…

Why do you work at institutions that charge 18-22 year olds $15,000-$30,000 a year?

(App.2057, Pl. Dep. Ex. # 18 (emphasis added); *see also* App.160-161, Pl. Dep. 160:24-161:2 (explaining the "1 fucking loser" he was referring to was Archer)).

### c.  De Piero Begins Applying for Jobs.

87.    The next day, June 17, 2020, De Piero texted his friend Bullock, "I started looking up new jobs today. Sucks." (App.2144).[5]

88.    On June 30, 2020, De Piero applied for jobs at Princeton University and Lafayette College. (App.2151-2154). He did not get interviews for either position (App.208, Pl. Dep. 208:1-3).

89.    De Piero also applied to jobs at: Open Minds, Foundation for Individual Rights and Expression ("FIRE"), Seton Hall University, U.S. Merchant Marine Academy, New Hope Solebury School, Raritan Valley Community College, Brookdale Community College, West Chester University, and Jefferson University. (App.209, Pl. Dep. 209:14-20); (App.2155, Pl. Dep. Ex. # 25); (*see also* De Piero App.2156-2171).[6]

### d.  De Piero's First Outreach to FIRE and text to Josh Bullock on June 18, 2020.

90.    On June 18, 2020, De Piero sent an email to FIRE, writing "[t]ruth be told, I located your organization earlier this week while conducting a search for possible future legal

---

[5] In the same text chain on the same day, De Piero and Josh Bullock appear to be discussing comments on a thread and De Piero writes "Like last yr- people shouting Me Toooo because someone tried to kiss them on a date. Wow." (App.2144).

[6] Notably, in this document De Piero responded under a heading "[h]ow do you reconcile diversity in teaching + learning?" with "[d]ifferent backgrounds – culturally, linguistically, racially, socioeconomically." (App.2158).

representation." (App.2172, Pl. Dep. Ex. # 21).

91.     In this same email, De Piero expressed interest in working for FIRE as a Program Analyst for the Individual Rights Defense Program. (App.2172).

92.     According to De Piero, FIRE replied a "wish you the best of luck, that kind of thing" and nothing further developed at that time. (App.180, Pl. Dep. 180:7-15).

93.     Also on June 18, 2020, De Piero texted his friend Bullock about the discussions of racism at Penn State, calling it "constant nonsense." De Piero wrote, "[e]very fucking day, it's white privilege white silence white power white flight white fragility white money white white race race color color. I'm sick of it." (App.2093).

94.     When asked when he thought this "constant nonsense" started, De Piero said he was "referencing what had been in the ether in recent times." De Piero testified that he agreed that discussions about race at Penn State Abington changed or ramped up after George Floyd's murder on May 25, 2020, and the text he sent on June 18, 2020 "seems to have a lately-ness feel to it." (App.183-184, Pl. Dep. 183:9-184:1).

### e. Juneteenth 2020.

95.     On June 19, 2020, a federal holiday that commemorates the ending of slavery in the United States, Aneesah Smith, the then Director of Diversity, Equity, and Inclusion at Penn State Abington, sent an email to the Abington Listserv about the holiday ("Juneteenth email"). (App.2176-2178, Pl. Dep. Ex. # 22, Naydan Dep. Ex. # 33, Baer Dep. Ex. # 9, Sabira De Piero Ex. # 3).

96.     The Juneteenth email stated: "Today more than ever, Black and Brown people are calling on white people to stand with them and take action. We've been fighting too hard and too long. Here are a few ways you can celebrate Juneteenth and continue to fight for racial justice beyond today." Following this, Smith identified five things that people could do to fight for racial

justice beyond today. (App.2176).

97.     At no point in the email does Smith write that white people *must* do any of these five things, the email simply lists them as "ways you ***can celebrate Juneteenth.***" (App.2176 (emphasis added); *see also* App.1668, Sabira De Piero Dep. 30:23-31:14 (agreeing the email says "[h]ere a few ways you can celebrate Juneteenth" and that it does not say "must" or "insist" and that it did not specifically reference Zack De Piero); (App.1274, Naydan Dep. 306:9-16 (explaining that when she reads the email, she reads it as Smith's "ideas for how we might learn.").

98.     During his deposition, De Piero was asked about each of the five ways in which Smith suggests someone can celebrate the holiday:[7]

> Q: [T]he first thing she lists is, "Stop talking and listen to what needs to be done." Did I read that correctly?
>
> A:  Yes.
>
> Q:  Was that specifically directed to you, Zack De Piero?
>
> A:  "Today more than ever, black and brown people are calling on white people." I am a white people singular. I am a white person. I work at Abington and this came to me through my employment listserv. Yes, that is directed to me.
>
> Q:  Have you heard of active listening?
>
> A:  You know, that's a concept. You know, it depends on what it means. But – yeah I have heard it for sure.
>
> Q:  Do you think your students learn better if they don't talk over you, but listen to what you have to say first?
>
> A:  Do I think that students learn better if they listen to what I have to say first?· Yes. But – yeah.
>
> Q:  Did this suggestion, "Stop talking and listen to what needs to be done" -- did that cause you, Zack De Piero, harm? Do you believe that sentence caused you harm?
>
> A:  Yes.

---

[7] Objections are removed for ease of reading.

Q: How?

A: Stop talking. I don't have a voice because I'm white. Calling on white people. Number one, stop talking. Me, white person, Abington, stop talking. I think that's very conducive to a productive work environment.

Q: And you read that as stop talking forever?

A: Yes.

Q: Okay.

A: Stop articulating opinions, ideas.

Q: And Number 4[8] says – and I will read it – "Stop being afraid of your own internalized white supremacy. Search and look within at hard facts of thought and deed. Who cares about being uncomfortable? What about being true, brave and real instead?" Did I read that correctly?

A: Yes.

Q: And again, did you believe that was directed to you personally, Zack De Piero?

A: Yes.

Q: And why did you think that?

A: Through logic and inference based on the statements in the email.

Q: Did you talk to any other white faculty members about Aneesah Smith's email?

A: Maybe. I don't recall.

Q: Did you talk to Aneesah Smith and say, "Hey, what did you mean by stop talking and stop being afraid of your own internalized white supremacy?"

A: No.

Q: In Number 5, Aneesah Smith writes – and I will read it – "Hold other white people accountable, not on social media, instead with measured voices that call folks in to look and wrestle – to change. Engage in courageous conversations, in hearing folks out and in allowing yourselves to feel terrible and to let that feeling be a crucible for change." Did I read that correctly?

A: Yes.

---

[8] Number 2 reads: "Find an accountability partner and make the list public of what actions you will take. You CAN do this on social media. A lot of those actions will be giving up privilege and making room for folks who you may not have noticed and have no room at all." Number 3 reads: "Spend time in spaces with folks who are not like you." (App.2176).

Q:  Was that sentence directed to you personally, Zack De Piero?

A: Yes.

Q:  Did she instruct you, Zack De Piero, personally to feel terrible?

A: Yes.

Q: And why do you say that?

A:  Because this is an administrator of the college, our DEI director, the director of diversity, equity and inclusion, taking [sic] to the campus-wide listserv, addressing white people specifically. I am white. It is now addressed specifically to me, and these are five ways that I need to fight for racial justice.

Q:  Did you have any discussion with Aneesah Smith to ask her what did she mean by this sentence?

A:  No.

Q:  And what she wrote is that you "should engage in courageous conversation, in hearing folks out and in allowing yourselves to feel terrible and let that feeling be a crucible for change." Did I read that correctly?

A:  Yes. You are reading the e-mail right now.

Q:  Okay. Did you read that as Aneesah Smith saying you should feel terrible forever?

A:  There is no stated stopping point at which I need to stop doing things as a white individual. So, it seems to be indefinite, yes.

Q:  Okay. And the answer may be no. You did not read this as, allow yourself to feel terrible about racial problems in the country and let that feeling motivate you to make changes in society? That's not how you read that?

A:  No. Not at all.

(App.186-191, Pl. Dep. 186:16-191:21).

99.    De Piero sent a screen capture of this email to his friend Snarky, writing, "[s]uch a shame that so many freaks like this lady have ruined the movement for other normal people." (App.2064).

100.    Later in the same conversation De Piero wrote:

Diversity (surface-level diversity) is the most important thing to these freaks, and they just refuse to accept that America is – EMPIRICALLY, WITHOUT QUESTION – the MOST DIVERSE nation in the world, with no close 2nd. And

> these freaks, honest to god, have no appreciation whatsoever for fucking
> DEMOCRACY – compromise/consensus, negotiating practical + realistic goals…
> respecting others' rights to think/feel differently. Theyre [*sic*] animals.

(App.2066).

101.    The "animals" De Piero was referring to are "[t]he people who support this extremely divisive race, essentially so-called antiracism campaign," including Aneesah Smith. (App.196, Pl. Dep. 196:10-22).

102.    De Piero also had a text conversation with his friend Josh Bullock about the Juneteenth email from Smith, writing "[w]ell, that didn't take long, did it? Our campus DEI person said that all whiteys need to make sacrifices in order to come to grips with their internalized white supremacy."(App.2094; *see also* App.198, Pl. Dep. 198:7-9 (confirming he was referring to Smith in this text)).

103.    Later in the same conversation, De Piero sent a link to an *Inquirer* article titled "I tried not to be an 'angry black woman' in the suburbs. But I have reasons to be angry." Bullock replied: "That's exactly it. Give a tangible list . . . Bc personally, until then, I'm looking at these idiots like my children. They're just fucking whining." De Piero replied:

> Bingo. I think the tangible goal honestly might be to just put Whitey in this trap
> where they can't win and watch em [*sic*] dance and squirm around all day [f]or
> some of the freaks. And I think the super hard-core white freaks in the mob alleviate
> their own guilt by making other Whiteys feel worse than they do. Psychologically,
> I really think that's what's happening. These freaks are just experiencing such
> intense guilt, even though they almost definitely haven't done anything wrong in
> their life, and they just can't handle it. So, they need to take that negative energy
> that they can't handle and displace it elsewhere. So they put it onto non-woke
> whitey. Every movement needs an enemy, and the mob freaks picked average Joe
> Whitey, which was/has been the most epic blunder of strategic mistakes. They
> should've picked particular laws as the enemy.

(App.2096).

104.    When asked what he meant by the phrase "Joe Whitey," De Piero testified that he meant "[j]ust your average – almost like a Joe-the-plumber kind of comment." When asked if he

meant "Joe the white plumber?" De Piero replied "Correct." (App.200, Pl. Dep. 200:8-13).

105.    In addition to Snarky and Bullock, De Piero also talked about the June 19, 2020 email with another friend, Mark Halderman. (App.201, Pl. Dep. 201:10-21).

106.    On June 22, 2020, De Piero wrote to Halderman, "It's b-a-d, dude. I'll say this: on Juneteenth, I woke up to a campus wide email form our DEI Director. U ready for this? ***That cunt*** says that all white people have INTERNALIZED THEIR WHITE SUPREMACY. Whaaaaaaat?!?! And…crickets. Nobody says shit. Sheep." (App.2181, Pl. Dep. Ex. # 23, (emphasis added)); *see also* App.202, Pl. Dep. 202:18-23 (testifying that he was referring to Smith when he used the word "cunt").

### f.  *August 2020 Black Linguistic Justice and Continued Conversations on Antiracism.*

107.    On August 3, 2020, Naydan shared a statement from a professional organization, the Conference on College Composition & Communication (referred to as the 4C's), with the Writing Program faculty, explaining:

> CCC [*sic*], our professional organization, just publicized this statement, which I'm sharing with you as you begin planning for Fall 2020. https://cccc.ncte.org/cccc/demand-for-black-linguistic-justice. It calls on all of us to engage in antiracist work through the thorny process of reviewing and revising our teaching materials and our perspectives. ***I hope you'll join me in this important work*** to assure that black students can find success in our classrooms and to assure that all students see that white supremacy manifests itself in language and in writing pedagogy.

(App.2215, Naydan Dep. Ex. # 9, Rigilano Dep. Ex. # 5 (emphasis added)).

108.    The 4Cs is "the major professional organization for writing studies" and "[a]nyone who works in writing pedagogy and writing studies and writing center studies probably looks to the 4C's organization as their professional organization." (App.1127, Naydan Dep. 159:4-160:6).

109.    Naydan regularly circulated statements and documents from the 4C's, "in case

anyone isn't a member and they wouldn't get it then and I want them to see it." (App.1130, Naydan Dep. 162:21-24).

110.    Rigilano understood that Naydan was "asking us to engage with [the 4C's statement] . . . it's – you know, it's a big conference that any comp person would be associated with, and so I think – I can't speak for her, but I think she thinks it's important to engage with it." (App.529, Rigilano Dep. 85:16-21).

111.    Rigilano did not view Naydan as issuing a directive: "I don't think she was promoting it. I – I think she was encouraging us to consider it, which we have discussed in different venues, if not this particular text." (App.535, Rigilano Dep. 91:21-24).

112.    In early August 2020, Naydan, Cohen, and Grace Lee-Amuzie, Assistant Teaching Professor of Applied Linguistics and Coordinator of the Academic Integration for Multilingual Student Success, were in the process of applying for a grant through the Schreyer Institute of Teaching Excellence. Applying for the grant, which sought "community of practice money to support some kind of dialogue about black linguistic justice," was Cohen's idea. (App.1142, Naydan Dep. 174:6-8).

113.    Naydan looped in Rigilano to the discussion and the group agreed that using money from the grant to secure a speaker would be a good path forward. (App.2220-2226).

114.    As part of the discussion regarding the Black Linguistic Justice grant, Naydan expressed an interest in having Writing Program meetings funded by the grant money focus on race and racism in the meetings. Cohen said he would be happy to focus on linguistic justice (the topic of the grant) at a Writing Program meeting, and floated the idea of "somebody like Asao [Inoue]" as a speaker in connection with the grant. (App.2227-2231).

115.    Inoue is a professor of Rhetoric and Composition in the College of Integrative

Sciences and Arts at Arizona State University. His research focuses on antiracist and social justice theory and practices in writing assessments. He is the 2019 Chair of the Conference on College Composition and Communication, and has been a past member of the CCCC Executive Committee, and the Executive Board of the Council of Writing Program Administrators. *See* Arizona State University, *Asao Inoue Biography*, https://search.asu.edu/profile/3341379.

116.    At that time, Inoue was a well-known, highly regarded, and highly in demand speaker on topics of racism in academia. (App.1113, Naydan Dep. 145:13-16 (confirming that Inoue was a "very famous scholar")); Arizona State University, *Asao Inoue Biography*, https://search.asu.edu/profile/3341379 (curriculum vitae)).

117.    Naydan thought "that this is an important subject to cover in our optional [Writing Program Professional Development] meetings." (App.1148, Naydan Dep. 180:8-9).

118.    On August 31, 2020, Naydan, Lee-Amuzie, Cohen, and Rigilano were awarded the grant from the Schreyer Institute for Teaching Excellence. (App.2232-2233, Rigilano Dep. Ex. # 7).

### 3.    Fall 2020 and Spring 2021 Semesters.

#### a.    Classroom-related Experience.

119.    During the Fall 2020 semester, De Piero taught a standalone freshman orientation course. (App.223, Pl. Dep. 223:13-16). Aneesah Smith reached out to De Piero to set up a Zoom visit from the Office of Diversity Equity and Inclusion ("ODEI") for the course. De Piero denied Smith's request to have the ODEI visit his course, writing that instead he would simply point his students to the main ODEI website. (App.2234-2247).

#### b.    Fall 2020 – Spring 2021 Writing Program Professional Development Meetings.

120.    On August 21, 2020, Naydan sent an email to the Writing Program attaching the

agenda for the Fall 2020 and Spring 2021 professional development meetings. (App.2238-2239 Naydan Dep. Ex. # 14; App.2240, Naydan Dep. Ex. # 13, Rigilano Dep. Ex. # 3).

121.    The Fall 2020 agenda for Writing Program professional development meetings included three meetings, all held over Zoom:

- Meeting 1 (August 31, 2020): Public Controversies and Private Struggles

- Meeting 2 (October 5, 2020): Supporting Domestic Multilingual Writers (associated reading: Christian Ortmeier-Hooper's "English May Be My Second Language, but I'm Not 'ESL'")

- Meeting 3 (November 2, 2020): Racism and Writing Assessment (associated video: "White Teachers Are a Problem – A conversation with Asao Inoue"; associated reading: Asao Inoue's *Labor-Based Grading Contracts*, Introduction through the end of Chapter 3)

(App.2240).

122.    The Spring 2021 agenda for Writing Program professional development meetings also included three meetings, again which were all held over Zoom:

- Meeting 1 (January 25, 2021): The Politics of Participation and Conversation

- Meeting 2 (February 22, 2021): Intercultural Competence

- Meeting 3 (March 29, 2021): Racism and Writing Assessment (associated reading: Asao Inoue's *Labor-Based Grading Contracts*, Chapters 4 though the end of the book).

(App.2240).

123.    Naydan attached a link to, and PDF copy of, Asao Inoue's (a professor of Rhetoric and Composition at Arizona State University) Labor-Based Grading Contracts book for anyone who wished to download and read it in connection with the third planned meeting for Spring 2021. Naydan wrote about the book, "I hope you enjoy reading it and I'm looking forward to our discussions about it—as well as the various other discussions we have planned." (App.2238).

124.    On August 23, 2020, before any of the professional development meetings occurred and at the very beginning of the Fall 2020 semester, De Piero engaged in a text exchange with Rigilano wherein De Piero expressed that he was unhappy about how things were going with the campus and within the Writing Program. (App.2241-2246, Pl. Dep. Ex. # 34, Rigilano Dep. Ex. # 11).

125.    The first Writing Program professional development meeting on the topic "Public Controversies and Private Struggles" occurred on August 31, 2020 via Zoom as scheduled. After the meeting, Naydan told Lee-Amuzie that there was a full range of views expressed during the meeting:

> I think all of the conversations we're going to have this year are going to be interesting and challenging because of the diverse views in the room. But I'm happy that we're having these conversations, and I tried to convey these sentiments at the meeting. Overall, I thought the meeting went really well largely because everyone felt comfortable to speak up—regardless of where they fell on the spectrum of views.

(App.2285).

126.    Around this same time, De Piero was working on a chapter for the Writing Across the Curriculum ("WAC") Clearinghouse—a "repository of open access, you know – scholarly, peer reviewed books, journal articles, teaching resources. It's intended to be for writing researchers and writing teachers"—with his former University of California, Santa Barbara colleague, Jennifer Johnson, and William Macauley of the University of Nevada. (App.220, 222, Pl. Dep. 220:3-24; 222:9-16).

127.    Macauley requested that each chapter author meet with Inoue for one-hour over Zoom for one a collaborative session. (App.2286).

128.    According to De Piero, Macauley "wanted to inject some kind of antiracism or something into this piece . . . And as I recall, I refused to do that[.]" (App. 221, Pl. Dep. 221:10-

19).

129.    De Piero sent Johnson, his co-author, an email expressing his disagreement with a lot of Inoue's work, and his desire not to meet with him as Macauley requested. (2289-2291).

130.    De Piero also exchanged emails with Macauley regarding his request. De Piero wrote that he would be willing to participate in the meeting with Inoue if the dialogue/conversation was not a "bowing down to the senior scholar" sort of thing and they were free to "challenge each other's ideas, to argue about whether race does/doesn't or should/shouldn't play a primary role in the TA [teaching assistant] preparation ideas that we've put forth in our chapter." (App.2292).

131.    Macauley replied that he would be free to challenge each other's ideas in the dialogue and it did not even have to be about race. Macauley asked if they were "good to go" with the Zoom conversation, and De Piero replied "Yep :)." (App.2293-2297).

132.    The second Writing Program professional development meeting on "Supporting Domestic Multilingual Writers" occurred on October 5, 2020 via Zoom as scheduled (App.2298).

133.    The following day, Cohen sent an email to Writing Program faculty to remind them about the third, and final, Writing Program professional development meeting of the year, scheduled to be held over Zoom on November 2, 2020. (App.2299).

134.    The scheduled topic of the November 2 meeting was "Racism and Writing Assessment" and Cohen explained that during the meeting, "Lila [Naydan] and I will create some discussion points to explore race, racism, and writing assessment. . . . I'll be very happy to see you there!" The associated reading was Inoue's Labor-Based Grading Contracts and the associated video was titled "White Teachers are a Problem – A Conversation with Asao Inoue." (App.2299).

135.    De Piero watched the Inoue's video and read the reading prior to the meeting. (App.226, Pl. Dep. 226:19-23).

136.    De Piero acknowledged that nowhere in the video did Inoue say that his views were the views of Penn State. (App.227, Pl. Dep. 227:6-9; *see also* App.2300-2311, Naydan Dep. Ex. # 25).

137.    De Piero attended the November 2 Writing Program professional development meeting over Zoom and could not point to anything but Naydan's August 3 email sharing the 4C's as the only "example" of Naydan condemning him for teaching while white. (App. 227, 229, Pl. Dep. 227:17-21, 229:1-24; *see* App.2215-2219).

138.    In preparation for the first English Program professional development meeting of the Spring 2021 semester, Naydan emailed De Piero and Cohen to inquire if they would lead a dialogue about grading contracts at the next meeting. The agenda for the meeting was to first discuss majors meeting, advising, and COVID-related issues, then discuss celebration of graduating seniors, and finally, to discuss antiracism and grading. (App.2312, Pl. Dep. Ex. # 29).

139.    At first, De Piero agreed to lead the discussion with Cohen, however, a few days later, De Piero wrote to Naydan that "[o]n second thought, I think I need to back out of this request/role. While I think that ive [*sic*] got a solid background in assessment — and I could lead a discussion/activity on a particular assessment instrument — I'm not an expert in antiracist assessment. I don't know how that manifests in instrument construction." (App.2312-2314).

140.    Naydan replied later that same day, writing "[n]o problem at all if you want to back out, though I'd be happy to talk more with you about what I mean by antiracist assessment." (App.2314).

141.    Cohen then replied and said "I think Zack's right in that I don't at all have the background to be able to talk coherently about how this kind of assessment is anti-racist." (App.2314).

142.    De Piero answered the following day and wrote that it sounds like Naydan has a vision for how this should go, and he'd prefer to sit out and participate, but not facilitate. Again, Naydan replied "No problem, Zack." (App.2315-2316).

### c.   *Arts & Humanities as Activism Series.*

143.    On October 22, 2020, David Ruth, the then Interim Division Head for Arts and Humanities, emailed all faculty to invite them to attend events in the *Arts and Humanities as Activism* series. (App.2317-2318, Pl. Dep. Ex. # 30).

144.    One of the events, which was scheduled for November 13, 2020, was titled "Counterstory: The Rhetoric and Writing of Critical Race Theory"- a faculty discussion with Aja Y. Martinez, assistant professor of writing and rhetoric at the University of North Texas.[9] (App.2318).

145.    Ruth's invitation asked, "[p]lease plan to join us" and said, "[w]e're looking forward to more of the engaging discussions among students, faculty, and staff that have made earlier events in the series so successful." (App.2317).

146.    De Piero alleges that, "Lee-Amuzie . . . imposed" the Arts and Humanities presentation on the Writing Program faculty, (App.1908-1909, Amended Complaint at ¶ 73), when she wrote:

> Dear Colleagues,
>
> You might have seen the invitation below that Dave Ruth sent out this week, but I'm sending it again to make sure that the faculty in the Writing Program and AIMSS *are aware of the presentation* by Dr. Aja Martinez on Nov 13 (Friday). The content of her talk will be relevant and useful particularly to those who teach English and writing courses. I hope to see many of you at the event.

---

[9] The other two events in the series discussed in this email were "The Struggle Over Monuments" and "What Does Artistic and Scientific Collaboration Look Like? A Virtual Studio Visit and Discussion with Artist Deirdre Murphy." (App.2317).

Grace

(App.2319 (emphasis added)).

147.    De Piero likewise alleges that Naydan "imposed" the event on Writing Program faculty, (App.1908, Amended Complaint at ¶ 72), when she said in an email, "I'm following up on Grace's last message to our group to ***encourage you to please attend*** Dr. Aja Martinez's talk on counterstory this Friday, Nov, 13, at 12:15 pm[.]" (App.2320 (emphasis added)).

148.    De Piero replied to Naydan's email the following day, on November 12, 2020, saying that he would not be able to attend the presentation, but "I'm interested in Dr. Martinez's ideas, though, so if a recording is made available, please send it my way." Martinez did not give her consent to the recording, so it was not recorded. (App.2322-2323, Pl. Dep. Ex. # 31).

149.    When asked if he thought that this Arts and Humanities event was mandatory, De Piero replied "[s]trongly encouraged." (App.236, Pl. Dep. 236:20-22).

150.    When asked if either Naydan or Lee-Amuzie said you must attend Martinez's event, De Piero testified "[n]o. The language is 'please attend.'" (App.240, Pl. Dep. 240:16-19).

151.    De Piero's colleague, Rigilano, testified that, in fact, during the period from 2020 through 2022, Writing Program faculty were not required to attend training modules, or any kind of sessions on diversity, equity and inclusion, nor did he attend any. (App.490-491, Rigilano Dep. 46:20-47:2).

152.    De Piero "sought [the Aja Martinez presentation] out through an NCTE event – National Council of Teachers of English – shortly thereafter [NCTE] had Martinez doing the same presentation." (App.237-238, Pl. Dep. 237:22-238:2).

153.    When asked "[s]o you chose to engage that content after Martinez had already presented at Penn State; correct?" De Piero replied "I saw it after the Penn State event, correct."

(App. 238, Pl. Dep. 238:10-17).

154.    In other words, De Piero could not attend Aja Martinez's presentation at Penn State, and thereafter sought out and attended, on his own, the same Aja Martinez presentation being put on by a third party organization.

C.    **Spring 2021 Semester.**

1.    **January 19, 2021 Writing Program Meeting.**

155.    On January 11, 2021, Marissa Nicosia, a faculty member in the Writing Program, emailed all Writing Program faculty about a Zoom meeting that she was leading about antiracist pedagogy that was scheduled for January 19, 2021. Nicosia wrote: "I invite you to share an example [of antiracist pedagogical practices] from your own teaching practice." (App.2326, Naydan Dep. Ex. # 11); *see also* App.2327-2356, Rigilano Dep. Ex. # 8 (including individuals' examples submitted ahead of the meeting)).

156.    De Piero attended the event and recorded it. (App.2357, Pl. Dep. Ex. # 32).

157.    De Piero did not produce this recording in response to the discovery requests directed towards him. Instead, his wife, Sabira De Piero, produced this recording (and others) in response to a third party subpoena directed towards her. However, Ms. De Piero testified that she did *not* make the recording of this January 19, 2021 meeting, or the other videos of De Piero's work meetings that she produced in response to the subpoena. (App.1652, Sabira De Piero Dep. 14:4-11).

158.    Ms. De Piero explained that when she received her subpoena, she searched her personal computer for anything relevant to De Piero's time at Penn State, and for the *first* time, she came across the recordings of De Piero's work meetings in her downloads folder. Thus, she turned them over in response to her subpoena. (App.1652-1653, Sabira De Piero Dep. 14:14-15:2: ("I did not recognize the[] [recordings] as something I had generated, so I just tuned in a little bit

and realized that they sounded relevant.").

159.    Sabira De Piero testified that De Piero did not send her the videos, nor were they shared with her through the cloud, but instead, she did not know how they got there, and they were "just there." (App.1653-1654, Sabira De Piero Dep. 15:8-16:1).

160.    Sabira De Piero also clarified that De Piero is the only one who would have had access to her device except for her, and she imaged that De Piero himself was the one to record the meetings, but again, she is unsure of how they reached her device. (App.1654, Sabira De Piero Dep. 16:2-13).

161.    De Piero testified that he did not ask anybody during the January 19, 2021 Zoom meeting if he had consent to record the meeting and he did not recall anybody during the meeting saying that he or his wife had their consent to record them during the meeting. (App.244-245, Pl. Dep. 244:13-245:1).

162.    Contrary to the allegation in De Piero's Amended Complaint, *nowhere* in the recording does Naydan, or anyone, say that anyone "must apply different grading standards on the basis of race." (App.2357).

163.    Likewise, *nowhere* in the recording does Naydan, or anyone, say that they "discouraged grading students equally regardless of race as somehow an overt act of 'racism.'" (App.2357).

164.    When De Piero was asked if he recalled when in the meeting Naydan allegedly said that people must apply different grading standards on the basis of race, as he specifically alleged in his Amended Complaint, De Piero replied that he "remember[ed] her saying that she is thinking of grading as an antiracist act" and he replied "I don't recall" when asked if she said that you must apply different grading standards on the basis of race. (App.245, Pl. Dep. 245:2-21).

165.     De Piero testified that the language he was referring to in his Amended Complaint about Naydan and grading was the following excerpt from the recording:

> So I make a different rubric for every single assignment, for every single course . . . and I'm really trying to think about race and grading as a potentially anti-racist act. One thing I've done in the past based on different things I've read. I passed one of them around over the summer. Valerie Ballester is the author and I think it's called *How Writing Rubrics Fail*. That piece really led me to de-emphasize standard American English in whatever form I might have emphasized in past rubrics. I try to just take a focus off of that because there is right when you think about standard American English, that concept is raced. So that is white English, and that's not to say that I don't think that we should teach it, because I think that that language gives access to power. . . So I'm trying to equip them and I try to help them with sentence level mechanical issues. White students, black students, brown students. Right. I try to help everybody with mechanical issues, but I try to deemphasize that in my rubrics and how I grade. So that's something I will work with you on, but it's not something I'm going to sit and grade. So that's that's one example of a rubric that deemphasizes that, and all of them deemphasize but in different ways. Thanks everybody.

(App.2357 at 13:56-15:46).

166.     Naydan does not talk about applying different grading standards on the basis of race or discouraging grading students equally regardless of race. Instead, she speaks about de-emphasizing standard American English in whatever form she had emphasized it in the past. The deemphasis on standard American English in her grading rubrics applies to all students, regardless of color: "white students, black students, brown students. Right." (App.2357 at 13:56-15:46).

167.     Naydan also testified that she does *not* use labor-based grading, nor does she ever intend to. (App.1060, Naydan Dep. 92:17-20). Naydan also testified that she has never instructed, asked, or pressured to grade students in any way based on their race (App.1840, Naydan Decl. at ¶ 28), nor has Baer (App.1834, Baer Decl. at ¶ 17).

168.     In fact, apart from a general grading rubric, that is provided purely as a sample rubric that faculty are permitted, but not required, to adopt (App.2358-2374), Writing Program faculty at Penn State Abington have general autonomy over the grading of their courses.

(App.1834, Baer Decl. at ¶ 20; App.1840, Naydan Decl. at ¶ 30; App.1847, Rigilano Decl. at ¶ 23; App.1851, Cohen Decl. at ¶ 23; App.1843, Esposito Decl. at ¶ 15; App.1855, Lee-Amuzie Decl. at ¶ 21).

169.     Faculty in the Writing Program testified that they have bever been instructed, asked, or pressured by Naydan or anyone else at the University to grade students in any way based on race and they are unaware of any faculty at Penn State Abington who grade students based on the students' race. (App.1834, Baer Decl. at ¶¶ 16, 18-19; App.1840, Naydan Decl. at ¶¶ 28-29; App.1847, Rigilano Decl. at ¶¶ 21-22; App.1851, Cohen Decl. at ¶¶ 21-22; App.1843, Esposito Decl. at ¶¶ 13-14; App.1855, Lee-Amuzie Decl. at ¶¶ 19-20).

### 2.      February through Early March 2021.

170.     On February 4, 2021, faculty at Penn State put together a letter in support of the Black Caucus after the group was "Zoom bombed" by people saying antiracist comments. The letter was addressed to then Penn State President Eric Barron and had specific items that the faculty wanted put into action. De Piero signed the response letter with an asterisk next to his name, writing "(please keep the asterisk)". (App.2375-2378).

171.     Thereafter, on February 12, 2021, De Piero attended an English Program meeting about the possibility of starting a Writing Major with Baer. During the meeting, De Piero took typed notes that read: "This crap is ridiculous… almost like someone wants to be able to put a stamp of approval: 'Sealed! Antiracist approved!!!!'" and in much larger font at the bottom of the page: "They're pissing me off – what meeting is this?" (App.2379, Pl. Dep. Ex. # 33).

172.     The day after the meeting with Baer, on February 13, 2021, De Piero texted his friend Josh Bullock about the February 12, 2021 meeting, writing that during the meeting this "***asshole woke supe bitch*** goes: ' so I am looking at the chat, and it seems like some people are confused about what [antiracist pedagogy] is and what it means." (App.2108 (emphasis added)).

173.    De Piero testified that when he said his "asshole woke supe bitch" he was referring to Naydan. (App.259, Pl. Dep. 259:14-17).

174.    Also on February 13, 2021, De Piero texted his friend Snarky with a screenshot of a text that he sent their other friend, Halderman, again about the February 12, 2021 meeting, and wrote about the PSU participants in that meeting: "fucking losers. suck my dick." (App.2087).

### 3.    April 15, 2021 Meeting Between Baer and De Piero and Events Leading up to it.

175.    In March 2021, Naydan submitted a Bias Report with Penn State's Affirmative Action Office ("AAO") alleging that an unnamed faculty member was creating a hostile environment based on Naydan's "[g]ender or gender identity." (App.2380-2381; *see also* App.2382-2388, Naydan Dep. Ex. # 7, Borges Dep. Ex. # 6, Baer Dep. Ex. # 4, P). Naydan confirmed that the report was about De Piero, and that she did not want to get him "into any trouble," but was rather looking for strategies to manage the situation. (App.1108, Naydan Dep. 140:14-18 (testifying that the report was a "request for a discussion about the hostility I was feeling in order to help me get out of hostile situations because I didn't want to be in a hostile situation with Dr. De Piero.")); App.2387, Baer Dep. Ex. # 3 ("I purposefully didn't report Zack's name . . . I also said I didn't want to get this person into any trouble. I just want my situation to get better.")).

176.    Also in March 2021, De Piero experienced some issues with advising a student. (App.2389-2391).

177.    De Piero emailed the student about her switching advisors to Naydan, which Naydan thought was inappropriate. Naydan shared this with Baer and requested guidance on how to assist De Piero in advising students. (App.2389-2391).

178.    Baer requested a meeting with De Piero to discuss advising students. The meeting occurred via Zoom on April 15, 2021. De Piero recorded the meeting. (App.2392, Pl. Dep. Ex. #

37).

179.    De Piero told his friend, Snarky, via text message on April 15, 2021 that he "recorded [the meeting with Baer] just in case this gets legal." (App.2406, Pl. Dep. Ex. # 35).

180.    De Piero testified that he did not ask Baer for her permission to record the meeting and she did not say that she consented to recording her voice during the meeting. (App.265, Pl. Dep. 265:5-11).

181.    Sabira De Piero testified that she was present during the meeting, however, she did not announce herself to Baer that she was listening in on the call, nor did she speak at all during the meeting, and she was not on the camera. (Sabira De Piero Dep. 34:14-35:6).

182.    Ms. De Piero also testified that this was another recording that she just found on her computer at a later date. (App.1673, Sabira De Piero Dep. 35:12-15).The recording was produced by Ms. De Piero in response to the subpoena directed towards her, not by De Piero.

183.    Baer testified that she did not provide her consent for the meeting to be recorded at any time and she never saw anyone else aside from De Piero on the screen during the meeting. (App.1594, Baer Dep. 265:2-19; App.1835, Baer Decl. at ¶ 29).

184.     Baer further testified that from her experience, meetings such as the April 15, 2021 meeting with faculty members would have been treated as private meetings and it was her expectation at the time that the meeting was private between just her and De Piero. (App.1594-1595, Baer Dep. 265:20-266:3).

185.    Prior to the meeting and during the meeting, De Piero took notes. (App.2412-2414, Pl. Dep. Ex. # 36).

186.    Baer also took notes during the meeting, indicating that De Piero shared during the meeting that he does not love the politicization of everything with Naydan and it is "like she is

running an election." (App.2415-2416, Baer Dep. Ex. # 8).

187.    De Piero alleged that during this April 15, 2021 meeting with Baer he "confirmed and repeated that Defendants' racially discriminatory training meetings for the writing faculty should stop immediately." (App.1911 at ¶ 84).

188.    However, the recording of the meeting that was produced through discovery reveals that De Piero does *not* state that the "racially discriminatory training meetings for writing faculty should stop immediately" even once, let alone "repeatedly." (App.2392).

189.    Similarly, the notes that De Piero took during the meeting do not say this either. (App.2412-2414).

190.    When asked if he said this somewhere in the meeting, De Piero testified that maybe this was just "a paraphrased version of what I wanted to hear." (App.277, Pl. Dep. 277:13-19).

191.    In actuality, during the meeting, Baer said that Naydan is very committed to antiracist pedagogy, and De Piero replied "***I am too.***" (App.2392 at 22:14-22:32).

192.    When asked about this at his deposition, De Piero curiously replied that he "ha[s] never used the term 'antiracism.' As a teacher I was forced to talk about it." (App.283, Pl. Dep. 283:6-8).

### 4.    Dr. Inoue's Presentation in April 2021.

193.    Around this same time in April 2021, with funding from the Center for Intercultural Leadership & Communication, Naydan, Lee-Amuzie, and Cohen arranged for Asao Inoue to host a Zoom presentation for the Writing Program and the Academic Integration for Multilingual Student Success faculty. The title of Inoue's Zoom presentation was "Understanding and Addressing White Language Supremacy in Antiracist Writing Assessments Ecologies" and it was scheduled for April 23, 2021. (App.2417-2419).

194.    On April 1, 2021, Lee-Amuzie sent an email to the PSU Abington faculty with the

flyer for the event, writing "I hope you'll mark your calendars and attend this important event!" (App.2417).

195.    Naydan similarly sent out a reminder email to the English Program faculty, writing "[w]e hope you'll make time to attend his important talk" and "[w]e hope to see you next week!" (App.2420-2421).

196.    On April 20, 2021, De Piero sent an email to Naydan, Cohen, and Lee-Amuzie to ask if his ENGL 211 Intro to Writing Studies students could attend Inoue's presentation on April 23, 2021. According to De Piero, he thought Inoue's presentation presented an "interesting opportunity for students to dig further into the various concepts we've been studying throughout the semester- possibly even earn some extra credit in the process." (Ap.2422-2423).

197.    Naydan replied that unfortunately, the presentation was just for faculty, not for students, and she thanked him for "always thinking about professional experiences for your students[.]" (App.2422).

198.     Inoue's presentation occurred on April 23, 2021.

**D.    Fall 2021 Semester.**

199.    On August 12, 2021, just before the start of the Fall 2021 Semester, De Piero had an informal interview with Northampton Community College for a tenured track position. (App.2274-2275).

200.    De Piero texted Rigilano about the opportunity the next day, writing that the job would be tenure based "solely on teaching and service – no research," "5k more a year" than he made at Penn State Abington, with a "steady 3k/year increase." De Piero said it was not a job offer yet and asked Rigilano to keep his "wandering eye" between them. (App.2274-2275).

1.     **De Piero's September 2021 Bias Report with the Affirmative Action
Office.**

201.     On September 1, 2021, De Piero received an email from "Authorized Penn State
Mass Mail [] on behalf of Office of the President" with the subject line "Resources for Reporting
Wrongdoing." In the body of the email, it states "Penn State encourages the reporting of
misconduct. If you see something, say something." The email included links to various
mechanisms for reporting misconduct. (App.2424-2433).

202.     On September 13, 2021, De Piero filed a Bias Report with Penn State's Affirmative
Action Office alleging discrimination and harassment on the basis of race and color. De Piero
alleged in his Bias Report that "[o]ver the past year – and on multiple occasions – some members
of my department (English) have mad discriminatory/biased remarks against White students and
White faculty (not specific ones, but in general terms)." (App.2434-2436, Pl. Dep. Ex. # 39, Borges
Dep. Ex. # 13, Baer Dep. Ex. # 10).

203.     Within three days of receipt of the Bias Report, on September 16, 2021, Carmen
Borges met with Baer via Zoom to connect about De Piero's Bias Report. (App.2437-2438, Baer
Dep. Ex. # 11).

204.     Borges took handwritten notes during this meeting, which include language that
"Lila very committed to diversity issues. Sometimes too much" and "Friederike agreed that Lila
does easily puts things/interactions in the microaggression category." (App.2439-2440, Naydan
Dep. Ex. # 8, Borges Dep. Ex. # 26, Baer Dep. Ex. # 12).

205.     However, when asked if Borges' notes reflected her impression of Naydan, Baer
testified "[n]o, that's not how I would explain this. I think that what I meant to say is the first part,
Lila is very committed to diversity issues" and regarding the second part "sometimes too much,"
Baer testified that what she meant to say was "[t]hat is Zack's perception that it's too much . . . I

personally don't think it's too much, so that's I think what Carmen [Borges] meant or at least that's what I meant." (App.1518-1519, Baer Dep. 189:23-190:10).

206.    The following day, and within four days of receipt of De Piero's Bias Report, on September 17, 2021, Borges reached out to De Piero via email regarding scheduling a meeting the following week and next steps. (App.2441).

207.    As promised, Borges reached back out to De Piero on September 20, 2021 to request his availability for a meeting that week. De Piero replied that he was available on September 22, 2021, and Borges set up the meeting for that day. (App.2442-2443).

208.    Borges met with De Piero as planned on September 22, 2021 via Zoom. De Piero recorded the Zoom meeting. (App.2444, Pl. Dep. Ex. # 40).

209.    De Piero testified that he did not ask Borges for her permission to record that meeting, nor did he tell Borges that he had been recording that meeting at any time. (App.287-288, Pl. Dep. 287:20-288:5).

210.    Sabira De Piero testified that while she was present during this Zoom meeting, she did not appear on camera or announce herself during the meeting. (App.1677, Sabira De Piero Dep. 39:12-17).

211.    Borges also testified that she did not provide her consent to this meeting being recorded, and at the time of the meeting, Borges had an expectation that the meeting would be held privately between her and De Piero only, and she did not know it was being recorded. (App.911-912, Borges Dep. 271:9-272:7).

212.    De Piero's Amended Complaint alleges as follows: "When De Piero met with Defendant Borges on September 22, 2021, to discuss his 'Bias Report,' she told De Piero that 'There is a problem with the white race.'" (App.1912 at ¶ 89).

213.    However, the recording of the meeting reveals that Borges *never* said that "there is a problem with the white race." The language that De Piero misconstrues as this misquote is found around 29 minutes and 33 seconds into the recording. Borges actually stated:

> We don't carry the burden of our race, of our people. We don't carry it individually. We don't. That's a that's you know, that's a broad thing in society. You're not responsible. You are a white person, but you're not responsible for everything that has happened or what white people have done or not done. But the important thing is to have, to have, the ability to look at it from a broader perspective, not from an individual perspective. [] And then you adopt from there what you what makes sense to you. Then you you adopt it or you see what doesn't make sense you don't have to agree.

(App.2444 at 29:33-30:19).

214.    When confronted with his misquotation of Borges in the Amended Complaint during his deposition, De Piero stated: "[w]hether or not those seven or eight words appear in succession in that clip or not, the fact remains that Borges, in that meeting, is talking about – she is trying to distance the University and Naydan from this egregiously, racially discriminatory content. And in doing so, she is trying to inform me – she is trying to create separation, letting me know that I don't bear the sins of my racial fathers, so to speak. So, that points to that." (App.291, Pl. Dep. 291:13-24).

215.    Borges never said "there is a problem with the white race" in the September 22, 2021 meeting. De Piero's Amended Complaint, which he has amplified in any number of media appearances,[10] incorrectly says that she did.

216.    De Piero's Amended Complaint also alleges that Borges "instructed De Piero to

[10] *See, e.g.*, https://www.fairforall.org/penn-state/ (*FAIR* article titled "Former Penn State Professor Stands Up Against Discrimination"); https://www.centredaily.com/news/local/education/penn-state/article276703856.html (*Centre Daily Times* article titled "White Professor Files Lawsuit Against Penn State for "Racially Hostile Environment"); https://www.forbes.com/sites/susanharmeling/2024/02/24/dei-practitioners-have-a-lot-to-learn-from-professor-zack-depieros-lawsuit-against-penn-state/ (*Forbes* article titled "DEI Practitioners Have A Lot To Learn From Professor Zack DePiero's [*sic*] Lawsuit Against Penn State").

continue attending so-called 'antiracist' workshops 'until you get it.'" (App.1912 at ¶ 89).

217.     However, this is not an accurate recitation of the meeting and mischaracterizes Borges' words once again. The transcript accurately reflects as follows:

> Carmen: Have you tried not attending? If you don't attend, what happens?
>
> Zack: I didn't attend yesterday's meeting for the pretty much the first time since I've been here. I asked my supervisor when I met with her, Friederike Baer, two weeks back. She asked me how what she could do to support me, and I said, I didn't want anything more to do with Lila moving forward in the future except bare necessities. What courses are you teaching, when? And she said, fine. So she you're your suggestion you just offered it sounds like Friederike is okay with that.

(App.2444 at 23:13-58)

218.     In other words, Borges actually asked De Piero about maybe *not* attending the sessions that were bothering him, and then De Piero confirmed that he was told "fine" when he asked to have a "bare" level of contact with Naydan going forward.

219.     De Piero's Amended Complaint also alleges that "Borges also provided a phone number for De Piero to seek mental health support." (App.1912 at ¶ 89).

220.     Borges testified that it is the Affirmative Action Office's standard procedure to advise a person who submits a bias complaint or a discrimination complaint at Penn State about the available support services, which includes counseling services. (App.913, Borges Dep. 273:6-22) ("it's actually a reminder of a Penn State benefit for all employees" and it is "standard practice")).

221.     De Piero engaged in text exchanges with his friend, Josh Bullock, about this September 22, 2021 meeting. On September 26, 2021, De Piero texted Bullock and wrote "I have some pretty massive news . . . So.. even after I reported it to my top supervisor twice, my other supe- this department chair ***crazy woke cunt***- just won't stop." (App.2113 (emphasis added); *see also* App.295, Pl. Dep. 295:13-15 (testifying that the "crazy woke cunt" he was referring to was

Naydan).

222.     De Piero went on to tell Bullock that he had the meeting with Borges "[b]ut the jokes on her: [I] recorded it. And sent it to my new lawyer, who is taking me on as a 'public interest' case[.]" (App.2113; *see also* App.297, Pl. Dep. 297:2-3 (testifying that he sent the recording of the meeting to attorney David Nucci).

223.     On October 1, 2021, Borges spoke with Baer again to discuss De Piero's Bias Report. (App.2445, Borges Dep. Ex. # 29).

224.     Borges then met with Naydan regarding De Piero's Bias Report on October 12, 2021. (App.2446, Borges Dep. Ex. # 27).

225.     Following the meeting between Borges and Naydan, Naydan sent Borges an email summarizing "a snapshot of what [she saw] as the beginning of [her] issue[s] [with De Piero]." (App.2447-2448, Borges Dep. Ex. # 28, Naydan Dep. Ex. # 24).

226.     Naydan testified as follows regarding the October 12, 2021 meeting and her follow-up email:

> I remember her asking me when issues with Zack began. And here, I see that I'm answering her question that she posed to today me when we spoke. In case you want to see a snapshot of what I see as the beginning of the issue, this is what I see as the beginning. So she had asked me for a sense of when the issue began, and I was providing her with an answer to her question.

(App.1206, Naydan Dep. 238:13-19).

**2.     October 18, 2021 Writing Program Meeting.**

227.     On September 20, 2021, Naydan sent an email to the Writing Program reminding them about an upcoming Writing Program professional development meeting scheduled for October 18, 2021 via Zoom. The topic for the meeting was a discussion of Octavio Pimentel, Charise Pimentel, and John Dean's article titled "The Myth of the Colorblind Writing Classroom: White Instructors Confront White Privilege in Their Classrooms." (App.2449); (*see also*

App.2450-2463, Naydan Dep. Ex. # 26).[11]

228.    The article was selected by Lee-Amuzie. (App.1008, Naydan Dep. 40:20-21). Naydan testified that "faculty were invited to read this if they wanted to read it and if they wanted to engage with it." (App.1003, Naydan Dep. 35:16-18).

229.    The article was not Naydan's piece of scholarship, she did not write the article. Nobody at Penn State wrote the article. (App.1002, Naydan Dep. 34:8; *see also* App.1014, Naydan Dep. 46:8-10 ("It's not my argument or my scholarly line of inquiry. It's a text I brought for a scholarly discussion with my colleague, Grace Lee-Amuzie")).

230.    Rigilano similarly testified: "it's true for sure that Lila and Grace chose, they curated the texts, but I don't know if that makes them responsible for the content." (App.588-589, Rigilano Dep. 144:22-145:4).

231.    The Writing Program meeting led by Lee-Amuzie and Naydan regarding the article "The Myth of the Colorblind Classroom: White Instructors Confront White Privilege in Their Classroom" occurred as planned via Zoom on October 18, 2021.

232.    De Piero recorded the meeting, which he attended virtually via Zoom. (App.2464, Pl. Dep. Ex. # 43, Borges Dep. Ex. # 20).

233.    De Piero testified that he did not ask any of the participants if they consented to the recording of the meeting, nor did anyone give De Piero their consent to record the meeting. (App.303, Pl. Dep. 303:10-19).

234.    Rigilano also testified that De Piero did not ask for his consent to record the meeting and he was not aware that De Piero recorded the meeting until this lawsuit. (App.613,

---

[11] Naydan testified that the handwriting on the document is her notes that she made for the purpose of comprehension, predominantly. (App.1216-1217, Naydan Dep. 248:8, 249:2-3).

Rigilano Dep. 169:9-16; App.1847, Rigilano Decl. at ¶ 18).

235.    Naydan similarly testified that she did not know she was being recorded during the October 18, 2021 meeting, De Piero did not ask for her consent to permission the meeting, and De Piero did not tell her or anyone else that he was recording the meeting. (App.1280-1281, Naydan Dep. 312:23-313:7; App.1839, Naydan Decl. at ¶ 24).

236.    The other three faculty members in attendance (Cohen, Esposito, and Lee-Amuzie) similarly testified that at no time did De Piero request their consent to recording the October 18, 2021 meeting, nor did they ever consent to the recording of that meeting, they were unaware that De Piero was recording the October 18, 2021 meeting, and it was their expectation and understanding that the meeting was private and limited only to the Writing Program members in attendance. (App.1851, Cohen Decl. at ¶ 18; App.1843, Esposito Decl. at ¶ 10; App.1854-1855, Lee-Amuzie Decl. at ¶ 16).

237.    Sabira De Piero also testified that she was in the room when the meeting occurred and De Piero recorded it, however, she did not announce herself at any time during the meeting. (App.1680, Sabira De Piero Dep. 42:11-22).

238.    Additionally, Rigilano testified that "it was a meeting for writing program faculty . . . other people outside of that wouldn't have been, you know, invited. Like if there was – if there was an – if it was an in-person meeting, it would have just been writing faculty members." (App.569, Rigilano Dep. 125:17-21).

239.    There were exactly six participants in the meeting: Naydan, Lee-Amuzie, Esposito, Rigilano, Cohen, and De Piero. No other members of the Writing Program attended the professional development meeting that day. (App.2464; *see also* App.2721 (De Piero screenshot of participants)).

240.    Naydan began the meeting by stating "that anybody who doesn't feel comfortable talking about any of this does not have to be here by any means." (App.2464 at 3:05-3:10).

241.    De Piero testified that he felt uncomfortable with the content of the meeting (App.301, Pl. Dep. 301:14-16), yet he made the decision to attend the meeting and stay through the duration, even after Naydan's announcement.

242.    Next, Naydan provided the group the guidelines for the meeting, including "listening actively with an ear to understanding others' views, criticize ideas not individuals, commit to learning, not debating, avoid blame, speculation and inflammatory language, and allow everyone the chance to speak." (App.2464 at 3:12-3:50).

243.    Prior to the meeting, Naydan and Lee-Amuzie selected four quotes from the article associated with the meeting. The agenda for the meeting was for the group to discuss each quote in sequential order. (App.2465-2466).

244.    The below is a recitation of the first quote:

The practice of not labeling [White European American] texts as cultural texts serves to keep them as the unstated cultural norm, the norm to which all other texts can be differentiated from. Thus, despite its inclusive qualities, the diversity approach to teaching writing, in many ways, reinforces the status quo.

The other critique of the diversity approach is its inability to deconstruct race. In its insistence that we are all equal because we are all different, the diversity approach, or what Gilyard refers to as the "formulaic polycultural curriculum" (1999, p. 47), neglects to examine how race indeed shapes different life experiences and opportunities for people. Nieto and Bode critique the diversity approach by stating, "To be effective, multicultural education needs to move beyond diversity as a passing fad. It needs to take into account our history of immigration as well as the social, political, and economic inequality and exclusion that have characterized our past and present, particularly our educational history" (2008, p. 5). Without attending to issues of inequity and particularly the role race [plays] in constructing social inequities, we remain unaware of and thereby unwittingly reproduce racist discourses and practices in our classrooms.

The diversity approach, without the deconstruction of race and white privilege, can do more harm than good in classrooms.

(App.2465).

245.    During the meeting, De Piero referenced this quote and stated: "It's a pretty extreme charge to suggest that teachers are reproducing racist discourses and practices in their classrooms, uh especially with I guess I took the one I modified it by removing unwittingly, which is also maybe even heightens that extreme charge. What does it mean to attend to issues of inequity because if I'm not doing that, then I open myself up to accusations that I am quote reproducing racist discourses and practices." "That's that's a real question, too. I didn't I didn't assign this text for a training meeting." (App.2464 at 18:20-19:19).

246.    De Piero specifically called out Naydan and Lee-Amuzie by name while attacking this quote, saying: "I think really that question is for Lila or Grace since you two assigned it to my knowledge . . ." (App.2464 at 19:44-19:52).

247.    Naydan testified that she felt as though De Piero's question was "questioning the whole presence of the scholarly conversation [they] were trying to have, which was an optional scholarly conversation." (App.1001-1002, Naydan Dep. 33:23-34:2).

248.    Despite two of his colleagues providing responses, De Piero was dissatisfied with the responses to his pointed question so far, and said "I'm looking for actual answers though. The only concrete thing that's been mentioned was Carolyn's example of a thirty minute conference versus a ninety minute conference. I'm just I'm I'm a little confused as to why other examples aren't available, especially with such a hefty charge in that quote, quote number one." (App.2464 at 23:14-23:40).

249.    In response to De Piero's question here, Naydan replied "Grace I don't I don't know how to respond to this because it's your segment of the meeting. I also feel very uncomfortable right now, and I just wanted to say that."" (App.2464 at 23:48-24:00).

250.    De Piero replied "I couldn't agree more. I felt uncomfortable the last year and a

half at these meetings. I did think, though, that uncomfortable conversations were a part, where an explicit goal for some of these. So I'm a little confused about that, too." (App.2464 at 24:04-24:20).

251.    Naydan testified that to her, it felt like De Piero was mocking her discomfort. (App.1019, Naydan Dep. 51:11-12).

252.     Naydan further testified that it was De Piero's persistence, pattern, and targeting her that created hostility towards her. (App1021, Naydan Dep. 53:7-11). Naydan also testified that she cannot speak for a scholar who wrote the text. (App.1027, Naydan Dep. 59:2-3).

253.    During the meeting, Lee-Amuzie attempted to provide a response to De Piero's question with an example from her own personal life. (App.2464 at 24:26-32:00).

254.    Additionally, Naydan attempted to provide a response to De Piero's question by providing an example about a student she had in a course in a prior semester and her teaching methods to help the student succeed with audio versions of texts, specifying that this was "one concrete change" that she made. (App.2464 at 33:34-35:57).

255.    De Piero was again not satisfied, and asked why white teachers were the focus (App.2464 at 41:14-41:50) saying "those are also real questions, too, I'm not sort of doing the talking to talk sort of thing." (App.2464 at 42:37-42:43).

256.    Lee-Amuzie attempted to answer De Piero's question by clarifying that this is "not about individual instructors" and she spoke about structural racism with an analogy about an ecosystem. (App.2464 at 47:29-49:48). But De Piero was again dissatisfied with Lee-Amuzie's response, and said "it's not about me, it's about the person next to me? Is that the message? If it's not about the individual then who is it about?"(App.2464 at 50:04-50:15).

257.    Cohen then attempted to provide another example about a class he teaches about

health and ability. (App.2464 at 50:19-51:32).

258.    De Piero, again unsatisfied with the dialogue, stated "There are legal um descriptions for what falls under discrimination and harassment. And it's when it's you attribute negative characteristics to certain protected groups based on thing outside out of their control. All forms of discrimination and harassment are a problem. And in many cases they're illegal." (App.2464 at 51:35-52:04).

259.    Esposito, Naydan, and Rigilano then all provided thoughts and tried to relate the scholarly texts to their personal lives. (App.2464 at 52:05-1:00:30). The meeting concluded after about 60 minutes.

260.    Naydan testified that she encountered a pattern of hostility from De Piero and she felt that he had come to the meeting in order to express that hostility. Naydan felt as though the pattern created a palpable sense of hostility, and the meeting in context matters. (App.1014, Naydan Dep. 46:18-24; *see also* App.1839, Naydan Decl. at ¶ 23 (stating that from her perspective, she believes that De Piero personally targeted her and her colleague Lee- Amuzie during the meeting and made her feel intimidated, threatened, harassed, and uncomfortable and De Piero made the meeting extremely uncomfortable); App.1854, Lee-Amuzie Decl. at ¶ 15 (stating that in her perspective, she felt personally targeted by De Piero during the meeting and she felt intimidated, threatened, harassed, and uncomfortable)).

261.    Naydan further testified that during the meeting, she witnessed De Piero act in a way that she felt was unprofessional and that she felt was not in line with how those meetings are normally conducted; in her personal view, De Piero's behavior was contrary to the intellectual discussions that typically take place at those meetings; in her personal view De Piero's actions during the October 18, 2021 meeting were inappropriate, confrontational, and unprofessional; and

from her perspective, De Piero's behavior was not an appropriate way to talk to his colleagues. (App.1839, Naydan Decl. at ¶¶ 21-22).

262. Similarly, Lee-Amuzie testified that from her perspective, she personally felt targeted by De Piero during the meeting, intimidated, threatened, harassed, and uncomfortable. (App.1854, Lee-Amuzie Decl. at ¶ 15).

263. Rigilano and Cohen similarly testified that during the October 18, 2021 meeting, they witnessed De Piero act in a manner that they thought was not consistent with his expectation for colleagues and that they though was not in line with the type of academic or intellectual dialogues that these meetings typically provoke, and in their personal view, De Piero's conduct was confrontational and unprofessional and improperly targeted Naydan and Lee-Amuzie and made the meeting uncomfortable for other attendees. (App.1846, Rigilano Decl. at ¶¶ 15-17, App.1850-1851, Cohen Decl. at ¶¶ 14-17) (also testifying that he was attempting to interject and deescalate the situation created by De Piero when he responded to his question saying "this is an interesting question").

264. De Piero took notes during the meeting and sent them to himself via email with an attachment of a screenshot of the participants during the meeting. De Piero's notes confirm that there were six people present and "Lila also mentioned if anybody feels uncomfortable, they're free to leave." (App.2467-2468, Pl. Dep. Ex. # 41).

265. After the meeting concluded, Naydan emailed Baer to inform her that she felt as though De Piero harassed her in the meeting and Naydan requested to meet with Baer and an ombudsperson. (App.2469-2470).

266. Baer forwarded Naydan's email discussed above to Borges, asking for suggestions regarding next steps. Borges replied suggesting that Baer meet with Naydan and the ombudsperson

to hear what happened at the Writing Program meeting. Borges also suggested that Baer speak with Lee-Amuzie separately to hear what happened during the meeting. (App.2469-2472).

267.    Later that evening, Borges and Baer shared an email exchange where Baer wrote that when she spoke with Naydan, Naydan seemed hesitant to file a Bias Report because "she is worried that Zack may see this as retaliation" for De Piero filing a complaint against her. Baer opined that it would be good for Borges to reach out to Naydan. (App.2473-2479, Baer Dep. Ex. # 14).

268.    Naydan testified that she had told Baer in their meeting on October 18, 2021 that she did not want to file anything if it could be perceived as retaliation. (App.1228, Naydan Dep. 260:8-9).

269.    Borges reached out to Naydan as discussed with Baer in the evening of October 18, 2021. Borges attached a complaint form for her to provide information for AAO to look into this. Borges also provided "[t]his is not retaliation given it is about Zack's behavior" to address Naydan's concern with filing the Bias Report. Naydan replied and said "I am not well, sadly. Today was very hard." Naydan attached the filled out Bias Report form to the email. (App.2480, Naydan Dep. Ex. # 28).

3.    **Naydan and Lee-Amuzie's October 2021 Respective Bias Reports with the Affirmative Action Office and Conclusion of All Bias Reports in November/December 2021.**

270.    As stated above, on October 18, 2021 Naydan submitted a Bias Report to AAO (via email to Borges) on the evening of October 18, 2021. (App.2481-2487).

271.    Naydan testified that she complained that De Piero behaved hostilely towards her during the meeting and she thought his tone was hostile, he spoke forcefully, and at points seemed angry and upset. (App.994, Naydan Dep. 26:8-21).

272.    Naydan further testified that the sustained hostility at the meeting and before the

meeting created a feeling of being threatened for her. (App.997, Naydan Dep. 29:1-3).

273.    Lee-Amuzie also submitted a Bias Report to AAO regarding De Piero's behavior in the October 18, 2021 meeting. (App.2488-2490).

274.    Borges met with Naydan over Zoom on the morning of October 19, 2021 to discuss the Bias Report that Naydan filed the night before. Borges took handwritten notes of the meeting and wrote that Naydan expressed that De Piero had been openly challenging her on everything for about two years and they discussed the recent incident in the meeting the day prior. (App.2500-2501, Borges Dep. Ex. # 19).

275.    Borges reported back to Baer on October 19, 2021 that she spoke with Naydan and Borges will "proceed to look into all of this . . . I will be talking (confidentially) to others in the program and we can meet later to discuss solutions." (App.2473).

276.    Also on October 19, 2021, Naydan forwarded to Borges an email that she received from Cohen after the meeting concluded. Cohen wrote to Naydan "I just wanted to check in after today's meeting and ask how you're feeling? No need to respond if you don't want to talk about it." Naydan replied that she felt terrible, "truly terrible" and Cohen responded that "I think you did the absolute best that could've been done. If there's a way I can help you feel better, I'm here. That was a shitty, shitty interaction." (App.2502-2503).

277.    On October 20, 2021, Borges met with Lee-Amuzie over Zoom to discuss her Bias Report about the October 18, 2021 meeting. Borges took handwritten notes during this meeting, which reflect that Lee-Amuzie felt that "Zack's tone was challenging" and she felt as though Zack attended the meeting to derail it. Borges' notes also reflect that Lee-Amuzie said that De Piero "demanded answer" and "Zack kept asking + saying this is a question for Lila + Grace", "other male faculty said he was intentionally misreading text, referring to Zack" and "Lila was visibly

shaken." (App.2497-2498).

278.   Also on October 20, 2021, Borges met with Cohen over Zoom to discuss the October 18, 2021 meeting. As with the meetings with other individuals she met with, Borges took handwritten notes during the meeting with Cohen. Borges' notes reflect that that Cohen informed Borges that De Piero was "very angry" in the meeting and Cohen "would describe it as combative, controversial topic" and that "Zack was aggressive." Cohen also told Borges that "Zack was angry, hostile, not appropriate way to talk to colleagues they were both prof." (App.2492).

279.   The following day, on October 21, 2021, Borges met with Rigilano over Zoom to discuss the October 18, 2021 meeting. Borges notes from the meeting with Rigilano indicate that Rigilano informed Borges that "Zack's tone was challenging." (App.2495-2496).

280.   Rigilano also testified that during the October 18, 2021 meeting, De Piero's tone was "fairly intensified" "during his questioning" and "it seemed a little more confrontational than is sort of the norms of those kinds of meetings." (App.573, Rigilano Dep. 129:1-8).

281.   Rigilano further testified that De Piero was asking questions "directed towards Lila and Grace specifically, how – how they would respond as opposed to sort of just the group, which again would have been the sort of norm for that kind of conversation." (App.573, Rigilano Dep. 129:24-130:4).

282.   Rigilano also testified that he thought De Piero's questioning during the meeting at about 23 minutes and 14 seconds in was "unprofessional." (App.583-584, Rigilano Dep. 139:24-140:9).

283.   Rigilano continued on to testify that this October 18, 2021 Writing Program meeting "wasn't like a training for how to [be antiracist]. It was more like this is, you know, an article. Let's talk about it." (App. 587, Rigilano Dep. 143:5-7).

284.     Naydan, Lee-Amuzie, Rigilano, Cohen, and Esposito all testified that following the October 18, 2021 meeting, they spoke with Carmen Borges, and provided their recollection and perception of De Piero's actions during the meeting, and during the entirety of the meeting, they spoke truthfully and honestly. Everything that they said to Carmen Borges during that meeting accurately reflected their recollection and perception of De Piero's actions at the time. (App.1839, Naydan Decl. at ¶¶ 25-26; App.1855, Lee-Amuzie Decl. at ¶¶ 17-18; App.1847, Rigilano Decl. at ¶¶ 19-20; App.1851, Cohen Decl. at ¶¶ 19-20; App.1843, Esposito Decl. at ¶¶ 11-12).

285.     Borges met with De Piero on October 27, 2021 via Zoom. De Piero recorded this meeting as well. (App.2505), however, he testified at his deposition that he did not ask for or obtain Borges' consent to record the meeting. (App.307, Pl. Dep. 307:8-9).

286.     Borges also confirmed that De Piero did not inform her that he was recording the meeting or seek her consent to do so. (App.912-913, Borges Dep. 272:15-273:2).

287.     While De Piero's Amended Complaint alleges that Borges told De Piero during this October 27, 2021 meeting that he "need[ed] to get beyond that," referring to the entire White Teachers are a Problem video (Amended Complaint at ¶ 103), this statement is taken entirely out of context. Borges said that De Piero "need[ed] to get beyond that," referring specifically to the title and the provocativeness of the video and to try to put that aside and see Inoue's full perspective, the full story of what he was talking about. (App.2505 at 23:10-24:52).

288.     Borges also clarified that, regarding the October 18, 2021 meeting, "the problem was the manner [in which De Piero addressed the group]. It came across hostile, aggressive, intimidating. And that's consensus among others that I have spoken to that were in the meeting. It came across that way. [] that's the problem, it's not what you're trying to clarify for yourself is not like how you tried to ask the question is the manner in which it was done." (App.2505 at 30:19-

30:52).

289.    De Piero testified that the camera click that you can hear at the end of the recording was him taking a screenshot of the computer screen where you can see the Zoom chat. De Piero testified that he pasted the definition of the word "discrimination" or "harassment" for Borges in the Zoom chat, and he wanted to capture that. (App. 309, Pl. Dep. 309:12-310:4).

290.    De Piero also recorded his own voice note after the meeting with Borges concluded. (App.2506).

291.    Also on the evening of October 27, 2021, Sabira De Piero engaged in a text message exchange with her friend, Lauren Warkentien, where Ms. De Piero wrote: "Large institutions are very good at burying abuse. If you recall, Penn State was in trouble for the whole Sandusky thing, molestation and all that. I'm not comparing Zack's situation to that, except that this is what victims have to go through when they're up against something much bigger than them." (App.2513, Sabira De Piero Dep. Ex. # 4).

292.    Ms. De Piero continued on saying "Zacks [*sic*] last resort is a 'burn the house down' response which is exposing the school for all their bullshit by either some sort of media blitz or expose (ex-pose-say), in a book or something. Fuckers. He's not going away quietly. If that wasn't obvious!" (App.2514).

293.    On November 12, 2021, Borges sent De Piero a conclusion letter regarding his Bias Report. The letter stated "we do not find sufficient evidence to substantiate your allegation of discrimination. The particular topic for academic discussion, while it may be offensive to you, does not constitute discrimination towards you as an individual and does not rise to a violation of the University's Non-Discrimination policy." (App.2515, Baer Dep. Ex. # 13).

294.    The letter explained that it is Naydan's responsibility to identify topics of current

national interest beneficial for discussion and professional development for the faculty in the English Writing Program, and Naydan explained that she makes requests for topics for discussion to the faculty and the selection of topics is made in a collaborative manner. The letter further provides that attendance at the Writing Program professional development meetings is voluntary. (App.2515).

295.   On December 8, 2021, Borges sent Naydan a letter regarding her Bias Report against De Piero. The conclusion of the letter stated as follows: "Based on the totality of the circumstances, it is our conclusion that De Piero's conduct was unprofessional and contrary to the University Values Statement.[12] However, we cannot conclude that the conduct meets the definition of unlawful harassment and constitutes a violation of University Policy AD91." The letter further stated "[w]e find professional and programmatic disagreements at play here, and that De Piero's conduct is more appropriately categorized as unprofessional" and "[c]onversations with the division head and human resources will take place to discuss appropriate mechanisms to address this faculty member's conduct." (App.2521-2522, Naydan Dep. Ex. # 32).

296.   In response to receiving the December 8, 2021 letter, Naydan replied to Borges saying that she "work[s] hard to cultivate a supportive environment for professional development in the programs I oversee and my hope is that we can have a more positive environment moving forward." (App.2523).

297.   On December 9, 2021, Borges sent Lee-Amuzie a letter regarding her Bias Report against De Piero. The conclusion letter that went to Lee-Amuzie had the same conclusion as the letter sent to Naydan, as discussed above. (App.2524).

298.   Also on December 9, 2021, Borges sent De Piero a conclusion letter regarding

---

[12] *See* App.2516-2520, Naydan Dep. Ex. # 3, Borges Dep. Ex. # 22, Baer Dep. Ex. # 18.

Naydan's and Lee-Amuzie's Bias Reports. The letter stated as follows:

> Based on the totality of information obtained and reviewed, it is our conclusion that your conduct during the meeting was unprofessional and contrary to the University Values Statement. However, we cannot conclude that the conduct meets the definition of unlawful harassment and that it constitutes a violation of University policy AD91. We consider this matter to be more of a personnel issue, therefore it will be referred to the division head and human resources for appropriate handling.

(App.2525-2526, Borges Dep. Ex. # 24, Baer Dep. Ex. # 17).

**E.   Spring 2022 Semester.**

**1.   Baer and Marranzini Address De Piero's Behavior After the Conclusion of the Investigations.**

299.   Baer and Marranzini scheduled a meeting with De Piero for January 13, 2022 to set expectations for his interactions with colleagues. (App.2528).

300.   A few days before the scheduled meeting, on January 10, 2022, De Piero requested that the meeting be delayed until the PHRC concluded its investigation into a complaint he had filed, he also requested permission to record the meeting. (App.2528-2529).

301.   Baer replied the next day and confirmed that the meeting would move forward as planned and "we do not authorize recording of the meeting in any way, shape, or form." (App.2530).

302.   The meeting went forward as planned, with Marranzini and Baer discussing with De Piero the University's values of respect, responsibility, excellence, and community, and that he should be mindful of the impact of his behavior on others. (App.2532-2533, Borges Dep. Ex. # 21, Baer Dep. Ex. # 25; App.2534-2536, Baer Dep. Ex. # 20; App.2537-2538 (recapping meeting)).

303.   On January 20, 2022, Baer and Marranzini met with Naydan. In the meeting, Naydan expressed that she was committed to treating De Piero fairly moving forward. (App.2539,

Naydan Dep. Ex. # 31).

304.    De Piero was not suspended, put on probation, or formally disciplined in any way

for his behavior during the October 18, 2021 meeting.

**2.    De Piero's Faculty Annual Review for 2021.**

305.    On June 8, 2022, De Piero received his annual performance review. (App.1990-

1991).

306.    De Piero was rated "Very Good" in "Scholarship of Teaching and Learning" and

"Fair to Good" in "Service and the Scholarship of Service to the University, Society and the

Profession," with the following explanation:

> Thanks for your service as an Abington Faculty Senator (concluded spring 21), your membership on the Academic Integrity Committee, and your participation in the Fall 2021 Commonwealth Connections Instructor Days.

> As you know, an investigation into your conduct during a meeting with colleagues on October 18, 2021 by the AAO concluded that it was "aggressive, disruptive, unprofessional, and in opposition to the University's Values Statement." Civility and mutual respect are essential requirements for meaningful and effective service contributions designed to fostering an inclusive, welcoming and intellectually rich academic community. I would like to reiterate the expectation that I included in the summary of our meeting in January 2022: that you will be respectful to your colleagues and that you will conduct yourself professionally in all communications and behaviors. I rate your performance in the area of Service and the Scholarship of Service as Fair to Good.

(App.1991).

307.    Nothing in the review suggested that De Piero's attendance at professional

development meetings, or decision not to attend such meetings, had any bearing on his

performance review. (App.1991).

F.      **Summer 2022[13] through Spring 2023**

1.      **De Piero's Offer at Northampton Community College and Resignation From Penn State Abington.**

308.    On July 18, 2022, De Piero received an offer from Northampton Community College for a full-time appointment as an Assistant Professor, English, effective August 22, 2022. The salary for the position was $61,000 for the year. The offer also came with eligibility for full-time benefits, including medical, dental, vision, and retirement. (App.2550-2551, Pl. Dep. Ex. # 45).

309.    The base salary at Northampton Community College of $61,000 is higher than the base salary that De Piero was making at Penn State at $54,900. (App.2552, Pl. Dep. Ex. # 51).

310.    De Piero also testified that there were opportunities for him to teach in the summer at Northampton Community College, and he took advantage of this opportunity in Summer 2023. (App.312, Pl. Dep. 312:6-12).

311.    De Piero accepted the job at Northampton Community College and resigned from Penn State on August 2, 2022. (App.2553-2554).

312.    De Piero testified that he "believes" he received a salary increase this past year at Northampton Community College. (App. 318, Pl. Dep. 318:11-13).

G.      **De Piero's Lawsuit, Legal Representation, and Media Appearances.**

313.    De Piero assisted his then-counsel in preparing a draft of the federal complaint against Penn State and the individual defendants. On April 28, 2023, De Piero sent his aunt, Martha "Marky" Lombardo, and his uncle, Bruce Lombardo, this draft that he helped prepare. (App.2555-

---

[13] Also around this time period, De Piero reached out to several groups seeking legal representation to sue the University. *See* App.2540-2543 (De Piero reaching out to Christopher Rufo at Manhattan Institute in April 2022 for a referral to a lawyer and/or information on how to leak documents without getting sued for libel or slander); App.2544(request for legal help in May 2022 from Alliance Defending Freedom); App.2545-2549 (request for legal help in June 2022 from FIRE).

2569, Pl. Dep. Ex. # 47).

314.    De Piero testified that he went through the April 2023 draft and changed the names in the caption and the body of the complaint, assigning each individual defendant a "dummy name." (App.322-323, Pl. Dep. 322:18-323:18).

315.    De Piero's testimony about the "dummy names" was as follows:

Q: Okay. So, in the draft you sent your aunt and uncle where you changed the names, there is someone titled Antifala Ocasio-Cortez. Who is that supposed to be?

A: It's a play-off of the word "Antifa," and the congresswoman AOC.

Q: And who at Penn State are you saying is Antifala Ocasio-Cortez?

A: I don't think these were directed to be specific individuals. I think this was just inserting -- instead of redacting names, just putting in dummy names.

Q: So, even though underneath it says, "Individually and in her official capacity as associate professor of English," that's not supposed to be a reference to Liliana Naydan?

A: No. I don't believe so, no.

Q: And Crimeala Spinoza is not supposed to be referenced to Carmen Borges?

A: No. I think that -- there was, like, a crime -- crimeala. Anyways.

Q: And Luna Marscapone, which would be the same exact initials, is not supposed to be Lisa Marranzini?

A: So, that's a good example of just wanting to protect the names and just writing something and taking what was there, kind of, thing.

Q: Which -- so, if I go through Danielle Squirrel, Worthlessa Embarassee, Joe Sheep, Alotta Racismo and Esteban Cantteacho -- you are going to tell me they are not supposed to be particular people who have been named in this lawsuit, even though their titles are underneath each one of those names?

A: Their titles were listed already with their names above it. And instead of keeping their names there, I just put a dummy name in there.

Q: Yeah, no. I understand that. But you're not -- by calling Aneesah Smith Alotta Racismo, that's not a direct reference to your views on Aneesah Smith? That's what you're telling me?

A: In that name, no. In her actions in that Juneteenth e-mail was a racist diatribe against white individuals at Penn State.

Q: And by referencing an associate professor of English as Antifala Ocasio-Cortez, that's not suggesting that Liliana Naydan is Antifa? That's not what you were trying to make a joke about?

A: No. I mean, I'm just trying to make something that is extremely stressful, very heavy, somewhat more palpable or less brutal, so that my uncle could give me feedback on it and what he thought.

(App.323-325, Pl. Dep. 323:6-325:20).

316.    De Piero fired his first law firm. In a text message between De Piero, his wife, and his friend Snarky on May 31, 2023, De Piero wrote that "the Weisberg Firm relationship has been terminated" and "FAIR shit is heating up." De Piero also wrote the following regarding the Weisberg firm: "***them telling me I COULDN'T speak/write about this was the #1 thing I needed to hear. that's the EXACT OPPOSITE of why I'm doing this. I'm doing this so that AS MANY PEOPLE AS POSSIBLE can hear." De Piero continued on to say "[a]nd in the process, to force all the freaks, losers, and weirdos across higher ed to also start to be aware of what's coming to them if they keep up the antiracism racism." (App.2570-2574, Sabira De Piero Dep. Ex. # 6).

317.    In response to De Piero's above text, Sabira De Piero replied: "Yes that's exactly the point! People are too scared to stand up. People have to see you stand up to pave the way and inspire them. Or nothing changes. Ive [sic] been saying this whole way through - ***this whole thing is not about you.*** It happened to you, yes. But It's about re-orienting a system that is starting to go down the wrong path." De Piero replied "***100% not about me not at all.***" (App.2576) (emphasis added).

318.    When asked about De Piero's text that it was not about him, Ms. De Piero replied that "it's about a greater – racist practices against white teachers." (App.1713, Sabira De Piero Dep. 75:6-12).

319.    De Piero has received widespread media attention, and seeks out additional opportunities to discuss, and rehash, what he otherwise describes as awful events. (App.326, Pl.

Dep. 326:3-18 (describing television appearances on the Sean Hannity Show, Fox News digital

program, Fox and Friends, and NewsNation's On Balance with Leland Vittert); App.327, Pl. Dep.

327:13-24 (describing appearances on the Chris Stigall Show, The Dom Giordano Show, and at

least one other radio show); App.328, Pl. Dep. 328:1-16) (identifying op-eds he's written

discussing this case in the *New York Post*, *Real Clear Politics*, and *The Federalist*.); App.329, Pl.

Dep. 329:8-15 (highlighting that he's been mentioned in several articles in the *New York Post* and

*Forbes*)); App.1699-1700, Sabira De Piero Dep. 61:12-62:10 (discussing forthcoming

documentary).

**H.    De Piero's Medical Treatment and Alleged Damages.**

320.    On July 15, 2023, De Piero's mother and father tragically passed away in a flash

flood, contributing to his decision to seek treatment of depression and anxiety. (App.339, Pl. Dep.

339:7-10; App.2578-2581).

321.    When asked what other damages, other than emotional damages, that he is seeking

in this lawsuit, De Piero testified "[t]hat's a big, tough question" and explained how he feels the

lawsuit is "in the public interest" and how him bringing this lawsuit was "in many ways, I was

sacrificing my entire career for" bringing this lawsuit. (App.340-341, Pl. Dep. 340:9-341:16).

**I.    Other Faculty Members at Penn State Abington's Views Regarding Diversity, Equity, and Inclusion at Penn State Abington.**

322.    Rigilano testified that he did not ever feel that the materials discussed in the Writing

Program meetings at Penn State Abington were racist against white people. (App.612, Rigilano

Dep. 168:19-24).

323.    Baer, Naydan, Esposito, Nicosia, and Rigilano also testified as follow:

I identify as a white person.

I have never felt discriminated against on the basis of my race as a white person at
Penn State University.

I have never felt discriminated against on the basis of my race as a white person during any English Program meeting, any Writing Program professional development meeting, any other English Program or Writing Program related events, or in relation to the review or discussions of suggested materials in connection with the same.

I do not recall ever receiving an email from Penn State University or any employee of Penn State University that was discriminatory towards me as a white person.

I have never felt discriminated against on the basis of my race as a white person during any Diversity, Equity, and Inclusion presentation or meeting or any Arts & Humanities presentation or meeting at Penn State University.

(App.1834-1835, Baer Decl. at ¶¶ 21-22, 24-26; App.1840-1841, Naydan Decl. at ¶¶ 31-32, 34-36; App.1843-1844, Esposito Decl. at ¶¶ 16-17, 19-21; App.1847-1848, Rigilano Decl. at ¶¶ 24-25, 27-29; App.1851-1852, Cohen Decl. at ¶¶ 24-28).

324.    Additionally, Baer, Naydan, Esposito, Nicosia, and Rigilano testified as follows:

Neither Penn State University nor any individual defendant in this lawsuit ever discriminated against me as a white person.

At no time during my employment at Penn State University have I felt that I could not express my views either in support of or against any topic relating to race, racism, discrimination, antiracism, or diversity, equity and inclusion at Penn State University.

(App.1834-1835, Baer Decl. at ¶¶ 23, 27; App.1840-1841, Naydan Decl. at ¶¶ 33, 37; App.1844, Esposito Decl. at ¶¶ 18, 22; App.1847-1848, Rigilano Decl. at ¶¶ 26, 30)

325.    Lee-Amuzie and Wong also testified that at no time during their employment at Penn State University have they felt that they could not express their views either in support of or against any topic relating to race, racism, discrimination, antiracism, or diversity, equity and inclusion at Penn State University. (App.1855, Lee-Amuzie Decl. at ¶ 22; App.1859, Wong Decl. at ¶ 12).


Date: October 21, 2024

SAUL EWING LLP

/s/ *James A. Keller*
James A. Keller, Esq., ID No. 79855
Matthew J. Smith, Esq., ID No. 314157
Amy L. Piccola, Esq., ID No. 208888
Carolyn M. Toll, Esq. ID No. 326050
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA, 19102-2186
T: (215) 972-1964
James.Keller@saul.com
Matthew.Smith@saul.com
Amy.Piccola@saul.com
Carolyn.Toll@saul.com

*Attorneys for The Defendants Pennsylvania State University, Liliana Naydan, Carmen Borges, Alina Wong, Friederike Baer, and Aneesah Smith*