*De Piero v. Pennsylvania State University, et al.*, Case No. 2:23-cv-02281

# JOINT APPENDIX PART TWO

# App.0445-0968

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA


ZACK DE PIERO,                    :

          Plaintiff,              : NO. 2:23-cv-02281-WB

     -vs-                         :

PENNSYLVANIA STATE UNIVERSITY,    :

Et al,                            :

          Defendants.             :


                    - - -


          ***VIDEOTAPED DEPOSITION***


     DEPONENT:  Matthew Rigilano

     DATE:  May 9, 2024

     TIME:  10:07 a.m.

     PLACE:  1500 Market Street, 38th Floor

               Philadelphia, Pennsylvania

     REPORTER:  Vicki Mengel, Notary Public


          FARRELL COURT REPORTING

               215-513-7278

          Farrellreporting@verizon.net

Matthew Rigilano

1    APPEARANCES:

2

3    ALLEN HARRIS PLLC

4    BY:  MICHAEL THAD ALLEN, ESQUIRE

5    P.O. Box 404

6    Quaker Hill, Connecticut 06320

7         Representing Plaintiff

8

9    SAUL EWING LLP

10   BY:  MATTHEW SMITH, ESQUIRE

11   1500 Market Street, 38th Floor

12   Philadelphia, Pennsylvania 19102

13        Representing Defendants

14

15

16

17

18

19

20

21

22

23

24

Farrell Court Reporting

Matthew Rigilano

Page 3

1                    I N D E X

2

3  WITNESS                                      PAGE

4

5  MATTHEW RIGILANO

6

7  BY:  MR. ALLEN                                  4

8  BY:  MR. SMITH                                168

9

10                  E X H I B I T S

11

12  1                  Notice                      5

13  2                  Meetings agenda '19-20     31

14  3                  Meetings agenda '20-21     39

15  4                  Report draft               50

16  5                  E-mail                     80

17  6                  E-mails                    92

18  7                  Letter of award           105

19  8                  E-mail and attachments    108

20  9                  Audio clips               126

21  10                 E-mail                    155

22  11                 Text messages             159

23

24  (Exhibits attached to transcript except for Exhibit 9)

Farrell Court Reporting

Matthew Rigilano

1       VIDEOGRAPHER:  We're on the record.  The

2   following is a videotaped deposition.  My name is Rick

3   Kanzinger, Jr, and I'm with Farrell Court Reporting

4   Service.  This deposition is being taken on Thursday, May

5   9, 2024.  The time is 10:08 a.m.  We are located at 1500

6   Market Street, 38th Floor in Philadelphia, Pennsylvania.

7   Today's case is Zack De Piero vs. Penn State University,

8   et al, Case No. 2:23-cv-02281-WB.  This is filed in the

9   United States District Court for the Eastern District of

10  Pennsylvania, and present for the taking of this

11  videotaped deposition are the witness, Matthew Rigilano.

12  And would counsel please state their names for the record.

13      MR. ALLEN:  My name is Michael Thad Allen for the

14  plaintiff, Zack De Piero.

15      MR. SMITH:  Matthew J. Smith from Saul Ewing on

16  behalf of defendants.

17      VIDEOGRAPHER:  The court reporter is Vicki

18  Mengel.  Will the court reporter please swear in the

19  witness.

20      MATTHEW RIGILANO, was called as a witness and

21  after having been first duly sworn, according to law, was

22  examined and testified as follows:

23      VIDEOGRAPHER:  You may begin questioning.

24  BY MR. ALLEN:

Farrell Court Reporting

Matthew Rigilano

1    Q.   So as you heard, my name is Mike Allen.  I'm the

2    attorney for Zack De Piero, who's the plaintiff in this

3    case.  I just wanted to go over at the beginning some

4    ground rules.

5         (Exhibit 1 was marked for identification.)

6    BY MR. ALLEN:

7    Q.   I'm gonna first introduce Exhibit No. 1 for the

8    record is Plaintiff's Re-Notice of Deposition of Matthew

9    Rigilano.  I've given a copy of this to Mr. Smith as well,

10   and I'll come back and ask you a question about that.  But

11   before we do that, can I ask if you've ever been deposed

12   before?

13   A.   No, I have not.

14   Q.   Is there anything to your knowledge that would

15   interfere with your ability to tell truthful testimony

16   today?

17   A.   No.

18   Q.   You're not on any medication that would interfere

19   with your memory?

20   A.   No.

21   Q.   You're not feeling sick, dizzy?

22   A.   No.

23   Q.   You don't have a mental illness that would

24   prevent you from testifying truthfully?

Farrell Court Reporting

Matthew Rigilano

Page 6

1    A.    No.

2    Q.    Thank you.  As you will probably notice sooner or

3    later, there will be objections from time to time.  I'm

4    gonna ask you first off if you're represented by an

5    attorney today.

6    A.    Yes.

7    Q.    And is your attorney Matthew Smith?

8    A.    Yes.

9    Q.    Okay.  So Mr. Smith may object from time to time.

10   Except in some few circumstances which will be obvious,

11   that does not relieve you of the obligation to answer the

12   question.  We're creating a record for the court which may

13   by used in trial.  Therefore, he will from time to time

14   place objections on the record to preserve those

15   objections for trial.

16        MR. SMITH:  Michael, just to clarify, I don't

17   dispute I'm here on his behalf, but technically represent

18   the university.  He's an employee of the university.  I

19   obviously represent the individual defendants in this

20   lawsuit, but just to clarify that we don't represent him

21   in an individual capacity.

22   BY MR. ALLEN:

23   Q.    You understand you're not being sued.  You're not

24   a party to this lawsuit, right?

Farrell Court Reporting

Matthew Rigilano

Page 7

1      A.    Yes.

2      Q.    Whether there's anything that may arise

3   concerning your individual capacity, that might be

4   something you want to consult your lawyer about.  But if

5   that comes up, feel free to consult with your lawyer.

6           You can take a break at any time.  Just tell me.

7   I make one exception is you are obligated to answer the

8   question that's before you.  If at any time you don't

9   understand my question, just ask.  Feel free to interrupt

10  me.  If you don't interrupt me for clarification of a

11  question, I will assume you've understood the question as

12  asked.  Is that clear?

13     A.    Yes.

14     Q.    Thank you.  Can you explain -- now, I'm not gonna

15  ask you to disclose anything you've discussed with your

16  attorney concerning legal advice, but I am entitled to

17  know what you've done to prepare for today's deposition.

18     A.    I have met with Matt Smith.

19     Q.    Did you review any documents?

20     A.    Um, yes.

21     Q.    What documents did you review?

22     A.    I saw -- can I says things that -- is this not

23  covered by attorney client?

24          MR. SMITH:  You can tell him what you -- what you

Farrell Court Reporting

Matthew Rigilano

Page 8

1   reviewed.  You obviously --

2   BY MR. ALLEN:

3      Q.   So underlying facts are not privileged.  Legal

4   advice, consultation with your attorney is privileged.

5      A.   Sure.

6           MR. ALLEN:  And I'm not lecturing your client on

7   privilege.  So any time, feel free to --

8           MR. SMITH:  Just --

9   BY MR. ALLEN:

10     Q.   So the documents themselves would not be

11  protected by privilege, and --

12     A.   I understand.

13     Q.   -- the plaintiff is entitled to know what you

14  consulted in preparation for your deposition.

15     A.   Okay.  I saw a text message that I had sent that

16  I exchanged with -- or a screenshot of a text message.

17     Q.   Were these multiple text messages?

18     A.   Um, just one.

19     Q.   Okay.  And what did the text message say?

20     A.   Um, the text message, I don't recall word for

21  word what it said, but it was me responding to something

22  that Zack was talking about, like, with respect to an

23  e-mail chain.

24     Q.   And what was -- what was Mr. De Piero saying?

Farrell Court Reporting

Matthew Rigilano

Page 9

1     A.   I think he was -- again, not verbatim, but

2  voicing frustration about a colleague's opinion about mask

3  wearing or failure to weak a mask.

4     Q.   Who was the colleague?

5     A.   I don't know entirely.  The chain I think had

6  multiple respondents, so I don't know what -- what the

7  text message was in specific reference to.

8     Q.   You mean the text message was between you and

9  Mr. De Piero?

10    A.   Yes.

11    Q.   But there was an e-mail referenced in the message

12  that had multiple recipients?

13    A.   Yes.

14    Q.   Okay.  And I'm sure if that were to come up in an

15  exhibit, you would recognize it?

16    A.   Yes.

17    Q.   So we may have opportunity to discuss that.  Do

18  you recognize the Exhibit No. 1 that I've introduced into

19  the record?

20    A.   This is the subpoena?

21    Q.   This is actually captioned re-notice of your

22  deposition.

23    A.   Oh, okay.

24    Q.   You see the caption there on the first page?

Farrell Court Reporting

Matthew Rigilano

Page 10

1    Just let the record reflect I'm pointing for the witness

2    without marking --

3         A.   Oh, yes.

4         Q.   Is it say to safe that you've appeared today to

5    testify in response to this renotice of deposition?

6         A.   Yes.

7         Q.   And you were served a subpoena in this case,

8    correct?

9         A.   Yes.

10        Q.   And you didn't refuse service of that subpoena,

11   did you?

12        A.   No.

13        Q.   Thank you.  I just wanna talk a little bit about

14   your background, the nature of your training and

15   qualifications.

16             MR. SMITH:  Michael, not to -- I don't mean to

17   interrupt.  Just to get on the record, I do just wanna

18   note for the record that we served objections to the

19   document requests attached to this renotice, just so

20   that's --

21             MR. ALLEN:  Yes, and you can --

22             MR. SMITH:  -- on the record, but I'm not

23   disputing the notice.

24             MR. ALLEN:  You can introduce those in the record

Farrell Court Reporting

Matthew Rigilano

1   if you want when you do redirect or whatnot.

2          MR. SMITH:  Not necessary.

3          MR. ALLEN:  And feel free to discuss this off the

4   record.

5   BY MR. ALLEN:

6       Q.   So I just want to talk to you a bit about your

7   job, your background, your qualifications.  Can you state

8   for the record where you work.

9       A.   Penn State Abington.

10      Q.   And what is the nature of your work for Penn

11  State Abington?

12      A.   Um, I am currently an associate teaching

13  professor of writing and English.  I teach courses in

14  writing and English.

15      Q.   Does that include English composition?

16      A.   Yes.

17      Q.   And when you say you teach English, can you

18  explain what you mean which that?

19      A.   Sure.  Um, there are some courses at Abington

20  that are writing courses specifically to teach writing at

21  different levels.  And then, there are some courses that

22  are more -- are based in literature, different literary

23  periods.  So when I say writing and English, that's the

24  distinction.

Farrell Court Reporting

Matthew Rigilano

Page 12

1       Q.   Is your primary function to teach writing and
2  composition at the university of Penn State?

3       A.   It is.

4       Q.   And you said this again, but -- you said this
5  before, but I'm gonna ask again.  What is your official
6  title?

7       A.   It is -- I was recently promoted to associate
8  teacher professor.  At the time that we're discussing, I
9  was -- I've been for the first five years of my employment
10 there an assistant teaching professor.

11      Q.   And what's the difference being assistant
12 teaching professor and associate teaching professor?

13      A.   I -- it's the -- associate is the sort of next
14 step up that you are -- that you can apply for after five
15 years of employment.  Presumably it will entail a longer
16 contract.

17      Q.   When you say longer contract, what's your
18 understanding of the nature of your contract?  Let me put
19 it differently.

20           When you were an assistant teaching professor,
21 what was the nature of your contract as you understood it
22 with Penn State?

23      A.   It was a year-to-year teaching contract.  So
24 every year, I would be awarded a new contract.

Farrell Court Reporting

Matthew Rigilano

Page 13

1     Q.    Are you familiar with the term adjunct professor?

2     A.    Yes.

3     Q.    Would you say that that was the equivalent of an

4     adjunct professor?

5     A.    No.  Typically, an adjunct doesn't have any kind

6     of, like, full-time status.  Whereas I have full-time

7     status, which would mean that I was within certain

8     limitations guaranteed to teach four sections every

9     semester.

10    Q.    Is the distinction you're drawing being that you

11    weren't paid by the class?  You had a full-time equivalent

12    position for the entire year?

13    A.    Correct.  Yeah, that my contract would stipulate

14    the salary, basically.

15    Q.    And you said I was.  Do you mean when you were an

16    assistant teaching professor?

17    A.    Yes.

18    Q.    And you said you presumably will have a longer

19    term contract as an associate teaching professor?

20    A.    Yes.  The details aren't clear to me, but I think

21    the general understanding is that, um, as you get

22    subsequent promotions on this track, you get more sort of

23    job security.

24    Q.    Uh-huh.

Farrell Court Reporting

Matthew Rigilano

Page 14

1    A.    Although this is the relatively new track that

2    Penn State has developed only in the really just starting

3    when I began.  So before that, I think there were

4    lecturers and adjuncts and only recently did they have

5    this teaching track.

6    Q.    And explain for the record why you know that you

7    were -- you were promoted to associate teaching professor,

8    but you don't know the terms of what that means.

9    A.    Could you rephrase that, please?

10   Q.    Let me -- yeah.  Can we strike that question?

11         But you just explained that you presume that

12   there's some longer window of job security?

13   A.    Yeah.

14   Q.    But you don't know what it is?

15   A.    Uh --

16   Q.    So that would suggest to me that you don't know

17   the terms of your employment.

18         MR. SMITH:  Objection to form.

19   BY MR. ALLEN:

20   Q.    So my question for you is I'm just -- I just want

21   to understand your position.  Can you explain --

22   A.    Sure.

23   Q.    -- why you don't know the terms of your

24   employment in that sense and you just presume it?

Matthew Rigilano

Page 15

1              MR. SMITH:  Objection to form.

2              THE WITNESS:  The -- I have sort of an

3    understanding that the contract will likely be a three

4    year contract.  This is something I've been just sort of

5    like told, can't remember by whom, precisely.  I say

6    presumably in the sense that I haven't received my -- I

7    was just promoted and I haven't received yet, like, my new

8    contract that would have a -- presumably; again,

9    presumably insofar as just because I haven't seen it, a

10   higher wage and different terms for the year.

11   BY MR. ALLEN:

12       Q.   And who did you receive this news from that you

13   were gonna be promoted?

14       A.   Just a couple weeks ago.  I believe -- I'm

15   blanking on the -- the interim chancellor's name.  But

16   also from Friederike Baer, who's our dean of the division.

17       Q.   Can you spell Friederike Baer's name for the

18   record, please?

19       A.   Um --

20       Q.   Since you're a writing professor, you asked for

21   it.

22       A.   Can I take -- can I refer to the document in

23   front of me?

24       Q.   Please.  And he's referring to Exhibit 1 for the

Farrell Court Reporting

Matthew Rigilano

1   record.

2        A.   Friederike Baer?

3        Q.   Yes.

4        A.   This is spelled F-R-I-E-D-E-R I-K-E B-A-E-R.

5        Q.   Her last name is B-A-E-R, and that's pronounced

6   Baer?

7        A.   Uh-huh.

8        Q.   Thank you.  And you said she was the dean of your

9   division.  Did I get that correctly or did I get that

10  wrong?

11       A.   Um, yes, the dean of arts and humanities.

12       Q.   Okay.  And as the dean of arts and humanities,

13  what is her relationship to your position where you teach

14  writing and English?

15       A.   Um, she's the person who -- who one goes to.

16  She's like our supervisor.  She renews our contract

17  every -- we -- all employees have a yearly evaluation, and

18  she's the one who evaluates our sort of annual activities

19  and suggests, you know, continued employment.

20       Q.   Uh-huh.

21       A.   Or deals with those kinds of issues.

22       Q.   And when you teach, do you belong to a specific

23  department?

24       A.   Um, the departmental structure at Abington is a

Farrell Court Reporting

Matthew Rigilano

1    little bit confusing.

2        Q.    Uh-huh.

3        A.    There are programs.

4        Q.    Okay.

5        A.    So there's the writing program and the English

6    program that are two different things, but the courses

7    taught by instructors in those programs are all English

8    courses.  They have the english designation.

9        Q.    Uh-huh.

10       A.    Um, so I'm a part of those two programs.

11       Q.    And explain to the best -- you said it seems to

12   be confusing, so that's fine.  That's on the record, but

13   please explain what you understand by a program as an

14   institutional unit of Penn State.

15       A.    Yeah.  So the -- the writing program, for

16   instance, yeah, why it isn't a department is kind of an

17   administrative question that I couldn't speak to.

18       Q.    Uh-huh.

19       A.    But the function of the program is to schedule

20   courses, organize events.

21       Q.    Uh-huh.

22       A.    And there are -- we have writing program meetings

23   that we use for -- to organize for professional

24   development, things of that nature.

Matthew Rigilano

Page 18

1      Q.   And do the programs have their own leaders or
2   director of heads?
3      A.   Yes.  Um, there is a distinction between the
4   writing program, which I think exists sort of like
5   immediately under the Division of Arts and Sciences.  And
6   so for whatever reason, the writing program doesn't have a
7   chair.  It just has a coordinator, whereas the English
8   program does have a chair.
9      Q.   And then above the program is the dean or above
10   the program is the English department chair?
11      A.   The dean, I believe.
12      Q.   Okay.  And that's true for the English program as
13   well?
14      A.   Yes.  So the -- the chair of the English program
15   would -- would -- yeah, the dean would be the next sort of
16   rank above them.
17      Q.   And is there a separate English department or the
18   program -- the English program and the English department
19   is the same thing?
20      A.   I -- I think it's just a program.
21      Q.   Okay.  Are there departments, academic
22   departments within the arts and sciences?
23      A.   At -- at the larger institutional level at Penn
24   State Main, for instance, they have departments.  Here, I

Farrell Court Reporting

Matthew Rigilano

Page 19

1    think it's -- I could be wrong or misinformed, but I

2    believe they're just programs, the idea being that they're

3    responsible for providing courses for majors.

4         Q.   Okay.

5         A.   Um --

6         Q.   Is there a writing major?

7         A.   There is a writing minor.

8         Q.   Uh-huh.

9         A.   But not a writing major.

10        Q.   Yeah.

11        A.   There is an English major.

12        Q.   That was gonna be my follow-up question.  Thank

13   you.

14             You said the English program has a chair.  Who is

15   that?

16        A.   Currently, it is Marissa Nicosia.

17        Q.   Who was the program chair of English in 2020?

18        A.   I believe it was Lila Naydan.

19        Q.   And to your knowledge, how long did she hold that

20   position as chair of the English program?

21        A.   Um, Covid has made some of these memories very

22   difficult.

23        Q.   Just for --

24        A.   A couple of years.

Farrell Court Reporting

Matthew Rigilano

1    Q.   Thank you.  I'm talking about after Covid, but --
2   so 2020 to whenever.

3    A.   Yeah.  Um, I believe she held the post before
4   that and then for some years after.  She took a sabbatical
5   at one point.

6    Q.   Okay.  And who is the -- you said there's a
7   coordinator of the writing program.  Who that is?

8    A.   Um, that is Lila Naydan.

9    Q.   Currently?

10   A.   Yes.

11   Q.   And was she also program coordinator reaching
12  back to 2020 --

13   A.   Yes.

14   Q.   -- of the writing program?

15   A.   Yes.

16   Q.   Thank you.  Before she became the program
17  director of the English program, what was Marissa
18  Nicosia's relationship to either English or writing?

19   A.   Um, she is -- I'm trying to think of her rank
20  precisely, but she's a tenured professor of Renaissance
21  literature.

22   Q.   And what is Lila Naydan's responsibilities as a
23  professor?  Not as an administrator, but as a professor?

24   A.   She teaches 20th century and contemporary

Farrell Court Reporting

Matthew Rigilano

1    American literature.

2         Q.    Does she teach writing courses?

3         A.    Periodically.

4         Q.    And you mentioned that M N was a tenured

5    professor.  You also referred to your new track.  That's

6    not a tenure track position, is it?

7         A.    Correct.  The -- the teaching track is a

8    nontenure line.

9         Q.    Can you explain for the record the difference

10   between these non-tenured lines such as you have and

11   tenure?

12        A.    Sure.  The -- the main difference is that the

13   teaching line, as the sort of title suggests, is focused

14   entirely on teaching.  So, um, your evaluations, your, you

15   know, obligation is to teach.  Whereas on the tenure

16   track, there's an obligation to do research.  And once you

17   get tenure, you have, you know, relatively good job

18   security.

19        Q.    Why?  Can you explain?

20        A.    I think it varies institutionally.  They have

21   different kind of notions of what counts as tenure.  But I

22   think the idea being that -- again, school by school and

23   state by state to my understanding, but the idea being

24   that you -- that tenure gives you a little bit more

Matthew Rigilano

1  license to, you know, pursue creative intellectual

2  projects without censure.  That's the traditional

3  definition, I think.

4       Q.   So in your understanding, there's a great deal

5  more freedom as a tenured professor?

6            MR. SMITH:  Objection to form.

7            THE WITNESS:  Yes.

8  BY MR. ALLEN:

9       Q.   And that includes the freedom to say what you

10 want about topics that interest you?

11           MR. SMITH:  Objection to form.

12           THE WITNESS:  Um, I think traditionally.  I

13 don't -- I think that, you know, this is a larger question

14 beyond my expertise.  But tenure as a sort of idea has

15 been eroded or pulled back significantly across the board

16 in the last 20 years, so it's difficult to say precisely

17 what tenure grants you today.

18 BY MR. ALLEN:

19      Q.   You feel that people at Penn State who have

20 tenure have more job security than you do, correct?

21           MR. SMITH:  Objection to form.

22           THE WITNESS:  Yes, only -- I mean, primarily

23 because they have do not have a yearly contract.  I --

24 I -- my -- I could be -- my job could not be renewed, you

Farrell Court Reporting

Matthew Rigilano

Page 23

1   know, just for any reason, like dropping numbers of

2   students, et cetera.

3   BY MR. ALLEN:

4       Q.   And that's not true for a tenured professor?

5       A.   Not in my understanding.

6       Q.   And if you had this job security, you would also

7   understand you had more freedom to say what you chose on

8   matters of concern?

9            MR. SMITH:  Objection to form.

10           THE WITNESS:  I'm not sure.

11   BY MR. ALLEN:

12       Q.   Who's your immediate supervisor.

13       A.   I guess Friederike Baer.

14       Q.   As a program coordinator, what role did Lila

15   Naydan exercise over you?  Let me strike that question.

16   That was terrible.

17           As an assistant teacher of writing or assistant

18   teaching professor of writing, what authority did Lila

19   Naydan have over you as a writing program coordinator?

20       A.   I'm not sure what authority.  Um, I can tell you

21   what her role was as coordinator.  She -- her -- the

22   primary role of the coordinator to schedule courses.

23       Q.   Did she assign you courses?

24       A.   Um, every year, there's a coordination between

Farrell Court Reporting

Matthew Rigilano

Page 24

1   the writing coordinator and the English chair.  They send

2   out request forms, basically, asking back to members what

3   they would like to teach in the semester being -- being

4   scheduled.

5        Q.   And what other responsibilities does she have

6   vis-a-vie, you know, assistant teaching professors?

7        A.   Um, so aside from scheduling, the -- the other I

8   think sort of central duty is to organize the writing

9   program meetings.

10       Q.   Describe the writing program meetings.  What are

11  those?

12       A.   About two or three times a semester, I think

13  that's vary.  Normally, yeah, two or three, um, the -- we

14  have an hour long meeting, the substance of which can

15  vary.  There are some meetings dedicated to revising

16  course outcomes.  There are some meetings that are sort of

17  we'll invite someone from a different, you know, program

18  to talk about advising.  Sometimes, members of the program

19  will, like, provide professional development.  So, for

20  instance, I've ran a meeting and describe a concept, for

21  instance, and organizing events.  Oftentimes, the agenda

22  will have multiple ideas on it.

23       Q.   Each program meeting, is that what you call them?

24       A.   Yeah.

Farrell Court Reporting

Matthew Rigilano

Page 25

1     Q.   Each program meeting will have multiple items

2  often?

3     A.   Often, they'll be like, you know, we'll talk.

4  We'll begin, um, with, like, catching up after, you know,

5  like an event or something like that.  Or if there's some

6  other kind of pressing concern, we'll talk about that in

7  addition to whatever sort of primary, you know, item.

8     Q.   And how many total faculty members, whether

9  tenured or just teaching professors, are there in the

10  writing program?

11     A.   Can I count for a second?

12     Q.   Yeah.

13     A.   There are a number of adjuncts that don't go to

14  meetings.  They're not invited or, you know.  I cannot

15  attest specifically to how many faculty members there are

16  in the writing program.  Part of the issue is that there

17  are faculty members that are -- that primarily teach in

18  the English courses and then will periodically teach,

19  like, one or two writing courses.  And they -- they don't

20  go to the writing program meetings, for instance, even

21  though they teach writing courses.  So I'd say in general,

22  the max number of people that would attend the meetings

23  would be somewhere like 12, 10 or 12.

24     Q.   And do you know how many associate and assistant

Matthew Rigilano

Page 26

1    teaching professors are associated with the writing

2    program?

3        A.    Um, approximately six or seven.

4        Q.    And was that the same in 2020 as now?

5        A.    Yeah.

6        Q.    And about these writing program meetings, you

7    said that there are some adjuncts that teach courses, but

8    they don't go to the program meetings.  I believe you said

9    they're not invited?

10       A.    I don't think they're on the -- the listserv that

11   would -- where the announcement would reach them.

12       Q.    And for a teaching professor of whatever rank, is

13   it expected that they'll go?

14       A.    It's not mandatory, but recommended.

15       Q.    If you were a first year assistant teaching

16   professor, could you just decide to blow them all off?

17            MR. SMITH:  Objection to form.

18            THE WITNESS:  You could.

19   BY MR. ALLEN:

20       Q.    Would that have a positive impact on your job

21   prospects at Penn State Abington?

22            MR. SMITH:  Objection to form.

23            THE WITNESS:  I think it probably depends on the

24   context.  Lila usually mentions like, you know, that the

Farrell Court Reporting

Matthew Rigilano

1   meetings aren't sort of -- you know, they're not

2   mandatory.   There have been times when people have had

3   like issues with child care or things of that nature on a

4   recurrent basis that made it so it's like hard for them to

5   go regularly.  So, um, um, yeah.

6   BY MR. ALLEN:

7        Q.   Have you ever told Lila -- you refer to her as

8   Lila or Lisa?

9        A.   Lila.

10       Q.   Have you ever told Lila Naydan that you aren't

11  gonna go to any of them?  What I mean by that, you're not

12  gonna go to any of them, not a single one.

13       A.   Have I ever?

14       Q.   Yeah.

15       A.   No.

16       Q.   Would you ever do that?

17       A.   No.

18       Q.   Why not?

19       A.   I think they're a -- a valuable activity if

20  you're interested in, you know, sort of creating a kind of

21  community of teachers.  Or if you are interested in

22  organizing events, that's one of the things that gets

23  talked about.  You can't really be a part of the event,

24  which you might want to for the sake of service, if you

Farrell Court Reporting

Matthew Rigilano

Page 28

1    don't go to the meetings, so I -- that's why I go.

2         Q.   Does going to the meetings count as service to

3    the university?

4         A.   I don't think so.  I've never put it on my

5    evaluation.  I think providing, like, professional

6    developments at one of the meetings, like running the show

7    counts as service.  But I think attending is just --

8         Q.   And I guess my follow-up question, have you ever

9    known an assistant teaching professor to skip them

10   consistently?

11        A.   Yes.

12        Q.   Who?

13        A.   Jimmy Pack.

14        Q.   And did that have any positive impact on his

15   career at Penn State Abington?

16        A.   I can't say.

17        Q.   Did it have any negative impact?

18        A.   I don't know.

19        Q.   When you were an assistant writing professor

20   of -- at Penn State Abington, did you go to them

21   consistently?

22        A.   Yes.

23        Q.   Did you feel an obligation to go to them

24   consistently?

Farrell Court Reporting

Matthew Rigilano

1      A.   A personal obligation.  I -- I -- I'm the kind of

2  person that would go to -- would go to the meetings to be

3  a part of it.

4      Q.   And back to the structure of the program both

5  writing and English.

6      A.   Uh-huh.

7      Q.   I believe you said that without giving specific

8  dates, but in the range of 2020 to 2022, Lila Naydan was

9  both the program chair of writing -- of English and the

10  program director of writing?

11     A.   Yes.

12          MR. SMITH:  Objection to form.

13  BY MR. ALLEN:

14     Q.   Okay.  And in that -- in either of those roles,

15  did she play a part in evaluating you?

16     A.   No.

17     Q.   Did she review your teaching evaluations from

18  students?

19     A.   No.

20     Q.   That would only be Friederike Baer?

21     A.   Yes.

22     Q.   Was anyone else involved in reviewing your

23  performance?

24     A.   No.  At the end of the year, one writes a FAR,

Farrell Court Reporting

Matthew Rigilano

1   faculty annual review.  And that gets submitted to

2   Friederike, who gets the whole thing.

3       Q.   You're responsible for compiling the FAR, which

4   is a faculty annual review?

5       A.   Yeah.

6       Q.   And during the time we just talked about, 2020 to

7   2022, what position did Zack De Piero have at Penn State

8   Abington?

9       A.   We were hired at the same time with the same

10  position, so he was an assistant teaching professor.

11      Q.   Likewise teaching classes in English as well as

12  in writing?

13      A.   He -- yeah.  He mostly taught writing courses.

14  But I believe he taught an inter-domain class having to do

15  with The Beatles, which is a hybrid sort of course.

16      Q.   When you say inter-domain, what do you mean by

17  that?

18      A.   It's a new -- new-ish designation for a course

19  that has two different disciplinary angles.  So for

20  instance, you could teach a course that is both humanities

21  focus, but then also maybe social sciences.

22      Q.   Is it fair to say another word for that is

23  interdisciplinary or --

24      A.   Yeah.  I think they are conceptually

Farrell Court Reporting

Matthew Rigilano

1  interdisciplinary.  I think the reason they're called

2  inter-domain is because in the system of general education

3  at Penn State, there are, like, knowledge domains, and so

4  these kinds of courses deal with more than one domain.

5        MR. ALLEN:  I'm gonna mark as Exhibit 2 for the

6  record.  Matt, I don't have a Bates numbers on this one.

7  I'm not aware of its Bates number at this time.

8        (Exhibit 2 was marked for identification.)

9  BY MR. ALLEN:

10     Q.   So I just introduced for the record as Exhibit 2

11 a document captioned Writing Program Meeting dates 2019 to

12 2020.  Do you see that?

13     A.   Yes.

14     Q.   Do you recall seeing this document at that time?

15     A.   Um, I've seen a lot of these kinds of documents.

16 This doesn't seem unfamiliar, but I'm sure I've seen it.

17     Q.   And this would have been a time you were an

18 assistant writing professor, right?

19     A.   Yes.

20     Q.   Assistant writing professor of teaching.  Is that

21 the correct title?

22     A.   Oh, excuse me.  Yeah.  Assistant teaching

23 professor of writing.

24     Q.   Thank you for clarifying.  And so is this the

Farrell Court Reporting

Matthew Rigilano

Page 32

1    typical year of a writing program meeting schedule?  In

2    other words, you had described them earlier as two to

3    three times a semester.  And you would agree with me,

4    wouldn't you, that this plans out three meetings each

5    semester?

6        A.   Yeah.

7        Q.   And the meetings are focused on different topics,

8    correct?

9        A.   Yes.

10       Q.   The meeting one is captioned topic start of

11   semester business, correct?

12       A.   Yes.

13       Q.   What would be included as start of semester

14   business?

15       A.   Um, likely discussing what events might get

16   organized, if there's anything peculiar having to do with

17   advising or scheduling, typical sort of things.

18       Q.   And then meeting two was developing inclusive

19   writing prompts.  Do you see that?

20       A.   Yeah.

21       Q.   And that's taught by someone named Grace

22   Lee-Amuzie.  Did I read that right?

23       A.   Yes, I think so.

24       Q.   And who is Grace Lee-Amuzie?

Farrell Court Reporting

Matthew Rigilano

1    A.   Um, she at the time I believe was an assistant

2  teaching professor.  She is now on the tenure line.  Um,

3  she was teaching for I believe a program known as AIMSS,

4  A-I-M-S-S, so it's primarily she teaches and I think

5  coordinating courses, writing courses for students for

6  whom English is a second language, international students.

7    Q.   Is that what AIMSS is focused on?

8    A.   Yes.

9    Q.   Okay.  And you said she made the jump from this

10  assistant teaching professor to a tenure track position?

11    A.   Yeah.  She applied to an opening and has that

12  job.

13    Q.   Is that considered a promotion?

14    A.   No.  I think it was she got a new -- a new

15  position, so it starts -- now, she's an assistant

16  professor.

17    Q.   And you understand it as a more favorable

18  position to have a tenure track position than an assistant

19  writing professor position?

20    A.   Um, if you want to do research, yes.

21    Q.   It comes with more potential job security,

22  correct?

23    MR. SMITH:  Objection to form.

24    THE WITNESS:  Inasfar as it's not on an annual

Farrell Court Reporting

Matthew Rigilano

Page 34

1    contract, yes.

2    BY MR. ALLEN:

3         Q.   Do you remember what developing including writing

4    prompts included at that time?

5         A.   I don't.

6         Q.   And then it looks like you gave the meeting

7    three, right, critical thinking in the writing classroom?

8         A.   Yes.

9         Q.   Did I read that correctly?

10        A.   Uh-huh.

11        Q.   That was back in November of 2019.  What was the

12   substance of that class?

13        A.   So --

14        Q.   Or excuse me.  Strike that.

15             What was the substance of that writing program

16   meeting that you led in November of 2019?

17        A.   So I provided a -- an overview, a brief history

18   of the concept of critical thinking as it develops in

19   philosophy and English pedagogy and tried to show how

20   critical thinking is valuable in the writing classroom.

21        Q.   And did you mean by critical thinking universal

22   concepts of critical thinking?

23        A.   I'm sorry.  What do you mean by universal?

24        Q.   Sure.  Were you talking about critical thinking

Matthew Rigilano

1   for all human beings or were you talking about critical

2   thinking in terms of criticizing certain aspects of

3   American life or --

4        A.   Um, I think both in a certain sense.  Critical

5   thinking as, like, a cognitive faculty, like the ability

6   to synthesize different kinds of information, but also

7   critical thinking as critique, as -- as ideology critique.

8        Q.   Were you talking about the skills of critique of

9   ideology or were you talking about specific ideologies

10  that you had a criticism of?

11       A.   Um, the skills.

12       Q.   And so I think that's what I was getting at in

13  term of universal approach.  You were teaching the basic

14  skills that all human beings could and should learn?

15       A.   Primarily, yeah.

16       Q.   And you didn't see yourself as trying to convey a

17  particular point of view on given ideological topics or

18  anything of that nature?

19       A.   Not intentionally, no.  I do -- I mentioned the

20  Frankfort school of critical theory, which is a

21  philosophical orientation developed in 20th century German

22  Marxism.  And so naturally, their form of critique is a

23  Marxist critique.  That's part of the tradition of

24  critical thinking.

Farrell Court Reporting

Matthew Rigilano

Page 36

1    Q.   And do you consider yourself a Marxist?

2    A.   Yeah.

3    Q.   Of the Frankfort school variety?

4    A.   Not necessarily.

5    Q.   You know, I forgot to ask you.  Can you explain

6    for the record where you received your training and what

7    degrees you currently hold?

8    A.   Um, I have a -- I got an English major and

9    anthropology minor at Penn State University in State

10   College.  I got a master's of English at Syracuse

11   University and a Ph.D in English at State University of

12   New York in Buffalo.

13   Q.   And when -- when did you graduate from SUNY New

14   York?

15   A.   Um, 2015.

16   Q.   Did you go to work for Penn State after 2015,

17   meaning directly after your --

18   A.   Not directly.

19   Q.   Where did you go to work first?

20   A.   I was an adjunct at several schools in the

21   Philadelphia area.  And after which, I had a year-long

22   post-doc to do research at UCLA at the Clark Library.

23   Q.   So when did you start at Penn State Abington?

24   A.   I believe it was 2018.

Farrell Court Reporting

Matthew Rigilano

Page 37

1      Q.   Now, I don't really want you to have to say your

2   specific address for any reason.  I don't think that's

3   important.  But can you tell me where you live?

4      A.   I live in New Jersey currently.

5      Q.   What part of New Jersey?

6      A.   Southern Jersey.

7      Q.   Could you just name the town or community that

8   you live in?

9      A.   Pennsauken.

10     Q.   And in the neighborhood where you live, do you --

11  do you have neighbors who are black?

12     A.   Yes.

13     Q.   So would you describe your -- your neighborhood

14  as integrated?

15          MR. SMITH:  Objection to form.

16          THE WITNESS:  What do you mean by integrated?

17  BY MR. ALLEN:

18     Q.   Well, I mean, let me put it this way.  What do

19  you understand by integrated, by an integrated

20  neighborhood?

21     A.   Oh, I guess, I meant like if it was meant sort of

22  in general as there was an integration of people of

23  different backgrounds or if it like integrated as in it

24  was, like, deliberately integrated.

Farrell Court Reporting

Matthew Rigilano

Page 38

1     Q.    Well, I'm assuming there are no laws that either

2  require or forbid integrated by race of a neighborhood in

3  New Jersey.

4     A.    Right.

5     Q.    -- to your understanding?

6     A.    Excuse me.  I was thinking if you meant, like,

7  historically speaking, like, an integrated neighbor that

8  was --

9     Q.    No.  I mean now as --

10    A.    Sure.

11    Q.    -- you experience -- or 2020, let's say.  In

12  2020, was that a multiracial neighborhood that you live

13  in?

14    A.    I didn't live there in 2020.

15    Q.    When did you first move there?

16    A.    Um -- well, actually, wait.  When did I move

17  there?  I moved there in the middle of 2020.  So excuse

18  me, I was wrong.

19    Q.    So in the middle of the Covid year?

20    A.    Yeah.

21    Q.    So at that time you moved there, based on your

22  direct experience, is that a multi-racial neighborhood --

23    A.    Yeah.

24    Q.    -- that integrates multiple races in a single

Farrell Court Reporting

Matthew Rigilano

Page 39

1    community?

2         A.    Yeah.

3              MR. SMITH:  Objection to form.

4              MR. ALLEN:  Thank you.

5              I'm gonna introduce as Exhibit 3, I believe.

6              (Exhibit 3 was marked for identification.)

7    BY MR. ALLEN:

8         Q.    So Exhibit 3 is the writing program meeting fall

9    2020 to spring 2021.  Do you see how the caption says

10   that, and it has a relatively strange typo, 20201.  Do you

11   see that?

12        A.    I do.

13        Q.    Do you remember seeing this document?

14        A.    Um, again, not specifically.  But in general,

15   yes, I'm familiar with the document.

16        Q.    And it's -- you see in the lower right-hand

17   corner, there's a very small page number type marking ZDP

18   02934?

19        A.    I do.

20        Q.    I'm just gonna represent to you those are what's

21   called Bates numbers.  When attorneys are producing

22   documents in litigation to each other, we give them

23   stamped numbers that run continuously through all the

24   documents produced.  I may from time to time refer to the

Farrell Court Reporting

Matthew Rigilano

Page 40

1   Bates numbers.  I'm gonna say for the record this is

2   marked ZDP 02934.

3          You understand that this was the agenda for the

4   writing program meetings for the fall 2020 to spring 2021.

5      A.   Yes.

6      Q.   And that's in that caption there, that's probably

7   just an inadvertent typo, to the best of your knowledge?

8      A.   Oh, yes.

9      Q.   And here again, there are three meetings laid out

10  each semester, correct?

11     A.   Correct.

12     Q.   In your experience, did things change between

13  2019-2020 and the new school year 2020-2021 with regard to

14  the program of the writing program meetings?

15     A.   Starting in the fall of 2020?

16     Q.   Starting with this --

17     A.   Yeah.

18     Q.   -- writing program meeting in the fall of 2020,

19  yes.

20     A.   Yes.

21     Q.   And describe those differences?

22     A.   Um, I think after the events of the summer of

23  2020 with the murder of George Floyd and the subsequent

24  protests, there was an effort here for sure and across the

Matthew Rigilano

Page 41

1    country to think more explicitly and more deliberately

2    about issues of racism, and that became the topic for the

3    next few semesters.

4        Q.   When you say the next few semesters, how long did

5    that emphasis that you've just described last?

6        A.   Without reference to the next year's agenda, I

7    can't be certain, but I think until fall 2021, perhaps

8    spring 2022.

9        Q.   Okay.  And looking at meeting three, this was

10   apparently put together by Stephen Cohen and Lila Naydan.

11   Do you see that?

12       A.   Yes.

13       Q.   Racism and writing assessment?

14       A.   Yes.

15       Q.   Did I read that correctly?  Who's Stephen Cohen?

16   Can you describe his position as Penn State Abington for

17   the record?

18       A.   Yes.  At the time, he was a lecturer in the

19   writing program.  Also, it's a full-time position.

20       Q.   A lecturer is a full-time position?  And that's

21   different from a writing instructor, excuse me, a

22   writing --

23       A.   Yeah.

24       Q.   An associate teaching professor or an assistant

Farrell Court Reporting

Matthew Rigilano

Page 42

1    teaching professor is different from a lecturer.  Is that

2    it?

3         A.   Yeah.  He was hired, um, I'm not sure how long

4    before, but before Zack and I, and that was when it's

5    possible, but they didn't have the -- the track that I was

6    referring to, the teaching track, and so lecturer was the

7    sort of general stand-in for a full-time, but non-tenure

8    teaching faculty.  He is now an assistant teaching

9    professor.  He was promoted, so lecturer would be a rung

10   below assistant.

11        Q.   Is a lecturer more what we discussed earlier as

12   an adjunct professor?

13        A.   It's -- it -- not quite 'cause it still occupies

14   that middle ground.  It's -- it's again not, like, paid by

15   the course.

16        Q.   It's a full-time equivalent?

17        A.   It's full-time, yeah.

18        Q.   Okay.  So would someone like Stephen Cohen who's

19   a lecturer participate regularly in the writing program

20   meetings?

21        A.   Um, by participate as a general member of the

22   meeting, not --

23        Q.   A general member of the writing program.

24        A.   Yeah.  Yes.

Farrell Court Reporting

Matthew Rigilano

Page 43

1     Q.   I'm assuming that Stephen Cohen was in the

2   writing program, so let back up.  Was he in the writing

3   program?

4     A.   Yeah.  Yes.

5     Q.   Okay.  Was he a regular attendant at -- was he a

6   regular participant in them throughout the years you've

7   been there?

8     A.   Yeah.

9     Q.   And there's also something assigned called White

10   Teachers are a Problem.  Do you see that?

11     A.   I do.

12     Q.   What was the substance of that program?

13     A.   Um, it was an YouTube video.  It included an

14   interview with Asao Inoue, who is a professor of writing

15   and composition.  I don't -- I can't remember where, maybe

16   Arizona, somewhere west.  And the -- I believe the

17   interviewer was maybe a graduate student or someone who

18   had a YouTube channel.  I don't -- I'm not gonna

19   speculate.  I don't remember exactly, and it was about

20   issues of race in education.

21     Q.   And were white people or white teachers, excuse

22   me, characterized as a problem in that content that was

23   proscribed through your writing program meeting three?

24     A.   I don't really remember the interview itself.

Farrell Court Reporting

Matthew Rigilano

Page 44

1    Q.   You don't remember anything about that?

2    A.   I remember thinking that -- that the title was

3    clearly provocative, White Teachers are a Problem.   But I

4    believe that the substance of the conversation, to the

5    extent that I can remember, had more to do with -- or had

6    less to do with, like, indicting white teachers and more

7    to do with sort of imploring white faculty, who make up

8    the majority of writing instructors in the U.S., to

9    consider race, their race in their course design and

10   interactions in the classroom.

11   Q.   Did you fell that you did not consider race as

12   part of your approach to teaching and understand of

13   writing prior to this 2020-2021 academic year?

14   A.   I had considered it before, yes.

15   Q.   And have you ever heard at Penn State Abington of

16   anyone assigning a course material of the nature black

17   teachers are a problem?

18   A.   No.

19   Q.   Would you object to such content if someone said

20   let's all get together and read a paper called black

21   people are the problem?

22        MR. SMITH:  Objection to form.

23        THE WITNESS:  I would, yes.

24   BY MR. ALLEN:

Farrell Court Reporting

Matthew Rigilano

1    Q.   And I assume that you consider yourself as far as

2   possible not to be racist, correct?

3    A.   Correct.

4    Q.   And by that, I mean that you would not judge

5   someone by stereotypes based on skin color?

6    A.   Correct.

7    Q.   And would you consider something assigned black

8   people are the problem to be racist in that regard?

9         MR. SMITH:  Objection to form.

10         THE WITNESS:  Um, yes.

11   BY MR. ALLEN:

12    Q.   Was there any -- setting aside anything said by

13   my client, Zack De Piero, was there anything in your

14   experience said objecting to White Teachers Are a Problem

15   as being racist?

16    A.   By members of the writing program?

17    Q.   Correct, except for Zack De Piero.

18    A.   No, I don't recall any other objections.

19    Q.   And you gave in spring of 2021, meeting number

20   one, The Politics and Participation and Conversation.  Did

21   I read that correctly?

22    A.   Yes.

23    Q.   That was held in January of 2021.  And it lists

24   you as the leader of that discussion?

Farrell Court Reporting

Matthew Rigilano

Page 46

1      A.     Uh-huh.

2      Q.     Can you just explain for the record what you

3   discussed in the writing program meeting?

4      A.     Sure.  Um, I think the substance of it or, shall

5   I say, the motivation of it was I think primarily like our

6   recent experiences on Zoom where class -- where student

7   participation was a major problem for many people for a

8   bunch of fairy obvious reasons, and so the discussion was

9   meant to get us to think about, like, how do we get

10   students to participate.  But also, the reason it's called

11   like sort of the politics of participation is to some

12   extent like trying to think about maybe like the

13   sociological and cultural reasons why students from

14   different backgrounds may or may not participate.  Yeah.

15      Q.     Did you have any particular focus on white people

16   being the problem in that meeting?

17      A.     No.

18      Q.     Were you -- were you required at Penn State --

19   I'm done with Exhibit No. 3, thank you, for now at least.

20           I want to ask you more generally back in this

21   time period 2020 to 2022, let's say.  Were you required to

22   attend training modules, any kind of sessions on

23   diversity, equity and inclusion?

24      A.     No.

Farrell Court Reporting

Matthew Rigilano

Page 47

1    Q.    Did you attend any?

2    A.    I didn't.  I went to some talks that would have

3    been kind of under the sort of the aegis of DEI, not

4    remembering who sponsored them specifically.  But we -- we

5    invited Asao Inoue to give a talk.  It was on Zoom.  And

6    there was another one, I can't remember the name of the

7    speaker, but I attended those two.  But in terms of, like,

8    the broader sessions offered by different programs in

9    different levels of, like, the administration, um, I

10   didn't attend many.  I mean, this is neither here nor

11   there.  I had a very small child also, born at the end of

12   2019, so --

13   Q.    Congratulations.  Your only child now?

14   A.    Yes.

15   Q.    So he or she must be what, five, now, six?

16   A.    Four.

17   Q.    How nice.  Did you keep a copy of any of those

18   DEI materials in the talks you did go to?

19   A.    Um, if -- no.  I mean, typically, the talks

20   wouldn't have -- they were all on Zoom at this time.

21   There weren't handouts and such.  I -- I have the e-mails

22   record, of some of which I procured or the ones I could

23   find, yeah.

24   Q.    And I'm glad you pronounced his name Asao Inoue?

Farrell Court Reporting

Matthew Rigilano

Page 48

1    A.   I believe.  I've always said Asao Inoue, Inoue.

2    Q.   Inoue?  Well, since he's not here to correct

3 me --

4    A.   I could --

5    Q.   -- we'll use your pronunciation.  I've wondered

6 that myself, and I've not been able to figure it out from

7 various things I looked up.

8         Were you aware of any initiatives in that time

9 frame, 2020-2022 roughly to reorient Penn State University

10 Abington campus towards some kind of diversity, equity and

11 inclusion initiative?

12   A.   Um, not specifically.  I think -- I don't

13 remember the timeline.  I believe we already had an office

14 of DEI and prior to 2020.

15   Q.   Do you know who would have led that office?

16   A.   May I?

17   Q.   Please.  Just let the record show -- we've got a

18 video, but he's -- you're referring to the notice of

19 deposition?

20   A.   Yes.  I think it's Annisa Smith.

21   Q.   Annisa Smith?

22   A.   Yes.  But then again, like, that could have --

23 she might have recently taken the post.  I can't remember

24 the timeline.

Farrell Court Reporting

Matthew Rigilano

Page 49

1        Q.   Are you familiar with an employee at the time of

2   Penn State Abington or Penn State more generally named A

3   W?

4        A.   I don't know who that is.

5        Q.   So you don't know what her position was at the

6   time, A W?

7        A.   No.

8        Q.   Did you participate in any initiatives to

9   increase the presence of DEI on campus?

10       A.   Aside from attending the -- the speakers, not

11   really.  And the program meetings, of course.

12       Q.   In your experience, did the program meetings

13   after 2020 -- we just compared 2019-2020 and the school

14   year 2020-2021, right?  And in that transition, did you

15   find thereafter they were more focused on things that have

16   loosely been characterized as diversity, equity and

17   inclusion?

18       A.   Beginning with the semester of fall 2020, yes.

19       Q.   Thank you.  So had you ever heard of an ad hoc

20   committee on diversity, equity and inclusion?

21       A.   This is a senate committee?

22       Q.   Well, I'm asking you.

23       A.   Oh.  Yes.  Um, I wasn't a member of the faculty

24   senate at this time.  But I believe yes, there was an

Farrell Court Reporting

Matthew Rigilano

Page 50

1  ongoing sort of, yeah, committee probably formulated

2  around that time.  I'm not exactly sure what their mission

3  specifically was, I think to draft something.

4      Q.   So you were never shared any materials or

5  documents from the ad hoc committee on diversity, equity

6  and inclusion?

7      A.   Oh, I'm sure they sent something through e-mails

8  and whatever.

9           MR. ALLEN:  I'm just gonna share with you a

10  document I'm gonna mark as Exhibit 4.

11           THE WITNESS:  Can I grab a bottle of water real

12  quick?

13           MR. ALLEN:  Oh, absolutely.  Should we go off the

14  record, please?

15           VIDEOGRAPHER:  Off the record, 11:10.

16                  (A break was held.)

17           VIDEOGRAPHER:  We're back on the record, 11:11.

18      (Exhibit 4 was marked for identification.)

19  BY MR. ALLEN:

20      Q.   Thank you.  So I just marked as Exhibit 4 a

21  document which is Bates stamped ZDP 02247 on its first

22  page.  It's captioned 2020-2021 Ad Hoc Committee on

23  Diversity, Equity and Inclusion year end draft report --

24  or let me put it year end report draft.  Did I read that

Farrell Court Reporting

Matthew Rigilano

Page 51

1   correctly?

2       A.   Yeah.

3       Q.   And I just wanted to skip down to the committee

4   members.  Do you recognize any committee members that were

5   part of the writing program?

6       A.   Yes.  G A, Lila Naydan, Jimmy Pack.

7       Q.   And Jimmy Pack was the individual you had

8   identified earlier as skipping all the writing program

9   meetings?

10      A.   I think yes.  I mean, um, to be clear, he has

11  attended them, like, very periodically, mostly at the

12  first year or two of my starting there, but then less so.

13      Q.   Do you know --

14      A.   It's not -- it's not like I never saw him at one,

15  but he basically doesn't go.

16      Q.   Do you know of any reason why he doesn't go?

17      A.   Um, not really.

18      Q.   And then there's Anissa Smith as part of the

19  staff.  That's the woman you had referred to earlier as

20  the DEI director at Penn State Abington?

21      A.   If I --

22           MR. SMITH:  Objection to form.

23           THE WITNESS:  -- remember correctly, I think that

24  is.

Farrell Court Reporting

Matthew Rigilano

1   BY MR. ALLEN:

2       Q.   Okay.  I just since -- now, let me clarify.  You

3   didn't participate in this committee?

4       A.   I did not.

5       Q.   Do you remember ever getting this report draft?

6       A.   Um, I don't.  I -- I do remember, like,

7   periodically getting e-mail updates through the list serv

8   of things going on with the committee.  I don't know if

9   this was sent as a PDF or maybe it was a link that was

10   provided.  Um, I didn't -- I didn't read it.  I feel --

11       Q.   I'm also going to direct your attention -- I

12   don't mean to interrupt you, but you'll see that they're

13   double-sided.

14       A.   Ah.

15       Q.   So I just don't want you to be confused.

16       A.   Sure.

17       Q.   Please, if at any time I'm asking you to comment

18   on a document you haven't had time to examine, just tell

19   me.  It's not my purpose to rush you through a document,

20   but I don't -- I don't want to spend time reading the

21   whole document, since you already testified that you

22   didn't get it at the time, and --

23       A.   Or didn't read it at the time.

24       Q.   Were you ever interviewed as part of this

Matthew Rigilano

Page 53

1    committee's work or anything of that nature?

2        A.    No.

3        Q.    Okay.  I just had a few questions about the

4    report draft.  You'll see on the bottom, there's a page

5    ZDP 2249.  Could you just, you know, fast forward to that

6    page?  There's a caption called Rationale Abington?

7        A.    Okay.

8        Q.    And I'm just gonna direct you to the second

9    sentence of the first paragraph there.  It says Abington

10   continues to serve a racially, culturally and ethnically

11   diverse population, with 50 percent of students who

12   identify as minorities and 40 percent who identify as

13   first generation college students.  While perhaps

14   comparatively diverse to other institutions, Abington

15   still has a majority white staff at 59 percent and faculty

16   64 percent.

17            Did I read that correctly?

18       A.    Yes.

19       Q.    Is it your understanding, then, that there is --

20   from these statistics that there's discrimination at

21   Abington?

22            MR. SMITH:  Objection to form.

23            THE WITNESS:  Um, no.

24   BY MR. ALLEN:

Farrell Court Reporting

Matthew Rigilano

Page 54

1    Q.   Should there be more white staff?

2         MR. SMITH:  Objection to form.

3         THE WITNESS:  Um, what do you mean by should?

4    Like according to what idea?

5    BY MR. ALLEN:

6    Q.   At Penn State Abington, in your understanding and

7    experience, is there an initiative to increase the

8    proportion of faculty who are not white?

9    A.   Yes.  I think, um, in -- in general, nonspecific

10   terms, I think there is the idea that, um, because of the

11   sort of the disparity that you mention in the numbers that

12   it would be a good idea to, you know, make sure that we

13   are attending to diversity in hiring practices.  I

14   don't -- I'm not familiar with any quota or anything of

15   that nature that Abington has in mind.

16   Q.   Is there any general initiative that you're aware

17   of to decrease the portion of faculty that are of any

18   other race, to your knowledge?

19   A.   No, not to my knowledge.

20   Q.   Is there an initiative to your knowledge to

21   increase the number of faculty who are black?

22   A.   I don't know if I've heard that specifically.

23   Typically, the idea of attending to diversity is usually

24   articulated in those terms.  So a list such as you

Farrell Court Reporting

Matthew Rigilano

Page 55

1    mentioned like racially, culturally and ethnically diverse

2    faculty would be, you know, sought.

3        Q.   And in fact, it says in the second sentence of

4    the second paragraph there first, because we recognize the

5    many diverse perspectives that students, faculty and staff

6    can bring to the campus community, therefore, we believe

7    that it is important to hire faculty and staff who reflect

8    the student body.  Did I read that right?

9        A.   Yeah.

10       Q.   And then second, as a community of educators

11   dedicated to ongoing development, we need an array of

12   diverse perspectives in terms of training programs.  Did I

13   read that right?

14       A.   Yeah.

15       Q.   Third, it is important to teach diverse

16   perspectives within the curriculum through course content.

17   And finally, because we believe that diversity is not

18   static, it is important to make sure that these

19   initiatives are sustained and available over time.  Did I

20   read that right?

21       A.   Yeah.

22       Q.   So is it -- is it your understanding that if a

23   report of the Penn State Abington is reporting that 50

24   percent of students identify as minorities that the goal

Matthew Rigilano

Page 56

```
 1   would be to have 50 percent of the faculty and staff be
 2   minority?
 3              MR. SMITH:  Objection to form.
 4              THE WITNESS:  Not based on the -- the paragraph
 5   that you just read.  I mean, the -- I think the line there
 6   is we believe that it is important to hire faculty and
 7   staff who reflect the student body.  Um, I guess that
 8   could be interpreted to mean reflect in terms of precise
 9   numbers, but it could also mean just more generally
10   reflect those diverse perspectives.
11   BY MR. ALLEN:
12      Q.   And --
13      A.   I don't know what -- yeah, what they --
14      Q.   How do you understand that conversation at Penn
15   State Abington when it's supposed to reflect the diversity
16   of the student body?  What diversity is it supposed to
17   reflect?
18              MR. SMITH:  Objection to form.
19              THE WITNESS:  I'm just reading over it again.
20   BY MR. ALLEN:
21      Q.   Please.
22      A.   Right.  I understand it to mean kind of just
23   generally that we have a diverse student body and that we
24   should strive to have a diverse faculty that -- that
```

Farrell Court Reporting

Matthew Rigilano

Page 57

1   reflects it.  I'm not -- I'm not sure that it would mean

2   specifically that we need to achieve a particular number.

3   I don't know --

4        Q.   Sure.

5        A.   -- if that works or if that's desirable.  I think

6   it says a general orientation.

7        Q.   Uh-huh.

8        A.   I don't know what that would look like in terms

9   of hiring committees, for instance.

10       Q.   Uh-huh.

11       A.   How this would translate other than the fact that

12  I think Penn State in general beyond this document has a

13  kind of university-wide commitment to, you know, attending

14  to issues of diversity in the hiring practice.

15       Q.   That kind of feeds into what I wanted to ask you

16  next is I know you hadn't seen this document before today,

17  and I'm not trying to suggest you had.  But this is

18  certainly not the first time that you've encountered the

19  idea of the diversification of Penn State Abington's

20  faculty and staff at Penn State Abington, correct?

21       A.   That's correct.

22       Q.   And so with regard to your experience of this

23  initiative to diversify the employees of Penn State

24  Abington, I guess what I'm trying to get at with my

Matthew Rigilano

Page 58

1  question is how does Penn State Abington define diversity?

2  What diversity are they interested in, Professor Rigilano?

3          MR. SMITH:  Objection to form.

4  BY MR. ALLEN:

5      Q.   Rigilano, excuse me.

6          MR. SMITH:  Just to clarify, are you asking him

7  Penn State administration's view, his view, writing

8  program's view?

9  BY MR. ALLEN:

10      Q.   Based on your understanding, the institution Penn

11  State Abington.

12      A.   Yeah.

13      Q.   What are they driving -- what is Penn State

14  Abington driving for when they want to diversify the

15  faculty?

16          MR. SMITH:  Same objection.

17          THE WITNESS:  Um --

18          MR. ALLEN:  It's preserved for the record.

19          THE WITNESS:  Yeah.  I mean, I think the triad

20  there of racial, culturally and ethnically probably is the

21  central.  There's also this other list, right, of diverse

22  identities across genders, sexual orientations, home

23  languages, religion.  Um, you know what?  I feel like I

24  see this kind of rhetoric in different ways.  I don't

Matthew Rigilano

1    think I see a particular stress.

2    BY MR. ALLEN:

3        Q.   Uh-huh.

4        A.   Um, I feel like I probably see class difference

5    less than all these other ones.  But otherwise, um, I

6    think it's, again, like it's kind of like a nebulous

7    thing.  I don't, like, remember specific meetings that --

8    yeah.

9        Q.   Do you ever recall any emphasis on the diversity

10   of critical viewpoints?

11       A.   Not as such.  I think often times, critical

12   viewpoints are linked that the fact that there would be

13   different critical viewpoints probably connected to these

14   diverse identities.

15       Q.   And if you skip forward to the next page, I

16   believe it's ZDP 02250, you see how there's a number three

17   under the heading hiring recommendations?

18       A.   Yes.

19       Q.   And the committee is providing recommendations to

20   the chancellor in that number three, correct?

21       A.   Yeah.  I'll take a second to read this.  Okay?

22       Q.   Have you had a chance to read that?

23       A.   Yeah.

24       Q.   So under number three, they're recommending to

Farrell Court Reporting

Matthew Rigilano

Page 60

1    the chancellor meeting a baseline for full-time hiring

2    goals based on historically and continuous marginalized

3    intersectional identities, most notably race and

4    ethnicity, but also gender identity and expression, sexual

5    orientation, ability, et cetera.  Did I read that

6    correctly?

7         A.    Yeah.

8               MR. SMITH:  Objection to form.

9    BY MR. ALLEN:

10        Q.    What -- what -- what do you understand

11   intersectional identities to mean?

12        A.    Um, so the idea being that one's identity is

13   composed of a multitude of different attributes.  So for

14   instance, you could be a, you know, a -- a black, you

15   know, queer woman, and those two things would be important

16   part of your identity.

17        Q.    Can I suggest you mean three things; black,

18   woman --

19        A.    Excuse me.  Yes.

20        Q.    -- queer, right?  So those ascribed identities,

21   correct?

22        A.    Yeah.

23        Q.    Do you know if this was implemented?

24              MR. SMITH:  Objection to form?

Farrell Court Reporting

Matthew Rigilano

Page 61

1                    THE WITNESS:  I don't know.

2    BY MR. ALLEN:

3        Q.   At number -- under number five, it also if you

4    skip to the last sentence that begins on that page, it

5    says we recommend that BiPOC faculty serving on search

6    committees be compensated for their time e.g. through a

7    course release or be relieved of certain other service

8    responsibilities (University of Colorado Boulder.)

9                    Did I read that correctly?

10       A.   Yes.

11       Q.   And I think that's usually pronounced BiPOC,

12   right?  What does that stand for?

13       A.   I believe it stands for Biracial, Indigenous

14   People of Color.  I could be wrong about --

15       Q.   Does it also -- could it also stand for Black,

16   Indigenous and People of Color?

17                   MR. SMITH:  Objection to form.

18                   THE WITNESS:  Yes.  I think you're right.

19   BY MR. ALLEN:

20       Q.   Thank you.  So this is a recommendation to pay

21   people on the basis of their race more, relieve them of

22   courses on account of their race and et cetera, correct?

23                   MR. SMITH:  Objection to form.

24                   THE WITNESS:  Could you mind if I read the whole

Farrell Court Reporting

Matthew Rigilano

Page 62

1    item number five?

2    BY MR. ALLEN:

3         Q.    Please.

4         A.    Okay.  Could you repeat the question?

5         Q.    Sure.  You understand this is recommending that

6    BiPOC faculty be paid for their time through course

7    releases or otherwise in ways that people who are not

8    BiPOC would not be entitled to, correct?

9              MR. SMITH:  Objection to form.

10             THE WITNESS:  That seems to be what this is

11   suggesting.

12   BY MR. ALLEN:

13        Q.    Do you know if that was implemented?

14        A.    I don't know.  Not to my knowledge.

15        Q.    Incidentally, in your writing program faculty,

16   are there any faculty who are not white?

17        A.    Yes.

18        Q.    And how many?

19        A.    Um, we are mostly white.  I can think of Grace,

20   who identifies as Asian American, I believe.  Um, but in

21   the writing program, I think that's pretty much it.

22        Q.    I'm sorry.  I should just ask.  Do you consider

23   yourself white?

24        A.    Yes.

Farrell Court Reporting

Matthew Rigilano

Page 63

1      Q.  It also says under number six that the college is

2  recommended to revise the current search process checklist

3  and make it standard hiring form to be completed by all

4  search committee members.  The revised search process

5  checklist should consist of best diversity, equity and

6  inclusion DEI practices for each stage of the search

7  process.

8        Did I read that correctly?

9     A.  Yeah.

10     Q.  Go ahead and read all number six.

11     A.  Sure.  Okay.

12     Q.  Are you aware that this was implemented or not?

13     A.  I don't -- I don't know.  The reason I don't know

14  is -- or the reason I hesitated is I was on a hiring

15  committee.

16     Q.  Uh-huh.

17     A.  But I -- I wasn't the chair of the committee, and

18  I don't recall if this was or was not yet implemented.

19     Q.  I -- I was gonna ask you.  Have you been on a

20  search committee?

21     A.  One, yeah?

22     Q.  One?  When was that?

23     A.  Um, fall of 2022.

24     Q.  In that search committee, was DEI discussed in

Farrell Court Reporting

Matthew Rigilano

1    terms of evaluating candidates?

2         A.   Um, not that I recall.

3         Q.   When you were promoted, were you required to

4    write a DEI statement of any kind?

5         A.   I was not.

6         Q.   Have you ever been required to write out a DEI

7    statement?

8         A.   Um, not by Penn State Abington.  I've applied to

9    many jobs beforehand, and it's sort of typical in academic

10   hiring to provide a diversity statement.

11        Q.   And just to close the loop, not by Penn State

12   Abington.  Did any institutional agency associated with

13   Penn State writ large, which is many universities, ever

14   require you to do a diversity, equity and inclusion

15   statement?

16        A.   I'm trying to remember if I had to write one for

17   as I applied to Penn State Abington, like initially.  Um,

18   I don't remember if that was part of it or not.

19        Q.   If such a document existed, do you know if that

20   would be in your personnel file?

21        A.   I'm not sure what they keep.

22        Q.   I think I'll set that aside for now.  Thank you

23   for reviewing that.

24        A.   Yeah.

Farrell Court Reporting

Matthew Rigilano

Page 65

1      Q.   Um, I just wanted to ask you some general

2  questions.  Can you explain to the court what you

3  understand by antiracism?

4      A.   It's a difficult question because there are sort

5  of I think competing definitions that have gained

6  popularity that are attached to this or that individual,

7  um, so like I don't think I could say what the general

8  tendency might be.  But in my -- in my understanding,

9  antiracism is a -- an orientation, a position, a sort of

10  school of thought that, um, seeks to understand and combat

11  racism.

12      Q.   And can we agree that -- I think we already did,

13  but racism means imposing stereotypes to the disadvantage

14  of someone just based on the color of their skin?

15           MR. SMITH:  Objection to form.

16           THE WITNESS:  I think that's one component of

17  racism, not that it's necessarily the whole -- the whole

18  thing.

19  BY MR. ALLEN:

20      Q.   What are some other things that you would include

21  as racism?

22      A.   I know that one aspect of antiracist sort of

23  theory and sort of foregrounds the systemic nature of

24  racism, right?  So the idea that it's not necessarily a

Farrell Court Reporting

Matthew Rigilano

1   matter of kind of like, personal animus or just

2   stereotypes, for instance, but the way in which

3   institutions, historical practices, et cetera, the way in

4   which, you know, power is -- is wielded in any racist way.

5      Q.   And so let's bring this to your topic of writing

6   and teaching the English language.  What is meant by the

7   phrase white language supremacy?

8      A.   I think that's often used to describe the way in

9   which in writing studies and in I think other sort of

10  programs in the university in general, um, there's an

11  assumption of what a -- what the correct standard is to

12  write, what's often called standard English.

13     Q.   Uh-huh.

14     A.   And it is -- that -- that standard is derived

15  very often from the kind of habits and practices of

16  typically sort of white speakers.  So for instance, it's

17  the conventions of white English are different from the

18  conventions of say, you know, colloquial black English.

19     Q.   Are you familiar with the phrase African-American

20  English?

21     A.   Yeah, or sometimes African-American Vernacular,

22  AAV.

23     Q.   I think there are many -- like everything,

24  there's so many delightful acronyms all over the place,

Farrell Court Reporting

Matthew Rigilano

Page 67

1    right, and there are no exception.  So AAE, African-

2    American English, or AAVE and so forth, right?

3             Can we agree that that usually refers to a

4    dialect of the English language predominantly spoken by

5    African-Americans?

6        A.   Yeah.  Yes.

7        Q.   And to some extent, would you agree that it has

8    its own distinctive grammar, its own distinctive meaning

9    of words, vocabulary certain?

10       A.   Yes.

11       Q.   And you have just made a distinction between that

12   and, say, standard English, correct?

13       A.   Yes.

14       Q.   And what is the language spoken by the majority

15   of Americans in your view as a writing professor?

16       A.   What kind of English?

17       Q.   Yeah.

18       A.   It's difficult to answer.  Standard English is

19   typically, like, a writing convention or like it usually

20   designates not so much like just habits of speak, but

21   writing conventions, many of which like, you know, people

22   don't actually use in spoken language, right?  So, you

23   know, little, like, grammatical quirks, ways of, I don't

24   know, using prepositions, things like that you might mark

Farrell Court Reporting

Matthew Rigilano

Page 68

1   in a paper, but would never think to correct someone or to

2   in spoken language.  So it's hard to say whether the

3   majority of -- of those in the U.S. speak standard

4   English.  That's -- that's a tough assumption.

5       Q.   And you -- I'm sorry.  I didn't understand your

6   answer.  They do or they don't -- the vast majority of

7   Americans do or do not speak standard English?

8       A.   To my understanding, standard English is --

9   refers to a set of writing conventions, and so I don't --

10  I'm not sure I would say that people speak standard

11  English.

12      Q.   Would you say these writing conventions that

13  you're referring to as standard English are adopted by the

14  vast majority of Americans?

15      A.   Depends on education, very often.  Insofar as

16  standard English still is the dominant way that I think

17  educators at many levels teach, you know, English and

18  writing, then that would -- then that would make -- I

19  would agree to that, yeah.

20      Q.   You would never say that it's basically academic

21  prose, though, would you?

22      A.   No.  No.

23      Q.   God forbid, right?

24      A.   Yeah.  I would say academic prose, you know --

Farrell Court Reporting

Matthew Rigilano

Page 69

1  well, one, it varies by discipline, you know,

2  significantly.  Um, I would say, you know, some standard

3  English in my mind is usually something like, you know,

4  what do you read in The New York Times.

5       Q.   Okay.

6       A.   What are the sort of grammatical or

7  phraseological conventions that you see in, like, the

8  paper of record.

9       Q.   Let me ask this a different way.  Is standard

10  English in your expertise and view as a writing teacher

11  and Ph.D the language of commerce in the United States?

12            MR. SMITH:  Objection to form.

13            THE WITNESS:  Um, traditionally yes, absolutely.

14  I feel as if it's -- that's changing, like, depending on

15  the business sector, I don't know if that's totally the

16  case.  But in general and most of the time, yes.

17  BY MR. ALLEN:

18       Q.   So is teaching Black students the rules of

19  composition and grammar that are traditionally accepted as

20  standard English racist?

21            MR. SMITH:  Objection to form.

22            THE WITNESS:  No.

23  BY MR. ALLEN:

24       Q.   Do you know the African-American public

Farrell Court Reporting

Matthew Rigilano

Page 70

1    intellectual John McWhorter?

2         A.    To some extent, yeah.

3         Q.    Ever heard him speak?

4         A.    Um, no.  I've read some of his work online, but I

5    don't -- I think I haven't heard him speak.

6         Q.    I'm gonna represent to you that he has described

7    himself on one occasion as speaking with a Connecticut

8    insurance salesman's accent.

9         A.    Okay.  I can imagine that.  Yeah.

10        Q.    You -- you would never argue as a -- as a scholar

11   and Ph.D of -- a student of the English language that that

12   makes him any less black, would you?

13        A.    No.

14        Q.    That doesn't make him white somehow, does it?

15        A.    No.

16        Q.    The fact that he grew up speaking in that way,

17   does that make him a victim of systemic racism?

18              MR. SMITH:  Objection to form.

19              THE WITNESS:  The way -- the fact that he grew up

20   speaking like a Connecticut insurance salesman, does that

21   make him you said less of a victim?  Can you say it one

22   more time?

23   BY MR. ALLEN:

24        Q.    The victim of -- of white supremacy.

Farrell Court Reporting

Matthew Rigilano

Page 71

1      A.    Um, is the idea --

2      Q.    Forget about John McWhorter.

3      A.    Yeah.

4      Q.    You would -- you would acknowledge and have

5   perhaps met individuals who are Black but who --

6      A.    Right.

7      Q.    -- speak standard American English --

8      A.    Sure.

9      Q.    -- with great proficiency and skill?

10      A.    Yeah.

11      Q.    I'm sure you've read James Baldwin, correct?

12      A.    Yeah.  Yes.

13      Q.    And you would never say, I would assume, that the

14   beauty of James Baldwin's prose makes him the victim of

15   white supremacy because it was written in standard

16   English?

17      A.    Oh, right.  Right.

18           MR. SMITH:  Objection to form.

19           THE WITNESS:  I would not say that, no.

20   BY MR. ALLEN:

21      Q.    And I assume you would say the same for Maya

22   Angelou, correct?  In fact, these are masters of the

23   English language, are they not?

24      A.    Fair.

Matthew Rigilano

1    Q.    So explain to me what black linguistic justice

2    is.

3    A.    Um, this is not a concept that I have great

4    familiarity with.  I've heard the term and I know that

5    the -- there were documents circulated at one time dealing

6    with that theme, so I can't speak authoritatively.  My

7    understanding is that the idea I think is that for many

8    Black students entering the writing classroom, they're in

9    certain circumstances, like, they are -- like either

10   through assessment or through the instructor kind of told

11   to communicate in a particular way, right, to adopt the

12   conventions of standard English.  And I think the theory

13   of the term you mentioned is that -- that it's an

14   injustice to suppress this sort of, you know, the mother

15   tongue or sort of more indigenous or first language that

16   the student might have, right?  That -- that somehow, the

17   teaching or the imposition of standard English entails the

18   suppression of what for many students might be seen as a

19   key part of their identity.

20   Q.    And is it -- is it your understanding that

21   learning standard American English requires a Black

22   student to give us their familiarity with African-American

23   English?

24   A.    I think this is -- that's the -- one of the major

Matthew Rigilano

Page 73

1   points of -- of sort of tension in the -- in higher

2   education right now, one of the things being debated.  I

3   think for a long time, there was a, you know, very sort of

4   from my understanding, a strict requirement to adopt those

5   conventions and to, you know, leave everything else at the

6   door.

7          I think in the last couple of decades, there's

8   been -- there's been a pedagogical movement that would say

9   that students' experience, like, with language, with

10  literacy are important tools to leverage in the writing

11  classroom and that the goal of writing instruction is not

12  to, like, impose one set of conventions, but rather to --

13  and I believe this -- to give a student rhetorical

14  awareness so that they understand, like, you know, what

15  languages and what tools do you use in different kinds of

16  context, right?

17         What's gonna work if you're -- if you're applying

18  for a job with The New York Times, what conventions do you

19  want to adopt to speak the language, you know, that will

20  ensure your success there?  There are obviously contexts

21  where hybridity is accepted or encouraged.  There are

22  contexts where standard English is maybe not habitually

23  used and would get you less of a good response.  Like, say

24  you're a politician dealing to different kinds of audience

Matthew Rigilano

Page 74

1   members.  And so anyway, the long -- the answer to the

2   question would be that standard English I think is very

3   often taught, but as, like, a particular mode as opposed

4   to an imposition.

5       Q.   Should a Filipino first-generation immigrant who

6   speaks maybe Tagalog and Spanish and English at most as a

7   second language be forced to learn African-American

8   English so he can interact with black Americans?

9           MR. SMITH:  Objection to form.

10          THE WITNESS:  If that's what the student wants to

11  do.

12  BY MR. ALLEN:

13      Q.   Didn't ask what they wanted.

14      A.   Oh, oh.

15      Q.   I said would you teach -- let's put it this way.

16      A.   Oh, okay.  Sure.  Sure.

17      Q.   I'm sure -- we just read that Abington is -- it

18  seems to be proud of itself as a very diversified student

19  body by race and ethnic origins, right?

20      A.   Uh-huh.

21      Q.   So I'm sure you've had people like the

22  hypothetical student I've just described?

23      A.   Yeah.

24      Q.   Someone who's a first-generation immigrant, may

Farrell Court Reporting

Matthew Rigilano

1    know multiple languages, but English is a second language.

2        A.    Right.   Right.

3        Q.    And one thing we can presume, that they don't

4    have much familiarity with African-American English.

5    Should they be -- should they be taught African-American

6    English so they can interact with African Americans in the

7    United States?

8            MR. SMITH:   Objection to form.

9    BY MR. ALLEN:

10       Q.    I'm asking you as a writing professor --

11       A.    Yeah.

12       Q.    -- at Penn State.

13       A.    It's an interesting question.   I can't say I've

14   considered it much.   I mean, my first response would just

15   be I don't see anything particularly problematic with

16   that.   I think, you know, the -- one would have to balance

17   it against just the general outcomes of the course and

18   what its utility is meant to be.   Right?   If we're -- if

19   we want students to, you know -- you mentioned like the

20   language of commerce.   You know, if we want students to be

21   able to be competitive on the job market or to do this or

22   that or to be on their -- for instance, in their

23   discipline or in graduate studies, then that would

24   probably have less purchase.   That would be less pertinent

Matthew Rigilano

1    like, you know, as I prioritize the demands of the class.

2    But I also think it's an interesting idea.  I mean, I

3    teach a wide variety of texts, not all of which is what

4    you would call standard English, to give students from

5    different backgrounds different models of rhetorical

6    expertise.

7         Q.   Let me switch to a different topic.  Can you

8    describe what you understand as white privilege?

9         A.   Um, yes.  The idea is that if you are white in

10   America, you are accorded privileges that non-white people

11   aren't.

12        Q.   Is that how you understood it as purveyed by Penn

13   State?

14        A.   I'm not sure I have a clear idea of how Penn

15   State sort of defines it.

16        Q.   Has it been discussed at Penn State since you've

17   been there?

18        A.   Yes.

19        Q.   Widely discussed?

20        A.   Since 2020 recurrently.

21        Q.   Has it been discussed repeatedly by your program

22   coordinator of writing, Liliana Naydan?

23        A.   Um, I don't know about by her.  But certainly,

24   the materials that we were addressing as listed on the

Farrell Court Reporting

Matthew Rigilano

Page 77

1   agenda, many of which -- not -- not all, but many of which

2   deal with white privilege or some -- or some version of

3   the concept, if not in name.

4       Q.   And to -- the close the loop, is it safe to say

5   that she promoted this engagement with concepts like white

6   privilege?

7       A.   Promoted the engagement?  Yes.

8       Q.   Was there any discussion of black privilege at

9   Penn State?

10      A.   Not to my knowledge.

11      Q.   Any discussion of Asian privilege?

12      A.   No.

13      Q.   Jewish privilege?

14      A.   No.

15      Q.   Just white privilege, right?

16      A.   Primarily, yes.

17      Q.   Now, I assume at Penn State Abington, given the

18  nature of the campus described in the DEI draft report

19  that we saw earlier, which was Exhibit 4, that you have a

20  great variety of white students as well?

21      A.   Yeah.

22      Q.   And I just want to know your experience.  Are

23  they white students who predominately come from extremely

24  wealthy backgrounds, in your experience?

Matthew Rigilano

1     A.    I'm sure there are statistics on this that have

2   been collected by administrators.  But in my experience,

3   most of the white students that I've had are -- well,

4   first of all, most are regional either sort of to the

5   county or sort of the tri-state area and most are what I

6   would call middle class.

7     Q.    Do you consider them privileged simply because

8   they're white?

9     A.    In some respects, not --

10    Q.    You --

11    A.    -- in all.

12    Q.    I'm sorry.  Go ahead.

13    A.    Not in all respects.  I definitely have had white

14  students that were -- that had financial problems and

15  struggled in terms of tuition, purchasing books and what

16  have you, which is clearly not a privilege.

17    Q.    Let me put it differently.  In your experience

18  teaching the white students of Penn State Abington in your

19  writing classes, do you consider them automatically

20  privileged because they're write?

21    A.    I think being white in America confers certain

22  privileges regarding of other disadvantages or, you know,

23  other ways in which you might be unprivileged.

24    Q.    And I assume you've also had a great number of

Farrell Court Reporting

Matthew Rigilano

Page 79

1    black students in your classes who come to learn writing?

2        A.    Correct.

3        Q.    Do you consider them automatically disadvantaged?

4              MR. SMITH:  Objection to form.

5              THE WITNESS:  Not automatically.

6    BY MR. ALLEN:

7        Q.    And I -- do you consider any other race but your

8    white students to be automatically enjoying some form of

9    privilege as you described it earlier?

10       A.    Um, well, I mean like with my wealthy students

11   enjoy privilege, but that is cross racial and again, only

12   in the American context.  We have, for instance, many

13   international students, so I can't speak to their relative

14   privileges in their respective countries.

15             MR. SMITH:  Would you mind not right now, but

16   take a bathroom break?

17             MR. ALLEN:  I was gonna say, like I was gonna try

18   to think if I can get to something.  Let's go --

19             MR. SMITH:  Whatever's a good time for you.

20             MR. ALLEN:  Can we go off the record?

21             VIDEOGRAPHER:  Off the record, 11:53.

22                  (A short break was held.)

23             VIDEOGRAPHER:  We're back on the record, 12:03.

24   BY MR. ALLEN:

Matthew Rigilano

Page 80

1      Q.   Professor Rigilano, did you yourself participate

2   in any initiatives to promote black linguistic justice on

3   campus?

4      A.   No.

5           MR. ALLEN:   I'm going to introduce as Exhibit 5 a

6   document that has the Bates stamp on the first page ZDP

7   02419, and it's captioned -- it's a Gmail captioned

8   Liliana Marika Naydan writing program Penn State Abington.

9           (Exhibit 5 was marked for identification.)

10  BY MR. ALLEN:

11     Q.   So just a question, would you have received this

12  e-mail?

13     A.   Yes.

14     Q.   And I don't see your e-mail address in the first,

15  you know, heading.  Is there a listserv or something of

16  that nature that's identified there that you would have

17  been a party to?

18     A.   Yes.  This was sent through Canvas, which is

19  our -- our sort of learning platform.

20     Q.   I see.  And is that a sort of hub for sending

21  messages to the faculty or --

22     A.   Often, yes, we'd be part of like a group on

23  there.

24     Q.   Right.  And this is dated August 3, 2020, right?

Farrell Court Reporting

Matthew Rigilano

1  A. Yeah.

2  Q. And so its headline black linguistic justice, you

3 remember reading about this at the time?

4  A. Vaguely.

5  Q. And she includes a link.  We'll get to that in a

6 second.  And then in the sentence right after the link,

7 she characterizes the content there as calling on all of

8 us to engage in, quote, antiracist work through the thorny

9 process of reviewing and revising our teaching materials

10 and our perspectives, right?

11  A. Uh-huh.

12  Q. And she wans to assure in the last -- the last

13 part of the compound sentence that ends that paragraph, to

14 assure that all students see that white supremacy

15 manifests itself in language and in writing pedagogy,

16 right?

17  A. Uh-huh.  Yes.

18  Q. And then, I'm just gonna turn your attention to

19 the next page.  And do you see at the bottom, there's a

20 stamp of the URL address?

21  A. Yes.

22  Q. Is that the same one that Liliana Naydan was

23 referring to in her -- in her e-mail?

24  A. Yes.

Farrell Court Reporting

Matthew Rigilano

Page 82

1    Q.   And this appears to be material -- and I'm just

2    gonna represent to you that this was material captured

3    from that very same website.

4    A.   Uh-huh.

5    Q.   And it's captioned this ain't another statement,

6    this is a demand for black linguistic justice.  And it's

7    subheading Conference on College Composition and

8    Communication, July 2020.  Did I read that right?

9    A.   Yes.

10   Q.   Can you explain for the court what the Conference

11   on College Composition and Communication is?

12   A.   Um, the -- the 4C's, as it is sometimes referred

13   to, is a professional organization.  They have annual

14   conferences.  People join that are part of the writing and

15   composition world.

16   Q.   And are you a member of the CCCC?

17   A.   I have never been a member of the 4C's.

18   Q.   As a self-avowed Marxist, have you lobbied to

19   replace the last letter with P?

20   A.   Understood.  If I was a member, I'm sure I

21   could --

22   Q.   Obviously, it's not a serious question, so we can

23   strike that question.

24        Did you read this at the time that Liliana Naydan

Matthew Rigilano

Page 83

1  circulated this call for, quote, black linguistic justice?

2       A.   I did.

3       Q.   So you're familiar with its content?

4       A.   Vaguely.  I haven't read it since, so I'm kind of

5  fuzzy on the specifics.

6       Q.   If I just skip down to the top of -- well, it's

7  marked two out of eight in this website, this printout.

8  It has an inset paragraph there?

9       A.   Uh-huh.

10      Q.   That starts with Ebonics.  Do you see where I'm

11  referring to?

12      A.   The black square?

13      Q.   No.  I'm talking about the it's on page --

14      A.   Oh.

15      Q.   -- 2 of 8, and it has an inset paragraph?

16      A.   Yes.

17      Q.   It says Ebonics reflects the black experience and

18  conveys black traditions and social -- socially real

19  truths.  Did I read that right?

20      A.   Yeah.

21      Q.   As a linguist yourself, what is Ebonics?

22      A.   I believe it's just a now used less term to refer

23  to African American vernacular.

24      Q.   Do you know anything about the history of

Farrell Court Reporting

Matthew Rigilano

Page 84

1   Ebonics?  If you don't, that's okay.

2       A.   I don't.  I know it -- it -- it emerges in I

3   believe the '70s as a -- as an object of study.

4       Q.   And this is something being actively promoted by

5   the program director of the writing program, right?

6            MR. SMITH:  Objection to form.

7   BY MR. ALLEN:

8       Q.   This black linguistic justice movement of the

9   CCCC?

10           MR. SMITH:  Objection to form.

11           THE WITNESS:  Well, she's, yeah, encouraging us

12  to engage with this material.  Yeah.

13  BY MR. ALLEN:

14      Q.   And then if you look at the black -- I think you

15  first referred to that black block of I guess action items

16  that this group is setting forth, right?  The second one

17  says -- apparently, these are calls to action, if you skip

18  down.  Is that fair to characterize the document as

19  highlighting these as calls to action?

20      A.   Yeah.

21      Q.   And the second one is teachers have to stop -- I

22  shouldn't say it says that literally.  It says teachers

23  stop teaching black students to code switch and teach

24  black students about antiblack linguistic racism and white

Farrell Court Reporting

Matthew Rigilano

1   linguistic supremacy instead, right?

2       A.   I see that, yes.

3       Q.   Was this discussed by your program director,

4   Liliana Naydan?

5       A.   Not that I remember.

6       Q.   It also says teachers --

7       A.   I --

8       Q.   Go ahead.

9       A.   I don't believe.  Like again, I could be wrong.

10  I don't believe this was subject to -- to much discussion

11  in a program meeting, and so I don't know if it was just

12  an e-mail thing or maybe it was, but I don't know.

13      Q.   She's certainly promoting it in this e-mail,

14  right?

15           MR. SMITH:  Objection to form.

16           THE WITNESS:  Um, well, she's -- she's asking us

17  to engage with it.  Promote, I'm not sure.  I mean,

18  it's -- you know, it's a big conference that any comp

19  person would be associated with, and so I think -- I can't

20  speak for her, but I think she thinks it's important to

21  engage with it.

22  BY MR. ALLEN:

23      Q.   Well, let's look at what she says for herself on

24  Page 1 of Exhibit 5.  The e-mails says I hope you'll join

Farrell Court Reporting

Matthew Rigilano

Page 86

1    me in this important work to assure that black students

2    can find success in our classrooms, right?

3         A.   Yes.

4         Q.   Is it fair to say she's promoting it?

5              MR. SMITH:   Objection to form.

6    BY MR. ALLEN:

7         Q.   She's saying I hope you'll join me, correct?

8         A.   Yes.

9         Q.   Is it your testimony today that that's not really

10   promoting or endorsing this black linguistic judgment --

11   justice movement of the CCCC?

12        A.   I mean, I think she's promoting our engagement,

13   which is to say, you know, I don't think she's saying I

14   agree to every element in this document.  But I think she

15   thinks in general, it is a legitimate and important

16   conversation to have and that she clearly subscribes to

17   certain ideas about the way in which white supremacy

18   manifests itself in language as written there.

19        Q.   Sure.  As your program director, right?

20        A.   Yes.

21        Q.   You would agree that she's sending this as the

22   program director of the writing program?

23        A.   Um --

24        Q.   Through Canvas, right?

Farrell Court Reporting

Matthew Rigilano

Page 87

1     A.   She was -- she was the director at this time,

2  yes.

3     Q.   And she was also department head of the English

4  program?

5     A.   Correct.

6     Q.   Just to close the loop, if you jump back to Page

7  2 of 8 of this website, you see how at the bottom under

8  that big block of black, white letters on black

9  background, it says we demand that.  It's almost like a

10  manifesto, correct?

11          MR. SMITH:  Objection to form.

12          THE WITNESS:  Could you point to where you're

13  referring again?  Oh, on the side.  Yeah.

14  BY MR. ALLEN:

15     Q.   Do you see we demand, and then down here?

16     A.   Yes, I see that.

17     Q.   And these are the same.  I think we can see this

18  on film, but I'm just -- I'm just pointing to the witness

19  that there is literally the phrase we demand that.  And

20  then, there's a bullet point one, two, three.  And those

21  are the same demands that are in this black block?

22     A.   Uh-huh.  Yes.

23     Q.   Apparently for emphasis, correct?

24     A.   Yes.

Farrell Court Reporting

Matthew Rigilano

Page 88

1   Q.   Okay.  And then if you look down on the next

2   page, there's another demand?

3   A.   Three of eight.  Yeah.

4   Q.   Yes.  And incidentally, this is publicly

5   available on the website of the CCCC?

6   A.   Yeah.

7   Q.   It say demand.  We demand that teachers stop

8   using academic language and standard English as the

9   accepted communicative norm which reflects white

10   mainstream English, exclamation point, right?

11   A.   Yes.

12          MR. SMITH:  Michael, I apologize.  Are we -- I'm

13   not sure where we are on Page 3.  Are we at the bottom?

14          MR. ALLEN:  Page 3 of 8.  Do you see where it

15   says demand, hash tag, numeral one?

16          MR. SMITH:  Oh, I'm sorry.  I was looking at

17   number two.  Thank you.

18   BY MR. ALLEN:

19   Q.   It's in bold as the heading of that entire

20   section, right?

21   A.   Correct.

22   Q.   And if you look down at some of the text, it says

23   in the looks like third sentence in that paragraph under

24   that we demand big black block with white letters,

Matthew Rigilano

Page 89

1    socially constructed terms like academic language and

2    standard English are rooted in white supremacy with white

3    in bold, right?

4         A.   Uh-huh.

5         Q.   Whiteness and antiblackness and contribute to

6    antiblack policies that are codified and enacted to

7    privilege white, white in bold again, linguistic and

8    cultural norms while deeming Black language inferior.  Did

9    I read that correctly?

10        A.   You did.

11        Q.   Do you know of any writing professor at Penn

12   State Abington that would have ever characterized African-

13   American English as inferior while you were there?

14        A.   No.

15        Q.   Have you ever taught that to any students in your

16   classes?

17        A.   That, like, Black linguistic practices are

18   inferior?

19        Q.   Yes.

20        A.   No.

21        Q.   But you have taught them that standard American

22   English is what we talked about earlier is the language of

23   commerce, accepted forms of communication among people who

24   would -- I think you characterized this applies to The New

Farrell Court Reporting

Matthew Rigilano

Page 90

1    York Times, correct?

2         A.    That I've taught standard English, yes.

3         Q.    Yeah.

4         A.    I -- but I -- I typically understand it as not

5    the only way to communicate.

6         Q.    And who is your experience has ever taught that

7    it's the only way to communicate?  Let me strike that

8    question.

9         A.    I've been --

10        Q.    Can you name a single professor that you know has

11   taught that at Penn State on any campus?

12        A.    No.

13        Q.    Thank you.  And when you teach standard English

14   as you've described it, your goal isn't to impose upon

15   students who are not white the impression that they're

16   inferior, is it?

17        A.    That's not my goal.

18        Q.    Do you agree with this statement that is purveyed

19   in this demand number two, the second sentence there, it

20   says -- excuse me.  It says in the third sentence will

21   using white, mainstream English prevent black students

22   from being judged and treated unfairly based solely on the

23   color of their skin?  Do you see where they ask that?

24        A.    Could you point me in the direction one more

Matthew Rigilano

1   time?

2       Q.   Sure.   Under number two, see where it says we

3   demand that?

4       A.   Yes.

5       Q.   And it has demand in big, bold letters and

6   underscored?

7       A.   Okay.

8       Q.   Then, there's a number two.

9       A.   Yeah.   I'll read the whole --

10      Q.   Yeah.   So read it for a second.   And then, I'll

11  read it into the record.

12      A.   Okay.

13      Q.   So is it fair to say that this CCCC group is

14  characterizing the teaching of standard American English

15  as what they say here, antiblack linguistic racism?

16      A.   It does seem to imply that.

17      Q.   And that's something that your program director

18  was promoting at Penn State Abington in your writing

19  program?

20          MR. SMITH:   Objection to form.

21          THE WITNESS:   I don't know.   I don't think she

22  was promoting it.   I -- I think she was encouraging us to

23  consider it, which we have discussed in different venues,

24  if not this particular text.   I think many of our writing

Farrell Court Reporting

Matthew Rigilano

Page 92

1  program meetings kind of approach these different ideas,

2  you know, this kind of new rhetoric emerging in 2020 as

3  things to consider.

4      MR. ALLEN:  Let's look at another exhibit that

5  I'm gonna mark as Exhibit 6.  This is gonna be a PSU --

6  incidentally, the Bates stamp used by your counsel is for

7  their production of institutional documents is PSU-De

8  Piero followed by the page number.  Can we understand when

9  I say PSU and the number, that's their documents and their

10  Bates stamps?

11      MR. ALLEN:  Sure.  Yeah.

12      (Exhibit 6 was marked for identification.)

13  BY MR. ALLEN:

14      Q.  So this is Bates stamped PSU 002441.  I'm again

15  gonna have -- ask that the court reporter mark this as

16  Exhibit 6.

17      The heading is an e-mail dated August 12, 2020.

18  And it's from you, Professor Rigilano.  I'm just providing

19  a copy of this to your counsel.

20      Now, it's in the nature of e-mails that they

21  start at the bottom and they go to the top.  So if I can

22  ask you to turn to the last page, that'll be -- if I'm not

23  mistaken, that will be the first in time.  And then, they

24  go on.

Farrell Court Reporting

Matthew Rigilano

Page 93

1        It starts with an e-mail by your program

2    coordinator of the writing program, Liliana Naydan, on

3    August 7, 2020 at 8:34 p.m.  Do you see that?

4        A.   Yes.

5        Q.   And she's again sending out an e-mail where the

6    caption in bold is black linguistic justice, correct?

7        A.   Yes.

8        Q.   And that's this sort of CCCC movement that we

9    just were reading a little bit about in the previous

10   Exhibit No. 5, correct?

11       A.   Yes.  I'm not sure why it's the title of this

12   chain.  Maybe it's a reply to the initial e-mail?

13       Q.   We'll go through it.

14       A.   Okay.

15       Q.   And again, she says I think this is a great idea,

16   right?

17       A.   Yes.

18       Q.   Then if we go up to the next e-mail, there's a

19   response on August 7th at 9:52 p.m. by Stephen Cohen,

20   right?

21       A.   Yes.

22       Q.   And did you describe Stephen Cohen as a lecturer

23   before?

24       A.   Yes.

Farrell Court Reporting

Matthew Rigilano

Page 94

1    Q.    Okay.  And they're discussing the -- the message

2    sent in Canvas, as you can see by the subject line,

3    correct?

4    A.    Yes.

5    Q.    And then, it says if you skip down about the

6    sixth line down, there's a sentence that begins mostly,

7    I'm asking you.  Do you see that?

8    A.    Uh-huh.

9    Q.    Have you had a chance to read this -- this

10   e-mail?

11   A.    Recently?

12   Q.    Just right now.

13   A.    Oh.  Should I read this paragraph?

14   Q.    Sure, please.

15   A.    Okay.

16   Q.    You've had a chance to read it?

17   A.    Yeah.

18   Q.    So is it fair to characterize this message from

19   Stephen Cohen on August 7, 2020 in Exhibit 6 he is talking

20   to your program director, Liliana Naydan, about making

21   what they're referring to as black linguistic justice some

22   kind of initiative that they're developing part of the,

23   quote, official and sanctioned work of the English

24   program?

Farrell Court Reporting

Matthew Rigilano

Page 95

1          MR. SMITH:  Objection to form.

2          THE WITNESS:  Um, I think this was referring to a

3     community of practice, but I don't know what its

4     relationship to black linguistic justice is.

5     BY MR. ALLEN:

6     Q.   Well, this comes in response to her e-mail black

7     linguistic justice, correct, which she says is a great

8     idea.

9          MR. SMITH:  Objection to form.

10         MR. ALLEN:  Your attorney just objected.  I'm not

11    sure what the objection.

12         MR. SMITH:  I --

13         MR. ALLEN:  She says I think this is a great

14    idea.  What's the objection?

15         MR. SMITH:  Michael, as the witness pointed out,

16    there's an e-mail below that that we can't see that she's

17    responding to.  I think it's unclear what she's saying is

18    a great idea.  You're assuming that she's talking about

19    black linguistic justice.  There's an e-mail from Stephen

20    Cohen --

21         MR. ALLEN:  I'm not assuming.  It says black

22    linguistic justice in the caption of the e-mail, correct?

23         MR. SMITH:  Michael, I'm saying there's an e-mail

24    below, Friday, August 7, 2020, 7:23 p.m. from Stephen

Matthew Rigilano

Page 96

1   Cohen where we can't see the body of the e-mail, and she's

2   responding to that.

3       MR. ALLEN:  True enough.  I'm asking him about

4   the e-mails that are right here.  And your objection is

5   preserved, so I'm just gonna go back.

6   BY MR. ALLEN:

7       Q.   And Professor Rigilano, you just said this refers

8   to a community of practice, correct?

9       A.   Yes.

10      Q.   But I wanna read this sentence that begins

11  mostly, I'm asking you.  Okay?  So says mostly, I'm asking

12  you because I'd like to see you, Lila -- or Leela, I

13  believe you've pronounced it -- channel communications

14  about it so that it seems official, quote, and sanctioned

15  by the English program (rather than just the community of

16  practice I was going to put together with people who are

17  teaching online,) right?

18      A.   Correct.

19      Q.   So don't you understand from that that he wants

20  to establish this with what they're working on here, which

21  is referring to black linguistic justice, that he wants to

22  make this some sort of, quote, official and sanctioned

23  project of the English program, right?

24      MR. SMITH:  Objection to form.

Farrell Court Reporting

Matthew Rigilano

1          THE WITNESS:  There was this idea of a community

2     of practice -- I don't remember at what level of the

3     university or if it was outside the university -- that one

4     could apply to to get funds to create whatever a community

5     of practice actually is, which I'm not sure.  Um, again, I

6     think that the -- the black linguistic justice is the

7     subject heading to the e-mail and not necessarily the idea

8     to which Lila is -- is consenting to.  But indeed, Stephen

9     is asking Lila to take sort of charge of this initiative,

10    assuming that it would have more success coming from

11    someone sort of with more clout.

12    BY MR. ALLEN:

13         Q.   And in the -- in the third sentence after that

14    section, he says of course, it might not, which would be

15    all right, too, but I think it stands a better chance of

16    becoming something if it's an official English department

17    thing, right?

18         A.   Yes.

19         Q.   Now, when you got this e-mail string, wouldn't

20    you have understood that to be an initiative to make

21    something part of the official English department?

22         A.   Yeah.  This community of -- this, whatever it's

23    called again, community of practice to make it a sort of a

24    more official element of the -- of the program.

Matthew Rigilano

Page 98

1      Q.   And it's your testimony today that you didn't
2  understand this initiative to be about black linguistic
3  justice?
4      A.   I -- I don't remember.  I don't think so.  It's
5  not -- I think it was more of a general -- it had to do
6  with antiracism, but I can't be sure what its specific
7  reference was.
8      Q.   And then the next e-mail up from that, it looks
9  like -- and just before we go on, your attorney was
10  pointing out that there's some e-mail that seems to have
11  been referred to.  And it says show quoted text at the
12  bottom, right, from Stephen Cohen?
13      A.   Uh-huh.
14      Q.   Do you have any reason -- do you know of any
15  reason why that e-mail was not included in Penn State's
16  production of this e-mail chain?
17      A.   No.
18      Q.   You don't yourself recall deleting it or anything
19  of that nature, do you?
20      A.   No.  It looks like it was there.  It says show
21  quoted text.  I don't know what that means.
22      Q.   So if we go on up on August 9th, so it's now two
23  days later, there's an e-mail by Lee -- Grace Lee-Amuzie,
24  correct?

Matthew Rigilano

Page 99

1   A.   Yes.

2   Q.   And then again, another one by Liliana Naydan on

3   August 9th at 9:24 p.m.   I have to say, you guys work

4   late.   She says -- although it's not clear who the

5   recipient is, but we know -- we'll get to in a second that

6   you received this entire string.   But she says I'm

7   interested in making this work writing program work, not

8   just the work of a special interest group.

9        Do you see how that what I just read aloud starts

10  at the end of the first line?

11  A.   Yeah.   Can I read the first sentence again?   It

12  is kind of weird.

13  Q.   Sure.   I can't find the original e-mail that

14  Stephen sent.

15  A.   Nobody can.

16  Q.   Apparently, she doesn't know either, but I wanted

17  to mention that I'm interested in making this work writing

18  program work, not just the work of a special interest

19  group, right?

20  A.   Yes.

21  Q.   And remember, she had sent an e-mail captioned

22  black linguistic justice as I guess a response to this

23  e-mail, right?

24  A.   That was in the subject header, yes.

Farrell Court Reporting

Matthew Rigilano

1    Q.   And she clearly wants to make whatever she's

2  referring to in the original e-mail that Stephen sent

3  writing program work, not just a hobby?

4    A.   Yeah.  I -- I take that to mean that she wants

5  the writing program to be involved with this community and

6  not just a sort of like a subcommittee.

7    Q.   And then, you see the next day, August 10, 2020

8  at 10:54 a.m., Stephen Cohen responds in the thread,

9  right?

10    A.   There might have been things moved around.

11    Q.   I don't -- I think this was all single sided,

12  right?

13         MR. SMITH:  I have it on mine.

14         THE WITNESS:  It's -- it's -- the number is 2442?

15         MR. SMITH:  Correct.

16  BY MR. ALLEN:

17    Q.   Now, you've discovered the magic of Bates

18  numbers, which we attorneys perversely love.

19    A.   Makes sense.

20    Q.   But yes, here we are in famous PSU page 02442.

21  And you see, it's an e-mail by Stephen Cohen here in

22  Exhibit 6 sent on August 10, 2020 at 10:54 a.m.

23    A.   Okay.

24    Q.   And let's just read some of this e-mail.  Again,

Farrell Court Reporting

Matthew Rigilano

Page 101

1    they're focusing on the centrality of this initiative to

2    the writing program.  If you look at the third paragraph,

3    I think, and please correct me if I'm wrong, that Lila's

4    saying she want -- I assume that's a typo -- want to find

5    a way to make this part of all our regularly scheduled

6    writing program professional development meetings.  Did I

7    read that correctly?

8        A.    Yes.

9        Q.    And do you remember this being an initiative at

10   that time?

11       A.    Um, I don't remember it being an initiative.  It

12   certainly is the case that the year's programming revolved

13   about issues of antiracism.  I was on this chain,

14   presumably, but yeah.  I see that that's what was going

15   on, yeah.

16       Q.    And then, let's skip up to the next e-mail.

17   That's at the midway down the PSU 02441 page.  Do you see

18   that, starts from Liliana Naydan?

19       A.    Yes.

20       Q.    It's a little bit later that morning, just before

21   noon.  She says I am having separate conversations with

22   each of you about how I want to focus on race this

23   semester and all year, really.  Did I read that right?

24   That's the second or --

Matthew Rigilano

1    A.    Yes, I see it.

2    Q.    -- third sentence.

3    A.    Yeah.

4    Q.    Now, do you remember her talking to you

5    individually about this initiative?

6    A.    I don't remember it.

7    Q.    You don't remember the conversation she's

8    referring to here?

9    A.    Um, presumably it has to do with this e-mail

10   above it.  But, like, in terms of just do I remember

11   having the e-mail conversation?  Not particularly.

12   Q.    And you see that your e-mail is here on the CC

13   line, correct?

14   A.    Yes.

15   Q.    And that seems to be a private e-mail; is that

16   correct?

17   A.    Yeah.  That's my Gmail account.

18   Q.    Okay.  Then, we get to the header e-mail in which

19   you're writing back and responding to this thread, right?

20   A.    Yes.

21   Q.    And you express your agreement that the writing

22   program meetings should be used to discuss how teaching

23   can respond to the social and political dynamics of the

24   present moment, right?

Farrell Court Reporting

Matthew Rigilano

1     A.   Yes.

2     Q.   More particularly, skipping through a sentence,

3  you write I agree that the topic on which I will be

4  leading discussions in January can and should be modified

5  to address issues of race and racism more directly, right?

6     A.   Yes.

7     Q.   And when you wrote this e-mail, did you review

8  the entire thread that you were responding to to find out

9  what they were talking about?

10    A.   Huh.  I must have read, been -- yeah, aware of

11  it.

12    Q.   And that would have included your program

13  director's reference to black linguistic justice right?

14    A.   That reference would have been part of it, yeah.

15    Q.   But as you sit here today, you can't remember the

16  individual conversation she referred to in her e-mail

17  thread that you had about this topic, right?

18    A.   Um, not that I remember.  I mean, I was planning

19  to lead one of the meetings that was on the agenda in

20  January on participation, and -- yeah.  Right.  So I

21  have -- there's another e-mail that I gave where, yeah,

22  Lila and I -- I don't remember this.  I just remember it

23  from looking at it in the e-mails that I collected.

24    Q.   The e-mail in your production, is that --

Farrell Court Reporting

Matthew Rigilano

1      A.   Yeah, where, yeah, there was this idea to modify

2  whatever -- I had no plan, so it wasn't a problem -- to be

3  in concert with this initiative.

4      Q.   And do you remember writing a grant of some sort

5  in conjunction with this project?

6      A.   I don't -- I don't know if that ever came into

7  fruition.  Or if it did, it was like it became a thing

8  that Grace and Stephen were doing.

9      Q.   Do you remember the Schreyer Institution for

10  Teaching Excellence at Penn State?

11      A.   Familiar with it.

12      Q.   You don't recall anything about applying for a

13  grant with them?

14      A.   I recall I think that that is what the -- the

15  community of practice is.  Is that -- maybe they sponsor

16  it, but I don't remember writing one, for instance.

17      Q.   You don't remember participating with your

18  program coordinator Liliana Naydan, Grace Lee-Amuzie,

19  Stephen Cohen in an initiative to get a grant from the

20  Schreyer Institute?

21      A.   Is that the same thing as the community of -- I

22  don't know if that's --

23      Q.   Well, this community of practice thing is

24  something you brought up.  But we examined an e-mail by

Farrell Court Reporting

Matthew Rigilano

1    Stephen Cohen, where he says that what he wants to do is

2    specifically not a community of practice, but basically

3    institutionalize something in the writing program.  Do you

4    recall that looking --

5        A.    Yeah.

6        Q.    -- at those e-mails in Exhibit 6?

7        A.    I do.

8        Q.    So again, I didn't participate in this, so I'm

9    asking you as the witness.

10       A.    Right.  I don't remember.

11       Q.    Okay.

12       A.    I do a lot of, you know, engagement.

13             MR. ALLEN:  Well, I'm gonna introduce as Exhibit

14   7, if I can have that stamped.

15             (Exhibit 7 was marked for identification.)

16   BY MR. ALLEN:

17       Q.    This is -- Exhibit 7 is an e-mail sent from the

18   Schreyer Institute for Teaching Excellence on August 31,

19   2020.  And it -- the first Bates stamp on it is 00 -- it's

20   PSU, excuse me, 002368.  Did I read that correctly?

21       A.    Correct.

22       Q.    So does this help refresh your memory that you

23   were at least, you know, addressed by the Schreyer

24   Institute in the granting of this award?

Farrell Court Reporting

Matthew Rigilano

1    A.    Sad to say, it doesn't refresh my memory.   But I

2    see my name there, yes.   I think -- I remember -- I think

3    that they required four participants.   And I was obviously

4    from the other e-mail agreed to a part of it, but I

5    don't -- I don't think I drafted the proposal.   Maybe

6    that's why I don't have a firm memory of it, but it looks

7    like we won some money.

8    Q.    Well, and there's -- it looks like if you skip to

9    the second page, it was the whopping sum of $300, right?

10   A.    Yeah.

11   Q.    And that goes a long way in academic programs, I

12   know.   But I'm more interested in the first line of the

13   second page of Exhibit 7.   It says congratulations --

14   you're also addressed in the letter of congratulations

15   directly in the salutation, correct?

16   A.    Correct.

17   Q.    Congratulations.   It is my pleasure to inform you

18   that your community of practice submission writing

19   teachers for linguistic justice has been awarded support

20   from the Schreyer Institute for Teaching Excellence,

21   right?

22   A.    Indeed.

23   Q.    Now, do you recall, if you do, that that's

24   linguistic justice referred to here is that program that

Farrell Court Reporting

Matthew Rigilano

1  Liliana Naydan was originally referring to in the e-mail

2  string in which she recruited you to apply for this

3  program?

4       A.   Um, right.  So it seems like this community was

5  related to black linguistic justice.  I don't know if it's

6  directly related to the 4C's articulation of that, but

7  certainly --

8       Q.   Okay.

9       A.   -- the idea.

10      Q.   What other initiatives did you work on with

11  regard to these kinds of teacher training programs or

12  anything of that nature that was related to what we've

13  just loosely been referring to as linguistic justice, but

14  please more generally any of thes sort of DEI inflected

15  writing program initiatives?

16      A.   Um, like I said earlier, I didn't do a lot of the

17  or attend many of the various workshops that were on

18  offer.  I went to I believe most, not all of the writing

19  program meetings.

20      Q.   Uh-huh.

21      A.   That we discussed, you know, the text in line

22  with this.  Um, it could be that I -- I mean, I didn't

23  remember doing this.  So there might have been something

24  similar to it, but not to my memory.

Farrell Court Reporting

Matthew Rigilano

1              MR. ALLEN:  Well, let's -- and I just wanna ask

2      about this next exhibit that I'm gonna mark as Exhibit 8.

3              (Exhibit 8 was marked for identification.)

4      BY MR. ALLEN:

5          Q.   Exhibit 8, marked for the record.  It begins with

6      an e-mail captioned 1/19 program meeting antiracist

7      pedagogy.  I'm gonna state for the record that this is

8      Bates stamped ZDP 01507.  But for some reason, the exhibit

9      that I've just circulated to counsel, the Bates stamp has

10     not printed on the bottom of the page.

11             MR. SMITH:  Probably just my copy.

12             MR. ALLEN:  Or both.  But I'm gonna -- I'm gonna

13     circulate to you this same document.  For some reason, it

14     printed one time with the Bates stamp on that first cover

15     e-mail.  And --

16             MR. SMITH:  Okay.

17             MR. ALLEN:  -- for some reason, the one you have

18     doesn't have Bates stamps.

19             MR. SMITH:  So just to clarify, the first page is

20     1507?

21             MR. ALLEN:  Correct.

22             MR. SMITH:  And are they consecutive after that?

23     Do you know?

24             MR. ALLEN:  I believe we will find the

Farrell Court Reporting

Matthew Rigilano

1   attachments are associated with this e-mail.  I can't say

2   that -- in your production, they're not always sequential,

3   and I'm not -- for the record, I'm not impugning your

4   production.  But we didn't get them always in order, so I

5   just can't say.  If they're not on there, I just can't

6   say.

7            MR. SMITH:  Okay.  I understand.

8            MR. ALLEN:  But I think we'll be --

9            MR. SMITH:  We know the first page Bates number.

10           MR. ALLEN:  That's -- I want to give the

11   reference in the record for the court reporter.  We'll go

12   from there.  I think we'll be able to establish the

13   association through the witness.

14   BY MR. ALLEN:

15       Q.   Can I just ask you to look through that?  This

16   one is double-sided, I believe so.

17       A.   Sure.  This is 1/19/2021, yeah.

18       Q.   Correct.  It's dated January 11, 2021, an e-mail

19   sent at 10:55 a.m.  And the person who sent the e-mail is

20   Marissa Nicosia, correct?

21       A.   Correct, Nicosia.

22       Q.   I believe you explained this earlier in your

23   testimony, but who -- can you describe who she was and

24   what position she had at Penn State Abington?

Matthew Rigilano

1    A.   Um, she's the current chair of the English

2   program, and she is a tenure line professor of Renaissance

3   English.

4    Q.   And do you recognize this e-mail?

5    A.   Uh, yeah.  Yeah, again, sort of vaguely, right?

6   We had a box to submit different materials that we thought

7   addressed antiracist pedagogical practices.

8    Q.   And I think you'll see your name and e-mail up in

9   the to line there, right?

10    A.   Indeed.

11    Q.   And there's my client right next to you, Zack De

12   Piero, right?

13    A.   Uh-huh.

14    Q.   So is it safe to say that's your institutional

15   PSU e-mail?

16    A.   Yeah.

17    Q.   And are these materials you recognize in the --

18   there's a screen shot of a Google Drive here.  Do you see

19   that?

20    A.   Yes.

21    Q.   On the third page?  With your name mentioned

22   looks like Rigilano discussion board on Phillis Wheatley?

23    A.   Yes.

24    Q.   Were these the materials associated with the

Farrell Court Reporting

Matthew Rigilano

1  antiracist pedagogy that was being discussed by your

2  colleague Nicosia?

3      A.   In the initial e-mail?

4      Q.   Yes.

5      A.   Yes.

6      Q.   So these were things that the people

7  participating in this uploaded?

8      A.   Yes.

9      Q.   And just skipping down, it looks like the

10  plaintiff Zack De Piero submitted something with a Homer

11  Simpson meme?

12     A.   Uh-huh.

13     Q.   Then next in line was Thomas Heise?  Did I read

14  that correctly?

15     A.   Just Heise.

16     Q.   Heise.  Who is Thomas Heise?

17     A.   Um, he is also a tenure line professor.  He

18  teaches creative writing and American literature.

19     Q.   And he's suggesting that students in his courses

20  would read WEB DuBois, right?

21     A.   Correct.

22     Q.   Nella Larsen, Ralph Ellison, James Baldwin,

23  Chester Himes, Rita Dove, Terrance Hayes and Toni

24  Morrison, right?

Farrell Court Reporting

Matthew Rigilano

Page 112

1    A.    Yes.

2    Q.    Now, I think you would agree that those are all

3  superlative masters of the English language, correct?

4    A.    Correct.

5    Q.    Are they any less black for writing in standard

6  American English?

7    A.    I don't think so.

8    Q.    You would agree that WEB DuBois wrote in standard

9  American English, correct?

10    A.    Yes.

11    Q.    Just as an example.  I don't see why we would go

12  through each one of them, but --

13    A.    I mean, there -- you know, there are

14  distinctions, regional and rhetorical distinctions between

15  these authors.  For instance, Toni Morrison is, as you

16  say, a master of the English language, but she's also a

17  master of sort of, you know, creating literary voices that

18  emerge from the African-American linguistic context.

19    Q.    You would agree, would you not, that it would

20  diminish Toni Morrison to be characterized simply as a

21  Black author rather than an American author, would you

22  not?

23    A.    Could you say that again?

24    Q.    It would diminish Toni Morrison simply to

Farrell Court Reporting

Matthew Rigilano

1    characterize her as a Black author rather than an American

2    author writ large?

3              MR. SMITH:  Objection to form.

4              THE WITNESS:  I think it would be accurate to say

5    that she's a black American author.

6    BY MR. ALLEN:

7         Q.   You're familiar with Mark Twain, right?

8         A.   Yes.

9         Q.   You know that he charactered himself as an

10   American author?

11        A.   Indeed.

12        Q.   And Toni Morrison is certainly no less of an

13   American author in that sense than Mark Twain?

14        A.   Certainly.

15        Q.   The melanin in her skin doesn't make her any less

16   an American author?

17        A.   Certainly.

18        Q.   Doesn't make her any less a master of standard

19   American English?

20        A.   I agree.

21        Q.   You realize that both of those authors wrote in

22   black vernacular, correct?

23        A.   To some extent.  I'm not a Twain scholar.

24        Q.   But you're a student of American literature,

Farrell Court Reporting

Matthew Rigilano

1  correct?

2     A.   Actually, no.  18th century British literature is

3  my central focus in literary studies.

4     Q.   In your studies and as a professional instructor

5  of writing and English, you've been exposed to Mark Twain?

6     A.   Certainly.

7     Q.   And Toni Morrison?

8     A.   Yes.

9     Q.   Thank you.  And -- but Thomas Heise here asserts

10  that in the second sentence of his second paragraph, in

11  the literature, we explore representations of the internal

12  complexity -- I'm gonna skip through the parenthetical --

13  inside racial communities and how this complexity is

14  manifest in a context of white racism.

15     A.   Uh-huh.

16     Q.   Did I read that correctly?

17     A.   Yes.

18     Q.   Do you know of any professors at Penn State

19  Abington that have addressed in this time frame 2020-2022,

20  say, black racism?

21     A.   You mean racism perpetrated by black people?

22     Q.   Correct.

23     A.   I'm not familiar.

24     Q.   Any -- anyone tried to incorporate in the

Farrell Court Reporting

Matthew Rigilano

1    teaching materials of Penn State Abington the racism of

2    Hispanics, say, against, black people?

3        A.   Huh.  I'm not sure.  I don't know really what

4    other people are up to, but not to my knowledge.

5        Q.   You would agree that racism exists among other

6    ethnic minorities, correct?  For each other, for instance?

7        A.   Yes.

8        Q.   It would be foolish to deny that such things

9    exist, correct?

10       A.   Yes.

11       Q.   But in your experience, was it only white racism

12   that was being addressed by these pedagogical movements at

13   Penn State at this time?

14       A.   Um, yeah.  I'd say the majority of the discussion

15   at this time was dealing with anti-Black racism

16   perpetrated primarily by white people.  I think this is a

17   resulting not entirely, but clearly primarily from the

18   events of that summer.

19       Q.   And we're talking -- just to be clear for the

20   record, we're talking about the tumultuous summer of 2020?

21       A.   Correct.

22       Q.   In which Covid was compounded by the murder of

23   George Floyd?

24       A.   Yes.

Farrell Court Reporting

Matthew Rigilano

Page 116

1     Q.    The events in Kenosha, Wisconsin and several

2    others.  Is that fair?

3     A.    Yeah.

4     Q.    Okay.  Then there's Liliana Naydan's contribution

5    on the next page.  I think it's page 6 of Exhibit 8.  Do

6    you see that one?

7     A.    Yes.

8     Q.    And she's asking her audience to respect your

9    peers and educate yourself about bias, correct?

10    A.    Yes.

11    Q.    It sounds like she's also encouraging critical

12   discussion if you look at those bullet points, correct?

13    A.    Um, yes.  So should I -- I'll take a moment to

14   read them.

15    Q.    Please.

16    A.    Okay.

17    Q.    And she -- in fact, in that third bullet point,

18   she actually appears to endorse or encourage criticizing

19   ideas, right?

20    A.    Yes.

21    Q.    So long as you don't criticize individuals.  Is

22   that fair?

23    A.    Yes.

24    Q.    Okay.  And this bias she's talking of, how did

Farrell Court Reporting

Matthew Rigilano

Page 117

1    you understand that?  What is she referring to as you

2    understood it when you read these materials?

3         A.   I guess I assumed that she was talking about the

4    various forms of bias that exist in society and that

5    students should learn about them.  So, for instance,

6    sexism, racism, other kind of oftentimes implicitly held

7    beliefs that I think she's encouraging people to

8    understand.

9         Q.   And don't the materials as we've just examined

10   them also promote bias against white people?

11           MR. SMITH:  Objection to form.

12           THE WITNESS:  Which materials?

13   BY MR. ALLEN:

14        Q.   I don't know.  We just went over Thomas Heise,

15   isn't it his name?

16        A.   Yes, we did.

17        Q.   He's talking about, quote, white racism, but no

18   one else's racism, right?  Does that evince a bias against

19   white people?  It's only their racism we're gonna talk

20   about?

21        A.   I don't know if that's a bias.  It's a focus.

22        Q.   How is a bias different from a focus?

23        A.   Well, I mean, it's two paragraphs.  I don't know

24   if this excludes other kinds of racism, even though it's

Matthew Rigilano

1   clearly focusing on and on white racism.

2        Q.   But you've never heard Thomas Heise to

3   concentrate or focus as you've said on any other kind of

4   racism, have you?

5        A.   Not to my knowledge.  I don't know him well or

6   haven't read his syllabi.

7        Q.   If you could just skip down to Marissa Nicosia's

8   contribution.  She's here on page -- it's the PDF page 10.

9   It starts with the caption Three Performances of Richard

10  II?

11       A.   Yes.

12       Q.   Do you remember examining this?

13       A.   Vaguely.  I can read it over.

14       Q.   Yeah, please.

15       A.   Okay.

16       Q.   So I'm really interested in the sentence that

17  begins the last paragraph there.  Shakespeare is perhaps

18  the pinnacle of white privilege in the cannon.  You see

19  that?

20       A.   Yes.

21       Q.   Now, you were in these discussions.  What did she

22  mean by that as you understood it?

23       A.   Um, I don't remember talking about it.  I think

24  it's sort of -- I think the idea is that, you know, we

Farrell Court Reporting

Matthew Rigilano

1    have these long standing literary cannons, and Shakespeare

2    was white and is often heralded as, you know, the great

3    playwright that he is.  And -- and like that maybe his,

4    you know, whiteness plays a role in other people's efforts

5    to, like, I don't know, create, like, cultural or social

6    lineage or connection.  I'm not really sure what she means

7    by it, honestly.

8        Q.   Is it linguistic injustice to expose Black

9    students to Shakespeare?

10       A.   No.

11       Q.   You would never argue that, right?

12       A.   I would not.

13       Q.   Have you ever heard of anyone arguing that, I

14   don't know, Toni Morrison is canonized because she enjoys

15   black privilege?

16       A.   I have not heard that argument.

17       Q.   You've heard the argument that she's canonized

18   because she's a great writer, right?

19       A.   Yes.

20       Q.   And I think the same for any of those other

21   authors, WEB DuBois, right?

22       A.   Correct.

23       Q.   So it's only white author that you've heard Chris

24   time a quote pinnacle of white privilege at Penn State

Farrell Court Reporting

Matthew Rigilano

1    Abington?

2         A.   Yes.  I mean, insofar as this is probably the

3    sole example.

4         Q.   And then, I see your contribution is next.  The

5    discussion board week nine about I believe it's Phillis

6    Wheatley, is it?

7         A.   It is.  Yes.

8         Q.   And how would you describe your contribution?

9         A.   I'll read it over again.

10        Q.   You wrote this, right?

11        A.   Yes.

12        Q.   And I'm not suggesting your memory is faulty.  I

13   just wanted to confirm.

14        A.   Yeah.

15        Q.   So just to repeat the question, could you read my

16   question to the witness again, Madame Court Reporter?

17        (The court reporter read back the last question.)

18        THE WITNESS:  Um, so this is a discussion board

19   post that would have been in my upper level 18th century

20   British Literature course.  Um, and a discussion board

21   is -- it takes place on Canvas.  It's asynchronizly done,

22   so students would respond to it and to one another.  And

23   I'm asking them to think about the poetry of Phillis

24   Wheatley, who was an important prominent 18th century

Matthew Rigilano

Page 121

1    poet.  She was enslaved for the early part of her life,

2    and she was writing in a moment of political turmoil.

3         Q.   Would you characterize this poem as standard

4    American English to the extent that poetry is standard

5    American English?  You know what I mean?  I'm not saying

6    that poetry doesn't have its own stylistic formalities,

7    but I want to ask whether this is more written in the

8    style of mainstream English.

9         A.   Um, not standard American English.  I feel like

10   that as a model emerges more in the 19th century and kind

11   of solidifies in the 20th.  She's writing in -- in heroic

12   couplets, which would have been popular by people like

13   Dryden and Pope, the early part of the 18th century.

14        Q.   Shakespeare?

15        A.   Well, he had, yet again, another sort of, yeah,

16   particular way of writing.  I mean, it's she's writing in

17   the style of high British poetry in the 18th century.  I

18   wouldn't say it's standard American or any kind of

19   American because most Americans if they were to read this

20   would have no idea what to do, just given the fact that

21   she was extraordinarily literate and --

22        Q.   Astounding.

23        A.   -- culturally aware, whereas, you know, most

24   people that are just, whatever, cobblers would not have

Matthew Rigilano

1    the mythological, Biblical, cultural knowledge to parse

2    this.

3        Q.   It's safe to say she writes heroic couplets in a

4    superlative fashion compared to probably most white people

5    of her day, correct?

6        A.   Yes.

7        Q.   You might even say she's a better writer than

8    George Washington, right?

9        A.   I've never read his correspondence.  But given

10   that she is the one canonized in literary volumes, then

11   probably a good argument.

12       Q.   Is she any less Black for writing in this

13   tradition of British letters?

14       A.   No.  I think it's part of the complexity of her

15   experience was that she was -- wrote in this particular

16   way.

17       Q.   And would you -- is it fair to say this embodies

18   your critical approach to teaching that you described

19   earlier?  You wanna teach critical thinking.  That's what

20   you said earlier, right?

21       A.   Yeah.

22       Q.   And you described your critical thinking

23   approach?

24       A.   Right.

Farrell Court Reporting

Matthew Rigilano

1      Q.   Does this project, this prompt embody that

2   critical approach?

3      A.   Yes.  For instance, there are -- there's -- you

4   know, there are schools of thought that would look at this

5   poem and interpret it exclusively with respect to its own

6   internal logic and not consider, for instance, the social,

7   kind of cultural context that I would think, you know, if

8   you're reading it critically, you'd have to understand,

9   you know, what does it mean for an enslaved person to be

10  writing an encomium to General Washington?  Right?  There

11  are many factors at play that inform the poem, so that

12  would be yes.

13     Q.   I'm curious.  Have you ever applied for a tenure

14  track position at Penn State Abington?

15     A.   No.

16          MR. ALLEN:  Can we go off?

17          VIDEOGRAPHER:  Off the record, 1:00.

18              (A break was held.)

19          VIDEOGRAPHER:  We're back on the record, 1:33.

20  BY MR. ALLEN:

21     Q.   So for the record, I have an audio file.  Well,

22  let me -- let me preface this.  Do you recall, Professor

23  Rigilano, a program meeting on October 18, 2020, I believe

24  it was?  It was on the myth of the color-blind classroom.

Farrell Court Reporting

Matthew Rigilano

Page 124

1      A.    Yes.

2      Q.    And do you remember my client, Zack De Piero,

3  being there?

4      A.    Yes.

5      Q.    Who led that meeting?

6      A.    Um, I think that meeting was co-led by Lila and

7  Grace.

8      Q.    Your program coordinator Liliana Naydan and Grace

9  Lee-Amuzie?

10     A.    Correct.

11     Q.    That was a meeting that advertised to the entire

12  program faculty, correct?

13     A.    Yeah, it would have been.  But yeah, there's --

14     Q.    So anyone could come?

15     A.    Yes.

16     Q.    And it was by Zoom?

17     A.    Uh-huh.

18     Q.    So it was more or less participate in, but at the

19  same time broadcast into people's homes?

20          MR. SMITH:  Objection to the form.

21          THE WITNESS:  It was on Zoom.

22  BY MR. ALLEN:

23     Q.    Correct.  So people were working from home at

24  that time?

Farrell Court Reporting

Matthew Rigilano

Page 125

1    A.   Oh, correct.  Yes.

2         Q.   I ask because it was -- it was still the Covid

3    era?

4    A.   Uh-huh.

5         Q.   And there was no monitor -- do you -- let me put

6    it this way.

7              Do you recall any monitoring of who may or may

8    not have been privy to the Zoom meeting in the background;

9    family members, random neighbors, anything of that nature?

10   A.   Oh, I don't know.  I don't -- I didn't see

11   anybody, like, walking around, but it's always possible on

12   Zoom.

13        Q.   There was never any requirement by the two

14   directors of the program, your program coordinator Liliana

15   Naydan or Grace Lee-Amuzie to limit the Zoom to only

16   people who were visible on the screen?

17   A.   Um, well, it was a meeting for writing program

18   faculty.  I don't -- I mean, other people outside of that

19   wouldn't have been, you know, invited.  Like if there

20   was -- if there was an -- if it was an in-person meeting,

21   it would have just been writing faculty members.

22        Q.   Correct.  But we're talking about how it actually

23   was.

24   A.   Yeah.

Farrell Court Reporting

Matthew Rigilano

Page 126

1    Q.    A Zoom meeting?

2    A.    Yeah.

3    Q.    There was no emphasis by either your program

4    director, Liliana Naydan or Grace Lee-Amuzie that it be

5    kept confidential, right?

6    A.    No.  It didn't have, like, a passcode for

7    entrance.

8    Q.    Do you know if it was recorded by your employer,

9    Penn State Abington?

10    A.    Not to my knowledge.

11    Q.    Okay.  So I'm gonna introduce a recording of that

12    meeting.  I'm gonna represent to you that this is a

13    recording made of that meeting as Exhibit 9.

14         (Exhibit 9 was marked for identification.)

15    BY MR. ALLEN:

16    Q.    I can't give you the exhibit, but we're gonna

17    listen to some clips.  Before we do that, I want to ask

18    you how did -- how did Zack De Piero, how did his

19    participation go in the meeting?

20    A.    Um, so this is the meeting after which there was

21    some discussion with the bias commission, what have you.

22    Q.    You're saying that or you're -- I can't testify,

23    so I'm not --

24    A.    Correct.  Right.

Farrell Court Reporting

Matthew Rigilano

1    Q.    So it's your -- let's just back up.

2          It's your recollection that after this, there was

3    a discussion with the anti-bias people at Penn State?

4    A.    Yeah.  I was just reminding myself of the date.

5    It's been a long, long time.  I obviously have thought

6    about this meeting, you know, on more than one occasion.

7    It was a sort of it felt like a big thing.  I think it was

8    the last meeting I saw Zack in attendance that I

9    recollect, at least on camera.

10    Q.    Uh-huh.

11    A.    I don't remember a lot about, like, how the

12    conversation began or after with respect to Zack's, how do

13    you put it, his participation.

14    Q.    Yes.

15    A.    But then, there was a distinct moment where

16    things kind of turned and he seemed to be addressing I

17    think fairly explicitly Lila and Grace on a particular

18    matter from the reading, and it got a little -- a little

19    uncomfortable and it was like a couple of minutes.  And

20    then, I don't remember what occurred after, like, how far

21    into the meeting that moment was or how the conference

22    kind of got back on track.

23    Q.    I'm glad you mentioned that it got uncomfortable.

24    That's what you just said, right?  Do you recall any of

Farrell Court Reporting

Matthew Rigilano

1    your colleagues at this time advocating that it was

2    necessary to feel uncomfortable in these kinds of

3    conversations about race in the United States?

4        A.   Um, I don't -- I don't remember any particular

5    utterance.  But indeed, during this year, I think part of

6    the rhetoric was to have these conversations that we would

7    often be -- you know, you might be in a position to feel

8    uncomfortable.

9        Q.   Is it a requirement by your employer that you

10   never make anyone feel uncomfortable?

11       A.   I don't know.  For instance, I'm not sure if

12   there's like a code of conduct that says it explicitly.

13   Not to my knowledge.

14       Q.   Do you personally find it unprofessional to ask

15   questions that make people uncomfortable?

16       A.   Um, I don't think that the question itself if --

17   I think it's okay to ask a question that might make

18   someone feel uncomfortable; of course, within the limits

19   of it not being harassing or what have you.  So yeah, I

20   think it's okay that a question can make someone

21   uncomfortable.

22       Q.   Do you recall Zack De Piero gesticulating during

23   the conversation on October 18, 2020?

24       A.   I don't recall his sort of visual presence very

Farrell Court Reporting

Matthew Rigilano

1   well.  Um, I recall he had a fairly intensified tone

2   during his questioning.

3        Q.   Did you find that offensive?

4        A.   I wouldn't say offensive.  I found it

5   uncomfortable.  I think it --

6        Q.   Interesting.

7        A.   The -- it seemed a little more confrontational

8   than is sort of the norms of those kind of meetings.

9        Q.   You remember in your program director Liliana

10  Naydan's materials about racial justice and linguistics

11  that she had actually encouraged people to ask critical

12  questions, right?

13       A.   Uh-huh.

14       Q.   Is it unprofessional to ask critical questions of

15  the directors of a -- let's say the leaders of a

16  discussion like they were leading that discussion October

17  18th?

18       A.   Well, I agree that there was the encouragement to

19  ask critical questions.  I think one of the criteria from

20  the -- from the item mentioned by Lila is like, you know,

21  debating ideas, not individuals.  Um, I feel like this

22  what we're talking about kind of slips between those.  I

23  mean, I think that Zack was -- he was asking about a

24  particular idea about racism in the classroom, but it was

Farrell Court Reporting

Matthew Rigilano

1   directed towards Lila and Grace specifically, how -- how

2   they would respond as opposed to sort of just the group,

3   which again would have been the sort of norm for that kind

4   of conversation.

5       Q.   Do you recall any other participants in the

6   conversation telling the group that they thought Zack's

7   questions were good questions?

8       A.   I don't remember.

9       Q.   So let me just recap.  You don't recall him

10  gesticulating in any kind of offensive way?

11      A.   Not that I can remember.

12      Q.   And you were an eyewitness to the whole Zoom

13  meeting, right?

14      A.   Yes.  I was present, yeah.

15      Q.   You did say that at certain points, you thought

16  that his tone was somewhat I think you described it as

17  elevated?

18      A.   Intense.

19      Q.   Intense.  And that you felt that he addressed

20  Liliana Naydan and Grace Lee-Amuzie directly, which was

21  not the norm for that group?

22      A.   Yeah.  Yeah.  Like for a question like this where

23  it's, you know, just discussing kind of like an academic

24  matter, this seemed to be like have the effect of putting

Farrell Court Reporting

Matthew Rigilano

1   them on the spot, if I could put it that way.

2       Q.   But they were the organizers of this meeting,

3   right?

4       A.   They were.

5       Q.   And they assigned the reading that you were all

6   reading together, right?

7       A.   They did.

8       Q.   Would it be beyond the norm of academic

9   discussions in the writing program led by Liliana Naydan

10  to address someone directly who had assigned a reading?

11      A.   I don't think it was the direct address as such.

12  I think it was the tone seemed to imply that he was

13  frustrated and wanted, like, a specific kind of answer,

14  um.

15      Q.   Was it illegitimate for him to ask a critical

16  question of the people who had organized the writing

17  program meeting?

18      A.   I think it's a gray area.  I think after the

19  fact, I remember thinking, um, that -- that that kind of

20  line of questioning might have been more effective if it

21  was sort of maybe between, like, Lila and Friederike or

22  something like -- like, you know, that Zack had an issue

23  with it and wanted to kind of address it at the level of,

24  like, the administrative level.  So I don't know if it was

Farrell Court Reporting

Matthew Rigilano

1    illegitimate, but it certainly wasn't -- wasn't typical.

2        Q.    Did you believe Zack De Piero should be

3    reprimanded for his behavior in that meeting?

4        A.    I don't know.  I can imagine a number of

5    different ways to resolving it through, like, mediation.

6    I don't -- I don't think that he -- that there was cause

7    for disciplinary action.  It didn't seem to rise to that

8    occasion in my mind.

9        Q.    But you were interviewed by the -- I think you

10   called them the antibias --

11       A.    I'm not exactly sure what the committee called

12   itself.  But yeah, I think they were investigating.

13       Q.    Did you -- do you recall who was investigating,

14   the name of the individual?

15       A.    Only from when I -- from looking through the

16   materials that I provided.  Carmen something.

17       Q.    Does Borges ring a bell?

18       A.    Yes.

19       Q.    That was her?

20       A.    Yeah.

21       Q.    So let's play a couple of clips from that.  Bear

22   with me.  It's not entirely easy to navigate through this,

23   at least I'm not that tech savvy.  And let the record

24   reflect that I am going to play the -- a clip that starts

Matthew Rigilano

1   at 18 minutes and 19 seconds in Exhibit 9, which is an

2   audio file of the October 18, 2020 teacher training

3   program meeting titled The Myth of the Color Blind

4   Classroom.  Is that the correct characterization of that

5   meeting?

6       A.   I think the text we were discussing was The myth

7   of the Color Blind Classroom.  I don't think it was usual

8   to title the meeting as such, but that was the theme for

9   the day.

10      Q.   I just want to make sure that the record reflects

11  that we're talking about the right meeting.

12      A.   Yeah.

13      Q.   And if at any point you think this is a recording

14  that's not of that meeting, just -- just tell me and we'll

15  go to try to sort that out, so let me just play this.  I

16  think this will be audible.

17           MR. ALLEN:  And for opposing counsel, I'll

18  obviously provide the recording.  It's been produced in

19  discovery, but I'll provide it as part of the exhibits

20  that we've sent to the court reporter in electronic form

21  and all that.  Okay?

22           So let's just listen.  Again, this is 18 minutes

23  and 19 seconds.  Sorry.  I succeeded in getting it to

24  play, but now it's -- it was off the mark.  Excuse me.

Farrell Court Reporting

Matthew Rigilano

Page 134

1    Can you hear it?

2                        (Audio plays.)

3    BY MR. ALLEN:

4        Q.    Do you recall him asking that question?

5        A.    Yeah.

6        Q.    Do you find anything about his tone there to be

7    aggressive or unprofessional?

8        A.    No.

9        Q.    And I just want to -- that took him about, you

10   know, from 18 minutes, 19 second time stamp to 19 minutes

11   and 6 seconds to ask that question.  Let's listen to the

12   response.

13                       (Audio plays.)

14   BY MR. ALLEN:

15       Q.    So now, it's 19 minutes and 45 seconds later.

16   Did it appear to you that he got an answer to his

17   question?

18       A.    At that time?

19       Q.    Right.

20       A.    No.

21       Q.    Is that professional to organize a writing

22   program meeting and not answer people's questions when

23   they ask them like that?

24                 MR. SMITH:  Objection to form.

Farrell Court Reporting

Matthew Rigilano

1           THE WITNESS:  Um, well, I think there's all kinds

2    of reasons why people might be -- as I think I mumbled

3    there, I'm re-reading the quote.

4    BY MR. ALLEN:

5           Q.    That was you?

6           A.    Yeah, I think so, collecting their thoughts.  I

7    mean, my -- my guess here or not a guess, but the way I

8    thought I read the situation is Zack says I'm not the one

9    who assigned this for a program reading or for a training

10   program, which kind of sort of had a bit of a tone like as

11   if it's sort of, you know, disapproval, and so that might

12   have been caught Lila and Grace sort of off as in like oh,

13   I'm not just answering a question about racism, but

14   asking -- answering a question about sort of other motives

15   for assigning the readings.

16          Q.    When he said I didn't assign the reading, that

17   was true, though, right?

18          A.    That is -- that was true.

19          Q.    Is the truth somehow toxic to Liliana Naydan and

20   Grace Lee-Amuzie?

21          MR. SMITH:  Objection to form.

22          THE WITNESS:  I'm not -- I couldn't answer for

23   them.

24   BY MR. ALLEN:

Farrell Court Reporting

Matthew Rigilano

1      Q.   Let's -- let's listen to the time stamp 19

2   minutes and 44 seconds.  This is somewhat later after

3   the -- basically the crickets that we heard in response to

4   his first question.

5                    (Audio plays.)

6   BY MR. ALLEN:

7      Q.   So just without getting an answer, he asks a

8   follow-up.

9           You heard that, right?

10     A.   Yes.

11     Q.   Now, what about that question is unprofessional

12   to you?

13     A.   I think the question itself, like the request to

14   see like a side by side of, you know, whatever acceptable

15   or unacceptable forms of teaching is not in and of itself

16   objectionable.  I feel that the -- in the context here,

17   such a question is kind you would voice to the group,

18   like, you know, this is an interesting problem, right?

19   This is the problem that we're all sort of confronting.

20   What are various ways of answering the question?

21           By specifically, you know, kind of intently

22   asking it of Lila and Grace, it was almost as if, like,

23   you know, looking for -- looking for something like, you

24   know, an explicit, like, line in the sand or an explicit

Farrell Court Reporting

Matthew Rigilano

1  rule to follow, an explicit protocol, like, as opposed to

2  more of like a theoretical address.  And so again, I think

3  that is a fine question to ask.  And in a different

4  context, like, one might want to, you know, go to an

5  administrator and be like okay, this is the way I'm

6  teaching.  We're being told, you know, or it's being

7  suggested that we teach a different way.  What am I

8  supposed to do here?  Seems like an administrative

9  concern, not so much sort of discussion concern.

10      Q.   But you remember examining I think it was Exhibit

11  6 where Liliana Naydan as your program director of the

12  writing program expressed her interest in making

13  antiracist pedagogy or words to that effect part of

14  everything we do this semester.  You remember that

15  language?

16      A.   Yes.

17      Q.   And you're saying it's unprofessional to address

18  a question to her directly about a program she put

19  together asking for examples of what it is he is supposed

20  to do?  That's -- that's in your view improper?

21      A.   I -- again, I think that the -- what he wants to

22  find out is -- is legitimate and I think the question is

23  legitimate.  I thought the context for asking it was

24  unusual and, you know, created a bit of a chill in the --

Farrell Court Reporting

Matthew Rigilano

Page 138

1    the discussion.

2         Q.   And of course, this is a discussion in which the

3    underlying things that you were reading were identifying

4    white supremacy, white people, white teaching as the

5    problem, right?

6         A.   Right.   Right.

7         Q.   Do you think that would be insulting to someone

8    who is white?

9              MR. SMITH:   Objection to form.

10             THE WITNESS:   I mean, I was -- I was not

11   insulted.

12   BY MR. ALLEN:

13        Q.   Would you tolerate at Penn State Abington

14   literature that talked about the problem with Black people

15   teaching in the Black classroom and speaking in Black

16   African-American English?   Would you even tolerate that at

17   Penn State?

18        A.   Tolerate -- what the -- what were the examples

19   again?

20        Q.   Disparaging -- literature that was disparaging --

21        A.   Disparaging.

22        Q.   -- Black people, being Black in the classroom.

23        A.   Certainly not.

24        Q.   Manifesting blackness in the classroom, simply

Farrell Court Reporting

Matthew Rigilano

1    having melanin in their skin in the classroom.  You would

2    not tolerate that, would you, sir?

3        A.    I would not.

4        Q.    Do you think anything about the -- not

5    withstanding whether you thought it was proper, do you

6    think he should be sanctioned for asking such a question

7    in the middle of a meeting that's specifically on these

8    readings that were assigned by these two specific

9    professional instructors of English and writing?

10       A.    Um, I think that because it apparently did make

11   them uncomfortable -- I think they articulate that -- that

12   that's cause enough to create some -- again, some kind of

13   mediation, some way of resolving the issue.  I don't know.

14   I haven't thought about sanctions or what would be

15   appropriate in that respect.

16       Q.    Would you expect a professional writing professor

17   to scamper off to the DEI office or whatever that is, the

18   anti-bias office and demand that someone be punished for

19   asking that question?

20            MR. SMITH:  Objection to form.

21            THE WITNESS:  I don't know how the bias office

22   works.

23   BY MR. ALLEN:

24       Q.    Let's listen to another clip, and maybe you can

Farrell Court Reporting

Matthew Rigilano

Page 140

1    answer the question, then.  This is at 23 minutes and 14

2    seconds.  Sorry.  Just backing up a little bit.  It's very

3    hard to get this quite right.

4                        (Audio plays.)

5    BY MR. ALLEN:

6        Q.   What about his tone there was unprofessional,

7    harassing or bullying?

8        A.   I think the reason that I found it to be

9    unprofessional -- I wouldn't say bullying, I don't think

10   that quite applies, but -- but confrontational in the

11   sense that he's sort of trying to make, the way I read it,

12   make Lila and Grace responsible for the reading.  Um, it

13   seems to me like again, in this -- this context, if he was

14   interested in that, he would ask generally or say

15   generally you know what, I'm not seeing a lot of, you

16   know, evidence for the kind of things we would do.  Like,

17   what do we think?  Here, it's more like I need you to be

18   responsible for, like, the entire sort of discipline or

19   the whole movement of, you know, antiracist theory to

20   provide the examples, um, as opposed to something we would

21   kind of like assess collectively.  And I mean, I -- I

22   don't know what I would say if I was put in that position.

23       Q.   Weren't these very people encouraging everyone to

24   report racism wherever they saw it?

Farrell Court Reporting

Matthew Rigilano

1    A.   Yeah.

2    Q.   As you listen to Zack, wasn't it clear that

3    that's what he thought he was doing?

4         MR. SMITH:   Objection to form.

5    BY MR. ALLEN:

6    Q.   Did you get the impression that Zack was calling

7    out a certain racist inclination in the literature and

8    materials that had been put together by his program

9    coordinator, Liliana Naydan, and Grace Lee-Amuzie?

10   A.   I didn't get that impression.  I thought it was

11   more about, like, if I don't, you know, subscribe to a

12   certain way of teaching, like -- or is that a problem,

13   right?  'Cause he's saying like compare side by side and

14   said what if I don't do that.  I think he seemed to be

15   looking for clarity about, you know, where to -- what

16   his -- what he should do in the classroom.

17   Q.   Well, it's a writing program --

18   A.   Yeah.

19   Q.   -- training session, right?

20   A.   Yeah.

21   Q.   Isn't that supposed to be what he's to take away

22   from the writing program meeting?

23   A.   Um, I think -- I don't know.  Training session is

24   a word I actually wouldn't have normally used for these

App.0585

Matthew Rigilano

Page 142

1    kinds of things.  I mean, they're more like discussions.

2        Q.    Incidentally, the exhibit we examined with your

3    own contributions, that was the Exhibit 8 about antiracist

4    pedagogy, was that meant to be a kind of collection of

5    techniques or materials to be used in the classroom?

6        A.    The -- the box that included a number of the

7    different assignments that --

8        Q.    Right, with your exploration of the --

9        A.    Yes.

10       Q.    -- was it Phillis Wheatley?

11       A.    That's right.  Um, I think it was more to share

12   that -- yeah, the strategies because we teach different

13   fields.  We couldn't really co-opt one another's work.

14   Obviously, I don't teach Shakespeare, but just the

15   different, yeah, broad strategies, yeah.

16       Q.    It's meant to give people techniques that they

17   can adapt and use?

18       A.    Yeah.

19       Q.    And that was part of the writing program

20   meetings, too, correct?

21       A.    Well, that was an English program meeting.  But

22   in general, yeah.  There was -- sometimes, they're more

23   like workshops where we are -- for instance, we'll be

24   writing something.  And other times, there will be

Farrell Court Reporting

Matthew Rigilano

1    discussions.

2        Q.   And this writing program meeting was -- was no

3    different in kind, was it?

4        A.   Um, not by much.  Only in the sense that I --

5    again, I don't think I was being like -- it wasn't like

6    this is a training for how to do it.  It was more like

7    this is, you know, an article.  Let's talk about it.

8        Q.   Let's look at the -- another statement that he

9    makes, a question that he asks.  It's at 24 minutes and 5

10   seconds.  I'll see if I can --

11                    (Audio plays.)

12   BY MR. ALLEN:

13       Q.   Was that an unprofessional, bullying or harassing

14   comment to make?

15       A.   I don't think it was bullying or harassing.

16       Q.   We already discussed that it's also true,

17   correct?  People were calling for uncomfortable

18   conversations on race?

19       A.   Yes.

20            MR. SMITH:  Objection to form.

21   BY MR. ALLEN:

22       Q.   Including Liliana Naydan?

23       A.   Yes.

24       Q.   She just didn't wanna be uncomfortable herself,

Farrell Court Reporting

Matthew Rigilano

1   apparently, right?

2          MR. SMITH:  Objection to form.

3          THE WITNESS:  I don't know.

4   BY MR. ALLEN:

5      Q.   Let's skip forward to time stamp 41 minutes and

6   10 seconds.

7                    (Audio plays.)

8   BY MR. ALLEN:

9      Q.   Is something bullying and harassing about that

10  question?

11     A.   Um, not bullying.  I do think that it continues

12  the same thread as the earlier questioning where it's

13  instead of asking, like, a specific question that, you

14  know, the group can talk about it, it was more like

15  holding Grace and Lila responsible for other people's

16  texts.  Like, for instance, when he asks like well, why --

17  why are we reading this instead of something titled that,

18  it's like, I mean, I don't know if there is something

19  titled that.  And also, like, one would have to ask the

20  author, really, right, why they titled it or why they

21  thought that was important.

22          I mean, it's true for sure that Lila and Grace

23  chose, they curated the texts, but I don't know if that

24  makes them responsible for the content and it felt like

Farrell Court Reporting

Matthew Rigilano

1    there was sort of supposition in the question that they

2    are responsible for the content.  I feel like that is

3    where you -- where one gets the sense of sort of

4    discomfort or potentially like, you know disrespect.

5    If -- you know, like I said, I don't think harassment's

6    exactly.  It's certainly uncomfortable.

7        Q.   Well, if they had that point of view, why didn't

8    they -- to your knowledge, why didn't they respond?

9        A.   I don't know.  It's -- I don't know.

10       Q.   Did you ever feel uncomfortable disagreeing with

11   Liliana Naydan on these issues on black linguistic

12   justice, white supremacy, white privilege, the whole

13   litany of antiracist linguistics, however she

14   characterized it?

15       A.   I did not feel uncomfortable.

16       Q.   You never felt that you couldn't speak your mind?

17   Did you ever fear if you dissented from these programs

18   that they were peddling in this writing program meeting

19   that you would be subject to at least disapproval and at

20   worst discipline?

21       A.   Not really.

22       Q.   I wanna skip forward to 45 minutes and 16 seconds

23   through the meeting.

24                        (Audio plays.)

Farrell Court Reporting

Matthew Rigilano

Page 146

1   BY MR. ALLEN:

2       Q.   Was that a harassing and bullying question?

3       A.   I think my response probably is the same as the

4   previous one, yeah.

5       Q.   And do you remember him gesticulating wildly at

6   the time he asked that question?

7       A.   I don't really remember the visuals.

8       Q.   Let's skip forward to 47 minutes and 3 seconds.

9       A.   Could you say that time stamp again?

10      Q.   47 minutes and 3 seconds in Exhibit No. 9.

11                      (Audio plays.)

12  BY MR. ALLEN:

13      Q.   Can you tell me who had responded to his inquiry

14  there?  Do you recognize the voice?

15      A.   I think that was Carolyn.

16      Q.   Carolyn?

17      A.   I can't recall her last name at present.

18      Q.   Was she a member of the writing program?

19      A.   Yes.

20      Q.   What was her position?

21      A.   Um, I'm not sure or assistant teaching professor.

22      Q.   She seemed pretty capable of responding to Zack,

23  right?

24      A.   Yeah.

Farrell Court Reporting

Matthew Rigilano

Page 147

1      Q.   Did she sound insulted to you when you just

2  listened to that?

3      A.   Not that I could tell.

4      Q.   And if I ask again is that a bullying and

5  harassing tone of voice that he was using right then, how

6  would you respond?

7      A.   Not in so much.

8      Q.   And I think your answer will be the same.   But

9  was he gesticulating wildly, as such as you remember it at

10  that time?

11      A.   I can't.   Yeah, I don't remember the visuals.   I

12  did -- I mean, I don't think again that it was sort of

13  bullying or harassing, but these instances did seem like

14  they were kind of accumulating in a certain way.

15      Q.   Is that wrong to continue to ask questions that

16  no one is answering and they accumulate?   I mean, maybe

17  they could have answered the question the first time he

18  asked it, right?

19           MR. SMITH:   Objection to form.

20           THE WITNESS:   It's possible that it would have

21  gone differently.

22  BY MR. ALLEN:

23      Q.   But they didn't, did they.

24      A.   I remember -- are there answers?   I guess you

Farrell Court Reporting

Matthew Rigilano

Page 148

1    can't testify.

2         Q.   You heard roughly 30 seconds of crickets when he

3    asked his first question.

4         A.   But there was some other --

5              MR. SMITH:  Objection to form.

6              THE WITNESS:  -- windows between the clips that I

7    can't recall if there were any other answers.

8    BY MR. ALLEN:

9         Q.   Without a doubt, other people were participating

10   in the conversation and had their own observations.  I'm

11   not denying that.  But when he asked his question first,

12   you heard the complete nonresponse.  He tried again and

13   addressed Liliana Naydan and Grace Lee-Amuzie directly,

14   and then he still got no response, correct?

15        A.   That's correct.

16        Q.   Isn't that unprofessional of the program

17   coordinators?

18        A.   That's a tough call.  I mean, on the one hand, I

19   think, you know, if they felt the question was sort of too

20   personal as not addressing the ideas, but addressing them,

21   they might have been disinclined to -- to talk in a

22   meeting such as this.  Again, if it was like a scheduled

23   meeting to, like, discuss some of these issues, I -- I

24   doubt that that -- this would have been -- it would have

Farrell Court Reporting

Matthew Rigilano

Page 149

1   worked on the same way.

2        Q.   Liliana Naydan and Grace Lee-Amuzie are full

3   grown women, right?

4        A.   Yes.

5        Q.   They're not toddlers?

6        A.   No.

7        Q.   They're not children, right?

8        A.   No.

9        Q.   They're intellectuals in this area and even

10  publish on it, correct?

11       A.   Correct.

12       Q.   Do you have any knowledge that they're especially

13  fragile and can't handle criticism?

14       A.   No special knowledge, no.

15       Q.   Now, I believe you said -- did you say Grace

16  Lee-Amuzie is not white, identifies as Asian of some sort?

17       A.   Correct.

18       Q.   Do you know what national origin or heritage?

19       A.   I believe she is Korean American.

20       Q.   Uh-huh.

21       A.   However, I'm not positive.

22       Q.   Do you know if she suffers from any kind of

23  Korean fragility of some sort?

24       A.   I'm --

Farrell Court Reporting

Matthew Rigilano

1          MR. SMITH:  Objection to form.

2          THE WITNESS:  -- not aware.

3    BY MR. ALLEN:

4      Q.   How about Liliana Naydan?  Do you know what

5    heritage, national origin, race she claims to be?

6      A.   Um, I think she has -- she has ethnic roots in

7    Ukraine.

8      Q.   So Eastern Europe?

9      A.   Uh-huh.

10     Q.   Would you characterize her as white, then?

11     A.   Yes.

12     Q.   Does she suffers from some kind of white

13   fragility that she can't stand criticism, to your

14   knowledge?

15     A.   Not to my knowledge.

16     Q.   Thank you.  I'm gonna skip forward to 49 minutes

17   and 49 seconds.  Sorry.  I got it there all like a good

18   little boy, and it started on its own without listening to

19   me.

20               (Audio plays.)

21   BY MR. ALLEN:

22     Q.   Right here.  So again, all the questions I asked

23   before.  It sounds to me like you had previously said he

24   should pose his questions in more general terms, correct?

Farrell Court Reporting

Matthew Rigilano

1    Wasn't he doing that right there?

2         A.    I think that was an instance of the things kind

3    of turning in that direction.

4         Q.    And do you think there was anything harassing or

5    bullying about that question?

6         A.    No.

7         Q.    The last clip I'm gonna have you listen to is his

8    last intervention in the conversation at 51 minutes and 34

9    seconds.

10         And just to close the loop in that 49 minutes and

11    49 seconds, you don't recall in association with that any

12    wild gesticulation or insulting gestures that Zack De

13    Piero made towards the program hosts?

14         A.    I don't recall that.

15         Q.    Thank you.  So again, this is at 51 minutes and

16    34 seconds.

17                        (Audio plays.)

18    BY MR. ALLEN:

19         Q.    Is he yelling in that clip?

20         A.    No.

21         Q.    Is he bullying and harassing anyone in that clip?

22         A.    No.

23         Q.    If you knew that your employer was potentially

24    going to break the law by introducing some kind of illegal

Matthew Rigilano

1    policy, wouldn't you feel obligated to bring that to your

2    supervisor's attention?

3            MR. SMITH:  Objection to form.

4            THE WITNESS:  In general terms, yeah.

5    BY MR. ALLEN:

6        Q.    So is there something you think he should have

7    been punished for by bringing that up at the end of the

8    meeting?

9        A.    Um, I'm not sure if the meeting was the venue for

10   this kind of, you know, concern that he had, especially

11   there at the end.  It seems like it was a law breaking

12   thing looking at first.  But worthy of punishment?  No.

13       Q.    Were you aware that Zack De Piero submitted a

14   complaint to the appropriate office at Penn State on

15   account of racial harassment at Penn State due to the same

16   kinds of issues that he was bringing up in that meeting?

17       A.    At the time of that meeting, I don't think I knew

18   that.

19       Q.    Eventually you learned it?

20       A.    Yeah, somehow.

21       Q.    Are you aware of anything that Penn State did

22   about it?

23       A.    Um, no.

24       Q.    Were you interviewed in connection with Zack De

Farrell Court Reporting

Matthew Rigilano

Page 153

1    Piero's complaint against his colleagues at Penn State for
2    racial harassment?
3        A.    No.
4        Q.    I think I asked this, but I can't remember.  Do
5    you remember him at the end gesticulating in any kind of
6    insulting way with his hands, his facial expression?
7        A.    I don't recall any visuals.  When you teach all
8    day on Zoom, we kind of have no memory for --
9        Q.    If he was doing something insulting with his
10   hands, with his facial expressions, don't you think that
11   would have stood out in your mind?
12       A.    Um, no.  One, just because it's been a long time
13   and -- yeah.  I mean, it's like I remember very little on
14   Zoom for whatever reason.
15       Q.    Well, certainly, if he flipped off his program
16   coordinator, you would have remembered that, right?
17       A.    Yes.  If something like that were to have
18   happened, yes.
19       Q.    Do you recall being interviewed by Carmen
20   Borges -- I believe we already established that you did --
21   in connection with a complaint made about Zack for
22   precisely his behavior in this meeting?
23       A.    Yes.
24       Q.    Did they ask you about whether you remember him

Farrell Court Reporting

Matthew Rigilano

Page 154

1  gesticulating?

2       A.   I don't remember.

3       Q.   Did Carmen Borges ask you about Zack's tone?

4       A.   Yeah.

5       Q.   And what did you tell her?

6       A.   I think largely what I've said here, that it was

7  intense and confrontational.  I don't remember the words I

8  used.

9       Q.   Is it wrong to be confrontational in an academic

10 meeting over disagreements as long as you keep your voice

11 in a measured and professional tone?

12      A.   Um, I don't know.  I mean, it's -- I think it's a

13 genuine gray area.  I think it's not the norm for the

14 meetings, which is what made it unsettling.  As to whether

15 there should be more confrontation such as in meetings, I

16 feel like that's a discussion.

17      Q.   And you realize that Penn State is a public

18 institution; in other words, an agency of the state

19 government of Pennsylvania?

20           MR. SMITH:  Objection to form.

21           THE WITNESS:  Yeah.  Yes.

22 BY MR. ALLEN:

23      Q.   Would you agree that you were discussing matters

24 of public concerns in that meeting?

Farrell Court Reporting

Matthew Rigilano

Page 155

1      A.   I think in general, yes.

2      Q.   And Mr. De Piero wasn't talking about his own

3    particular administrative role in that meeting, was he?

4      A.   I don't believe he had an administrative role at

5    that time.

6      Q.   You would agree he was trying to engage in the

7    larger ideas that were embodied in the text that had been

8    distributed by the program coordinators, right?

9      A.   Yes.

10      Q.   I just want to finish up this about the -- the

11    investigation.  I want to introduce an Exhibit 10, so go

12    back to paper.  This was actually from the documents you

13    produced, Professor Rigilano.  I'll have that marked

14    Exhibit 10.  It is Bates stamped Rigilano 00042 as the

15    first page.  I'm providing a copy to your counsel.

16      (Exhibit 10 was marked for identification.)

17    BY MR. ALLEN:

18      Q.   Do you see the e-mail that begins the top of this

19    page is from you, correct?

20      A.   Yes.

21      Q.   From your institutional e-mail?

22      A.   Yes.

23      Q.   And it's to Carmen Borges, who we identified as

24    the investigator?

Farrell Court Reporting

Matthew Rigilano

Page 156

1      A.    Yes.

2      Q.    So is it -- is it correct that this document

3  reflects your participation in the investigation?

4      A.    Yes.

5      Q.    And in fact, it looks like you organized some

6  kind of meeting in the morning of October 21, 2021, right?

7      A.    Yes.  She I think originally contacted me, and

8  then we -- we organized a Zoom meeting.

9      Q.    And so within three days of the clips being

10  uttered that we just said, they were swinging into action

11  and investigating and interviewing at least you, correct?

12      A.    Yes.

13      Q.    Would you characterize that as pretty swift

14  action?

15      A.    Yes.

16      Q.    And then if you skip down to the page marked

17  Rigilano 43, could you describe for the record what this

18  is and what role it played in the investigation so far as

19  you were participating in the investigation?

20      A.    Sure.  I only remember it from -- from reading

21  the e-mails, but it's -- I believe what transpired was

22  that after the meeting on Zoom, um, Carmen had maybe asked

23  about specifically what the nature of the questioning was,

24  and I obliged by sending the -- the agenda with the

Matthew Rigilano

1   highlighted portion and then my sort of italicized, you

2   know, summary of -- of how that was initiated.

3       Q.   So the italics were actually text that you wrote

4   yourself?

5       A.   Yes.

6       Q.   And the highlighting, is that highlighting you

7   added yourself?

8       A.   Yes.

9       Q.   And the highlighting is on the first quote, hash

10  tag number one, correct?

11      A.   Right, related to the first clip you played.

12      Q.   And why did you highlight that?

13      A.   I think that was the basis of the first question

14  that Zack asked at the meeting.  He -- he mentioned

15  something about unwittingly, et cetera, and this was the

16  line.

17      Q.   Thereby unwittingly reproduce racist discourses

18  and practice in our classrooms, right?

19      A.   Correct.

20      Q.   And that's referring to the -- I mean, within the

21  context of a piece titled White Instructors Confront White

22  Privilege in their classrooms, that's about white

23  instructors with their supposed white privilege

24  unwittingly reproducing racist discourse and practices in

Matthew Rigilano

1    their classrooms?

2          A.    Yes.   That's what the article is about, yeah.

3          Q.    That's how you understand it, too?   And there

4    wasn't any comparable discussion of how, I don't know,

5    Hispanic professors might reproduce Hispanic privilege in

6    their classrooms, was there?

7          A.    No.

8          Q.    Or Hispanic racism towards, I don't know, Indian

9    Americans?

10         A.    No.

11         Q.    There wasn't any discussion of that, was it?

12         A.    No.

13         Q.    Maybe Indian Brahmins racism towards lower

14   classed Indians.   Anything like that --

15         A.    No.

16         Q.    -- discussed?

17         A.    No.

18         Q.    About how long did that interview last?

19         A.    I don't know for sure.   I remember it being

20   significant, maybe an hour.

21         Q.    And I think you've already testified you

22   basically said nothing different in substance that what

23   you've testified to here today?

24         A.    Not that I can remember.   I mean, if there was a

Farrell Court Reporting

Matthew Rigilano

1   transcript of it, you know, I agree to that, but I'm

2   pretty sure my memory hasn't changed much.  I mean, I

3   probably remember the visuals then 'cause it was fresh.

4   But now, I don't.

5       Q.   And this would have been, again, only three days

6   later, so everything would have been relatively fresh in

7   your mind?

8       A.   Correct.

9       Q.   And Zoom and Covid brain had not yet set in?

10      A.   Exactly.  There's a clock on that.

11      Q.   Okay.  So I don't have any further questions on

12  that.  It's 2:30.

13          MR. SMITH:  Would you mind if we take a --

14          MR. ALLEN:  Can we go off?  Yeah.

15          VIDEOGRAPHER:  Off the record, 2:26.

16                  (A break was held.)

17          VIDEOGRAPHER:  We're back on the record, 2:37.

18  BY MR. ALLEN:

19      Q.   We've reached the best part of the deposition for

20  you, Professor Rigilano, the end.  Well, I presume.

21          (Exhibit 11 was marked for identification.)

22  BY MR. ALLEN:

23      Q.   I just wanted to ask you a question.  Do you

24  recognize this document that I've marked as Exhibit 11?

Farrell Court Reporting

Matthew Rigilano

1      A.    It appears to be text messages between me and

2   Zack.  I don't have any of my old text messages, so I

3   don't really recognize them, but it looks to be the case.

4      Q.    And this is Bates stamp ZDP 00206, so it comes

5   from Zack De Piero's production, I'm gonna represent to

6   you.  You don't have any reason to believe that these are

7   inaccurate records of your text messages with my client,

8   Zack De Piero, do you?

9      A.    No.

10      Q.    And I want you to fast forward to page 18, but

11   I'll get you a Bates stamp number.  It's 223.

12      A.    Okay.

13      Q.    So these appear to be text messages.  If you scan

14   up from January 27, 2021, right?  Do you see that at the

15   top of the previous page, ZDP 0222?

16      A.    Hold on.  Okay.  Yes.

17      Q.    So this is January 27, 2021.  And what are you

18   and Zack talking about?

19      A.    I have no idea.  On 223?

20      Q.    On 223, correct.

21      A.    Okay.  I'll read through it here.  Huh.

22   Interesting.

23      Q.    If I represent that I -- that -- excuse me.  If I

24   represent that you're talking about the scholar of writing

Matthew Rigilano

1    that we talked about earlier, Asao Inoue, is it?

2        A.   Asao Inoue.

3        Q.   Sorry.

4        A.   Yes.  Asao Inoue.

5        Q.   Asao Inoue?

6        A.   Asao Inoue.

7        Q.   Yes.  Does that help refresh your memory of what

8    he's talking here, them bringing Asao Inoue, sorry, to

9    campus?

10       A.   Yes.  This must be in relation to that.

11       Q.   And then you say -- your -- your comments are on

12   the left hand side of this text message string, right?

13       A.   Yes.

14       Q.   And of course, the bubbles on the right side are

15   Zack's as the person who holds the phone that has this --

16   these messages on it?

17       A.   Huh.

18       Q.   Right?  And you say wow, I absolutely won't

19   mention this.  Excuse me.  Wow, I obviously won't mention

20   this.  I also have criticism of some aspects of his work,

21   meaning Inoue.  As we have discussed, I think you should

22   do what you think is right, but I am not sure you will

23   meet a receptive audience for that request.  Is that a

24   fair reading of that message?

Farrell Court Reporting

Matthew Rigilano

Page 162

1    A.    Correct.

2    Q.    So you're warning Zack that he's going to make

3  himself unpopular.  Is that fair?

4    A.    Um, well, just simply that he won't be received,

5  like -- or I think that it was, you know, pretty much the

6  case that by this point, the decision to invite had -- had

7  already taken place and money acquired and things of that

8  nature.  And clearly, you know, I think as we've

9  discussed, I think Lila's supportive of Inoue's work, so I

10  think I'm just referring to the fact that I don't think

11  he'd get a good -- I don't think his request would --

12  would go anywhere.

13    Q.    And so voicing criticism of this author is not

14  going to be well received?

15    A.    Um, I don't know about the criticism, but the --

16  the request to have it canceled I don't think would be

17  received well.

18    Q.    Let's move forward to page 28, and that's Zack De

19  Piero Bates number 233.

20    A.    Okey doke.

21    Q.    And I just give you a second to review the

22  context there.  If you scan up to the three pages

23  previous, ZDP 230, you'll see that these are from February

24  12, 2021.

Farrell Court Reporting

Matthew Rigilano

1      A.    Okay.

2      Q.    Just tell me when you've had a chance to review

3   your messages.

4      A.    Yes.

5      Q.    So just to cut to the chase, you're talking about

6   these sort of antiracist grading practices that are being

7   discussed at this time in your department.   Is that

8   accurate?

9      A.    I'm not sure this was -- that this was about

10   grading practices.   I don't recall.   I mean, it was

11   obviously about something having to do with antiracist

12   pedagogy as he mentions in the prior message.

13      Q.    Fair enough.   And on the blue bubble that begins

14   check it out, it says early on in that meeting, Marissa

15   proudly declares that she led an antiracist English

16   department meeting, right?   So you're discussing that

17   general topic?

18      A.    Uh-huh.

19      Q.    In your bubble on the left side says this is why

20   I find it very hard to pipe up in this meeting -- this

21   meetings.   Not sure -- not -- excuse me.   Let me back up

22   and try that again.

23         This is why I find it very hard to pipe up in

24   this meetings not just re: antiracism because it rarely

Farrell Court Reporting

Matthew Rigilano

Page 164

1    feels like a genuine convo, more like a piece of theater

2    for which I do not have a script.  All talking is improv.

3    Could make a splash, but very likely to bomb.  Did I read

4    that correctly?

5        A.   Correct.

6        Q.   So you testified earlier that you never felt

7    inhibited in speaking in meetings about antiracism,

8    linguistic justice, black linguistic justice, white

9    supremacy, white privilege, et cetera, et cetera in its

10   various forms, correct?

11       A.   Correct.

12       Q.   Yet, here in I believe this was early 2021, that

13   seems to me you very expressly stated that you felt

14   uncomfortable speaking in any critical way about these

15   topics at least publicly to your colleagues?

16           MR. SMITH:  Objection to form.

17           THE WITNESS:  Yeah.  Um, I'm not really sure

18   precisely what I'm referring to here.  It's true.  I say

19   it's very hard to pipe up.  I'm not sure what meetings I'm

20   referring to, honestly.  Zack says Marissa proudly

21   declares she lead an antiracist English department

22   meeting, so there was a meeting in which Marissa discusses

23   her efforts in antiracism.

24   BY MR. ALLEN:

Matthew Rigilano

1      Q.    To be antiracist?

2      A.    Yeah.

3      Q.    Do you remember that meeting?

4      A.    I don't.  And I find it hard to believe that I

5  would say this about writing program meetings 'cause I

6  typically do pipe up about all kinds of matters, so I

7  don't know if this was a -- I think this is a -- you said

8  this was, yeah, 12, 2/12.

9      Q.    February 2021.

10      A.    Yeah.  Maybe it was a larger scale administrative

11  meeting, but yeah.  Indeed, whatever the context is, as it

12  says not just regarding antiracism, but presumably other

13  things I find it hard to pipe up.

14      Q.    Those are your words, right?

15      A.    Yeah.

16      Q.    And you wouldn't -- you wouldn't lie just to make

17  Zack somehow befriend you or some feel like you had to

18  placate him in this sense, do you?

19      A.    Um, I wouldn't lie.  But, I mean, you know, over

20  the long course of a -- of a friendship, you know,

21  sometimes you give more sort of credence to people's --

22      Q.    Sure.

23      A.    -- feelings and thoughts and, you know.

24      Q.    I'm talking about your feelings and thoughts

Farrell Court Reporting

Matthew Rigilano

1   about this particular --

2       A.   Right.   No.   I know, yes.   I don't think I was

3   just placating him.

4       Q.   Right.

5       A.   But I also -- I'm not totally sure what the

6   context of the meeting -- the ones I find hard to pipe up

7   in.

8       Q.   And you're saying you can't remember?

9       A.   I can't remember.   And I -- I -- I would be

10  surprised if I was talking about our writing program

11  meetings.

12      Q.   But the only reference on the right side in

13  Zack's messages is to some kind of meeting in which

14  Marissa being who?

15      A.   The chair or the -- at this point, just a faculty

16  member in English who ran the workshop that we had

17  discussed.

18      Q.   And this is Marissa Nicosia?

19      A.   Correct.

20      Q.   And she was proudly declaring some kind of

21  antiracist English department meeting, correct?

22      A.   Correct.

23      Q.   That's the preceding reference.

24      A.   If there's a meeting in which Marissa proudly

Matthew Rigilano

1   declares that she led.  It says early on in that meeting,

2   Marissa proudly declares that she led an antiracist

3   English department meeting.  So it must have been like

4   maybe a broader meeting when Marissa was present and she

5   was, you know, declaring about the fact that she had run

6   this other meeting.  I don't know if the meeting in

7   question is a writing program meeting or something else.

8   I mean, I know it's a --

9       Q.   As you sit here today, you have no memory of what

10  the meeting particularly was that you referred to there?

11      A.   No.  I mean, it could have been a -- we could

12  have just left a writing program meeting and that's what I

13  was, in fact, referring to.  I feel like it's weird that I

14  would say it's hard to pipe up, 'cause I very often do.

15      Q.   And you say --

16      A.   But it is true in larger scale meetings, I'm not

17  particularly vocal.

18      Q.   Right.  And you say I find it hard to pipe up in

19  this meetings.  I think that's a typo or auto correct.

20      A.   Yeah.  These meetings.

21      Q.   Probably these meetings.  Not just re:

22  antiracism.  So isn't it proper to understand from what

23  you said you find it very hard to pipe up in these

24  meetings about antiracism as well as other things at Penn

Farrell Court Reporting

Matthew Rigilano

Page 168

1  State Abington?

2      A.   In this context, that seems to be what I'm

3  suggesting.

4          MR. ALLEN:  Okay.  I'm gonna pass the witness to

5  you now.

6          MR. SMITH:  Okay.  Let's take a short break

7  before I jump into that.  I thought you had a lot more.

8          VIDEOGRAPHER:  Off the record, 2:50.

9                     (A break was held.)

10         VIDEOGRAPHER:  We're back on the record, 2:55.

11  BY MR. SMITH:

12     Q.   Good afternoon, Dr. Rigilano.

13     A.   Good afternoon.

14     Q.   Just a couple quick questions.  I think we'll be

15  wrapping up here.  In relation to your employment at Penn

16  State, have you ever felt discriminated against as a white

17  faculty member?

18     A.   No.

19     Q.   Earlier, we talked about several of the writing

20  program meetings at Penn State Abington.  In relation to

21  the writing program meetings that you attended, did you

22  ever feel that the materials discussed at any of those

23  meetings were racist against white people?

24     A.   No.

Matthew Rigilano

Page 169

1       Q.    Something I just wanted to clarify from earlier.

2   There was some questions about attendance at the writing

3   program meetings.  Were there full-time non-adjunct

4   faculty who regularly did not attend those meetings?

5       A.    Yes.

6       Q.    Is attendance taken at those monthly writing

7   program meetings?

8       A.    No.

9       Q.    In relation to the October 18, 2021 writing

10  program Zoom meeting that was talked about earlier, at any

11  time did Dr. De Piero request your consent to record that

12  meeting in any way?

13      A.    No.

14      Q.    Prior to this lawsuit, were you aware whether

15  Dr. De Piero recorded that meeting?

16      A.    No.

17      Q.    At any point in time during that same meeting,

18  was Dr. De Piero's behavior disruptive to the meeting?

19      A.    Um, I think the initial line of questioning sort

20  of disrupted the, you know, general flow.  But I think as

21  we heard, it became a topic of conversation.

22            MR. SMITH:  I think that's all I have.

23            MR. ALLEN:  No further questions.

24            VIDEOGRAPHER:  This concludes the videotaped

Farrell Court Reporting

Matthew Rigilano

Page 170

1    deposition.   The time is 2:58.   We're now going off the

2    record.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Farrell Court Reporting

```
 1                C E R T I F I C A T I O N

 2

 3          I, Vicki Mengel, Court Reporter, certify that the

 4    following is a true and accurate transcript of the

 5    foregoing deposition/hearing/arbitration, that the witness

 6    was first sworn by me at the time, place, and on the date

 7    herein before me set forth.

 8              I further certify that I am neither attorney nor

 9    counsel for, not related to nor employed by any of the

10    parties to the action in which this deposition was taken;

11    further, that I am not a relative or employee of any

12    attorney or counsel employed in this case, nor am I

13    financially interested in this action.

14

15                        Vicki Mengel

16                        VICKI MENGEL

17                        Court Reporter and Notary Public

18

19

20

21

22

23

24
```

| A | | | | |
|---|---|---|---|---|
| **A-I-M-S-S** 33:4 | **achieve** 57:2 | **advocating** 128:1 | 56:20 58:4,9,18 | **animus** 66:1 |
| **a.m** 1:17 4:5 100:8 100:22 109:19 | **acknowledge** 71:4 | **aegis** 47:3 | 59:2 60:9 61:2,19 | **Anissa** 51:18 |
| **AAE** 67:1 | **acquired** 162:7 | **African** 75:6 83:23 | 62:2,12 65:19 | **Annisa** 48:20,21 |
| **AAV** 66:22 | **acronyms** 66:24 | **African-** 67:1 89:12 | 69:17,23 70:23 | **announcement** 26:11 |
| **AAVE** 67:2 | **action** 84:15,17,19 132:7 156:10,14 | **African-American** 66:19,21 69:24 | 71:20 74:12 75:9 79:6,17,20,24 | **annual** 16:18 30:1 30:4 33:24 82:13 |
| **ability** 5:15 35:5 60:5 | **actively** 84:4 | 72:22 74:7 75:4,5 112:18 138:16 | 80:5,10 84:7,13 85:22 86:6 87:14 | **another's** 142:13 |
| **Abington** 11:9,11 11:19 16:24 26:21 28:15,20 30:8 36:23 41:16 44:15 48:10 49:2 51:20 53:6,9,14,21 54:6 54:15 55:23 56:15 57:20,24 58:1,11 58:14 64:8,12,17 74:17 77:17 78:18 80:8 89:12 91:18 109:24 114:19 115:1 120:1 123:14 126:9 138:13 168:1,20 | **activities** 16:18 | **African-Americans** 67:5 | 88:14,18 92:4,11 92:13 95:5,10,13 95:21 96:3,6 97:12 100:16 105:13,16 108:1,4 108:12,17,21,24 109:8,10,14 113:6 117:13 123:16,20 124:22 126:15 133:17 134:3,14 135:4,24 136:6 138:12 139:23 140:5 141:5 143:12,21 144:4,8 146:1,12 147:22 148:8 150:3,21 151:18 152:5 154:22 155:17 159:14,18,22 164:24 168:4 169:23 | **answer** 6:11 7:7 67:18 68:6 74:1 131:13 134:16,22 135:22 136:7 140:1 147:8 |
| | **activity** 27:19 | **afternoon** 168:12 168:13 | | **answered** 147:17 |
| | **ad** 49:19 50:5,22 | **agency** 64:12 154:18 | | **answering** 135:13 135:14 136:20 147:16 |
| | **adapt** 142:17 | **agenda** 3:13,14 24:21 40:3 41:6 77:1 103:19 156:24 | | **answers** 147:24 148:7 |
| | **added** 157:7 | | | **anthropology** 36:9 |
| | **addition** 25:7 | | | **anti-bias** 127:3 139:18 |
| | **address** 37:2 80:14 81:20 103:5 131:10,11,23 137:2,17 | **aggressive** 134:7 | | **anti-Black** 115:15 |
| | | **ago** 15:14 | | **antibias** 132:10 |
| | **addressed** 105:23 106:14 110:7 114:19 115:12 130:19 148:13 | **agree** 32:3 65:12 67:3,7 68:19 86:14,21 90:18 103:3 112:2,8,19 113:20 115:5 129:18 154:23 155:6 159:1 | | **antiblack** 84:24 89:6 91:15 |
| | | | | **antiblackness** 89:5 |
| **Abington's** 57:19 | | | | **antiracism** 65:3,9 98:6 101:13 163:24 164:7,23 165:12 167:22,24 |
| **able** 48:6 75:21 109:12 | **addressing** 76:24 127:16 148:20,20 | **agreed** 106:4 | **aloud** 99:9 | |
| **absolutely** 50:13 69:13 161:18 | **adjunct** 13:1,4,5 36:20 42:12 | **agreement** 102:21 | **America** 76:10 78:21 | **antiracist** 65:22 81:8 108:6 110:7 111:1 137:13 140:19 142:3 145:13 163:6,11 163:15 164:21 165:1 166:21 167:2 |
| **academic** 18:21 44:13 64:9 68:20 68:24 88:8 89:1 106:11 130:23 131:8 154:9 | **adjuncts** 14:4 25:13 26:7 | **Ah** 52:14 | **American** 21:1 35:3 62:20 67:2 71:7 72:21 79:12 83:23 89:13,21 91:14 111:18 112:6,9,21 113:1,5,10,13,16 113:19,24 121:4,5 121:9,18,19 149:19 | |
| | **administration** 47:9 | **ahead** 63:10 78:12 85:8 | | |
| | **administration's** 58:7 | **AIMSS** 33:3,7 | | |
| | **administrative** 17:17 131:24 137:8 155:3,4 165:10 | **ain't** 82:5 | | |
| **accent** 70:8 | | **al** 1:8 4:8 | | |
| **acceptable** 136:14 | **administrator** 20:23 137:5 | **Allen** 2:3,4 3:7 4:13 4:13,24 5:1,6 6:22 8:2,6,9 10:21,24 11:3,5 14:19 15:11 22:8,18 23:3,11 26:19 27:6 29:13 31:5,9 34:2 37:17 39:4,7 44:24 45:11 50:9 50:13,19 52:1 53:24 54:5 56:11 | **Americans** 67:15 68:7,14 74:8 75:6 121:19 158:9 | |
| **accepted** 69:19 73:21 88:9 89:23 | **administrators** 78:2 | | | |
| **accorded** 76:10 | **adopt** 72:11 73:4 73:19 | | **Angelou** 71:22 | |
| **account** 61:22 102:17 152:15 | **adopted** 68:13 | | **angles** 30:19 | |
| **accumulate** 147:16 | **advertised** 124:11 | | | |
| **accumulating** 147:14 | **advice** 7:16 8:4 | | | |
| **accurate** 113:4 163:8 | **advising** 24:18 32:17 | | | **apparently** 41:10 84:17 87:23 99:16 139:10 144:1 |
| | | | | **appear** 134:16 |

160:13
**APPEARANCES**
2:1
**appeared** 10:4
**appears** 82:1
116:18 160:1
**applied** 33:11 64:8
64:17 123:13
**applies** 89:24
140:10
**apply** 12:14 97:4
107:2
**applying** 73:17
104:12
**approach** 35:13
44:12 92:1 122:18
122:23 123:2
**appropriate** 139:15
152:14
**approximately** 26:3
**area** 36:21 78:5
131:18 149:9
154:13
**argue** 70:10 119:11
**arguing** 119:13
**argument** 119:16
119:17 122:11
**Arizona** 43:16
**array** 55:11
**article** 143:7 158:2
**articulate** 139:11
**articulated** 54:24
**articulation** 107:6
**arts** 16:11,12 18:5
18:22
**Asao** 43:14 47:5,24
48:1 161:1,2,4,5,6
161:8
**ascribed** 60:20
**Asian** 62:20 77:11
149:16
**aside** 24:7 45:12
49:10 64:22
**asked** 7:12 15:20
146:6 147:18
148:3,11 150:22

153:4 156:22
157:14
**asking** 24:2 49:22
52:17 58:6 75:10
85:16 94:7 96:3
96:11,11 97:9
105:9 116:8
120:23 129:23
134:4 135:14
136:22 137:19,23
139:6,19 144:13
**asks** 136:7 143:9
144:16
**aspect** 65:22
**aspects** 35:2 161:20
**asserts** 114:9
**assess** 140:21
**assessment** 41:13
72:10
**assign** 23:23 135:16
**assigned** 43:9 45:7
131:5,10 135:9
139:8
**assigning** 44:16
135:15
**assignments** 142:7
**assistant** 12:10,11
12:20 13:16 23:17
23:17 24:6 25:24
26:15 28:9,19
30:10 31:18,20,22
33:1,10,15,18
41:24 42:8,10
146:21
**associate** 11:12
12:7,12,13 13:19
14:7 25:24 41:24
**associated** 26:1
64:12 85:19 109:1
110:24
**association** 109:13
151:11
**assume** 7:11 45:1
71:13,21 77:17
78:24 101:4
**assumed** 117:3

**assuming** 38:1 43:1
95:18,21 97:10
**assumption** 66:11
68:4
**assure** 81:12,14
86:1
**Astounding** 121:22
**asynchronizly**
120:21
**attached** 3:24 10:19
65:6
**attachments** 3:19
109:1
**attend** 25:22 46:22
47:1,10 107:17
169:4
**attendance** 127:8
169:2,6
**attendant** 43:5
**attended** 47:7
51:11 168:21
**attending** 28:7
49:10 54:13,23
57:13
**attention** 52:11
81:18 152:2
**attest** 25:15
**attorney** 5:2 6:5,7
7:16,23 8:4 95:10
98:9
**attorneys** 39:21
100:18
**attributes** 60:13
**audible** 133:16
**audience** 73:24
116:8 161:23
**audio** 3:20 123:21
133:2 134:2,13
136:5 140:4
143:11 144:7
145:24 146:11
150:20 151:17
**August** 80:24 92:17
93:3,19 94:19
95:24 98:22 99:3
100:7,22 105:18

**author** 112:21,21
113:1,2,5,10,13
113:16 119:23
144:20 162:13
**authoritatively**
72:6
**authority** 23:18,20
**authors** 112:15
113:21 119:21
**auto** 167:19
**automatically**
78:19 79:3,5,8
**available** 55:19
88:5
**award** 3:18 105:24
**awarded** 12:24
106:19
**aware** 31:7 48:8
54:16 63:12
103:10 121:23
150:2 152:13,21
169:14
**awareness** 73:14

**B**

**B** 3:10
**B-A-E-R** 16:4,5
**back** 5:10 20:12
22:15 24:2 29:4
34:11 43:2 46:20
50:17 79:23 87:6
96:5 102:19
120:17 123:19
127:1,22 155:12
159:17 163:21
168:10
**background** 10:14
11:7 87:9 125:8
**backgrounds** 37:23
46:14 76:5 77:24
**backing** 140:2
**Baer** 15:16 16:2,6
23:13 29:20
**Baer's** 15:17
**balance** 75:16
**Baldwin** 71:11

111:22
**Baldwin's** 71:14
**based** 11:22 38:21
45:5 56:4 58:10
60:2 65:14 90:22
**baseline** 60:1
**basic** 35:13
**basically** 13:14 24:2
51:15 68:20 105:2
136:3 158:22
**basis** 27:4 61:21
157:13
**Bates** 31:6,7 39:21
40:1 50:21 80:6
92:6,10,14 100:17
105:19 108:8,9,14
108:18 109:9
155:14 160:4,11
162:19
**bathroom** 79:16
**Bear** 132:21
**Beatles** 30:15
**beauty** 71:14
**becoming** 97:16
**befriend** 165:17
**began** 14:3 127:12
**beginning** 5:3
49:18
**begins** 61:4 94:6
96:10 108:5
118:17 155:18
163:13
**behalf** 4:16 6:17
**behavior** 132:3
153:22 169:18
**beings** 35:1,14
**beliefs** 117:7
**believe** 15:14 18:11
19:2,18 20:3 26:8
29:7 30:14 33:1,3
36:24 39:5 43:16
44:4 48:1,13
49:24 55:6,17
56:6 59:16 61:13
62:20 73:13 83:22
84:3 85:9,10

96:13 107:18
108:24 109:16,22
120:5 123:23
132:2 149:15,19
153:20 155:4
156:21 160:6
164:12 165:4
**bell** 132:17
**belong** 16:22
**best** 17:11 40:7
63:5 159:19
**better** 97:15 122:7
**beyond** 22:14 57:12
131:8
**bias** 116:9,24 117:4
117:10,18,21,22
126:21 139:21
**Biblical** 122:1
**big** 85:18 87:8
88:24 91:5 127:7
**BiPOC** 61:5,11
62:6,8
**Biracial** 61:13
**bit** 10:13 11:6 17:1
21:24 93:9 101:20
135:10 137:24
140:2
**black** 37:11 44:16
44:20 45:7 54:21
60:14,17 61:15
66:18 69:18 70:12
71:5 72:1,8,21
74:8 77:8 79:1
80:2 81:2 82:6
83:1,12,17,18
84:8,14,15,23,24
86:1,10 87:8,8,21
88:24 89:8,17
90:21 93:6 94:21
95:4,6,19,21
96:21 97:6 98:2
99:22 103:13
107:5 112:5,21
113:1,5,22 114:20
114:21 115:2
119:8,15 122:12

138:14,15,15,22
138:22 145:11
164:8
**blackness** 138:24
**blanking** 15:15
**Blind** 133:3,7
**block** 84:15 87:8,21
88:24
**blow** 26:16
**blue** 163:13
**board** 22:15 110:22
120:5,18,20
**body** 55:8 56:7,16
56:23 74:19 96:1
**bold** 88:19 89:3,7
91:5 93:6
**bomb** 164:3
**books** 78:15
**Borges** 132:17
153:20 154:3
155:23
**born** 47:11
**bottle** 50:11
**bottom** 53:4 81:19
87:7 88:13 92:21
98:12 108:10
**Boulder** 61:8
**box** 2:5 110:6 142:6
**boy** 150:18
**Brahmins** 158:13
**brain** 159:9
**break** 7:6 50:16
79:16,22 123:18
151:24 159:16
168:6,9
**breaking** 152:11
**brief** 34:17
**bring** 55:6 66:5
152:1
**bringing** 152:7,16
161:8
**British** 114:2
120:20 121:17
122:13
**broad** 142:15
**broadcast** 124:19

**broader** 47:8 167:4
**brought** 104:24
**bubble** 163:13,19
**bubbles** 161:14
**Buffalo** 36:12
**bullet** 87:20 116:12
116:17
**bullying** 140:7,9
143:13,15 144:9
144:11 146:2
147:4,13 151:5,21
**bunch** 46:8
**business** 32:11,14
69:15

---

## C

**call** 24:23 76:4 78:6
83:1 148:18
**called** 4:20 31:1
39:21 43:9 44:20
46:10 53:6 66:12
97:23 132:10,11
**calling** 81:7 141:6
143:17
**calls** 84:17,19
**camera** 127:9
**campus** 48:10 49:9
55:6 77:18 80:3
90:11 161:9
**canceled** 162:16
**candidates** 64:1
**cannon** 118:18
**cannons** 119:1
**canonized** 119:14
119:17 122:10
**Canvas** 80:18 86:24
94:2 120:21
**capable** 146:22
**capacity** 6:21 7:3
**caption** 9:24 39:9
40:6 53:6 93:6
95:22 118:9
**captioned** 9:21
31:11 32:10 50:22
80:7,7 82:5 99:21
108:6

**captured** 82:2
**care** 27:3
**career** 28:15
**Carmen** 132:16
153:19 154:3
155:23 156:22
**Carolyn** 146:15,16
**case** 4:7,8 5:3 10:7
69:16 101:12
160:3 162:6
**catching** 25:4
**caught** 135:12
**cause** 42:13 132:6
139:12 141:13
159:3 165:5
167:14
**CC** 102:12
**CCCC** 82:16 84:9
86:11 88:5 91:13
93:8
**censure** 22:2
**central** 24:8 58:21
114:3
**centrality** 101:1
**century** 20:24
35:21 114:2
120:19,24 121:10
121:13,17
**certain** 13:7 35:2,4
41:7 61:7 67:9
72:9 78:21 86:17
130:15 141:7,12
147:14
**certainly** 57:18
76:23 85:13
101:12 107:7
113:12,14,17
114:6 132:1
138:23 145:6
153:15
**cetera** 23:2 60:5
61:22 66:3 157:15
164:9,9
**chain** 8:23 9:5
93:12 98:16
101:13

**chair** 18:7,8,10,14
19:14,17,20 24:1
29:9 63:17 110:1
166:15
**chance** 59:22 94:9
94:16 97:15 163:2
**chancellor** 59:20
60:1
**chancellor's** 15:15
**change** 40:12
**changed** 159:2
**changing** 69:14
**channel** 43:18
96:13
**charactered** 113:9
**characterization**
133:4
**characterize** 84:18
94:18 113:1 121:3
150:10 156:13
**characterized**
43:22 49:16 89:12
89:24 112:20
145:14
**characterizes** 81:7
**characterizing**
91:14
**charge** 97:9
**chase** 163:5
**check** 163:14
**checklist** 63:2,5
**Chester** 111:23
**child** 27:3 47:11,13
**children** 149:7
**chill** 137:24
**chose** 23:7 144:23
**Chris** 119:23
**circulate** 108:13
**circulated** 72:5
83:1 108:9
**circumstances** 6:10
72:9
**claims** 150:5
**clarification** 7:10
**clarify** 6:16,20 52:2
58:6 108:19 169:1

Matthew Rigilano

clarifying 31:24
clarity 141:15
**Clark** 36:22
class 13:11 30:14
  34:12 46:6 59:4
  76:1 78:6
classed 158:14
classes 30:11 78:19
  79:1 89:16
classroom 34:7,20
  44:10 72:8 73:11
  123:24 129:24
  133:4,7 138:15,22
  138:24 139:1
  141:16 142:5
classrooms 86:2
  157:18,22 158:1,6
clear 7:12 13:20
  51:10 76:14 99:4
  115:19 141:2
clearly 44:3 78:16
  86:16 100:1
  115:17 118:1
  162:8
client 7:23 8:6
  45:13 110:11
  124:2 160:7
clip 132:24 139:24
  151:7,19,21
  157:11
clips 3:20 126:17
  132:21 148:6
  156:9
clock 159:10
close 64:11 77:4
  87:6 151:10
clout 97:11
co-led 124:6
co-opt 142:13
cobblers 121:24
code 84:23 128:12
codified 89:6
cognitive 35:5
**Cohen** 41:10,15
  42:18 43:1 93:19
  93:22 94:19 95:20

96:1 98:12 100:8
  100:21 104:19
  105:1
colleague 9:4 111:2
colleague's 9:2
colleagues 128:1
  153:1 164:15
collected 78:2
  103:23
collecting 135:6
collection 142:4
collectively 140:21
college 36:10 53:13
  63:1 82:7,11
colloquial 66:18
color 45:5 61:14,16
  65:14 90:23 133:3
  133:7
color-blind 123:24
**Colorado** 61:8
combat 65:10
come 5:10 9:14
  77:23 79:1 124:14
comes 7:5 33:21
  95:6 160:4
coming 97:10
comment 52:17
  143:14
comments 161:11
commerce 69:11
  75:20 89:23
commission 126:21
commitment 57:13
committee 49:20,21
  50:1,5,22 51:3,4
  52:3,8 59:19 63:4
  63:15,17,20,24
  132:11
committee's 53:1
committees 57:9
  61:6
communicate 72:11
  90:5,7
communication
  82:8,11 89:23
communications

96:13
communicative
  88:9
communities
  114:13
community 27:21
  37:7 39:1 55:6,10
  95:3 96:8,15 97:1
  97:4,22,23 100:5
  104:15,21,23
  105:2 106:18
  107:4
comp 85:18
comparable 158:4
comparatively
  53:14
compare 141:13
compared 49:13
  122:4
compensated 61:6
competing 65:5
competitive 75:21
compiling 30:3
complaint 152:14
  153:1,21
complete 148:12
completed 63:3
complexity 114:12
  114:13 122:14
component 65:16
composed 60:13
composition 11:15
  12:2 43:15 69:19
  82:7,11,15
compound 81:13
compounded
  115:22
concentrate 118:3
concept 24:20
  34:18 72:3 77:3
concepts 34:22 77:5
conceptually 30:24
concern 23:8 25:6
  137:9,9 152:10
concerning 7:3,16
concerns 154:24

concert 104:3
concludes 169:24
conduct 128:12
conference 82:7,10
  85:18 127:21
conferences 82:14
confers 78:21
confidential 126:5
confirm 120:13
**Confront** 157:21
confrontation
  154:15
confrontational
  129:7 140:10
  154:7,9
confronting 136:19
confused 52:15
confusing 17:1,12
congratulations
  47:13 106:13,14
  106:17
conjunction 104:5
connected 59:13
**Connecticut** 2:6
  70:7,20
connection 119:6
  152:24 153:21
consecutive 108:22
consent 169:11
consenting 97:8
consider 36:1 44:9
  44:11 45:1,7
  62:22 78:7,19
  79:3,7 91:23 92:3
  123:6
considered 33:13
  44:14 75:14
consist 63:5
consistently 28:10
  28:21,24
constructed 89:1
consult 7:4,5
consultation 8:4
consulted 8:14
contacted 156:7
contemporary

20:24
content 43:22 44:19
  55:16 81:7 83:3
  144:24 145:2
context 26:24 73:16
  79:12 112:18
  114:14 123:7
  136:16 137:4,23
  140:13 157:21
  162:22 165:11
  166:6 168:2
contexts 73:20,22
continue 147:15
continued 16:19
continues 53:10
  144:11
continuous 60:2
continuously 39:23
contract 12:16,17
  12:18,21,23,24
  13:13,19 15:3,4,8
  16:16 22:23 34:1
contribute 89:5
contribution 116:4
  118:8 120:4,8
contributions 142:3
convention 67:19
conventions 66:17
  66:18 67:21 68:9
  68:12 69:7 72:12
  73:5,12,18
conversation 44:4
  45:20 56:14 86:16
  102:7,11 103:16
  127:12 128:23
  130:4,6 148:10
  151:8 169:21
conversations
  101:21 128:3,6
  143:18
convey 35:16
conveys 83:18
convo 164:1
coordinating 33:5
coordination 23:24
coordinator 18:7

Matthew Rigilano

20:7,11 23:14,19
23:21,22 24:1
76:22 93:2 104:18
124:8 125:14
141:9 153:16
**coordinators**
148:17 155:8
**copy** 5:9 47:17
92:19 108:11
155:15
**corner** 39:17
**correct** 10:8 13:13
21:7 22:20 31:21
32:8,11 33:22
40:10,11 45:2,3,6
45:17 48:2 57:20
57:21 59:20 60:21
61:22 62:8 66:11
67:12 68:1 71:11
71:22 79:2 86:7
87:5,10,23 88:21
90:1 93:6,10 94:3
95:7,22 96:8,18
98:24 100:15
101:3 102:13,16
105:21 106:15,16
108:21 109:18,20
109:21 111:21
112:3,4,9 113:22
114:1,22 115:6,9
115:21 116:9,12
119:22 122:5
124:10,12,23
125:1,22 126:24
133:4 142:20
143:17 148:14,15
149:10,11,17
150:24 155:19
156:2,11 157:10
157:19 159:8
160:20 162:1
164:5,10,11
166:19,21,22
167:19
**correctly** 16:9 34:9
41:15 45:21 51:1

51:23 53:17 60:6
61:9 63:8 89:9
101:7 105:20
111:14 114:16
164:4
**correspondence**
122:9
**counsel** 4:12 92:6
92:19 108:9
133:17 155:15
**count** 25:11 28:2
**countries** 79:14
**country** 41:1
**counts** 21:21 28:7
**county** 78:5
**couple** 15:14 19:24
73:7 127:19
132:21 168:14
**couplets** 121:12
122:3
**course** 24:16 30:15
30:18,20 42:15
44:9,16 49:11
55:16 61:7 62:6
75:17 97:14
120:20 128:18
138:2 161:14
165:20
**courses** 11:13,19,20
11:21 17:6,8,20
19:3 21:2 23:22
23:23 25:18,19,21
26:7 30:13 31:4
33:5,5 61:22
111:19
**court** 1:1,22 4:3,9
4:17,18 6:12 65:2
82:10 92:15
109:11 120:16,17
133:20
**cover** 108:14
**covered** 7:23
**Covid** 19:21 20:1
38:19 115:22
125:2 159:9
**create** 97:4 119:5

139:12
**created** 137:24
**creating** 6:12 27:20
112:17
**creative** 22:1
111:18
**credence** 165:21
**crickets** 136:3
148:2
**criteria** 129:19
**critical** 34:7,18,20
34:21,22,24 35:1
35:4,7,20,24
59:10,11,13
116:11 122:18,19
122:22 123:2
129:11,14,19
131:15 164:14
**critically** 123:8
**criticism** 35:10
149:13 150:13
161:20 162:13,15
**criticize** 116:21
**criticizing** 35:2
116:18
**critique** 35:7,7,8,22
35:23
**cross** 79:11
**cultural** 46:13 89:8
119:5 122:1 123:7
**culturally** 53:10
55:1 58:20 121:23
**curated** 144:23
**curious** 123:13
**current** 63:2 110:1
**currently** 11:12
19:16 20:9 36:7
37:4
**curriculum** 55:16
**cut** 163:5

---

**D**

**D** 3:1
**date** 1:16 127:4
**dated** 80:24 92:17
109:18

**dates** 29:8 31:11
**day** 100:7 122:5
133:9 153:8
**days** 98:23 156:9
159:5
**De** 1:4 4:7,14 5:2
8:24 9:9 30:7
45:13,17 110:11
111:10 124:2
126:18 128:22
132:2 151:12
152:13,24 155:2
160:5,8 162:18
169:11,15,18
**deal** 22:4 31:4 77:2
**dealing** 72:5 73:24
115:15
**deals** 16:21
**dean** 15:16 16:8,11
16:12 18:9,11,15
**debated** 73:2
**debating** 129:21
**decades** 73:7
**decide** 26:16
**decision** 162:6
**declares** 163:15
164:21 167:1,2
**declaring** 166:20
167:5
**decrease** 54:17
**dedicated** 24:15
55:11
**deeming** 89:8
**defendants** 1:9 2:13
4:16 6:19
**define** 58:1
**defines** 76:15
**definitely** 78:13
**definition** 22:3
**definitions** 65:5
**degrees** 36:7
**DEI** 47:3,18 48:14
49:9 51:20 63:6
63:24 64:4,6
77:18 107:14
139:17

**deleting** 98:18
**deliberately** 37:24
41:1
**delightful** 66:24
**demand** 82:6 87:9
87:15,19 88:2,7,7
88:15,24 90:19
91:3,5 139:18
**demands** 76:1
87:21
**deny** 115:8
**denying** 148:11
**department** 16:23
17:16 18:10,17,18
87:3 97:16,21
163:7,16 164:21
166:21 167:3
**departmental**
16:24
**departments** 18:21
18:22,24
**depending** 69:14
**depends** 26:23
68:15
**DEPONENT** 1:15
**deposed** 5:11
**deposition** 1:13 4:2
4:4,11 5:8 7:17
8:14 9:22 10:5
48:19 159:19
170:1
**derived** 66:14
**describe** 24:10,20
37:13 40:21 41:16
66:8 76:8 93:22
109:23 120:8
156:17
**described** 32:2 41:5
70:6 74:22 77:18
79:9 90:14 122:18
122:22 130:16
**design** 44:9
**designates** 67:20
**designation** 17:8
30:18
**desirable** 57:5

**details** 13:20
**developed** 14:2
  35:21
**developing** 32:18
  34:3 94:22
**development** 17:24
  24:19 55:11 101:6
**developments** 28:6
**develops** 34:18
**dialect** 67:4
**difference** 12:11
  21:9,12 59:4
**differences** 40:21
**different** 11:21,22
  15:10 17:6 21:21
  24:17 30:19 32:7
  35:6 37:23 41:21
  42:1 46:14 47:8,9
  58:24 59:13 60:13
  66:17 69:9 73:15
  73:24 76:5,5,7
  91:23 92:1 110:6
  117:22 132:5
  137:3,7 142:7,12
  142:15 143:3
  158:22
**differently** 12:19
  78:17 147:21
**difficult** 19:22
  22:16 65:4 67:18
**diminish** 112:20,24
**direct** 38:22 52:11
  53:8 131:1
**directed** 130:1
**direction** 90:24
  151:3
**directly** 36:17,18
  103:5 106:15
  107:6 130:20
  131:10 137:18
  148:13
**director** 18:2 20:17
  29:10 51:20 84:5
  85:3 86:19,22
  87:1 91:17 94:20
  126:4 129:9

137:11
**director's** 103:13
**directors** 125:14
  129:15
**disadvantage** 65:13
**disadvantaged** 79:3
**disadvantages**
  78:22
**disagreeing** 145:10
**disagreements**
  154:10
**disapproval** 135:11
  145:19
**disciplinary** 30:19
  132:7
**discipline** 69:1
  75:23 140:18
  145:20
**disclose** 7:15
**discomfort** 145:4
**discourse** 157:24
**discourses** 157:17
**discovered** 100:17
**discovery** 133:19
**discriminated**
  168:16
**discrimination**
  53:20
**discuss** 9:17 11:3
  102:22 148:23
**discussed** 7:15
  42:11 46:3 63:24
  76:16,19,21 85:3
  91:23 107:21
  111:1 143:16
  158:16 161:21
  162:9 163:7
  166:17 168:22
**discusses** 164:22
**discussing** 12:8
  32:15 94:1 130:23
  133:6 154:23
  163:16
**discussion** 45:24
  46:8 77:8,11
  85:10 110:22

115:14 116:12
  120:5,18,20
  126:21 127:3
  129:16,16 137:9
  138:1,2 154:16
  158:4,11
**discussions** 103:4
  118:21 131:9
  142:1 143:1
**disinclined** 148:21
**disparaging** 138:20
  138:20,21
**disparity** 54:11
**dispute** 6:17
**disputing** 10:23
**disrespect** 145:4
**disrupted** 169:20
**disruptive** 169:18
**dissented** 145:17
**distinct** 127:15
**distinction** 11:24
  13:10 18:3 67:11
**distinctions** 112:14
  112:14
**distinctive** 67:8,8
**distributed** 155:8
**District** 1:1,2 4:9,9
**diverse** 53:11,14
  55:1,5,12,15
  56:10,23,24 58:21
  59:14
**diversification**
  57:19
**diversified** 74:18
**diversify** 57:23
  58:14
**diversity** 46:23
  48:10 49:16,20
  50:5,23 54:13,23
  55:17 56:15,16
  57:14 58:1,2 59:9
  63:5 64:10,14
**division** 15:16 16:9
  18:5
**dizzy** 5:21
**document** 10:19

15:22 31:11,14
  39:13,15 50:10,21
  52:18,19,21 57:12
  57:16 64:19 80:6
  84:18 86:14
  108:13 156:2
  159:24
**documents** 7:19,21
  8:10 31:15 39:22
  39:24 50:5 72:5
  92:7,9 155:12
**doing** 104:8 107:23
  141:3 151:1 153:9
**doke** 162:20
**domain** 31:4
**domains** 31:3
**dominant** 68:16
**door** 73:6
**double-sided** 52:13
  109:16
**doubt** 148:9,24
**Dove** 111:23
**Dr** 168:12 169:11
  169:15,18
**draft** 3:15 50:3,23
  50:24 52:5 53:4
  77:18
**drafted** 106:5
**drawing** 13:10
**Drive** 110:18
**driving** 58:13,14
**dropping** 23:1
**Dryden** 121:13
**DuBois** 111:20
  112:8 119:21
**due** 152:15
**duly** 4:21
**duty** 24:8
**dynamics** 102:23

─────────
**E**
─────────
**E** 3:1,10
**e-mail** 3:16,19,21
  8:23 9:11 52:7
  80:12,14 81:23
  85:12,13 92:17

93:1,5,12,18
  94:10 95:6,16,19
  95:22,23 96:1
  97:7,19 98:8,10
  98:15,16,23 99:13
  99:21,23 100:2,21
  100:24 101:16
  102:9,11,12,15,18
  103:7,16,21,24
  104:24 105:17
  106:4 107:1 108:6
  108:15 109:1,18
  109:19 110:4,8,15
  111:3 155:18,21
**e-mails** 3:17 47:21
  50:7 85:24 92:20
  96:4 103:23 105:6
  156:21
**e.g** 61:6
**earlier** 32:2 42:11
  51:8,19 77:19
  79:9 89:22 107:16
  109:22 122:19,20
  144:12 161:1
  164:6 168:19
  169:1,10
**early** 121:1,13
  163:14 164:12
  167:1
**Eastern** 1:2 4:9
  150:8
**easy** 132:22
**Ebonics** 83:10,17
  83:21 84:1
**educate** 116:9
**education** 31:2
  43:20 68:15 73:2
**educators** 55:10
  68:17
**effect** 130:24
  137:13
**effective** 131:20
**effort** 40:24
**efforts** 119:4
  164:23
**eight** 83:7 88:3

**either** 20:18 29:14
38:1 72:9 78:4
99:16 126:3
**electronic** 133:20
**element** 86:14
97:24
**elevated** 130:17
**Ellison** 111:22
**else's** 117:18
**embodied** 155:7
**embodies** 122:17
**embody** 123:1
**emerge** 112:18
**emerges** 84:2
121:10
**emerging** 92:2
**emphasis** 41:5 59:9
87:23 126:3
**employee** 6:18 49:1
**employees** 16:17
57:23
**employer** 126:8
128:9 151:23
**employment** 12:9
12:15 14:17,24
16:19 168:15
**enacted** 89:6
**encomium** 123:10
**encountered** 57:18
**encourage** 116:18
**encouraged** 73:21
129:11
**encouragement**
129:18
**encouraging** 84:11
91:22 116:11
117:7 140:23
**endorse** 116:18
**endorsing** 86:10
**ends** 81:13
**engage** 81:8 84:12
85:17,21 155:6
**engagement** 77:5,7
86:12 105:12
**english** 11:13,14,15
11:17,23 16:14

17:5,7,8 18:7,10
18:12,14,17,18,18
19:11,14,17,20
20:17,18 24:1
25:18 29:5,9
30:11 33:6 34:19
36:8,10,11 66:6
66:12,17,18,20
67:2,4,12,16,18
68:4,7,8,11,13,16
68:17 69:3,10,20
70:11 71:7,16,23
72:12,17,21,23
73:22 74:2,6,8
75:1,4,6 76:4 87:3
88:8,10 89:2,13
89:22 90:2,13,21
91:14 94:23 96:15
96:23 97:16,21
110:1,3 112:3,6,9
112:16 113:19
114:5 121:4,5,8,9
138:16 139:9
142:21 163:15
164:21 166:16,21
167:3
**enjoy** 79:11
**enjoying** 79:8
**enjoys** 119:14
**enslaved** 121:1
123:9
**ensure** 73:20
**entail** 12:15
**entails** 72:17
**entering** 72:8
**entire** 13:12 88:19
99:6 103:8 124:11
140:18
**entirely** 9:5 21:14
115:17 132:22
**entitled** 7:16 8:13
62:8
**entrance** 126:7
**equity** 46:23 48:10
49:16,20 50:5,23
63:5 64:14

**equivalent** 13:3,11
42:16
**era** 125:3
**eroded** 22:15
**especially** 149:12
152:10
**ESQUIRE** 2:4,10
**establish** 96:20
109:12
**established** 153:20
**et** 1:8 4:8 23:2 60:5
61:22 66:3 157:15
164:9,9
**ethnic** 74:19 115:6
150:6
**ethnically** 53:10
55:1 58:20
**ethnicity** 60:4
**Europe** 150:8
**evaluates** 16:18
**evaluating** 29:15
64:1
**evaluation** 16:17
28:5
**evaluations** 21:14
29:17
**event** 25:5 27:23
**events** 17:20 24:21
27:22 32:15 40:22
115:18 116:1
**Eventually** 152:19
**evidence** 140:16
**evince** 117:18
**Ewing** 2:9 4:15
**exactly** 43:19 50:2
132:11 145:6
159:10
**examine** 52:18
**examined** 4:22
104:24 117:9
142:2
**examining** 118:12
137:10
**example** 112:11
120:3
**examples** 137:19

138:18 140:20
**Excellence** 104:10
105:18 106:20
**exception** 7:7 67:1
**exchanged** 8:16
**exclamation** 88:10
**excludes** 117:24
**exclusively** 123:5
**excuse** 31:22 34:14
38:6,17 41:21
43:21 58:5 60:19
90:20 105:20
133:24 160:23
161:19 163:21
**exercise** 23:15
**exhibit** 3:24 5:5,7
9:15,18 15:24
31:5,8,10 39:5,6,8
46:19 50:10,18,20
77:19 80:5,9
85:24 92:4,5,12
92:16 93:10 94:19
100:22 105:6,13
105:15,17 106:13
108:2,2,3,5,8
116:5 126:13,14
126:16 133:1
137:10 142:2,3
146:10 155:11,14
155:16 159:21,24
**exhibits** 3:24
133:19
**exist** 115:9 117:4
**existed** 64:19
**exists** 18:4 115:5
**expect** 139:16
**expected** 26:13
**experience** 38:11
38:22 40:12 45:14
49:12 54:7 57:22
73:9 77:22,24
78:2,17 83:17
90:6 115:11
122:15
**experiences** 46:6
**expertise** 22:14

69:10 76:6
**explain** 7:14 11:18
14:6,21 17:11,13
21:9,19 36:5 46:2
65:2 72:1 82:10
**explained** 14:11
109:22
**explicit** 136:24,24
137:1
**explicitly** 41:1
127:17 128:12
**exploration** 142:8
**explore** 14:11
**expose** 119:8
**exposed** 114:5
**express** 102:21
**expressed** 137:12
**expression** 60:4
153:6
**expressions** 153:10
**expressly** 164:13
**extent** 44:5 46:12
67:7 70:2 113:23
121:4
**extraordinarily**
121:21
**extremely** 77:23
**eyewitness** 130:12

**F**

**F-R-I-E-D-E-R**
16:4
**facial** 153:6,10
**fact** 55:3 57:11
59:12 70:16,19
71:22 116:17
121:20 131:19
156:5 162:10
167:5,13
**factors** 123:11
**facts** 8:3
**faculty** 25:8,15,17
30:1,4 35:5 42:8
44:7 49:23 53:15
54:8,17,21 55:2,5
55:7 56:1,6,24

Matthew Rigilano

57:20 58:15 61:5
62:6,15,16 80:21
124:12 125:18,21
166:15 168:17
169:4
**failure** 9:3
**fair** 30:22 71:24
84:18 86:4 91:13
94:18 116:2,22
122:17 161:24
162:3 163:13
**fairly** 127:17 129:1
**fairy** 46:8
**fall** 39:8 40:4,15,18
41:7 49:18 63:23
**familiar** 13:1 39:15
49:1 54:14 66:19
83:3 104:11 113:7
114:23
**familiarity** 72:4,22
75:4
**family** 125:9
**famous** 100:20
**far** 29:24 30:3 45:1
127:20 156:18
**Farrell** 1:22 4:3
**Farrellreporting...**
1:24
**fashion** 122:4
**fast** 53:5 160:10
**faulty** 120:12
**favorable** 33:17
**fear** 145:17
**February** 162:23
165:9
**feeds** 57:15
**feel** 7:5,9 8:7 11:3
22:19 28:23 52:10
58:23 59:4 69:14
121:9 128:2,7,10
128:18 129:21
136:16 145:2,10
145:15 152:1
154:16 165:17
167:13 168:22
**feeling** 5:21

**feelings** 165:23,24
**feels** 164:1
**fell** 44:11
**felt** 127:7 130:19
144:24 145:16
148:19 164:6,13
168:16
**fields** 142:13
**figure** 48:6
**file** 64:20 123:21
133:2
**filed** 4:8
**Filipino** 74:5
**film** 87:18
**finally** 55:17
**financial** 78:14
**find** 47:23 49:15
86:2 99:13 101:4
103:8 108:24
128:14 129:3
134:6 137:22
163:20,23 165:4
165:13 166:6
167:18,23
**fine** 17:12 137:3
**finish** 155:10
**firm** 106:6
**first** 4:21 5:7 6:4
9:24 12:9 26:15
36:19 38:15 50:21
51:12 53:9,13
55:4 57:18 72:15
75:14 78:4 80:6
80:14 84:15 92:23
99:10,11 105:19
106:12 108:14,19
109:9 136:4
147:17 148:3,11
152:12 155:15
157:9,11,13
**first-generation**
74:5,24
**five** 12:9,14 47:15
61:3 62:1
**flipped** 153:15
**Floor** 1:18 2:11 4:6

**flow** 169:20
**Floyd** 40:23 115:23
**focus** 30:21 46:15
101:22 114:3
117:21,22 118:3
**focused** 21:13 32:7
33:7 49:15
**focusing** 101:1
118:1
**follow** 137:1
**follow-up** 19:12
28:8 136:8
**followed** 92:8
**following** 4:2
**follows** 4:22
**foolish** 115:8
**forbid** 38:2 68:23
**forced** 74:7
**foregrounds** 65:23
**Forget** 71:2
**forgot** 36:5
**form** 14:18 15:1
22:6,11,21 23:9
26:17,22 29:12
33:23 35:22 37:15
39:3 44:22 45:9
51:22 53:22 54:2
56:3,18 58:3 60:8
60:24 61:17,23
62:9 63:3 65:15
69:12,21 70:18
71:18 74:9 75:8
79:4,8 84:6,10
85:15 86:5 87:11
91:20 95:1,9
96:24 113:3
117:11 124:20
133:20 134:24
135:21 138:9
139:20 141:4
143:20 144:2
147:19 148:5
150:1 152:3
154:20 164:16
**formalities** 121:6
**forms** 24:2 89:23

117:4 136:15
164:10
**formulated** 50:1
**forth** 67:2 84:16
**forward** 53:5 59:15
144:5 145:22
146:8 150:16
160:10 162:18
**found** 129:4 140:8
**four** 13:8 47:16
106:3
**fragile** 149:13
**fragility** 149:23
150:13
**frame** 48:9 114:19
**Frankfort** 35:20
36:3
**free** 7:5,9 8:7 11:3
**freedom** 22:5,9
23:7
**fresh** 159:3,6
**Friday** 95:24
**Friederike** 15:16,17
16:2 23:13 29:20
30:2 131:21
**friendship** 165:20
**front** 15:23
**fruition** 104:7
**frustrated** 131:13
**frustration** 9:2
**full** 149:2
**full-time** 13:6,6,11
41:19,20 42:7,16
42:17 60:1 169:3
**function** 12:1 17:19
**funds** 97:4
**further** 159:11
169:23
**fuzzy** 83:5

---
## G
**G** 51:6
**gained** 65:5
**gender** 60:4
**genders** 58:22
**general** 13:21 25:21

31:2 37:22 39:14
42:7,21,23 54:9
54:16 57:6,12
65:1,7 66:10
69:16 75:17 86:15
98:5 123:10
142:22 150:24
152:4 155:1
163:17 169:20
**generally** 46:20
49:2 56:9,23
107:14 140:14,15
**generation** 53:13
**genuine** 154:13
164:1
**George** 40:23
115:23 122:8
**German** 35:21
**gesticulating**
128:22 130:10
146:5 147:9 153:5
154:1
**gesticulation**
151:12
**gestures** 151:12
**getting** 35:12 52:5
52:7 133:23 136:7
**give** 39:22 47:5
72:22 73:13 76:4
109:10 126:16
142:16 162:21
165:21
**given** 5:9 35:17
77:17 121:20
122:9
**gives** 21:24
**giving** 29:7
**glad** 47:24 127:23
**Gmail** 80:7 102:17
**go** 5:3 25:13,20
26:8,13 27:5,11
27:12 28:1,1,20
28:23 29:2,2
36:16,19 47:18
50:13 51:15,16
63:10 78:12 79:18

79:20 85:8 92:21
92:24 93:13,18
96:5 98:9,22
109:11 112:11
123:16 126:19
133:15 137:4
155:11 159:14
162:12
**goal** 55:24 73:11
90:14,17
**goals** 60:2
**God** 68:23
**goes** 16:15 106:11
**going** 28:2 52:8,11
80:5 96:16 101:14
132:24 151:24
162:2,14 170:1
**gonna** 5:7 6:4 7:14
12:5 15:13 19:12
27:11,12 31:5
39:5,20 40:1
43:18 50:9,10
53:8 63:19 70:6
73:17 79:17,17
81:18 82:2 92:5,5
92:15 96:5 105:13
108:2,7,12,12
114:12 117:19
126:11,12,16
150:16 151:7
160:5 168:4
**good** 21:17 54:12
73:23 79:19
122:11 130:7
150:17 162:11
168:12,13
**Google** 110:18
**government** 154:19
**grab** 50:11
**Grace** 32:21,24
62:19 98:23 104:8
104:18 124:7,8
125:15 126:4
127:17 130:1,20
135:12,20 136:22
140:12 141:9

**144:**15,22 148:13
149:2,15
**grading** 163:6,10
**graduate** 36:13
43:17 75:23
**grammar** 67:8
69:19
**grammatical** 67:23
69:6
**grant** 104:4,13,19
**granting** 105:24
**grants** 22:17
**gray** 131:18 154:13
**great** 22:4 71:9
72:3 77:20 78:24
93:15 95:7,13,18
119:2,18
**grew** 70:16,19
**ground** 5:4 42:14
**group** 80:22 84:16
91:13 99:8,19
130:2,6,21 136:17
144:14
**grown** 149:3
**guaranteed** 13:8
**guess** 23:13 28:8
37:21 56:7 57:24
84:15 99:22 117:3
135:7,7 147:24
**guys** 99:3

**H**

**H** 3:10
**habits** 66:15 67:20
**habitually** 73:22
**hand** 148:18 161:12
**handle** 149:13
**handouts** 47:21
**hands** 153:6,10
**happened** 153:18
**harassing** 128:19
140:7 143:13,15
144:9 146:2 147:5
147:13 151:4,21
**harassment** 152:15
153:2

**harassment's** 145:5
**hard** 27:4 68:2
140:3 163:20,23
164:19 165:4,13
166:6 167:14,18
167:23
**HARRIS** 2:3
**hash** 88:15 157:9
**Hayes** 111:23
**head** 87:3
**header** 99:24
102:18
**heading** 59:17
80:15 88:19 92:17
97:7
**headline** 81:2
**heads** 18:2
**hear** 134:1
**heard** 5:1 44:15
49:19 54:22 70:3
70:5 72:4 118:2
119:13,16,17,23
136:3,9 148:2,12
169:21
**Heise** 111:13,15,16
111:16 114:9
117:14 118:2
**held** 20:3 45:23
50:16 79:22 117:6
123:18 159:16
168:9
**help** 105:22 161:7
**heralded** 119:2
**heritage** 149:18
150:5
**heroic** 121:11 122:3
**hesitated** 63:14
**high** 121:17
**higher** 15:10 73:1
**highlight** 157:12
**highlighted** 157:1
**highlighting** 84:19
157:6,6,9
**Hill** 2:6
**Himes** 111:23
**hire** 55:7 56:6

**hired** 30:9 42:3
**hiring** 54:13 57:9
57:14 59:17 60:1
63:3,14 64:10
**Hispanic** 158:5,5,8
**Hispanics** 115:2
**historical** 66:3
**historically** 38:7
60:2
**history** 34:17 83:24
**hobby** 100:3
**hoc** 49:19 50:5,22
**hold** 19:19 36:7
160:16
**holding** 144:15
**holds** 161:15
**home** 58:22 124:23
**Homer** 111:10
**homes** 124:19
**honestly** 119:7
164:20
**hope** 85:24 86:7
**hosts** 151:13
**hour** 24:14 158:20
**hub** 80:20
**Huh** 103:10 115:3
160:21 161:17
**human** 35:1,14
**humanities** 16:11
16:12 30:20
**hybrid** 30:15
**hybridity** 73:21
**hypothetical** 74:22

**I**

**I-K-E** 16:4
**idea** 19:2 21:22,23
22:14 54:4,10,12
54:23 57:19 60:12
65:24 71:1 72:7
76:2,9,14 93:15
95:8,14,18 97:1,7
104:1 107:9
118:24 121:20
129:24 160:19
**ideas** 24:22 86:17

92:1 116:19
129:21 148:20
155:7
**identification** 5:5
31:8 39:6 50:18
80:9 92:12 105:15
108:3 126:14
155:16 159:21
**identified** 51:8
80:16 155:23
**identifies** 62:20
149:16
**identify** 53:12,12
55:24
**identifying** 138:3
**identities** 58:22
59:14 60:3,11,20
**identity** 60:4,12,16
72:19
**ideological** 35:17
**ideologies** 35:9
**ideology** 35:7,9
**II** 118:10
**illegal** 151:24
**illegitimate** 131:15
132:1
**illness** 5:23
**imagine** 70:9 132:4
**immediate** 23:12
**immediately** 18:5
**immigrant** 74:5,24
**impact** 26:20 28:14
28:17
**implemented** 60:23
62:13 63:12,18
**implicitly** 117:6
**imploring** 44:7
**imply** 91:16 131:12
**important** 37:3
55:7,15,18 56:6
60:15 73:10 85:20
86:1,15 120:24
144:21
**impose** 73:12 90:14
**imposing** 65:13
**imposition** 72:17

74:4
**impression** 90:15
141:6,10
**improper** 137:20
**improv** 164:2
**impugning** 109:3
**in-person** 125:20
**inaccurate** 160:7
**inadvertent** 40:7
**Inasfar** 33:24
**incidentally** 62:15
88:4 92:6 142:2
**inclination** 141:7
**include** 11:15 65:20
**included** 32:13 34:4
43:13 98:15
103:12 142:6
**includes** 22:9 81:5
**including** 34:3
143:22
**inclusion** 46:23
48:11 49:17,20
50:6,23 63:6
64:14
**inclusive** 32:18
**incorporate** 114:24
**increase** 49:9 54:7
54:21
**Indian** 158:8,13
**Indians** 158:14
**indicting** 44:6
**indigenous** 61:13
61:16 72:15
**individual** 6:19,21
7:3 51:7 65:6
103:16 132:14
**individually** 102:5
**individuals** 71:5
116:21 129:21
**inferior** 89:8,13,18
90:16
**inflected** 107:14
**inform** 106:17
123:11
**information** 35:6
**inhibited** 164:7

**initial** 93:12 111:3
169:19
**initially** 64:17
**initiated** 157:2
**initiative** 48:11
54:7,16,20 57:23
94:22 97:9,20
98:2 101:1,9,11
102:5 104:3,19
**initiatives** 48:8 49:8
55:19 80:2 107:10
107:15
**injustice** 72:14
119:8
**Inoue** 43:14 47:5
47:24 48:1,1,2
161:1,2,4,5,6,8,21
**Inoue's** 162:9
**inquiry** 146:13
**inset** 83:8,15
**inside** 114:13
**insofar** 15:9 68:15
120:2
**instance** 17:16
18:24 24:20,21
25:20 30:20 57:9
60:14 66:2,16
75:22 79:12
104:16 112:15
115:6 117:5 123:3
123:6 128:11
142:23 144:16
151:2
**instances** 147:13
**Institute** 104:20
105:18,24 106:20
**institution** 58:10
104:9 154:18
**institutional** 17:14
18:23 64:12 92:7
110:14 155:21
**institutionalize**
105:3
**institutionally**
21:20
**institutions** 53:14

66:3
**instruction** 73:11
**instructor** 41:21
72:10 114:4
**instructors** 17:7
44:8 139:9 157:21
157:23
**insulted** 138:11
147:1
**insulting** 138:7
151:12 153:6,9
**insurance** 70:8,20
**integrated** 37:14,16
37:19,19,23,24
38:2,7
**integrates** 38:24
**integration** 37:22
**intellectual** 22:1
70:1
**intellectuals** 149:9
**intense** 130:18,19
154:7
**intensified** 129:1
**intentionally** 35:19
**intently** 136:21
**inter-domain** 30:14
30:16 31:2
**interact** 74:8 75:6
**interactions** 44:10
**interdisciplinary**
30:23 31:1
**interest** 22:10 99:8
99:18 137:12
**interested** 27:20,21
58:2 99:7,17
106:12 118:16
140:14
**interesting** 75:13
76:2 129:6 136:18
160:22
**interfere** 5:15,18
**interim** 15:15
**internal** 114:11
123:6
**international** 33:6
79:13

**interpret** 123:5
**interpreted** 56:8
**interrupt** 7:9,10
10:17 52:12
**intersectional** 60:3
60:11
**intervention** 151:8
**interview** 43:14,24
158:18
**interviewed** 52:24
132:9 152:24
153:19
**interviewer** 43:17
**interviewing**
156:11
**introduce** 5:7 10:24
39:5 80:5 105:13
126:11 155:11
**introduced** 9:18
31:10
**introducing** 151:24
**investigating**
132:12,13 156:11
**investigation**
155:11 156:3,18
156:19
**investigator** 155:24
**invite** 24:17 162:6
**invited** 25:14 26:9
47:5 125:19
**involved** 29:22
100:5
**issue** 25:16 131:22
139:13
**issues** 16:21 27:3
41:2 43:20 57:14
101:13 103:5
145:11 148:23
152:16
**italicized** 157:1
**italics** 157:3
**item** 25:7 62:1
129:20
**items** 25:1 84:15

---

**J**

**J** 4:15
**James** 71:11,14
111:22
**January** 45:23
103:4,20 109:18
160:14,17
**Jersey** 37:4,5,6
38:3
**Jewish** 77:13
**Jimmy** 28:13 51:6,7
**job** 11:7 13:23
14:12 21:17 22:20
22:24 23:6 26:20
33:12,21 73:18
75:21
**jobs** 64:9
**John** 70:1 71:2
**join** 82:14 85:24
86:7
**Jr** 4:3
**judge** 45:4
**judged** 90:22
**judgment** 86:10
**July** 82:8
**jump** 33:9 87:6
168:7
**justice** 72:1 80:2
81:2 82:6 83:1
84:8 86:11 93:6
94:21 95:4,7,19
95:22 96:21 97:6
98:3 99:22 103:13
106:19,24 107:5
107:13 129:10
145:12 164:8,8

---

**K**

**Kanzinger** 4:3
**keep** 47:17 64:21
154:10
**Kenosha** 116:1
**kept** 126:5
**key** 72:19
**kind** 13:5 17:16
21:21 25:6 27:20
29:1 46:22 47:3

48:10 56:22 57:13
57:15 58:24 59:6
64:4 66:1,15
67:16 72:10 83:4
92:1,2 94:22
99:12 117:6 118:3
121:10,18 123:7
127:16,22 129:8
129:22 130:3,10
130:23 131:13,19
131:23 135:10
136:17,21 139:12
140:16,21 142:4
143:3 147:14
149:22 150:12
151:2,24 152:10
153:5,8 156:6
166:13,20
**kinds** 16:21 31:4,15
35:6 73:15,24
107:11 117:24
128:2 135:1 142:1
152:16 165:6
**knew** 151:23
152:17
**know** 7:17 8:13 9:5
9:6 14:6,8,14,16
14:23 16:19 21:15
21:17 22:1,13
23:1 24:6,17 25:3
25:4,7,14,24
26:24 27:1,20
28:18 36:5 48:15
49:4,5 51:13,16
52:8 53:5 54:12
54:22 55:2 56:13
57:3,8,13,16
58:23 60:14,15,23
61:1 62:13,14
63:13,13 64:19
65:22 66:4,18
67:21,23,24 68:17
68:24 69:1,2,3,15
69:24 72:4,14
73:3,5,14,19 75:1
75:16,19,20 76:1

76:23 77:22 78:22
80:15 83:24 84:2
85:11,12,18 86:13
89:11 90:10 91:21
92:2 95:3 98:14
98:21 99:5,16
104:6,22 105:12
105:23 106:12
107:5,21 108:23
109:9 112:13,17
113:9 114:18
115:3 117:14,21
117:23 118:5,24
119:2,4,5,14
121:5,23 123:4,7
123:9 125:10,19
126:8 127:6 128:7
128:11 129:20
130:23 131:22,24
132:4 134:10
135:11 136:14,18
136:21,23,24
137:4,6,24 139:13
139:21 140:15,16
140:19,22 141:11
141:15,23 143:7
144:3,14,18,23
145:4,5,9,9
148:19 149:18,22
150:4 152:10
154:12 157:2
158:4,8,19 159:1
162:5,8,15 165:7
165:19,20,23
166:2 167:5,6,8
169:20
**knowledge** 5:14
19:19 31:3 40:7
54:18,19,20 62:14
77:10 115:4 118:5
122:1 126:10
128:13 145:8
149:12,14 150:14
150:15
**known** 28:9 33:3
**Korean** 149:19,23

**L**

**laid** 40:9
**language** 33:6 66:6
66:7 67:4,14,22
68:2 69:11 70:11
71:23 72:15 73:9
73:19 74:7 75:1
75:20 81:15 86:18
88:8 89:1,8,22
112:3,16 137:15
**languages** 58:23
73:15 75:1
**large** 64:13 113:2
**largely** 154:6
**larger** 18:23 22:13
155:7 165:10
167:16
**Larsen** 111:22
**late** 99:4
**law** 4:21 151:24
152:11
**laws** 38:1
**lawsuit** 6:20,24
169:14
**lawyer** 7:4,5
**lead** 103:19 164:21
**leader** 45:24
**leaders** 18:1 129:15
**leading** 103:4
129:16
**learn** 35:14 74:7
79:1 117:5
**learned** 152:19
**learning** 72:21
80:19
**leave** 73:5
**lecturer** 41:18,20
42:1,6,9,11,19
93:22
**lecturers** 14:4
**lecturing** 8:6
**led** 34:16 48:15
124:5 131:9
163:15 167:1,2
**Lee** 98:23
**Lee-Amuzie** 32:22

32:24 98:23
104:18 124:9
125:15 126:4
130:20 135:20
141:9 148:13
149:2,16
**Leela** 96:12
**left** 161:12 163:19
167:12
**legal** 7:16 8:3
**legitimate** 86:15
137:22,23
**let's** 38:11 44:20
46:21 66:5 74:15
79:18 85:23 92:4
100:24 101:16
108:1 127:1
129:15 132:21
133:22 134:11
136:1,1 139:24
143:7,8 144:5
146:8 162:18
168:6
**letter** 3:18 82:19
106:14
**letters** 87:8 88:24
91:5 122:13
**level** 18:23 97:2
120:19 131:23,24
**levels** 11:21 47:9
68:17
**leverage** 73:10
**Library** 36:22
**license** 22:1
**lie** 165:16,19
**life** 35:3 121:1
**Likewise** 30:11
**Lila** 19:18 20:8,22
23:14,18 26:24
27:7,8,9,10 29:8
41:10 51:6 96:12
97:8,9 103:22
124:6 127:17
129:20 130:1
131:21 135:12
136:22 140:12

144:15,22
**Lila's** 101:3 162:9
**Liliana** 76:22 80:8
81:22 82:24 85:4
93:2 94:20 99:2
101:18 104:18
107:1 116:4 124:8
125:14 126:4
129:9 130:20
131:9 135:19
137:11 141:9
143:22 145:11
148:13 149:2
150:4
**limit** 125:15
**limitations** 13:8
**limits** 128:18
**line** 21:8,13 33:2
56:5 94:2,6 99:10
102:13 106:12
107:21 110:2,9
111:13,17 131:20
136:24 157:16
169:19
**lineage** 119:6
**lines** 21:10
**linguist** 83:21
**linguistic** 72:1 80:2
81:2 82:6 83:1
84:8,24 85:1
86:10 89:7,17
91:15 93:6 94:21
95:4,7,19,22
96:21 97:6 98:2
99:2 103:13
106:19,24 107:5
107:13 112:18
119:8 145:11
164:8,8
**linguistics** 129:10
145:13
**link** 52:9 81:5,6
**linked** 59:12
**Lisa** 27:8
**list** 52:7 54:24
58:21

Matthew Rigilano

**listed** 76:24
**listen** 126:17
  133:22 134:11
  136:1 139:24
  141:2 151:7
**listened** 147:2
**listening** 150:18
**lists** 45:23
**listserv** 26:10 80:15
**litany** 145:13
**literacy** 73:10
**literally** 84:22
  87:19
**literary** 11:22
  112:17 114:3
  119:1 122:10
**literate** 121:21
**literature** 11:22
  20:21 21:1 111:18
  113:24 114:2,11
  120:20 138:14,20
  141:7
**litigation** 39:22
**little** 10:13 17:1
  21:24 67:23 93:9
  101:20 127:18,18
  129:7 140:2
  150:18 153:13
**live** 37:3,4,8,10
  38:12,14
**LLP** 2:9
**lobbied** 82:18
**located** 4:5
**logic** 123:6
**long** 19:19 24:14
  41:4 42:3 73:3
  74:1 106:11
  116:21 119:1
  127:5,5 153:12
  154:10 158:18
  165:20
**longer** 12:15,17
  13:18 14:12
**look** 57:8 84:14
  85:23 88:1,22
  92:4 101:2 109:15

116:12 123:4
  143:8
**looked** 48:7
**looking** 41:9 88:16
  103:23 105:4
  132:15 136:23,23
  141:15 152:12
**looks** 34:6 88:23
  98:8,20 106:6,8
  110:22 111:9
  156:5 160:3
**loop** 64:11 77:4
  87:6 151:10
**loosely** 49:16
  107:13
**lot** 31:15 105:12
  107:16 127:11
  140:15 168:7
**love** 100:18
**lower** 39:16 158:13

**M**

**M** 21:4
**Madame** 120:16
**magic** 100:17
**main** 18:24 21:12
**mainstream** 88:10
  90:21 121:8
**major** 19:6,9,11
  36:8 46:7 72:24
**majority** 44:8
  53:15 67:14 68:3
  68:6,14 115:14
**majors** 19:3
**making** 94:20 99:7
  99:17 137:12
**mandatory** 26:14
  27:2
**manifest** 114:14
**Manifesting** 138:24
**manifesto** 87:10
**manifests** 81:15
  86:18
**marginalized** 60:2
**Marika** 80:8
**Marissa** 19:16

20:17 109:20
  118:7 163:14
  164:20,22 166:14
  166:18,24 167:2,4
**mark** 31:5 50:10
  67:24 92:5,15
  108:2 113:7,13
  114:5 133:24
**marked** 5:5 31:8
  39:6 40:2 50:18
  50:20 80:9 83:7
  92:12 105:15
  108:3,5 126:14
  155:13,16 156:16
  159:21,24
**market** 1:18 2:11
  4:6 75:21
**marking** 10:2 39:17
**Marxism** 35:22
**Marxist** 35:23 36:1
  82:18
**mask** 9:2,3
**master** 112:16,17
  113:18
**master's** 36:10
**masters** 71:22
  112:3
**material** 44:16 82:1
  82:2 84:12
**materials** 47:18
  50:4 76:24 81:9
  110:6,17,24 115:1
  117:2,9,12 129:10
  132:16 141:8
  142:5 168:22
**Matt** 7:18 31:6
**matter** 66:1 127:18
  130:24
**matters** 23:8
  154:23 165:6
**Matthew** 1:15 2:10
  3:5 4:11,15,20 5:8
  6:7
**max** 25:22
**Maya** 71:21
**McWhorter** 70:1

71:2
**mean** 9:8 10:16
  11:18 13:7,15
  22:22 27:11 30:16
  34:21,23 37:16,18
  38:9 45:4 47:10
  47:19 51:10 52:12
  54:3 56:5,8,9,22
  57:1 58:19 60:11
  60:17 75:14 76:2
  79:10 85:17 86:12
  100:4 103:18
  107:22 112:13
  114:21 117:23
  118:22 120:2
  121:5,16 123:9
  125:18 129:23
  135:7 138:10
  140:21 142:1
  144:18,22 147:12
  147:16 148:18
  153:13 154:12
  157:20 158:24
  159:2 163:10
  165:19 167:8,11
**meaning** 36:17 67:8
  161:21
**means** 14:8 65:13
  98:21 119:6
**meant** 37:21,21
  38:6 46:9 66:6
  75:18 142:4,16
**measured** 154:11
**mediation** 132:5
  139:13
**medication** 5:18
**meet** 161:23
**meeting** 24:14,20
  24:23 25:1 31:11
  32:1,10,18 34:6
  34:16 39:8 40:18
  41:9 42:22 43:23
  45:19 46:3,16
  60:1 85:11 108:6
  123:23 124:5,6,11
  125:8,17,20 126:1

126:12,13,19,20
  127:6,8,21 130:13
  131:2,17 132:3
  133:3,5,8,11,14
  134:22 139:7
  141:22 142:21
  143:2 145:18,23
  148:22,23 152:8,9
  152:16,17 153:22
  154:10,24 155:3
  156:6,8,22 157:14
  163:14,16,20
  164:22,22 165:3
  165:11 166:6,13
  166:21,24 167:1,3
  167:4,6,6,7,10,12
  169:10,12,15,17
  169:18
**meetings** 3:13,14
  17:22 24:9,10,15
  24:16 25:14,20,22
  26:6,8 27:1 28:1,2
  28:6 29:2 32:4,7
  40:4,9,14 42:20
  49:11,12 51:9
  59:7 92:1 101:6
  102:22 103:19
  107:19 129:8
  142:20 154:14,15
  163:21,24 164:7
  164:19 165:5
  166:11 167:16,19
  167:20,21,24
  168:20,21,23
  169:3,4,7
**melanin** 113:15
  139:1
**member** 42:21,23
  49:23 82:16,17,20
  146:18 166:16
  168:17
**members** 24:2,18
  25:8,15,17 45:16
  51:4,4 63:4 74:1
  125:9,21
**meme** 111:11

Farrell Court Reporting

memories 19:21
memory 5:19
  105:22 106:1,6
  107:24 120:12
  153:8 159:2 161:7
  167:9
Mengel 1:20 4:18
mental 5:23
mention 54:11
  99:17 161:19,19
mentioned 21:4
  35:19 55:1 72:13
  75:19 110:21
  127:23 129:20
  157:14
mentions 26:24
  163:12
message 8:15,16,19
  8:20 9:7,8,11 94:1
  94:18 161:12,24
  163:12
messages 3:22 8:17
  80:21 160:1,2,7
  160:13 161:16
  163:3 166:13
met 7:18 71:5
Michael 2:4 4:13
  6:16 10:16 88:12
  95:15,23
middle 38:17,19
  42:14 78:6 139:7
midway 101:17
Mike 5:1
mind 54:15 61:24
  69:3 79:15 132:8
  145:16 153:11
  159:7,13
mine 100:13
minor 19:7 36:9
minorities 53:12
  55:24 115:6
minority 56:2
minutes 127:19
  133:1,22 134:10
  134:10,15 136:2
  140:1 143:9 144:5

145:22 146:8,10
  150:16 151:8,10
  151:15
misinformed 19:1
mission 50:2
mistaken 92:23
mode 74:3
model 121:10
models 76:5
modified 103:4
modify 104:1
modules 46:22
moment 102:24
  116:13 121:2
  127:15,21
money 106:7 162:7
monitor 125:5
monitoring 125:7
monthly 169:6
morning 101:20
  156:6
Morrison 111:24
  112:15,20,24
  113:12 114:7
  119:14
mother 72:14
motivation 46:5
motives 135:14
move 38:15,16
  162:18
moved 38:17,21
  100:10
movement 73:8
  84:8 86:11 93:8
  140:19
movements 115:12
multi-racial 38:22
multiple 8:17 9:6
  9:12 24:22 25:1
  38:24 75:1
multiracial 38:12
multitude 60:13
mumbled 135:2
murder 40:23
  115:22
myth 123:24 133:3

133:6
mythological 122:1

___

**N**

N 3:1 21:4
name 4:2,13 5:1
  15:15,17 16:5
  37:7 47:6,24 77:3
  90:10 106:2 110:8
  110:21 117:15
  132:14 146:17
named 32:21 49:2
names 4:12
national 149:18
  150:5
naturally 35:22
nature 10:14 11:10
  12:18,21 17:24
  27:3 35:18 44:16
  53:1 54:15 65:23
  77:18 80:16 92:20
  98:19 107:12
  125:9 156:23
  162:8
navigate 132:22
Naydan 19:18 20:8
  23:15,19 27:10
  29:8 41:10 51:6
  76:22 80:8 81:22
  82:24 85:4 93:2
  94:20 99:2 101:18
  104:18 107:1
  124:8 125:15
  126:4 130:20
  131:9 135:19
  137:11 141:9
  143:22 145:11
  148:13 149:2
  150:4
Naydan's 20:22
  116:4 129:10
nebulous 59:6
necessarily 36:4
  65:17,24 97:7
necessary 11:2
  128:2

need 55:11 57:2
  140:17
negative 28:17
neighbor 38:7
neighborhood
  37:10,13,20 38:2
  38:12,22
neighbors 37:11
  125:9
neither 47:10
Nella 111:22
never 28:4 50:4
  51:14 68:1,20
  70:10 71:13 82:17
  118:2 119:11
  122:9 125:13
  128:10 145:16
  164:6
new 12:24 14:1
  15:7 21:5 30:18
  33:14,14 36:12,13
  37:4,5 38:3 40:13
  69:4 73:18 89:24
  92:2
new-ish 30:18
news 15:12
nice 47:17
Nicosia 19:16
  109:20,21 111:2
  166:18
Nicosia's 20:18
  118:7
nine 120:5
non-adjunct 169:3
non-tenure 42:7
non-tenured 21:10
non-white 76:10
nonresponse
  148:12
nonspecific 54:9
nontenure 21:8
noon 101:21
norm 88:9 130:3,21
  131:8 154:13
normally 24:13
  141:24

norms 89:8 129:8
notably 60:3
Notary 1:20
note 10:18
notice 3:12 6:2
  10:23 48:18
notions 21:21
November 34:11,16
number 25:13,22
  31:7 39:17 45:19
  54:21 57:2 59:16
  59:20,24 61:3,3
  62:1 63:1,10
  78:24 88:17 90:19
  91:2,8 92:8,9
  100:14 109:9
  132:4 142:6
  157:10 160:11
  162:19
numbers 23:1 31:6
  39:21,23 40:1
  54:11 56:9 100:18
numeral 88:15

___

**O**

object 6:9 44:19
  84:3
objected 95:10
objecting 45:14
objection 14:18
  15:1 22:6,11,21
  23:9 26:17,22
  29:12 33:23 37:15
  39:3 44:22 45:9
  51:22 53:22 54:2
  56:3,18 58:3,16
  60:8,24 61:17,23
  62:9 65:15 69:12
  69:21 70:18 71:18
  74:9 75:8 79:4
  84:6,10 85:15
  86:5 87:11 91:20
  95:1,9,11,14 96:4
  96:24 113:3
  117:11 124:20
  134:24 135:21

138:9 139:20
141:4 143:20
144:2 147:19
148:5 150:1 152:3
154:20 164:16
**objectionable**
136:16
**objections** 6:3,14
6:15 10:18 45:18
**obligated** 7:7 152:1
**obligation** 6:11
21:15,16 28:23
29:1
**obliged** 156:24
**observations**
148:10
**obvious** 6:10 46:8
**obviously** 6:19 8:1
73:20 82:22 106:3
127:5 133:18
142:14 161:19
163:11
**occasion** 70:7 127:6
132:8
**occupies** 42:13
**occurred** 127:20
**October** 123:23
128:23 129:16
133:2 156:6 169:9
**offensive** 129:3,4
130:10
**offer** 107:18
**offered** 47:8
**office** 48:13,15
139:17,18,21
152:14
**official** 12:5 94:23
96:14,22 97:16,21
97:24
**oftentimes** 24:21
117:6
**oh** 9:23 10:3 31:22
37:21 40:8 49:23
50:7,13 71:17
74:14,14,16 83:14
87:13 88:16 94:13

125:1,10 135:12
**okay** 6:9 8:15,19
9:14,23 16:12
17:4 18:12,21
19:4 20:6 29:14
33:9 41:9 42:18
43:5 52:2 53:3,7
59:21 62:4 63:11
69:5 70:9 74:16
84:1 88:1 91:7,12
93:14 94:1,15
96:11 100:23
102:18 105:11
107:8 108:16
109:7 116:4,16,24
118:15 126:11
128:17,20 133:21
137:5 159:11
160:12,16,21
163:1 168:4,6
**Okey** 162:20
**old** 160:2
**once** 21:16
**one's** 60:12
**ones** 47:22 59:5
166:6
**ongoing** 50:1 55:11
**online** 70:4 96:17
**opening** 33:11
**opinion** 9:2
**opportunity** 9:17
**opposed** 74:3 130:2
137:1 140:20
**opposing** 133:17
**order** 109:4
**organization** 82:13
**organize** 17:20,23
24:8 134:21
**organized** 32:16
131:16 156:5,8
**organizers** 131:2
**organizing** 24:21
27:22
**orientation** 35:21
57:6 60:5 65:9
**orientations** 58:22

**origin** 149:18 150:5
**original** 99:13
100:2
**originally** 107:1
156:7
**origins** 74:19
**outcomes** 24:16
75:17
**outside** 97:3 125:18
**overview** 34:17

_____

**P**

**P** 82:19
**p.m** 93:3,19 95:24
99:3
**P.O** 2:5
**Pack** 28:13 51:6,7
**page** 3:3 9:24 39:17
50:22 53:4,6
59:15 61:4 80:6
81:19 83:13 85:24
87:6 88:2,13,14
92:8,22 100:20
101:17 106:9,13
108:10,19 109:9
110:21 116:5,5
118:8,8 155:15,19
156:16 160:10,15
162:18
**pages** 162:22
**paid** 13:11 42:14
62:6
**paper** 44:20 68:1
69:8 155:12
**paragraph** 53:9
55:4 56:4 81:13
83:8,15 88:23
94:13 101:2
114:10 118:17
**paragraphs** 117:23
**parenthetical**
114:12
**parse** 122:1
**part** 17:10 25:16
27:23 29:3,15
35:23 37:5 44:12

51:5,18 52:24
60:16 64:18 72:19
80:22 81:13 82:14
94:22 97:21 101:5
103:14 106:4
121:1,13 122:14
128:5 133:19
137:13 142:19
159:19
**participant** 43:6
**participants** 106:3
130:5
**participate** 42:19
42:21 46:10,14
49:8 52:3 80:1
105:8 124:18
**participating**
104:17 111:7
148:9 156:19
**participation** 45:20
46:7,11 103:20
126:19 127:13
156:3
**particular** 35:17
46:15 57:2 59:1
72:11 74:3 91:24
121:16 122:15
127:17 128:4
129:24 155:3
166:1
**particularly** 75:15
102:11 103:2
167:10,17
**party** 6:24 80:17
**pass** 168:4
**passcode** 126:6
**pay** 61:20
**PDF** 52:9 118:8
**peculiar** 32:16
**pedagogical** 73:8
110:7 115:12
**pedagogy** 34:19
81:15 108:7 111:1
137:13 142:4
163:12
**peddling** 145:18

**peers** 116:9
**Penn** 4:7 11:9,10
12:2,22 14:2
17:14 18:23 22:19
26:21 28:15,20
30:7 31:3 36:9,16
36:23 41:16 44:15
46:18 48:9 49:2,2
51:20 54:6 55:23
56:14 57:12,19,20
57:23 58:1,7,10
64:17 75:12 76:12
76:14,16 77:9,17
78:18 80:8 89:11
90:11 91:18 98:15
104:10 109:24
114:18 115:1,13
119:24 123:14
126:9 127:3
138:13,17 152:14
152:15,21 153:1
154:17 167:24
168:15,20
**Pennsauken** 37:9
**Pennsylvania** 1:2,7
1:19 2:12 4:6,10
154:19
**people** 22:19 25:22
27:2 37:22 43:21
44:21 45:8 46:7
46:15 61:14,16,21
62:7 67:21 68:10
74:21 76:10 82:14
89:23 96:16 111:6
114:21 115:2,4,16
117:7,10,19
121:12,24 122:4
124:23 125:16,18
127:3 128:15
129:11 131:16
135:2 138:4,14,22
140:23 142:16
143:17 148:9
168:23
**people's** 119:4

Matthew Rigilano

124:19 134:22
144:15 165:21
**percent** 53:11,12,15
53:16 55:24 56:1
**performance** 29:23
**Performances**
118:9
**period** 46:21
**periodically** 21:3
25:18 51:11 52:7
**periods** 11:23
**perpetrated** 114:21
115:16
**person** 16:15 29:2
85:19 109:19
123:9 161:15
**personal** 29:1 66:1
148:20
**personally** 128:14
**personnel** 64:20
**perspectives** 55:5
55:12,16 56:10
81:10
**pertinent** 75:24
**perversely** 100:18
**Ph.D** 36:11 69:11
70:11
**Philadelphia** 1:19
2:12 4:6 36:21
**Phillis** 110:22 120:5
120:23 142:10
**philosophical** 35:21
**philosophy** 34:19
**phone** 161:15
**phrase** 66:7,19
87:19
**phraseological** 69:7
**piece** 157:21 164:1
**Piero** 1:4 4:7,14 5:2
8:24 9:9 30:7
45:13,17 92:8
110:12 111:10
124:2 126:18
128:22 132:2
151:13 152:13
155:2 160:8

162:19 169:11,15
**Piero's** 153:1 160:5
169:18
**pinnacle** 118:18
119:24
**pipe** 163:20,23
164:19 165:6,13
166:6 167:14,18
167:23
**placate** 165:18
**placating** 166:3
**place** 1:18 6:14
66:24 120:21
162:7
**plaintiff** 1:5 2:7
4:14 5:2 8:13
111:10
**Plaintiff's** 5:8
**plan** 104:2
**planning** 103:18
**plans** 32:4
**platform** 80:19
**play** 29:15 123:11
132:21,24 133:15
133:24
**played** 156:18
157:11
**plays** 119:4 134:2
134:13 136:5
140:4 143:11
144:7 145:24
146:11 150:20
151:17
**playwright** 119:3
**please** 4:12,18 14:9
15:18,24 17:13
48:17 50:14 52:17
56:21 62:3 94:14
101:3 107:14
116:15 118:14
**pleasure** 106:17
**PLLC** 2:3
**poem** 121:3 123:5
123:11
**poet** 121:1
**poetry** 120:23

121:4,6,17
**point** 20:5 35:17
87:12,20 88:10
90:24 116:17
133:13 145:7
162:6 166:15
169:17
**pointed** 95:15
**pointing** 10:1 87:18
98:10
**points** 73:1 116:12
130:15
**policies** 89:6
**policy** 152:1
**political** 102:23
121:2
**politician** 73:24
**politics** 45:20 46:11
**Pope** 121:13
**popular** 121:12
**popularity** 65:6
**population** 53:11
**portion** 54:17 157:1
**pose** 150:24
**position** 13:12
14:21 16:13 19:20
21:6 30:7,10
33:10,15,18,18,19
41:16,19,20 49:5
65:9 109:24
123:14 128:7
140:22 146:20
**positive** 26:20
28:14 149:21
**possible** 42:5 45:2
125:11 147:20
**post** 20:3 48:23
120:19
**post-doc** 36:22
**potential** 33:21
**potentially** 145:4
151:23
**power** 66:4
**practice** 57:14 95:3
96:8,16 97:2,5,23
104:15,23 105:2

106:18 157:18
**practices** 54:13
63:6 66:3,15
89:17 110:7
157:24 163:6,10
**preceding** 166:23
**precise** 56:8
**precisely** 15:5
20:20 22:16
153:22 164:18
**predominantly**
67:4
**predominately**
77:23
**preface** 123:22
**preparation** 8:14
**prepare** 7:17
**prepositions** 67:24
**presence** 49:9
128:24
**present** 4:10 102:24
130:14 146:17
167:4
**preserve** 6:14
**preserved** 58:18
96:5
**pressing** 25:6
**presumably** 12:15
13:18 15:6,8,9
101:14 102:9
165:12
**presume** 14:11,24
75:3 159:20
**pretty** 62:21 146:22
156:13 159:2
162:5
**prevent** 5:24 90:21
**previous** 93:9 146:4
160:15 162:23
**previously** 150:23
**primarily** 22:22
25:17 33:4 35:15
46:5 77:16 115:16
115:17
**primary** 12:1 23:22
25:7

**printed** 108:10,14
**printout** 83:7
**prior** 44:13 48:14
163:12 169:14
**prioritize** 76:1
**private** 102:15
**privilege** 8:7,11
76:8 77:2,6,8,11
77:13,15 78:16
79:9,11 89:7
118:18 119:15,24
145:12 157:22,23
158:5 164:9
**privileged** 8:3,4
78:7,20
**privileges** 76:10
78:22 79:14
**privy** 125:8
**probably** 6:2 26:23
40:6 50:1 58:20
59:4,13 75:24
108:11 120:2
122:4,11 146:3
159:3 167:21
**problem** 43:10,22
44:3,17,21 45:8
45:14 46:7,16
104:2 136:18,19
138:5,14 141:12
**problematic** 75:15
**problems** 78:14
**process** 63:2,4,7
81:9
**procured** 47:22
**produced** 39:24
133:18 155:13
**producing** 39:21
**production** 92:7
98:16 103:24
109:2,4 160:5
**professional** 17:23
24:19 28:5 82:13
101:6 114:4
134:21 139:9,16
154:11
**professor** 11:13

12:8,10,12,12,20
13:1,4,16,19 14:7
15:20 20:20,23,23
21:5 22:5 23:4,18
26:12,16 28:9,19
30:10 31:18,20,23
33:2,10,16,19
41:24 42:1,9,12
43:14 58:2 67:15
75:10 80:1 89:11
90:10 92:18 96:7
110:2 111:17
123:22 139:16
146:21 155:13
159:20
**professors** 24:6
25:9 26:1 114:18
158:5
**proficiency** 71:9
**program** 17:5,6,13
17:15,19,22 18:4
18:6,8,9,10,12,14
18:18,18,20 19:14
19:17,20 20:7,11
20:14,16,17 23:14
23:19 24:9,10,17
24:18,23 25:1,10
25:16,20 26:2,6,8
29:4,9,10 31:11
32:1 33:3 34:15
39:8 40:4,14,14
40:18 41:19 42:19
42:23 43:2,3,12
43:23 45:16 46:3
49:11,12 51:5,8
62:15,21 76:21
80:8 84:5,5 85:3
85:11 86:19,22,22
87:4 91:17,19
92:1 93:1,2 94:20
94:24 96:15,23
97:24 99:7,18
100:3,5 101:2,6
102:22 103:12
104:18 105:3
106:24 107:3,15

107:19 108:6
110:2 123:23
124:8,12 125:14
125:14,17 126:3
129:9 131:9,17
133:3 134:22
135:9,10 137:11
137:12,18 141:8
141:17,22 142:19
142:21 143:2
145:18 146:18
148:16 151:13
153:15 155:8
165:5 166:10
167:7,12 168:20
168:21 169:3,7,10
**program's** 58:8
**programming**
101:12
**programs** 17:3,7,10
18:1 19:2 47:8
55:12 66:10
106:11 107:11
145:17
**project** 96:23 104:5
123:1
**projects** 22:2
**prominent** 120:24
**promote** 80:2 85:17
117:10
**promoted** 12:7 14:7
15:7,13 42:9 64:3
77:5,7 84:4
**promoting** 85:13
86:4,10,12 91:18
91:22
**promotion** 33:13
**promotions** 13:22
**prompt** 123:1
**prompts** 32:19 34:4
**pronounced** 16:5
47:24 61:11 96:13
**pronunciation** 48:5
**proper** 139:5
167:22
**proportion** 54:8

**proposal** 106:5
**proscribed** 43:23
**prose** 68:21,24
71:14
**prospects** 26:21
**protected** 8:11
**protests** 40:24
**protocol** 137:1
**proud** 74:18
**proudly** 163:15
164:20 166:20,24
167:2
**provide** 24:19
64:10 133:18,19
140:20
**provided** 34:17
52:10 132:16
**providing** 19:3 28:5
59:19 92:18
155:15
**provocative** 44:3
**PSU** 92:5,9,14
100:20 101:17
105:20 110:15
**PSU-De** 92:7
**public** 1:20 69:24
154:17,24
**publicly** 88:4
164:15
**publish** 149:10
**pulled** 22:15
**punished** 139:18
152:7
**punishment** 152:12
**purchase** 75:24
**purchasing** 78:15
**purpose** 52:19
**pursue** 22:1
**purveyed** 76:12
90:18
**put** 12:18 28:4
37:18 41:10 50:24
74:15 78:17 96:16
125:5 127:13
131:1 137:18
140:22 141:8

**putting** 130:24

**Q**

**Quaker** 2:6
**qualifications**
10:15 11:7
**queer** 60:15,20
**question** 5:10 6:12
7:8,9,11,11 14:10
14:20 17:17 19:12
22:13 23:15 28:8
58:1 62:4 65:4
74:2 75:13 80:11
82:22,23 90:8
120:15,16,17
128:16,17,20
130:22 131:16
134:4,11,17
135:13,14 136:4
136:11,13,17,20
137:3,18,22 139:6
139:19 140:1
143:9 144:10,13
145:1 146:2,6
147:17 148:3,11
148:19 151:5
157:13 159:23
167:7
**questioning** 4:23
129:2 131:20
144:12 156:23
169:19
**questions** 53:3 65:2
128:15 129:12,14
129:19 130:7,7
134:22 147:15
150:22,24 159:11
168:14 169:2,23
**quick** 50:12 168:14
**quirks** 67:23
**quite** 42:13 140:3
140:10
**quota** 54:14
**quote** 81:8 83:1
94:23 96:14,22
117:17 119:24

135:3 157:9
**quoted** 98:11,21

**R**

**race** 38:2 43:20
44:9,9,11 54:18
60:3 61:21,22
74:19 79:7 101:22
103:5 128:3
143:18 150:5
**races** 38:24
**racial** 58:20 79:11
114:13 129:10
152:15 153:2
**racially** 53:10 55:1
**racism** 41:2,13
65:11,13,17,21,24
70:17 84:24 91:15
103:5 114:14,20
114:21 115:1,5,11
115:15 117:6,17
117:18,19,24
118:1,4 129:24
135:13 140:24
158:8,13
**racist** 45:2,8,15
66:4 69:20 141:7
157:17,24 168:23
**Ralph** 111:22
**ran** 24:20 166:16
**random** 125:9
**range** 29:8
**rank** 18:16 20:19
26:12
**rarely** 163:24
**Rationale** 53:6
**re-notice** 5:8 9:21
**re-reading** 135:3
**reach** 26:11
**reached** 159:19
**reaching** 20:11
**read** 32:22 34:9
41:15 44:20 45:21
50:24 52:10,23
53:17 55:8,13,20
56:5 59:21,22

Matthew Rigilano

60:5 61:9,24 63:8
63:10 69:4 70:4
71:11 74:17 82:8
82:24 83:4,19
89:9 91:9,10,11
94:9,13,16 96:10
99:9,11 100:24
101:7,23 103:10
105:20 111:13,20
114:16 116:14
117:2 118:6,13
120:9,15,17
121:19 122:9
135:8 140:11
160:21 164:3
**reading** 52:20
56:19 81:3 93:9
123:8 127:18
131:5,6,10 135:9
135:16 138:3
140:12 144:17
156:20 161:24
**readings** 135:15
139:8
**real** 50:11 83:18
**realize** 113:21
154:17
**really** 14:2 27:23
37:1 43:24 49:11
51:17 86:9 101:23
115:3 118:16
119:6 142:13
144:20 145:21
146:7 160:3
164:17
**reason** 18:6 23:1
31:1 37:2 46:10
51:16 63:13,14
98:14,15 108:8,13
108:17 140:8
153:14 160:6
**reasons** 46:8,13
135:2
**recall** 8:20 31:14
45:18 59:9 63:18
64:2 98:18 104:12

104:14 105:4
106:23 123:22
125:7 127:24
128:22,24 129:1
130:5,9 132:13
134:4 146:17
148:7 151:11,14
153:7,19 163:10
**recap** 130:9
**receive** 15:12
**received** 15:6,7
36:6 80:11 99:6
162:4,14,17
**receptive** 161:23
**recipient** 99:5
**recipients** 9:12
**recognize** 9:15,18
51:4 55:4 110:4
110:17 146:14
159:24 160:3
**recollect** 127:9
**recollection** 127:2
**recommend** 61:5
**recommendation**
61:20
**recommendations**
59:17,19
**recommended**
26:14 63:2
**recommending**
59:24 62:5
**record** 4:1,12 5:8
6:12,14 9:19 10:1
10:17,18,22,24
11:4,8 14:6 15:18
16:1 17:12 21:9
31:6,10 36:6 40:1
41:17 46:2 47:22
48:17 50:14,15,17
58:18 69:8 79:20
79:21,23 91:11
108:5,7 109:3,11
115:20 123:17,19
123:21 132:23
133:10 156:17
159:15,17 168:8

168:10 169:11
170:2
**recorded** 126:8
169:15
**recording** 126:11
126:13 133:13,18
**records** 160:7
**recruited** 107:2
**recurrent** 27:4
**recurrently** 76:20
**redirect** 11:1
**refer** 15:22 27:7
39:24 83:22
**reference** 9:7 41:6
98:7 103:13,14
109:11 166:12,23
**referenced** 9:11
**referred** 21:5 51:19
82:12 84:15 98:11
103:16 106:24
167:10
**referring** 15:24
42:6 48:18 68:13
81:23 83:11 87:13
94:21 95:2 96:21
100:2 102:8 107:1
107:13 117:1
157:20 162:10
164:18,20 167:13
**refers** 67:3 68:9
96:7
**reflect** 10:1 55:7
56:7,8,10,15,17
132:24
**reflects** 57:1 83:17
88:9 133:10 156:3
**refresh** 105:22
106:1 161:7
**refuse** 10:10
**regard** 40:13 45:8
57:22 107:11
**regarding** 78:22
165:12
**regional** 78:4
112:14
**regular** 43:5,6

**regularly** 27:5
42:19 101:5 169:4
**related** 107:5,6,12
157:11
**relation** 161:10
168:15,20 169:9
**relationship** 16:13
20:18 95:4
**relative** 79:13
**relatively** 14:1
21:17 39:10 159:6
**release** 61:7
**releases** 62:7
**relieve** 6:11 61:21
**relieved** 61:7
**religion** 58:23
**remember** 15:5
34:3 39:13 43:15
43:19,24 44:1,2,5
47:6 48:13,23
51:23 52:5,6 59:7
64:16,18 81:3
85:5 97:2 98:4
99:21 101:9,11
102:4,6,7,10
103:15,18,22,22
104:4,9,16,17
105:10 106:2
107:23 118:12,23
124:2 127:11,20
128:4 129:9 130:8
130:11 131:19
137:10,14 146:5,7
147:9,11,24 153:4
153:5,13,24 154:2
154:7 156:20
158:19,24 159:3
165:3 166:8,9
**remembered**
153:16
**remembering** 47:4
**reminding** 127:4
**Renaissance** 20:20
110:2
**renewed** 22:24
**renews** 16:16

**renotice** 10:5,19
**reorient** 48:9
**repeat** 62:4 120:15
**repeatedly** 76:21
**rephrase** 14:9
**replace** 82:19
**reply** 93:12
**report** 3:15 50:23
50:24 52:5 53:4
55:23 77:18
140:24
**reporter** 1:20 4:17
4:18 92:15 109:11
120:16,17 133:20
**reporting** 1:22 4:3
55:23
**represent** 6:17,19
6:20 39:20 70:6
82:2 126:12 160:5
160:23,24
**representations**
114:11
**represented** 6:4
**Representing** 2:7
2:13
**reprimanded** 132:3
**reproduce** 157:17
158:5
**reproducing**
157:24
**request** 24:2 136:13
161:23 162:11,16
169:11
**requests** 10:19
**require** 38:2 64:14
**required** 46:18,21
64:3,6 106:3
**requirement** 73:4
125:13 128:9
**requires** 72:21
**research** 21:16
33:20 36:22
**resolving** 132:5
139:13
**respect** 8:22 116:8
123:5 127:12

139:15
**respective** 79:14
**respects** 78:9,13
**respond** 102:23
120:22 130:2
145:8 147:6
**responded** 146:13
**respondents** 9:6
**responding** 8:21
95:17 96:2 102:19
103:8 146:22
**responds** 100:8
**response** 10:5 73:23
75:14 93:19 95:6
99:22 134:12
136:3 146:3
148:14
**responsibilities**
20:22 24:5 61:8
**responsible** 19:3
30:3 140:12,18
144:15,24 145:2
**resulting** 115:17
**review** 7:19,21
29:17 30:1,4
103:7 162:21
163:2
**reviewed** 8:1
**reviewing** 29:22
64:23 81:9
**revise** 63:2
**revised** 63:4
**revising** 24:15 81:9
**revolved** 101:12
**rhetoric** 58:24 92:2
128:6
**rhetorical** 73:13
76:5 112:14
**Richard** 118:9
**Rick** 4:2
**right** 6:24 31:18
32:22 34:7 38:4
49:14 55:8,13,20
56:22 58:21 60:20
61:12,18 65:24
67:1,2,22 68:23

71:6,17,17 72:11
72:16 73:2,16
74:19 75:2,2,18
77:15 79:15 80:24
80:24 81:6,10,16
82:8 83:19 84:5
84:16 85:1,14
86:2,19,24 88:10
88:20 89:3 93:16
93:20 94:12 96:4
96:17,23 97:15,17
98:12 99:19,23
100:9,12 101:23
102:19,24 103:5
103:13,17,20
105:10 106:9,21
107:4 110:5,9,11
110:12 111:20,24
113:7 116:19
117:18 119:11,18
119:21 120:10
122:8,20,24
123:10 126:5,24
127:24 129:12
130:13 131:3,6
133:11 134:19
135:17 136:9,18
138:5,6,6 140:3
141:13,19 142:8
142:11 144:1,20
146:23 147:5,18
149:3,7 150:22
151:1 153:16
155:8 156:6
157:11,18 160:14
161:12,14,18,22
163:16 165:14
166:2,4,12 167:18
**right-hand** 39:16
**Rigilano** 1:15 3:5
4:11,20 5:9 58:2,5
80:1 92:18 96:7
110:22 123:23
155:13,14 156:17
159:20 168:12
**ring** 132:17

**rise** 132:7
**Rita** 111:23
**role** 23:14,21,22
119:4 155:3,4
156:18
**roles** 29:14
**rooted** 89:2
**roots** 150:6
**roughly** 48:9 148:2
**rule** 137:1
**rules** 5:4 69:18
**run** 39:23 167:5
**rung** 42:9
**running** 28:6
**rush** 52:19

## S

**S** 3:10
**sabbatical** 20:4
**Sad** 106:1
**safe** 10:4 77:4
110:14 122:3
**sake** 27:24
**salary** 13:14
**salesman** 70:20
**salesman's** 70:8
**salutation** 106:15
**sanctioned** 94:23
96:14,22 139:6
**sanctions** 139:14
**sand** 136:24
**Saul** 2:9 4:15
**savvy** 132:23
**saw** 7:22 8:15 51:14
77:19 127:8
140:24
**saying** 8:24 86:7,13
95:17,23 101:4
121:5 126:22
137:17 141:13
166:8
**says** 7:22 39:9 53:9
55:3 57:6 61:5
63:1 83:17 84:17
84:22,22 85:6,23
85:24 87:9 88:15

88:22 90:20,20
91:2 93:15 94:5
95:7,13,21 96:11
97:14 98:11,20
99:4,6 101:21
105:1 106:13
128:12 135:8
163:14,19 164:20
165:12 167:1
**scale** 165:10 167:16
**scamper** 139:17
**scan** 160:13 162:22
**schedule** 17:19
23:22 32:1
**scheduled** 24:4
101:5 148:22
**scheduling** 24:7
32:17
**scholar** 70:10
113:23 160:24
**school** 21:22,22
35:20 36:3 40:13
49:13 65:10
**schools** 36:20 123:4
**Schreyer** 104:9,20
105:18,23 106:20
**sciences** 18:5,22
30:21
**screen** 110:18
125:16
**screenshot** 8:16
**script** 164:2
**search** 61:5 63:2,4
63:4,6,20,24
**second** 25:11 33:6
53:8 55:3,4,10
59:21 74:7 75:1
81:6 84:16,21
90:19 91:10 99:5
101:24 106:9,13
114:10,10 134:10
162:21
**seconds** 133:1,23
134:11,15 136:2
140:2 143:10
144:6 145:22

146:8,10 148:2
150:17 151:9,11
151:16
**section** 88:20 97:14
**sections** 13:8
**sector** 69:15
**security** 13:23
14:12 21:18 22:20
23:6 33:21
**see** 9:24 31:12
32:19 35:16 39:9
39:11,16 41:11
43:10 52:12 53:4
58:24 59:1,4,16
69:7 75:15 80:14
80:20 81:14,19
83:10 85:2 87:7
87:15,16,17 88:14
90:23 91:2 93:3
94:2,7 95:16 96:1
96:12 99:9 100:7
100:21 101:14,17
102:1,12 106:2
110:8,18 112:11
116:6 118:18
120:4 125:10
136:14 143:10
155:18 160:14
162:23
**seeing** 31:14 39:13
140:15
**seeks** 65:10
**seen** 15:9 31:15,16
57:16 72:18
**self-avowed** 82:18
**semester** 13:9 24:3
24:12 32:3,5,11
32:13 40:10 49:18
101:23 137:14
**semesters** 41:3,4
**senate** 49:21,24
**send** 24:1
**sending** 80:20
86:21 93:5 156:24
**sense** 14:24 15:6
35:4 100:19

113:13 140:11
143:4 145:3
165:18
**sent** 8:15 50:7 52:9
80:18 94:2 99:14
99:21 100:2,22
105:17 109:19,19
133:20
**sentence** 53:9 55:3
61:4 81:6,13
88:23 90:19,20
94:6 96:10 97:13
99:11 102:2 103:2
114:10 118:16
**separate** 18:17
101:21
**sequential** 109:2
**serious** 82:22
**serv** 52:7
**serve** 53:10
**served** 10:7,18
**service** 4:4 10:10
27:24 28:2,7 61:7
**serving** 61:5
**session** 141:19,23
**sessions** 46:22 47:8
**set** 64:22 68:9
73:12 159:9
**setting** 45:12 84:16
**seven** 26:3
**sexism** 117:6
**sexual** 58:22 60:4
**Shakespeare**
118:17 119:1,9
121:14 142:14
**share** 50:9 142:11
**shared** 50:4
**short** 79:22 168:6
**shot** 110:18
**show** 28:6 34:19
48:17 98:11,20
**sick** 5:21
**side** 87:13 136:14
136:14 141:13,13
161:12,14 163:19
166:12

**sided** 100:11
**significant** 158:20
**significantly** 22:15
69:2
**similar** 107:24
**simply** 78:7 112:20
112:24 138:24
162:4
**Simpson** 111:11
**single** 27:12 38:24
90:10 100:11
**sir** 139:2
**sit** 103:15 167:9
**situation** 135:8
**six** 26:3 47:15 63:1
63:10
**sixth** 94:6
**skill** 71:9
**skills** 35:8,11,14
**skin** 45:5 65:14
90:23 113:15
139:1
**skip** 28:9 51:3
59:15 61:4 83:6
84:17 94:5 101:16
106:8 114:12
118:7 144:5
145:22 146:8
150:16 156:16
**skipping** 51:8 103:2
111:9
**slips** 129:22
**small** 39:17 47:11
**Smith** 2:10 3:8 4:15
4:15 5:9 6:7,9,16
7:18,24 8:8 10:16
10:22 11:2 14:18
15:1 22:6,11,21
23:9 26:17,22
29:12 33:23 37:15
39:3 44:22 45:9
48:20,21 51:18,22
53:22 54:2 56:3
56:18 58:3,6,16
60:8,24 61:17,23
62:9 65:15 69:12

69:21 70:18 71:18
74:9 75:8 79:4,15
79:19 84:6,10
85:15 86:5 87:11
88:12,16 91:20
95:1,9,12,15,23
96:24 100:13,15
108:11,16,19,22
109:7,9 113:3
117:11 124:20
134:24 135:21
138:9 139:20
141:4 143:20
144:2 147:19
148:5 150:1 152:3
154:20 159:13
164:16 168:6,11
169:22
**social** 30:21 83:18
102:23 119:5
123:6
**socially** 83:18 89:1
**society** 117:4
**sociological** 46:13
**sole** 120:3
**solely** 90:22
**solidifies** 121:11
**somewhat** 130:16
136:2
**sooner** 6:2
**sorry** 34:23 62:22
68:5 78:12 88:16
133:23 140:2
150:17 161:3,8
**sort** 12:13 13:22
15:2,4 16:18 18:4
18:15 21:13 22:14
24:8,16 25:7 27:1
27:20 30:15 32:17
37:21 42:7 44:7
46:11 47:3 50:1
54:11 64:9 65:4,9
65:22,23 66:9,16
69:6 72:14,15
73:1,3 76:15 78:4
78:5 80:19,20

93:8 96:22 97:9
97:11,23 100:6
104:4 107:14
110:5 112:17
118:24 121:15
127:7 128:24
129:8 130:2,3
131:21 133:15
135:10,11,12,14
136:19 137:9
140:11,18 145:1,3
147:12 148:19
149:16,23 157:1
163:6 165:21
169:19
**sought** 55:2
**sound** 147:1
**sounds** 116:11
150:23
**Southern** 37:6
**Spanish** 74:6
**speak** 17:17 67:20
68:3,7,10 70:3,5
71:7 72:6 73:19
79:13 85:20
145:16
**speaker** 47:7
**speakers** 49:10
66:16
**speaking** 38:7 70:7
70:16,20 138:15
164:7,14
**speaks** 74:6
**special** 99:8,18
149:14
**specific** 9:7 16:22
29:7 35:9 37:2
59:7 98:6 131:13
139:8 144:13
**specifically** 11:20
25:15 39:14 47:4
48:12 50:3 54:22
57:2 105:2 130:1
136:21 139:7
156:23
**specifics** 83:5

**speculate** 43:19
**spell** 15:17
**spelled** 16:4
**spend** 52:20
**splash** 164:3
**spoken** 67:4,14,22
68:2
**sponsor** 104:15
**sponsored** 47:4
**spot** 131:1
**spring** 39:9 40:4
41:8 45:19
**square** 83:12
**staff** 51:19 53:15
54:1 55:5,7 56:1,7
57:20
**stage** 63:6
**stamp** 80:6 81:20
92:6 105:19 108:9
108:14 134:10
136:1 144:5 146:9
160:4,11
**stamped** 39:23
50:21 92:14
105:14 108:8
155:14
**stamps** 92:10
108:18
**stand** 61:12,15
150:13
**stand-in** 42:7
**standard** 63:3
66:11,12,14 67:12
67:18 68:3,7,8,10
68:13,16 69:2,9
69:20 71:7,15
72:12,17,21 73:22
74:2 76:4 88:8
89:2,21 90:2,13
91:14 112:5,8
113:18 121:3,4,9
121:18
**standing** 119:1
**stands** 61:13 97:15
**start** 32:10,13
36:23 92:21

Matthew Rigilano

Page 190

**started** 150:18
**starting** 14:2 40:15
40:16 51:12
**starts** 33:15 83:10
93:1 99:9 101:18
118:9 132:24
**state** 1:7 4:7,12
11:7,9,11 12:2,22
14:2 17:14 18:24
21:23,23 22:19
26:21 28:15,20
30:7 31:3 36:9,9
36:11,16,23 41:16
44:15 46:18 48:9
49:2,2 51:20 54:6
55:23 56:15 57:12
57:19,20,23 58:1
58:7,11,13 64:8
64:11,13,17 75:12
76:13,15,16 77:9
77:17 78:18 80:8
89:12 90:11 91:18
104:10 108:7
109:24 114:18
115:1,13 119:24
123:14 126:9
127:3 138:13,17
152:14,15,21
153:1 154:17,18
168:1,16,20
**State's** 98:15
**stated** 164:13
**statement** 64:4,7,10
64:15 82:5 90:18
143:8
**States** 1:1 4:9 69:11
75:7 128:3
**static** 55:18
**statistics** 53:20 78:1
**status** 13:6,7
**step** 12:14
**Stephen** 41:10,15
42:18 43:1 93:19
93:22 94:19 95:19
95:24 97:8 98:12
99:14 100:2,8,21

104:8,19 105:1
**stereotypes** 45:5
65:13 66:2
**stipulate** 13:13
**stood** 153:11
**stop** 84:21,23 88:7
**strange** 39:10
**strategies** 142:12
142:15
**Street** 1:18 2:11 4:6
**stress** 59:1
**strict** 73:4
**strike** 14:10 23:15
34:14 82:23 90:7
**string** 97:19 99:6
107:2 161:12
**strive** 56:24
**structure** 16:24
29:4
**struggled** 78:15
**student** 43:17 46:6
55:8 56:7,16,23
70:11 72:16,22
73:13 74:10,18,22
113:24
**students** 23:2 29:18
33:5,6 46:10,13
53:11,13 55:5,24
69:18 72:8,18
75:19,20 76:4
77:20,23 78:3,14
78:18 79:1,8,10
79:13 81:14 84:23
84:24 86:1 89:15
90:15,21 111:19
117:5 119:9
120:22
**students'** 73:9
**studies** 66:9 75:23
114:3,4
**study** 84:3
**style** 121:8,17
**stylistic** 121:6
**subcommittee**
100:6
**subheading** 82:7

**subject** 85:10 94:2
97:7 99:24 145:19
**submission** 106:18
**submit** 110:6
**submitted** 30:1
111:10 152:13
**subpoena** 9:20 10:7
10:10
**subscribe** 141:11
**subscribes** 86:16
**subsequent** 13:22
40:23
**substance** 24:14
34:12,15 43:12
44:4 46:4 158:22
**succeeded** 133:23
**success** 73:20 86:2
97:10
**sued** 6:23
**suffers** 149:22
150:12
**suggest** 14:16 57:17
60:17
**suggested** 137:7
**suggesting** 62:11
111:19 120:12
168:3
**suggests** 16:19
21:13
**sum** 106:9
**summary** 157:2
**summer** 40:22
115:18,20
**SUNY** 36:13
**superlative** 112:3
122:4
**supervisor** 16:16
23:12
**supervisor's** 152:2
**support** 106:19
**supportive** 162:9
**supposed** 56:15,16
137:8,19 141:21
157:23
**supposition** 145:1
**suppress** 72:14

**suppression** 72:18
**supremacy** 66:7
70:24 71:15 81:14
85:1 86:17 89:2
138:4 145:12
164:9
**sure** 8:5 9:14 11:19
14:22 21:12 23:10
23:20 31:16 34:24
38:10 40:24 42:3
46:4 50:2,7 52:16
54:12 55:18 57:1
57:4 62:5 63:11
64:21 68:10 71:8
71:11 74:16,16,17
74:21 76:14 78:1
82:20 85:17 86:19
88:13 91:2 92:11
93:11 94:14 95:11
97:5 98:6 99:13
109:17 115:3
119:6 128:11
132:11 133:10
144:22 146:21
152:9 156:20
158:19 159:2
161:22 163:9,21
164:17,19 165:22
166:5
**surprised** 166:10
**sustained** 55:19
**swear** 4:18
**swift** 156:13
**swinging** 156:10
**switch** 76:7 84:23
**sworn** 4:21
**syllabi** 118:6
**synthesize** 35:6
**Syracuse** 36:10
**system** 31:2
**systemic** 65:23
70:17

---

**T**

**T** 3:10
**tag** 88:15 157:10

**Tagalog** 74:6
**take** 7:6 15:22
59:21 79:16 97:9
100:4 116:13
141:21 159:13
168:6
**taken** 4:4 48:23
162:7 169:6
**takes** 120:21
**talk** 10:13 11:6
24:18 25:3,6 47:5
117:19 143:7
144:14 148:21
**talked** 27:23 30:6
89:22 138:14
161:1 168:19
169:10
**talking** 8:22 20:1
34:24 35:1,8,9
83:13 94:19 95:18
102:4 103:9
115:19,20 116:24
117:3,17 118:23
125:22 129:22
133:11 155:2
160:18,24 161:8
163:5 164:2
165:24 166:10
**talks** 47:2,18,19
**taught** 17:7 30:13
30:14 32:21 74:3
75:5 89:15,21
90:2,6,11
**teach** 11:13,17,20
12:1 13:8 16:13
16:22 21:2,15
24:3 25:17,18,21
26:7 30:20 55:15
68:17 74:15 76:3
84:23 90:13
122:19 137:7
142:12,14 153:7
**teacher** 12:8 23:17
69:10 107:11
133:2
**teachers** 27:21

---

Farrell Court Reporting

Matthew Rigilano

43:10,21 44:3,6
44:17 45:14 84:21
84:22 85:6 88:7
106:19
**teaches** 20:24 33:4
111:18
**teaching** 11:12
12:10,12,12,20,23
13:16,19 14:5,7
21:7,13,14 23:18
24:6 25:9 26:1,12
26:15 28:9 29:17
30:10,11 31:20,22
33:2,3,10 35:13
41:24 42:1,6,8,8
44:12 66:6 69:18
72:17 78:18 81:9
84:23 91:14 96:17
102:22 104:10
105:18 106:20
115:1 122:18
136:15 137:6
138:4,15 141:12
146:21
**tech** 132:23
**technically** 6:17
**techniques** 142:5
142:16
**tell** 5:15 7:6,24
23:20 37:3 52:18
133:14 146:13
147:3 154:5 163:2
**telling** 130:6
**tendency** 65:8
**tension** 73:1
**tenure** 21:6,11,15
21:17,21,24 22:14
22:17,20 33:2,10
33:18 110:2
111:17 123:13
**tenured** 20:20 21:4
22:5 23:4 25:9
**term** 13:1,19 35:13
72:4,13 83:22
**terms** 14:8,17,23
15:10 35:2 47:7

54:10,24 55:12
56:8 57:8 64:1
78:15 89:1 102:10
150:24 152:4
**Terrance** 111:23
**terrible** 23:16
**testified** 4:22 52:21
158:21,23 164:6
**testify** 10:5 126:22
148:1
**testifying** 5:24
**testimony** 5:15 86:9
98:1 109:23
**text** 3:22 8:15,16,17
8:19,20 9:7,8
88:22 91:24 98:11
98:21 107:21
133:6 155:7 157:3
160:1,2,7,13
161:12
**texts** 76:3 144:16
144:23
**Thad** 2:4 4:13
**thank** 6:2 7:14
10:13 16:8 19:12
20:1,16 31:24
39:4 46:19 49:19
50:20 61:20 64:22
88:17 90:13 114:9
150:16 151:15
**theater** 164:1
**theme** 72:6 133:8
**theoretical** 137:2
**theory** 35:20 65:23
72:12 140:19
**thes** 107:14
**thing** 18:19 30:2
59:7 65:18 75:3
85:12 97:17 104:7
104:21,23 127:7
152:12
**things** 7:22 17:6,24
27:3,22 32:17
40:12 48:7 49:15
52:8 60:15,17
65:20 67:24 73:2

92:3 100:10 111:6
115:8 127:16
138:3 140:16
142:1 151:2 162:7
165:13 167:24
**think** 9:1,5 13:20
14:3 18:4,20 19:1
20:19 21:20,22
22:3,12,13 24:8
24:12 26:10,23
27:19 28:4,5,7
30:24 31:1 32:23
33:4,14 35:4,12
37:2 40:22 41:1,7
46:4,5,9,12 48:12
48:20 50:3 51:10
51:23 54:9,10
56:5 57:5,12
58:19 59:1,6,11
61:11,18 62:19,21
64:22 65:5,7,12
65:16 66:8,9,23
68:1,16 70:5 72:7
72:12,24 73:3,7
74:2 75:16 76:2
78:21 79:18 84:14
85:19,20 86:12,13
86:14 87:17 89:24
91:21,22,24 93:15
95:2,13,17 97:6
97:15 98:4,5
100:11 101:3
104:14 106:2,2,5
109:8,12 110:8
112:2,7 113:4
115:16 116:5
117:7 118:23,24
119:20 120:23
122:14 123:7
124:6 127:7,17
128:5,16,17,20
129:5,19,23
130:16 131:11,12
131:18,18 132:6,9
132:12 133:6,7,13
133:16 135:1,2,6

136:13 137:2,10
137:21,22 138:7
139:4,6,10,11
140:8,9,17 141:14
141:23 142:11
143:5,15 144:11
145:5 146:3,15
147:8,12 148:19
150:6 151:2,4
152:6,17 153:4,10
154:6,12,13 155:1
156:7 157:13
158:21 161:21,22
162:5,8,9,10,10
162:11,16 165:7
166:2 167:19
168:14 169:19,20
169:22
**thinking** 34:7,18,20
34:21,22,24 35:2
35:5,7,24 38:6
44:2 122:19,22
131:19
**thinks** 85:20 86:15
**third** 55:15 88:23
90:20 97:13 101:2
102:2 110:21
116:17
**Thomas** 111:13,16
114:9 117:14
118:2
**thorny** 81:8
**thought** 65:10
110:6 123:4 127:5
130:6,15 135:8
137:23 139:5,14
141:3,10 144:21
168:7
**thoughts** 135:6
165:23,24
**thread** 100:8
102:19 103:8,17
144:12
**three** 15:3 24:12,13
32:3,4 34:7 40:9
41:9 43:23 59:16

59:20,24 60:17
87:20 88:3 118:9
156:9 159:5
162:22
**Thursday** 4:4
**time** 1:17 4:5 6:3,3
6:9,9,13,13 7:6,8
8:7 12:8 30:6,9
31:7,14,17 33:1
34:4 38:21 39:24
39:24 41:18 46:21
47:20 48:8 49:1,6
49:24 50:2 52:17
52:18,20,22,23
55:19 57:18 61:6
62:6 69:16 70:22
72:5 73:3 79:19
81:3 82:24 87:1
91:1 92:23 101:10
108:14 114:19
115:13,15 119:24
124:19,24 127:5
128:1 134:10,18
136:1 144:5 146:6
146:9 147:10,17
152:17 153:12
155:5 163:7
169:11,17 170:1
**timeline** 48:13,24
**times** 24:12 27:2
32:3 59:11 69:4
73:18 90:1 142:24
**title** 12:6 21:13
31:21 44:2 93:11
133:8
**titled** 133:3 144:17
144:19,20 157:21
**today** 5:16 6:5 10:4
22:17 57:16 86:9
98:1 103:15
158:23 167:9
**today's** 4:7 7:17
**toddlers** 149:5
**told** 15:5 27:7,10
72:10 137:6
**tolerate** 138:13,16

**138**:18 139:2
**tone** 129:1 130:16
  131:12 134:6
  135:10 140:6
  147:5 154:3,11
**tongue** 72:15
**Toni** 111:23 112:15
  112:20,24 113:12
  114:7 119:14
**tools** 73:10,15
**top** 83:6 92:21
  155:18 160:15
**topic** 32:10 41:2
  66:5 76:7 103:3
  103:17 163:17
  169:21
**topics** 22:10 32:7
  35:17 164:15
**total** 25:8
**totally** 69:15 166:5
**tough** 68:4 148:18
**town** 37:7
**toxic** 135:19
**track** 13:22 14:1,5
  21:5,6,7,16 33:10
  33:18 42:5,6
  123:14 127:22
**tradition** 35:23
  122:13
**traditional** 22:2
**traditionally** 22:12
  69:13,19
**traditions** 83:18
**training** 10:14 36:6
  46:22 55:12
  107:11 133:2
  135:9 141:19,23
  143:6
**transcript** 3:24
  159:1
**transition** 49:14
**translate** 57:11
**transpired** 156:21
**treated** 90:22
**tri-state** 78:5
**triad** 58:19

**trial** 6:13,15
**tried** 34:19 114:24
  148:12
**true** 18:12 23:4
  96:3 135:17,18
  143:16 144:22
  164:18 167:16
**truth** 135:19
**truthful** 5:15
**truthfully** 5:24
**truths** 83:19
**try** 79:17 133:15
  163:22
**trying** 20:19 35:16
  46:12 57:17,24
  64:16 140:11
  155:6
**tuition** 78:15
**tumultuous** 115:20
**turmoil** 121:2
**turn** 81:18 92:22
**turned** 127:16
**turning** 151:3
**Twain** 113:7,13,23
  114:5
**two** 17:6,10 24:12
  24:13 25:19 30:19
  32:2,18 47:7
  51:12 60:15 83:7
  87:20 88:17 90:19
  91:2,8 98:22
  117:23 125:13
  139:8
**type** 39:17
**typical** 32:1,17 64:9
  132:1
**typically** 13:5 47:19
  54:23 66:16 67:19
  90:4 165:6
**typo** 39:10 40:7
  101:4 167:19

**U**

**U.S** 44:8 68:3
**UCLA** 36:22
**Uh** 14:15 110:5

**Uh-huh** 13:24 16:7
  16:20 17:2,9,18
  17:21 19:8 29:6
  34:10 46:1 57:7
  57:10 59:3 63:16
  66:13 74:20 81:11
  81:17 82:4 83:9
  87:22 89:4 94:8
  98:13 107:20
  110:13 111:12
  114:15 124:17
  125:4 127:10
  129:13 149:20
  150:9 163:18
**Ukraine** 150:7
**um** 7:20 8:18,20
  11:12,19 13:21
  15:19 16:11,15,24
  17:10 18:3 19:5
  19:21 20:3,8,19
  21:14 22:12 23:20
  23:24 24:7,13
  25:4 26:3 27:5,5
  31:15 32:15 33:1
  33:2,20 35:4,11
  36:8,15 38:16
  39:14 40:22 42:3
  42:21 43:13 45:10
  46:4 47:9,19
  48:12 49:23 51:10
  51:17 52:6,10
  53:23 54:3,9,10
  56:7 58:17,23
  59:4,5 60:12
  62:19,20 63:23
  64:2,8,17 65:1,7
  65:10 66:10 69:2
  69:13 70:4 71:1
  72:3 76:9,23
  79:10 82:12 85:16
  86:23 95:2 97:5
  101:11 102:9
  103:18 107:4,16
  107:22 110:1
  111:17 115:14
  116:13 118:23

120:18,20 121:9
  124:6 125:17
  126:20 128:4,16
  129:1,21 131:14
  131:19 135:1
  139:10 140:12,20
  141:23 142:11
  143:4 144:11
  146:21 150:6
  152:9,23 153:12
  154:12 156:22
  162:4,15 164:17
  165:19 169:19
**unacceptable**
  136:15
**unclear** 95:17
**uncomfortable**
  127:19,23 128:2,8
  128:10,15,18,21
  129:5 139:11
  143:17,24 145:6
  145:10,15 164:14
**underlying** 8:3
  138:3
**underscored** 91:6
**understand** 6:23
  7:9 8:12 14:21
  17:13 23:7 33:17
  37:19 40:3 44:12
  56:14,22 60:10
  62:5 65:3,10 68:5
  73:14 76:8 90:4
  92:8 96:19 98:2
  109:7 117:1,8
  123:8 158:3
  167:22
**understanding**
  12:18 13:21 15:3
  21:23 22:4 23:5
  38:5 53:19 54:6
  55:22 58:10 65:8
  68:8 72:7,20 73:4
**understood** 7:11
  12:21 76:12 82:20
  97:20 117:2
  118:22

**unfairly** 90:22
**unfamiliar** 31:16
**unit** 17:14
**United** 1:1 4:9
  69:11 75:7 128:3
**universal** 34:21,23
  35:13
**universities** 64:13
**university** 1:7 4:7
  6:18,18 12:2 28:3
  36:9,11,11 48:9
  61:8 66:10 97:3,3
**university-wide**
  57:13
**unpopular** 162:3
**unprivileged** 78:23
**unprofessional**
  128:14 129:14
  134:7 136:11
  137:17 140:6,9
  143:13 148:16
**unsettling** 154:14
**unusual** 137:24
**unwittingly** 157:15
  157:17,24
**updates** 52:7
**uploaded** 111:7
**upper** 120:19
**URL** 81:20
**use** 17:23 48:5
  67:22 73:15
  142:17
**usual** 133:7
**usually** 26:24 54:23
  61:11 67:3,19
  69:3
**utility** 75:18
**utterance** 128:5
**uttered** 156:10

**V**

**vaguely** 81:4 83:4
  110:5 118:13
**valuable** 27:19
  34:20
**varies** 21:20 69:1

variety 36:3 76:3
77:20
various 48:7 107:17
117:4 136:20
164:10
vary 24:13,15
vast 68:6,14
venue 152:9
venues 91:23
verbatim 9:1
vernacular 66:21
83:23 113:22
version 77:2
Vicki 1:20 4:17
victim 70:17,21,24
71:14
video 43:13 48:18
VIDEOGRAPH...
4:1,17,23 50:15
50:17 79:21,23
123:17,19 159:15
159:17 168:8,10
169:24
videotaped 1:13 4:2
4:11 169:24
view 35:17 58:7,7,8
67:15 69:10
137:20 145:7
viewpoints 59:10
59:12,13
vis-a-vie 24:6
visible 125:16
visual 128:24
visuals 146:7
147:11 153:7
159:3
vocabulary 67:9
vocal 167:17
voice 136:17 146:14
147:5 154:10
voices 112:17
voicing 9:2 162:13
volumes 122:10
vs 4:7
vs- 1:6

**W**

W 49:3,6
wage 15:10
wait 38:16
walking 125:11
wanna 10:13,17
96:10 108:1
122:19 143:24
145:22
wans 81:12
want 7:4 11:1,6
14:20 22:10 27:24
33:20 37:1 46:20
52:15,20 58:14
73:19 75:19,20
77:22 101:4,4,22
109:10 121:7
126:17 133:10
134:9 137:4
155:10,11 160:10
wanted 5:3 51:3
57:15 65:1 74:13
99:16 120:13
131:13,23 159:23
169:1
wants 74:10 96:19
96:21 100:1,4
105:1 137:21
warning 162:2
Washington 122:8
123:10
wasn't 49:23 63:17
104:2 132:1,1
141:2 143:5 151:1
155:2 158:4,11
water 50:11
way 37:18 66:2,3,4
66:8 68:16 69:9
70:16,19 72:11
74:15 86:17 90:5
90:7 101:5 106:11
121:16 122:16
125:6 130:10
131:1 135:7 137:5
137:7 139:13
140:11 141:12

147:14 149:1
153:6 164:14
169:12
ways 58:24 62:7
67:23 78:23 132:5
136:20
we'll 24:17 25:3,4,6
48:5 81:5 93:13
99:5 109:8,11,12
133:14 142:23
168:14
we're 4:1 6:12 12:8
50:17 75:18 79:23
115:19,20 117:19
123:19 125:22
126:16 129:22
133:11 136:19
137:6 159:17
168:10 170:1
we've 48:17 107:12
117:9 133:20
159:19 162:8
weak 9:3
wealthy 77:24
79:10
wearing 9:3
WEB 111:20 112:8
119:21
website 82:3 83:7
87:7 88:5
week 120:5
weeks 15:14
weird 99:12 167:13
went 47:2 107:18
117:14
weren't 13:11
47:21 140:23
west 43:16
Whatever's 79:19
whatnot 11:1
Wheatley 110:22
120:6,24 142:10
white 43:9,21,21
44:3,6,7 45:14
46:15 53:15 54:1
54:8 62:16,19,23

66:7,16,17 70:14
70:24 71:15 76:8
76:9 77:2,5,15,20
77:23 78:3,8,13
78:18,21 79:8
81:14 84:24 86:17
87:8 88:9,24 89:2
89:2,7,7 90:15,21
114:14 115:11,16
117:10,17,19
118:1,18 119:2,23
119:24 122:4
138:4,4,8
145:12,12 149:16
150:10,12 157:21
157:21,22,23
164:8,9 168:16,23
whiteness 89:5
119:4
whopping 106:9
wide 76:3
Widely 76:19
wielded 66:4
wild 151:12
wildly 146:5 147:9
window 14:12
windows 148:6
Wisconsin 116:1
withstanding 139:5
witness 3:3 4:11,19
4:20 10:1 15:2
22:7,12,22 23:10
26:18,23 33:24
37:16 44:23 45:10
50:11 51:23 53:23
54:3 56:4,19
58:17,19 61:1,18
61:24 62:10 65:16
69:13,22 70:19
71:19 74:10 79:5
84:11 85:16 87:12
87:18 91:21 95:2
95:15 97:1 100:14
105:9 109:13
113:4 117:12
120:16,18 124:21

135:1,22 138:10
139:21 144:3
147:20 148:6
150:2 152:4
154:21 164:17
168:4
woman 51:19 60:15
60:18
women 149:3
won 106:7
wondered 48:5
word 8:20,21 30:22
141:24
words 32:2 67:9
137:13 154:7,18
165:14
work 11:8,10 36:16
36:19 53:1 70:4
73:17 81:8 86:1
94:23 99:3,7,7,8
99:17,18,18 100:3
107:10 142:13
161:20 162:9
worked 149:1
working 96:20
124:23
works 57:5 139:22
workshop 166:16
workshops 107:17
142:23
world 82:15
worst 145:20
worthy 152:12
wouldn't 32:4
47:20 97:19
121:18 125:19
129:4 140:9
141:24 152:1
165:16,16,19
wow 161:18,19
wrapping 168:15
writ 64:13 113:2
write 64:4,6,16
66:12 78:20 103:3
writer 119:18 122:7
writes 29:24 122:3

**writing** 11:13,14,20
11:20,23 12:1
15:20 16:14 17:5
17:15,22 18:4,6
19:6,7,9 20:7,14
20:18 21:2 23:17
23:18,19 24:1,8
24:10 25:10,16,19
25:20,21 26:1,6
28:19 29:5,9,10
30:12,13 31:11,18
31:20,23 32:1,19
33:5,19 34:3,7,15
34:20 39:8 40:4
40:14,18 41:13,19
41:21,22 42:19,23
43:2,2,14,23 44:8
44:13 45:16 46:3
51:5,8 58:7 62:15
62:21 66:5,9
67:15,19,21 68:9
68:12,18 69:10
72:8 73:10,11
75:10 76:22 78:19
79:1 80:8 81:15
82:14 84:5 86:22
89:11 91:18,24
93:2 99:7,17
100:3,5 101:2,6
102:19,21 104:4
104:16 105:3
106:18 107:15,18
111:18 112:5
114:5 121:2,11,16
121:16 122:12
123:10 125:17,21
131:9,16 134:21
137:12 139:9,16
141:17,22 142:19
142:24 143:2
145:18 146:18
160:24 165:5
166:10 167:7,12
168:19,21 169:2,6
169:9
**written** 71:15 86:18

121:7
**wrong** 16:10 19:1
38:18 61:14 85:9
101:3 147:15
154:9
**wrote** 103:7 112:8
113:21 120:10
122:15 157:3

---

### X

**X** 3:1,10

---

### Y

**yeah** 13:13 14:10
14:13 17:15,16
18:15 19:10 20:3
24:13,24 25:12
26:5 27:5,14 30:5
30:13,24 31:22
32:6,20 33:11
35:15 36:2 38:20
38:23 39:2 40:17
41:23 42:3,17,24
43:4,8 46:14
47:23 50:1 51:2
55:9,14,21 56:13
58:12,19 59:8,21
59:23 60:7,22
63:9,21 64:24
66:21 67:6,17
68:19,24 70:2,9
71:3,10,12 74:23
75:11 77:21 81:1
83:20 84:11,12,20
87:13 88:3,6 90:3
91:9,10 92:11
94:17 97:22 99:11
100:4 101:14,15
102:3,17 103:10
103:14,20,21
104:1,1 105:5
106:10 109:17
110:5,5,16 115:14
116:3 118:14
120:14 121:15
122:21 124:13,13
125:24 126:2

127:4 128:19
130:14,22,22
132:12,20 133:12
134:5 135:6 141:1
141:18,20 142:12
142:15,15,18,22
146:4,24 147:11
152:4,20 153:13
154:4,21 158:2
159:14 164:17
165:2,8,10,11,15
167:20
**year** 12:24 13:12
15:4,10 23:24
26:15 29:24 32:1
38:19 40:13 44:13
49:14 50:23,24
51:12 101:23
128:5
**year's** 41:6 101:12
**year-long** 36:21
**year-to-year** 12:23
**yearly** 16:17 22:23
**years** 12:9,15 19:24
20:4 22:16 43:6
**yelling** 151:19
**York** 36:12,14 69:4
73:18 90:1
**YouTube** 43:13,18

---

### Z

**Zack** 1:4 4:7,14 5:2
8:22 30:7 42:4
45:13,17 110:11
111:10 124:2
126:18 127:8
128:22 129:23
131:22 132:2
135:8 141:2,6
146:22 151:12
152:13,24 153:21
157:14 160:2,5,8
160:18 162:2,18
164:20 165:17
**Zack's** 127:12
130:6 154:3

161:15 166:13
**ZDP** 39:17 40:2
50:21 53:5 59:16
80:6 108:8 160:4
160:15 162:23
**Zoom** 46:6 47:5,20
124:16,21 125:8
125:12,15 126:1
130:12 153:8,14
156:8,22 159:9
169:10

---

### 0

**00** 105:19
**00042** 155:14
**00206** 160:4
**002368** 105:20
**002441** 92:14
**01507** 108:8
**0222** 160:15
**02247** 50:21
**02250** 59:16
**02419** 80:7
**02441** 101:17
**02442** 100:20
**02934** 39:18 40:2
**06320** 2:6

---

### 1

**1** 3:12 5:5,7 9:18
15:24 85:24
**1/19** 108:6
**1/19/2021** 109:17
**1:00** 123:17
**1:33** 123:19
**10** 3:21 25:23 100:7
100:22 118:8
144:6 155:11,14
155:16
**10:07** 1:17
**10:08** 4:5
**10:54** 100:8,22
**10:55** 109:19
**105** 3:18
**108** 3:19
**11** 3:22 109:18
159:21,24

**11:10** 50:15
**11:11** 50:17
**11:53** 79:21
**12** 25:23,23 92:17
162:24 165:8
**12:03** 79:23
**126** 3:20
**14** 140:1
**1500** 1:18 2:11 4:5
**1507** 108:20
**155** 3:21
**159** 3:22
**16** 145:22
**168** 3:8
**18** 123:23 128:23
133:1,2,22 134:10
160:10 169:9
**18th** 114:2 120:19
120:24 121:13,17
129:17
**19** 133:1,23 134:10
134:10,15 136:1
**19-20** 3:13
**19102** 2:12
**19th** 121:10

---

### 2

**2** 3:13 31:5,8,10
83:15 87:7
**2/12** 165:8
**2:23-cv-02281-WB**
1:5 4:8
**2:26** 159:15
**2:30** 159:12
**2:37** 159:17
**2:50** 168:8
**2:55** 168:10
**2:58** 170:1
**20** 22:16
**20-21** 3:14
**2015** 36:15,16
**2018** 36:24
**2019** 31:11 34:11
34:16 47:12
**2019-2020** 40:13
49:13

Matthew Rigilano

Page 195

**2020** 19:17 20:2,12
    26:4 29:8 30:6
    31:12 38:11,12,14
    38:17 39:9 40:4
    40:15,18,23 46:21
    48:14 49:13,18
    76:20 80:24 82:8
    92:2,17 93:3
    94:19 95:24 100:7
    100:22 105:19
    115:20 123:23
    128:23 133:2
**2020-2021** 40:13
    44:13 49:14 50:22
**2020-2022** 48:9
    114:19
**20201** 39:10
**2021** 39:9 40:4 41:7
    45:19,23 109:18
    156:6 160:14,17
    162:24 164:12
    165:9 169:9
**2022** 29:8 30:7 41:8
    46:21 63:23
**2024** 1:16 4:5
**20th** 20:24 35:21
    121:11
**21** 156:6
**215-513-7278** 1:23
**223** 160:11,19,20
**2249** 53:5
**23** 140:1
**230** 162:23
**233** 162:19
**24** 143:9
**2442** 100:14
**27** 160:14,17
**28** 162:18

---
**3**
---

**3** 3:14 39:5,6,8
    46:19 80:24 88:13
    88:14 146:8,10
**30** 148:2
**300** 106:9
**31** 3:13 105:18

**34** 151:8,16
**38th** 1:18 2:11 4:6
**39** 3:14

---
**4**
---

**4** 3:7,15 50:10,18
    50:20 77:19
**40** 53:12
**404** 2:5
**41** 144:5
**43** 156:17
**44** 136:2
**45** 134:15 145:22
**47** 146:8,10
**49** 150:16,17
    151:10,11
**4C's** 82:12,17 107:6

---
**5**
---

**5** 3:12,16 80:5,9
    85:24 93:10 143:9
**50** 3:15 53:11 55:23
    56:1
**51** 151:8,15
**59** 53:15

---
**6**
---

**6** 3:17 92:5,12,16
    94:19 100:22
    105:6 116:5
    134:11 137:11
**64** 53:16

---
**7**
---

**7** 3:18 93:3 94:19
    95:24 105:14,15
    105:17 106:13
**7:23** 95:24
**70s** 84:3
**7th** 93:19

---
**8**
---

**8** 3:19 83:15 87:7
    88:14 108:2,3,5
    116:5 142:3
**8:34** 93:3
**80** 3:16

---
**9**
---

**9** 1:16 3:20,24 4:5
    126:13,14 133:1
    146:10
**9:24** 99:3
**9:52** 93:19
**92** 3:17
**9th** 98:22 99:3

Farrell Court Reporting

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA


ZACK DE PIERO,                          :

            Plaintiff,          : NO. 2:23-cv 02281-WB

        -vs-                            :

PENNSYLVANIA STATE UNIVERSITY,   :

et al,                                  :

            Defendants.          :


- - -


***VIDEOTAPED REMOTE DEPOSITION***


DEPONENT:  Carmen Borges

DATE:  June 24, 2024

TIME:  11:14 a.m.

REPORTER:  Vicki Mengel, Notary Public


FARRELL COURT REPORTING

215-513-7278

Farrellreporting@verizon.net

Carmen Borges

1    APPEARANCES:

2

3    ALLEN HARRIS PLLC

4    BY:  MICHAEL THAD ALLEN, ESQUIRE

5    P.O. Box 404

6    Quaker Hill, Connecticut 06320

7        Representing Plaintiff

8

9    SAUL EWING LLP

10   BY:  MATTHEW SMITH, ESQUIRE

11   1500 Market Street, 38th Floor

12   Philadelphia, Pennsylvania 19102

13       Representing Defendants

14

15

16

17

18

19

20

21

22

23

24

Farrell Court Reporting

Carmen Borges

Page 3

```
1                    I N D E X

2

3   WITNESS                                 PAGE

4

5   CARMEN BORGES

6

7   BY:  MR. ALLEN                             5

8   BY:  MR. SMITH                           264

9

10

11                  E X H I B I T S

12

13   Borges 1         Notice of deposition   26

14   Borges 2         ZDP 02247              25

15   Borges 3         Census data            37

16   Borges 4         PSU 2631               42

17   Borges 5         PSU 2622               46

18   Borges 6         PSU 02658              83

19   Borges 7         PSU 4123               98

20   Borges 8         PSU 412               107

21   Borges 9         ZDP 0138              113

22   Borges 10        ZDP 175               128

23   Borges 11        PSU 2415              130

24   Borges 12        ZDP 0181              134
```

Farrell Court Reporting

Carmen Borges

Page 4

```
 1                      E X H I B I T S

 2

 3    Borges 13          PSU 2572              157

 4    Borges 14          Notes                158

 5    Borges 15          PSU 03236            159

 6    Borges 16          ZDP 55               162

 7    Borges 17          PSU 2537             166

 8    Borges 18          Bates 1546           182

 9    Borges 19          PSU 03154            185

10    Borges 20          Audio clips          240

11    Borges 21          PSU 01281            241

12    Borges 22          Penn State Values    243

13    Borges 23          Bates 03347          250

14    Borges 24          ZDP 088              251

15    Borges 25          PSU 0612             254

16    Borges 26          PSU 04137            260

17    Borges 27          PSU 3278             265

18    Borges 28          PSU 4934             267

19    Borges 29          PSU 4134             269

20    (Exhibits attached to transcript.)

21

22

23

24
```

Farrell Court Reporting

Carmen Borges

1              CARMEN BORGES, was called as a witness and after

2    having been first duly sworn, according to law, was

3    examined and testified as follows:

4    BY MR. ALLEN:

5        Q.   So Ms. Borges, my name is Michael Allen.  I am an

6    attorney representing Zack De Piero, who's --

7              MR. SMITH:  Let's go off the record for a minute.

8              (A discussion was held off the record.)

9    BY MR. ALLEN:

10       Q.   So Ms. Borges, sorry for those technical

11   difficulties.  There's been a few technical challenges

12   this morning.  Thanks for your patience.  I was saying I'm

13   the attorney for Zack Di Piero in this case.  I'm just

14   gonna go over at the beginning a few sort of rules of the

15   road for a deposition.  Have you ever been deposed before?

16       A.   Yes, I have.

17       Q.   When were you deposed?

18       A.   About 10 years ago.

19       Q.   What was the nature of the case?

20       A.   Denial of remote work or some thing -- was

21   working remotely.  And then, he -- he began to show

22   performance issues, and they had to withdrew his right to

23   work remotely, and so it -- yeah.

24       Q.   And that was in while you were working for Penn

Farrell Court Reporting

Carmen Borges

1    State University?

2        A.    Yes.

3        Q.    And were the methods of taking depositions

4    explained to you at that time?

5        A.    Yes, I think so.

6        Q.    So you know that this is an extension of the

7    court.  We're creating a record for the court, and that's

8    the purpose of the deposition is more or less to say -- to

9    find out what you would say at trial.  Because it's an

10   extension of the court, there's -- there are formalities

11   we have to observe.  So for instance, although there's a

12   video and if you seem that you're shaking your head or

13   nodding your head, that doesn't appear on the transcript.

14   So when I ask you a question, I'm gonna ask that you

15   answer audibly.  Do you understand?

16       A.    Yes.

17       Q.    Likewise, there are lots of things we say like

18   uh-huh, uh-uh, hmm-hmm.  We use those things in normal

19   conversation.  But because of the formality of this

20   transcript and record, I'm going to be asking you to

21   answer audibly yes, no to questions, things of that

22   nature.

23            Is there anything that would interfere with your

24   ability to answer questions truthfully today?

Farrell Court Reporting

Carmen Borges

Page 7

1      A.    No.

2      Q.    You're not on any medications?

3      A.    No.

4      Q.    Not suffering from any illness that would affect

5  your memory?

6      A.    No.

7      Q.    Okay.  Thank you.  As you probably learned in

8  your previous deposition, your attorney may object from

9  time to time.  That's a normal part of building the record

10  for trial.  It does not relieve you of the obligation to

11  answer questions that have been asked.  There are certain

12  instances where he may direct you not to answer.  Those

13  will be very clear if he objects and directs you not to

14  answer, so that is not an issue.  But again, if it comes

15  up, it will be very clear.  Otherwise, you will be

16  required to answer a question despite an objection your

17  attorney may make.  Is that clear?

18      A.    That's clear.

19      Q.    Okay.  And you understand the meaning of oaths,

20  correct?

21      A.    Yes.

22      Q.    You understand that you're obligated to tell the

23  truth --

24      A.    Yes.

Farrell Court Reporting

Carmen Borges

Page 8

1            THE REPORTER:  I'm sorry.  The volume is getting

2       difficult -- difficult at times.

3            THE WITNESS:  What if I speak louder?  Can you

4       hear me like this?

5       BY MR. ALLEN:

6            Q.   So another thing I wanted to explain is feel free

7       to interrupt me at any time.  If you need a break, you can

8       get a break, obviously.  The only thing I ask is that you

9       answer any question that has already been posed to you.

10           The second thing is if you need to interrupt me

11      to ask for clarification, feel free to do so.  I can

12      guarantee you I won't feel offended in any way.  I would

13      rather have you answering a question that you understand

14      than one that you're guessing about.

15           To that extent, however, if you answer a

16      question, I am going to assume you understood the question

17      as asked.  Is that clear?

18           A.   That's clear.

19           Q.   I'm gonna ask if you have done anything to

20      prepare yourself for the deposition today.

21           A.   Other than reviewing whatever I had about the

22      case, which is -- it's been a long time.

23           Q.   And what notes did you review about the case?

24           A.   The ones that we provided.

Farrell Court Reporting

Carmen Borges

Page 9

1      Q.   So you provided certain documents to your counsel

2   in this case.  Can you identify which documents those were

3   specifically?

4      A.   Notes of interviews, interview.

5      Q.   Interviews for what?

6      A.   For Zack Di Piero's complaint.

7      Q.   Did you review other notes in addition to the

8   notes you reviewed for Zack Di Piero's complaint?

9      A.   I don't think there were any other notes.

10     Q.   And by Zack Di Piero's complaint, you mean the

11  complaint that he submitted to Penn State or the complaint

12  in this case in a federal lawsuit in the Eastern District

13  of Pennsylvania?

14     A.   The complaint he submitted to Penn State.

15     Q.   Have you spoken with anyone in preparation for

16  your deposition today?

17     A.   Other than the attorney?

18     Q.   Can you identify your attorney?  I don't want to

19  ask you what you discussed with your attorney, but I am

20  entitled to know whether you have spoken to your attorney

21  in preparation for the deposition today.

22     A.   Yes, I did.  I was.

23     Q.   And did you speak to anyone else?

24     A.   No.

Farrell Court Reporting

Carmen Borges

Page 10

1      Q.   And about how much time did you dedicate to

2   preparing for your deposition today?

3      A.   Um, we met for two hours.  No, not even two

4   hours.

5      Q.   Okay.

6      A.   Yeah.  I can't recall exactly the amount of time,

7   but it was enough time, the necessary time to --

8      Q.   Now, I wanna ask you some questions about the

9   nature of your job at Penn State and your qualifications

10  and so forth.  I recall in one document you indicated that

11  you were from --

12     A.   I am originally from Puerto Rico.

13     Q.   So not another country?

14     A.   Good.  I'm glad to hear that from you.  And I

15  heard -- you should speak Spanish now.  I heard your

16  daughter was --

17     Q.   (Phrase in Spanish.)

18     A.   (Phrase in Spanish.)

19     Q.   (Phrase in Spanish.)

20     A.   Perfecto.

21     Q.   And I believe that you had indicated to Dr. De

22  Piero that where you came from, you were considered white;

23  is that correct?

24     A.   That's correct.

Farrell Court Reporting

Carmen Borges

Page 11

1    Q.   Can you explain what you mean by that?

2    A.   Well, it means that I understand the issues in

3    this country.

4    Q.   Right.

5    A.   The racial issues.

6    Q.   And what racial issues do you mean?

7    A.   The racial history of -- of the country.

8    Q.   And when did you leave Puerto Rico to come to the

9    United States?

10   A.   My husband got a position at Penn State.  He was

11   a professor at Penn State, so we moved here from Puerto

12   Rico about 30 some years ago, 30 plus.

13   Q.   And you're married to an employee of Penn State?

14   A.   My husband was a professor, and he's retired.

15   Q.   When did he retire?

16   A.   He retire about 10 years ago.

17   Q.   What did he teach at Penn State?

18   A.   Engineering.

19   Q.   Have you been a victim of racial discrimination

20   in the United States?

21   A.   No, not that I can think of.

22   Q.   And I guess the question to this -- the answer to

23   this question would be self-evident, then.  Have you ever

24   been the object of racial discrimination at Penn State?

Farrell Court Reporting

Carmen Borges

Page 12

1    A.    Not that I can think of, no.

2    Q.    And what would you consider yourself to be if you

3    were to identify your own race?

4    A.    White.

5    Q.    Explain your job at Penn State.

6    A.    Um, I work in the affirmative action office.

7    I've been there 36 years.  Mostly, you know, in complaints

8    of discrimination, my focus or my preference or my --

9    mediation or the solution of complaints.

10         THE REPORTER:  I'm sorry.  I didn't catch the

11   full answer.

12         THE WITNESS:  My main focus in the office is

13   consultations and problem solving and resolution of --

14   of -- of conflicts in the workplace that typically result

15   in -- in complaints.

16   BY MR. ALLEN:

17   Q.    How has your job changed over time?

18   A.    It's more structured now, more process oriented.

19   Q.    What processes are you --

20         THE REPORTER:  I didn't catch the full question.

21   I'm sorry.  I'm sorry, everyone.

22         MR. ALLEN:  I was asking -- can you read back the

23   witness's last answer?

24   (The court reporter read back the last question and

Farrell Court Reporting

Carmen Borges

Page 13

1                      answer.)

2    BY MR. ALLEN:

3        Q.   And my question for you is what processes have

4    changed in the intervening time that you're referring to

5    in that answer?

6        A.   Um, the university has established a system, a

7    broader, bigger system for people to file complaints.

8    Before, people would, you know, on their own decide to

9    file a complaint and go to our office.  Now, they have,

10   you know, onlines, the bias.  They have different sources

11   to file complaint.  So we are getting, you know,

12   complaints from very different sources, you know, and lots

13   of more complaints.

14       Q.   Is there an initiative at Penn State which has

15   been summarized as if you see something, say something?

16       A.   Yeah.  That's what -- you know, I mean, that's

17   what -- that's what's created so much more awareness

18   and -- and -- and, you know, more -- more complaints

19   coming in.  Uh-huh.

20       Q.   When was this see something, say something policy

21   introduced?

22       A.   That's been about four, five years.

23       Q.   Was it introduced around the 2020 time frame?

24       A.   Well, that was Covid at that time.  Yeah.  No.

Farrell Court Reporting

Carmen Borges

Page 14

1    Yes.  Yes, it was before that.

2         Q.   So -- and I know memory is what it is.  But it

3    was approximately shortly before the Covid outbreak that

4    this new --

5         A.   About that.  I would think so, yeah, shortly

6    before the Covid.

7         Q.   Okay.  So just to get a clean record, so there

8    was a new policy introduced emphasizing if you see

9    something, say something, and it was introduced shortly

10   before Covid?

11        A.   Yeah.

12        Q.   And you mentioned in a previous answer something

13   about bias complaints.  Did I get that right?

14        A.   Yes.  Uh-huh.

15        Q.   What is a bias complaint?

16        A.   When somebody is being treated differently, I

17   would think -- would say because of -- of -- of certain

18   characteristics.

19        Q.   What characteristics?

20        A.   There's a long list of them.  I mean, everybody

21   has protection under those characteristics.

22        Q.   Well, could you name them if you could, please?

23        A.   Age, gender, disability, race.

24             THE REPORTER:  I didn't catch the question.

Farrell Court Reporting

Carmen Borges

1          THE WITNESS:  I don't have them all in my -- in

2     my memory, but those are the ones that -- that I can say

3     for now.

4     BY MR. ALLEN:

5          Q.   Is a bias complaint supposed to address legal

6     discrimination?

7          A.   What is legal discrimination?

8          Q.   Well, that's what I'm trying to get at because

9     it's mentioned in some of the documents we'll be reviewing

10    today, so I'm trying to understand what the difference is.

11          What I mean to ask is do bias -- are bias

12    complaints supposed to address behavior that is defined as

13    discrimination under antidiscrimination laws?

14          MR. SMITH:  Objection to form.  I'm sorry.

15    Object to form.  I'll speak up.  I objected to the same

16    question before.

17          MR. ALLEN:  While we're at it, sorry.  I'm gonna

18    do some legalese here.  We agreed to stipulate that we

19    will reserve all objections except as to form for the time

20    of trial.

21          MR. SMITH:  Agreed.

22    BY MR. ALLEN:

23          Q.   Sorry.  You just mentioned a long list of things

24    that would encompass bias at Penn State.  Do you remember

Farrell Court Reporting

Carmen Borges

Page 16

1   talking about that?  And you could remember a few

2   categories, but not all of them.  Do you remember telling

3   me that?

4        A.   You mean now?

5        Q.   In our deposition.

6        A.   Oh, yeah.  Yeah.  Uh-huh.

7        Q.   Yes.  And this is what I'm trying to ask about.

8   This list of categories that might constitute bias at Penn

9   State, are these supposed to be categories that derive

10  from the law?

11       A.   Under the protection of the categories, yeah.

12       Q.   So, for instance, you would agree, wouldn't you,

13  that all universities discriminate on the basis of

14  intelligence at some level, right?

15       A.   Well, that's not a category.

16       Q.   That's my question.  That discrimination is

17  legal, right?

18       A.   Oh, yes.  There's -- there's legal

19  discrimination.

20       Q.   And giving a student an F for doing a bad job,

21  that's not discrimination, is it?

22       A.   No, unless a student challenges that and it's

23  proven that -- that he didn't -- the work did not deserve

24  an F, so --

Farrell Court Reporting

Carmen Borges

1    Q.   Who gets to decide whether work deserves an F at

2   Penn State?

3    A.   That's an academic process for -- for students.

4   And faculty -- faculty decide that.

5    Q.   But my question was it's legal to discriminate

6   against a student by giving them an F provided the

7   discrimination is on the basis of them not doing their

8   work, correct?

9    A.   Correct.

10        MR. SMITH:  Objection to form.

11  BY MR. ALLEN:

12   Q.   Back to your position at Penn State.  Who's your

13  immediate supervisor?

14   A.   Suzanne Adair.

15   Q.   What's her position?

16   A.   Assistant -- assistance vice president for

17  affirmative action, yeah.

18   Q.   And has the name of your office changed recently?

19   A.   Yes.

20   Q.   Do you recall when?

21   A.   About three, four months ago.

22   Q.   What did it change to?

23   A.   Office of Equal Opportunity and Access.

24   Q.   Do you know why the name was changed?

Farrell Court Reporting

Carmen Borges

Page 18

1     A.   I guess outdated.  No, not really a reason that

2   I'm --

3     Q.   Was your office ever responsible for implementing

4   affirmative action policy at Penn State?

5     A.   Yes.

6     Q.   What affirmative action policies were you

7   implementing at Penn State?

8     A.   Hiring procedures, process for hiring affirmative

9   actions goals to have to -- you know, to reach out and

10  expand the search to -- to create a wider pool of

11  applicants.  That -- that was an enforcement or that we --

12  we do that, we do from our office.  Every search is

13  required to -- to do outreach effort and create the best

14  possible diverse pool of applicants for every position.

15    Q.   How would you define a best possible diverse pool

16  of applicants from your office?

17    A.   The search, where have they reach out?  Where

18  have they advertise the vacancy?  It's about advertising

19  and -- and -- and reaching out to create a diverse pool of

20  applicant.  That always was the goal of our office.  Once

21  you have a diverse pool of applicants, then, you know, the

22  search committee can have -- can work with that.

23    Q.   So my question is how do you define a diverse

24  pool?

Farrell Court Reporting

Carmen Borges

1    A.   People from different -- well, different

2   ethnicities, although the -- the search committee would

3   not know that.  But at some level, our office would --

4   would have known how -- what the pool looked like.

5    Q.   So you were drawn to recruit diverse pool of

6   applicants.  Do you mean diverse in --

7    A.   That's what affirmative action is -- requirements

8   are about.

9    Q.   And who sets these requirements at Penn State?

10    A.   Well, affirmative action as -- as an executive

11   order is clear on what are the -- what are the categories,

12   the four categories that are more so the focus of

13   affirmative action.

14    Q.   Did you just say four categories or did I

15   misunderstand?

16    A.   Four, yeah.

17    Q.   What are those four categories?

18    A.   Black, Hispanics, Asians and Native American I

19   think the other one.

20    Q.   So solely racial or ethnic categories?

21    A.   Yeah.

22    Q.   And when your office changed August -- excuse me,

23   you said three to four months ago?

24    A.   Uh-huh.

Farrell Court Reporting

Carmen Borges

1        Q.    When your office changed to become the office of

2    ethics and compliance, did I get that right?

3        A.    Equal opportunity.

4        Q.    Equal opportunity.  Excuse me.

5        A.    And access.

6        Q.    Office of Equal Opportunity and Access.

7        A.    OEOA.  We're still struggle with that.  It was

8    much easier AAO than OEOA.

9        Q.    I agree.  It's more difficult to say.  Has there

10   been a change in your approach to affirmative action

11   policies in hiring since the name change?

12       A.    No.

13       Q.    And you also said that the hiring committee of

14   whatever sort wouldn't know anything about the diverse --

15   the diversification of the pool that was selected by your

16   office?

17       A.    Yeah.  They would not know.

18       Q.    Does that mean that the hiring committees at Penn

19   State operate in a color blind fashion?

20            MR. SMITH:  Objection to form.

21            THE WITNESS:  In many ways, yes.  Yes, they do

22   because they don't know the diversity of the pool, so

23   there's no way for them unless -- unless they guess based

24   on other information.  They would not officially know how

Farrell Court Reporting

Carmen Borges

Page 21

1    the pool identify themselves.

2    BY MR. ALLEN:

3        Q.    So I'm just trying to understand how the process

4    works.   So at what level is hiring done at Penn State?   At

5    the department level, at the dean's level, at the

6    president's level?

7        A.    It's done at the unit level.

8        Q.    The unit being the department?

9        A.    If it's academic, it's the department.   If it's

10   staff, it's a unit.

11       Q.    And how does the unit compose a hiring committee?

12       A.    The dean names the faculty.

13       Q.    And how is a job description drafted to solicit

14   candidates?

15       A.    It's -- it's also an academic -- you know, it's

16   also based -- the faculty does that based on their needs

17   or what the position, what they need, so --

18       Q.    And then that's published in whatever venue is

19   most likely to draw candidates?

20       A.    It's published in whatever venue they -- they

21   choose to.   They go to conferences and try to recruit in

22   conferences.   Now online, there's a lot of, you know,

23   other sources online, so --

24       Q.    And at what time does the -- well, it used to be

Farrell Court Reporting

Carmen Borges

Page 22

1   called the affirmative action office.  At what time did

2   the affirmative action office get involved?

3        A.   Let's see.  I'm thinking because that took a

4   major change since, you know, we -- a few years ago.  We

5   would gets information in paper form about the applicant,

6   by about, you know, the search committee and, you know,

7   all the information.  Now, it's -- it's -- it's on --

8   it's -- it's more centralized.  You know, with technology,

9   it's all centralized, so we don't -- we don't get it.

10  There is now share service is what they call this.  All

11  that information now is centralized.

12       Q.   You mean it's in a centralized database or --

13       A.   Yeah.

14       Q.   Is that kind of a university management program?

15       A.   Yeah, exactly.

16       Q.   I got you.

17       A.   That's a big change.

18       Q.   So my -- my question is different, though.  My

19  question is at what time in this application process does

20  the affirmative action office, now renamed the --

21       A.   OEOA.

22       Q.   At what time do they get involved in a typical

23  hiring process?

24       A.   We don't get involved at all.

Farrell Court Reporting

Carmen Borges

Page 23

1     Q.   When did that stop?

2     A.   With all the -- all the technology, when

3   everything went -- how do I say?  Everything is

4   centralized now, more centralized.  So how we get involved

5   in terms of discussing with -- with departments and with

6   units is the awareness and the importance of -- of

7   reaching out and creating a diverse pool.  That's --

8   that's the extent of -- of -- of the information we -- we

9   provide.

10    Q.   And the diversity is still defined in these four

11  categories that you explained before?

12    A.   For affirmative action regulation, the purposes

13  of that, those are the categories.  Now, they're broader.

14  You know, now with -- now, they're broader because, you

15  know, it's now -- you know, everybody brings -- brings --

16  brings some sort -- some diversity to the table.

17    Q.   How are they broader?  What is this other

18  diversity that other people now bring to the table that

19  they didn't bring before?

20    A.   Um, well, everybody.  Everybody, you know.

21    Q.   Did they suddenly -- did they suddenly bring this

22  diversity to the table now and they didn't before when you

23  only focused on four categories?

24    A.   Well, I suppose they were there.  They were --

Farrell Court Reporting

Carmen Borges

Page 24

1    they were -- they were there all the time.  It's just --

2    what I'm speaking is about requirements of -- of for

3    affirmative action, where the four categories.  But that

4    wasn't -- that was the minimum, you know.  That wasn't --

5    that was our obligation to -- to monitor.  But the search

6    committees, you know, had free range to hire, you know,

7    the best qualified applicant.  And there, you have tools

8    with a lot of diverse people.

9         Q.   So again, my question is how are you defining

10   diversity, this suddenly new expanded definition of

11   diversity?  How is it defined now that it wasn't defined

12   as earlier?

13        A.   I think now, it's defined like everybody has --

14   everybody is diverse, basically.

15        Q.   So if everyone's diverse, what meaning does

16   diversity have?

17             MR. SMITH:  Objection to form.

18             THE WITNESS:  I think the focus now is more

19   accepted and understanding everybody's -- what everybody

20   brings to the table.  In other words, everybody's diverse.

21   BY MR. ALLEN:

22        Q.   So if everyone is diverse, no one is excluded,

23   right --

24        A.   Exactly.

Farrell Court Reporting

Carmen Borges

1      Q.    -- by anyone?  You can have a department of all

2   one kind of American, I guess let's say Hispanics.  Since

3   they're all diverse, there would not be exclusion of

4   anyone.

5           MR. SMITH:  Objection to form.

6   BY MR. ALLEN:

7      Q.    That's how that would work?

8      A.    What do you mean exclusion of anyone?

9      Q.    What I mean is you just testified that everyone

10  is diverse, right?

11     A.    Everybody brings something to the table.  You

12  know, people are people, and people are different, and

13  everybody brings some different characteristics.

14     Q.    So there's no reason to exclude anyone from a

15  pool of applicants or add anyone to a pool of applicants,

16  is there?

17     A.    There's no reason to exclude anyone as long as

18  the qualifications are met for the -- for the -- for the

19  position.

20     Q.    I'm gonna introduce these for the record as

21  Exhibit 2.

22     (Exhibit Borges 2 was marked for identification.)

23  BY MR. ALLEN:

24     Q.    So I'm just going to -- incidentally, Ms. Borges,

Farrell Court Reporting

Carmen Borges

1   if you need any time to read these exhibits or examine

2   them -- some of them will be lengthy, some of them will

3   not be -- but just tell me.  They're also printed double

4   sided.  Just tell me.

5         MR. SMITH:  Not to interrupt.  Did we mark the

6   exhibit?  I just see the amended dep notice, but I don't

7   think we --

8         MR. ALLEN:  Oh, I don't think that has been

9   marked.  Madame Reporter, have I marked Exhibit 1 yet?

10        THE REPORTER:  You have not.

11  BY MR. ALLEN:

12        Q.   May I ask you to put this one aside for a second?

13  Can you grab the first one there?  I'm gonna mark for

14  Exhibit 1 a document captioned re-notice of deposition of

15  Carmen Borges.

16        (Exhibit Borges 1 was marked for identification.)

17  BY MR. ALLEN:

18        Q.   I'm sorry.  If you want me to pronounce your name

19  Borges, I'm happy to do that.  But if I pronounce your

20  name --

21        A.   However you want.  I'm used to Borges, but you

22  got it right.  It's really Borges.

23        Q.   You recognize this document, Exhibit 1?

24        A.   Yes.

Farrell Court Reporting

Carmen Borges

1    Q.   And is it accurate to say you've appeared for

2  this deposition today in response to this re-notice of

3  deposition?

4    A.   Yes.

5    Q.   Okay.  That's all I have to say about that one.

6  And we can put these aside, and they'll go to the court

7  reporter in electronic form.  This I've marked as Exhibit

8  2.  It's a document captioned 2020 to 2021 ad hoc

9  committee on diversity, equity and inclusion, DEI year end

10  report draft.  Do you see that?

11    A.   Uh-huh.

12    Q.   And I'm just going to say for the record that the

13  Bates number on the first page is ZDP 02247; is that

14  correct?

15    A.   That's correct.

16    Q.   I don't know if you understood this before, but I

17  assuming so.  The attorneys place little numbers on all

18  the documents.  Those are called Bates numbers, and they

19  just give a continuous stream of page numbers to every

20  document produced in this case.  So when I refer to Bates

21  numbers, you'll know what I mean, correct?

22    A.   Uh-huh.

23    Q.   Okay.  Were you ever presented with this document

24  before?

Farrell Court Reporting

Carmen Borges

Page 28

1      A.    No.

2      Q.    Did you know about ad hoc committee on diversity,

3   equity and inclusion that was active at Penn State in --

4      A.    No.

5      Q.    -- this time period?

6      A.    Not at all.

7      Q.    One thing you'll need to do is wait for me to

8   finish my questions.

9      A.    Okay.

10     Q.    And we all do this, and I will try to wait for

11  you to finish your answer in return.   Okay?

12           Do you recognize the committee members that are

13  listed in the second block paragraph there?

14     A.    Some of them.

15     Q.    You see that Grace Lee-Amuzie was one of the

16  cochairs, correct?

17     A.    Correct.

18     Q.    And a member of the committee was also Lili or

19  Lila Naydan?

20     A.    Correct.  I don't see her -- oh, her name is

21  here, yeah.  Yes.  Yes.

22     Q.    And there's also a staff member Anessah Smith

23  listed as a committee member, correct?

24     A.    I see it here.  I don't know about that.

Farrell Court Reporting

Carmen Borges

1    Q.    Okay.  And who is Grace Lee-Amuzie?

2    A.    A faculty member, to my understanding.

3    Q.    In what department?

4    A.    I'm not sure.

5    Q.    How about Lila Naydan?  Do you know what her

6    position is at the Penn State University?

7    A.    She's the coordinator of the writing program at

8    Abington.

9    Q.    Does she have any other positions during the time

10   2020 to roughly 2022?

11   A.    Not aware.

12   Q.    And how about Anessah Smith?  What is her

13   position at Penn State University?

14   A.    I don't know.

15   Q.    And if you skip down to page ZDP 2249, you see

16   where it says Rationale Abington?

17   A.    Yes.

18   Q.    In your position as an associate director of

19   OEOA, affirmatively -- excuse me, formerly affirmative

20   action office, were you responsible for the Penn State

21   Abington?

22   A.    Not for DEI matters.

23   Q.    I understand.  Were you responsible for

24   implementing the affirmative action policy of Penn State

Farrell Court Reporting

Carmen Borges

Page 30

1    at Penn State Abington?

2        A.    Yes.

3        Q.    And Penn State Abington's a regional campus,

4    right?

5        A.    Yes.

6        Q.    The main campus of Penn State being Penn State

7    in --

8        A.    University Park.

9        Q.    University park.  Thank you very much.  You know

10   approximately how many students Penn State Abington has?

11       A.    No.

12       Q.    Incidentally, who would be responsible for

13   implementing the DEI policies of Penn State Abington?

14       A.    The chancellor, I would think.

15       Q.    Who was the chancellor during the 2020-2022 term?

16       A.    I'm thinking the current -- the current

17   chancellor.

18       Q.    It will say in the records.  Just reading this

19   Rationale Abington, it says Penn State Abington ascribes

20   to a mission of -- mission and vision that seeks to,

21   quote, provide accessible education to a diverse student

22   body with faculty who facilitate opportunities for growth

23   by being responsive to students' needs and talents.  Did I

24   read that correctly?

Farrell Court Reporting

Carmen Borges

Page 31

1      A.   Where are you?

2      Q.   It's the first sentence of the section Rational

3   Abington.

4      A.   Yes, I see it.

5      Q.   Do you have any reason to believe that diverse

6   student body in the way it's used here is -- means

7   anything different from what you described diversity to

8   mean when you were testifying today?

9      A.   I mean, diverse student body and diversity

10  includes everybody that brings something to the table.

11     Q.   Okay.  So it's your testimony today that in

12  writing about this in 2020-2021 in this draft report, they

13  meant that everyone was diverse?

14          MR. SMITH:  Objection to form.

15          THE WITNESS:  I don't have an answer for that.

16  BY MR. ALLEN:

17     Q.   Okay.  See where in parenthesis it says Penn

18  State Abington 2020 NT?  Do you see that?

19     A.   Uh-huh.

20     Q.   You know what that refers to?

21     A.   No, I don't.

22     Q.   Incidentally, if you don't know, that's a

23  perfectly honest answer.  I don't want you to feel that

24  you have to answer something that --

Farrell Court Reporting

Carmen Borges

1    A.    No.   I wanna make it clear that I am not a DEI

2    person.

3    Q.    I understand.

4    A.    You know, that I know there was a lot of these

5    things going on at the university and expectations, but

6    I -- that wasn't -- that wasn't my -- I wasn't -- I wasn't

7    involved in any of that.

8    Q.    But your office was responsible for diversity

9    hiring, correct?

10         MR. SMITH:  Objection to form.

11         THE WITNESS:  Diversity hiring of employees,

12   yeah, faculty and staff, not students.

13   BY MR. ALLEN:

14   Q.    Oh, I understand.

15   A.    Uh-huh.

16   Q.    So you weren't responsible -- just to be clear, I

17   think what you're saying is your office of affirmative

18   action was not responsible for recruiting a diverse

19   student body?

20   A.    No.

21   Q.    You see this, the -- excuse me.  Strike that,

22   please.

23         You see the sentence that begins after the

24   parenthesis that we've just examined?  It says Abington

Farrell Court Reporting

Carmen Borges

1   continues to serve a racially, culturally and ethnically

2   diverse population with 50 percent of students who

3   identify as minorities and 40 percent who identify as

4   first generation college students.  While perhaps

5   comparatively diverse to other institutions, Abington

6   still has a majority white staff and faculty.  And it

7   lists white staff as 59 percent and faculty as 64 percent,

8   correct?

9       A.   Correct.

10      Q.   And so you did have responsibility as -- in the

11  affirmative action office for addressing the white staff

12  and white faculty diversity, correct?

13      A.   The diversity for -- right.

14      Q.   So is it your testimony today that this 64

15  percent of white faculty qualified as diverse because

16  everyone's diverse?

17          MR. SMITH:  Objection to form.

18          THE WITNESS:  It doesn't say it's diverse.  It's

19  64 percent of faculty.  Abington has a majority white

20  staff, so yeah.

21  BY MR. ALLEN:

22      Q.   And they're all diverse, according to your

23  testimony earlier today, because everyone's diverse,

24  right?

Farrell Court Reporting

Carmen Borges

1      A.    I don't know how to answer that.   Everybody's

2   diverse, so everybody's -- this is talking about a

3   particular, you know, category there.

4      Q.    And what category is --

5      A.    The white staff and white faculty.

6      Q.    Identified by race, correct?

7      A.    Correct.

8      Q.    And if you skip down to the next paragraph, it

9   starts the recommendations presented in this report are

10   significant to the Abington community for at least the

11   following reasons.   First, because we recognize that the

12   many diverse perspectives that students, faculty and staff

13   can bring to the campus community; therefore, we believe

14   that it is important to hire faculty and staff who reflect

15   the student body.

16          Second, as a community of educators dedicated to

17   ongoing development, we need an array of diverse

18   perspectives in terms of training programs.   And third, it

19   is important to teach diverse perspectives within the

20   curriculum through course content.   Finally, because we

21   believe that diversity is not static, it is important to

22   make sure that these initiatives are sustained and

23   available over time.   Did I read that correctly?

24      A.    Yes.

Farrell Court Reporting

Carmen Borges

1      Q.    Were these the kind of policies that your office

2   was active in promoting at Penn State?

3      A.    Um, not necessarily.

4      Q.    When did your office not promote these kinds of

5   race based hiring policies at Penn State?

6            MR. SMITH:  Objection to form.

7            THE WITNESS:  We don't have race based hiring

8   policies.  I mean, the concept here on -- in diversity or

9   the thinking if you have -- if there's a high number or

10  percentage of -- of faculty and staff of a certain

11  category and you have a high percentage of students from

12  another category, I mean, the logical thing is to think

13  okay, we need to -- we need to balance that out.  Because

14  if Abington has 40 percent first generation college

15  students or minority students, so it would make sense

16  that, you know, you provide for those students or you

17  create a higher percentage of diverse faculty and staff.

18  BY MR. ALLEN:

19     Q.    Diverse based on race, right?

20     A.    Diverse based on race.

21     Q.    And do you know of any evidence that diverse

22  students based on race are demanding that they only be

23  taught by the same percentage of faculty that --

24     A.    No.

Farrell Court Reporting

Carmen Borges

1     Q.   -- the student --

2     A.   No.

3     Q.   -- population makes up?  You have to let me

4  finish.  Let me phrase it again.  Do you know of any

5  evidence that students are demanding at Penn State

6  Abington that they have to learn from faculty who have the

7  same percentage by race representation as is reflected in

8  the student body by race?

9          MR. SMITH:  Objection to form.

10         THE WITNESS:  I'm not aware of any -- of any

11 students' demands around that area.

12 BY MR. ALLEN:

13    Q.   Do you know of any evidence that teaching is

14 ineffective if the faculty does not match the same racial

15 breakdown as the student body?

16    A.   Say that again.  Do I have what?

17    Q.   Do you know of any evidence that teaching at Penn

18 State Abington is ineffective when the percentage by race

19 of faculty does not match the percentage by race of the

20 student body?

21    A.   No, I'm not aware of any evidence.  That -- that

22 would be a specific research project, but I'm not aware.

23    Q.   This was never part of any of your training?

24    A.   No.

Farrell Court Reporting

Carmen Borges

Page 37

1       Q.   I'm just gonna introduce as Exhibit 3 some public

2   information from the United States sentence -- Census,

3   excuse me.

4            MR. SMITH:  Can we put that aside?

5            MR. ALLEN:  Yes, I think I'm done with Exhibit 2.

6   You can put that to the side, but just a last question.

7   BY MR. ALLEN:

8       Q.   You were never aware of any final report or

9   anything of that nature that grew out of this project that

10  we just discussed in Exhibit 2?

11      A.   No.

12      (Exhibit Borges 3 was marked for identification.)

13  BY MR. ALLEN:

14      Q.   Okay.  So if you would just look at Exhibit 3,

15  which is the document I just put before you?

16      A.   If I can see it.

17      Q.   I understand.  It is quite small.  This is U.S.

18  Census data which is from a public source published by the

19  United States government.  I'm going to represent that to

20  you.  Now, I understand this is very small.  I apologize.

21  I have certainly reached an age at which that's not a very

22  pleasant experience for me sometimes downright impossible.

23      A.   Okay.

24      Q.   But you do understand that one of the factors

Carmen Borges

Page 38

1    tracked by the United States Census is population by race?

2         A.   Uh-huh.

3         Q.   And if you see, there's race and Hispanic origin

4    is one of the headings about a third of the way down the

5    page.  It's the second heading?

6         A.   Uh-huh.

7         Q.   And white alone as a percentage of the average

8    United States population is 75.5 percent.  Do you see

9    that?

10        A.   I see that.  Yeah.

11        Q.   So the percentage of population of faculty at

12   Penn State Abington that's white is 64 percent.  Remember

13   seeing that?

14        A.   Uh-huh.

15        Q.   So that's actually far less than the population

16   at large?

17        A.   Correct.

18        Q.   Doesn't that suggest that Abington is

19   discriminating against white faculty?

20             MR. SMITH:  Objection to form.

21             THE WITNESS:  No, I don't think.  I don't see how

22   that suggests.

23   BY MR. ALLEN:

24        Q.   You think it's just by random chance that the

Farrell Court Reporting

Carmen Borges

Page 39

1   percentage of white faculty is 11 percent lower on average

2   than the U.S. population at large?

3          MR. SMITH:  Objection to form.

4          THE WITNESS:  I don't -- I don't know how to

5   answer that.

6   BY MR. ALLEN:

7       Q.   Did your office track the percentage of Black

8   faculty at Penn State Abington?

9       A.   Um, yeah.  That's captured for the affirmative

10   action plan.

11       Q.   Was it larger or smaller that the percentage of

12   faculty -- excuse me.  Larger or smaller than the

13   percentage of black Americans in the population at large?

14       A.   I don't recall.

15       Q.   Would your answer be the same if I asked you

16   about the three other categories you mentioned; Asian,

17   Hispanic and I believe you said American Indian?

18       A.   Uh-huh.  Native American.  Native, yeah,

19   native --

20       Q.   So although your office, the affirmative action

21   office now the OEOA office, had the responsibility for

22   promoting diversity on the basis of race, you don't know

23   the answers to those questions?

24          MR. SMITH:  Objection to form.

Farrell Court Reporting

Carmen Borges

Page 40

1          THE WITNESS:  Not off the top of my head.  I

2     would need to go see the plan.

3     BY MR. ALLEN:

4          Q.   Was that something your office tracked?  Let me

5     strike that question.

6          Was the percentage by race of those four

7     categories tracked by your office among the faculty

8     population at Penn State Abington?

9          A.   I mean, it is tracked university-wide.  So I

10    suppose yeah, it's -- this goes by location, so Abington

11    should have their numbers in our affirmative action plan.

12         Q.   And were you responsible in the affirmative

13    action office for implementing that plan?

14         A.   We are responsible for collecting the data and

15    creating the plan, but the changes are -- are -- you know,

16    we're not responsible for -- for -- for the numbers.

17         Q.   That wasn't my question.  Once the plan is

18    promulgated, your office had a role in implementing the

19    plan, correct?

20         A.   In discussing the plan with -- with units, yes.

21    The plan is discussed with -- with -- with each unit to

22    see how their numbers are looking.

23         Q.   And you also had a role in trying to create

24    diverse hiring pools, correct?

Farrell Court Reporting

Carmen Borges

Page 41

1    A.    It's encouraged.

2    Q.    So that wasn't my question.  My question was

3  whether your office had a role in creating these diverse

4  hiring pools on the basis of race.

5    A.    Yes, that makes sense.

6    Q.    Okay.  If you just -- one more thing.  I just

7  wanted to point out that there's also a breakdown in every

8  census document (unintelligible.)  I'm not sure -- I don't

9  want to get my -- actually, I think I don't have the --

10  the correct -- I thought I had the population for the

11  Abington area, and I think I might not have the right

12  document.  Hold on.  I have Abington Town, Plymouth

13  County, so let's strike that question.  I have the

14  wrong -- I had the wrong Abington.

15        Incidentally, do you know what the population of

16  Abington itself is by race?

17    A.    No.  I -- I -- I just assume it's the highest

18  across all the other campuses or areas of the university.

19    Q.    I mean --

20    A.    Based on -- based on their location.  Huh?

21    Q.    I mean, the municipality of Abington.  Do you

22  know what the population breakdown of Abington the

23  municipality is on the basis of race?

24    A.    No, I don't.

Farrell Court Reporting

Carmen Borges

Page 42

1    Q.   Is that important to any of the diversity

2  calculations at the affirmative action office?

3    A.   Well, it's important for the expectation of the

4  applicant pool, you should expect a higher applicant pool

5  of the population that are represented in an area.

6    Q.   I'm gonna switch gears and talk about some of the

7  policies of Penn State.  Before I do, were there various

8  antiharassment policies, professionalism policies and so

9  forth promulgated by Penn State?

10   A.   Oh, there are -- there are non-discrimination

11  policies, yes.

12   Q.   And are they any different for a regional campus

13  such as Abington?

14   A.   No.  They're university-wide.

15   Q   So the policies are -- they conform university

16  wide?

17   A.   Yes.

18   Q.   Thank you.  So I'm gonna introduce I think we're

19  up to Exhibit 4.

20   (Exhibit Borges 4 was marked for identification.)

21  BY MR. ALLEN:

22   Q.   This -- this is a document captioned AC 47,

23  general standards of professional ethics.  Did I read that

24  correctly?

Farrell Court Reporting

Carmen Borges

Page 43

1    A.    Yes.

2    Q.    And I'm just gonna represent that it has a Bates

3    number of PSU-De Piero 0022632.  Oh, I'm sorry.  I think I

4    started in the middle.  It starts with 2631.  You

5    understand if I just refer to these Penn State documents

6    that are Bates stamped PSU-De Piero as PSU Bates stamps so

7    we don't have to say PSU-De Piero every time?

8    A.    Yeah.  Well, there's the number of the policy,

9    no?

10   Q.    Right.  Exactly.

11   A.    Uh-huh.

12   Q.    I just want to avoid confusing you because

13   sometimes, my client's documents refer to his name.  But

14   you'll understand if I say it's Bates marked PSU number,

15   number, number that I'm referring to this Bates down here?

16   A.    That's okay.

17   Q.    All right.  So what is this policy?

18   A.    This is an academic policy.  Would not -- we

19   don't work much with this policy.

20   Q.    Is your office responsible for enforcing this

21   policy?

22   A.    No.  This is an office of faculty affairs.  It's

23   in the academic realm.

24   Q.    And do you see under number one -- excuse me.

Farrell Court Reporting

Carmen Borges

Page 44

1    Let me back up and strike that question.

2              You were aware of this policy, correct?

3      A.   I was aware, generally aware whenever I had

4    needed to look for it, but it's not a policy that -- that

5    I'm very familiar with.  This is -- this is administered

6    by the vice provost for faculty affairs by the faculty

7    senate.  If the faculty has -- has an issue regarding

8    something related to this policy, it would -- it would go

9    to faculty senate from the committee, the faculty senate

10   committee.

11     Q.   So it's a separate process for complaints that

12   might arrive under this policy -- as might arise under the

13   policies that your office enforce?

14     A.   Yes.

15     Q.   Okay.  Were there cases where antiharassment

16   policies that were enforced by the office of affirmative

17   action conflicted with the policy for professional ethics?

18              MR. SMITH:  Objection to form.

19   BY MR. ALLEN:

20     Q.   Let me be specific.  During your time at Penn

21   State, were there instances where a policy for

22   professional ethics conflicted with the antidiscrimination

23   policies that your office enforced, the affirmative action

24   office?

Farrell Court Reporting

Carmen Borges

1     A.    I can't think of a situation.

2     Q.    If you look down to number four in this policy,

3  see how the paragraphs of the policy are numbered?

4     A.    Uh-huh.

5     Q.    Number four, they're printed double sided.

6     A.    No.  It's fine.

7     Q.    You see it?

8     A.    Yeah.

9     Q.    It says -- the second sentence there says they,

10  meaning college professors, respect and defend the free

11  inquiry of their associates.  In the exchange of criticism

12  and ideas, they show due respect for the opinions of

13  others.  Did I read that correctly?

14     A.    That's correct.  Yeah.

15     Q.    And so it's your testimony today that that never

16  conflicted in your experience with the other affirmative

17  action policies that you were required to enforce at Penn

18  State?

19     A.    I can't think of a time.  I can't think of an

20  example or a situation.

21     Q.    So you don't think --

22     A.    Because these would go to faculty senate.

23  Somebody has a complaint around this topic, it goes to

24  faculty senate committee, faculty senate committee.

Farrell Court Reporting

Carmen Borges

Page 46

1    Q.   And just because it goes to a different line of

2    enforcement, a different institutional route of

3    enforcement, does that somehow mean it can't conflict with

4    your antidiscrimination policies in the affirmative action

5    office?

6         MR. SMITH:  Objection to form.

7         THE WITNESS:  Well, I cannot think of an example

8    or a situation where this would apply.

9    BY MR. ALLEN:

10   Q.   I think we'll have better luck with this one, if

11   I have it.  I'm gonna introduce as Exhibit 5 another

12   document.  Let's just put that one aside.

13        (Exhibit Borges 5 was marked for identification.)

14   BY MR. ALLEN:

15   Q.   Exhibit 5 is captioned AD 91, discrimination and

16   harassment and related inappropriate conduct.  Did I read

17   that correctly?

18   A.   Yes.

19   Q.   And the Bates number on the first page is PSU

20   2622.  Did I read that correctly?  2622 is the Bates

21   number --

22   A.   Oh, oh, oh.  Yeah, yeah, yeah.  Uh-huh.

23   Q.   I'm just doing that for the record to make sure

24   we don't mix up exhibits.  So this is Exhibit 5, and I'm

Carmen Borges

1   just going to ask you if you are familiar with this AD 91

2   policy.

3       A.   Yes, I am.

4       Q.   What is the AD 91 discrimination and harassment

5   and related inappropriate conduct supposed to cover?

6       A.   Complaints of discrimination and harassment.

7       Q.   How is discrimination and harassment defined?

8       A.   Can I look at the information I have?  I mean, I

9   always struggle with these definitions, okay.  So no?

10          MR. SMITH:  Go on memory.

11          THE WITNESS:  Well, it's -- it's --

12          MR. ALLEN:  For the record, the witness has

13   referred to some notes, and I'm gonna ask that those be

14   produced in discovery --

15          THE WITNESS:  Well, it's just definitions.

16   BY MR. ALLEN:

17       Q.   -- that she's relied on.  No, it's fine.

18       A.   The definition is behavior that -- behavior that

19   would -- I need to -- I need to -- some definitions are

20   long.

21          MR. SMITH:  Sure.  Are you asking her how this

22   policy defines it, the definitions within this policy?

23          MR. ALLEN:  Can you read the question before the

24   witness, Madame Court Reporter?

Farrell Court Reporting

Carmen Borges

Page 48

1          (The court reporter read back the question.)

2          THE WITNESS:  Okay.  Conduct of any nature that

3    denies an individual the opportunity to participate and

4    benefit from a university program that otherwise --

5    otherwise adversely affects a term or condition of the

6    individual's employment.

7    BY MR. ALLEN:

8          Q.   And if you -- if you skip down to page 2 of the

9    document, which is actually PSU 02623, do you see how the

10   heading at the top of the page is harassment?  Am I wrong?

11   Did I get that --

12         A.   The policy statement.

13         Q.   I'm sorry.  I think it's 2624.  I think it's page

14   3.

15         A.   Oh, yeah.  It should be here, the --

16         Q.   I'm sorry.  In looking at them online, I

17   sometimes --

18         A.   Yeah, I know.

19         Q.   So harassment is defined at the top of that

20   page --

21         A.   Okay.

22         Q.   -- 2624.  Do you see?

23         A.   Yes.  Exactly that definition.

24         Q.   Behavior consisting of physical or verbal

Farrell Court Reporting

Carmen Borges

Page 49

1   conduct, including acts of bias in capital letters, that

2   is sufficiently severe or pervasive such that it

3   substantially interferes with an individual's employment,

4   education or access to university programs, activities or

5   opportunities and would detrimentally affect a reasonable

6   person under the same circumstances.  Did I read that

7   correctly?

8       A.    Uh-huh.

9       Q.    You have any reason why acts of bias is

10  capitalized in the middle of the sentence like that?

11      A.    No idea.

12      Q.    You don't know of any special definition of acts

13  of bias that this policy relies on?

14      A.    No.

15      Q.    Then the policy goes on to say harassment may

16  include, but is not limited to, verbal or physical acts,

17  graphic or written statements, threats or the use of slurs

18  or other derogatory language statements in reference to

19  others.  Did I read that correctly?

20      A.    Yes.

21      Q.    So in reference to others, could that include,

22  say, slurs with regard to Black people?

23      A.    Yeah.  Slurs related to offending somebody or

24  related to somebody. yeah.

Farrell Court Reporting

Carmen Borges

Page 50

1    Q.   Or famously in the media recently, you've got

2    people refer to calling for the genocide of the Jews or

3    something like that?

4    A.   That would be a slur.

5    Q.   And is this supposed to be enforced in a race

6    neutral manner?

7    A.   Yes.

8    Q.   And so if I ask about any racial category; Asian,

9    Hispanic and also I think you mentioned Native Americans

10   or also white people, they would come under this policy?

11   A.   Yes.

12   Q.   And then going on, it says whether the alleged

13   conduct constitutes prohibited harassment depends on the

14   totality of the particular circumstances, including the

15   nature, frequency and duration of the conduct in question,

16   the location and conduct in which it occurs and the status

17   of the individuals involved.  Did I read that correctly?

18   A.   That's correct.

19   Q.   How would the status of the individuals involved

20   affect whether something is prohibited harassment?

21   A.   Because, you know, if somebody's somebody's

22   supervisor or they're -- if they are on equal levels,

23   that's -- that would be the status.  If it's a student and

24   like a person of, you know -- a faculty member and a

Carmen Borges

1   student, the status would mean here the nature of their

2   positions at the university.

3        Q.   Incidentally, can you define verbal conduct for

4   me?  What does that mean?

5        A.   Offensive or -- offensive language or insults

6   or --

7        Q.   How is that different from speech?

8        A.   Regular speech as something offensive is

9   different.

10        Q.   So the difference is verbal conduct is offensive

11   and regular speech is not?

12        A.   It depends what the regular speech is about.

13        Q.   Well, that's why I'm asking you how you define

14   verbal conduct.  You just testified that it is not regular

15   speech.  It's not speech, apparently, so what is it?

16        A.   Offensive verbal conduct, I would say.  I

17   never -- never thought about that, but it's offensive.

18        Q.   So verbal conduct is offensive speech?

19        A.   Uh-huh.

20        Q.   So by uh-huh, you mean yes?

21        A.   Yes, I would guess.

22        Q.   I'm not trying to harass you.  It's just that for

23   the purpose of the record, we have to have a clear answer.

24        A.   I know.  I know, and I try to correct myself

Farrell Court Reporting

Carmen Borges

Page 52

1    with -- that is just habit.

2        Q.   And I do it, too.  And you know, if you wanna

3    jump in and tell me and slap me upside the head.  And --

4        A.   The verbal speech.

5        Q.   See in the first line, it says behavior

6    consisting of physical or verbal conduct?  It's the first

7    cause in the definition of harassment.  Do you see that?

8        A.   Behavior consisting of verbal conduct,

9    including -- well, that is sufficiently severe, pervasive

10   that it substantially interferes.  I mean, there's the

11   definition, if it's an offensive something that

12   interferes.

13       Q.   You're talking about speech, right?

14       A.   Physical or verbal, yeah, conduct.

15       Q.   Okay.  And the only difference between verbal

16   conduct and any kind of other speech is verbal conduct

17   that's offensive falls under this harassment policy?

18       A.   It could.

19       Q.   Does this policy anywhere define non-legal

20   harassment?

21           MR. SMITH:  Objection to form.

22           THE WITNESS:  Non-legal harassment?  What would

23   that be?  Tell me what's non-legal harassment.

24   BY MR. ALLEN:

Farrell Court Reporting

Carmen Borges

Page 53

1      Q.   Well, I don't know.  I'm just going off the

2   things we've read in the documents provided by Penn State

3   University.

4      A.   As opposed to legal harassment?

5      Q.   Correct.

6      A.   It's misbehavior.

7      Q.   Is that defined in this policy, this kind of

8   misbehavior?

9           MR. SMITH:  Objection to form.

10          THE WITNESS:  Whether the alleged conduct

11   constitute prohibited harassment depends on the totality

12   of the particular circumstances, including the nature,

13   frequency and duration of the conduct.  So I think that

14   would explain, you know, one comment, one situation.  But

15   a continuation which falls into the harassment category,

16   continuation of offensive attacks or physical attacks or

17   written statements.

18   BY MR. ALLEN:

19      Q.   So let me rephrase my question.  Can you

20   distinguish in this policy harassment that rises to the

21   level of legal harassment from harassment that doesn't

22   rise to the level of legal harassment?

23          MR. SMITH:  Objection to form.

24   BY MR. ALLEN:

Farrell Court Reporting

Carmen Borges

Page 54

1    Q.    That's just a yes or no question.  So if you can

2    give me yes or no, then we can go from there.

3    A.    Yes.

4    Q.    Thank you.  And could you then explain the

5    difference between harassment that rises to the level of

6    legal harassment and harassment that is not rising to the

7    legal definition of harassment as explained in this policy

8    and as someone who is responsible for enforcing this

9    policy?

10    A.    It's a continuation.

11         MR. SMITH:  Objection to form.

12         THE WITNESS:  A continuation of the behavior.

13    One incident, two incident, but the continuation, the

14    pattern of the behavior or the nature of continuing is

15    what makes it harassment.

16    BY MR. ALLEN:

17    Q.    Do you know of anywhere in this policy where it

18    defines disruptive behavior?

19    A.    Not in this policy.  In the code of conduct

20    for -- you know, for the university, there is.

21    Q.    Which code of conduct are you referring to?

22    A.    The values, the Penn State values.

23    Q.    So when you say code of conduct, you --

24    A.    No, no.  I meant -- I meant the values.  Sorry.

Farrell Court Reporting

Carmen Borges

Page 55

1      Q.    That's -- all I was gonna say is when you say

2   code of conduct, you're using that interchangeably with

3   the values of Penn State University?

4      A.    (Indicating.)

5      Q.    Okay.

6      A.    Those are the expectations for behavior.  Those

7   are the value of the institution.

8      Q.    Okay.  Similarly does this policy define

9   aggressive behavior?

10      A.    It would have to be defined by the action, by the

11   situation in particular.  Yeah.

12      Q.    Does this policy define unprofessionalism?

13      A.    No, I don't think so.

14      Q.    But from Exhibit No. 4, which was the

15   professional ethics policy, we know that colleagues are

16   obligated to respect and defend the free inquiry of their

17   associates, right?

18      A.    Right.

19      Q.    That is professional behavior?

20      A.    Yes.

21      Q.    And asking critical questions in a workshop?

22      A.    Yes, in a respectful manner.

23      Q.    Exchanging criticism is professional conduct,

24   right?

Carmen Borges

1            MR. SMITH:  Objection to form.

2            THE WITNESS:  It is.

3    BY MR. ALLEN:

4      Q.   Is running behind the back of your colleagues to

5    submit anonymous complaints professional behavior?

6            MR. SMITH:  Objection to form.

7            THE WITNESS:  Running behind your -- well, if

8    you're gonna submit a complaint, you don't have to -- you

9    don't have to inform anybody.

10   BY MR. ALLEN:

11     Q.   Do you consider that professional behavior for a

12   grown faculty member?

13           MR. SMITH:  Objection to form.

14           THE WITNESS:  To file a complaint?

15   BY MR. ALLEN:

16     Q.   Yes.

17     A.   Yeah.  That's not -- that's separate.  That is a

18   total separate issue.

19     Q.   And in the meantime, that's been encouraged at

20   Penn State, correct?

21           MR. SMITH:  Objection to form.

22           THE WITNESS:  Yes.

23   BY MR. ALLEN:

24     Q.   Is this policy -- I'm going back to Exhibit 5, AD

Farrell Court Reporting

Carmen Borges

Page 57

1   91 policy.  Does this policy define microaggressions?

2        A.   No.

3        Q.   What is a microaggression, if you know?

4        A.   It's -- microaggression is an offensive action or

5   an offensive statement towards -- towards somebody.

6        Q.   So it's an offensive action or offensive

7   statement that would include this thing we've been talking

8   about before called verbal conduct?

9        A.   It could be verbal.

10       Q.   So if someone feels something is offensive, that

11  makes it a microaggression?

12       A.   Yeah, I would say so.

13       Q.   And is it part of your job as the affirmative

14  action office associate director to investigate

15  microaggressions?

16       A.   If it's a consistent pattern, if it's something

17  consistent, it would -- it would -- it would not just be

18  one microaggression.  It would just be more harassment.

19  It has to be more than that's the one incident.

20       Q.   That was not my question.  My question was was it

21  your job as associate director of the affirmative action

22  office to investigate microaggressions?

23       A.   Not microaggressions, per se.  No, not like that.

24  But a pattern of microaggressions that -- probably, yes.

Farrell Court Reporting

Carmen Borges

1      Q.   How many complaints did you receive about

2  microaggressions in 2020 to 2022?

3      A.   What, the word micro -- alleging a

4  microaggression?

5      Q.   Yes.

6      A.   No.

7      Q.   You didn't get any?

8      A.   Not -- not -- not defining that in those terms.

9      Q.   What terms are you referring to?

10     A.   Microaggression.  If you say you want a

11  microaggression, if it's an offensive comment or an attack

12  on somebody's -- see, we're talking the definitions here.

13     Q.   Right.

14     A.   So exactly.  What's a microaggression, you know?

15  That's -- if something's said purposefully, it's openly

16  implied that could be offensive to someone else, yeah,

17  that -- is it a pattern?  Does it -- does that become a

18  pattern?  Then it -- it gets into more of the policy.

19     Q.   I think you would agree that a microaggression as

20  defined in these terms that you've been using this

21  morning, it's something less than an overt act of

22  aggression, correct?  Otherwise, it wouldn't be micro,

23  would it?

24          MR. SMITH:  Objection to form.

Farrell Court Reporting

Carmen Borges

1            THE WITNESS:  Yeah.  It's -- it's -- yeah.

2    Microaggression, it would be something -- I mean,

3    people -- I'm saying one time or something and somebody,

4    you know, will -- that's -- that's a different thing than

5    that, then, than a consistent pattern.

6    BY MR. ALLEN:

7        Q.    In your earlier testimony with regard to Exhibit

8    5, which is the AD 91 policy, you emphasized that to be

9    harassment, something would have to be severe or pervasive

10   such that it substantively interferes with an individual's

11   employment, education or access to university programs,

12   correct?

13       A.    That's what the policy says.

14       Q.    So by their very definition, could

15   microaggressions ever be severe?

16           MR. SMITH:  Objection to form.

17           THE WITNESS:  They could.

18   BY MR. ALLEN:

19       Q.    Please explain how a microaggression could be

20   severe.

21           MR. SMITH:  Objection to form.

22           THE WITNESS:  If your -- if your behavior -- that

23   goes into behavior.  If your behavior is consistently --

24   consistently attacking or putting down a person or saying

Farrell Court Reporting

Carmen Borges

Page 60

1   things that could be offensive to the person, that -- that

2   could be severe.

3   BY MR. ALLEN:

4       Q.   Aren't you describing something that's

5   persistent?  That's a separate definition here,

6   persistent.  Aren't you describing -- or pervasive, excuse

7   me.

8       A.   Pervasive.

9       Q.   Aren't you describing something that's pervasive,

10  not severe?

11          MR. SMITH:  Objection to form.

12          THE WITNESS:  Well, both.  If they're pervasive

13  or severe, pervasive or severe, yeah, severe or pervasive.

14  BY MR. ALLEN:

15      Q.   So.

16      A.   Sufficiently, that is sufficiently severe or

17  pervasive.  So a microaggression would probably not fall

18  in that category of sufficiently severe or pervasive.

19      Q.   Okay.  You have any experience in the -- as long

20  as you've worked there, do you have any experience in the

21  affirmative action office of investigating

22  microaggressions that rose to the level of severe?

23      A.   Not described as microaggression, no.  I mean,

24  behavior.  We look at the behavior.  You know, it depends

Farrell Court Reporting

Carmen Borges

1   on what the behavior.  It's not -- it's not that -- you

2   know.  Because if it says microaggression, then you have

3   to figure out what are the examples of the

4   microaggression.  What are the behaviors?

5        Q.   In your experience as an officer of the

6   affirmative action office at Penn State, have you ever

7   investigated accusations of microaggressions that were

8   found to be so pervasive that they constituted harassment?

9        A.   There could be.  That could have been a scenario.

10       Q.   That's not what I asked.

11       A.   Uh-huh.

12       Q.   I asked in your experience, did you ever --

13       A.   Well --

14       Q.   -- investigate such a complaint and you found

15   microaggressions to be pervasive such that they formed a

16   pattern of harassment?

17       A.   Not described as microaggression, described a

18   conduct.

19       Q.   So in other words, there was conduct that wasn't

20   described as microaggressions that might have formed the

21   basis for a harassment complaint, correct?

22       A.   Uh-huh.  Correct.

23       Q.   And you've had plenty of those?

24       A.   Uh-huh.

Farrell Court Reporting

Carmen Borges

1      Q.   But you have not had any complaints of

2   microaggressions that were so pervasive that you found

3   that they constituted harassment?

4      A.   Not using the word microaggression, no.

5      Q.   Did you define complaints as complaints about

6   microaggression in your office?

7      A.   No.

8           MR. ALLEN:  Let's go off the record, please.

9           (A discussion was held off the record.)

10  BY MR. ALLEN:

11     Q.   So at some point did you get a complaint -- let

12  me back up and strike that question.

13          In March of 2020, do you recall getting a

14  complaint from Liliana Naydan?

15     A.   March 2020?

16     Q.   Correct.

17     A.   I know this.  Yes.

18     Q.   How did you determine that it was from Liliana

19  Naydan?

20     A.   She -- she sent me the --

21     Q.   So you knew that she had submitted it?

22     A.   She submitted it.  I'm not -- she did -- she

23  didn't identify who she was complaining about.

24     Q.   I see.  So it was anonymous to the extent that

Farrell Court Reporting

Carmen Borges

1  she didn't identify --

2      A.   Exactly, but she identify herself.

3      Q.   Let me finish.  It was anonymous to the extent

4  that she didn't identify what I'll call the respondent,

5  right?

6      A.   Exactly.

7      Q.   The person she was accusing?

8      A.   Uh-huh.

9      Q.   What was the nature of that complaint?

10     A.   She had a list of thing, a list of items, a lot

11  of examples about a faculty member in her unit that was

12  undermining her authority, was -- was undermining her --

13  yeah.  Basically, that was -- all the example she gave was

14  about not -- not respecting her -- her authority.

15     Q.   You remember any of the specific examples?

16     A.   Well, you probably have it, don't you?  I mean,

17  it's a long list.  She had -- I remember it's about two

18  pages of her examples that she -- yeah.

19     Q.   And --

20     A.   Or even more.  Or even more, even two or three

21  pages.  Very detailed.

22     Q.   But I'm just asking you based on your --

23     A.   Uh-huh.

24     Q.   -- preparation for this deposition and what you

Carmen Borges

Page 64

1   remember now, do you remember any of the specific

2   allegations made by Liliana Naydan in March of 2020?

3       A.   Other than this faculty member and her under

4   her -- not under her supervision because she was the --

5   she's more -- she was the coordinator, but under her

6   directions was -- was undermining her and was not -- you

7   know.

8       Q.   And do you know how specifically he was

9   undermining Liliana Naydan, this anonymous --

10      A.   Bypassing her, making decisions on his own,

11  challenging, kind of confronting her with some challenges.

12      Q.   Like what?

13      A.   Definitions of things.

14      Q.   In terms of what?

15      A.   Yeah.   I remember now specifically about SRTEs

16  for faculty.   Those are the evaluations.   Apparently,

17  there had been an article discussed that women and

18  minorities got lower student ratings and -- and then, that

19  was distributed, and this faculty member put her to the

20  challenge of what does that mean.   What -- why are you

21  saying this and, you know.

22      Q.   Is that unprofessional to ask for specifics like

23  that?

24      A.   He was told to go do the research on the matter.

Farrell Court Reporting

Carmen Borges

1    That's how that ended.

2        Q.   What is an SS -- excuse me.  You mentioned this

3    acronym SRTE.

4        A.   It's --

5        Q.   Can you define that for --

6        A.   Those are student -- student evaluations of

7    teaching.

8        Q.   Do you know what it stands for, the SRTE?

9        A.   Student -- student, SR, T, teachers evaluations.

10   Student -- what would that be?  Student?

11       Q.   That's okay.  We don't have to --

12       A.   Yeah.  Yeah.

13       Q.   -- spend time on this.  For the record --

14       A.   It's interesting.  I mean, you know, this is how

15   we get to use -- we use an acronyms that --

16       Q.   So at one point, he questioned whether --

17       A.   Maybe student report.

18       Q.   So it could be support -- student report and

19   teacher evaluation?

20       A.   Uh-huh.

21       Q.   So one of the things that this -- the

22   complainant, Liliana Naydan, complained about was that

23   this individual, the respondent, questioned whether

24   minorities and women actually got lower SRTE evaluations

Farrell Court Reporting

Carmen Borges

Page 66

1    than white men?

2        A.   That was one -- one item.  That was one of the

3    two pages of issues that he had been -- this person had

4    been challenging her on.

5        Q.   I'm just trying to get what you remember.

6        A.   Okay.

7        Q.   And your memory is that that ended with him being

8    told to go look it up himself?

9        A.   Yes.

10       Q.   And was there any indication that the respondent

11   had asked that question in bad faith?

12       A.   I can't answer that.

13       Q.   Is it professional when someone asks a question

14   asking for data to tell them to go look it up themselves?

15       A.   I don't know if it's professional or

16   unprofessional.  I mean, that was the answer.

17       Q.   So you really can't answer that question?

18       A.   I mean, in the context of -- of -- as I remember,

19   it was a big article, you know, of the work and

20   everybody's so busy to really take time to -- to dissect

21   the article for the person that's questioning it.

22   That's -- that's how it kind of reads.  This is what it

23   is.  If -- you know, if you want more details or more

24   information, go check it out for yourself.

Carmen Borges

1      Q.   I think you would agree that if a student body

2  was systematically reviewing teachers at Penn State

3  Abington and always giving, regardless of the quality of

4  the instruction, Black and female professors lower

5  teaching evaluations, that would probably be -- indicate a

6  problem, right?

7      A.   Yes.

8      Q.   Do you know of any evidence at Penn State

9  Abington that that's the case?

10     A.   No.

11     Q.   At Penn State in general?

12     A.   No.   There's a lot of research.   There's a unit

13  of Penn State that has done research on that.   The

14  Schriner Institute for Teaching and Learning, they took on

15  a big project to research that, but I'm not familiar with

16  their results.

17     Q.   Wouldn't those results be important for your

18  office of affirmative action?

19     A.   No.

20     Q.   No?   Okay.   What did you do in response to

21  Liliana Naydan's report that an anonymous faculty member

22  had done these things?

23     A.   Nothing.   She didn't want anything done.   She

24  just wanted it on file and documented.   She didn't want

Carmen Borges

Page 68

1   anything done.

2        Q.   Did you interview anyone?

3        A.   No.

4        Q.   Did you talk to anyone besides Liliana Naydan?

5        A.   No.

6        Q.   You didn't meet with Naydan?

7        A.   It was a telephone call.

8        Q.   It was a telephone call?

9        A.   Uh-huh.

10       Q.   If you remember -- I know this can be sometimes

11  hazy.  Was Covid in effect then?

12       A.   Yeah.

13       Q.   It was March 2020.

14       A.   March 2020, Covid was -- was coming on.  Yes.

15       Q.   That was the --

16       A.   I can -- I -- I know.

17       Q.   Okay.  So after March of 2020, is it correct to

18  say that there were very few in person meetings ever until

19  Covid had passed, basically?

20       A.   I think we went remote at that time around that

21  time.  The whole university went remote.

22       Q.   And after that, was it very rare to have in

23  person meetings as part of your work?

24       A.   Well, in our office, they were rare.  I don't

Farrell Court Reporting

Carmen Borges

Page 69

1    know in other units how they were functioning.

2         Q.   I'm just asking about you.

3         A.   Yeah, we were remote.

4         Q.   Did you speak to Liliana Naydan's supervisor?

5         A.   Friederike, yes.

6         Q.   Who is Liliana Naydan's supervisor?

7         A.   Friederike.  Friederike -- I can't recall.

8         Q.   If I said Baer, would that --

9         A.   Baer, Baer, Baer.  Friederike Baer.

10        Q.   B-A-E-R?

11        A.   Uh-huh.  Exactly.

12        Q.   And I think her -- it's a German name, correct?

13        A.   Yes.

14        Q.   And her first name is F-R --

15        A.   Friederike.

16        Q.   -- E-D-R-I-E-C-K-E, right?

17        A.   Yes.

18        Q.   And if I've misspelled it, I think we'll be able

19   to correct that.  But --

20        A.   Uh-huh.

21        Q.   -- it's an unusual spelling, so I wanted --

22        A.   It is.

23        Q.   -- to spell it for the reporter.

24        A.   Oh, I see.

Farrell Court Reporting

Carmen Borges

1    Q.   And when you spoke to Friederike Baer, did you

2  make notes of that conversation?

3    A.   I don't recall.

4    Q.   Did you make notes of your conversation with

5  Liliana Naydan?

6    A.   If I did, I would have provided them.  I don't

7  recall.  I have to check.

8    Q.   Please understand.  Sometimes, we get handwritten

9  notes, and it's not clear whose they are, so I may ask you

10  about that.  Obviously, if they're not your notes, you can

11  just say, right?

12        So while we're at it, can you explain what your

13  normal practice when you get -- practice when any

14  complaint comes in?  How does it come in?  Please explain

15  what you do.

16    A.   As I said, because of the changes -- before,

17  people would first do, come in in person.

18    Q.   Sure.

19    A.   And we would sit down and get the facts and get

20  the information, then.  Now, with people being able to

21  file online, they just submit their complaints, and so

22  they come to our office.  They went to bias office.  At

23  the beginning, it was pretty confusing.  They were going

24  all over the place, and somebody was sorting out where

Farrell Court Reporting

Carmen Borges

Page 71

1   they belong.  And then, you know, if they ended in our

2   office, the ones that pertain to our office.

3          So all that change is happening with Covid, with

4   the remote.  And, you know, things circulate.  So, you

5   know, the first thing we do is try to make contact with

6   the person that filing the complaint to get more

7   information, get more details about what's happening and

8   then -- and go from there, determine from there what needs

9   to happen next.

10       Q.   Do you share the specific complaints with the

11  respondents?

12       A.   The specific allegations, yeah, we talk to the

13  respondent.  We have to ask them about the allegation to

14  hear their side of the story.

15       Q.   Do you give them the specific complaint that was

16  submitted against them?

17       A.   No.

18       Q.   Why?

19       A.   It's private -- private -- private information

20  for our office.  So we -- we share the allegations.

21       Q.   But you consider the actual complaint in the

22  words of the complainant private information,

23  quote-unquote?

24       A.   In our office, we do, yeah.

Farrell Court Reporting

Carmen Borges

1        Q.   In the course of your investigations, do you

2   gather evidence?

3        A.   Well, we talk to the -- to the respondent and any

4   other witnesses that may be necessary to talk to.

5        Q.   Is there other kinds of evidence you gather?

6        A.   Depends on the situation, yeah.  If -- if we need

7   some other evidence or the respondent wants to provide

8   something, yeah, they provide.

9        Q.   What other evidence do you get from the

10  respondents or complainants?

11       A.   Whatever they wanna provide.

12       Q.   Such as what?

13       A.   Something that would -- that would contradict or

14  that would explain what the allegations -- what the

15  allegation was about.

16       Q.   Do you collect their e-mails?

17       A.   The address.

18       Q.   Does your office go in and pull faculty members'

19  e-mails from the Penn State University e-mail system?

20       A.   If we have access to do it, yes.

21       Q.   You do that without the faculty's permission?

22       A.   Oh, we have access to a lot of information, yeah.

23  Data, information, personnel matters, yeah, we have access

24  to all that.

Farrell Court Reporting

Carmen Borges

Page 73

1    Q.   So your answer is that in some investigations,
2  you would go into a faculty member's e-mail without their
3  permission to investigate what they were saying?
4    A.   E-mail, you mean communication?  Oh, no, no, no.
5    Q.   Okay.
6    A.   No, no, just the e-mail address.
7    Q.   Okay.
8    A.   I thought we were talking about the e-mail
9  address, but no.  And the personnel appointments, when did
10  they start working, general things like that.
11    Q.   Sure.
12    A.   But no, we don't get into e-mails.
13    Q.   I --
14    A.   Private e-mails.
15    Q.   You might collect documents from the parties?
16    A.   If they provide them, yeah.
17    Q.   And you rely upon the parties to provide them?
18    A.   Uh-huh.
19    Q.   Do you include any other things in investigating
20  besides what you get from the parties themselves?
21    A.   Well, if they mention someone else that we should
22  talk to, someone else that has knowledge of the situation.
23    Q.   What do you do with that?
24    A.   We contact them to see what they know.

Farrell Court Reporting

Carmen Borges

1    Q.   Do you gather documents and other relevant

2   evidence from them, too?

3    A.   If -- if it's relevant or appropriate, yeah.

4    Q.   I believe earlier you made reference to something

5   called the bias office.  Do you recall referring to a bias

6   office?

7    A.   The bias complaints were going at the time into

8   educational equity office.

9    Q.   So at the time meaning 2020 to 2022?

10    A.   Before -- yeah.  Around there, yeah.

11    Q.   And you said there was an educational equity

12   office?

13    A.   Office of educational equity, yeah.

14    Q.   What was the relationship of the office of

15   educational equity to the affirmative action office in

16   which you work?

17    A.   The office of educational equity was more focus

18   on students, and our office was -- is more focus on

19   employees.

20    Q.   So bias complaints could be submitted by faculty,

21   right?

22    A.   Yes.

23    Q.   And it would still go to the office of

24   educational equity?

Farrell Court Reporting

Carmen Borges

Page 75

1       A.    Initially all bias complaints were going to the

2   office of educational equity initially.  At some point

3   when Alina started, for whatever reason, it -- it began

4   to -- to -- they were not -- they were not handling all

5   the bias complaint, but they were sending them.  If there

6   was an employee, if was an employee matter, they send them

7   to our office.

8       Q.    And you refer to Alina.  Is that Alina Wong?

9       A.    Uh-huh.

10      Q.    What was her position?

11      A.    She was in the educational equity office.

12      Q.    Was she the director of that office?

13      A.    No.

14      Q.    You know her --

15      A.    System director or something.

16      Q.    Who was the head of the office of educational

17  equity?

18      A.    It's still Marcus Whitehurst.

19      Q.    And Alina Wong worked under?

20      A.    Under Marcus Whitehurst.  And the whole concept

21  of bias reporting started as a student, for students.  And

22  then, they were addressed by them also.  They were

23  addressed by that office, mostly a student complaining

24  about a faculty or something.  But then, they were

Farrell Court Reporting

Carmen Borges

Page 76

1    addressed.  At some point, the bias expanded and everybody
2    got confused or everybody then had options too, but -- and
3    then, they began to file there, too.  And then it was like
4    okay, so the ones that are employee related, we send them
5    to affirmative action.  The ones that are student related,
6    we address them.
7         Q.   So let's talk about the time period.  When did
8    this whole bias reporting thing begin?  You said at the
9    beginning, so I'm just trying to loosely let's do -- put
10   down some markers of when that was.
11        A.   Exactly.  It would have been before Covid, before
12   '20.
13        Q.   So before my client was hired by Penn State
14   University, which was I believe he started in 2019?
15        A.   2019?
16        Q.   In the fall of 2019.
17        A.   The bias --
18             MR. SMITH:  I wanna say 2018.  I don't wanna --
19   BY MR. ALLEN:
20        Q.   I'm sorry.  So it appears my client started in
21   2018.
22        A.   2018.
23        Q.   Yeah.
24        A.   2018, yeah.

Farrell Court Reporting

Carmen Borges

Page 77

1    Q.   You think the bias report started before Covid?

2    A.   Yeah.  The bias for students were before 2018.

3  After 2018 or '19, then it kind of began to go to our

4  office.

5    Q.   So let me try to summarize, and I'm not trying to

6  put words in your mouth.  Shortly before Covid, there was

7  this reorganization of the process where there was --

8  someone was making a decision about whether it should be

9  sent to your office, it stays among the students in the

10  office of educational equity and so forth, right?

11    A.   Yeah.

12    Q.   Basically a sorting thing?

13    A.   Sorting.

14    Q.   Who was responsible for that?

15    A.   Alina, I believe.

16    Q.   That was Alina Wong?

17    A.   I believe.  And to complicate matters, then there

18  was the hotline created also.

19    Q.   There was a hotline for bias reporting?

20    A.   For any reason of anything.  So that became a

21  whole, huge thing about lots of complaints of all kinds.

22  And so then, the -- the hotline was also trying to

23  coordinate how do we sort this out.  So some were sent to

24  our office, others to the unit.  It was a period of -- of

Farrell Court Reporting

Carmen Borges

Page 78

1    a lot of confusion about providing people lots of venues

2    to file complaints.  And believe me, people were using

3    them.  All -- all and each one of them, so it -- it -- we

4    got flooded with -- with -- with lot of issues.

5         Q.  So it's safe to say that this caused an explosion

6    of complaints?

7         A.  It caused an explosion of complaints.  Major,

8    minor, nonsense, whatever, anonymous, all kinds of things.

9    And then, there was where does this belong, how is this

10   sorted out, where does it go.  It -- it -- it was -- it's

11   getting better now.  Things are balancing out and better

12   defined, but it was a period of -- and on top of that, it

13   was Covid and working remotely.  There was -- there was a

14   lot of confusion around all that.

15        Q.  So even though people weren't actually in face to

16   face contact, they were still flooding your offices with

17   complaints?

18        A.  Even more easier than making an appointment and

19   go in person, and that -- that was the difference.  You

20   know, before if you had to file a complaint, you make an

21   appointment and you meet with someone.  We, you know, got

22   all the facts and you did it on your own.  But after that,

23   now it is -- it was also encouraged for people that knew

24   about issues to -- third parties or witnesses could file

Farrell Court Reporting

Carmen Borges

1   also.

2        Q.   So a third party who wasn't even involved in the

3   conduct could file a complaint about someone?

4        A.   Exactly.  So that's the picture of how -- how --

5   how -- how, you know, confusing it was and how many

6   complaints we're handling and the need to establish

7   processes and systems.  It became very clear.  Our office

8   was very short staffed.  It was -- yeah.  It was -- it was

9   challenging times.

10       Q.   And the administration expanded to accommodate

11  all of these complaints?

12       A.   What administration?  Our office?

13       Q.   Penn State's administration, your office.  You've

14  already mentioned two offices.  It sounds like there was a

15  hotline office?

16       A.   The hotline office, yeah, hotline.  Ethics and

17  compliance it's called, that one.  Ethics and compliance,

18  bias reporting and our office, yes.

19       Q.   So was there an expansion in these offices to

20  meet the demand for processing all of these complaints?

21       A.   Can you --

22       Q.   Did these offices expand to cope with this

23  increase?

24       A.   Not -- gradually.  Gradually, it has, but not

Farrell Court Reporting

Carmen Borges

Page 80

1    immediately.

2         Q.    And ultimately, the taxpayers of Pennsylvania are

3    paying for that?

4              MR. SMITH:  Objection to form.

5              THE WITNESS:  We're being stretched.  We're doing

6    more than -- we could use more people, but it hasn't.

7    Positions have not been filled.

8    BY MR. ALLEN:

9         Q.    And this is the last question I'll ask about that

10   before we get into some of the specifics of the March

11   complaint.  Has this whole process -- you said it flooded

12   your office, correct?  Let's just talk about your office.

13   It flooded your office with new complaints?

14        A.    Uh-huh.

15        Q.    Did you get an increased volume of complaints

16   that you considered meritorious?

17        A.    I think about, yeah.  Maybe.  I don't know.

18   Yeah, maybe.  I'll answer maybe.

19        Q.    But it doesn't stand out in your mind that this

20   suddenly flushed out real --

21        A.    Well, they all take time.  I mean, they all --

22   you need to sort it out.  You need to figure it out.  You

23   need to follow up on some things.  All the -- it's time

24   consuming.

Farrell Court Reporting

Carmen Borges

Page 81

1          That particular complaint that you're talking

2     about was never -- nothing was done with that because it

3     was anonymous.

4          Q.   I don't need to --

5          A.   It was anonymous, and it was just put aside.

6          Q.   I don't want to interrupt you.  I know I am, but

7     I just think we'll move on a little faster because we'll

8     have plenty of time to talk about that.

9          I think the answer to this question should be

10    clear, though.  This massive increase in reporting did

11    lead to a vast increase in frivolous complaints?

12         A.   I would think so, yes.

13         Q.   And you're not -- you're very certain about that,

14    correct?

15         A.   Well, you know, we take every -- we should -- we

16    should -- I mean, we are expected to take every complaint

17    seriously and sort it out until it's figured out, yeah.

18    But the volume was high, yeah.

19         Q.   So you're certain about that?  Just answer my

20    question.

21         A.   Certain?

22         Q.   You're certain that it increased the number of

23    frivolous complaints?

24         A.   Why do you talk frivolous?  What's a frivolous?

Farrell Court Reporting

Carmen Borges

Page 82

1   What's that mean?

2        Q.   I believe you used the word silly or some word

3   like that when you testified earlier.  Complaints that

4   they're really not merit based.

5        A.   Well, you really don't know until you look into

6   it, you know.

7        Q.   Well, you know once you've looked into it, don't

8   you?

9        A.   Exactly.  Once you looked into it, then it's

10  clarification of issues or mediate a solutions.  It's not

11  as complex as an investigation.

12       Q.   So my question is really a simple one.  You're

13  certain that this increase in reporting led to an increase

14  in frivolous complaints?

15            MR. SMITH:  Objection to form.

16            THE WITNESS:  No, I -- I -- I didn't say that and

17  I -- I can't say that because we need to look at a

18  complaint before considering that it had no merit, so --

19  BY MR. ALLEN:

20       Q.   Well, once you look at it, did you find that

21  many, many more had no merit than before?

22       A.   For the complainant, they had merit.  So you had

23  to -- you know, you had to find -- find a mediated

24  explanation or resolution to something.

Farrell Court Reporting

Carmen Borges

Page 83

1    Q.   So did you see your job as validating the

2    feelings of complainants?

3    A.   Not validating the feelings, but taking the

4    complaint seriously until proven differently.

5    Q.   In your entire time in the office of affirmative

6    action, did you ever tell a complainant that their

7    complaint had no merit?

8    A.   In those words, no.

9    MR. ALLEN:  Let's go off the record, please.

10                     (A break was held.)

11   (Exhibit Borges 6 was marked for identification.)

12   BY MR. ALLEN:

13   Q.   Ms. Borges, I've premarked an Exhibit No. 6 for

14   the record that starts with PSU 02658 as a Bates number

15   and has a caption at the top list of key issues since

16   March 2020 and in parenthesis in chronological order,

17   close parenthesis.

18        Is this the document we were discussing before, a

19   complaint about someone whose name was not disclosed at

20   this time in March 2020?

21   A.   Yes, it is.

22   Q.   And you see that this individual -- so first of

23   all, I think you testified earlier that this complaint was

24   submitted by Liliana Naydan, right?

Carmen Borges

1    A.    Yes.

2    Q.    And in the first line, Professor Naydan says

3    there have been many incidents, all microaggressions,

4    right?

5    A.    Yes, I see.

6    Q.    And she claims that this has created a, quote,

7    hostile working environment for her and a potentially

8    hostile learning environment for students, correct?

9    A.    That's what it says.

10   Q.    Are you -- do you have any knowledge about how

11   microaggressions experienced by Professor Naydan can

12   somehow create a hostile learning environment for

13   students?

14         MR. SMITH:  Objection to form.

15         THE WITNESS:  I think she explains things here,

16   so that should be here.  I think that pertained to an

17   incident that advising a student.

18   BY MR. ALLEN:

19   Q.    So there was only one incident, advising a

20   student, that you know of?

21   A.    According to this that I remember, there was one

22   incident that -- yeah.

23   Q.    Did you find evidence that the respondent

24   committed a, quote, microaggression against this student?

Carmen Borges

Page 85

1     A.   I mean, I wouldn't call it a microaggression.  It
2   was, um -- I don't think she labeled that one
3   microaggression.  She labeled it him bypassing her -- her
4   authority or dealing with a student or including the
5   students in e-mails that the student should not have been
6   included in e-mails between the two of them.
7     Q.   Did including the students in e-mails somehow
8   detract from their learning experience, the students'
9   learning --
10    A.   No.
11    Q.   -- experience?
12    A.   No, it does.  It's -- it's just not professional.
13    Q.   So there's no situation where professors at Penn
14   State include each other and students in e-mails?
15    A.   Unless the student has a need to know the
16   decision.
17    Q.   It's talking about advisor, right?  Students need
18   to know that information, right?
19    A.   Probably, yes.
20    Q.   And you said you don't recall that one being
21   described as a microaggression?
22    A.   No.  I think she described that as disrespectful
23   or bypassing her authority or not including her as the
24   coordinator of the program and the advisor.

Farrell Court Reporting

Carmen Borges

Page 86

1    Q.   And that's discussed in this complaint, correct?

2    A.   I think so.  As I remember when I read it, yes.

3    Q.   So in the first sentence, she says these are all

4    microaggressions, right?  These have been -- there have

5    been many incidents, all microaggressions, right?  Those

6    are her words?

7    A.   Those are her words, yes.

8    Q.   And she submitted this to your office, right?

9    A.   Yes.

10    Q.   Okay.  If you go down to number two, number one

11    is blanked out.  That might be something that was about a

12    student.  We don't know.  Do you have any memory of what

13    was in that blanked out --

14    A.   I was gonna ask you.  Why is that blanked out?

15    Q.   You'll have to ask your attorney.  That was

16    blanked out by Penn State under a claim that it protects

17    FERPA information.  At least that's the understanding, and

18    your counsel can correct that, but we're gonna skip

19    that --

20    A.   Maybe it has the name of a student there.

21    Q.   Something of that nature?

22    A.   Uh-huh.

23    Q.   Then under number two, if you skip to the fourth

24    sentence, you see where it says this faculty member?  It

Farrell Court Reporting

Carmen Borges

Page 87

1  says this faculty members questioned our feelings and

2  remarks in an e-mail saying that feels like a stretch to

3  me, no, question mark.  Did I read that correctly?

4       A.   Uh-huh.

5       Q.   And it was something about a statement that women

6  and faculty of color expressed that they felt worried

7  about enforcing mask wearing --

8       A.   Uh-huh.

9       Q.   -- right?  Does that constitute a microaggression

10  to you, as an office who enforces the policies of Penn

11  State?

12       A.   It did to her.  I --

13       Q.   It's potentially against the rules of Penn State

14  to question somebody's feelings?

15            MR. SMITH:  Objection to form.

16  BY MR. ALLEN:

17       Q.   That's what it says here, right.  This faculty

18  member questioned our feelings.  Did I read that wrong?

19       A.   No.

20       Q.   Do you know of any reason why that would be

21  objectable to read it that way?

22       A.   That's what it says.  That's her interpretation

23  of feelings and remarks.

24       Q.   And is that a violation of the rules of Penn

Carmen Borges

Page 88

1    State to question other people's feelings?

2              MR. SMITH:  Objection to form.

3              THE WITNESS:  It's not against the rules.

4    BY MR. ALLEN:

5        Q.   It also -- if you skip down another two

6    sentences, do you see where it says implicitly in bold?

7        A.   Uh-huh.

8        Q.   Liliana Naydan complains that he implicitly

9    critiqued the article she sent as anecdotal and not

10   empirical and asked for an article rooted in empirical

11   evidence.  Did I read that correct?

12       A.   Uh-huh.

13       Q.   Do you know what the substance of this, quote,

14   implicit critique was?

15       A.   No.

16       Q.   That means it was implied, right?

17       A.   Uh-huh.

18       Q.   In other words, it wasn't overt, right?  Is that

19   a -- is that a violation of the rules of Penn State to say

20   something that might be interpreted as implying a

21   critique?  Is that -- does that violate the rules in some

22   way?

23             MR. SMITH:  Objection to form.

24             THE WITNESS:  Not that -- that in and of itself,

Farrell Court Reporting

Carmen Borges

Page 89

1    you know.  No.  And again, it's a pattern.  It's the

2    pattern of things.  It's not one or two incidents.

3    BY MR. ALLEN:

4        Q.   Can there be a pattern of someone interpreting

5    insults where none exist?  That can be a pattern, too,

6    right?

7        A.   Of the receiver.

8        Q.   Can a complainant have a pattern of submitting

9    bogus complaints?

10            MR. SMITH:  Object to form.

11            THE WITNESS:  No because it's how she felt.  It's

12   how -- what she experienced.

13   BY MR. ALLEN:

14       Q.   So what she feels and experienced can't be

15   criticized, right?

16            MR. SMITH:  Objection to form.

17            THE WITNESS:  I don't know what to say.

18   BY MR. ALLEN:

19       Q.   Did you ever tell Liliana Naydan that she might

20   grow up and not be so offended by some of these things?

21            MR. SMITH:  Objection to form.

22            THE WITNESS:  No, I never did.  I never addressed

23   this, I have to say.  This was never addressed

24   specifically because --

Farrell Court Reporting

Carmen Borges

Page 90

1   BY MR. ALLEN:

2       Q.   You never addressed this complaint?

3       A.   It was anonymous.  She never had -- we never had

4   permission to address this complaint.

5       Q.   Did you ever learn that this complaint referred

6   to my client, Zack Di Piero?

7       A.   I learn much later.

8       Q.   And we'll get -- I believe you testified earlier

9   that Liliana Naydan is a faculty member, right?

10      A.   Yes.

11      Q.   And she's a grown woman, right?

12      A.   Yes.

13      Q.   And she's a scholar, correct?

14      A.   Yes.

15      Q.   And she's complaining that she finds it to be a,

16  quote, microaggression if someone implicitly critiques

17  her?

18          MR. SMITH:  Objection to form.

19          THE WITNESS:  That's what she says.

20  BY MR. ALLEN:

21      Q.   Do you know if she ever discussed this with Zack

22  Di Piero directly?

23      A.   I don't know.

24      Q.   You see in number three, it says she's

Farrell Court Reporting

Carmen Borges

Page 91

1   complaining that it's a microaggression, remember, in the

2   last sentence that he also called the scholarship of a

3   very famous scholar of color in our field unoriginal,

4   derivative in a meeting through, though not with that

5   word.  Do you see that?

6       A.    Uh-huh.

7       Q.    Is that against the rules of Penn State?

8       A.    What, calling -- what's it calling?

9       Q.    Calling a very famous scholar of color in our

10  field unoriginal and derivative.  You ever heard of

11  scholars calling each other unoriginal and derivative?

12      A.    It could happen.  I mean, people have different

13  opinions of things.

14      Q.    Don't you think academics do that all the time?

15      A.    All the time.

16      Q.    You said you were married to an academic, right?

17      A.    Yeah.

18      Q.    Have you ever heard him complain that other

19  scholars' work was unoriginal?

20      A.    I can't think of a situation, but it's nothing --

21      Q.    I should strike that question because it invades

22  the spousal privilege, so I'll withdraw it.  But you've

23  certainly heard scholars in your house complain about

24  other scholars work, right.

Farrell Court Reporting

Carmen Borges

1      A.   Oh, yes.

2      Q.   As unoriginal?

3      A.   They -- they believe that it's unoriginal.

4      Q.   But apparently to Professor Naydan, this is a

5   microaggression, right?  That's what she wrote in here,

6   right?

7      A.   Yes.

8      Q.   Did anyone ever tell her to your knowledge that

9   that was the normal function of scholars to complain about

10   other people's work and do original work instead?

11      A.   I don't know if her supervisor told her that, if

12   Friederike told her that.

13      Q.   Do you think she should be told that?

14      A.   That could be a conversation with -- with her

15   supervisor, her higher up or the department head.  Yeah.

16      Q.   So look at number five, too.  This is another

17   thing which Professor Naydan apparently considers a

18   microaggression.  This faculty, meaning Zack De Piero,

19   once mentioned in an e-mail to me that he was, quote, not

20   intending any of this to be disrespectful or me giving you

21   a microaggression or anything like that.  Did I read that

22   correctly?

23      A.   Yes.

24      Q.   Then it goes on.  Zack De Piero apparently also

Farrell Court Reporting

Carmen Borges

1    wrote in this e-mail I'm just trying to explain myself

2    plus talk through ideas.  Did you see that?

3         A.    Uh-huh.

4         Q.    Now, according to Exhibit No. 4, which was the

5    professional ethics of policy of Penn State University,

6    that's supposed to be one of the jobs that academics have,

7    right?  But Liliana Naydan is complaining that that, too,

8    is a microaggression, right?

9         A.    Yes.

10             MR. SMITH:  Objection to form.

11   BY MR. ALLEN:

12        Q.    Even when the faculty member says he's not

13   intending to create whatever that means, a

14   microaggression, right?

15        A.    Right.

16        Q.    Another thing that I wanted to ask you about is

17   in number six.  She says I feel like he -- this is the

18   sentence that begins in the third line of bullet point

19   number six or whatever you wanna say.  I feel like he

20   copies one white male advisor because he feels I won't

21   know the answer to his questions -- question or wants

22   someone to oversee my answer to him.  No other faculty

23   member in English ever copies this white male advisor when

24   e-mailing me with advising questions.  Did I read that

Farrell Court Reporting

Carmen Borges

1    correctly?

2        A.    Yes.

3        Q.    Why do you think she's pointing out that the male

4    advisor is white?

5              MR. SMITH:   Objection to form.

6              THE WITNESS:   You'd have to ask her that.

7    BY MR. ALLEN:

8        Q.    Why would a complainant point out that the

9    advisor was male?

10             MR. SMITH:   Objection to form.

11             THE WITNESS:   You'd have to ask her.

12   BY MR. ALLEN:

13       Q.    Is it a microaggression at Penn State University

14   to copy e-mails to white male faculty?

15       A.    Is it what?

16       Q.    A microaggression.

17             MR. SMITH:   Objection to form.

18   BY MR. ALLEN:

19       Q.    Is it against the rules --

20             THE REPORTER:   I'm sorry.  I didn't hear the

21   answer.

22             THE WITNESS:   No.

23             MR. ALLEN:   The witness answered no.

24   BY MR. ALLEN:

Farrell Court Reporting

Carmen Borges

Page 95

1    Q.   Is it against any rule at Penn State that you

2  know of to copy a white male faculty member on anything?

3    A.   There's no rule on that.

4    Q.   It seems to be very important to Professor

5  Liliana Naydan, however, isn't it?  Doesn't it?

6    A.   It seems so based on what she's saying.

7    Q.   She goes out of her way to point out that this

8  individual was a white male advisor twice, correct?

9    A.   Correct.

10    Q.   Incidentally, is there any policy at Penn State

11  against referring to people by their last names?

12    A.   No.

13    Q.   By their first names?

14    A.   No.

15    Q.   So that isn't based on your knowledge and

16  experience a microaggression, is it?

17         MR. SMITH:  Objection to form.

18         THE WITNESS:  No.

19  BY MR. ALLEN:

20    Q.   You nevertheless answered no?  I just didn't --

21    A.   No.

22    Q.   Were you ever aware of anything that my client,

23  Zack De Piero, did to put, quote, even more service labor,

24  close quote, on Liliana Naydan?

Farrell Court Reporting

Carmen Borges

1    A.   I wouldn't know that.  Friederike would -- would

2    know that.

3    Q.   Just if you move down to the bottom of page 2661,

4    PSU 2661, the second paragraph up from the bottom,

5    Professor Naydan is discussing a student who is apparently

6    seeking an advisor.  Do you see that paragraph that begins

7    this faculty member never replied?  And if you skip to the

8    last two sentences that begin the faculty member showed

9    up, do you see that sentence?

10   A.   Uh-huh.  Faculty --

11   Q.   I'm just gonna --

12   A.   Yeah.

13   Q.   -- read it into the record.

14   A.   Go ahead.

15   Q.   The faculty member showed up to the advising

16   meeting the next day and didn't discuss the student's

17   advising choice, so that was good in my view.  In my view,

18   the three of us had a very awkward advising meeting in

19   which this faculty member provided misinformation in

20   assertive ways about World Campus courses, minors and

21   internships.  Did I read that correctly?

22   A.   Yes.

23   Q.   So it seems that she says it was good.  But then

24   she finds it some sort of microaggression, nonetheless,

Farrell Court Reporting

Carmen Borges

1   right?

2          MR. SMITH:  Objection to form.

3          THE WITNESS:  Oh, you're waiting for my answer?

4   That's what she's saying.

5   BY MR. ALLEN:

6      Q.   Okay.  Did you ever identify any misinformation

7   provided by my client to advisees?

8      A.   No.

9      Q.   In the next paragraph, it flows over onto the

10  next page.  Do you see that?  I'm just gonna read the top

11  sentence on the page.  It says I, meaning Liliana Naydan,

12  also felt that another part of the problem is that as a

13  chair and coordinator, I address issues involving

14  diversity, equity and inclusion.  He seems to -- he seems

15  hostile to my doing that.  Did I read that correctly?

16     A.   Yes.

17     Q.   Do you have any reason to believe Liliana Naydan

18  was lying about that?

19     A.   I don't know.  I mean --

20     Q.   You have --

21     A.   No knowledge.

22     Q.   Okay.  So you don't -- you believe she's

23  correctly representing as chair and coordinator, she

24  addressed issues involving diversity, equity and inclusion

Farrell Court Reporting

Carmen Borges

Page 98

1    as a Penn State program director?

2         MR. SMITH:  Objection to form.

3         THE WITNESS:  That's what she says.

4    BY MR. ALLEN:

5    Q.   Is it against the rules of Penn State University

6    to disagree with the diversity, equity and inclusion

7    initiatives of a chair and coordinator?

8    A.   No.

9    Q.   Is it unprofessional to disagree with a chair and

10   coordinator's diversity, equity and inclusion program?

11   A.   No.

12        MR. ALLEN:  I'm gonna mark Exhibit 7 as some

13   handwritten notes.

14   (Exhibit Borges 7 was marked for identification.)

15        MR. ALLEN:  Bates marked PSU 4123.

16   BY MR. ALLEN:

17   Q.   I guess the first question is is this your notes?

18   A.   Yes.

19   Q.   It is?  So this is in your handwriting?

20   A.   Yes.

21   Q.   Okay.  When did you take these notes?

22   A.   Well, it says there March 31st, '21.

23   Q.   And is this after a Zoom meeting with Liliana

24   Naydan?

Farrell Court Reporting

Carmen Borges

1      A.    That's what it says, meeting at Zoom.

2      Q.    What does DAA stand for?  See there on the third

3  line?

4      A.    Diversity and inclusion, I guess.  Yeah.  I

5  didn't get that right.

6      Q.    So that was like --

7      A.    Oh, no, no, no.  This is the director of academic

8  affairs.  That's Friederike's title.

9      Q.    Friederike Baer at that time was the director of

10  academic affairs?

11     A.    Exactly.  Uh-huh.

12     Q.    Did she have another position at Penn State

13  Abington as well?

14     A.    She's also a faculty member there.

15     Q.    It also says division head Abington.  What does

16  that refer to?

17     A.    Department.

18     Q.    What was -- what was her department?

19     A.    I mean, the writing program would have been under

20  her department.  Uh-huh.

21     Q.    English department too, right?

22     A.    English.  Exactly.

23     Q.    Okay.  And you say maybe gender bias and/or

24  racial bias going on for about a year, right?

Farrell Court Reporting

Carmen Borges

Page 100

1      A.   That's what she consulted about.   Uh-huh.

2      Q.   What in the complaint about an anonymous

3  professor that we just read constitutes gender bias even

4  if you took everything in there alleged as true?

5      A.   It's disagreement and -- between two faculty or

6  disagreeing.  That's the issue that I thought Friederike

7  could -- would address or could discuss with both of them.

8      Q.   Employees sometimes don't get along, do they?

9      A.   Exactly.

10     Q.   That doesn't mean there's any bias?

11     A.   Well, it could be perceived by one of -- of the

12  parties as bias, but it's really not (unintelligible)

13  sometimes.

14     Q.   So my question was can you identify allegations

15  if taken as true that constituted gender bias in the

16  complaint that was submitted by Liliana Naydan in March of

17  2020?

18     A.   In her feeling and her perception, it was.   I

19  mean --

20     Q.   Does that mean that it actually was or that she

21  just had these subjective feelings?

22     A.   She had -- she had those feelings.   It was

23  never -- that was never investigated.

24     Q.   Is it your job to validate her feelings?

Farrell Court Reporting

Carmen Borges

1              MR. SMITH:  Objection to form.

2              THE WITNESS:  No.  It's my job to take it as an

3    allegation, to see whether it true or not.

4    BY MR. ALLEN:

5         Q.   And you never investigated this as --

6         A.   No.

7         Q.   Would I get the same answers if I asked about

8    racial bias, the second part of it?

9              MR. SMITH:  Objection to form.

10   BY MR. ALLEN:

11        Q.   I'm sure we can do this for --

12        A.   That's an example she gave.

13        Q.   I'm just gonna retract that --

14        A.   It's the Black male student.

15        Q.   Oh, okay.  There was -- that's probably what's

16   blacked out.  I don't believe so, but --

17        A.   Yeah, it's the student.  It's an issue with a

18   student that -- that --

19        Q.   And I'm honestly not interested in naming this

20   person or -- you know, they play a role in this only to

21   extent that these accusations were made against my client.

22   It's not about him.  It's about the accusations made by

23   Liliana Naydan about my client, so I want to just put that

24   on the record.

Farrell Court Reporting

Carmen Borges

Page 102

1          But it says here in your notes -- and these would

2     have been a recording you made of what Liliana Naydan was

3     saying you, right?

4          A.   Uh-huh.

5          Q.   A year ago, a Black student complained to her

6     and --

7          A.   Division head.

8          Q.   Division head would have been Friederike Baer?

9          A.   Uh-huh.

10         Q.   They had a meeting with faculty.  She's now

11    feeling his wrath?  Does not want to identify male

12    faculty.  Wants his identity -- no.  Wants his --

13         A.   Okay.  She's now feeling his I guess, you know,

14    his reaction to that incident.

15         Q.   Right.  But where it says wants his something --

16         A.   Does not --

17         Q.   Wants this documented?

18         A.   Does not wish to identify male faculty.  Wants

19    this documented.

20         Q.   Why don't you read the rest, since this is your

21    handwriting?

22         A.   Division head aware, working with her, wants to

23    decide, to document.  Want to --

24         Q.   Wants recorded to documented in our office?

Farrell Court Reporting

Carmen Borges

Page 103

1    A.    She has decided to document it in our office,

2    does not want to file a complaint.

3    Q.    Okay.  So to summarize, there was apparently a

4    Black student who complained to her.  Do you know what the

5    substance of that complaint was?

6    A.    Yes.  What I heard about that was that a Black

7    student complain kind of bias, a bias report.

8    Q.    That he --

9    A.    It -- it would have been I guess to Friederike.

10   I don't know where that bias report happened, but I get

11   Friederike may have told Lila since he worked on Lila's

12   department, Lila conveyed to him there was a bias report

13   from a student that we need to sit down and discuss.

14   And -- and he came prepare with all the documentation he

15   had against -- against all the background information on

16   that student.

17   Q.    What was the background information?  Do you

18   know?

19   A.    Well, it turned out that the bias report, the

20   complaint of the student was about age, not about race.

21   Q.    What were Zack's documents that he brought to

22   this meeting that you just described, if you know?

23   A.    I -- I'm not aware.  Friederike would know

24   because according to Lila, there was a lot of

Carmen Borges

Page 104

1   documentation, and they met with Friederike in her office.

2       Q.   Do you know what the age of the student was at

3   the time?

4       A.   I think I heard it was an older student.  I mean,

5   older than regular college age student.

6       Q.   Do you know you what the cut off for federal age

7   discrimination is?

8       A.   Uh-uh.

9       Q.   Was any determination made whether this student

10  even qualified to allege age discrimination?

11      A.   Well, people -- people allege it.  I mean,

12  whether you're qualified or not, people allege things.

13  The issue is whether it's proven.

14      Q.   You would agree that we discriminate against

15  people all the time on the basis of age, right?  You take

16  away people's licenses when they can't drive anymore,

17  right?

18          MR. SMITH:  Objection to form.

19  BY MR. ALLEN:

20      Q.   We don't let people under the age of 21 buy

21  alcohol, right?

22      A.   Yeah.

23      Q.   You know anything about the merit of this, quote,

24  age discrimination complaint?

Farrell Court Reporting

Carmen Borges

1      A.    No.   It was about a grade or -- no, I don't know.

2  Friederike will be in a better position to explain that.

3      Q.    And you know that the student accused my client

4  of discrimination, right?

5      A.    That's what I heard.  It was a bias report.

6      Q.    If you got a complaint of discrimination made by

7  a Black student, would you assume it was on the basis of

8  race?

9          MR. SMITH:  Objection to form.

10          THE WITNESS:  Say that again.  Who would assume?

11  Who would need to assume?

12  BY MR. ALLEN:

13      Q.    You as a person who enforces the

14  antidiscrimination policies of Penn State University.

15      A.    Okay.  If I get a complaint?

16      Q.    You got a bias report.  The student was Black and

17  accused Zack Di Piero of discrimination.  Without saying

18  more, would you assume it was on the basis of race?

19          MR. SMITH:  Objection to form.

20          THE WITNESS:  If the person is not saying on what

21  basis, is not saying -- well, it could reasonably be

22  assumed that it would be -- typically it's about race.  I

23  mean, if the person is Black, you could easily assume that

24  it is.

Farrell Court Reporting

Carmen Borges

Page 106

1   BY MR. ALLEN:

2        Q.   Would that be a microaggression to make that

3   assumption?

4        A.   I don't understand.

5        Q.   Does Professor Naydan's feelings about it make it

6   a microaggression?

7        A.   Where is she saying it's a microaggression?  I

8   don't see anywhere.

9        Q.   Well, assuming in her report the bias report

10  which is Exhibit No. 6 had a blacked out section, and you

11  said that referred to this incident, correct?  If you go

12  back to --

13       A.   No.

14       Q.   -- Exhibit 6?

15       A.   It may not.  It may not.  It may not refer

16  because I never heard the name of that student, so that

17  may not refer to that student.

18       Q.   Okay.  And I don't want --

19       A.   It may refer -- it may refer to the student --

20       Q.   You don't --

21       A.   -- advising, to the student advising.

22       Q.   We don't have to go further.  I thought it was

23  about that student that you had testified about.  But if

24  you haven't, then we can correct --

Farrell Court Reporting

Carmen Borges

Page 107

1    A.    Yeah.  No.  No.

2    Q.    Now, there's one other.  We'll mark as Exhibit 8

3    again some handwritten notes.

4    (Exhibit Borges 8 was marked for identification.)

5         MR. ALLEN:  Bates stamped PSU 412.  These have a

6    date at the top of April 8, 2020.

7    BY MR. ALLEN:

8    Q.    I'm gonna have to ask.  Are these your notes?

9    A.    Yes.

10   Q.    And I'm not -- look.  My handwriting is way

11   worse, so I admire your handwriting.  Don't get me wrong.

12   And do these have to do with the same incident surrounding

13   the March 2021 bias report by Liliana Naydan?

14        MR. SMITH:  I don't mean to interrupt, but I

15   think we keep going back between whether it was March

16   2020, March 2021.  Just to clarify for the record, I think

17   it was 2021.  But a few times, we've said different dates

18   on when Lila submitted this anonymous complaint.

19        THE WITNESS:  Anonymous complaint.

20        MR. SMITH:  I think you just said 2021.  And

21   before, you said --

22        MR. ALLEN:  I think you're right.  I think I was

23   going -- I'm glad you're correcting me because I don't

24   know if the bias report itself has any date on it.

Farrell Court Reporting

Carmen Borges

Page 108

1           THE WITNESS:  Okay.  The anonymous was March '21,

2    the anonymous.  Huh?

3    BY MR. ALLEN:

4       Q.   So I think the record is now corrected.  And I'm

5    grateful for opposing counsel to have caught that, which I

6    was gleefully unaware of that I was doing.

7       A.   March 2021 was the anonymous complaint.  Okay.

8       Q.   And it was Exhibit 6?

9       A.   Yes.

10      Q.   Is March 2021?

11      A.   2021.

12      Q.   And the notes, of course, were also from 2021?

13      A.   Also March.

14      Q.   Exhibit 7 was notes from that same day, March 31,

15   2021?

16      A.   March 31, 2021.

17      Q.   Okay.  Thank you.  And Exhibit 8, then, are notes

18   from April 8, 2021, approximately a week and a day later,

19   right?

20      A.   Exhibit 8 or --

21      Q.   Exhibit 8 is the --

22           MR. SMITH:  The one he just gave you.

23   BY MR. ALLEN:

24      Q.   The one I just introduced into the record.

Farrell Court Reporting

Carmen Borges

1    A.   What did I -- oh, here, the one I have here.

2    Okay.  Sorry.  All right.  So this was --

3    Q.   This --

4    A.   Okay.  This is April '21.  April 2021.  Okay.

5    Q.   And again, the issues are in your handwriting

6    microaggressions created a hostile working environment for

7    Naydan and potentially for students, right?

8    A.   Uh-huh.

9    Q.   That's more or less taken directly from the first

10   sentence of her complaint, right?

11   A.   Uh-huh.  Yes.

12   Q.   And it says Friederike will have a conversation

13   with the faculty member, correct?

14   A.   Correct.

15   Q.   So was it clear by this time who the faculty

16   member is even though the complaint was anonymous?

17   A.   You have to ask Friederike that, but I believe

18   Friederike knew because they have -- the meeting with a

19   student was in Friederike's office.

20   Q.   Now, they discussed the incident we talked about

21   where a Black student accused Zack Di Piero of

22   discrimination in that first paragraph, right?  You and

23   Friederike Baer discussed that, right?  These are your

24   notes?

Farrell Court Reporting

Carmen Borges

Page 110

1      A.    Uh-huh.

2      Q.    And these are your notes.  Issues started with --

3      A.    Issues started with a complaint from a student

4    spring 2020.  Fear he was being accused of racism.

5      Q.    And that's what you discussed with Liliana -- I

6    mean with Friederike Baer in this meeting?

7      A.    Yes.

8      Q.    Is there any indication from Friederike Baer that

9    the fear of being accused of racism wasn't sincere on my

10   client's part?

11     A.    I don't recall.

12     Q.    Let's look back one more.

13     A.    So one thing I did was in her work about the

14   faculty's SRTE.  Here's the acronym again.  And Friederike

15   said that they were good that, you know, nothing --

16   nothing was reflected in the SRTEs regarding, you know,

17   the student evaluations.

18     Q.    Those are Zack Di Piero's SRTEs?

19     A.    Uh-huh.  So the five and seven are the ratings

20   and the other were the comments.

21     Q.    Do you recall Friederike Baer commenting about

22   Liliana Naydan's preoccupation with microaggressions?

23     A.    No.  In that -- in that meeting, their solution

24   was that she was going to discuss, have a conversation

Farrell Court Reporting

Carmen Borges

Page 111

1   with the faculty member regarding the topics outlined,

2   which would have been what she was alleging.

3       Q.   Do you remember Friederike Baer ever being

4   critical of Liliana Naydan and her preoccupation with

5   microaggressions?

6       A.   I don't really recall.

7       Q.   So you don't recall that Friederike Baer said to

8   you that she puts too much emphasis on microaggressions,

9   meaning Liliana Naydan?

10      A.   That was the word of the moment, so I don't

11  recall if she specifically attributed it to her.

12      Q.   Who specifically attributed what to whom?

13      A.   If Friederike attributed to Liliana, but it was

14  common at the time that people were using the word

15  microaggressions very loosely.

16      Q.   Was it common that faculty members would tell on

17  each other about microaggressions anonymously?

18      A.   I don't know.  Friederike would know her faculty

19  there, how --

20      Q.   Liliana Naydan asked that this become a record in

21  your office associated with my client, right?

22      A.   She wanted that documented, but never -- she

23  never follow up on -- on acting on it or wanting anything

24  done on it.  It's just documented.

Farrell Court Reporting

Carmen Borges

1      Q.   It is documented.

2      A.   Exactly.  And the resolution was that Friederike

3 was going to have a conversation with the faculty member.

4      Q.   But you don't consider --

5      A.   -- the employees in your area.  If you're the

6 supervisor, there is -- you know, thing -- thing going on

7 between them.  So you have to, you know, have a

8 conversation with both of them.

9      Q.   And you don't consider going behind someone's

10 back and submitting an anonymous complaint without talking

11 to them directly, that's -- isn't that a microaggression?

12           MR. SMITH:  Objection to form.

13           THE WITNESS:  No.  That's common.  That happens.

14 People do file complaints without letting the person know

15 that they did.  And again --

16 BY MR. ALLEN:

17      Q.   She's trying to get something on his record in

18 your office.

19      A.   She's putting this -- yeah.  She submitted this

20 anonymously and she never activated it and never wanted to

21 follow up on this.

22      Q.   So your testimony today is that she never

23 followed up on this?

24      A.   She never wanted this to be investigated or she

Farrell Court Reporting

Carmen Borges

Page 113

1    never wanted to provide a name of the faculty member

2    either.

3        Q.   Okay.  And you're also aware that Friederike Baer

4    knew who it was specifically, the respondent?

5        A.   I think so.  I'm not totally clear, but I think

6    Friederike knew.

7        Q.   I want to look at another string of e-mails on a

8    completely different topic.  Did your office ever become

9    aware of a discussion on the university listserv in August

10   of 2020 concerning new police officers that are being

11   introduced in the Penn State police force?

12       A.   Yes.

13       Q.   Was that investigated by your office?

14       A.   Yes.

15       Q.   I'm gonna mark as Exhibit 9 an e-mail chain which

16   begins with the date August 12, 2020 and the Bates number

17   ZDP 0138.

18       (Exhibit Borges 9 was marked for identification.)

19   BY MR. ALLEN:

20       Q.   And again, that's following up because I've

21   already got the date mistaken once.  This is August 12,

22   2020, so we're going back in time a little bit.

23       A.   Oh, yes.  August 2020.  Yes.

24       Q.   So I take it from your reaction that you

Farrell Court Reporting

Carmen Borges

Page 114

1  recognize this e-mail chain?

2      A.   Yes.

3      Q.   And I'll just represent for the record that it's

4  from the e-mail of my client, Zack Di Piero.  And I'm not

5  asking about that, whether you recognize his e-mail.  I'm

6  asking you whether you recognize the substance of the

7  e-mails.

8      A.   I have very familiar with that, yes.

9      Q.   And so let me make sure.  As your counsel -- he's

10 not in the room, but Jim Keller said that these Gmails go

11 from start to finish whereas Outlook e-mails go from

12 finish to start, which is unendingly confusing for us

13 lawyers.

14          What's -- can you describe what this dispute was

15 about?

16     A.   The new hires were highlighted or introduced in

17 the website.  And Sharon, who is a faculty member,

18 researcher in these areas of racism and other, she made a

19 comment in the website something about it looks like this

20 office -- or this officer looks like the type that would

21 need training, something like that.

22     Q.   Was it diversity, equity and inclusion training

23 she meant?

24     A.   It could be assumed that that's the training she

Carmen Borges

1  meant, yes.

2      Q.   I'm sure we'll get to her e-mails --

3      A.   I don't know whether she said it in specific

4  word, but that's how it was interpreted.

5      Q.   You see the second e-mail here?  Before we go on,

6  why would anyone say that about this police officer?  Do

7  you remember what he looked like, what his qualifications

8  where?  Why on Earth would they single him out as someone

9  who needed training?

10     A.   Well, that was -- that was her assessment.

11     Q.   What was your understanding of why he was

12  targeted as someone who needed training?

13     A.   I didn't have a say into it.  I just -- I just

14  address her -- her -- her comments about him.  That was

15  my -- the nature of my involvement.  Sharon Holt, the

16  professor.

17     Q.   Sharon Holt is a professor of what?

18     A.   She's the professor of -- I don't know the topic,

19  but she does research on -- on racism and -- and --

20     Q.   Okay.  And is she in the English department, by

21  any chance?

22     A.   No.

23     Q.   Okay.  And this was a listserv for all faculty at

24  Penn State?

Farrell Court Reporting

Carmen Borges

Page 116

1    A.   For all faculty.

2    Q.   Limited to Penn State Abington?

3    A.   Yes.

4    Q.   So it wasn't the whole system?

5    A.   No.

6    Q.   It was Penn State Abington?

7    A.   Just Abington.

8    Q.   Okay.

9    A.   Penn State Abington.

10    Q.   And so the second e-mail down is an e-mail by

11  Liliana Naydan, right?

12    A.   Yes, I see it.

13    Q.   Have you talked to her about what she said in

14  this discussion?

15    A.   To whom?

16    Q.   Liliana Naydan.

17    A.   No.  I didn't even know Liliana was involved in

18  this at all.  I first when I saw this e-mail is when I saw

19  her name there.  But at the time, I didn't.  It was

20  Sharon.  The issue was Sharon.  The comment was made by

21  Sharon.

22    Q.   Sure.  Do you see how she addresses Steve Bloomer

23  by his first name?  Steve, I respect you very much, but

24  Black Lives Matter.  That's not always a comfortable or

Carmen Borges

1    easy thing to say if you're a white person trying to say

2    it right.  It doesn't mean that you're always going to be

3    welcoming, but I think we need to keep saying it and

4    backing up what we say with real actions and I think it's

5    okay to feel uncomfortable by a string of e-mail messages

6    from our police because those messages are political, even

7    if they're trying to masquerade as neutral.  The messages

8    from our police have been making me uncomfortable.

9            Did I read that right?

10   A.   Yes, but I don't know what this is about.

11   Messages from our police?  I don't know what she's taking

12   about here.

13   Q.   If you look down to the next string, it says in

14   response to S. Holz's letter to the campus.  Do you see

15   that?

16   A.   Uh-huh.  It was another person.  Uh-huh.

17   Q.   That's Theresa Marie Bloom?

18   A.   Uh-huh.

19   Q.   And she says isn't the judging of another based

20   on outward appearances and experience the very definition

21   of racism?  See how she says that in the second paragraph?

22   And there's another e-mail by Steve Bloomer below that.

23   Then, there's one by Kevin Charles Cannon.  Do you know

24   who Kevin Charles Cannon is?

Farrell Court Reporting

Carmen Borges

Page 118

1      A.    Uh-uh.

2      Q.    Looks like he's a professor of chemistry at Penn

3  State Abington in his footer at the bottom of ZDP 139.  Do

4  you see that?

5      A.    Uh-huh.

6      Q.    And you see that he says so exactly what about

7  any of these officers' introductions triggered you and

8  Sharon, the assumption that someone of this, quote,

9  caliber requires antiracism and diversity training,

10  question mark?  Did I read that correctly?

11      A.    Uh-huh.

12      Q.    And he also addresses you and Sharon, right?

13      A.    Right.

14      Q.    And presumably since the e-mail below that is

15  from Liliana Naydan, he's addressing her, right?

16      A.    Sounds like it.

17      Q.    And there's a subject that says an open reply to

18  Sharon Holt on the subject line of Liliana Naydan's e-mail

19  that starts at the top of ZDP 0138.  Do you see that?

20      A.    Uh-huh.

21      Q.    Does that refer to this discussion of police

22  officers and that Sharon Holt apparently made a reaction

23  to the announcement of a police officer?

24      A.    It sounds like it.  Uh-huh.

Farrell Court Reporting

Carmen Borges

1     Q.   You skip down to the bottom of 0140, there's

2   another e-mail by Liliana Naydan addressed to Dear Kevin

3   and all.  She says the problem for me is that our country

4   is in a state of crisis because the police are killing

5   Black people, right?

6     A.   Where -- is that at the beginning or at the end?

7     Q.   It's the second sentence that begins --

8     A.   Oh, yeah.  Okay.  Must have been as a result of

9   the George Floyd incident, huh?

10     Q.   George Floyd was, of course, murdered at the end

11   of May 2020.  Am I right about that?

12     A.   Yes.

13     Q.   So this is that Covid, slash --

14     A.   Oh, yeah.

15     Q.   -- George Floyd summer?

16     A.   Yeah.

17     Q.   Do we know what I'm talking about when I say

18   that?  I mean, it's the -- it affected us all, obviously.

19     A.   Yeah, exactly.

20     Q.   Liliana Naydan talks about the police as a

21   systemic problem.  She also says in the sentence that

22   begins on the very tail end of the third line and that

23   problem has everything to do with who has power and who

24   lacks it, right?

Farrell Court Reporting

Carmen Borges

Page 120

1    A.   Uh-huh.

2    Q.   And then in the final line, she talks about

3  dismantling the racist institutions that oppress and

4  murder them and -- Black students?

5    A.   Yeah, to the George Floyd situation.  It was on

6  everybody's mind.  Uh-huh.

7    Q.   But does that clarify that Liliana Naydan was

8  participating in this conversation?

9    A.   Looks like it, yes.

10   Q.   And she was addressing Dear Kevin by name,

11 correct?

12   A.   Uh-huh.

13   Q.   And then apparently, there's a Susan Catherine

14 Owens who felt a little bit disturbed by this discussion

15 in the next one down.  If you look at the -- she addresses

16 Steve.  In her second line, she starts out a sentence on

17 that line I found this second e-mail to be very disturbing

18 and upsetting.  I will be sending Officer Lacey a personal

19 e-mail welcoming him to Penn State Abington, right?  See

20 it begins on the second line of her e-mail in the middle

21 of the line?

22   A.   Oh, yeah.

23   Q.   I found this second e-mail --

24   A.   Yeah.

Farrell Court Reporting

Carmen Borges

1    Q.   So I read that correctly?

2    A.   Yes.

3    Q.   So did you understand from her statement that she

4  did not approve of being lectured about how police are

5  somehow systemically racist or something like that?

6    A.   She clearly says she does not approve that.

7  Yeah.

8    Q.   I found one more.  And there's Karina Vardo

9  addresses Lila and Sharon, right?

10    A.   Uh-huh.

11    Q.   She addresses them by their first name, right?

12    A.   Uh-huh.

13    Q.   She talks about, quote, precariously -- excuse

14  me.  I'll just read the sentence that begins at the end of

15  the first line.  I'm seeing several claims of reverse

16  e-mail -- excuse me.  I'm seeing several claims of reverse

17  racism in this e-mail thread that precariously ignore that

18  racism is about prejudice plus institutional system power,

19  right?  And there's another e-mail by someone named Dawn

20  Michelle Kramlich?

21    A.   Uh-huh.

22    Q.   She says in the second paragraph the oppressor by

23  definition can't be the oppressed and so forth, right?

24    A.   Uh-huh.

Farrell Court Reporting

Carmen Borges

1     Q.   And she says remembering that is key, especially

2  for those of us who benefit from white privilege, right?

3     A.   Uh-huh.

4     Q.   You know what Penn State faculty mean when they

5  say white privilege?

6     A.   Having the power and the privilege and the power,

7  I guess.

8     Q.   And you said you grew up identifying as white,

9  right?

10    A.   Uh-huh.  Yes.

11    Q.   Do you feel like you had power and privilege in

12  Puerto Rico?

13    A.   I wanna say that it certainly was easier for me

14  to get ahead than if I were -- had been Black.

15    Q.   But the (unintelligible)?

16    A.   Yes.  Believe it or not, there -- there's --

17  there is racism in Puerto Rico.

18    Q.   I don't deny that.  Are you aware of any embedded

19  white privilege at Penn State?

20    A.   White privilege?  How can I answer that?  I guess

21  all the positions of powers and all the decisions are made

22  by white people at Penn State.

23    Q.   And --

24    A.   Is that a privilege of what?

Farrell Court Reporting

Carmen Borges

Page 123

1    Q.   Including by yourself?  The decisions you make

2    come from a position of white privilege in your office of

3    affirmative action?

4    A.   No, I wouldn't describe them as white privilege.

5    Q.   As an officer of the office -- or affirmative

6    action office, excuse me, if faculty members were

7    exercising their white privilege to discriminate against

8    Black employees, staff or students, you would certainly

9    address that, correct?  Did you do it in this case to

10   address the white privilege in the police department?

11   A.   Yes.  In this case, I had -- I had a conversation

12   with Sharon about -- about -- about her --

13   Q.   What did you say to Sharon?

14   A.   That this was uncomfortable, that this was

15   inappropriate.

16   Q.   You think Sharon Holt in condemning racism among

17   the police, was she exercising white privilege?

18   A.   She was exercising intellectual privilege because

19   she -- she -- that's her line of -- of research and work.

20   Q.   And presumably, she's an expert in this area,

21   right?

22   A.   Well, apparently she writes and she's -- that's

23   her field.  I didn't get into it.  She is a member.

24   She -- she writes about that, so that gave -- that gives

Farrell Court Reporting

Carmen Borges

Page 124

1  her -- I mean, we can talk about privilege or advantage.

2  That gives her that view because she -- she does research

3  and she works in those fields.

4      Q.   I mean, I don't even know if she's white or not,

5  so --

6      A.   She's white.

7      Q.   -- I suppose I should ask.

8      A.   She's white.

9      Q.   She's white?  And you would describe her

10  privilege as did you say intellectual privilege?

11      A.   Intellectual, yeah.  Knowledge privilege that the

12  common person would not have.  But in any case, we had a

13  conversation.  I -- I conveyed that that was inappropriate

14  and -- and the resolution was that she was going to

15  apologize.

16      Q.   Who did she apologize to?

17      A.   To the web -- to the web page or to the police

18  officer.  Let me see.  Was she gonna put it online or she

19  was gonna talk to him?  I think -- I remember Sharon was

20  telling me that she wanted to have a conversation with him

21  and apologize in person.  I don't know if that happened.

22      Q.   So before we move on, did you recall Professor

23  Naydan saying on -- in the e-mail that is Wednesday,

24  August 12, 2020 at 9:12 a.m. -- that's on the first page,

Carmen Borges

Page 125

1    I believe?

2        A.    First page of what?

3        Q.    The Exhibit No. 9.

4        A.    Okay.  Is this number nine?

5        Q.    Yes.  The number nine is the -- Exhibit No. 9

6    starts with the Bates stamp 0138.

7        A.    I had an eight.  So it's nine?  Okay.

8        Q.    Unfortunately, we don't have the stamps, which we

9    would have if the reporter was in person.  So she's saying

10   it's not always comfortable to talk about these topics,

11   correct?

12              MR. SMITH:  Objection to form.

13              THE WITNESS:  Where at?  On what page?

14   BY MR. ALLEN:

15       Q.    Sure.  It's the second e-mail on the Bates

16   stamped page, which is --

17       A.    140 or what page?

18       Q.    0138, the first page of Exhibit 9.

19       A.    Okay.  The first page.

20       Q.    The second e-mail.  Again, I'll read it again.

21       A.    Okay.

22       Q.    That's not always a comfortable or easy thing to

23   say if you're a white person trying to say it right.  It

24   doesn't mean that you're always going to be welcoming, but

Farrell Court Reporting

Carmen Borges

Page 126

1    I think we need to keep saying it.  Did I read that

2    correctly?

3         A.   Is this from Lila?

4         Q.   Do you see in the -- Liliana Naydan is in the to

5    line?

6         A.   Liliana Naydan.  Okay.  Steve, referring to Steve

7    or not?  Not the one to Steve?

8         Q.   She says Steve.  She addresses someone by name

9    Steve.

10        A.   Okay.  Uh-huh.  I respect you very much, but

11   Black lives do matter.

12        Q.   Incidentally, is this a microaggression to

13   address someone by their name?

14        A.   No.

15        Q.   In a critical e-mail?

16        A.   No.  It's very common.

17        Q.   Was Liliana Naydan somehow tough enough to

18   withstand this kind of being addressed by her name in this

19   e-mail exchange?

20             MR. SMITH:  Objection to form.

21             THE WITNESS:  Don't know -- for that, but it's

22   common.  I'm on departments that people call each other by

23   first names.

24   BY MR. ALLEN:


Farrell Court Reporting

Carmen Borges

1    Q.   Even when having ideas that are critical of each

2  other, right?

3    A.   Uh-huh.  Yes.

4    Q.   Do you expect faculty members to be grown up

5  enough to deal with mutual criticism like this?

6    A.   Yes.

7    Q.   Now, the point of reading that sentence was I

8  wanted to ask you this question.  By saying that's not

9  always a comfortable easy thing to say, but then she

10  follows up by saying but I think we need to keep saying

11  it, did you understand by that that Professor Naydan

12  embraced feeling uncomfortable in these conversations

13  about race?

14         MR. SMITH:  Objection to form.

15         THE WITNESS:  Wait a minute.  I'm not following

16  your line.

17  BY MR. ALLEN:

18    Q.   Sure.

19    A.   That's not always -- that's not always

20  comfortable or easy thing to say if you're a white person

21  trying to say it right.  It doesn't mean that you're

22  always going to be -- to be welcomed, but I think we need

23  to keep saying it.  Okay.  Is what it is, need to keep

24  saying it, backing up what we say.  And I think it's okay

Farrell Court Reporting

Carmen Borges

1    to feel uncomfortable by the string of e-mail messages

2    from our police officers because those messages are

3    political.

4        Q.   She thinks it's okay to feel uncomfortable,

5    right?

6        A.   Uh-huh.

7        Q.   Why did she feel it's okay to lecture someone

8    else and make them feel uncomfortable?

9             MR. SMITH:  Objection to form.

10            THE WITNESS:  Again, you have to ask her that.

11            MR. ALLEN:  Let me introduce Exhibit 10, which

12   will be a document.  It's Bates stamp ZDP 175.

13   (Exhibit Borges 10 was marked for identification.)

14   BY MR. ALLEN:

15       Q.   Again, these are more e-mails, this one by Sharon

16   Holt, right?  This is part of that same discussion?

17       A.   Uh-huh.  Our own healing, our own racial healing.

18   I mean, this is -- this is where the George Floyd trauma

19   comes in.

20       Q.   Sure.  And this is Sharon Holt.  Do you think

21   this is part of the apology that you referring to?

22       A.   My -- this may be part of it, but my

23   understanding was that she wanted to apologize in person

24   to the officer.

Farrell Court Reporting

Carmen Borges

Page 129

1    Q.   Okay.  I wanted to ask you a question about this.

2  She circulates some resources, right, at the bottom of her

3  message?

4    A.   Sharon, we have work to do.  Where?  Oh, here --

5    Q.   Here are some blue links?

6    A.   Yeah, under her -- her name.

7    Q.   And one of them is embracing discomfort in equity

8  work, right?

9    A.   Conversation with white people about -- yeah.

10   Q.   Right.  One is a conversation with white people

11 about race, correct?

12   A.   Uh-huh.

13   Q.   Any indication that Sharon Holt was interesting

14 in having -- interested in having a conversation with

15 Black people about race at all?

16       MR. SMITH:  Objection to form.

17       THE WITNESS:  This may happen in her line of

18 research, also.

19 BY MR. ALLEN:

20   Q.   So is your answer no to my question?

21   A.   I have no knowledge of that.

22   Q.   So although you testified that you're not sure if

23 this was her apology, you are testifying that this was

24 part of that exchange about the police officers, right?

Carmen Borges

Page 130

1    A.   Yes.

2    Q.   You can put that one aside.  I'll introduce this

3  as Exhibit 11.

4    (Exhibit Borges 11 was marked for identification.)

5  BY MR. ALLEN:

6    Q.   This will be Bates stamped on the first page PSU

7  2415.  This is also from that same exchange of August 12,

8  2020.  Incidentally, you would agree that my client, Zack

9  Di Piero, was subordinate to Liliana Naydan in the

10  program?

11    A.   Yes.

12    Q.   'Cause she had power over him, right?

13    A.   She had -- she was a coordinator.  She didn't do

14  his evaluation and she didn't have anything to do with his

15  pay increases or his evaluation.  So if you consider

16  power, that's where the power is.  The others, she was

17  coordinating the programs.

18    Q.   Did she have more or less authority than Zack Di

19  Piero in the program?

20    A.   I think she had more.  As a coordinator, she had

21  more.

22    Q.   So by her definition, isn't it only possible for

23  her to discriminate against Zack, not vice versa 'cause

24  she has the authority, he doesn't?

Farrell Court Reporting

Carmen Borges

Page 131

1          MR. SMITH:  Objection to form.

2          THE WITNESS:  Yeah.  That would -- that would

3    be -- that's what she -- could also be arguing that she's

4    a female and he's a male, and there's a power dynamic with

5    genders also.

6    BY MR. ALLEN:

7          Q.   So again, here's an e-mail in this thread

8    about -- sort of picks up with an e-mail we've already

9    seen on 02416, page PSU 02416.  You see where Liliana

10   Naydan circulates the e-mail Steve, I respect you very

11   much, but Black Lives Matter, right?  Then, there's so

12   exactly what about any of these officers introductions

13   triggered you and Sharon, right?

14         A.   Uh-huh.

15         Q.   And I don't really wanna dwell on those things.

16         A.   I think there's -- this was in the other one.

17   Uh-huh.

18         Q.   But there's a new thread that begins on page

19   2415, as sometimes happens in lengthy threads, right?

20   Kevin Charles Cannon says all racism is wrong, right?  You

21   see where he says that in the e-mail of August 12, 2020 at

22   10:06 a.m.?

23         A.   It's in the first --

24         Q.   If you look at --

Farrell Court Reporting

Carmen Borges

Page 132

1    A.   They both look the same.

2    Q.   I'm just gonna indicate for the --

3    A.   Yeah.  Okay.  So who's writing?  Who's writing

4  here?

5    Q.   Well, it says -- I'm just indicating for the

6  witness Kevin Charles Cannon, right?  And this says Kevin

7  Charles Cannon as the footer --

8    A.   Okay.

9    Q.   -- correct?  So he's saying all racism is wrong,

10 right?

11   A.   Uh-huh.

12   Q.   Is that something you agree with, Ms. Borges?

13        MR. SMITH:  Objection to form.

14        THE WITNESS:  Yeah, I would -- I would agree, but

15 we have to remember the component of power, where the --

16 who holds the power.

17 BY MR. ALLEN:

18   Q.   And again, Liliana Naydan responds to him by

19 name.  Hi, Kevin, right?

20   A.   Uh-huh.

21   Q.   I don't think reverse racism exists since Black

22 people don't have power over white people in the U.S.,

23 right?

24   A.   Yeah.  That's what --

Farrell Court Reporting

Carmen Borges

Page 133

1     Q.    And she again addresses him directly by name,

2  right?

3     A.    Uh-huh.

4     Q.    Is that a microaggression?

5     A.    No.

6     Q.    And you receive no complaint that Liliana Naydan

7  was so fragile for whatever reason she couldn't be

8  addressed by name in a contentious conversation with

9  faculty members, right?

10    A.    No.

11    Q.    What did the cop look like who they were talking

12  about, Officer Lacey?

13    A.    I think there was a picture of him somewhere

14  circulated.

15    Q.    I don't think it's any of these exhibits.  But

16  you can recall what he looked like, right?

17    A.    Yes.

18    Q.    Can you describe it for the record?

19    A.    White, heavy -- heavy set.

20    Q.    Middle aged, would you say?

21    A.    Uh-huh.

22    Q.    I'm gonna mark as Exhibit 12 for the record an

23  e-mail exchange with Bates number ZDP 0181.  It's also

24  dated August 12, 2020.

Farrell Court Reporting

Carmen Borges

1        (Exhibit Borges 12 was marked for identification.)

2   BY MR. ALLEN:

3        Q.   Now, if we go to the bottom -- well, let's start

4   at the top since they go in chronological order.  Do you

5   remember this e-mail?

6        A.   I never saw this e-mail.

7        Q.   Do you know who Andy is who's signing this

8   e-mail?

9        A.   Yes.  He's now the interim chancellor.

10       Q.   When you say now, you mean August 12 --

11       A.   No, no.  At that time, he was academic affairs

12   person.

13       Q.   You see how the header of this e-mail says from

14   the office of the interim chancellor?

15       A.   Oh, so okay.  So he was by then.  Okay.

16       Q.   So he was acting as interim chancellor at this

17   time?

18       A.   In 2020?  As interim chancellor now.

19       Q.   And my purpose --

20       A.   Oh, well.  It says from the office.

21       Q.   Well --

22       A.   Now.

23       Q.   Yeah.  We can go into who the interim chancellor

24   is when they are and not when they're not.  So this, he

Farrell Court Reporting

Carmen Borges

1    writes about planning a forum to continue the conversation

2    around these issues.  See at the bottom there?

3         A.   Plan a forum.  Yeah.  Uh-huh.

4         Q.   Did your office assist in planning those forums?

5         A.   No.

6         Q.   Do you know what the content was?

7         A.   Not at all.  Don't know.

8         Q.   Did you talk with Andrew August about anything

9    concerning the police officers' introduction?

10        A.   No.

11        Q.   So I wanted to call your attention to this e-mail

12   by Michael Joseph Harty that followed.  You see that?

13        A.   Uh-huh.

14        Q.   Have you seen this e-mail before?

15        A.   No, I have not seen this before.

16        Q.   I'm just gonna call your attention to the second

17   to last paragraph of Mr. Harty's e-mail.  It starts the

18   leadership of this university.  Do you see that?

19        A.   The second page or the first page?

20        Q.   It's the second to last paragraph of his e-mail.

21        A.   Okay.

22        Q.   It says the leadership of this university sends

23   out e-mails all the time about, open quote, when you see

24   something, say something, close quote, ethics being

Farrell Court Reporting

Carmen Borges

Page 136

1   protected by the, quote, whistleblower law and reporting a

2   hostile and toxic work environment.  Well, I am starting

3   to feel very uncomfortable with the posts that I have seen

4   this morning and continue to see, and I feel the Abington

5   campus may be coming dangerously close to the textbook

6   definition of a, quote, hostile and toxic, close quote,

7   work environment.

8           Did I read that correctly?

9      A.   Yes.

10     Q.   Does that indicate to you that other people were

11  feeling that the conversation on race in which Professor

12  Naydan was participating as a prominent member was

13  creating a hostile environment at Penn State?

14          MR. SMITH:  Objection to form.

15          THE WITNESS:  I don't see that.

16  BY MR. ALLEN:

17     Q.   It's the job of your office to investigate

18  complaints like this, right?

19          MR. SMITH:  Objection to form.

20  BY MR. ALLEN:

21     Q.   It's the job of your office to investigate

22  allegations like this, right?

23     A.   I guess it should be, but I don't -- the only

24  moment in our office was to deal with Sharon, talk to

Farrell Court Reporting

Carmen Borges

Page 137

1    Sharon who was the one that -- that put the comment.

2         Q.   And you never reached out to Michael J. Harty,

3    right?

4         A.   No.  I had never seen this -- this communication.

5         Q.   Let's -- one more on this line of questioning.

6    Incidentally, do you remember a Black cop who was

7    introduced in the same time period -- a Black police

8    officer, let me put it this way?

9         A.   In a same listserv, introducing to the list?  I

10   believe so.  I vaguely believe that there was.

11        Q.   Were there any complaints about the Black police

12   officer needing, quote, antiracism training?

13        A.   No.

14        Q.   There were only complaints about a middle aged,

15   overweight white cop needing antiracism training, correct?

16        A.   I think it had a lot to do with how he described

17   his allegiance or his job description.

18        Q.   Do you have any knowledge that this white police

19   officer, Mr. Lacey, had ever engaged in racist behavior

20   towards Black people?

21        A.   I have no knowledge.

22        Q.   Did anyone bring up any evidence at the time that

23   he had done anything concretely to discriminate against

24   Black people?

Farrell Court Reporting

Carmen Borges

Page 138

1      A.    No.

2      Q.    In your entire history of working for Penn State,

3  have you ever even heard of a police officer murdering a

4  Black student on campus?

5      A.    No, I never heard that.

6      Q.    Off campus?

7      A.    Off campus University Park, yes, there was an

8  incident of a murder.

9      Q.    Where a police officer murdered a Black student?

10     A.    Uh-huh.

11     Q.    What happened?

12     A.    They were going to detain him for, um, what do

13  you call this about taking somebody for care, mental care.

14     Q.    A civil commitment?

15     A.    Yeah.  There's --

16     Q.    That he was going to be committed to the hospital

17  because of a psychiatrist condition?

18     A.    Apparently, he had some issues and he had family

19  had been -- had reported him not being -- not being able

20  to contact him.  And then, the police went to the door to

21  knock on the door, whatever happened there.  He came out

22  aggressively, and a police officer shot him in the hall

23  right there at the residence hall.

24     Q.    Was that determined to be a murder?

Farrell Court Reporting

Carmen Borges

1    A.    I don't know how legally it worked out.

2    Q.    Obviously, it's a tragedy.

3    A.    Yes.

4    Q.    Even if someone is killed lawfully in the course

5    of duty, it's disheartening, right?

6    A.    Uh-huh.

7    Q.    A --

8    A.    It's happening all the time.  I mean --

9    Q.    But you know of no evidence that found the police

10   officer at Penn State guilty of murdering this man in cold

11   blood?

12   A.    I'm not aware of the verdict on that case.

13         MR. ALLEN:  Can we go off the record, please?

14              (A break was held.)

15   BY MR. ALLEN:

16   Q.    Ms. Borges, do you remember in September of 2021

17   Zack Di Piero submitted a complaint to your office?

18   A.    Yes.

19   Q.    What was that complaint about?

20   A.    About a topic -- about a topic of the discussion

21   in program meetings based on a presentation done by a

22   researcher in the area.  He had done a presentation at a

23   conference, and then that was followed up with it being

24   the topic for discussion in that English program.

Farrell Court Reporting

Carmen Borges

Page 140

1    Q.   Do you remember what program you're talking

2  about?  You said in the program.  What were you talking

3  about?

4    A.   Asao Inoue.  Asao Inoue.

5    Q.   That's the name of the scholar.

6    A.   That's the name of the scholar who did a

7  presentation, a program.  I don't know exact when, but

8  Lila certainly did.  And then, Lila wanted to pick up on

9  that topic and use it for discussion among the faculty.

10   Q.   Why did my client, if you know, complain about

11 this presentation by Asao Inoue?

12   A.   Because of the -- of the -- of the labeling or

13 the topic of the presentation.

14   Q.   What was the labeling?

15   A.   It was like, you know, white people are a problem

16 or whatever dramatic or drastic topics or headlines.

17 Uh-huh.

18   Q.   Do you remember any of the other headlines?

19   A.   White people are a problem.  If you're in front

20 of a classroom and you're a white person, that's a

21 problem.  Yeah.

22   Q.   About how many of these headlines were there that

23 were presented in this -- what did you -- first of all,

24 what was this series of things?

Farrell Court Reporting

Carmen Borges

1      A.   They were meeting discussions of topic -- topics

2   for the English topic discussions.

3      Q.   For the English program?

4      A.   For the English program.

5      Q.   In which both Liliana Naydan and my client, Zack

6   Di Piero, were professors, right?

7      A.   Exactly.

8      Q.   And about how many of these headlines, if you

9   remember, were there?

10     A.   Three.

11     Q.   And just for the record, I wanted to spell Asao

12   Inoue.  I know his name 'cause it's not intuitive.

13   A-S-A-O.  His last name I-N-O-U-E; is that correct?

14     A.   Uh-huh.

15     Q.   And how did you get the complaint from Zack Di

16   Piero?

17     A.   He filled out a form, completed a form and send

18   the form, yeah.

19     Q.   Was that part of the normal channels for

20   submitting a complaint --

21     A.   Yeah.

22     Q.   -- at Penn State Abington?

23     A.   Yes.

24     Q.   Anywhere --

Farrell Court Reporting

Carmen Borges

Page 142

1      A.    In the system.

2      Q.    And what happened next?

3      A.    I contacted him about it, that we had received it

4  and that we needed to discuss it further and we scheduled

5  a meeting.

6      Q.    Did that meeting take place?

7      A.    Yes.

8      Q.    Do you remember the date, by any chance?

9      A.    Let's see.  That was in September that he file,

10  so it would have been maybe September or somewhere around

11  there.

12      Q.    And what did you discuss in that meeting?

13      A.    What his issues were, why he -- what was the

14  problem.  What was the concern he had with that topic.

15      Q.    What did he say his concern was?

16      A.    He felt personally attacked.

17      Q.    Why?

18      A.    Because he's white and he's talking about white

19  people being whatever.  What's the word?  I'm drawing a

20  blank here.  White people being a problem.

21      Q.    All white people?

22      A.    Well, it's phrased white people, so it can be

23  understood to mean all white people.

24      Q.    And did you tell him it was about the white race?

Carmen Borges

Page 143

1       A.    Yeah.

2       Q.    In that meeting?

3       A.    Yeah.  We talk about that, that it's refer

4    generally to the white race.

5       Q.    And in your experience an as officer of the

6    affirmative office, has anyone ever given a series of

7    presentation about how Black people are a problem on

8    campus?

9       A.    I can't -- I can't -- I can't think of that.

10      Q.    If a teacher was lecturing in a classroom about

11   how Black people are the problem at Penn State Abington,

12   would you expect to get complaints in your office?

13      A.    Probably.

14      Q.    What would you do about those complaints?

15      A.    You know, question what's the problem.  What are

16   you talking about?  What issues do you have?

17      Q.    Do you recall telling Zack Di Piero that you are

18   an academician, you are at a university and you are, you

19   know, a professor.  So, you know, that doesn't mean you

20   have to be convinced.  It only means you have to give

21   yourself the opportunity to see what's the perspective

22   here.  Do you recall saying that to him?

23      A.    Yes.

24      Q.    And do you recall him asking you if it was

Farrell Court Reporting

Carmen Borges

Page 144

1    discrimination if there was a pattern month after month

2    and there were numerous examples of being subjected to

3    programming indicating that the white race was somehow a

4    problem?

5         A.   Well, they were programs.  I don't know if they

6    were that many, but that was the topic of the -- of the

7    semester.

8         Q.   Do you remember Professor De Piero complaining at

9    that time in the meeting in September 2021 that month

10   after month he was being exposed to this stuff?

11        A.   I don't know if month after month, but he said he

12   was being exposed to it.  I think if it was month after

13   month because those meetings are not that frequently.  But

14   the fact that he had -- he felt that he -- he didn't agree

15   with that and that he was -- he didn't understand it.  He

16   didn't understand that message from that researcher or the

17   paper that researcher wrote.  He didn't understand it at

18   all and --

19        Q.   Is it fair to summarize what he was saying is

20   that he was feeling harassed by the constant exposure to

21   the material of this nature?

22        A.   No, it's not fair because it was a voluntary

23   meeting.  He did not have to be part of it.  He did -- he

24   did not have to be part of it.  He just felt uncomfortable

Farrell Court Reporting

Carmen Borges

Page 145

1    just by the fact that it was being discussed, that it was

2    being brought to the -- to the department.

3         Q.   You've already testified that Professor Naydan

4    had authority over Zack Di Piero, correct?

5              MR. SMITH:  Objection to form.

6              THE WITNESS:  She was the coordinator, but things

7    were coordinated with participation and -- and input from

8    the rest of the faculty.  It wasn't that her only

9    imposition or position.

10   BY MR. ALLEN:

11        Q.   If someone was harassing a Black professor, would

12   it be an excuse to say well, he didn't have to come to the

13   meeting?

14             MR. SMITH:  Objection to form.

15             THE WITNESS:  Nobody has to go to this.  Those

16   meetings were voluntary.  They didn't have -- people

17   didn't have to participate.

18   BY MR. ALLEN:

19        Q.   That's not my question.  I said if someone was

20   harassing a Black professor in a meeting, would it be an

21   excuse for the person harassing the Black professor that

22   the Black professor didn't have to be there?

23             MR. SMITH:  Objection to form.

24             THE WITNESS:  Whose decision would it be for the

Farrell Court Reporting

Carmen Borges

Page 146

1  Black professor to be there or not?  Not the other --

2  BY MR. ALLEN:

3      Q.   It's a voluntary meeting, right?

4      A.   It's a voluntary meeting.

5      Q.   So it's okay to harass Black people if the

6  meeting's voluntary?

7          MR. SMITH:  Objection to form.

8  BY MR. ALLEN:

9      Q.   Would that be okay at Penn State?  This is on

10 record.  You're testifying.

11     A.   You know, I am trying to --

12     Q.   You're testifying as someone who enforces the

13 affirmative action policies at Penn State.

14     A.   But I'm trying to make sense of your question.

15 What is it that you're asking?

16     Q.   Well, you said it's not harassment of my client

17 because the meeting was voluntary, right?

18         MR. SMITH:  Objection to --

19         THE WITNESS:  I mean, it's voluntary to all the

20 faculty that wanna go discuss that topic.

21 BY MR. ALLEN:

22     Q.   So what my question is --

23     A.   Uh-huh.

24     Q.   If a Black professor was there and he was being

Farrell Court Reporting

Carmen Borges

1   harangued as the problem, the Black professor is the

2   problem, would it be okay because it was just a voluntary

3   meeting?

4          MR. SMITH:  Objection to form.

5          THE WITNESS:  If you're individually targeting a

6   person, yes.  That's -- that's a different situation if

7   you're targeting a specific person.  But if you're

8   discussing about a Black race, it's -- it's not a specific

9   to that individual.  It's not specific to that particular

10  Black faculty.

11  BY MR. ALLEN:

12     Q.  But clearly, you would agree with me that if I

13  started saying Puerto Ricans are the problem in this

14  meeting, which I certainly do not agree with, you would

15  feel personally offended by that, correct?

16         MR. SMITH:  Objection to form.

17         THE WITNESS:  Not necessarily.  I would wanna

18  know what -- why are you saying that.  What's -- you know,

19  what are the problem.  Why are you saying that?

20  BY MR. ALLEN:

21     Q.  So it would be natural for someone in that

22  situation to ask questions critical of the content of such

23  a ridiculous statement, correct?

24         MR. SMITH:  Objection to --

Farrell Court Reporting

Carmen Borges

Page 148

1              THE WITNESS:  And that was -- exactly.  And that

2    would have been the purpose of what I was, you know,

3    thinking is if that's the purpose of those meetings, let's

4    get to the what is -- what's the message here and what do

5    we need to learn from this.  What is the message?  Let's

6    unpack this message.  Beyond the titles, the shocking

7    titles, what is it that we as writing professionals need

8    to -- need to -- need to be discussing and learning.  That

9    was the purpose of those meetings.

10   BY MR. ALLEN:

11        Q.   And you encouraged Professor De Piero to go to

12   the meetings and engage with them critically, right?

13        A.   I said that's one option he had if he didn't

14   understand what was going on.  He did not understand the

15   topic.  He did not agree with it.  He didn't understand

16   it.  Getting beyond the shocking titles, there is a

17   message here for writing -- for writing professionals.  So

18   maybe you should go and question what is the message.

19   What do I need to be considering or looking at

20   differently?  That's a critical involvement.

21        Q.   And he should do that until he understood it,

22   right?

23        A.   I never said until he understood it.  I said

24   until you -- you get your answers.

Farrell Court Reporting

Carmen Borges

Page 149

1    Q.   So you said until you get your answers or at

2   least to that effect or until you get the perspective,

3   something to that effect?

4    A.   You know, it's -- it's -- being in academia for

5   me and -- and from I wanna say from other generations,

6   communication and freedom of speech and freedom of -- it's

7   a right that you have.  You need to -- you need to

8   understand concepts.  You need to -- you need to know what

9   is it that it's talking about before attacking them

10   because you need to understand it.  So it was for him

11   totally within his right to go and clarify what is -- why

12   are we discussing this within our writing program?  What

13   is it that we need to be doing differently, changing or

14   whatever.

15        What's the message here?  That was the big

16   mystery in all of the topics there.  What do we need to be

17   learning?

18    Q.   And it was your impression that Zack Di Piero

19   didn't understand Asao Inoue?

20    A.   He -- he -- he didn't agree and didn't wanna go

21   beyond that, yeah.  He didn't wanna go beyond an academic

22   discussion.

23    Q.   You know whether Liliana Naydan by having these,

24   quote, discussions was trying to implement this as a

Farrell Court Reporting

Carmen Borges

1   program in the writing department?

2           MR. SMITH:  Objection to form.

3           THE WITNESS:  No, I have no knowledge of

4   implementing it.  It's -- it was -- it was an

5   educational -- educational discussions about ways to do

6   things differently.  What my understanding had been was

7   that somebody had said or there was knowledge that the

8   minority students or the multicultural students were

9   failing entire -- so it's what do we need to be doing

10   differently to reach that population and address it.  That

11   was the gist of -- of having those type of discussions.

12   BY MR. ALLEN:

13       Q.   And just backing up and asking a question again,

14   is it your understanding that my client, Zack Di Piero,

15   didn't understand Asao Inoue because he didn't agree with

16   him?

17           MR. SMITH:  Objection to form.

18           THE WITNESS:  Not because he didn't agree.  He

19   didn't wanna -- he didn't want to go beyond.  Yeah.  He

20   didn't want -- he was opposing that topic within the

21   writing program.

22   BY MR. ALLEN:

23       Q.   Do you think he might have opposed it because he

24   did understand Asao Inoue?

Farrell Court Reporting

Carmen Borges

Page 151

1      A.   He -- the topic was -- I mean, if you go to the

2   meeting and engage in conversation and put your -- your

3   views across and see what comes out of it, you know,

4   and --

5      Q.   Does that include asking critical questions?

6      A.   Of course.

7      Q.   So Zack Di Piero had the right to ask critical

8   questions of every one of those meetings?

9      A.   Absolutely.

10      Q.   And just because they were voluntary didn't

11   divest him of that --

12      A.   No.

13      Q.   -- right?

14      A.   He had a right to clarify, criticize, oppose, get

15   feedback.  I mean, that's what the whole thing was about

16   or the idea of it.

17      Q.   And raising critical questions like that couldn't

18   be considered a microaggression, right?

19           MR. SMITH:  Objection to form.

20           THE WITNESS:  It depends on -- on how you do it.

21   BY MR. ALLEN:

22      Q.   How would you recommend to Professor De Piero

23   that he raise critical questions in these meetings

24   organized by Liliana Naydan?

Farrell Court Reporting

Carmen Borges

Page 152

1      A.   Well, like anybody else in that group that was --
2   that were discussing the topic.  That's -- you know,
3   people were there open to give examples, give ideas,
4   discuss things.
5      Q.   Would it be proper to engage the actual text,
6   like quote it?
7      A.   Say that again?
8      Q.   Would it be proper to engage the actual text by
9   quoting it?
10          MR. SMITH:  Objection to form.
11          THE WITNESS:  Engage meaning?
12   BY MR. ALLEN:
13      Q.   Sure.  Strike that question.  This is a perfect
14   example of asking me when I'm not clear.
15          Would a proper question, a proper critical
16   question in these meetings organized by Liliana Naydan
17   have been to read the text closely by Asao Inoue that has
18   been provided by Liliana Naydan?  Would that be proper?
19          MR. SMITH:  Objection to form.
20          THE WITNESS:  Well, the meeting had an agenda and
21   had some books, specific books to discuss.  That was not a
22   meeting for it -- you know, it was pretty structured
23   with -- with the topics for discussions, with ideas to
24   share -- share opinions and ideas about ways of doing,

Farrell Court Reporting

Carmen Borges

Page 153

1    treating students or whatever.

2    BY MR. ALLEN:

3        Q.    So to read that text, would that be

4    inappropriate?  To read that text in the meeting, is that

5    inappropriate?

6        A.    Not to read the text, no, to question the text

7    and ask questions.

8        Q.    After you review it?

9        A.    That's what he should do, and that's what the

10   meetings -- the meetings were for to share information and

11   ask questions and share.  Yeah.

12       Q.    If you ask questions that other members of the

13   audience said they found interesting, would that be an

14   indication that the program was functioning as you would

15   want an academic program to function?

16       A.    If you provide examples of what you do or the

17   faculty?

18       Q.    If another faculty member in that meeting

19   expressed the view that Zack's questions were interesting,

20   does that somehow indicate that they were inappropriate?

21       A.    No.

22       Q.    It indicates the opposite, right, that they were

23   good questions, correct?

24       A.    It could have been.  It's -- it's just how the

Farrell Court Reporting

Carmen Borges

1   questions were being phrased and asked.  That's a matter

2   of how.

3      Q.   How would they be phrased and asked in a way that

4   indicated they weren't proper?  Give me -- give me

5   examples of what you would expect to be improper ways of

6   asking these questions.

7      A.   Well, if you go back to the -- to my

8   investigation of that matter, when I interview the rest of

9   the people that were there, everyone there was reported

10   that the tone and manner was very inappropriate.

11      Q.   Including Matt Rigilano?

12      A.   In many witness, everybody -- everybody agree

13   that it was a tense meeting.  Zack was injecting himself

14   and not waiting for other people to give an answer,

15   insisting he wanted Lila to answer him, answer his

16   question, so that came across.  I mean, that's what I

17   heard from the people at the meeting.

18      Q.   Is it wrong to insist that someone answer your

19   question when you ask them a direct question?

20      MR. SMITH:  Objection to form.

21      THE WITNESS:  It depends how you do it.  Again,

22   it depends.

23   BY MR. ALLEN:

24      Q.   What does it depend on?

Farrell Court Reporting

Carmen Borges

1       A.    It depends on tone and manner.

2       Q.    What should his tone have been if he asked direct

3    questions of Liliana Naydan --

4       A.    Collegial --

5       Q.    -- who assigned the reading?

6       A.    Collegial and more engaged and collegial, not --

7    not come across like -- like what he was reported that

8    came across like -- like -- like upset, angry and -- and

9    aggressive.  That's how it was described.

10       Q.    What did you learn from your investigation?

11    Incidentally, when you say that manner, you're talking

12    about the August 18th meeting in which they discussed

13    something like beyond the color blind classroom, white

14    professors confront white privilege, something of that

15    nature?

16       A.    Yeah.

17       Q.    And there was a complaint filed against my client

18    by Liliana Naydan and Grace Lee-Amuzie directly after

19    that?

20       A.    Exactly.

21       Q.    Okay.  And so in your investigation, what did it

22    reveal about the, quote, tone?  How did Zack Di Piero

23    express the tone of anger?

24       A.    Like he posed a question.  And somebody would --

Farrell Court Reporting

Carmen Borges

1   would wanna make a comment about it or answer him, that he

2   would say no, I'm asking Lila.

3       Q.   He would say it in that tone of voice?

4       A.   Uh-huh.  That's what I heard from the witnesses.

5   I'm asking Lila.  I want Lila to respond to me.

6       Q.   And Lila Naydan and Grace Lee-Amuzie assigned the

7   reading, right?

8       A.   It was distributed.  Yeah, it was distributed

9   ahead of time, but they were, yeah.  I guess -- I don't

10  know if it was an agreement amongst all of the faculty

11  there whether they agree, but it was a pretty structured

12  meeting.  There was some -- some rules of behavior of all

13  that.  It was pretty structured, and the topics.

14      Q.   And did you find in your investigate that Zack

15  had raised his voice?

16      A.   I heard from -- from the witnesses that his tone

17  was angry and -- and hostile, yes.

18      Q.   And that's -- that's not in compliance with Penn

19  State's rules?

20      A.   That is not in compliance with collegiality and

21  respect.

22      Q.   Is it respectful to run around submitting

23  complaints particularly about your fellow faculty member?

24  Is that respectful?

Farrell Court Reporting

Carmen Borges

Page 157

1              MR. SMITH:  Objection to form.

2              THE WITNESS:  It doesn't have anything to do with

3    respect in the sense that I'm thinking.  No.

4    BY MR. ALLEN:

5         Q.   I'm gonna mark as Exhibit 13 a document with the

6    Bates number on the first page PSU 2572 dated September

7    13, 2021.

8         (Exhibit Borges 13 was marked for identification.)

9    BY MR. ALLEN:

10        Q.   It's rather long.  Do you recognize this

11   document?

12        A.   Yes.

13        Q.   What is this document?

14        A.   This was Zack's complaint.

15        Q.   And it came in on September 13, 2021?

16        A.   Yes.

17        Q.   Can you just describe what this format is?  Just

18   describe the nature of the complaint document, if you

19   could.

20        A.   This is a form, basically our office form.

21        Q.   Is this submitted online by the complainant?

22        A.   Uh-huh.

23        Q.   I'm going to mark as Exhibit 14 some more

24   handwritten notes.

Farrell Court Reporting

Carmen Borges

1      (Exhibit Borges 14 was marked for identification.)

2   BY MR. ALLEN:

3      Q.   These are dated September 22, 2021.  And again,

4   this is Exhibit 14 for the record.  Are those your notes?

5      A.   Yes.

6      Q.   Ms. Borges?

7      A.   Yes.

8      Q.   And this is dated September 22, 2021, right?

9      A.   Uh-huh.  Yes.

10      Q.   Was this the day of your discussion with Zack Di

11   Piero in connection with this complaint?

12      A.   It sounds like it, yes.

13      Q.   And of course, at the bottom of the first page,

14   it discusses his complaint that he's being subjected to

15   program -- writing program meetings in which are titled

16   things like white faculty are a problem, right?

17      A.   Yes.  That was one of them.  I think then there

18   must have been once a month.  Next month's writing program

19   agenda.

20      Q.   And it says next month's writing program agenda

21   is on, quote, white privilege in the classroom, right?

22      A.   Yes.

23      Q.   And here, it says he does not agree, you say, or

24   understand the topic of the agenda, right?  Is there

Farrell Court Reporting

Carmen Borges

Page 159

1    anything in these notes that you now think is inaccurate?

2         A.   What I -- what I could not understand is his

3    level of hostility and anger towards the topic and his

4    resistance to -- to -- to -- to discuss it or to -- or to

5    see, you know, what was this about.

6         Q.   Were you aware that he engaged with the work of

7    Asao Inoue as a scholar of writing?

8         A.   No, I wasn't aware of that.

9         Q.   He does have a Ph.D in writing composition,

10   right?

11        A.   Yeah.  I'm aware of that.

12        Q.   In fact, at the beginning of your notes, you say

13   he has a Ph.D, right?

14        A.   Uh-huh.  Yes.

15        Q.   When did you get in contact with Liliana Naydan

16   about this complaint?

17        A.   A month?  I don't remember.  I don't remember.

18        Q.   Mark as Exhibit 15 an e-mail thread with the

19   Bates number PSU 03236.  It's dated October 15, 2021, the

20   lead e-mail.

21   (Exhibit Borges 15 was marked for identification.)

22             MR. ALLEN:  I'm sorry.  Did I give you the wrong

23   one?

24             MR. SMITH:  Which one --

Farrell Court Reporting

Carmen Borges

1          MR. ALLEN:  Can I have that one back?  This is

2     the wrong e-mail.  I apologize.

3          THE WITNESS:  Yeah.

4     BY MR. ALLEN:

5     Q.   I pulled up the wrong e-mail.  So what I read

6     into the record is correct.  This is a document with Bates

7     number PSU 3236.  It's dated, but I got the date wrong.

8     That was the other one.  This is October 12, 2021.

9          Do you see that in the header to this e-mail?

10    You recognize this e-mail, Ms. Borges?

11    A.   I --

12    Q.   And does this help refresh your memory about when

13    you scheduled a meeting with Liliana Naydan?

14    A.   It sounds like, yeah, that's what I was after to

15    schedule a meeting with her.

16    Q.   In this e-mail?

17    A.   That's what it says.

18    Q.   And were you able to schedule that meeting?

19    A.   I would like to discuss this with you.

20    Q.   Uh-huh.

21    A.   Okay.

22    Q.   Were you able to discuss that in the meeting with

23    Professor Naydan?

24    A.   I don't recall that.  I don't recall that.

Farrell Court Reporting

Carmen Borges

1    Q.    And you also say in this e-mail --

2    A.    I'm contacting her to discuss this.  Uh-huh.

3    Q.    You also say no need to worry, correct?

4    A.    Yeah.

5    Q.    So already in contacting Professor Naydan, you

6    indicated to her that there was nothing to worry about,

7    right?

8    A.    Um, let's see why I said that to her.  I think

9    she was out sick at the time.  I think Friederike may have

10   told me that she was out sick, some -- yeah.  I'm not

11   clear, but --

12   Q.    In fact, nothing did happen to her about Zack's

13   complaint, right?  What's your answer?

14   A.    No.

15   Q.    No, nothing happened?

16   A.    No.

17   Q.    I'm sorry?

18   A.    Nothing happened because she wasn't -- she wasn't

19   directing anything at him.  This was an academic

20   discussion of -- of an important social problem.

21   Q.    Is it what Penn State would call a national

22   dialogue on race?

23   A.    No, no.  I don't know if that was a thing going

24   on or what.

Carmen Borges

Page 162

1    Q.   I'm gonna mark as Exhibit 16 an e-mail thread

2  with the Bates number ZDP 055, and this one is dated

3  October 15, 2021.

4    (Exhibit Borges 16 was marked for identification.)

5  BY MR. ALLEN:

6    Q.   Do you recognize this e-mail thread?

7    A.   Yes.

8    Q.   And at this time, October 15, 2021, it's over a

9  month since Zack submitted his complaint, right?  You'd

10  like to schedule a time to discuss with him where you are

11  in that investigation, right?

12    A.   Uh-huh.

13    Q.   That's the only investigation at that time

14  involving Zack Di Piero, correct?

15    A.   It's his complaint.

16    Q.   Dating back to September --

17    A.   The one in September.  Uh-huh.

18    Q.   And that was the complaint submitted as -- you

19  discuss some times to meet.  Later, he sends you some

20  additional information.  But we're into later in October,

21  right?  Also interestingly, I'm just gonna direct your

22  attention to the last e-mail in the thread.  You see

23  there's some attachments there?

24    A.   Yes.

Farrell Court Reporting

Carmen Borges

1    Q.   This wasn't the first time you had heard about

2  this?

3    A.   Well, not these other ones you included here,

4  huh?  Yeah.  But the issue of the police officer?

5    Q.   Yes.  These attachments are --

6    A.   Yeah.

7    Q.   -- to the police officer introduction and an open

8  reply to Sharon Holt, right?

9    A.   Uh-huh.

10    Q.   I'm not asking you to testify about those

11  attachments 'cause they're not included in this exhibit,

12  so just to be clear for the record.  But they refer to an

13  incident involving Sharon Holt and police officer

14  introductions, right?

15    A.   Yeah.

16    Q.   But this isn't the first time you had heard about

17  the police officer introductions?

18    A.   No.

19    Q.   Incidentally, did you schedule an actual meeting

20  to discuss his complaint with him after this October 15th

21  e-mail?

22    A.   Yes, because there are some times here that he

23  offers, so we must have -- yes, we must have had a -- we

24  must have scheduled a meeting.  That was the purpose of

Farrell Court Reporting

Carmen Borges

1    the communication.

2        Q.   Do you know which one of those dates you had a

3    meeting with Zack about his complaint?  Not what happened

4    afterwards, but his complaint?

5        A.   Is there an e-mail about that?  No?  But I did --

6    I did meet with him.

7        Q.   Okay.

8        A.   Uh-huh.

9        Q.   So it's your testimony today that you met with

10   him about exclusively his complaint?

11       A.   His complaint.  Yes.

12       Q.   Now, of course, this was October 15, 2021,

13   correct?

14       A.   Yeah.

15       Q.   That's the date?

16       A.   Uh-huh.

17       Q.   What happened three days later on October 18,

18   2021?  Is that firm in your mind what happened three days

19   later?

20       A.   Yes.  That was the meeting, the incident of the

21   meeting.

22       Q.   Describe what you know of that meeting on October

23   18, 2021.

24       A.   Well, I got a complaint from -- from Lila and a

Carmen Borges

Page 165

1    complaint from Grace about what happened in that meeting.

2    They both filed complaints.

3        Q.   Grace Lee-Amuzie and Lila Naydan filed complaints

4    against Zack Di Piero?

5        A.   Uh-huh, right after the meeting.

6        Q.   When did they file those complaints?

7        A.   The meeting was the 18th, so they probably same

8    day or the next day.  It was very close.

9        Q.   And what did you do after that?

10       A.   Well, I did that investigation.  I talked to the

11   people that were in that meeting.

12       Q.   And in Exhibit 15, you were organizing at least

13   as late as October 12, 2021 an interview with Professor

14   Naydan concerning Zack's complaint, right?

15       A.   Yeah.  Yeah.  There's that e-mail.  I'm drawing a

16   blank on -- on if I met with her because I know she was

17   sick, but it just don't come to mind my meeting with her.

18       Q.   Did you ever have that meeting with her about

19   Zack's complaint because this was only a couple days

20   later, right?

21       A.   Uh-huh.  Uh-huh.  I can't recall if I -- if I --

22   if I met with her about Zack's complaint.

23       Q.   And of course, this e-mail to Liliana Naydan in

24   Exhibit 15 of October 12, 2021, that was almost a month

Farrell Court Reporting

Carmen Borges

1    after Zack's complaint, right?

2       A.   Yes.

3       Q.   Now, fast forward to October 18th.  You said they

4    submitted a complaint the day of or the next day, right?

5       A.   Uh-huh.

6       Q.   I think we're up to 17.  Am I right, Matt?  I'm

7    gonna mark as Exhibit No. 17 a packet of documents with

8    the lead Bates number PSU 2537 of various dates.

9    (Exhibit Borges 17 was marked for identification.)

10   BY MR. ALLEN:

11      Q.   The caption of this document, at least the lead

12   page, is quotes for discussion from the myth of the color

13   blind writing classroom, white instructors confront white

14   privilege in their classrooms.  Did I read that right?

15      A.   Uh-huh.  The thing was considered in that

16   meeting.

17      Q.   Now, I'm gonna represent to you that these are

18   all in a series, the page numbers in the Bates production.

19   And I'm just gonna give you an opportunity to look at

20   that, and the question is going to be is this the

21   complaint filed by -- well, there are two complaints.

22         Are these the papers that constitutes the

23   complaints by Liliana Naydan and Grace Lee-Amuzie against

24   Zack Di Piero?

Carmen Borges

Page 167

1    A.    The complaint was about the disruption, Zack's

2  disrupting the meeting and the tone of asking questions.

3  That was the -- the nature of the -- of their complaint.

4  It wasn't about the topic or anything further other than

5  how the conversation developed there.

6    Q.    Well, I'm not --

7    A.    Yeah.

8    Q.    Maybe that truly is.  I just want to ask the

9  question.  If you look at page PSU 2539?

10    A.    Uh-huh.

11    Q.    See at the top says --

12    A.    That's her complaint.  That's Liliana's

13  complaint.

14    Q.    So it says complaint information?

15    A.    Uh-huh.

16    Q.    And this is another one of the forms that your

17  office has --

18    A.    This is our form, our office form.

19    Q.    And this will -- I'm hoping this will go a little

20  faster if we --

21    A.    Yeah.

22    Q.    I'm talking over you, and I apologize.

23    A.    No, no, no.  I know time is of the essence.

24    Q.    If I can get through the question --

Farrell Court Reporting

Carmen Borges

Page 168

1      A.    Yes.

2      Q.    -- and you answer back --

3      A.    Okay.

4      Q.    -- it'll create a clean record.  Thank you.  And

5   what's the date on this complaint form?

6      A.    October 18, 2021.

7      Q.    And do you see it says I am -- under number one,

8   it says explain what has occurred?

9      A.    Uh-huh.

10     Q.    And she writes I am writing to report an

11  egregious incident of bullying by Zack Di Piero in a

12  writing program meeting that I cofacilitated on October

13  18, 2021 from 12:15 on 1:15 on Zoom.  Grace Lee-Amuzie, a

14  woman of color, and I planned the meeting together.  Did I

15  get that right?

16     A.    Uh-huh.

17     Q.    She also says for the meeting, Grace and I asked

18  faculty to read an academic book chapter titled the myth

19  of the color blind classroom, correct?

20     A.    Correct.

21     Q.    Now, the document that starts this packet, if you

22  flip back a page?

23     A.    Uh-huh.  This --

24     Q.    Are those the selections that they --

Farrell Court Reporting

Carmen Borges

Page 169

1    A.    Yeah.

2    Q.    -- gave in that presentation?

3    A.    That was what was selected to discuss in that

4    meeting.

5    Q.    And Grace Lee-Amuzie and Liliana Naydan,

6    according to her complaint, selected these, correct?

7    A.    With some of the other faculty that gave input.

8    Q.    Does it say that anywhere in this bullet point

9    number one or number one?  Does it say this was selected

10   with all the faculty?

11   A.    No, it doesn't say.

12   Q.    In fact, it says we, meaning Grace Lee-Amuzie and

13   Liliana Naydan, chose this article because it provides a

14   basic introduction to antiracism work in the field of

15   writing studies, right?

16   A.    Uh-huh.

17   Q.    So again, I guess Penn State's position is that

18   you can have a meeting in which in you target an entire

19   race for racial discrimination, but it's okay if it's

20   voluntary --

21   A.    It's a topic.

22   Q.    -- is that so?

23         MR. SMITH:  Objection to form.

24         THE WITNESS:  It's a topic.

Farrell Court Reporting

Carmen Borges

Page 170

1   BY MR. ALLEN:

2        Q.   If no one has to be present for harassment of

3   someone on the basis of race, it doesn't count as

4   harassment?  Is that your testimony?

5             MR. SMITH:  Objection to form.

6             THE WITNESS:  This is a topic of discussion.

7   This was an academic paper, an academic work that was

8   gonna be discussed.

9   BY MR. ALLEN:

10       Q.   Is it permissible to be critical of these ideas?

11       A.   Yes, in a respectful manner.  The only -- the

12   problem here to summarize it is that the way he -- he --

13   he -- he was forcing, he was expressing himself that came

14   across as disruptive and unprofessional.  And that was

15   the -- that was the end of that.

16       Q.   So it's not unprofessional to harangue white

17   people as a race, right?

18             MR. SMITH:  Objection to form.

19   BY MR. ALLEN:

20       Q.   It's unprofessional to ask questions about it in

21   some kind of aggressive tone?

22             MR. SMITH:  Objection to form.

23   BY MR. ALLEN:

24       Q.   That's your testimony?

Farrell Court Reporting

Carmen Borges

1    A.    It's about the tone and manner, yes.  You can ask

2    any question in -- in -- in a respectful manner.  But what

3    happened here, it was only the tone and manner.

4    Q.    Did you find as part of your investigation that

5    Zack had used some kind of aggressive body language as

6    well?

7    A.    Maybe they experienced that, but --

8    Q.    You didn't tell Zack in a meeting with him that

9    he had used aggressive body language?

10   A.    Well, that was what was reported.

11   Q.    So that's something you claim to have learned in

12   your investigation, right?

13   A.    From this -- yes, from this complaint.

14   Q.    Do you know where in this complaint that it says

15   anything about Zack making gestures, body language,

16   anything of that nature?

17   A.    Report an egregious incident of bullying.  That's

18   how it sounds.

19   Q.    Sure.  I understand she thinks these things are

20   egregious.

21   A.    And that's what she reported, and that was what

22   was confirmed by the people in attendance there.

23   Q.    My question is very different.

24   A.    Uh-huh.

Farrell Court Reporting

Carmen Borges

1    Q.   Where in this complaint, either by Liliana Naydan

2  or Grace Lee-Amuzie, do they claim that Zack made

3  aggressive gestures, used aggressive body language,

4  anything offensive about his gestures or body language?

5  Where in here are they complaining about that?

6    A.   I'd have to read it all, but it starts at the

7  beginning.

8    Q.   I just wanna focus on body language and gestures.

9    A.   Soon after Grace read the first quote, Zack used

10  hostile tone to express concern about the topic of

11  conversation and the reading.

12    Q.   Does that say anything about --

13    A.   He said he wasn't sure why we were reading this

14  article because it claimed -- he asked whether this is a

15  good article for professional development.  He took

16  particular issues with this line.

17    Q.   Is that in -- first of all, two questions, but

18  let's take them in order.  That quote that seems to be

19  highlighting, is that your highlighting or Lila Naydan's

20  highlighting?

21    A.   The underlining?

22    Q.   Yes.

23    A.   Yes, that's mine.

24    Q.   And there's like a bracket in the margin.  Do you

Farrell Court Reporting

Carmen Borges

1   see that?  Those are all yours?

2        A.   Yeah, those are all mine.

3        Q.   Just to be clear.

4        A.   Yeah.

5        Q.   And is that quote misquoted somehow by Zack Di

6   Piero?

7        A.   This is what was discussed.

8        Q.   That comes from the --

9        A.   In constructing social inequities, we remain

10  unaware and hereby unwittingly to reproduce racist

11  discourse and practices in our classrooms.  He took

12  particular issue with that line is what it says.

13       Q.   And does anything in that passage that you just

14  read -- this is my second question -- accuse Zack Di Piero

15  of making rude gestures?

16       A.   No.

17       Q.   Anything about his body language in that passage?

18       A.   He criticized individuals instead of ideas,

19  specifically me and Grace for selecting this reading and

20  developing professional opportunity.  He repeatedly called

21  out our names, asking us to answer his question and saying

22  he wasn't -- he wasn't interested in making remarks to

23  engage in discussion for discussion's sake.  He spoke

24  inflammatory language, intimidating, intimating that Grace

Carmen Borges

Page 174

1    and I were involved in illegal activity that discriminates

2    against white people as a protect class.  He dominated the

3    discussion and spoke more than anyone else.

4         About 15 minutes into the meeting, I said I felt

5    uncomfortable, and he mocked me, observing that the whole

6    point of antiracist dialogue is to feel uncomfortable.

7    Moreover, he made assumptions and generalizations.  Yeah.

8    Yeah, I think in that group, it kind of -- kind of

9    explains the behavior he exhibited in the meeting.

10        Q.   So my question was very different, and it's

11   actually very simple.

12        A.   Uh-huh.

13        Q.   And it will be a lot faster if we can just focus

14   on the question I asked.  Where in what you just read to

15   me are they accusing him of using inappropriate body

16   language, inappropriate gestures, rude gestures with

17   his --

18        A.   Right there in what I just read.  That's what --

19   that's --

20        Q.   Point specifically to where they talk about

21   his --

22        A.   He spoke -- he spoke inflammatory language.

23        Q.   Is that about his body?  That says his language,

24   right?  That doesn't say body.

Farrell Court Reporting

Carmen Borges

Page 175

1    A.   He spoke inflammatory language.

2    Q.   Does that say he --

3    A.   Well --

4    Q.   -- flipped them off?

5    A.   -- then the witnesses say he was adamant.  It was

6    the adamancy of the -- about -- about -- about

7    questioning.

8    Q.   That's namely in his tone, right?

9    A.   His tone and -- and his hand gestures, I --

10   Q.   Where does it say hand gestures?

11   A.   The witnesses said.

12   Q.   So you got that from witnesses?

13   A.   That they were -- they had to intervene to -- so

14   he could back off and they would give him an answer.  And

15   he would say no, I'm not asking you.  I'm asking Lila.  So

16   all that was happening in -- in a kind of a heated as it

17   was described in a heated -- a heated manner.

18   Q.   Okay.  Can you --

19   A.   It was only --

20   Q.   I'm sorry.  Go ahead.

21   A.   To the point that, I mean, it sounds like that

22   meeting only lasted 15 minutes.  15 minutes -- no, 15

23   minutes into the meeting.  I said I was -- I felt

24   uncomfortable.  So it had only been 15 minutes when the

Farrell Court Reporting

Carmen Borges

1    meeting was going on that things were heading in the wrong

2    direction and Lila, I felt un -- and he mocked me.

3        Q.   Do you recall Liliana Naydan telling another

4    faculty member at Penn State University that it was okay

5    to feel uncomfortable in these discussions about race,

6    right?  Those were her words, right?

7        A.   Yes.

8        Q.   In this complaint, it's somehow not okay to feel

9    uncomfortable?

10       A.   The whole point of --

11       Q.   Is that --

12            MR. SMITH:  Objection to --

13            THE WITNESS:  The whole point of antiracist --

14            MR. SMITH:  -- form.

15            THE WITNESS:  Is to feel uncomfortable.

16   BY MR. ALLEN:

17       Q.   That's what my client's discomfort, right?

18       A.   Uh-huh.

19       Q.   Is that an incorrect characterization of what

20   we've heard Liliana Naydan write to other professors at

21   Penn State in the past?

22       A.   I guess it would have depended on the tone of the

23   seriousness of the tone that was used from there.  I know

24   things went really bad there, and -- and the meeting

Carmen Borges

Page 177

1   ended.

2       Q.   You think the meeting ended right after that?

3   That's the impression you got from your investigation?

4       A.   That's the impression I got, that it ended early.

5       Q.   Do you think it's possible that professors in the

6   writing program lie to you when they talk to you in their

7   interview?

8            MR. SMITH:  Objection to form.

9            THE WITNESS:  I don't know.  I -- I -- I wouldn't

10  know.  I felt that they were describing -- describing what

11  was happening in the meeting, including one that said I

12  tried to save the situation by telling Zack okay, yeah,

13  this is the answer, whatever.  And Zack would say no, it's

14  not -- you know, I'm not asking you.  I'm asking Lila.  So

15  you can imagine how the meeting was -- what's happening.

16  And all the others felt that, you know, uncomfortable.

17  There was a lot of silence and very -- yeah.

18  BY MR. ALLEN:

19      Q.   Is it professional to be asked a question as a

20  grown up professor of writing and composition about

21  reading that you assigned and not to answer the question?

22           MR. SMITH:  Objection to form.

23           THE WITNESS:  Again, it's the tone.  I guess

24  she -- she -- it's the tone and the manner in which he

Carmen Borges

Page 178

1   asked her that that she -- she didn't --

2   BY MR. ALLEN:

3       Q.   So let's look forward.  I just wanna call your

4   attention back to this document.  It's -- there's a page

5   2541.  You see that?  It's got a lot of blacked out stuff

6   on it.

7       A.   Uh-huh.

8       Q.   I don't know why this is blacked out, but we're

9   just gonna --

10      A.   Yeah.  Who blacks that out?

11      Q.   Your counsel.

12           MR. SMITH:  We did produce unredacted versions of

13   all these documents as well.

14           MR. ALLEN:  I'm not seeing --

15           MR. SMITH:  I just wanted you to be aware that

16   there are unredacted copies.

17           MR. ALLEN:  Can we go off the record a second?

18           (A discussion was held off the record.)

19   BY MR. ALLEN:

20      Q.   So do you see in the second paragraph that begins

21   on that page Liliana Naydan in her complaint of October

22   18, 2021 is referring to an anonymous report about Zack in

23   late March 2021?

24      A.   Where, and what page is that?

Farrell Court Reporting

Carmen Borges

Page 179

1    Q.   Just let the record reflect that I'm pointing

2  with my pen, but not marking on the document.

3    A.   Okay.  Okay.  Yeah.

4    Q.   So this is material in her own words from that

5  this is all microaggressions complaint back in March 31st

6  of 2021, right?

7    A.   Uh-huh.

8    Q.   By the time we get to October, that's already

9  seven months in the rear-view mirror, right?

10   A.   Yes.

11   Q.   Is it accurate to say that the material that you

12  can read in these various bullet points that follow spring

13  forward that original March 2021 microaggressions

14  complaint?

15   A.   Spring forward in terms of how she's mentioning

16  it.

17   Q.   She's repeating, I guess --

18   A.   She's mentioning -- mentioning that she had

19  reported him before.

20   Q.   I strike my question.  I just wanna ask the

21  following.

22        If you examine the bullet points here, doesn't

23  this repeat the allegations made in the March 31st

24  microaggressions complaint?

Farrell Court Reporting

Carmen Borges

Page 180

1    A.   Yes.

2    Q.   But earlier, you testified that Professor Naydan

3  didn't want those things investigated, right?

4    A.   Correct.

5    Q.   So by the time we get to October, now she does

6  want them investigated, correct?

7    A.   Correct.

8    Q.   And was this part of your investigation?

9    A.   No, I didn't go back to those, to the March 2021.

10  Nuh-uh.

11    Q.   I just want to skip forward to 2547, if you

12  could.   It's page 11 of this series.   I believe there's

13  another complaint?

14    A.   Uh-huh.

15    Q.   And I just wanted to verify that this is a

16  complaint dated October 19, 2021 by Grace Lee-Amuzie?

17    A.   Uh-huh.   Yes.

18    Q.   And then she writes on the Bates number page 2548

19  explain what occurred which leads you to believe that you

20  have been subject to discrimination, right?

21    A.   Right.

22    Q.   And it says I and my colleagues, Lila Naydan,

23  cofacilitated a conversation about an article on

24  antiracism pedagogy for the writing program at Penn State

Carmen Borges

1    Abington, right?

2        A.    Right.

3        Q.    The only colleague she mentions is Lila Naydan,

4    correct?

5        A.    Correct.  Oh, yes, for coordinating -- oh, no,

6    cofacilitated the conversation.  But it -- it doesn't say

7    that they were the only two that determined the topic

8    or --

9        Q.    But it doesn't mention anyone else as

10   facilitating the conversation?

11       A.    Cofacilitated the conversation.  It means

12   referring to that meeting.

13       Q.    Correct.

14       A.    Uh-huh.

15       Q.    And then, it goes on.  Writing program

16   instructors were invited, not required to join the

17   conversation.  The Zoom conversation was organized in

18   collaboration between the writing program and academic

19   integration for multilingual student success and was part

20   of the ongoing efforts for diversity, equity and inclusion

21   in both programs.  Did I read that right?

22       A.    Uh-huh.

23       Q.    So it was your understanding after reading this

24   complaint that this writing program meeting was part of a

Carmen Borges

Page 182

1    common effort for diversity, equity and inclusion in

2    multiple programs, right?

3        A.   I just read that there.  I didn't really -- I

4    didn't dig into that any further.

5        Q.   I'm gonna mark as Exhibit 18 a series of

6    screenshots, and I'm going to represent that the first

7    Bates number is 1546, and they are screenshots of the

8    October 18, 2021 writing program meeting.

9        (Exhibit Borges 18 was marked for identification.)

10   BY MR. ALLEN:

11       Q.   Now, I apologize in advance.  My co-counsel and I

12   have commiserated about this, but the Bates numbers are

13   very tiny.  And if you need -- I don't know how to rectify

14   that, but it's as hard on my eyes as it is --

15       A.   You can read it first.

16       Q.   I'll try to pull them.  Now, I understand this is

17   not going to be a complete set of every minute of the

18   meeting.  But as you review those, can you point out

19   anyone who is using aggressive body language?

20       A.   No.

21       Q.   How would you characterize the way my client,

22   Zack Di Piero, looks in these pictures?

23       A.   Nothing special, I mean.

24       Q.   Does he look angry?

Farrell Court Reporting

Carmen Borges

Page 183

1    A.   Not angry.

2         Q.   Does he look aggressive?  Does he look different

3    from anyone else who appears in these pictures other than

4    he's a unique individual?

5    A.   Yes.

6         Q.   Incidentally, on the first couple of pages there,

7    do you see a chat window open to the right side of these

8    documents, Exhibit No. 18?

9    A.   That's the same picture, huh?

10        Q.   It's a little different.

11   A.   Oh, well.

12        Q.   At least --

13   A.   Yeah, it's a little --

14        Q.   We seem to have lost Steven Cohen.

15   A.   -- mouth.  I don't know.  And Grace also doesn't

16   have her hand on her mouth.  All -- all their hands are

17   down except Carolyn's.

18        Q.   We can agree that we hope never, ever to be

19   completely exposed for how we look during Zoom meetings, I

20   think.  But I just wanna ask you about the side bar.  Do

21   you understand that although Zoom has a chat function --

22   A.   Yes.

23        Q.   -- you can post things during the meeting and so

24   forth?

Farrell Court Reporting

Carmen Borges

Page 184

1      A.    Uh-huh.

2      Q.    Me represents Zack Di Piero.  See the blue

3   bubbles?

4      A.    Uh-huh.

5      Q.    What is that?  What is that as you understand it?

6      A.    I mean, you --

7      Q.    What is he posting there as you understand it?

8      A.    I can't -- I can't read anything.

9      Q.    Well, let me -- let me read it because it may be

10   that I understand it.  Maybe that --

11      A.    Okay.

12      Q.    -- you're not able to.

13      A.    You've already figured it out.

14      Q.    The top blue bubble --

15      A.    Uh-huh.

16      Q.    On screen, I can expand it, unfortunately.  I

17   wish I could do that for you.

18      A.    Oh, I see.  Okay.

19      Q.    That's all.  I'm just gonna -- and your counsel

20   can correct me if he thinks I'm reading it wrong.  In the

21   top blue bubble --

22      A.    Uh-huh.

23      Q.    -- it says without attending to issues of

24   inequality, ellipses, we, ellipses, reproduce racist

Carmen Borges

Page 185

1    discourses and practices in our classroom.  The second

2    blue bubble says once white instructors begin to identify

3    how whiteness operates in their own lives, they can begin

4    to deconstruct how white privilege operates within their

5    writing classrooms.

6         Did I read that correctly, so far as you can

7    tell?  I understand it's very small.

8         A.   Uh-huh.

9         Q.   So I'm gonna read -- I'm gonna just represent to

10   you that that is -- that those are quotes from the reading

11   material that the focus was for these provided in the

12   quotes.

13        Is there anything improper about reading that in

14   the chat?

15        A.   No.

16        Q.   I'm gonna mark as Exhibit 19 a document with a

17   Bates number PSU 03154 with the lead e-mail date

18   4/24/2023, but bear with me.  That seems unusual, but I

19   think you'll see why in a second.

20        (Exhibit Borges 19 was marked for identification.)

21   BY MR. ALLEN:

22        Q.   Let me ask if you if you recognize this document.

23        A.   Yes.

24        Q.   So let's concentrate on the lead e-mail first.  I

Farrell Court Reporting

Carmen Borges

Page 186

1    just have a few questions on that.  Who is Lonnie Albaugh?

2        A.   Lonnie is from our office, and he's the person

3    that responds to PHRC complaints.  They file complaints.

4        Q.   Do you know if he's a practicing attorney?

5        A.   He's an attorney, but not practicing solo.

6        Q.   Is he doing legal work for the University of Penn

7    State?

8        A.   No.  He's just like a --

9        Q.   You're telling me he responds to PHR --

10       A.   Pennsylvania Human Relations Commission, the

11   state agency.

12       Q.   What does that agency do?

13       A.   They investigate complaints against --

14       Q.   And do they enforce the laws of Pennsylvania

15   against discrimination in the workplace?

16       A.   (Indicating.)

17       Q.   Your testimony today is that Lonnie Albaugh, who

18   is an attorney, is not acting as an attorney when he does

19   that?

20       A.   No.  He's responding to a complaint, to a request

21   for information from the PHRC.

22       Q.   Do you know if he's passed the bar?

23       A.   I'm not sure, not clear on that.

24       Q.   Do you know if he's licensed to practice in the

Farrell Court Reporting

Carmen Borges

1    state of Pennsylvania?

2         A.    The position does not require.

3         Q.    So why are you sending this attachment to Lonnie

4    Albaugh?

5         A.    Because he was responding to the -- the complaint

6    of the agency.  Zack filed a complaint with the -- the

7    Human Relation Commission.  And so Lonnie responds, and he

8    did respond to -- to the -- to that complaint.

9         Q.    Were you otherwise involved in responding to the

10   Human Rights --

11        A.    No.

12        Q.    -- Commission complaint?

13        A.    No.

14        Q.    Are you involved at all in responding to an EEOC

15   complaints made by Zack Di Piero?

16        A.    No.

17        Q.    Are you aware that Zack had complained about

18   being discriminated against?

19        A.    To an outside agency?

20        Q.    To the PHRC as --

21        A.    No.  I wasn't aware of those complaints, no.

22        Q.    And why did you retain notes of your

23   investigation against Zack in these --

24        A.    That's what was asked of me.  That's what -- it

Farrell Court Reporting

Carmen Borges

Page 188

1    may have been that that's what he was responding to at the

2    time.

3        Q.   And I'm getting ahead of us.  These attached

4    notes that you referred to as scratchy notes, is that

5    accurate?  I like that, by the way.  That was very

6    endearing.  These are the scratchy notes of what?

7        A.   Of the -- the people that were at the meeting.

8        Q.   Which meeting?

9        A.   At the meeting of October 18th, the Zoom meeting.

10       Q.   The one about confronting the --

11       A.   The discussion about that topic, yeah.

12       Q.   Okay.  So I wanna turn to the notes now.  On

13   October 20, 2021, you appear to have taken notes on an

14   interview of Steven Cooks?

15       A.   Cohen.

16       Q.   Cohen.

17       A.   Uh-huh.

18       Q.   I'm sorry.  That it was on October 20th?

19       A.   Yes.

20       Q.   By Zoom?

21       A.   Uh-huh.

22       Q.   Does Steven Cohen say at any point in your

23   notes -- let me ask this more specifically.  You notes

24   reflect that Steven Cohen said in the meeting that Zack

Farrell Court Reporting

Carmen Borges

Page 189

1   asked interesting questions?

2      A.   Discussion didn't go far.  One remember clearly

3   discontent with the material, very angry, would describe

4   it as conduct that combative on controversial topic,

5   disagreement.  Zack was aggressive.  That's a quote.

6   Never experienced that here.  No intellectual debate.

7   Tried to de-escalate the conversation.  One of them said

8   that what if we took race out of -- out of it and say

9   gender.  Zack was angry, hostile, not appropriate way to

10  talk to colleagues.  They were unprofessional.  Lila said

11  at one point I'm really uncomfortable.  Carolyn wanted to

12  know of behaviors we could do in the classroom.  Yeah, not

13  quite.

14     Q.   So he never says in those notes -- at least you

15  apparently didn't record that he said in your interview

16  with him that he said in the meeting that Zack's questions

17  were interesting?

18     A.   (Unintelligible.)

19     Q.   And in what you just read, there's also nothing

20  about Zack displaying aggressive body language, is there?

21     A.   Well, Zack was aggressive.  That's as close as

22  that gets.

23     Q.   But it doesn't say anything about body language,

24  does it?

Carmen Borges

1    A.   No, it doesn't, but it's expressions, facial

2    expressions.  I mean, we're semantics here, but --

3    Q.   Do you consider --

4    A.   I --

5    Q.   -- saying something aggressive body language?  Is

6    that a reasonable way in your view as an officer of the

7    affirmative action office to interpret --

8    A.   Very angry.  Okay.  So, you know, with this

9    description, he would describe him as combative --

10   combative, you know, disagreements and very, very

11   aggressive.  He was aggressive.

12   Q.   So combative and very angry, these kind of

13   things --

14   A.   How do you do those things?

15   Q.   How did you --

16   A.   How do people -- how do you people -- how do

17   people physically come across when they are describing

18   that?

19   Q.   Did anyone ever describe Zack as flipping off the

20   cofacilitators?

21   A.   Well, at the point when -- you know, not using

22   those words, but insisting that Lila answer his questions,

23   yes.  He did -- it wasn't like, you know, he posed a

24   question and -- and others could jump in and give him --

Farrell Court Reporting

Carmen Borges

Page 191

1    give him some ideas or some answers.  At this point, he

2    said no, I'm asking Lila.  I want Lila to answer this.

3        Q.   And that in your mind is aggressive and hostile?

4        A.   Not in my mind.  In their description, it was.

5        Q.   The next page, there's a 10/22/21.  It says

6    Carolyn Esposito.  Do you see that?

7        A.   Uh-huh.

8        Q.   She was in the meeting as well on October 18,

9    2021?

10       A.   Yes.

11       Q.   In your notes, does it reflect that she also said

12   Zack's questions were interesting in the meeting?

13       A.   Tension when she arrive.  Notice one faculty seem

14   upset.  Campus what -- people different.  Yeah.  Article

15   in the meeting.  There is faculty on the -- yeah.

16       Q.   So anything in there about Zack's body language

17   or gestures?

18       A.   Only that the meeting was tense and that she

19   noticed that Zack seemed upset, so --

20       Q.   Is it against Penn State's rules to be upset by a

21   paper in which you're accused of being the problem as a

22   white person?  You wouldn't expect a Black person to just

23   sit there and not be upset by such a topic that was

24   labeled Black people are the problem, would you?

Farrell Court Reporting

Carmen Borges

Page 192

1              MR. SMITH:  Objection to form.

2    BY MR. ALLEN:

3        Q.   Would you expect that, that a Black person would

4    be upset by a paper called Black people are the problem at

5    Penn State?

6        A.   Yes.

7        Q.   So going on to the next 10/21/2021, there's a

8    Matt Rigilano entry in your notes, right?

9        A.   Uh-huh.

10       Q.   Can I ask you to examine those notes, please?

11       A.   Uh-huh.  So this is where the question he made,

12   referring to Zack.  He said so if we don't address

13   inequities in the classroom, does that mean we are racist?

14   Matt said -- Matt said let me look at it, like he tried to

15   answer that.  That's the one that then Zack said well, I'm

16   asking Lila and Grace how to respond.  They didn't.  Lila

17   says she felt uncomfortable.  Yeah, that's the one.

18       Q.   And that's against Penn State's rules to --

19       A.   No.

20       Q.   -- expect the director of a program and the

21   organizer of a workshop to answer a question?  Is that

22   your testimony today?

23       A.   It's not against the rules, no.

24       Q.   But it's all about the tone?

Farrell Court Reporting

Carmen Borges

Page 193

1      A.   It's unprofessionalism.

2      Q.   It's unprofessionalism?  So it is --

3      A.   Collegially.  No, no.  That's -- no.  It's common

4  collegiality, common sharing of information and

5  interactions.

6      Q.   Isn't it --

7      A.   Sharing ideas, yeah.  It's --

8      Q.   Under the Penn State values that you referred to

9  before?  Is that --

10     A.   Under the Penn State values, exactly.

11     Q.   Is it unprofessional to ignore a question posed

12 to you by a colleague?

13          MR. SMITH:  Objection to form.

14          THE WITNESS:  No.  I mean, it is -- it is --

15 BY MR. ALLEN:

16     Q.   I'm sorry.  What do you mean by no?  It is not

17 unprofessional or it isn't?

18     A.   It isn't unprofessional.  It's just what it was

19 explained here.  It was the state of the emotional state

20 in which Lila was falling into that didn't --

21     Q.   Is it unprofessional to get upset when someone

22 challenges your workshop topic?

23     A.   Again, it all depends on how the challenge --

24 how -- how is it challenged because that's what

Farrell Court Reporting

Carmen Borges

Page 194

1  academicians do all the time, challenging each other and

2  discussing things among each other, but it all comes down

3  to how that's done.

4      Q.   Now, I believe I may have asked this, but you'll

5  have to forgive me if I have.  Does Matt Rigilano in your

6  notes, your notes record that Matt Rigilano said that Zack

7  was making rude gestures, aggressive body language,

8  anything of that nature?

9      A.   I'd say no.

10     Q.   So I wanna go to --

11     A.   I think it was in the -- at the moment when he

12 posed the question and Matt wanted to take the question

13 because Matt -- the way he explain it, things were getting

14 tense.  And when the question was posed of Lila, and he

15 tried to step in to say well, let me -- let me answer.

16 And that's when Zack said I'm asking Lila and Grace to

17 respond.

18     Q.   You've already testified that that's not

19 necessarily unprofessional, right, to want the organizers

20 of a program --

21     A.   It depends.  Again --

22     Q.   -- to answer questions.

23     A.   -- it depends on the tone.

24     Q.   Sure.

Farrell Court Reporting

Carmen Borges

Page 195

1      A.   If you're saying in -- you know, in an

2   aggressive, high tone, it is.   It's -- it's offensive.

3   It's inappropriate, let's say.   There's no rule against

4   it, but it's --

5      Q.   And I'm just trying to go through witness by

6   witness, right?

7      A.   Yeah.

8      Q.   So we're at 10/20/2021.   It's Grace Lee-Amuzie at

9   the top.   Do you see that page?

10     A.   Yeah, Grace.

11     Q.   And of course, you've already testified that

12  she's a professor in the English program?

13     A.   Uh-huh.

14     Q.   And she was the co-facilitator in her own words

15  in her complaint?

16     A.   I don't -- I'm not sure if she's in that English

17  program.   She may be in another department.   Uh-huh.

18     Q.   And I'll just give you a chance to review your

19  notes about your conversation with her.

20     A.   Yes, bring that to the -- as a topic of

21  discussion.

22     Q.   Sure.   On the second page of her note, that would

23  be -- excuse me, the Bates number PSU 2533, right?

24         MR. SMITH:   I'm sorry.   Maybe I'm off.

Farrell Court Reporting

Carmen Borges

1    BY MR. ALLEN:

2        Q.    Strike that.  It would be Bates number PSU 3161;

3    is that right?  It says Grace didn't, comma, couldn't

4    respond.  Didn't know what to do.  There was silence,

5    right?  That's about five lines down, six lines down.  The

6    one that said Grace didn't, comma, couldn't respond,

7    didn't know what to do.

8        A.    Okay.

9        Q.    Did I read that right?

10       A.    Yes.

11       Q.    And again, I'm not trying to --

12       A.    Grace --

13       Q.    -- mischaracterize your notes.  I really am not.

14       A.    Grace didn't, couldn't respond.  Didn't know what

15   to do.  There was silence.  Some of the men responded, but

16   Zack kept asking and saying this is a question for Lila

17   and Grace.  He said this -- he said this is illegal.  It's

18   illegal discrimination based on race.  Participants trying

19   to have a productive conversation.  Lila and her responded

20   when someone else spoke or was a response to the other

21   person.  This is all what Grace was saying.

22       Q.    Sure.

23       A.    He's clearly not happy with the approach of DEI

24   at the campus.  She and Lila were frozen.  Others were

Farrell Court Reporting

Carmen Borges

Page 197

1   doing what they could to keep the conversation productive.

2   There was male faculty said -- but other male faculty said

3   he was intentionally misleading the text, referring to

4   Zack.  Lila was visibly shaken, said -- said it in the

5   meeting.  Zack said well, discomfort is part of the --

6   part of the what?

7        Q.   Okay.  This is not about trying to make --

8        A.   Okay.

9        Q.   -- can't read your own notes --

10       A.   Discomfort is part of the disconnection or

11   this -- this discussion.

12       Q.   Can I back up and ask you a question about her

13   statement that some of the men responded, right?  That's

14   what you recorded in your notes?

15       A.   Uh-huh.

16       Q.   Now, your notes don't reflect that Carolyn

17   Esposito also commented, right?

18       A.   Commented, but she wasn't that involved in -- in

19   trying to step in and make, give a response like some of

20   the -- some of the guys, like.

21       Q.   And that's the impression that Grace Lee-Amuzie

22   gave?

23       A.   And some of the others.

24       Q.   So the impression is that Zack was somehow

Farrell Court Reporting

Carmen Borges

1    silencing women?

2        A.    Steven -- not silencing women, but putting --

3    putting Lila on the spot.

4        Q.    Well, sure.  They organized the program, right?

5        A.    But again, it was the way he was throwing things

6    at them that -- that kind of set the tone for that meeting

7    and --

8        Q.    Was that --

9        A.    It wasn't -- it wasn't a productive meeting like

10   it was intended for academic, intellectual discussion of a

11   topic.  The meeting was confrontational, aggressive in

12   many ways.  I'm asking Lila.  I'm not asking you, you

13   know.

14       Q.    That's the tone that --

15       A.    That's the tone I got the impression and that the

16   meeting ended earlier and that Lila and Grace were -- were

17   in pieces, devastated.

18       Q.    If you go back to I think it's Exhibit 18.

19   That's the one with the pictures, right?  Now, again, I

20   know this is really small.  But you see it sort of begins

21   around 12:18 with Liliana Naydan posting -- this is the

22   thread on the --

23       A.    Oh, the picture.

24       Q.    -- right sidebar?

Carmen Borges

Page 199

1      A.   Oh, okay.

2      Q.   See how it begins with Lila Naydan, some kind of

3   thread at 12:18, a link probably to this document.  I

4   don't know.  Then, there's some -- Liliana Naydan posts at

5   12:19 various rules of the road in the white bubble.  Do

6   you see that?

7      A.   I can see --

8           MR. SMITH:  Are you on the second page?  'Cause

9   my first page cuts off and doesn't have the dates, just so

10  that I'm looking at the right page.

11          MR. ALLEN:  That's a good point.  This would be

12  the second page which has the Bates number 1547, ZDP 1547.

13  I'm happy to show the witness a picture of this, if you

14  don't mind, since I have --

15          MR. SMITH:  That's fine.  If you have the page,

16  that'll be helpful.

17          MR. ALLEN:  I'll give it to your counsel, and

18  this will be -- and I don't mean to hover over you.  I

19  just wanna --

20          THE WITNESS:  No, no, no.

21  BY MR. ALLEN:

22     Q.   I wanna show you that the meeting basically --

23  this thread -- and I would assume this is not the very

24  beginning of the meeting.  But it starts at 12:18, right?

Farrell Court Reporting

Carmen Borges

Page 200

1     A.    Uh-huh.

2     Q.    And the last one, someone is saying -- someone is

3   signing off.   Sorry.

4     A.    Who can see your --

5     Q.    Got to go, right?

6     A.    Sorry.   I got to go.   And that's --

7     Q.    That seems to be Steven Cohen?

8     A.    Uh-huh.

9     Q.    And that's at 1:15?

10    A.    Okay.

11    Q.    1:14, to be exact, right?

12    A.    Okay.   And it started at 1:19?

13    Q.    Well --

14    A.    12:00, 12:00.

15    Q.    So just for the record --

16    A.    It wasn't 15 minutes.

17    Q.    It was starting probably around 12:00, right?

18  But there's this post at 12:18.   And then, it seems like

19  someone leaves, perhaps.

20    A.    Uh-huh.

21    Q.    We don't know if it's the first.   But people are

22  beginning to wind up at 1:14 p.m., right?

23    A.    Yes.

24    Q.    Doesn't that indicate that the meeting went for

Farrell Court Reporting

Carmen Borges

Page 201

1    an hour and 15 minutes?

2        A.   Those meetings are the -- I think they were

3    scheduled for -- for that time.  Or it went.  It went on.

4        Q.   That doesn't seem to be that it ended early then,

5    did it?

6        A.   No.

7        Q.   Let's see.  There's another -- the last -- if I'm

8    not mistaken, the last set of notes are at 10/19/2021.

9    Jumping back for the record to Exhibit No. 19, we'll go to

10   the -- I believe it's the last set of notes, the few pages

11   with the heading 10/19/2021, Lila Naydan at Zoom.  Do you

12   see that?

13       A.   Which one?

14       Q.   19 --

15            MR. SMITH:  Back to the --

16            THE WITNESS:  This one?

17            MR. SMITH:  -- one we had a moment ago.

18            THE WITNESS:  No, this is 17.

19            MR. SMITH:  Your notes, interview notes.  I think

20   it's the one in front of --

21            THE WITNESS:  Oh, this one.  Okay.  Yes.

22   BY MR. ALLEN:

23       Q.   So if you go to the last two pages, I believe,

24   we'll get this done.

Farrell Court Reporting

Carmen Borges

1    A.    Okay.

2    Q.    And we can put these things --

3    A.    I know.  We're going crazy here.

4    Q.    I'm sorry to drag you through these.  But you can

5 understand as the record of the investigation --

6    A.    Absolutely.  Uh-huh.

7    Q.    So these are your notes of an interview with Lila

8 Naydan on 10/19/2021, right?

9    A.    Uh-huh.

10    Q.    And could you review these notes really quickly?

11    A.    Okay.  This is challenges with Zack for the last

12 two years.  She -- this is her.  She had learned that Zack

13 had issues with a woman he reported to previously at the

14 University of Pennsylvania.  She is referring to Lila when

15 she was hiring him.  She didn't check references or

16 background when she hired him.  Has been a challenge, has

17 been challenging her since a complaint of bias was filed

18 by a student in his class.  She told him that a bias

19 complaint was filed and they needed to meet with him

20 division head Friederike to discuss it.

21    Zack showed up with a pack of e-mails to prove he

22 was not racist.  He then learned that the complaint was

23 based on age.  He was a returning adult student who was

24 Black, and he assumed the complaint was about race.  That

Farrell Court Reporting

Carmen Borges

Page 203

1    incident damaged the working relationship between them,

2    Lila and Zack.  That was two years ago.  Since then, he

3    has been openly challenging her on everything.  There was

4    an incident yesterday in a meeting to discuss an article

5    on antiracism pedagogy for the writing program.

6           Yeah, this is where she put -- because

7    apparently, you know, she did hire him and they had a good

8    working relationship.  And at some point, this is where

9    she -- she believes he began to distrust her when this

10   incident of a student.

11      Q.   In your experience when professors are accused by

12   a student of discrimination, don't you expect them to try

13   to prove that they're not discriminatory?

14      A.   Of course.  The thing is that he didn't know what

15   the basis was, and what she's saying that he assume it was

16   race.  I mean, if the student is Black, I mean, that would

17   be the obvious.  There's an assumption.

18      Q.   And it was that she did know he was accused of

19   discrimination?

20      A.   That the student had filed a discrimination

21   complaint against him.

22      Q.   And it wasn't a random accident that he came in

23   and tried to prove that he wasn't racist with regard to

24   this student, correct?

Farrell Court Reporting

Carmen Borges

1    A.   Exactly.

2    Q.   And the finding of the university is that it

3  wasn't discrimination?

4    A.   He wasn't found -- it wasn't -- it wasn't about

5  race.

6    Q.   I'm going to interject.  Do you mean age?

7  Because I think --

8    A.   Oh, age.  Age.  Sorry.  Yes.

9    Q.   And again, I'm not trying to --

10    A.   No, no.  It was age.  It was a returning adult

11  student who we call the older students.

12    Q.   So in the complaint we read earlier that was

13  Exhibit 17, Liliana Naydan's formal complaint of

14  discrimination against my client, Zack Di Piero, do you

15  remember that beginning with this was an egregious act of

16  discrimination?  She used the word egregious, right?

17    A.   The complaint from the student.

18    Q.   No.

19    A.   Yeah, that's what I mean.

20    Q.   Had experienced the egregious discrimination --

21    A.   Oh, herself?

22         MR. SMITH:  Objection to form.

23  BY PROSECUTING ATTORNEY:

24    Q.   We can go read it.

Farrell Court Reporting

Carmen Borges

Page 205

1    A.    Well, I think she was referring to the whole

2  thing, the -- all the -- all the things that she's talking

3  there, not once incident.

4    Q.    But if we go back to the complaint information

5  report, and this is Exhibit 17, the first number one, what

6  she writes under number one is -- and this is on page PSU

7  2539, Exhibit 17?

8    A.    Okay.  Of 17?

9    Q.    It's the packet --

10          MR. SMITH:  The one right there.

11          THE WITNESS:  Oh, this?

12  BY MR. ALLEN:

13    Q.    It's the packet --

14    A.    Okay.

15    Q.    -- of complaints.

16    A.    Exactly.

17    Q.    So I think if you turn to the third page, which

18  would be perhaps --

19    A.    Uh-huh.

20    Q.    It's where the complaint begins, the formal

21  complaint.  You see where it says number one, explain what

22  has occurred?

23    A.    The beginning of the --

24    Q.    This is how she describes the incident.  I am

Farrell Court Reporting

1   writing to report an egregious incident of bullying by

2   Zack De Piero in a writing program meeting, right?

3       A.   Uh-huh.

4       Q.   So now, I just wanna flip back.  I'm sorry.

5   You're gonna get whiplash.  I know.

6       A.   She -- she has the timing here.  12:15 to 1:15.

7   Yeah.  Okay.  So that was an hour meeting.

8       Q.   I'm just curious.  In your interview with her on

9   10/19/2021, that was the next day, right?

10      A.   The next day.

11      Q.   It seems you spent most of the time -- at least

12  your notes reflect most of the discussion was about issues

13  that didn't even involve the October 18, 2021 meeting,

14  right?

15      A.   That she went into summarizing the whole, her

16  whole experience with -- with Zack from the beginning.

17      Q.   Including these issues in March that --

18      A.   Yeah.

19      Q.   -- you said she didn't want investigated?

20      A.   Yeah, exactly.

21      Q.   And she suddenly did?

22      A.   Yeah.  She kind of said this is -- this is the

23  person that I have been having problems with for the last

24  two years, and these are all the things that have

Carmen Borges

Page 207

1    happened.

2        Q.   This was three days after you had contacted her

3    to schedule a meeting concerning Zack's complaint against

4    her, right?

5        A.   Double check on that.  You know, double check

6    my -- that meeting.  I don't have any --

7        Q.   In Exhibit 16 showed that you reached out on --

8        A.   Yeah.

9        Q.   -- October 15, 2021 --

10       A.   Uh-huh.

11       Q.   -- to schedule a meeting with Liliana Naydan

12   about the Zack Di Piero complaint?

13       A.   Oh, yeah.  It was -- yeah.

14       Q.   And three days later, she submitted a complaint

15   against Zack, right?

16            MR. SMITH:  Did you say Exhibit 16?

17            MR. ALLEN:  I believe Exhibit 16 is ZDP 055.

18            MR. SMITH:  I have an objection to form, then.  I

19   guess from my notes, I have that was an e-mail to Zack,

20   not to Lila.

21            MR. ALLEN:  I think you are right and -- oh, I'm

22   sorry.  I think it's -- I think it's -- your objection is

23   very well put, and I apologize.

24   BY MR. ALLEN:

Farrell Court Reporting

Carmen Borges

1      Q.   Ms. Borges, I apologize.  I had been meaning

2   Exhibit 15, which is PSU 03236.  And again, I have to

3   retract my few questions because this one is dated October

4   12, 2021.  My point is you were trying to organize a

5   meeting with her on October 12, 2021?

6      A.   Uh-huh.  I wonder if we got to do it.  I wonder

7   because then, this happened, so --

8      Q.   So when you were going to interview her

9   concerning that meeting, you started her complaint --

10      A.   Well, the incident happened, the incident of the

11   meeting of the 18th.

12      Q.   Right.

13      A.   Well, and some of the other people -- some of the

14   others were saying -- and actually, the only thing that he

15   was -- excuse me -- found responsible for was for --

16   for -- for being inappropriate, being not collegial or

17   disrespectful or any other thing that is not any -- I

18   mean, the code of conduct that talks about respect.

19      Q.   Right.

20      A.   That was -- that's only thing, and that's not a

21   big deal of being found guilty of anything.

22      Q.   He was found guilty of disrespect.  Is that your

23   position?

24      A.   Uh-huh.  Uh-huh.

Farrell Court Reporting

Carmen Borges

Page 209

1    Q.   So I'm gonna give you -- actually, it's almost

2   5:00, and I understand it's getting late.

3    A.   We need to --

4    Q.   No, no.  That's already a foregone conclusion.

5   Do we wanna take a break before I go into -- I think we'll

6   be able to wrap it up relatively quickly, but it's really

7   up to you.

8         MR. SMITH:  I will have maybe 10 minutes at the

9   end, 15 at the most.

10                    (A break was held.)

11  BY MR. ALLEN:

12   Q.   We're almost to the end, and I wanted to say

13  something about the next exhibit because its designation

14  is a little bit -- I don't want there to be confusion on

15  the record.  So this is a recording of the actual meeting

16  of October 18, 20 --

17   A.   And by the way, I wanted to mention --

18   Q.   -- 2021.

19   A.   -- I did not give any permission to record.  We

20  never, ever in our office have any issues with recording

21  because we don't -- we don't allow the recording.

22  Actually, we have had some complainants that say well, if

23  I can't record, then we can't talk.  I say well, then we

24  can't talk.

Farrell Court Reporting

Carmen Borges

Page 210

1      Q.    Why don't you allow them to be recorded?

2      A.    Because that's illegal in Pennsylvania.

3      Q.    It's not if you get consent, correct?

4      A.    If you get consent --

5      Q.    Why don't you give consent?

6      A.    We don't give consent.

7      Q.    Why not?  Is that your policy?

8      A.    No, no.

9      Q.    It's the policy of the university?

10     A.    Not the university, either.  In our office.  And

11  my understanding is in other offices that we interact and

12  talk that it's not --

13     Q.    Is it because Penn State employees want to

14  represent things on the record that they know the record

15  that's audio recorded doesn't confirm?

16          MR. SMITH:  Objection to form.

17          THE WITNESS:  No.

18  BY MR. ALLEN:

19     Q.    So this exhibit doesn't involve a recording of

20  you.  This record is marked ZDP Exhibit 43.  It was

21  introduced at the deposition of my client, Zack De Piero,

22  at least in excerpts or clips, all of them being

23  designated Exhibit 43.  I say that, Ms. Borges, only to

24  make clear that some of the documents are Bates stamped

Farrell Court Reporting

Carmen Borges

Page 211

1   ZDP --

2        A.   Recording --

3        Q.   -- X, Y and Z.  This recording, I mean something

4   different when I say ZDP.  It has been marked as ZDP

5   Exhibit 43 because it was introduced at Zack Di Piero --

6   and those are his initials -- deposition and it was given

7   the number Exhibit 43, just to be clear so it's not

8   confused with the Bates stamp.

9        A.   But you're referring to a recording?

10       Q.   I am.  And I'm gonna play clips of that.

11       A.   Okay.

12       Q.   Obviously, if I could give it to you as a

13   document, I would.  But instead, we're gonna hear it.  I'm

14   hoping that it will be loud enough to be picked up.  I'm

15   gonna ask for your patience because it takes me some time

16   to navigate to different clips.

17            So the first one is about 18 minutes and 19

18   seconds.  It is the first time that my client, Zack Di

19   Piero, speaks in the meeting.  I'll just represent that.

20   Your client -- excuse me, your attorneys can check that.

21   If it's untrue, they'll have ample opportunity to point

22   that out to the judge.  And of course, neither they no I

23   want to be caught before a federal judge misrepresenting

24   the record, and I'm grateful to your attorney for

Carmen Borges

1    correcting me, my mistakes in doing that.  It begins here.

2                        (Audio plays.)

3    BY MR. ALLEN:

4        Q.   So that was Zack's first intervention in this

5    discussion.  It lasts from about the time stamp 18:19 to

6    19:04, 19 minutes and 4 seconds.  Can you explain to me

7    what in Zack's tone was aggressive that you just heard?

8        A.   (Indicating.)

9        Q.   What in Zack's tone was insulting?

10       A.   I -- I didn't hear anything insulting.

11       Q.   Given that you saw in the complaint that you

12   reviewed as the officer of the affirmative action office

13   Lila Naydan and Grace Lee-Amuzie's excerpts, do you

14   remember that in the past exhibit --

15       A.   Uh-huh.  Yeah.

16       Q.   -- No. 17, did you heard any misreading of the

17   text by my client, Zack De Piero, in that statement?

18       A.   Not in that statement.  That wasn't the whole

19   meeting, though.

20       Q.   Did you find that that was a harassing comment

21   for Zack to make?

22       A.   I didn't quite hear it, to tell you the truth

23   completely.  But what I heard did not sound --

24       Q.   Well, for the purposes since you didn't hear it,

Farrell Court Reporting

Carmen Borges

Page 213

1    and I understand --

2         A.   It's -- it's too low, the --

3         Q.   I know, and I've got it turned up all the way.

4    Let me see if I can --

5         A.   So this is the recording from the meeting?  Is

6    that what you're representing?

7         Q.   It is.

8         A.   Uh-huh.

9         Q.   And again, you weren't in the meeting, right?

10        A.   No.

11        Q.   So he was not recording you, correct?

12        A.   No.

13        Q.   Okay.  I'll try to -- maybe we can get it --

14                    (Audio plays.)

15             THE WITNESS:  Who's speaking there?

16   BY MR. ALLEN:

17        Q.   I would have to -- I don't know.  I don't think I

18   can testify.  If I knew, I would represent, but --

19        A.   But it's not anybody from that meeting.

20        Q.   Yes, it is.

21        A.   Is it?

22        Q.   Yes.

23        A.   But there were only -- if anyone, it would have

24   been Carolyn.

Farrell Court Reporting

Carmen Borges

Page 214

1    Q.   It may well be Carolyn Esposito.

2    A.   Yeah.

3    Q.   I mean, to me, it sounds like someone with a

4  Hispanic accent just as I hear it, heard it right then.

5  But I don't -- I can't --

6    A.   Because the only women there were, you know, Lila

7  and Grace and Carolyn.

8    Q.   Correct.  And you know what Lila and Grace sound

9  like?

10   A.   Uh-huh.

11   Q.   And you think that voice was not either of them?

12        MR. SMITH:  Did you have a start point?  Because

13  this is a new clip from the one we just heard.

14        MR. ALLEN:  No.  She wanted to hear it again, but

15  I think I started at 18 minutes, 5 seconds.  My skills in

16  navigating to the exact clip are plagued by fat fingers

17  and inexact touch pads.

18        THE WITNESS:  You say that was not Lila?  Are you

19  sure it wasn't Lila?

20        MR. ALLEN:  I'm not -- I'm not testifying.

21        MR. SMITH:  He's --

22  BY MR. ALLEN:

23   Q.   I'm not testifying.  I was trying to find out

24  what you know about it, but --

Farrell Court Reporting

Carmen Borges

1    A.    No.

2    Q.    And you brought it up.  I'm just playing through

3  this to get back to the clip.  Here Zack will start next.

4                        (Audio plays.)

5  BY MR. ALLEN:

6    Q.    Were you able to hear it that time through?

7    A.    Yeah.  I heard it well.

8    Q.    I want to then play forward from 19 minutes and 4

9  seconds and see what happens next.  Okay?

10                       (Audio plays.)

11  BY MR. ALLEN:

12    Q.    That is the second intervention into the

13  conversation.  Let me ask what about his tone was

14  harassing in that clip?

15    A.    Nothing.

16    Q.    Was it aggressive?  Is it unprofessional to ask

17  the organizers of a meeting to answer that question?

18    A.    Uh-uh.

19    Q.    What was the answer given to Zack in that almost

20  45 seconds?

21    A.    What was the answer?

22    Q.    Yes.  What answer did Grace Lee-Amuzie or Liliana

23  Naydan --

24    A.    Do you have it recorded?

Farrell Court Reporting

Carmen Borges

Page 216

1      Q.   Well, we just listened to --

2      A.   The question.

3      Q.   -- approximately 18 minutes and 19 seconds

4  through 20 minutes and 8 seconds.  Did you hear either one

5  of them provide any answer to that question?

6      A.   But I don't know if it was not recorded.  I don't

7  know if it -- if the recording was ongoing or -- or what

8  was recorded is only what Zack was saying.  What was it?

9      Q.   Well, let me represent to you that this is a full

10 recording that has not been edited.

11     A.   From the whole meeting?

12     Q.   Correct.  And again, I can the truth and provide

13 this to you so you can listen to the whole thing.

14     A.   Yes.  Okay.

15     Q.   It's been disclosed in discovery.  So I'm not --

16 my purpose here is not to hide the ball.  Because it's

17 such a long meeting, if we played it all, we'd be here for

18 an hour.

19     A.   Okay.

20     Q.   So I'm just trying to skip through and ask you

21 questions.

22     A.   So in all the meeting, nothing has been --

23          MR. SMITH:  I think I can help him clarify.  I

24 think the question's specifically just about the clip,

Farrell Court Reporting

Carmen Borges

Page 217

1    just about -- not what happened at the rest of the meeting

2    is my understanding.

3            THE WITNESS:  That clip.  But at what point of

4    that was -- you know, we're not hearing the whole meeting.

5    BY MR. ALLEN:

6        Q.    No, but for reasons I described.

7        A.    But we have a --

8        Q.    In this clip --

9        A.    You have it recorded?

10       Q.    Yes.

11       A.    The whole meeting?

12       Q.    We're gonna play some more.

13       A.    Yeah.

14       Q.    Again, I'm not trying to hide the ball from you.

15       A.    No, no.

16       Q.    And you can request your attorney to provide you

17   a listen, if you would like, to the whole thing.  In fact,

18   I don't mind.  If you insist, we'll play the whole thing.

19       A.    No.

20       Q.    But it will take us an hour --

21       A.    Yeah.

22       Q.    -- because it's an hour meeting.  So all I mean

23   is from 18:19 to 20 minutes and 8 seconds, did you hear

24   Liliana Naydan or Grace Lee-Amuzie answer Zack's question?

Farrell Court Reporting

Carmen Borges

Page 218

1       A.    No, not somehow recording it.

2       Q.    Is that professional?

3       A.    No.

4       Q.    Now, I'm just gonna play again, and we'll listen

5    to the answer that Zack gets to his second intervention.

6                      (Audio plays.)

7    BY MR. ALLEN:

8       Q.    So there's a female contributor to the

9    conversation wondering about the same questions that Zack

10   raised, right?

11      A.    Uh-huh.

12      Q.    Did she sound like she was intimidated?

13      A.    Uh-uh.

14      Q.    Was she struck dumb suddenly by Zack's question?

15      A.    Uh-uh.  I mean, the --

16      Q.    If you can identify her --

17      A.    Yeah.

18      Q.    -- from personal knowledge, because you did

19   interview her?

20      A.    Uh-huh.  Yeah.

21      Q.    You could say, is that Carolyn Esposito?

22      A.    It sounds like it.

23      Q.    I'm gonna fast forward a little bit to 23:14

24   where my client also answers -- excuse me, asks or let me

Farrell Court Reporting

Carmen Borges

Page 219

1    put it this way.

2              At the 23 minutes and 14 seconds stamp, my client

3    asks -- or excuse me, speaks again.

4                        (Audio plays.)

5    BY MR. ALLEN:

6        Q.   So that was a second time Zack asked a question.

7    What in his tone was harassing that you just heard?

8        A.   Nothing.

9        Q.   Anything aggressive?

10       A.   No.

11       Q.   Does that suggest to you that he was

12   gesticulating wildly?

13       A.   I think he was articulating whatever -- whatever

14   he wanted to explore, but --

15       Q.   And the woman who answered, was that Liliana

16   Naydan, that voice?

17       A.   That's what I'm thinking.  It sound, yeah.

18       Q.   And if you're not sure, it's okay --

19       A.   I'm not sure.  I was trying to, yeah.

20       Q.   So let's skip forward to 24:05 and my client

21   speaks again.

22                        (Audio plays.)

23   BY MR. ALLEN:

24       Q.   If you want, I can play the clip immediately

Farrell Court Reporting

Carmen Borges

Page 220

1    before that because he's responding to something as you

2    notes reflected that Professor Naydan said.  Would you

3    like me to do that?

4        A.   If you have the time, we can do it.

5                      (Audio plays.)

6    BY MR. ALLEN:

7        Q.   So that puts it more in context.  I believe there

8    was a professor who said she feels uncomfortable?

9        A.   Uh-huh.

10       Q.   Did you find Zack's tone harassing in that

11   response?

12       A.   No.

13       Q.   Aggressive?

14       A.   No.

15       Q.   In any way unprofessional?

16       A.   No.

17       Q.   So we're gonna skip forward to 41 minutes and 10

18   seconds.  Start here at 44 -- we'll start here at 43:55

19   and we'll come upon another time when my client speaks in

20   the meeting, which is approximately at -- I'm sorry.  For

21   the record, we're gonna begin this clip at 40 minutes and

22   58 seconds.

23                      (Audio plays.)

24   BY MR. ALLEN:

Farrell Court Reporting

Carmen Borges

Page 221

1      Q.   So are your answers the same to all the

2  questions --

3      A.   What was the answer to that?  Do you have it?

4      Q.   Yeah.  We can listen to it by all means.

5                  (Audio plays.)

6      THE WITNESS:  Another of the guys answer that.

7  BY MR. ALLEN:

8      Q.   I can represent that that's Matt Rigilano who we

9  deposed and also testified to this.

10     A.   Okay.

11     Q.   So was there anything in my client's tone that

12 was aggressive?

13     A.   No.

14     Q.   Can you say that for the --

15     A.   No.  I mean --

16     Q.   Was there anything in my client's tone that was

17 harassing that you just heard in that clip?

18     A.   No.

19     Q.   I'm just gonna represent to you that he doesn't

20 speak in the meeting until 45 minutes and 16 seconds, so

21 I'm gonna try to fast forward there.

22                  (Audio plays.)

23     THE WITNESS:  That's Carolyn.

24 BY MR. ALLEN:

Farrell Court Reporting

Carmen Borges

Page 222

1    Q.   So then the conversation goes on, but let's focus

2    on how Zack De Piero, my client, intervened in the

3    discussion at that time.  Was there anything in his

4    intervention during that last clip that you found

5    harassing?

6    A.   No.

7    Q.   Aggressive?

8    A.   No, inquisitive.

9    Q.   Did you consider his tone as you heard it today

10   professional?

11   A.   It was.

12   Q.   And you identified the professor who responded in

13   that brief clip as Carolyn Esposito?

14   A.   More likely.

15   Q.   Did that female professor you heard speak up, did

16   she sound intimidated?

17   A.   No.

18   Q.   I'm gonna skip forward now to the 49th minute, 49

19   seconds in.

20                      (Audio plays.)

21   BY MR. ALLEN:

22   Q.   So again --

23   A.   That's one of the guys, huh?

24   Q.   Correct.

Farrell Court Reporting

Carmen Borges

Page 223

1     A.     Uh-huh.

2     Q.     So in that clip from my client, Zack Di Piero, in

3  his intervention in the October 18, 2021 writing program

4  meeting, was he aggressive?

5     A.     No, normal -- normal conversation.  I mean,

6  normal asking a question.

7     Q.     So my second question is also do you as an

8  officer of the affirmative action office consider that to

9  be harassing?

10    A.     No.

11    Q.     In fact, we just heard one of the male professors

12 say that he found the question interesting, right?

13    A.     I didn't quite hear it.  I mean, it'd be

14 interesting to hear the whole recording because these are

15 snip and pieces what you're -- you're presenting.  So I

16 don't know if we're missing some areas that where he shows

17 some other tones that as I heard it from him and the guys

18 there.

19    Q.     And I'm going to represent to you that I'm

20 showing you all the clips in which my client speaks.  Of

21 course, the meeting goes for an hour.  I'm excluding some

22 of the other stuff simply in the interest of time.

23    A.     Uh-huh.

24    Q.     You're, of course, invited to listen to the

Farrell Court Reporting

Carmen Borges

Page 224

1   entire recording which has been produced in discovery.

2   There's one last time my client speaks at 51 minutes and

3   34 seconds.

4                       (Audio plays.)

5   BY MR. ALLEN:

6       Q.    So that's the last time my client intervenes in

7   the program meeting.  Did you find what he said in that

8   clip to be harassing?

9       A.    I find it deviating from the purpose of the

10  meeting as explained at the beginning of the meeting why

11  are we here for and the topics and the things that -- that

12  were to be discussed.  I find his questioning totally

13  deviating from that.

14      Q.    Was what he said an inaccurate --

15      A.    Inaccurate?

16      Q.    -- summary -- no, an inaccurate summary of PSU's

17  antidiscrimination policy?

18      A.    It just completely deviates from the purpose

19  of -- of the academic discussion they were having.  The

20  academic discussion was about --

21      Q.    I'm gonna try to interrupt 'cause we're almost

22  done.

23      A.    Yeah.

24      Q.    The best part of the deposition is of course the

Farrell Court Reporting

Carmen Borges

1    end, right?  But I wanna -- I want you to focus on my

2    question because what I'm asking was is what he said in

3    anyway inaccurate about the antidiscrimination policy of

4    Penn State University?

5          A.   But we're talking about a research topic.  We're

6    talking about -- we're talking about one particular -- one

7    focus.  The focus of the discussion was -- was -- was --

8    it seemed deviating from the focus of the discussion

9    totally.  That was -- that was discussed -- that was

10   presented as why are we here for.  What are we talking

11   about?  What do we have to learn and come out of this

12   discussion with?  And what I hear Zack saying is totally

13   against moving forward on an academic discussion on a

14   serious social -- social program.

15               Yeah.  He doesn't sound disrespectful.  That, I

16   agree.  But he sounds disengaged and he sounds --

17         Q.   In the last clip or in all the clips?

18         A.   Well, in the last one mostly.

19         Q.   I just want us to be as specific --

20         A.   Yeah, in the last --

21         Q.   With that, please --

22         A.   Yeah.  The initial ones, he's asking questions

23   related more to the topic.  It goes on into moving into

24   other areas totally out of the topic, and I think it may

Carmen Borges

1   have been how things got out of -- out of -- out of focus

2   there.

3       Q.   So I want you to answer the question that I've

4   asked you twice now.

5       A.   Uh-huh.

6       Q.   And what you said is now on the record.  Is what

7   he said in that last clip a more or less accurate summary

8   of Penn State's antidiscrimination policy?

9       A.   This is -- this is not -- this -- this was an

10  academic topic.  This is not a specific -- see, the

11  problem here is that they're discussing an academic, an

12  academic research project based on -- based on an academic

13  discussion based on a social problem, a social issue.

14      Q.   So yet you're not still answering my question,

15  which was very simple.

16      A.   Uh.

17      Q.   Which was is what Zack said in that last clip a

18  more or less accurate description of Penn State's

19  antidiscrimination policy?  That's a yes or no --

20      A.   Because what he's saying that it is

21  discrimination because the topic is about Black people.

22      Q.   The topic wasn't about Black people.

23      A.   Well, the topic is about people, yeah.

24      Q.   The topic was about white people.  Do you think

Carmen Borges

1    the conversation in the room would have been very

2    different if the entire --

3        A.   Yeah, but it's --

4        Q.   -- for an hour, they were told to discus

5    something that said Black teachers are the problem,

6    something preposterous like the Black teachers are somehow

7    the problem?  What do you think the discussion would have

8    been?

9        A.   Well, what we're missing -- what we're missing

10   here historical context.  We're missing here the big

11   picture.

12       Q.   You're aware that my client has sued Penn State,

13   correct?

14       A.   I'm aware.

15       Q.   And Judge Wendy Beetlestone, who is an immigrant

16   to this country from the nation of Nigeria, ruled that the

17   lawsuit could proceed, correct?

18       A.   I don't know.

19            MR. SMITH:  Objection to form.

20   BY MR. ALLEN:

21       Q.   Are you aware of that?

22       A.   No.

23       Q.   Judge Wendy Beetlestone ruled that this claim of

24   discrimination against Penn State University for creating

Carmen Borges

1   a hostile environment cannot be dismissed for convenience

2   sake.  And my question for you is is it inaccurate what

3   Zack Di Piero was discussing in the group that this kind

4   of constant bombardment of white people are the problem

5   type rhetoric could potentially create a hostile

6   environment?

7           MR. SMITH:  Objection to form.

8   BY MR. ALLEN:

9       Q.   Is he wrong about that, Ms. Borges?

10      A.   Yeah, he may be wrong about that.

11      Q.   And certainly Penn State is paying your attorneys

12  to make that argument, right?

13          MR. SMITH:  Objection to form.

14          THE WITNESS:  I think he -- I think he deviated

15  from the big picture of what -- what was to be discussed.

16  BY MR. ALLEN:

17      Q.   You would agree with me that they were discussing

18  the condition of race in America, correct?  And America's

19  antidiscrimination laws are part of the history of race in

20  this --

21      A.   But that doesn't eliminate the fact, the need in

22  academia to discuss the problem.

23      Q.   We are going to be here for a very long time if

24  you don't answer my questions.

Farrell Court Reporting

Carmen Borges

Page 229

1      A.   Well --

2      Q.   You're not answering the question.

3      A.   I don't have an answer.  I don't have an answer.

4      Q.   That's fine.  If you don't wanna answer a

5  question --

6      A.   I don't have one.

7      Q.   -- answer --

8      A.   I don't have one.

9      Q.   Okay.

10     A.   Let's say that.

11     Q.   But it would be -- just say that.

12     A.   But what I'm trying to say is that there's

13  nothing wrong with the topic.  And if anybody needed to be

14  sued, it's Asao, Asao.

15     Q.   Inoue?

16     A.   Inoue.

17     Q.   All right.

18     A.   Asao Inoue is the researcher.  This is a topic

19  that he put out there, and there's nothing wrong with

20  picking up a topic at a university and -- and dissecting

21  it or talking about it.

22     Q.   Is there --

23     A.   They need to be --

24     Q.   Let me ask a related question.  Is there a rule

Carmen Borges

1    or policy or conduct code at Penn State University that a

2    program director shouldn't lie about one of their faculty

3    members?

4        A.   It depends what the -- it depends, yeah.

5        Q.   Is there a rule against submitting false

6    complaints against a fellow faculty member?

7        A.   Well, no.  I mean, because the person that files

8    a complaint believes in what -- you know, believes it's

9    not a false complaint, believes in the complaint.  It's

10   proper.

11       Q.   So do you think it's reasonable to say that Zack

12   Di Piero in those clips that you just heard was harassing

13   Liliana Naydan?

14       A.   In the first line of questioning, asking

15   questions related to the topic, that was -- I think that

16   was appropriate.  At the end when he's trying to say that

17   because we're talking about this, that's -- that's

18   against -- that's discrimination because we're talking

19   about this here, that totally turned the conversation.  I

20   can see where that turned things around.

21       Q.   But your own office and other offices on campus

22   have been promulgating a policy that if you see something,

23   say something, right?

24       A.   We're talking academic.  We're talking academic

Farrell Court Reporting

Carmen Borges

1   topics.  We're not talking individual people telling each

2   other something.  We're talking an academic research

3   project that's being discussed between academics in the

4   writing program, and it all had to do with writing

5   program.

6        Q.   And isn't part of that allowing for criticism of

7   the viewpoints that are being discussed?

8        A.   For discussion and criticism, yeah.

9        Q.   How can a --

10       A.   Disagreement.

11       Q.   I interrupted you.  I'm sorry.

12       A.   Yeah.  Other -- other researchers in disagreement

13   with that.  Yes.

14       Q.   Sure.  So how can that honest conversation take

15   place when the criticism is met with complaints to your

16   office by your program director?

17            MR. SMITH:  Objection to form.

18            THE WITNESS:  But by the time that that

19   meeting -- by the time of the meeting, did Zack know

20   that -- that there was a complaint against him?

21   BY MR. ALLEN:

22       Q.   No.  She filed the complaint immediately after

23   the meeting, right?

24       A.   Well, after, exactly.  After based on the

Farrell Court Reporting

Carmen Borges

1    meeting.

2         Q.   Do you think that is a professional thing to do

3    as a program director given what you just heard?

4         A.   It's fine.  People do that all the time.  That

5    happens.

6         Q.   Is it okay to lie about your fellow faculty

7    member and say he was aggressive, harassing?

8              MR. SMITH:  Objection to form.

9              THE WITNESS:  That was the perception.  And I

10   don't know what happened -- you said you have the whole

11   recording, but her perception is that that's how he came

12   across -- across.

13   BY MR. ALLEN:

14        Q.   Does her subjective feelings about that have to

15   be validated in your office?

16        A.   No.  We need to find the truth about it.

17        Q.   But you actually didn't interview her about

18   Zack's complaint against Liliana Naydan, did you?

19             MR. SMITH:  Objection to form.

20             THE WITNESS:  Zack's complaint against Liliana.

21   BY MR. ALLEN:

22        Q.   The September 13, 2021 complaint.

23        A.   Oh, that complaint, because --

24        Q.   That got derailed, right?

Farrell Court Reporting

Carmen Borges

1    A.    No --

2    Q.    The --

3    A.    Because that was a whole -- that I saw it as a

4  different thing.  He was in disagreement with the topic in

5  itself.

6    Q.    And you directed him to continue to go to these

7  meetings until he would --

8    A.    No.

9    Q.    -- understand the perspective?

10   A.    Until he -- you know, it's an academic issue.  It

11  is an academic discussion.  And at the beginning when you

12  put that, he was, you know, kind of discussing it and

13  asking the right questions for an academic discussion.  So

14  I was thinking okay, that's -- that's the way -- that's

15  the way to go.  That's why I was -- this is why in his

16  complaint, what I thought is, you know, you have a right

17  to go and find, ask questions and you have a right to do

18  that, and that's what is done in academia, I mean.

19   Q.    He was asking questions, right?

20   A.    He was asking questions, and --

21   Q.    And he was reprimanded afterwards, correct?

22   A.    But I don't know -- I don't know how -- when the

23  meeting turned.  When he began to say that this is

24  discrimination and against university policy, that's

Farrell Court Reporting

Carmen Borges

Page 234

1    where -- that's where he -- things began to go wrong.

2    That's what deviated from the academic discussion.

3       Q.   Okay.  Let's listen -- since that's your

4    testimony -- and again, I represented to you that these

5    are the only times when he speaks in the meeting.  There

6    were several.  We got through them.  This is what follows.

7                     (Audio plays.)

8             THE WITNESS:  This is Grace?

9    BY MR. ALLEN:

10      Q.   Do you need us to go on, or is that sufficient

11   aftermath to convince you of the tenor of the conversation

12   after Zack stops speaking?

13      A.   That was before or after?

14      Q.   That was after Zack's last clip in which he

15   brought up the issue that they may be engaging in illegal

16   discrimination by constantly --

17      A.   And she's --

18      Q.   -- talking about white people being the problem.

19      A.   And she's explain why she's doing this work.

20      Q.   Is that somehow more appropriate to soliloquize

21   for six minutes about your family background in the

22   Ukraine than Zack's statement that this might be

23   actionable discrimination which led to an ongoing federal

24   lawsuit?

Farrell Court Reporting

Carmen Borges

1          MR. SMITH:  Objection --

2     BY MR. ALLEN:

3          Q.   That's your testimony?

4          MR. SMITH:  Objection to form.

5          THE WITNESS:  No.  That's not --

6     BY MR. ALLEN:

7          Q.   Are you aware that Grace Lee-Amuzie as reported

8     in your notes went on another soliloquy about her daughter

9     having her hair pulled back in gymnastics class?

10         A.   Yeah.  I heard that.

11         Q.   Does that strike you as submitting to standards

12    of white beauty to have female athletes pull their hair

13    back when they're on balance beams and competing in

14    gymnastics?  That's something that Grace Lee-Amuzie said

15    in this meeting.  Is that somehow on topic where Zack's

16    comment about discrimination which led to a federal

17    lawsuit is not on topic?

18         A.   I have to say that this is a very -- talking

19    about race and the history in this country of racial

20    slavery and racial discrimination, that's -- that's a

21    long, dark history and there's nothing wrong about

22    unpacking it and talking about it, and it happened to the

23    Black people.  And so therefore, it has to be addressed

24    as -- as a Black issue, as talking about what happened to

Carmen Borges

1    the Black people in this country.  And it happened based

2    on rogue laws and power that were at the time making

3    decisions, so I don't see anything wrong with talking

4    about that.  That's not discrimination.

5        Q.   Where in the clips we heard or any of that did

6    you hear discussion of Black people, Black history, all of

7    those topics you just raised?

8        A.   Well, in the discussion of power, in the

9    discussion of power related to -- to the topic.

10       Q.   Is that where -- I don't know who said that,

11   white people always have power over Black people or

12   something to that effect?

13       A.   Well, I don't know -- I don't remember

14   specifically.  But in the historically, it's about power

15   and -- and -- and --

16       Q.   Incidentally, what does the history of national

17   socialism have to do with American slavery in the United

18   States which Liliana Naydan was going on about for about

19   fives minutes?

20            MR. SMITH:  Objection to form.

21   BY MR. ALLEN:

22       Q.   Can you explain that to me, please?

23       A.   National socialism?  I didn't capture that.  What

24   is she talking about?

Farrell Court Reporting

Carmen Borges

1    Q.   She was talking about her camp that her --

2    A.   Jewish?

3    Q.   -- her relatives being put into concentration

4  camps or camps of some sort by the Nazis.  You know that

5  Nazi stands for national socialists, right?

6    A.   Yeah.

7    Q.   So she's talking about the Nazis who are

8  admittedly a racist regime in another country, and I'm

9  asking you what that has to do with discussing race

10  relations in the United States.

11        MR. SMITH:  Objection to form.

12        THE WITNESS:  I guess power, if it's having

13  power, having power to do what you wanna do.

14  BY MR. ALLEN:

15    Q.   And Zack's comment about discrimination law in

16  the United States doesn't have to do with power?  Is that

17  you testimony today?

18    A.   Individually, yes.  In the context of -- of

19  analyzing a social problem, the social history is

20  different than an individual situation.

21    Q.   The complaint lodged against Zack was against him

22  individually, wasn't it?

23    A.   Well, the complaint was based on his behavior.

24  It wasn't based on his idea.

Farrell Court Reporting

Carmen Borges

Page 238

1    Q.   We just reviewed his behavior, right?

2    A.   Well, now, that's -- that's -- that was news to

3  me, the first part of the behavior.  Although why do the

4  people there describe it in the way they did?

5    Q.   Isn't the simplest explanation is they couldn't

6  tolerate someone who disagreed with them?

7         MR. SMITH:  Objection to form.

8         THE WITNESS:  What I mean, the other -- the guys

9  that were there and Carolyn.  The way that they describe,

10  the tension and the way things were there, how -- where

11  does that -- how does that match if he behave in that tone

12  throughout?

13  BY MR. ALLEN:

14    Q.   Given the any evidence that Liliana Naydan and

15  Grace Lee-Amuzie were lying about my client, do you intend

16  to open an investigation of them?

17         MR. SMITH:  Objection to form.

18         THE WITNESS:  They were lying?  Why do you say

19  they were lying?  I mean --

20  BY MR. ALLEN:

21    Q.   They characterized this as aggressive.  They

22  characterized this as harassment, right?  Egregious

23  bullying.  Was anything in what you listened to called

24  egregious bullying by Liliana Naydan qualify as bullying

Carmen Borges

Page 239

1   in your mind?

2       A.   I would say the part where he was talking about

3   discrimination and questioning whether that was a

4   violation, that's where I would put that because that took

5   it out of the academic, intellectual discussion.

6       Q.   I'm gonna introduce Exhibit 20 for the record, a

7   document that has the Bates stamp PSU 01281.  It's dated

8   January 13, 2024.

9            MR. SMITH:  We're just trying to make sure we

10  have the exhibits straight.

11           MR. ALLEN:  Strike the entrance of Exhibit 20,

12  but recall that I introduced the exhibit which was the

13  audio recorded as ZDP Exhibit 43.

14           MR. SMITH:  And we can go off the record if you

15  wanna --

16           MR. ALLEN:  Can we go off the record briefly?

17               (A break was held.)

18           MR. ALLEN:  This is a brief on the record

19  designation of exhibits for the purpose of clarity.  The

20  audio clip of the October 18, 2021 meeting had been

21  designated at least in a partial clip in the deposition of

22  Zack Di Piero as ZDP Exhibit 43.  It had also been

23  introduced at the deposition of Matthew Rigilano and given

24  a different exhibit number in that deposition, which can

Farrell Court Reporting

Carmen Borges

Page 240

1    be found on the record of his deposition transcript.   In

2    this deposition, we are going to designate the same audio

3    clip which has the native format and is Bates marked ZDP

4    03827 as Exhibit 20.

5            It is still the contention of the plaintiff that

6    these are the same recordings that were used and

7    introduced by the defendants in the deposition of Zack Di

8    Piero, only this is the whole complete audio recording of

9    the entire meeting and not simply a clip.   In playing

10   clips for the witness, Carmen Borges, I have skipped

11   through the video in order to get to the clips that we

12   listened to.

13   (Exhibit Borges 20 was marked for identification.)

14   BY MR. ALLEN:

15   Q.   Do you have any reason to suspect that I did not

16   do what I just said?

17   A.   No.

18   Q.   Okay.   Just wanted to confirm.   So we have that,

19   then.   Now, I would like to introduce as Exhibit 21 for

20   the record -- again, to clear that up and I'm striking its

21   earlier designation, I'm introducing Exhibit 21, which is

22   marked with the Bates stamp PSU 01281.   And it's dated

23   January 14, 2024, I believe.   Did I get that right or am I

24   wrong?

Farrell Court Reporting

Carmen Borges

Page 241

1    A.    '22, it says here.

2    Q.    '22.  You see?  Now, I'm off my game and I gotta

3  get that --

4    A.    It's getting late.

5    Q.    I know.

6    (Exhibit Borges 21 was marked for identification.)

7  BY MR. ALLEN:

8    Q.    So it is marked January -- it is designated

9  January 13, 2022 on the face of the document.  Now, I

10  don't know if you recognize this document, Ms. Borges, so

11  I'm just going to ask you.  Do you recognize this

12  document?

13    A.    I think I've seen it.  I don't why it was -- I

14  don't know where.

15    Q.    Were you the author of this document?

16    A.    Oh, no.  Nuh-uh.  This is Lisa's.

17    Q.    Who is Lisa?

18    A.    Lisa Marranzini is from HR.

19    Q.    And you said you pronounced her name Marazini?

20    A.    Marranzini.

21    Q.    And she's from HR?

22    A.    HR.

23    Q.    Standing for human resources?

24    A.    Human resource.

Farrell Court Reporting

Carmen Borges

Page 242

1    Q.   Do you know her specific title?

2    A.   Yes.  She has a high title there.  She's the

3  overall human resources for the whole campus system at the

4  university.

5    Q.   Not just Abington?

6    A.   Not just Abington.  The whole -- all the HR from

7  the campuses report to her.

8    Q.   So it's your understanding that she drafted this?

9    A.   Yes.

10    Q.   Did you participate in its drafting?

11    A.   No.

12    Q.   Was it circulated to you at any time?

13    A.   It may have been that she was, you know,

14  questioning about something.

15    Q.   And based on your direct knowledge, do you know

16  what this was used for?

17    A.   This was a letter given to Zack, huh?

18    Q.   Well, I'm asking you.  I don't know.

19    A.   Yeah.  That's what I believe it was about, the

20  letter of expectations.

21    Q.   Okay.  And --

22    A.   Which was the only -- the only thing that --

23  that -- that was done as a result of all this.

24    Q.   There's a paragraph with four highlighted words

Farrell Court Reporting

Carmen Borges

1   in the middle of that first page.  Do you see that?

2       A.   Uh-huh.

3       Q.   Are these the Penn State values --

4       A.   Yeah.

5       Q.   -- from that Penn State values statement?

6       A.   Exactly.

7       (Exhibit Borges 22 was marked for identification.)

8   BY MR. ALLEN:

9       Q.   And I'm gonna introduce as Exhibit 22 some

10  printouts from the Penn State web page.

11      A.   Okay.

12      Q.   And you'll see that these were accessed -- if you

13  look in the upper right hand corner, it says 6/12/24,

14  4:46 p.m.

15      A.   Uh-huh.

16      Q.   And then down at the bottom of the page, it --

17  actually in the lower left hand corner, it shows the URL

18  where these were accessed.  Do you see that?

19      A.   Uh-huh.  I mean, the values are different, but

20  they may have -- they may have changed, if these are the

21  most current ones.  Not to my knowledge, but this sounds

22  like the ones that are --

23      Q.   Well, there's four values here, right, listed?

24      A.   Integrity, respect, responsibility, discovery,

Farrell Court Reporting

Carmen Borges

Page 244

1   excellence and community.

2        Q.   So respect is listed here, correct?

3        A.   Uh-huh.

4        Q.   In Exhibit 22?

5        A.   Yes.

6        Q.   So is responsibility, right?

7        A.   Yes.

8        Q.   And excellence as well?

9        A.   Yes.

10       Q.   As well as community?

11       A.   Exactly.

12       Q.   To your knowledge, have those four values changed

13  at any time in the last two years?

14       A.   No, not to my knowledge.

15       Q.   At the time of your meeting with Zack in the

16  complaint of Grace Lee-Amuzie and Liliana Naydan against

17  him, were these values that are referred to in Exhibit 21

18  up on the website as well?

19       A.   Yes.

20       Q.   And if you skip down to page 3 of the website,

21  you see it begins with the little Nittany Lion and it says

22  respect, responsibility, discovery, excellence, community?

23       A.   Uh-huh.

24       Q.   Did I leave one off?  In the nature of web pages,

Farrell Court Reporting

Carmen Borges

Page 245

1    it just --

2        A.    Yeah.

3              MR. SMITH:   Integrity.

4    BY MR. ALLEN:

5        Q.    For some reason, integrity doesn't seem to be on

6    this page, but we'll have a chance to look at it.   In

7    fact, why don't we skip that part and we'll go to --

8        A.    Respect, discovery, excellence and community,

9    yeah.

10       Q.    Can you go to the seventh page of the exhibit?

11   It's this one you're looking for.

12       A.    Exactly.

13             MR. SMITH:   Blue page?

14   BY MR. ALLEN:

15       Q.    It's a big blue page with Penn State values over

16   the header?

17       A.    Exactly.   This is it.

18       Q.    And again, this is from Penn State's website

19   within --

20       A.    Uh-huh.

21       Q.    -- a couple weeks of this deposition.   Okay?

22       A.    Uh-huh.

23       Q.    So did any of Zack's behavior that you just

24   listened to in the clip of the October 18, 2021 program

Carmen Borges

1    meeting somehow not demonstrate integrity?

2         A.    I think the only one that he -- it was respect.

3    The only one that he was told that he didn't live up to.

4    It was respect.

5         Q.    Well, they listed these four values, right?

6         A.    As a reminder of the values, but they only --

7         Q.    In Exhibit 21?

8         A.    But those are the -- as a reminder of the values,

9    but the one that he would have not follow was the only the

10   respect value.

11        Q.    So as you understand it, he was only found

12   responsible for being disrespectful?

13        A.    Exactly.

14        Q.    And in your view, the clip that you listened to,

15   did that demonstrate disrespect?

16             Let me strike that question because there were

17   several excerpts.   In the various times when Zack spoke

18   during the meeting, did he convey disrespect with his tone

19   of voice?

20        A.    Not when he was asking questions.

21        Q.    Did he convey disrespect by being aggressive?

22        A.    Not when he was asking.   I think he show

23   disrespect towards the end when he was confronting them

24   with what they were doing, that this -- you know, that

Farrell Court Reporting

Carmen Borges

Page 247

1    this is illegal, you cannot be doing that.  I think at

2    that point is -- is where the disrespect, the respect, the

3    disrespect happened.

4        Q.    Don't you expect that in the office for civil --

5    excuse me, the affirmative action office of Penn State

6    University that in the defense of the Penn State

7    community, faculty will bring it to the attention of their

8    colleagues when they think they're violating the law?

9        A.    I mean, you mean Zack bringing to their attention

10   that they were violating the law for discussing an

11   academic -- an academic work?

12       Q.    Well, you talked a lot about Liliana Naydan's

13   subjective feelings, right?  If she feels this was somehow

14   harassing, then it's worth I guess investigating, as far

15   as you're concerned?

16            MR. SMITH:  Objection to form.

17            THE WITNESS:  Yeah.  Like anything else that we

18   need to investigate both.  With anything, you know, we

19   need to investigate.  People -- people say an allegation,

20   and we need to see if that -- if that's -- if that

21   happened or not or if that's any violation of policy.

22   BY MR. ALLEN:

23       Q.    And you already just testified that you don't

24   think Zack was failing to display integrity, right?

Farrell Court Reporting

Carmen Borges

1    A.   Or respect, which is what is he was found that he

2  didn't follow with respect.  And, you know, he sounded

3  like he was asking questions in a respectful manner.  And

4  again, where I don't know what happened, but -- but

5  towards the end when he began to tell them you're doing

6  something illegal, that's where I think came out across as

7  a threat, and they weren't --

8    Q.   Do you have any reason to believe that Zack

9  somehow was insincere in raising those allegations of

10  discrimination?

11   A.   About them discussing this topic, the fact that

12  they're discussing this is illegal?  That's what he was

13  saying.

14   Q.   My question is different.

15   A.   Uh-huh.

16   Q.   Slightly different.  Do you have any reason to

17  believe that Zack lacked sincerity in any way when he

18  honestly believed --

19        MR. SMITH:  Objection.

20        MR. ALLEN:  Let me strike that question.

21        THE WITNESS:  Well, he --

22        THE REPORTER:  I was gonna say I didn't get that

23  whole question.

24  BY MR. ALLEN:

Farrell Court Reporting

Carmen Borges

1     Q.   I have to ask the question again because --

2     A.   Okay.

3     Q.   -- it's -- I'm getting caught in double

4   negatives, and I apologize.  Do you have any reason to

5   doubt Zack's sincere belief that what happened in that

6   meeting was discriminatory?

7     A.   I don't -- I can't speak to his sincere belief.

8     Q.   Well, you seem to be able to speak --

9     A.   I can't --

10    Q.   -- Liliana Naydan's --

11    A.   I can't -- but bringing that into a meeting of

12   that nature, I can see it turning the meeting around.

13  The -- the purpose of meeting being -- being dismantled

14  there because the purpose of the meeting is to -- to --

15  to -- to unpack and discuss this -- this -- this -- this

16  theory or this project or this presentation.  But the

17  moment he went on to say this is illegal, that's where it

18  went wrong.

19    Q.   And what did Liliana Naydan answer in response to

20  that last clip there?

21    A.   I guess she shared her own experience.

22    Q.   Did it sound like she was traumatized?

23    A.   No.

24         MR. SMITH:  Objection to form.

Farrell Court Reporting

Carmen Borges

Page 250

1    BY MR. ALLEN:

2         Q.   Did it sound like she was intimidated?

3         A.   No.

4         Q.   It certainly didn't sound like she was incapable

5    of speaking, did it?

6         A.   No.  She sounded fine sharing her story.

7         Q.   I'm gonna mark as Exhibit 23.

8         (Exhibit Borges 23 was marked for identification.)

9    BY MR. ALLEN:

10        Q.   A document with Bates stamp 03347.  I'm gonna

11   represent to you that this was sent on January 20, 2022.

12        A.   Uh-huh.

13        Q.   But what I don't see is in the header who sent

14   it, but it says Carmen?

15        A.   Yes.  That's me.

16        Q.   Did you send this e-mail, the one at the top?

17        A.   Yes.

18        Q.   And what are you responding to in this e-mail?

19        A.   A letter she share with us that they were gonna

20   give to Zack.

21        Q.   And is the letter that they were going to give to

22   Zack attached as the next -- now, I have to represent that

23   these are not in order.  PSU, the last page of the e-mail

24   chain is PSU 03347.  And then the document that begins

Farrell Court Reporting

Carmen Borges

Page 251

1   January 20, 2022, that is PSU 03930.  And I'm asking you

2   if you know if this is the letter that was circulated to

3   Zack Di Piero from Friederike Baer as the outcome of

4   the --

5        A.   The final letter?  I don't see.  Oh, this one.

6        Q.   It should start on the third page here.

7        A.   Oh, I see.  Okay.  All right.

8        Q.   Okay.

9        A.   Yeah.

10       Q.   Take as much time as you'd like to examine.

11       A.   Yeah.  It found that the only -- the only

12   recommendation that I said because at some point, they had

13   additional.

14       Q.   Yeah.

15       A.   And that's what I questioned them, that I didn't

16   see that necessary there.  So eventually, I think this is

17   the letter and --

18       Q.   And this also shows that you participated in the

19   final --

20       A.   They consulted.  They consulted us.  Uh-huh.

21       Q.   That's what I wanted to know.  The last thing --

22   I think this will be the last exhibit.  I'm gonna mark as

23   Exhibit 24 a letter with Bates stamp ZDP 088 dated

24   December 9, 2021.

Farrell Court Reporting

Carmen Borges

Page 252

1      (Exhibit Borges 24 was marked for identification.)

2    BY MR. ALLEN:

3      Q.   Do you recognize this letter?

4      A.   Yes.

5      Q.   You sent this letter to my client, Dr. De Piero,

6    on December 9, 2021?

7      A.   Yes.

8      Q.   And what was the purpose of this letter?

9      A.   This was I guess for him to know the result of

10   the investigation.

11     Q.   And what was the result of the investigation?

12   Just summarize for the record.

13     A.   Well, that his behavior was inconsistent, was

14   unprofessional and contrary to the university values

15   statement.

16     Q.   And that value statement was the one we --

17     A.   Yes.

18     Q.   -- reviewed from the web page?

19     A.   That's the one.

20     Q.   Was there a meeting with Zack Di Piero in January

21   concerning all of the allegations against him?

22     A.   In January?

23     Q.   I'm sorry, January of 2022.

24     A.   Well, this one is '21.

Farrell Court Reporting

Carmen Borges

Page 253

1    Q.   Right.  It's the end of the year, right?

2    A.   '21.

3         MR. SMITH:  December '21.

4  BY MR. ALLEN:

5    Q.   This is December --

6    A.   Oh, December.  Okay.

7    Q.   -- 9, 2021.

8    A.   Okay.  Okay.

9    Q.   So in January of the new year --

10   A.   Uh-huh.

11   Q.   -- 2022?

12   A.   Yeah.  Okay.

13   Q.   -- that --

14   A.   I -- I think that's when the Lisa -- Lisa and

15  Friederike were deciding --

16   Q.   Okay.

17   A.   -- how to, you know, have a conversation with him

18  or the follow-up letter.  That happened in January '22,

19  yes.

20   Q.   And so I think it happened on January 13, 2022.

21  Does that correspond with your memory?

22   A.   Yes, it's likely.

23   Q.   And my only question for you about that, did you

24  participate in the meeting?

Farrell Court Reporting

Carmen Borges

1      A.    No.

2      Q.    But you did discuss this with Friederike Baer and

3   Lisa Marranzini?

4      A.    No.  They only -- they only send the letter that

5   they were planning to provide to Zack, that they only run

6   the letter by us.  The rest of it and what the meeting was

7   about, no, we did not participate in it.

8           MR. ALLEN:  I'm gonna go off the record and

9   examine my notes.

10                      (A break was held.)

11   (Exhibit Borges 25 was marked for identification.)

12  BY MR. ALLEN:

13     Q.    I'm gonna mark as Exhibit 25 for the record a

14  document with Bates stamp PSU 0612.  You recognize this

15  document, Ms. Borges?

16     A.    I don't know why.  It seems like I did see it.

17     Q.    So you see your name is in the recipient line,

18  correct?

19     A.    Oh, then that's why I had.

20     Q.    And again, I'm not trying to catch you out.

21     A.    No, no, no, but there has to be an explanation.

22     Q.    But you acknowledge that you received this

23  e-mail?

24     A.    Okay.  Yes.

Farrell Court Reporting

Carmen Borges

Page 255

1    Q.   And it's dated January 10, 2022?

2    A.   Yes.

3    Q.   And then if you go down to the next page, it's

4    Zack De Piero, right?

5    A.   Uh-huh.

6    Q.   And it's from earlier in the day, correct?

7    A.   Zack on January 10th, yeah, at -- yes, that one

8    808.  Uh-huh.

9    Q.   So I just want to call your attention to the

10   second to last paragraph.  It's rather long, but it begins

11   with since my initial complaint.  Do you see that on page

12   2 of the document?

13   A.   Uh-huh.  Yes.

14   Q.   So he's talking about his initial complaint.  And

15   do you understand that that is referencing the 7/13/2021

16   complaint?

17   A.   Yes.

18   Q.   And he says a lot has happened since then, right?

19   A.   Yes.

20   Q.   In September after seeing that the discriminatory

21   incident were continuing within the writing program

22   similar to the ones that I initially reported to the PHRC

23   as well as Friederike in two separate meetings, I filed an

24   internal bias discrimination report with the PSU

Farrell Court Reporting

Carmen Borges

Page 256

1    affirmative action office.  Did I read that right?

2        A.    Uh-huh.  Yes.

3        Q.    And that's accurate, correct?

4        A.    Uh-huh.  That's accurate.

5        Q.    After meeting with the associate director Carmen

6    Borges, I was directed to continue attending these

7    meetings, even though I acknowledge that they felt

8    blatantly discriminatory and hostile such as when I asked

9    to watch a video titled white teachers are a problem for

10   an October 2020 writing program meeting.  Did I read that

11   correctly?

12       A.    You read it correctly.  It doesn't mean he was

13   correct.  I did not direct him to do anything.  I have no

14   power to direct him to do anything.

15       Q.    Well, then he continues.  Carmen instructed me to

16   attend these meetings, quote, until you get it, close

17   quote, my notes, but added that I was free to disagree and

18   articulate my point of view at those meetings.  Did I read

19   that correctly?

20       A.    Well, you're reading it correctly, but it didn't

21   happen that way.

22       Q.    Okay.

23       A.    I object to the word directed and instructed.

24       Q.    Okay.

Farrell Court Reporting

Carmen Borges

1      A.   I have no power over him or I'm not his boss to

2   tell him what to do.

3      Q.   And this e-mail he sent on January 10, 2022,

4   right?

5      A.   Uh-huh.

6      Q.   It was received by you, correct?

7      A.   Yes.

8      Q.   And you're objecting to his characterization of

9   this discussion with you today --

10     A.   Uh-huh.

11     Q.   -- after you prepared for this with your

12   attorney, correct?

13          MR. SMITH:  Objection to form.

14          THE WITNESS:  No.  No, no.

15   BY MR. ALLEN:

16     Q.   Was it just simply --

17     A.   When I read it, when I read it, but I objected to

18   whom at that time when I read it.  You know, I read it and

19   I said that's not correct, but nothing --

20     Q.   Can you identify any e-mail in which you objected

21   to Zack De Piero's characterization of your conversations

22   at the time?

23     A.   About this?

24     Q.   Correct.

Farrell Court Reporting

Carmen Borges

1      A.   No, because this was after all the facts, so I

2   just -- I just didn't react to it, didn't respond to it

3   because this was all after everything had been said and

4   done, and I saw it as his just venting out because of what

5   had happened and the letter he got, so I didn't --

6      Q.   Okay.

7      A.   Uh-huh.

8      Q.   Sorry.  I didn't mean to interrupt.

9      A.   No.  I didn't -- I didn't pay attention to --

10   didn't think I needed to or it was worth clarifying that.

11   At that point, everything was said and done.

12      Q.   I just want to ask you these questions for the

13   record.  At the time, you didn't object to Zack Di Piero's

14   characterization of your discussions?

15         MR. SMITH:  Objection to form.

16         THE WITNESS:  Of this e-mail --

17   BY MR. ALLEN:

18      Q.   Of this e-mail and the mischaracterizing --

19      A.   Well --

20      Q.   -- as you say now after preparing for this

21   deposition.

22      A.   No, no.  Oh, no.

23         MR. SMITH:  Objection to form.

24         THE WITNESS:  This was all -- this process, the

Farrell Court Reporting

Carmen Borges

1   investigation, the -- the letter, all that was said and

2   done.  That was over.  So I -- when I read this, I said,

3   you know, he's hurt.  He's this and this, so I didn't --

4   this was his reaction to everything, but it didn't call

5   for me to do anything further at the time.

6   BY MR. ALLEN:

7       Q.   I'm just gonna ask a simple yes or no question.

8       A.   Okay.

9       Q.   -- and we can move on if I can get a simple yes

10  or no answer, or you can say I can't answer.  At the time

11  January 10, 2022, you're claiming that Zack was

12  misrepresenting your conversations --

13      A.   Uh-huh.

14      Q.   -- here in our deposition.  But at the time on

15  January 10, 2022, you made no effort to correct this

16  record?

17          MR. SMITH:  Objection to form.

18          THE WITNESS:  I -- I didn't think I needed to.

19  BY MR. ALLEN:

20      Q.   And so you didn't?

21      A.   I didn't.

22      Q.   Okay.  That's all.  I'm gonna give you one last

23  exhibit, which is found -- this will be the last one, I

24  promise.  It will be Exhibit 27 -- excuse me.  It will be

Farrell Court Reporting

Carmen Borges

Page 260

1    Exhibit 26 for the record with Bates stamp PSU 04137.

2        (Exhibit Borges 26 was marked for identification.)

3    BY MR. ALLEN:

4        Q.   Now, I think this takes us back to the September

5    2021 time frame.  And these are handwritten notes?

6        A.   Uh-huh.

7        Q.   Is it fair to say they're handwritten notes of

8    your meeting with Friederike Baer on September 16, 2021?

9        A.   Yes.  That's from a conversation with Friederike.

10       Q.   And in that meeting, you recorded in your notes

11   that Friederike Baer told you Lila, meaning Liliana

12   Naydan, right?

13       A.   Yes.

14       Q.   Lila very committed to diversity issues,

15   sometimes too much.  Did I read that right?

16       A.   Yes.

17       Q.   She uses the phrase microaggressions too

18   frequently.  Did I read that correctly?

19       A.   Yes.  This was Friederike, yeah, what Friederike

20   shared with me.

21       Q.   And that Zack Di Piero had shared that he and

22   other faculty had issues with her pushing her, quote,

23   agenda, close quote, right?

24       A.   With her, share with her that he and other

Farrell Court Reporting

Carmen Borges

Page 261

1    faculty have issues with her pushing her, yeah.

2         Q.   She also said that Zack Di Piero --

3              THE REPORTER:  I'm sorry.  I did not hear that

4    question nor answer.

5    BY MR. ALLEN:

6         Q.   I apologize.  Let me rephrase.  She also says --

7    Friederike Baer also said to you in this meeting that Zack

8    Di Piero is a good teacher, correct?

9         A.   Try to find that in here.  Yes, because I had

10   questioned her about what -- what -- what record, what he

11   gets from the students and they were good.

12        Q.   So the teaching evaluations that we discussed

13   earlier in the record, I think you gave range, which I

14   can't remember, of his teaching evaluations, correct?

15        A.   Five and seven.

16        Q.   On what scale is that?

17        A.   That's good from --

18        Q.   Is the scale to 7 or to 10?

19        A.   The scale is to -- it must be to 10.  It used to

20   be to 5.  But that -- if there's a 7 there, then that one

21   is to 10.

22        Q.   At any rate, you characterize those teaching

23   evaluations as good?

24        A.   Seven is a good.  Uh-huh.

Farrell Court Reporting

Carmen Borges

1       Q.   Thank you.  One last question.  At the end, the

2   very last sentence you've written in your notes that

3   Friederike told the following.  Friederike agreed that

4   Lila easily puts things, interactions in the

5   microaggressions category, correct?

6       A.   Correct.

7       Q.   Did you understand from that Liliana Naydan was

8   perhaps too sensitive?

9       A.   That may have been the intention of the -- of the

10   comment.

11       Q.   Did you understand from this that Lila Naydan was

12   too sensitive?

13       A.   I don't remember making that -- making an

14   understanding of that.  I -- I just wrote it as I heard

15   it.

16       Q.   Did this influence your investigation of Zack Di

17   Piero when complaints were made against him by Liliana

18   Naydan?

19       A.   No.  The only thing that influenced me there was

20   the people in the meeting, what they said.  My interview

21   with -- with the ones in the meeting.  That's -- that was

22   my -- the only thing that I went by to corroborate.

23       Q.   So I just -- just to get a clean answer to the

24   question.  So what was written in your notes reflecting a

Farrell Court Reporting

Carmen Borges

Page 263

1   conversation with Friederike Baer on September 16, 2021

2   had no influence on your investigation of Zack Di Piero

3   after Liliana Naydan made a complaint against him?

4        A.    No.

5        Q.    Okay.

6              MR. ALLEN:  I'm gonna wrap it up there and pass

7   the witness.

8              THE WITNESS:  One thing for sure is that Zack's

9   job was not -- never at risk, and I assure him that he

10  would not lose his job for disagreeing.

11  BY MR. ALLEN:

12       Q.    Well, let me ask this, then.

13       A.    But encourage him to improve his relationship

14  with Lila.

15             MR. ALLEN:  I'm sorry to do that, but the witness

16  began speaking after I passed the witness.  I have one

17  more question about what you just said.

18  BY MR. ALLEN:

19       Q.    So if a Black man was simply tolerating racial

20  discrimination on the basis of his race, but didn't lose

21  his job, would that make it any less discrimination?

22             MR. SMITH:  Objection to form.

23  BY MR. ALLEN:

24       Q.    You're an officer of the affirmative action

Farrell Court Reporting

Carmen Borges

1  office at Penn State University.  What would your answer

2  be to the question?

3      A.   But these are discussions.  I mean, I cannot

4  make -- I cannot make a determination based on an

5  assumption like that.  No.  These are --

6      Q.   So it would be okay to tell a Black man Black

7  people are the problem as long as he didn't lose his job?

8          MR. SMITH:  Objection to form.

9          THE WITNESS:  So what Friederike was assuring him

10 is that you can -- you can disagree and, you know, your

11 job is not at stake.  Don't feel because any time -- I

12 think he had mentioned that he was concerned for his job,

13 but Friederike really clearly assure him that he would not

14 lose his job for disagreeing 'cause his job wasn't --

15         MR. SMITH:  There's not a question pending.

16         THE WITNESS:  All right.  Sorry.

17         MR. SMITH:  That's okay.  We all wanna get out of

18 here.  I know it's getting late.

19         THE WITNESS:  I don't know how you guys do this,

20 and I'm not gonna send any other e-mail -- is that still

21 on?

22         MR. SMITH:  You're still on the record.  Let's

23 wait for my questions.  You've been a terrific witness.

24 BY MR. SMITH:

Farrell Court Reporting

Carmen Borges

Page 265

1    Q.   Okay.  Good -- I guess good evening, Carmen.  I'm

2   gonna try to be very quick so we can all get out of here

3   and get home.  I just got a handful of questions, a couple

4   clarifying things.

5         First thing I want to touch on.  Earlier in your

6   deposition, I believe you testified that you didn't recall

7   if you met with Lila Naydan in relation to the complaint

8   that Zack filed against Lila.  Do you remember that?

9    A.   Uh-huh.

10    Q.   So I just want to mark a couple documents and ask

11  about a couple things.  I guess are we on I believe 27 or

12  28?  26 was the last one?  So I'll just keep going in

13  order?

14         MR. ALLEN:  26?  Do you wanna just introduce them

15  in series?

16         MR. SMITH:  If it's gonna be Borges 1, 2, 3, I'll

17  just --

18         MR. ALLEN:  I think it's easiest at this point

19  since we didn't go in series.

20    (Exhibit Borges 27 was marked for identification.)

21  BY MR. SMITH:

22    Q.   I'm going to mark this document as Borges Exhibit

23  27.  It's an e-mail chain.  You'll see at the bottom it is

24  Bates labeled PSU 3278.  The e-mail is dated October 20,

Carmen Borges

1    2021.  You recognize this document?

2        A.   Yes.

3        Q.   And just looking at the earliest e-mail in the

4    chain, which I think is the one at the bottom of the page,

5    looks like it's dated October 12th of 2021 at 11:03 a.m.,

6    an e-mail from you where you say hello, Liliana.  You see

7    that?

8        A.   Uh-huh.  Yes.

9        Q.   And I think you may have looked at this -- this

10   piece of the chain earlier, but this is another exhibit.

11   But this is the one where you say this is Carmen Borges

12   from the affirmative action office.  The office has

13   received a concern about a presentation in your program,

14   and I would like to discuss this with you.  And you ask

15   her about availability to schedule a meeting.  You --

16       A.   Yes.  Yes.

17       Q.   At 11:06 a.m. on the same day, Liliana Naydan

18   responds and she writes hi, Carmen.  I'm free from 1:30 to

19   3:00 p.m. today.  Are you free then?  Which program are

20   you concerned about?  You see that?

21       A.   Yes.

22       Q.   And one more e-mail above this, the same date at

23   11:16 a.m.  You are responding to Liliana's e-mail.  And

24   you say yes, I'm available at 2:00 p.m.  Do you want to do

Farrell Court Reporting

Carmen Borges

1   Zoom or Teams call?  If Zoom, I can coordinate it and send

2   you notice.  If Teams, I can call you.  Did I read that

3   correctly?

4       A.   Yes.  Yes.

5       Q.   I'm gonna ask you to put that aside for a moment.

6   And then I'll mark the next document -- I guess this would

7   be 28?

8            MR. ALLEN:  Yep.

9       (Exhibit Borges 28 was marked for identification.)

10  BY MR. SMITH:

11      Q.   A two page document -- I'm sorry it's not

12  stickered.  We just got this in a moment ago.  And it

13  begins with the Bates number PSU 4934 and goes on to 4935.

14  I will just note for the record that this document is

15  marked confidential subject to protective order.  There

16  may be some FERPA information in this document.

17           MR. ALLEN:  Can I just interrupt for a second?

18           MR. SMITH:  Sure.

19           MR. ALLEN:  Is this a copy of a previously

20  introduced document?

21           MR. SMITH:  No.  I'm not sure it was admitted at

22  a prior deposition, so --

23           MR. ALLEN:  So you're -- just to get the

24  designation correct, you're marking this as confidential,

Farrell Court Reporting

Carmen Borges

Page 268

1   and are the confidential portions marked by the student

2   issue?

3          MR. SMITH:  They are not.  I think that the

4   student's name or names are visible in this document, so

5   we would just mark this, I guess, exhibit as confidential

6   or however we were working it under the --

7          MR. ALLEN:  Correct.  And we agreed because of

8   the agreement which we stipulated to.

9          MR. SMITH:  I believe that's the only

10  confidential --

11         MR. ALLEN:  We have no interest, as I've said on

12  the record, with anyone.

13         MR. SMITH:  I just wanted to clarify.

14         MR. ALLEN:  I thought for a second this was the

15  previous complaint that Ms. Naydan submitted against Zack

16  because of its bullet point form, but please.

17  BY MR. SMITH:

18     Q.   So Carmen, looking at this document, you'll see

19  it's an e-mail dated the same dates as the e-mails we just

20  looked at.  It's october 12, 2021, and this e-mail is

21  later in the day at 3:05 p.m.  Do you see that?

22     A.   Yes.

23     Q.   And it's an e-mail from Liliana Naydan to you.

24  And she says hi, Carmen.  Thank you again for that

Farrell Court Reporting

Carmen Borges

1   conversation today.  I appreciate you and I appreciated

2   talking with you very much.  That's how the e-mail begins.

3   Did I read that correctly?

4        A.   Yes.

5        Q.   Does this refresh your recollection as to whether

6   you met with Liliana Naydan relating to Zack Di Piero's

7   complaint?

8        A.   I must have, yeah.  I mean, it's clearly that I

9   met with her.  I didn't take any notes, and I can't -- I

10  can't -- I can't -- nothing comes to mind about what we

11  talked.

12       Q.   Do you recall receiving this e-mail from Liliana

13  in relation to a follow-up from a meeting you had with

14  her?

15       A.   Yes.

16       Q.   That's --

17       A.   It talks about it --

18       Q.   We can put it aside.  That's all I need it for

19  just to clarify the record.  And then one more exhibit.

20  This is a one page document, Bates labeled PSU 4134, and I

21  think this will be Borges Exhibit 29.

22       (Exhibit Borges 29 was marked for identification.)

23  BY MR. SMITH:

24       Q.   This appears to be a handwritten note dated

Farrell Court Reporting

Carmen Borges

1    October 1, 2021.  Carmen, does this -- is this a note that

2    you created?

3         A.    Uh-huh.

4         Q.    And it seems to reflect a meeting with Friederike

5    Baer on October 1, 2021.  Is that accurate?

6         A.    Yes.

7         Q.    Does this refresh your recollection as to whether

8    you also met with Friederike Baer on October 1, 2021 in

9    relation to the complaint submitted by Zack Di Piero?  Is

10   that a yes?

11        A.    Yes.  Is not happy with her continued push of

12   diversity agenda.  I mean --

13        Q.    Does this record refresh your recollection as to

14   whether you met with Friederike relating to Zack's

15   complaint?

16        A.    Based on this, it looks like it.

17        Q.    Or had a call?  I don't know if you --

18        A.    A call --

19        Q.    -- met with her in person.

20        A.    Uh-huh.

21              MR. SMITH:  That's all.  Just down the path you

22   just went, I have a couple other questions.

23   BY MR. SMITH:

24        Q.    Carmen, earlier I think you testified so you had

Farrell Court Reporting

Carmen Borges

1    a meeting with Dr. De Piero on September 22, 2021 in

2    relation to the complaint that he submitted --

3         A.    Uh-huh.

4         Q.    -- regarding Liliana Naydan.  I want to ask you

5    more about that.  At any time did Dr. De Piero request

6    your consent to record the meeting you had with him on

7    September --

8         A.    Absolutely not.

9         Q.    Let me finish first.  Did Dr. De Piero request

10   your consent to record the meeting you had with him on

11   September 22, 2021?

12        A.    No.

13        Q.    At any time did you provide your consent to

14   Dr. De Piero for him to record that meeting?

15        A.    No.

16        Q.    And in your experience when you meet with a

17   complainant regarding a bias complaint that they submit at

18   Penn State, are those meetings private?

19        A.    Yes.

20        Q.    Do you have an expectation that those meetings

21   will be held privately?

22        A.    Yes.

23        Q.    And at the time of your meeting with Dr. De Piero

24   in September 2021, was it your expectation that that

Farrell Court Reporting

Carmen Borges

Page 272

1    specific meeting with Dr. De Piero was a private meeting

2    between you and just him?

3         A.   Yes.

4         Q.   At the time of your meeting with Dr. De Piero on

5    September 22, 2021, were you aware that Dr. De Piero was

6    recording that meeting?

7         A.   No.

8         Q.   I just want to ask you about the second meeting

9    you had with Dr. De Piero relating to the complaint

10   against Dr. De Piero, the complaints that Liliana Naydan

11   and Grace Lee-Amuzie submitted against Dr. De Piero.   I

12   believe you had a meeting with him on October 27, 2021; is

13   that correct?

14        A.   I think.

15        Q.   And similar to the first meeting, at any time did

16   Dr. De Piero request your consent to record the meeting

17   you had with him on October 27, 2021?

18        A.   No.

19        Q.   At any time did you provide your consent to

20   Dr. De Piero for him to record that meeting?

21        A.   No.

22        Q.   And at the time of your meeting Dr. De Piero on

23   October 27, 2021, was it your expectation that that

24   meeting was being held privately between just you and

Farrell Court Reporting

Carmen Borges

Page 273

1    Dr. De Piero?

2         A.   Yes.

3         Q.   And at the time of that meeting, were you aware

4    that Dr. De Piero was recording your meeting?

5         A.   No.

6         Q.   I think I just have one -- one last question.

7    When you first speak with an individual who has submitted

8    a bias complaint or a discrimination complaint at Penn

9    State, is it your standard practice to advise that person

10   about available support services?

11        A.   Yes.

12        Q.   And does that include counseling services?

13        A.   Yes.

14        Q.   And do you recall providing information to Dr. De

15   Piero regarding available support services and counseling

16   services when you contacted him regarding his

17   discrimination complaint?

18        A.   Yes, and it's actually a reminder of a Penn State

19   benefit for all employees.

20        Q.   And that's a standard practice that you do for

21   any complainant at Penn State, correct?

22        A.   Yes.

23             MR. SMITH:  I think that's all I have.

24             MR. ALLEN:  Just one more question or a series of

Farrell Court Reporting

Carmen Borges

Page 274

1    questions.

2    BY MR. ALLEN:

3        Q.   I wanted to turn back to Exhibit No. 28.  These

4    are these bullet points.  And if I could also ask you to

5    hang onto Exhibit 17 as well?  Can you get those two

6    exhibits up?  And with Exhibit 17 --

7        A.   Excuse me.

8        Q.   I'm sorry.  That's not the first one.  I'm

9    looking for the exhibit which is all of your notes.

10       A.   Is it this one?

11       Q.   No, the one that has all your notes of the

12   investigation of Zack.  Do you remember that?

13       A.   Yeah.  Let me see.

14       Q.   And --

15       A.   This one probably.

16       Q.   It's Exhibit 19, so my mistake.  Can I ask you to

17   look at Exhibit 19 and Exhibit 28 together?  And if we

18   could go to the very end of that is Liliana Naydan's

19   interview notes.  I believe they start on the end of the

20   exhibit, which is Bates marked PSU 163.  Can you look

21   at -- if I could just handle the exhibits for one second?

22       A.   Oh, okay.

23       Q.   These are the notes, your handwritten notes --

24       A.   Oh.

Farrell Court Reporting

Carmen Borges

Page 275

1    Q.    -- from your interview with Liliana Naydan.

2    A.    Uh-huh.  October 19th.

3    Q.    October 19, 2021?

4    A.    Uh-huh.

5    Q.    Correct?

6    A.    Correct.

7    Q.    And this is an e-mail Liliana Naydan Exhibit 28.

8    It's an e-mail Liliana Naydan sent you on October 12,

9    2021, not even a week before, correct?  And in both of

10   these interviews, she dwelled upon more or less the same

11   issues, correct?

12   A.    The Exhibit 28?

13   Q.    Exhibit 28 that was introduced into the record by

14   your counsel.

15   A.    Okay.

16   Q.    Is an e-mail by Liliana Naydan of 10/12/2021

17   apparently reflecting a conversation you had that day?

18   A.    Okay.  Uh-huh.

19   Q.    And my question is in your meeting with her on

20   the 12th and a meeting with her a week later on the 19th,

21   your notes reflect more or less that she wanted to discuss

22   the same things?

23   A.    Yes.  I mean, she says here the problems with

24   Zack began late 2019, early 2020.

Farrell Court Reporting

Carmen Borges

Page 276

1    Q.   Uh-huh.  And she's going back over the things

2    that she alleged in her original complaint that was

3    submitted against an anonymous faculty member in March of

4    2021, right?

5    A.   Uh-huh.  That's -- yeah.

6    Q.   So my question for you about Exhibit 28 is also

7    there doesn't seem to be any reflection in this e-mail

8    that you discussed anything about Zack Di Piero's

9    complaint of discrimination against her.  I'm looking at

10   the --

11   A.   Oh.

12   Q.   10/12/2021.

13   A.   10/12.

14   Q.   And if you can point to me something in this

15   e-mail that reflects a discussion you had about Zack Di

16   Piero's complaint against Liliana Naydan for

17   discrimination, please direct me to that passage.

18   A.   This is kind of like a summary of things.  The

19   issue with the student in 2020, yeah, the mask.

20   Q.   Is there something --

21   A.   Are we sure --

22   Q.   -- Liliana Naydan, right?

23   A.   I know.  Are we sure this was from 2021?  It

24   sounds like the -- yeah.

Farrell Court Reporting

Carmen Borges

Page 277

1    Q.   I'm just going on the exhibit that your attorney

2  introduced into the record.

3    A.   Yes.  This -- this is the list of things she had

4  submitted anonymously.

5    Q.   Now that you knew it was Zack, more or less,

6  right?  Now, and the question is it seemed like you were

7  setting up a meeting on the 12th of October as part of

8  your investigation into Zack De Piero's complaint of a

9  month earlier about discrimination, correct?

10    A.   Make --

11    Q.   But nothing in this e-mail seems to reflect any

12  questions about discrimination against my client by

13  Liliana Naydan, and I'm asking you if you can point to me

14  where anything reflects that you guys discussed, you and

15  Liliana Naydan discussed the allegation of discrimination

16  against her.

17    A.   No.

18    Q.   There's just one last question.  It has to do

19  with the very last exhibit was Exhibit 29.  This was your

20  handwritten note?

21    A.   This --

22    Q.   October 1, 2021 --

23    A.   This is -- yes.

24    Q.   -- with Friederike Baer.

Carmen Borges

Page 278

1    A.    Okay.

2    Q.    Bates stamped PSU 4134.  Now, it's my

3  understanding from our deposition today that it's your

4  habit to keep what you call scratchy notes on every

5  interview.

6         MR. SMITH:  Objection to form.

7         THE WITNESS:  Yes.

8  BY MR. ALLEN:

9    Q.    And so this is the scratchy notes of that October

10 1, 2021 meeting with Friederike Baer, right?

11   A.    Yeah, but that's --

12   Q.    One thing that -- I mean, I honestly don't know,

13 so this is why I'm asking.  I don't -- I have not found --

14 and I'm not saying that I'm perfect.

15   A.    Uh-huh.

16   Q.    I have not found any scratchy notes from your

17 conversation with Liliana Naydan from October 12, 2021 or

18 at any time in which you interviewed her about the

19 complaint that Zack Di Piero launched against her.

20 Therefore, my question is did you take what you call

21 scratchy notes, handwritten notes of that meeting?

22   A.    Um, even if it's not detail, I typically put the

23 date and something.

24   Q.    And --

Farrell Court Reporting

Carmen Borges

Page 279

1    A.    I don't remember --

2    Q.    -- this one was from around that time?

3    A.    Yeah.

4    Q.    Two weeks earlier, more or less?

5    A.    Yeah.

6    Q.    And it's only one paragraph, but it's --

7    A.    Yeah, something to remind me that yes, that day

8  we had that meeting.

9    Q.    So I'm gonna ask that you -- and I'll ask your

10  counsel, too, that you examine your records one more time

11  to see if such a handwritten note exists reflecting the

12  meeting --

13    A.    On October 12th.

14    Q.    -- you and Liliana Naydan about the complaint

15  Zack Di Piero, my client, lodged against her.  Last

16  question.  October 29 and continue issues with Lila Naydan

17  not happy with her continue push of diversity agenda.  Did

18  I read that correctly?

19    A.    Yes.

20    Q.    Is this something Dr. Baer raised with you?

21    A.    Yes.

22    Q.    So she felt that there were continued issues with

23  Professor Naydan as well?

24    A.    Well, her not being happy.

Farrell Court Reporting

Carmen Borges

Page 280

1    Q.   Her being?

2    A.   Lila not happy with her -- oh.  Continuations

3  with Lila not happy with her continue -- yeah, sounded

4  like Friederike was not.

5    Q.   Friederike was not happy?

6    A.   That's what it sounds, not happy with her

7  continued push of diversity agenda.

8    Q.   And you don't have any form --

9    A.   Maybe she will explain it further or maybe it was

10  Zack who was not happy, so yeah.

11    Q.   As you sit here today, you don't have any

12  concrete memory of who was unhappy with whom?

13    A.   Exactly.

14    Q.   Okay.

15    A.   I'm so sorry I didn't take better notes there.

16  But -- but either -- either she was not happy or Zack was

17  not happy.  It's one of the two.

18    Q.   Sounds like an unhappy department.

19    A.   Yeah.

20         MR. SMITH:  Objection to form.

21         MR. ALLEN:  I have no further questions.  I just

22  want to -- I think that maybe we can --

23         MR. SMITH:  We're all set.

24         (The deposition was concluded at 7:02 p.m.)

Farrell Court Reporting

1

```
 1              C E R T I F I C A T I O N

 2

 3          I, Vicki Mengel, Court Reporter, certify that the

 4   following is a true and accurate transcript of the

 5   foregoing deposition/hearing/arbitration, that the witness

 6   was first sworn by me at the time, place, and on the date

 7   herein before me set forth.

 8              I further certify that I am neither attorney nor

 9   counsel for, not related to nor employed by any of the

10   parties to the action in which this deposition was taken;

11   further, that I am not a relative or employee of any

12   attorney or counsel employed in this case, nor am I

13   financially interested in this action.

14

15                        Vicki Mengel

16                        VICKI MENGEL

17                        Court Reporter and Notary Public

18

19

20

21

22

23

24
```

## A

**A-S-A-O** 141:13
**a.m** 1:17 124:24
  131:22 266:5,17
  266:23
**AAO** 20:8
**ability** 6:24
**Abington** 29:8,16
  29:21 30:1,10,13
  30:19,19 31:3,18
  32:24 33:5,19
  34:10 35:14 36:6
  36:18 38:12,18
  39:8 40:8,10
  41:11,12,14,16,21
  41:22 42:13 67:3
  67:9 99:13,15
  116:2,6,7,9 118:3
  120:19 136:4
  141:22 143:11
  181:1 242:5,6
**Abington's** 30:3
**able** 69:18 70:20
  138:19 160:18,22
  184:12 209:6
  215:6 249:8
**Absolutely** 151:9
  202:6 271:8
**AC** 42:22
**academia** 149:4
  228:22 233:18
**academic** 17:3 21:9
  21:15 43:18,23
  91:16 99:7,10
  134:11 149:21
  153:15 161:19
  168:18 170:7,7
  181:18 198:10
  224:19,20 225:13
  226:10,11,12,12
  230:24,24 231:2
  233:10,11,13
  234:2 239:5
  247:11,11
**academician**
  143:18

**academicians** 194:1
**academics** 91:14
  93:6 231:3
**accent** 214:4
**accepted** 24:19
**access** 17:23 20:5,6
  49:4 59:11 72:20
  72:22,23
**accessed** 243:12,18
**accessible** 30:21
**accident** 203:22
**accommodate**
  79:10
**accurate** 27:1
  179:11 188:5
  226:7,18 256:3,4
  270:5
**accusations** 61:7
  101:21,22
**accuse** 173:14
**accused** 105:3,17
  109:21 110:4,9
  191:21 203:11,18
**accusing** 63:7
  174:15
**acknowledge**
  254:22 256:7
**acronym** 65:3
  110:14
**acronyms** 65:15
**act** 58:21 204:15
**acting** 111:23
  134:16 186:18
**action** 12:6 17:17
  18:4,6 19:7,10,13
  20:10 22:1,2,20
  23:12 24:3 29:20
  29:24 32:18 33:11
  39:10,20 40:11,13
  42:2 44:17,23
  45:17 46:4 55:10
  57:4,6,14,21
  60:21 61:6 67:18
  74:15 76:5 83:6
  123:3,6 146:13
  190:7 212:12

  223:8 247:5 256:1
  263:24 266:12
**actionable** 234:23
**actions** 18:9 117:4
**activated** 112:20
**active** 28:3 35:2
**activities** 49:4
**activity** 174:1
**acts** 49:1,9,12,16
**actual** 71:21 152:5
  152:8 163:19
  209:15
**ad** 27:8 28:2 46:15
  47:1,4 56:24 59:8
**Adair** 17:14
**adamancy** 175:6
**adamant** 175:5
**add** 25:15
**added** 256:17
**addition** 9:7
**additional** 162:20
  251:13
**address** 15:5,12
  72:17 73:6,9 76:6
  90:4 97:13 100:7
  115:14 123:9,10
  126:13 150:10
  192:12
**addressed** 75:22,23
  76:1 89:22,23
  90:2 97:24 119:2
  126:18 133:8
  235:23
**addresses** 116:22
  118:12 120:15
  121:9,11 126:8
  133:1
**addressing** 33:11
  118:15 120:10
**administered** 44:5
**administration**
  79:10,12,13
**admire** 107:11
**admitted** 267:21
**admittedly** 237:8
**adult** 202:23

  204:10
**advance** 182:11
**advantage** 124:1
**adversely** 48:5
**advertise** 18:18
**advertising** 18:18
**advise** 273:9
**advisees** 97:7
**advising** 84:17,19
  93:24 96:15,17,18
  106:21,21
**advisor** 85:17,24
  93:20,23 94:4,9
  95:8 96:6
**affairs** 43:22 44:6
  99:8,10 134:11
**affect** 7:4 49:5
  50:20
**affirmative** 12:6
  17:17 18:4,6,8
  19:7,10,13 20:10
  22:1,2,20 23:12
  24:3 29:19,24
  32:17 33:11 39:9
  39:20 40:11,12
  42:2 44:16,23
  45:16 46:4 57:13
  57:21 60:21 61:6
  67:18 74:15 76:5
  83:5 123:3,5
  143:6 146:13
  190:7 212:12
  223:8 247:5 256:1
  263:24 266:12
**affirmatively** 29:19
**aftermath** 234:11
**age** 14:23 37:21
  103:20 104:2,5,6
  104:10,15,20,24
  202:23 204:6,8,8
  204:10
**aged** 133:20 137:14
**agency** 186:11,12
  187:6,19
**agenda** 152:20
  158:19,20,24

  260:23 270:12
  279:17 280:7
**aggression** 58:22
**aggressive** 55:9
  155:9 170:21
  171:5,9 172:3,3
  182:19 183:2
  189:5,20,21 190:5
  190:11,11 191:3
  194:7 195:2
  198:11 212:7
  215:16 219:9
  220:13 221:12
  222:7 223:4 232:7
  238:21 246:21
**aggressively** 138:22
**ago** 5:18 11:12,16
  17:21 19:23 22:4
  102:5 201:17
  203:2 267:12
**agree** 16:12 20:9
  58:19 67:1 104:14
  130:8 132:12,14
  144:14 147:12,14
  148:15 149:20
  150:15,18 154:12
  156:11 158:23
  183:18 225:16
  228:17
**agreed** 15:18,21
  262:3 268:7
**agreement** 156:10
  268:8
**ahead** 96:14 122:14
  156:9 175:20
  188:3
**al** 1:8
**Albaugh** 186:1,17
  187:4
**alcohol** 104:21
**Alina** 75:3,8,8,19
  77:15,16
**allegation** 71:13
  72:15 101:3
  247:19 277:15
**allegations** 64:2

71:12,20 72:14
100:14 136:22
179:23 248:9
252:21
**allege** 104:10,11,12
**alleged** 50:12 53:10
100:4 276:2
**allegiance** 137:17
**alleging** 58:3 111:2
**Allen** 2:3,4 3:7 5:4
5:5,9 8:5 12:16,22
13:2 15:4,17,22
17:11 21:2 24:21
25:6,23 26:8,11
26:17 31:16 32:13
33:21 35:18 36:12
37:5,7,13 38:23
39:6 40:3 42:21
44:19 46:9,14
47:12,16,23 48:7
52:24 53:18,24
54:16 56:3,10,15
56:23 59:6,18
60:3,14 62:8,10
76:19 80:8 82:19
83:9,12 84:18
87:16 88:4 89:3
89:13,18 90:1,20
93:11 94:7,12,18
94:23,24 95:19
97:5 98:4,12,15
98:16 101:4,10
104:19 105:12
106:1 107:5,7,22
108:3,23 112:16
113:19 125:14
126:24 127:17
128:11,14 129:19
130:5 131:6
132:17 134:2
136:16,20 139:13
139:15 145:10,18
146:2,8,21 147:11
147:20 148:10
150:12,22 151:21
152:12 153:2

154:23 157:4,9
158:2 159:22
160:1,4 162:5
166:10 170:1,9,19
170:23 176:16
177:18 178:2,14
178:17,19 182:10
185:21 192:2
193:15 196:1
199:11,17,21
201:22 205:12
207:17,21,24
209:11 210:18
212:3 213:16
214:14,20,22
215:5,11 217:5
218:7 219:5,23
220:6,24 221:7,24
222:21 224:5
227:20 228:8,16
231:21 232:13,21
234:9 235:2,6
236:21 237:14
238:13,20 239:11
239:16,18 240:14
241:7 243:8 245:4
245:14 247:22
248:20,24 250:1,9
252:2 253:4 254:8
254:12 257:15
258:17 259:6,19
260:3 261:5 263:6
263:11,15,18,23
265:14,18 267:8
267:17,19,23
268:7,11,14
273:24 274:2
278:8 280:21
**allow** 209:21 210:1
**allowing** 231:6
**amended** 26:6
**America** 228:18
**America's** 228:18
**American** 19:18
25:2 39:17,18
236:17

**Americans** 39:13
50:9
**amount** 10:6
**ample** 211:21
**analyzing** 237:19
**and/or** 99:23
**Andrew** 135:8
**Andy** 134:7
**anecdotal** 88:9
**Anessah** 28:22
29:12
**anger** 155:23 159:3
**angry** 155:8 156:17
182:24 183:1
189:3,9 190:8,12
**announcement**
118:23
**anonymous** 56:5
62:24 63:3 64:9
67:21 78:8 81:3,5
90:3 100:2 107:18
107:19 108:1,2,7
109:16 112:10
178:22 276:3
**anonymously**
111:17 112:20
277:4
**answer** 6:15,21,24
7:11,12,14,16 8:9
8:15 11:22 12:11
12:23 13:1,5
14:12 28:11 31:15
31:23,24 34:1
39:5,15 51:23
66:12,16,17 73:1
80:18 81:9,19
93:21,22 94:21
97:3 122:20
129:20 154:14,15
154:15,18 156:1
161:13 168:2
173:21 175:14
177:13,21 190:22
191:2 192:15,21
194:15,22 215:17
215:19,21,22

216:5 217:24
218:5 221:3,6
226:3 228:24
229:3,3,4,7
249:19 259:10,10
261:4 262:23
264:1
**answered** 94:23
95:20 219:15
**answering** 8:13
226:14 229:2
**answers** 39:23
101:7 148:24
149:1 191:1
218:24 221:1
**antidiscrimination**
15:13 44:22 46:4
105:14 224:17
225:3 226:8,19
228:19
**antiharassment**
42:8 44:15
**antiracism** 118:9
137:12,15 169:14
180:24 203:5
**antiracist** 174:6
176:13
**anybody** 56:9 152:1
213:19 229:13
**anymore** 104:16
**anyway** 225:3
**apologize** 37:20
124:15,16,21
128:23 160:2
167:22 182:11
207:23 208:1
249:4 261:6
**apology** 128:21
129:23
**apparently** 51:15
64:16 92:4,17,24
96:5 103:3 118:22
120:13 123:22
138:18 189:15
203:7 275:17
**appear** 6:13 188:13

**appearances** 2:1
117:20
**appeared** 27:1
**appears** 76:20
183:3 269:24
**applicant** 18:20
22:5 24:7 42:4,4
**applicants** 18:11,14
18:16,21 19:6
25:15,15
**application** 22:19
**apply** 46:8
**appointment** 78:18
78:21
**appointments** 73:9
**appreciate** 269:1
**appreciated** 269:1
**approach** 20:10
196:23
**appropriate** 74:3
189:9 230:16
234:20
**approve** 121:4,6
**approximately** 14:3
30:10 108:18
216:3 220:20
**April** 107:6 108:18
109:4,4
**area** 36:11 41:11
42:5 112:5 123:20
139:22
**areas** 41:18 114:18
223:16 225:24
**arguing** 131:3
**argument** 228:12
**array** 34:17
**arrive** 44:12 191:13
**article** 64:17 66:19
66:21 88:9,10
169:13 172:14,15
180:23 191:14
203:4
**articulate** 256:18
**articulating** 219:13
**Asao** 140:4,4,11
141:11 149:19

150:15,24 152:17
159:7 229:14,14
229:18
**ascribes** 30:19
**Asian** 39:16 50:8
**Asians** 19:18
**aside** 26:12 27:6
37:4 46:12 81:5
130:2 267:5
269:18
**asked** 7:11 8:17
39:15 61:10,12
66:11 88:10 101:7
111:20 154:1,3
155:2 168:17
172:14 174:14
177:19 178:1
187:24 189:1
194:4 219:6 226:4
256:8
**asking** 6:20 12:22
47:21 51:13 55:21
63:22 66:14 69:2
114:5,6 143:24
146:15 150:13
151:5 152:14
154:6 156:2,5
163:10 167:2
173:21 175:15,15
177:14,14 191:2
192:16 194:16
196:16 198:12,12
223:6 225:2,22
230:14 233:13,19
233:20 237:9
242:18 246:20,22
248:3 251:1
277:13 278:13
**asks** 66:13 218:24
219:3
**assertive** 96:20
**assessment** 115:10
**assigned** 155:5
156:6 177:21
**assist** 135:4
**assistance** 17:16

**Assistant** 17:16
**associate** 29:18
57:14,21 256:5
**associated** 111:21
**associates** 45:11
55:17
**assume** 8:16 41:17
105:7,10,11,18,23
199:23 203:15
**assumed** 105:22
114:24 202:24
**assuming** 27:17
106:9
**assumption** 106:3
118:8 203:17
264:5
**assumptions** 174:7
**assure** 263:9 264:13
**assuring** 264:9
**athletes** 235:12
**attached** 4:20 188:3
250:22
**attachment** 187:3
**attachments** 162:23
163:5,11
**attack** 58:11
**attacked** 142:16
**attacking** 59:24
149:9
**attacks** 53:16,16
**attend** 256:16
**attendance** 171:22
**attending** 184:23
256:6
**attention** 135:11,16
162:22 178:4
247:7,9 255:9
258:9
**attorney** 5:6,13 7:8
7:17 9:17,18,19
9:20 86:15 186:4
186:5,18,18
204:23 211:24
217:16 257:12
277:1
**attorneys** 27:17

211:20 228:11
**attributed** 111:11
111:12,13
**audibly** 6:15,21
**audience** 153:13
**audio** 4:10 210:15
212:2 213:14
215:4,10 218:6
219:4,22 220:5,23
221:5,22 222:20
224:4 234:7
239:13,20 240:2,8
**August** 19:22 113:9
113:16,21,23
124:24 130:7
131:21 133:24
134:10 135:8
155:12
**author** 241:15
**authority** 63:12,14
85:4,23 130:18,24
145:4
**availability** 266:15
**available** 34:23
266:24 273:10,15
**average** 38:7 39:1
**avoid** 43:12
**aware** 29:11 36:10
36:21,22 37:8
44:2,3,3 95:22
102:22 103:23
113:3,9 122:18
139:12 159:6,8,11
178:15 187:17,21
227:12,14,21
235:7 272:5 273:3
**awareness** 13:17
23:6
**awkward** 96:18

---

**B**

**B** 3:11 4:1
**B-A-E-R** 69:10
**back** 12:22,24
17:12 44:1 48:1
56:4,24 62:12

106:12 107:15
110:12 112:10
113:22 154:7
160:1 162:16
168:2,22 175:14
178:4 179:5 180:9
197:12 198:18
201:9,15 205:4
206:4 215:3 235:9
235:13 260:4
274:3 276:1
**background** 103:15
103:17 202:16
234:21
**backing** 117:4
127:24 150:13
**bad** 16:20 66:11
176:24
**Baer** 69:8,9,9,9,9
70:1 99:9 102:8
109:23 110:6,8,21
111:3,7 113:3
251:3 254:2 260:8
260:11 261:7
263:1 270:5,8
277:24 278:10
279:20
**balance** 35:13
235:13
**balancing** 78:11
**ball** 216:16 217:14
**bar** 183:20 186:22
**based** 20:23 21:16
21:16 35:5,7,19
35:20,22 41:20,20
63:22 82:4 95:6
95:15 117:19
139:21 196:18
202:23 226:12,12
226:13 231:24
236:1 237:23,24
242:15 264:4
270:16
**basic** 169:14
**basically** 24:14
63:13 68:19 77:12

157:20 199:22
**basis** 16:13 17:7
39:22 41:4,23
61:21 104:15
105:7,18,21 170:3
203:15 263:20
**Bates** 4:8,13 27:13
27:18,20 43:2,6,6
43:14,15 46:19,20
83:14 98:15 107:5
113:16 125:6,15
128:12 130:6
133:23 157:6
159:19 160:6
162:2 166:8,18
180:18 182:7,13
185:17 195:23
196:2 199:12
210:24 211:8
239:7 240:3,22
250:10 251:23
254:14 260:1
265:24 267:13
269:20 274:20
278:2
**beams** 235:13
**bear** 185:18
**beauty** 235:12
**Beetlestone** 227:15
227:23
**began** 5:21 75:3
76:3 77:3 203:9
233:23 234:1
248:5 263:16
275:24
**beginning** 5:14
70:23 76:9 119:6
159:12 172:7
199:24 200:22
204:15 205:23
206:16 224:10
233:11
**begins** 32:23 93:18
96:6 113:16 119:7
119:22 120:20
121:14 131:18

Carmen Borges

178:20 198:20
199:2 205:20
212:1 244:21
250:24 255:10
267:13 269:2
**behave** 238:11
**behavior** 15:12
47:18,18 48:24
52:5,8 54:12,14
54:18 55:6,9,19
56:5,11 59:22,23
59:23 60:24,24
61:1 137:19
156:1 174:9
237:23 238:1,3
245:23 252:13
**behaviors** 61:4
189:12
**belief** 249:5,7
**believe** 10:21 31:5
34:13,21 39:17
74:4 76:14 77:15
77:17 78:2 82:2
90:8 92:3 97:17
97:22 101:16
109:17 122:16
125:1 137:10,10
180:12,19 194:4
201:10,23 207:17
220:7 240:23
242:19 248:8,17
265:6,11 268:9
272:12 274:19
**believed** 248:18
**believes** 203:9
230:8,8,9
**belong** 71:1 78:9
**benefit** 48:4 122:2
273:19
**best** 18:13,15 24:7
224:24
**better** 46:10 78:11
78:11 105:2
280:15
**beyond** 148:6,16
149:21,21 150:19

155:13
**bias** 13:10 14:13,15
15:5,11,11,24
16:8 49:1,9,13
70:22 74:5,5,7,20
75:1,5,21 76:1,8
76:17 77:1,2,19
79:18 99:23,24
100:3,10,12,15
101:8 103:7,7,10
103:12,19 105:5
105:16 106:9
107:13,24 202:17
202:18 255:24
271:17 273:8
**big** 22:17 66:19
67:15 149:15
208:21 227:10
228:15 245:15
**bigger** 13:7
**bit** 113:22 120:14
209:14 218:23
**black** 19:18 39:7,13
49:22 67:4 101:14
102:5 103:4,6
105:7,16,23
109:21 116:24
119:5 120:4
122:14 123:8
126:11 129:15
131:11 132:21
137:6,7,11,20,24
138:4,9 143:7,11
145:11,20,21,22
146:1,5,24 147:1
147:8,10 191:22
191:24 192:3,4
202:24 203:16
226:21,22 227:5,6
235:23,24 236:1,6
236:6,11 263:19
264:6,6
**blacked** 101:16
106:10 178:5,8
**blacks** 178:10
**blank** 142:20

165:16
**blanked** 86:11,13
86:14,16
**blatantly** 256:8
**blind** 20:19 155:13
166:13 168:19
**block** 28:13
**blood** 139:11
**Bloom** 117:17
**Bloomer** 116:22
117:22
**blue** 129:5 184:2,14
184:21 185:2
245:13,15
**body** 30:22 31:6,9
32:19 34:15 36:8
36:15,20 67:1
171:5,9,15 172:3
172:4,8 173:17
174:15,23,24
182:19 189:20,23
190:5 191:16
194:7
**bogus** 89:9
**bold** 88:6
**bombardment**
228:4
**book** 168:18
**books** 152:21,21
**Borges** 1:15 3:5,13
3:14,15,16,17,18
3:19,20,21,22,23
3:24 4:3,4,5,6,7,8
4:9,10,11,12,13
4:14,15,16,17,18
4:19 5:1,5,10
25:22,24 26:15,16
26:19,21,22 37:12
42:20 46:13 83:11
83:13 98:14 107:4
113:18 128:13
130:4 132:12
134:1 139:16
157:8 158:1,6
159:21 160:10
162:4 166:9 182:9

185:20 208:1
210:23 228:9
240:10,13 241:6
241:10 243:7
250:8 252:1
254:11,15 256:6
260:2 265:16,20
265:22 266:11
267:9 269:21,22
**boss** 257:1
**bottom** 96:3,4
118:3 119:1 129:2
134:3 135:2
158:13 243:16
265:23 266:4
**Box** 2:5
**bracket** 172:24
**break** 8:7,8 83:10
139:14 209:5,10
239:17 254:10
**breakdown** 36:15
41:7,22
**brief** 222:13 239:18
**briefly** 239:16
**bring** 23:18,19,21
34:13 137:22
195:20 247:7
**bringing** 247:9
249:11
**brings** 23:15,15,16
24:20 25:11,13
31:10
**broader** 13:7 23:13
23:14,17
**brought** 103:21
145:2 215:2
234:15
**bubble** 184:14,21
185:2 199:5
**bubbles** 184:3
**building** 7:9
**bullet** 93:18 169:8
179:12,22 268:16
274:4
**bullying** 168:11
171:17 206:1

238:23,24,24
**busy** 66:20
**buy** 104:20
**bypassing** 64:10
85:3,23

### C

**calculations** 42:2
**caliber** 118:9
**call** 22:10 63:4 68:7
68:8 85:1 126:22
135:11,16 138:13
161:21 178:3
204:11 255:9
259:4 267:1,2
270:17,18 278:4
278:20
**called** 5:1 22:1
27:18 57:8 74:5
79:17 91:2 173:20
192:4 238:23
**calling** 50:2 91:8,8
91:9,11
**camp** 237:1
**camps** 237:4,4
**campus** 30:3,6
34:13 42:12 96:20
117:14 136:5
138:4,6,7 143:8
191:14 196:24
230:21 242:3
**campuses** 41:18
242:7
**candidates** 21:14
21:19
**Cannon** 117:23,24
131:20 132:6,7
**capital** 49:1
**capitalized** 49:10
**caption** 83:15
166:11
**captioned** 26:14
27:8 42:22 46:15
**capture** 236:23
**captured** 39:9
**care** 138:13,13

**Carmen** 1:15 3:5
5:1 26:15 240:10
250:14 256:5,15
265:1 266:11,18
268:18,24 270:1
270:24
**Carolyn** 189:11
191:6 197:16
213:24 214:1,7
218:21 221:23
222:13 238:9
**Carolyn's** 183:17
**case** 5:13,19 8:22
8:23 9:2,12 27:20
67:9 123:9,11
124:12 139:12
**cases** 44:15
**catch** 12:10,20
14:24 254:20
**categories** 16:2,8,9
16:11 19:11,12,14
19:17,20 23:11,13
23:23 24:3 39:16
40:7
**category** 16:15 34:3
34:4 35:11,12
50:8 53:15 60:18
262:5
**Catherine** 120:13
**caught** 108:5
211:23 249:3
**cause** 52:7 130:12
130:23 141:12
163:11 199:8
224:21 264:14
**caused** 78:5,7
**census** 3:15 37:2,18
38:1 41:8
**centralized** 22:8,9
22:11,12 23:4,4
**certain** 7:11 9:1
14:17 35:10 81:13
81:19,21,22 82:13
**certainly** 37:21
91:23 122:13
123:8 140:8

147:14 228:11
250:4
**chain** 113:15 114:1
250:24 265:23
266:4,10
**chair** 97:13,23 98:7
98:9
**challenge** 64:20
193:23 202:16
**challenged** 193:24
**challenges** 5:11
16:22 64:11
193:22 202:11
**challenging** 64:11
66:4 79:9 194:1
202:17 203:3
**chance** 38:24
115:21 142:8
195:18 245:6
**chancellor** 30:14,15
30:17 134:9,14,16
134:18,23
**change** 17:22 20:10
20:11 22:4,17
71:3
**changed** 12:17 13:4
17:18,24 19:22
20:1 243:20
244:12
**changes** 40:15
70:16
**changing** 149:13
**channels** 141:19
**chapter** 168:18
**characteristics**
14:18,19,21 25:13
**characterization**
176:19 257:8,21
258:14
**characterize** 182:21
261:22
**characterized**
238:21,22
**Charles** 117:23,24
131:20 132:6,7
**chat** 183:7,21

185:14
**check** 66:24 70:7
202:15 207:5,5
211:20
**chemistry** 118:2
**choice** 96:17
**choose** 21:21
**chose** 169:13
**chronological** 83:16
134:4
**circulate** 71:4
**circulated** 133:14
242:12 251:2
**circulates** 129:2
131:10
**circumstances** 49:6
50:14 53:12
**civil** 138:14 247:4
**claim** 86:16 171:11
172:2 227:23
**claimed** 172:14
**claiming** 259:11
**claims** 84:6 121:15
121:16
**clarification** 8:11
82:10
**clarify** 107:16
120:7 149:11
151:14 216:23
268:13 269:19
**clarifying** 258:10
265:4
**clarity** 239:19
**class** 174:2 202:18
235:9
**classroom** 140:20
143:10 155:13
158:21 166:13
168:19 185:1
189:12 192:13
**classrooms** 166:14
173:11 185:5
**clean** 14:7 168:4
262:23
**clear** 7:13,15,17,18
8:17,18 19:11

32:1,16 51:23
70:9 79:7 81:10
109:15 113:5
152:14 161:11
163:12 173:3
186:23 210:24
211:7 240:20
**clearly** 121:6
147:12 189:2
196:23 264:13
269:8
**client** 76:13,20 90:6
95:22 97:7 101:21
101:23 105:3
111:21 114:4
130:8 140:10
141:5 146:16
150:14 155:17
182:21 204:14
210:21 211:18,20
212:17 218:24
219:2,20 220:19
222:2 223:2,20
224:2,6 227:12
238:15 252:5
277:12 279:15
**client's** 43:13
110:10 176:17
221:11,16
**clip** 214:13,16
215:3,14 216:24
217:3,8 219:24
220:21 221:17
222:4,13 223:2
224:8 225:17
226:7,17 234:14
239:20,21 240:3,9
245:24 246:14
249:20
**clips** 4:10 210:22
211:10,16 223:20
225:17 230:12
236:5 240:10,11
**close** 83:17 95:24
135:24 136:5,6
165:8 189:21

256:16 260:23
**closely** 152:17
**co-counsel** 182:11
**co-facilitator**
195:14
**cochairs** 28:16
**code** 54:19,21,23
55:2 208:18 230:1
**cofacilitated** 168:12
180:23 181:6,11
**cofacilitators**
190:20
**Cohen** 183:14
188:15,16,22,24
200:7
**cold** 139:10
**collaboration**
181:18
**colleague** 181:3
193:12
**colleagues** 55:15
56:4 180:22
189:10 247:8
**collect** 72:16 73:15
**collecting** 40:14
**college** 33:4 35:14
45:10 104:5
**collegial** 155:4,6,6
208:16
**collegiality** 156:20
193:4
**Collegially** 193:3
**color** 20:19 87:6
91:3,9 155:13
166:12 168:14,19
**combative** 189:4
190:9,10,12
**come** 11:8 50:10
70:14,17,22 123:2
145:12 155:7
165:17 190:17
220:19 225:11
**comes** 7:14 70:14
128:19 151:3
173:8 194:2
269:10

Carmen Borges

comfortable 116:24
125:10,22 127:9
127:20
coming 13:19 68:14
136:5
comma 196:3,6
comment 53:14
58:11 114:19
116:20 137:1
156:1 212:20
235:16 237:15
262:10
commented 197:17
197:18
commenting
110:21
comments 110:20
115:14
commiserated
182:12
Commission
186:10 187:7,12
commitment
138:14
committed 84:24
138:16 260:14
committee 18:22
19:2 20:13 21:11
22:6 27:9 28:2,12
28:18,23 44:9,10
45:24,24
committees 20:18
24:6
common 111:14,16
112:13 124:12
126:16,22 182:1
193:3,4
communication
73:4 137:4 149:6
164:1
community 34:10
34:13,16 244:1,10
244:22 245:8
247:7
comparatively 33:5
competing 235:13

complain 91:18,23
92:9 103:7 140:10
complainant 65:22
71:22 82:22 83:6
89:8 94:8 157:21
271:17 273:21
complainants 72:10
83:2 209:22
complained 65:22
102:5 103:4
187:17
complaining 62:23
75:23 90:15 91:1
93:7 144:8 172:5
complains 88:8
complaint 9:6,8,10
9:11,11,14 13:9
13:11 14:15 15:5
45:23 56:8,14
61:14,21 62:11,14
63:9 70:14 71:6
71:15,21 75:5
78:20 79:3 80:11
81:1,16 82:18
83:4,7,19,23 86:1
90:2,4,5 100:2,16
103:2,5,20 104:24
105:6,15 107:18
107:19 108:7
109:10,16 110:3
112:10 133:6
139:17,19 141:15
141:20 155:17
157:14,18 158:11
158:14 159:16
161:13 162:9,15
162:18 163:20
164:3,4,10,11,24
165:1,14,19,22
166:1,4,21 167:1
167:3,12,13,14
168:5 169:6
171:13,14 172:1
176:8 178:21
179:5,14,24
180:13,16 181:24

186:20 187:5,6,8
187:12 195:15
202:17,19,22,24
203:21 204:12,13
204:17 205:4,20
205:21 207:3,12
207:14 208:9
212:11 230:8,9,9
231:20,22 232:18
232:20,22,23
233:16 237:21,23
244:16 255:11,14
255:16 263:3
265:7 268:15
269:7 270:9,15
271:2,17 272:9
273:8,8,17 276:2
276:9,16 277:8
278:19 279:14
complaints 12:7,9
12:15 13:7,12,13
13:18 14:13 15:12
44:11 47:6 56:5
58:1 62:1,5,5
70:21 71:10 74:7
74:20 75:1 77:21
78:2,6,7,17 79:6
79:11,20 80:13,15
81:11,23 82:3,14
89:9 112:14
136:18 137:11,14
143:12,14 156:23
165:2,3,6 166:21
166:23 186:3,3,13
187:15,21 205:15
230:6 231:15
262:17 272:10
complete 182:17
240:8
completed 141:17
completely 113:8
183:19 212:23
224:18
complex 82:11
compliance 20:2
79:17,17 156:18

156:20
complicate 77:17
component 132:15
compose 21:11
composition 159:9
177:20
concentrate 185:24
concentration
237:3
concept 35:8 75:20
concepts 149:8
concern 142:14,15
172:10 266:13
concerned 247:15
264:12 266:20
concerning 113:10
135:9 165:14
207:3 208:9
252:21
concluded 280:24
conclusion 209:4
concrete 280:12
concretely 137:23
condemning 123:16
condition 48:5
138:17 228:18
conduct 46:16 47:5
48:2 49:1 50:13
50:15,16 51:3,10
51:14,16,18 52:6
52:8,14,16,16
53:10,13 54:19,21
54:23 55:2,23
57:8 61:18,19
79:3 189:4 208:18
230:1
conference 139:23
conferences 21:21
21:22
confidential 267:15
267:24 268:1,5,10
confirm 210:15
240:18
confirmed 171:22
conflict 46:3
conflicted 44:17,22

45:16
conflicts 12:14
conform 42:15
confront 155:14
166:13
confrontational
198:11
confronting 64:11
188:10 246:23
confused 76:2
211:8
confusing 43:12
70:23 79:5 114:12
confusion 78:1,14
209:14
Connecticut 2:6
connection 158:11
consent 210:3,4,5,6
271:6,10,13
272:16,19
consider 12:2 56:11
71:21 112:4,9
130:15 190:3
222:9 223:8
considered 10:22
80:16 151:18
166:15
considering 82:18
148:19
considers 92:17
consistent 57:16,17
59:5
consistently 59:23
59:24
consisting 48:24
52:6,8
constant 144:20
228:4
constantly 234:16
constitute 16:8
53:11 87:9
constituted 61:8
62:3 100:15
constitutes 50:13
100:3 166:22
constructing 173:9

consultations 12:13
consulted 100:1
  251:20,20
consuming 80:24
contact 71:5 73:24
  78:16 138:20
  159:15
contacted 142:3
  207:2 273:16
contacting 161:2,5
content 34:20 135:6
  147:22
contention 240:5
contentious 133:8
context 66:18 220:7
  227:10 237:18
continuation 53:15
  53:16 54:10,12,13
Continuations
  280:2
continue 135:1
  136:4 233:6 256:6
  279:16,17 280:3
continued 270:11
  279:22 280:7
continues 33:1
  256:15
continuing 54:14
  255:21
continuous 27:19
contradict 72:13
contrary 252:14
contributor 218:8
controversial 189:4
convenience 228:1
conversation 6:19
  70:2,4 92:14
  109:12 110:24
  112:3,8 120:8
  123:11 124:13,20
  129:9,10,14 133:8
  135:1 136:11
  151:2 167:5
  172:11 180:23
  181:6,10,11,17,17
  189:7 195:19

196:19 197:1
215:13 218:9
222:1 223:5 227:1
230:19 231:14
234:11 253:17
260:9 263:1 269:1
275:17 278:17
conversations
  127:12 257:21
  259:12
convey 246:18,21
conveyed 103:12
  124:13
convince 234:11
convinced 143:20
Cooks 188:14
coordinate 77:23
  267:1
coordinated 145:7
coordinating
  130:17 181:5
coordinator 29:7
  64:5 85:24 97:13
  97:23 98:7 130:13
  130:20 145:6
coordinator's 98:10
cop 133:11 137:6
  137:15
cope 79:22
copies 93:20,23
  178:16
copy 94:14 95:2
  267:19
corner 243:13,17
correct 7:20 10:23
  10:24 17:8,9
  27:14,15,21 28:16
  28:17,20,23 32:9
  33:8,9,12 34:6,7
  38:17 40:19,24
  41:10 44:2 45:14
  50:18 51:24 53:5
  56:20 58:22 59:12
  61:21,22 62:16
  68:17 69:12,19
  80:12 81:14 84:8

86:1,18 88:11
90:13 95:8,9
106:11,24 109:13
109:14 120:11
123:9 125:11
129:11 132:9
137:15 141:13
145:4 147:15,23
153:23 160:6
161:3 162:14
164:13 168:19,20
169:6 180:4,6,7
181:4,5,13 184:20
203:24 210:3
213:11 214:8
216:12 222:24
227:13,17 228:18
233:21 244:2
254:18 255:6
256:3,13 257:6,12
257:19,24 259:15
261:8,14 262:5,6
267:24 268:7
272:13 273:21
275:5,6,9,11
277:9
corrected 108:4
correcting 107:23
  212:1
correctly 30:24
  34:23 42:24 45:13
  46:17,20 49:7,19
  50:17 87:3 92:22
  94:1 96:21 97:15
  97:23 118:10
  121:1 126:2 136:8
  185:6 256:11,12
  256:19,20 260:18
  267:3 269:3
  279:18
correspond 253:21
corroborate 262:22
counsel 9:1 86:18
  108:5 114:9
  178:11 184:19
  199:17 275:14

279:10
counseling 273:12
  273:15
count 170:3
country 10:13 11:3
  11:7 119:3 227:16
  235:19 236:1
  237:8
County 41:13
couple 165:19
  183:6 245:21
  265:3,10,11
  270:22
course 34:20 72:1
  108:12 119:10
  139:4 151:6
  158:13 164:12
  165:23 195:11
  203:14 211:22
  223:21,24 224:24
courses 96:20
court 1:1,22 6:7,7
  6:10 12:24 27:6
  47:24 48:1
cover 47:5
Covid 13:24 14:3,6
  14:10 68:11,14,19
  71:3 76:11 77:1,6
  78:13 119:13
crazy 202:3
create 18:10,13,19
  35:17 40:23 84:12
  93:13 168:4 228:5
created 13:17 77:18
  84:6 109:6 270:2
creating 6:7 23:7
  40:15 41:3 136:13
  227:24
crisis 119:4
critical 55:21 111:4
  126:15 127:1
  147:22 148:20
  151:5,7,17,23
  152:15 170:10
critically 148:12
criticism 45:11

55:23 127:5 231:6
  231:8,15
criticize 151:14
criticized 89:15
  173:18
critique 88:14,21
critiqued 88:9
critiques 90:16
culturally 33:1
curious 206:8
current 30:16,16
  243:21
curriculum 34:20
cut 104:6
cuts 199:9

---

**D**

D 3:1
DAA 99:2
damaged 203:1
dangerously 136:5
dark 235:21
data 3:15 37:18
  40:14 66:14 72:23
database 22:12
date 1:16 107:6,24
  113:16,21 142:8
  160:7 164:15
  168:5 185:17
  266:22 278:23
dated 133:24 157:6
  158:3,8 159:19
  160:7 162:2
  180:16 208:3
  239:7 240:22
  251:23 255:1
  265:24 266:5
  268:19 269:24
dates 107:17 164:2
  166:8 199:9
  268:19
Dating 162:16
daughter 10:16
  235:8
Dawn 121:19
day 96:16 108:14

Carmen Borges

108:18 158:10
165:8,8 166:4,4
206:9,10 255:6
266:17 268:21
275:17 279:7
**days** 164:17,18
165:19 207:2,14
**De** 1:4 5:6 10:21
92:18,24 95:23
144:8 148:11
151:22 206:2
210:21 212:17
222:2 252:5 255:4
257:21 271:1,5,9
271:14,23 272:1,4
272:5,9,10,11,16
272:20,22 273:1,4
273:14 277:8
**de-escalate** 189:7
**deal** 127:5 136:24
208:21
**dealing** 85:4
**dean** 21:12
**dean's** 21:5
**Dear** 119:2 120:10
**debate** 189:6
**December** 251:24
252:6 253:3,5,6
**decide** 13:8 17:1,4
102:23
**decided** 103:1
**deciding** 253:15
**decision** 77:8 85:16
145:24
**decisions** 64:10
122:21 123:1
236:3
**deconstruct** 185:4
**dedicate** 10:1
**dedicated** 34:16
**defend** 45:10 55:16
**defendants** 1:9 2:13
240:7
**defense** 247:6
**define** 18:15,23
51:3,13 52:19

55:8,12 57:1 62:5
65:5
**defined** 15:12 23:10
24:11,11,13 47:7
48:19 53:7 55:10
58:20 78:12
**defines** 47:22 54:18
**defining** 24:9 58:8
**definition** 24:10
47:18 48:23 49:12
52:7,11 54:7
59:14 60:5 117:20
121:23 130:22
136:6
**definitions** 47:9,15
47:19,22 58:12
64:13
**DEI** 27:9 29:22
30:13 32:1 196:23
**demand** 79:20
**demanding** 35:22
36:5
**demands** 36:11
**demonstrate** 246:1
246:15
**Denial** 5:20
**denies** 48:3
**deny** 122:18
**dep** 26:6
**department** 21:5,8
21:9 25:1 29:3
92:15 99:17,18,20
99:21 103:12
115:20 123:10
145:2 150:1
195:17 280:18
**departments** 23:5
126:22
**depend** 154:24
**depended** 176:22
**depends** 50:13
51:12 53:11 60:24
72:6 151:20
154:21,22 155:1
193:23 194:21,23
230:4,4

**DEPONENT** 1:15
**deposed** 5:15,17
221:9
**deposition** 1:13
3:13 5:15 6:8 7:8
8:20 9:16,21 10:2
16:5 26:14 27:2,3
63:24 210:21
211:6 224:24
239:21,23,24
240:1,2,7 245:21
258:21 259:14
265:6 267:22
278:3 280:24
**depositions** 6:3
**derailed** 232:24
**derivative** 91:4,10
91:11
**derive** 16:9
**derogatory** 49:18
**describe** 114:14
123:4 124:9
133:18 157:17,18
164:22 189:3
190:9,19 238:4,9
**described** 31:7
60:23 61:17,17,20
85:21,22 103:22
137:16 155:9
175:17 217:6
**describes** 205:24
**describing** 60:4,6,9
177:10,10 190:17
**description** 21:13
137:17 190:9
191:4 226:18
**deserve** 16:23
**deserves** 17:1
**designate** 240:2
**designated** 210:23
239:21 241:8
**designation** 209:13
239:19 240:21
267:24
**despite** 7:16
**detail** 278:22

**detailed** 63:21
**details** 66:23 71:7
**detain** 138:12
**determination**
104:9 264:4
**determine** 62:18
71:8
**determined** 138:24
181:7
**detract** 85:8
**detrimentally** 49:5
**devastated** 198:17
**developed** 167:5
**developing** 173:20
**development** 34:17
172:15
**deviated** 228:14
234:2
**deviates** 224:18
**deviating** 224:9,13
225:8
**Di** 5:13 9:6,8,10
90:6,22 105:17
109:21 110:18
114:4 130:9,18
139:17 141:6,15
143:17 145:4
149:18 150:14
151:7 155:22
158:10 162:14
165:4 166:24
168:11 173:5,14
182:22 184:2
187:15 204:14
207:12 211:5,18
223:2 228:3
230:12 239:22
240:7 251:3
252:20 258:13
260:21 261:2,8
262:16 263:2
269:6 270:9 276:8
276:15 278:19
279:15
**dialogue** 161:22
174:6

**difference** 15:10
51:10 52:15 54:5
78:19
**different** 13:10,12
19:1,1 22:18
25:12,13 31:7
42:12 46:1,2 51:7
51:9 59:4 91:12
107:17 113:8
147:6 171:23
174:10 183:2,10
191:14 211:4,16
227:2 233:4
237:20 239:24
243:19 248:14,16
**differently** 14:16
83:4 148:20
149:13 150:6,10
**difficult** 8:2,2 20:9
**difficulties** 5:11
**dig** 182:4
**direct** 7:12 154:19
155:2 162:21
242:15 256:13,14
276:17
**directed** 233:6
256:6,23
**directing** 161:19
**direction** 176:2
**directions** 64:6
**directly** 90:22
109:9 112:11
133:1 155:18
**director** 29:18
57:14,21 75:12,15
98:1 99:7,9
192:20 230:2
231:16 232:3
256:5
**directs** 7:13
**disability** 14:23
**disagree** 98:6,9
256:17 264:10
**disagreed** 238:6
**disagreeing** 100:6
263:10 264:14

Farrell Court Reporting

Carmen Borges

Page 289

**disagreement** 100:5
189:5 231:10,12
233:4
**disagreements**
190:10
**disclosed** 83:19
216:15
**discomfort** 129:7
176:17 197:5,10
**disconnection**
197:10
**discontent** 189:3
**discourse** 173:11
**discourses** 185:1
**discovery** 47:14
216:15 224:1
243:24 244:22
245:8
**discriminate** 16:13
17:5 104:14 123:7
130:23 137:23
**discriminated**
187:18
**discriminates** 174:1
**discriminating**
38:19
**discrimination**
11:19,24 12:8
15:6,7,13 16:16
16:19,21 17:7
46:15 47:4,6,7
104:7,10,24 105:4
105:6,17 109:22
144:1 169:19
180:20 186:15
196:18 203:12,19
203:20 204:3,14
204:16,20 226:21
227:24 230:18
233:24 234:16,23
235:16,20 236:4
237:15 239:3
248:10 255:24
263:20,21 273:8
273:17 276:9,17
277:9,12,15

**discriminatory**
203:13 249:6
255:20 256:8
**discus** 227:4
**discuss** 96:16 100:7
103:13 110:24
142:4,12 146:20
152:4,21 159:4
160:19,22 161:2
162:10,19 163:20
169:3 202:20
203:4 228:22
249:15 254:2
266:14 275:21
**discussed** 9:19
37:10 40:21 64:17
86:1 90:21 109:20
109:23 110:5
145:1 155:12
170:8 173:7
224:12 225:9
228:15 231:3,7
261:12 276:8
277:14,15
**discusses** 158:14
**discussing** 23:5
40:20 83:18 96:5
147:8 148:8
149:12 152:2
194:2 226:11
228:3,17 233:12
237:9 247:10
248:11,12
**discussion** 5:8 62:9
113:9 116:14
118:21 120:14
128:16 139:20,24
140:9 149:22
158:10 161:20
166:12 170:6
173:23 174:3
178:18 188:11
189:2 195:21
197:11 198:10
206:12 212:5
222:3 224:19,20

225:7,8,12,13
226:13 227:7
231:8 233:11,13
234:2 236:6,8,9
239:5 257:9
276:15
**discussion's** 173:23
**discussions** 141:1,2
149:24 150:5,11
152:23 176:5
258:14 264:3
**disengaged** 225:16
**disheartening**
139:5
**dismantled** 249:13
**dismantling** 120:3
**dismissed** 228:1
**display** 247:24
**displaying** 189:20
**dispute** 114:14
**disrespect** 208:22
246:15,18,21,23
247:2,3
**disrespectful** 85:22
92:20 208:17
225:15 246:12
**disrupting** 167:2
**disruption** 167:1
**disruptive** 54:18
170:14
**dissect** 66:20
**dissecting** 229:20
**distinguish** 53:20
**distributed** 64:19
156:8,8
**District** 1:1,2 9:12
**distrust** 203:9
**disturbed** 120:14
**disturbing** 120:17
**diverse** 18:14,15,19
18:21,23 19:5,6
20:14 23:7 24:8
24:14,15,20,22
25:3,10 30:21
31:5,9,13 32:18
33:2,5,15,16,18

33:22,23 34:2,12
34:17,19 35:17,19
35:20,21 40:24
41:3
**diversification**
20:15
**diversity** 20:22
23:10,16,18,22
24:10,11,16 27:9
28:2 31:7,9 32:8
32:11 33:12,13
34:21 35:8 39:22
42:1 97:14,24
98:6,10 99:4
114:22 118:9
181:20 182:1
260:14 270:12
279:17 280:7
**divest** 151:11
**division** 99:15
102:7,8,22 202:20
**document** 10:10
26:14,23 27:8,20
27:23 37:15 41:8
41:12 42:22 46:12
48:9 83:18 102:23
103:1 128:12
157:5,11,13,18
160:6 166:11
168:21 178:4
179:2 185:16,22
199:3 211:13
239:7 241:9,10,12
241:15 250:10,24
254:14,15 255:12
265:22 266:1
267:6,11,14,16,20
268:4,18 269:20
**documentation**
103:14 104:1
**documented** 67:24
102:17,19,24
111:22,24 112:1
**documents** 9:1,2
15:9 27:18 43:5
43:13 53:2 73:15

74:1 103:21 166:7
178:13 183:8
210:24 265:10
**doing** 16:20 17:7
46:23 80:5 97:15
108:6 149:13
150:9 152:24
186:6 197:1 212:1
234:19 246:24
247:1 248:5
**dominated** 174:2
**door** 138:20,21
**double** 26:3 45:5
207:5,5 249:3
**doubt** 249:5
**downright** 37:22
**Dr** 10:21 252:5
271:1,5,9,14,23
272:1,4,5,9,10,11
272:16,20,22
273:1,4,14 279:20
**draft** 27:10 31:12
**drafted** 21:13 242:8
**drafting** 242:10
**drag** 202:4
**dramatic** 140:16
**drastic** 140:16
**draw** 21:19
**drawing** 142:19
165:15
**drawn** 19:5
**drive** 104:16
**due** 45:12
**duly** 5:2
**dumb** 218:14
**duration** 50:15
53:13
**duty** 139:5
**dwell** 131:15
**dwelled** 275:10
**dynamic** 131:4

| **E** | | |
|---|---|---|

**E** 3:1,11 4:1
**E-D-R-I-E-C-K-E**
69:16

**e-mail** 72:19 73:2,4
  73:6,8 87:2 92:19
  93:1 113:15 114:1
  114:4,5 115:5
  116:10,10,18
  117:5,22 118:14
  118:18 119:2
  120:17,19,20,23
  121:16,17,19
  124:23 125:15,20
  126:15,19 128:1
  131:7,8,10,21
  133:23 134:5,6,8
  134:13 135:11,14
  135:17,20 159:18
  159:20 160:2,5,9
  160:10,16 161:1
  162:1,6,22 163:21
  164:5 165:15,23
  185:17,24 207:19
  250:16,18,23
  254:23 257:3,20
  258:16,18 264:20
  265:23,24 266:3,6
  266:22,23 268:19
  268:20,23 269:2
  269:12 275:7,8,16
  276:7,15 277:11
**e-mailing** 93:24
**e-mails** 72:16,19
  73:12,14 85:5,6,7
  85:14 94:14 113:7
  114:7,11 115:2
  128:15 135:23
  202:21 268:19
**earlier** 24:12 33:23
  59:7 74:4 82:3
  83:23 90:8 180:2
  198:16 204:12
  240:21 255:6
  261:13 265:5
  266:10 270:24
  277:9 279:4
**earliest** 266:3
**early** 177:4 201:4
  275:24

**Earth** 115:8
**easier** 20:8 78:18
  122:13
**easiest** 265:18
**easily** 105:23 262:4
**Eastern** 1:2 9:12
**easy** 117:1 125:22
  127:9,20
**edited** 216:10
**education** 30:21
  49:4 59:11
**educational** 74:8,11
  74:13,15,17,24
  75:2,11,16 77:10
  150:5,5
**educators** 34:16
**EEOC** 187:14
**effect** 68:11 149:2,3
  236:12
**effort** 18:13 182:1
  259:15
**efforts** 181:20
**egregious** 168:11
  171:17,20 204:15
  204:16,20 206:1
  238:22,24
**eight** 125:7
**either** 113:2 172:1
  210:10 214:11
  216:4 280:16,16
**electronic** 27:7
**eliminate** 228:21
**ellipses** 184:24,24
**embedded** 122:18
**embraced** 127:12
**embracing** 129:7
**emotional** 193:19
**emphasis** 111:8
**emphasized** 59:8
**emphasizing** 14:8
**empirical** 88:10,10
**employee** 11:13
  75:6,6 76:4
**employees** 32:11
  74:19 100:8 112:5
  123:8 210:13

  273:19
**employment** 48:6
  49:3 59:11
**encompass** 15:24
**encourage** 263:13
**encouraged** 41:1
  56:19 78:23
  148:11
**endearing** 188:6
**ended** 65:1 66:7
  71:1 177:1,2,4
  198:16 201:4
**enforce** 44:13 45:17
  186:14
**enforced** 44:16,23
  50:5
**enforcement** 18:11
  46:2,3
**enforces** 87:10
  105:13 146:12
**enforcing** 43:20
  54:8 87:7
**engage** 148:12
  151:2 152:5,8,11
  173:23
**engaged** 137:19
  155:6 159:6
**engaging** 234:15
**Engineering** 11:18
**English** 93:23
  99:21,22 115:20
  139:24 141:2,3,4
  195:12,16
**entire** 83:5 138:2
  150:9 169:18
  224:1 227:2 240:9
**entitled** 9:20
**entrance** 239:11
**entry** 192:8
**environment** 84:7,8
  84:12 109:6 136:2
  136:7,13 228:1,6
**equal** 17:23 20:3,4
  20:6 50:22
**equity** 27:9 28:3
  74:8,11,13,15,17

  74:24 75:2,11,17
  77:10 97:14,24
  98:6,10 114:22
  129:7 181:20
  182:1
**especially** 122:1
**Esposito** 191:6
  197:17 214:1
  218:21 222:13
**ESQUIRE** 2:4,10
**essence** 167:23
**establish** 79:6
**established** 13:6
**et** 1:8
**ethics** 20:2 42:23
  44:17,22 55:15
  79:16,17 93:5
  135:24
**ethnic** 19:20
**ethnically** 33:1
**ethnicities** 19:2
**evaluation** 65:19
  130:14,15
**evaluations** 64:16
  65:6,9,24 67:5
  110:17 261:12,14
  261:23
**evening** 265:1
**eventually** 251:16
**everybody** 14:20
  23:15,20,20 24:13
  24:14,19 25:11,13
  31:10 76:1,2
  154:12,12
**everybody's** 24:19
  24:20 34:1,2
  66:20 120:6
**everyone's** 24:15
  33:16,23
**evidence** 35:21 36:5
  36:13,17,21 67:8
  72:2,5,7,9 74:2
  84:23 88:11
  137:22 139:9
  238:14
**EWING** 2:9

**exact** 140:7 200:11
  214:16
**exactly** 10:6 22:15
  24:24 43:10 48:23
  58:14 63:2,6
  69:11 76:11 79:4
  82:9 99:11,22
  100:9 112:2 118:6
  119:19 131:12
  141:7 148:1
  155:20 193:10
  204:1 205:16
  206:20 231:24
  243:6 244:11
  245:12,17 246:13
  280:13
**examine** 26:1
  179:22 192:10
  251:10 254:9
  279:10
**examined** 5:3 32:24
**example** 45:20 46:7
  63:13 101:12
  152:14
**examples** 61:3
  63:11,15,18 144:2
  152:3 153:16
  154:5
**excellence** 244:1,8
  244:22 245:8
**excerpts** 210:22
  212:13 246:17
**exchange** 45:11
  126:19 129:24
  130:7 133:23
**Exchanging** 55:23
**exclude** 25:14,17
**excluded** 24:22
**excluding** 223:21
**exclusion** 25:3,8
**exclusively** 164:10
**excuse** 19:22 20:4
  29:19 32:21 37:3
  39:12 43:24 60:6
  65:2 121:13,16
  123:6 145:12,21

195:23 208:15
211:20 218:24
219:3 247:5
259:24 274:7
**executive** 19:10
**exercising** 123:7,17
123:18
**exhibit** 25:21,22
26:6,9,14,16,23
27:7 37:1,5,10,12
37:14 42:19,20
46:11,13,15,24
55:14 56:24 59:7
83:11,13 93:4
98:12,14 106:10
106:14 107:2,4
108:8,14,17,20,21
113:15,18 125:3,5
125:18 128:11,13
130:3,4 133:22
134:1 157:5,8,23
158:1,4 159:18,21
162:1,4 163:11
165:12,24 166:7,9
182:5,9 183:8
185:16,20 198:18
201:9 204:13
205:5,7 207:7,16
207:17 208:2
209:13 210:19,20
210:23 211:5,7
212:14 239:6,11
239:12,13,22,24
240:4,13,19,21
241:6 243:7,9
244:4,17 245:10
246:7 250:7,8
251:22,23 252:1
254:11,13 259:23
259:24 260:1,2
265:20,22 266:10
267:9 268:5
269:19,21,22
274:3,5,6,9,16,17
274:17,20 275:7
275:12,13 276:6

277:1,19,19
**exhibited** 174:9
**exhibits** 4:20 26:1
46:24 133:15
239:10,19 274:6
274:21
**exist** 89:5
**exists** 132:21
279:11
**expand** 18:10 79:22
184:16
**expanded** 24:10
76:1 79:10
**expansion** 79:19
**expect** 42:4 127:4
143:12 154:5
191:22 192:3,20
203:12 247:4
**expectation** 42:3
271:20,24 272:23
**expectations** 32:5
55:6 242:20
**expected** 81:16
**experience** 37:22
45:16 60:19,20
61:5,12 85:8,11
95:16 117:20
143:5 203:11
206:16 249:21
271:16
**experienced** 84:11
89:12,14 171:7
189:6 204:20
**expert** 123:20
**explain** 8:6 11:1
12:5 53:14 54:4
59:19 70:12,14
72:14 93:1 105:2
168:8 180:19
194:13 205:21
212:6 234:19
236:22 280:9
**explained** 6:4 23:11
54:7 193:19
224:10
**explains** 84:15

174:9
**explanation** 82:24
238:5 254:21
**explore** 219:14
**explosion** 78:5,7
**exposed** 144:10,12
183:19
**exposure** 144:20
**express** 155:23
172:10
**expressed** 87:6
153:19
**expressing** 170:13
**expressions** 190:1,2
**extension** 6:6,10
**extent** 8:15 23:8
62:24 63:3 101:21
**eyes** 182:14

---

## F

**F** 16:20,24 17:1,6
**F-R** 69:14
**face** 78:15,16 241:9
**facial** 190:1
**facilitate** 30:22
**facilitating** 181:10
**fact** 144:14 145:1
159:12 161:12
169:12 217:17
223:11 228:21
245:7 248:11
**factors** 37:24
**facts** 70:19 78:22
258:1
**faculty** 17:4,4 21:12
21:16 29:2 30:22
32:12 33:6,7,12
33:15,19 34:5,12
34:14 35:10,17,23
36:6,14,19 38:11
38:19 39:1,8,12
40:7 43:22 44:6,6
44:7,9,9 45:22,24
45:24 50:24 56:12
63:11 64:3,16,19
67:21 72:18 73:2

74:20 75:24 86:24
87:1,6,17 90:9
92:18 93:12,22
94:14 95:2 96:7,8
96:10,15,19 99:14
100:5 102:10,12
102:18 109:13,15
111:1,16,18 112:3
113:1 114:17
115:23 116:1
122:4 123:6 127:4
133:9 140:9 145:8
146:20 147:10
153:17,18 156:10
156:23 158:16
168:18 169:7,10
176:4 191:13,15
197:2,2 230:2,6
232:6 247:7
260:22 261:1
276:3
**faculty's** 72:21
110:14
**failing** 150:9
247:24
**fair** 144:19,22
260:7
**faith** 66:11
**fall** 60:17 76:16
**falling** 193:20
**falls** 52:17 53:15
**false** 230:5,9
**familiar** 44:5 47:1
67:15 114:8
**family** 138:18
234:21
**famous** 91:3,9
**famously** 50:1
**far** 38:15 185:6
189:2 247:14
**FARRELL** 1:22
**Farrellreporting...**
1:24
**fashion** 20:19
**fast** 166:3 218:23
221:21

**faster** 81:7 167:20
174:13
**fat** 214:16
**fear** 110:4,9
**federal** 9:12 104:6
211:23 234:23
235:16
**feedback** 151:15
**feel** 8:6,11,12 31:23
93:17,19 117:5
122:11 128:1,4,7
128:8 136:3,4
147:15 174:6
176:5,8,15 264:11
**feeling** 100:18
102:11,13 127:12
136:11 144:20
**feelings** 83:2,3 87:1
87:14,18,23 88:1
100:21,22,24
106:5 232:14
247:13
**feels** 57:10 87:2
89:14 93:20 220:8
247:13
**fellow** 156:23 230:6
232:6
**felt** 87:6 89:11
97:12 120:14
142:16 144:14,24
174:4 175:23
176:2 177:10,16
192:17 256:7
279:22
**female** 67:4 131:4
218:8 222:15
235:12
**FERPA** 86:17
267:16
**field** 91:3,10 123:23
169:14
**fields** 124:3
**figure** 61:3 80:22
**figured** 81:17
184:13
**file** 13:7,9,11 56:14

Carmen Borges

67:24 70:21 76:3
78:2,20,24 79:3
103:2 112:14
142:9 165:6 186:3
**filed** 155:17 165:2,3
166:21 187:6
202:17,19 203:20
231:22 255:23
265:8
**files** 230:7
**filing** 71:6
**filled** 80:7 141:17
**final** 37:8 120:2
251:5,19
**Finally** 34:20
**find** 6:9 82:20,23
82:23 84:23
156:14 171:4
212:20 214:23
220:10 224:7,9,12
232:16 233:17
261:9
**finding** 204:2
**finds** 90:15 96:24
**fine** 45:6 47:17
199:15 229:4
232:4 250:6
**fingers** 214:16
**finish** 28:8,11 36:4
63:3 114:11,12
271:9
**firm** 164:18
**first** 5:2 26:13
27:13 31:2 33:4
34:11 35:14 46:19
52:5,6 69:14
70:17 71:5 83:22
84:2 86:3 95:13
98:17 109:9,22
116:18,23 121:11
121:15 124:24
125:2,18,19
126:23 130:6
131:23 135:19
140:23 157:6
158:13 163:1,16

172:9,17 182:6,15
183:6 185:24
199:9 200:21
205:5 211:17,18
212:4 230:14
238:3 243:1 265:5
271:9 272:15
273:7 274:8
**five** 13:22 92:16
110:19 196:5
261:15
**fives** 236:19
**flip** 168:22 206:4
**flipped** 175:4
**flipping** 190:19
**flooded** 78:4 80:11
80:13
**flooding** 78:16
**Floor** 2:11
**flows** 97:9
**Floyd** 119:9,10,15
120:5 128:18
**flushed** 80:20
**focus** 12:8,12 19:12
24:18 74:17,18
172:8 174:13
185:11 222:1
225:1,7,7,8 226:1
**focused** 23:23
**follow** 80:23 111:23
112:21 179:12
246:9 248:2
**follow-up** 253:18
269:13
**followed** 112:23
135:12 139:23
**following** 34:11
113:20 127:15
179:21 262:3
**follows** 5:3 127:10
234:6
**footer** 118:3 132:7
**force** 113:11
**forcing** 170:13
**foregone** 209:4
**forgive** 194:5

**form** 15:14,15,19
17:10 20:20 22:5
24:17 25:5 27:7
31:14 32:10 33:17
35:6 36:9 38:20
39:3,24 44:18
46:6 52:21 53:9
53:23 54:11 56:1
56:6,13,21 58:24
59:16,21 60:11
80:4 82:15 84:14
87:15 88:2,23
89:10,16,21 90:18
93:10 94:5,10,17
95:17 97:2 98:2
101:1,9 104:18
105:9,19 112:12
125:12 126:20
127:14 128:9
129:16 131:1
132:13 136:14,19
141:17,17,18
145:5,14,23 146:7
147:4,16 150:2,17
151:19 152:10,19
154:20 157:1,20
157:20 167:18,18
168:5 169:23
170:5,18,22
176:14 177:8,22
192:1 193:13
204:22 207:18
210:16 227:19
228:7,13 231:17
232:8,19 235:4
236:20 237:11
238:7,17 247:16
249:24 257:13
258:15,23 259:17
263:22 264:8
268:16 278:6
280:8,20
**formal** 204:13
205:20
**formalities** 6:10
**formality** 6:19

**format** 157:17
240:3
**formed** 61:15,20
**formerly** 29:19
**forms** 167:16
**forth** 10:10 42:9
77:10 121:23
183:24
**forum** 135:1,3
**forums** 135:4
**forward** 166:3
178:3 179:13,15
180:11 215:8
218:23 219:20
220:17 221:21
222:18 225:13
**found** 61:8,14 62:2
120:17,23 121:8
139:9 153:13
204:4 208:15,21
208:22 222:4
223:12 240:1
246:11 248:1
251:11 259:23
278:13,16
**four** 13:22 17:21
19:12,14,16,17,23
23:10,23 24:3
40:6 45:2,5
242:24 243:23
244:12 246:5
**fourth** 86:23
**fragile** 133:7
**frame** 13:23 260:5
**free** 8:6,11 24:6
45:10 55:16
256:17 266:18,19
**freedom** 149:6,6
**frequency** 50:15
53:13
**frequently** 144:13
260:18
**Friederike** 69:5,7,7
69:9,15 70:1
92:12 96:1 99:9
100:6 102:8 103:9

103:11,23 104:1
105:2 109:12,17
109:18,23 110:6,8
110:14,21 111:3,7
111:13,18 112:2
113:3,6 161:9
202:20 251:3
253:15 254:2
255:23 260:8,9,11
260:19,19 261:7
262:3,3 263:1
264:9,13 270:4,8
270:14 277:24
278:10 280:4,5
**Friederike's** 99:8
109:19
**frivolous** 81:11,23
81:24,24 82:14
**front** 140:19 201:20
**frozen** 196:24
**full** 12:11,20 216:9
**function** 92:9
153:15 183:21
**functioning** 69:1
153:14
**further** 106:22
142:4 167:4 182:4
259:5 280:9,21

---

**G**

**game** 241:2
**gather** 72:2,5 74:1
**gears** 42:6
**gender** 14:23 99:23
100:3,15 189:9
**genders** 131:5
**general** 42:23 67:11
73:10
**generalizations**
174:7
**generally** 44:3
143:4
**generation** 33:4
35:14
**generations** 149:5
**genocide** 50:2

Farrell Court Reporting

Carmen Borges

**George** 119:9,10,15
  120:5 128:18
**German** 69:12
**gesticulating**
  219:12
**gestures** 171:15
  172:3,4,8 173:15
  174:16,16 175:9
  175:10 191:17
  194:7
**getting** 8:1 13:11
  62:13 78:11
  148:16 188:3
  194:13 209:2
  241:4 249:3
  264:18
**gist** 150:11
**give** 27:19 54:2
  71:15 143:20
  152:3,3 154:4,4
  154:14 159:22
  166:19 175:14
  190:24 191:1
  195:18 197:19
  199:17 209:1,19
  210:5,6 211:12
  250:20,21 259:22
**given** 143:6 211:6
  212:11 215:19
  232:3 238:14
  239:23 242:17
**gives** 123:24 124:2
**giving** 16:20 17:6
  67:3 92:20
**glad** 10:14 107:23
**gleefully** 108:6
**Gmails** 114:10
**go** 5:7,14 13:9
  21:21 27:6 40:2
  44:8 45:22 47:10
  54:2 62:8 64:24
  66:8,14,24 71:8
  72:18 73:2 74:23
  77:3 78:10,19
  83:9 86:10 96:14
  106:11,22 114:10

114:11 115:5
134:3,4,23 139:13
145:15 146:20
148:11,18 149:11
149:20,21 150:19
151:1 154:7
167:19 175:20
178:17 180:9
189:2 194:10
195:5 198:18
200:5,6 201:9,23
204:24 205:4
209:5 233:6,15,17
234:1,10 239:14
239:16 245:7,10
254:8 255:3
265:19 274:18
**goal** 18:20
**goals** 18:9
**goes** 40:10 45:23
  46:1 49:15 59:23
  92:24 95:7 181:15
  222:1 223:21
  225:23 267:13
**going** 6:20 8:16
  25:24 27:12 32:5
  37:19 47:1 50:12
  53:1 56:24 70:23
  74:7 75:1 99:24
  107:15,23 110:24
  112:3,6,9 113:22
  117:2 124:14
  125:24 127:22
  138:12,16 148:14
  157:23 161:23
  166:20 176:1
  182:6,17 192:7
  202:3 204:6 208:8
  223:19 228:23
  236:18 240:2
  241:11 250:21
  265:12,22 276:1
  277:1
**gonna** 5:14 6:14
  8:19 15:17 25:20
  26:13 37:1 42:6

42:18 43:2 46:11
47:13 55:1 56:8
86:14,18 96:11
97:10 98:12
101:13 107:8
113:15 124:18,19
132:2 133:22
135:16 157:5
162:1,21 166:7,17
166:19 170:8
178:9 182:5
184:19 185:9,9,16
206:5 209:1
211:10,13,15
217:12 218:4,23
220:17,21 221:19
221:21 222:18
224:21 239:6
243:9 248:22
250:7,10,19
251:22 254:8,13
259:7,22 263:6
264:20 265:2,16
267:5 279:9
**good** 10:14 96:17
  96:23 110:15
  153:23 172:15
  199:11 203:7
  261:8,11,17,23,24
  265:1,1
**gotta** 241:2
**government** 37:19
**grab** 26:13
**Grace** 28:15 29:1
  155:18 156:6
  165:1,3 166:23
  168:13,17 169:5
  169:12 172:2,9
  173:19,24 180:16
  183:15 192:16
  194:16 195:8,10
  196:3,6,12,14,17
  196:21 197:21
  198:16 212:13
  214:7,8 215:22
  217:24 234:8

235:7,14 238:15
244:16 272:11
**grade** 105:1
**gradually** 79:24,24
**graphic** 49:17
**grateful** 108:5
  211:24
**grew** 37:9 122:8
**group** 152:1 174:8
  228:3
**grow** 89:20
**grown** 56:12 90:11
  127:4 177:20
**growth** 30:22
**guarantee** 8:12
**guess** 11:22 18:1
  20:23 25:2 51:21
  98:17 99:4 102:13
  103:9 122:7,20
  136:23 156:9
  169:17 176:22
  177:23 179:17
  207:19 237:12
  247:14 249:21
  252:9 265:1,11
  267:6 268:5
**guessing** 8:14
**guilty** 139:10
  208:21,22
**guys** 197:20 221:6
  222:23 223:17
  238:8 264:19
  277:14
**gymnastics** 235:9
  235:14

| **H** |
| --- |

**H** 3:11 4:1
**habit** 52:1 278:4
**hair** 235:9,12
**hall** 138:22,23
**hand** 175:9,10
  183:16 243:13,17
**handful** 265:3
**handle** 274:21
**handling** 75:4 79:6

**hands** 183:16
**handwriting** 98:19
  102:21 107:10,11
  109:5
**handwritten** 70:8
  98:13 107:3
  157:24 260:5,7
  269:24 274:23
  277:20 278:21
  279:11
**hang** 274:5
**happen** 71:9 91:12
  129:17 161:12
  256:21
**happened** 103:10
  124:21 138:11,21
  142:2 161:15,18
  164:3,17,18 165:1
  171:3 207:1 208:7
  208:10 217:1
  232:10 235:22,24
  236:1 247:3,21
  248:4 249:5
  253:18,20 255:18
  258:5
**happening** 71:3,7
  139:8 175:16
  177:11,15
**happens** 112:13
  131:19 215:9
  232:5
**happy** 26:19 196:23
  199:13 270:11
  279:17,24 280:2,3
  280:5,6,10,16,17
**harangue** 170:16
**harangued** 147:1
**harass** 51:22 146:5
**harassed** 144:20
**harassing** 145:11
  145:20,21 212:20
  215:14 219:7
  220:10 221:17
  222:5 223:9 224:8
  230:12 232:7
  247:14

Farrell Court Reporting

Carmen Borges

**harassment** 46:16
47:4,6,7 48:10,19
49:15 50:13,20
52:7,17,20,22,23
53:4,11,15,20,21
53:21,22 54:5,6,6
54:7,15 57:18
59:9 61:8,16,21
62:3 146:16 170:2
170:4 238:22
**hard** 182:14
**HARRIS** 2:3
**Harty** 135:12 137:2
**Harty's** 135:17
**hazy** 68:11
**head** 6:12,13 40:1
52:3 75:16 92:15
99:15 102:7,8,22
202:20
**header** 134:13
160:9 245:16
250:13
**heading** 38:5 48:10
176:1 201:11
**headings** 38:4
**headlines** 140:16
140:18,22 141:8
**healing** 128:17,17
**hear** 8:4 10:14
71:14 94:20
211:13 212:10,22
212:24 214:4,14
215:6 216:4
217:23 223:13,14
225:12 236:6
261:3
**heard** 10:15,15
91:10,18,23 103:6
104:4 105:5
106:16 138:3,5
154:17 156:4,16
163:1,16 176:20
212:7,16,23 214:4
214:13 215:7
219:7 221:17
222:9,15 223:11

223:17 230:12
232:3 235:10
236:5 262:14
**hearing** 217:4
**heated** 175:16,17
175:17
**heavy** 133:19,19
**held** 5:8 62:9 83:10
139:14 178:18
209:10 239:17
254:10 271:21
272:24
**hello** 266:6
**help** 160:12 216:23
**helpful** 199:16
**hi** 132:19 266:18
268:24
**hide** 216:16 217:14
**high** 35:9,11 81:18
195:2 242:2
**higher** 35:17 42:4
92:15
**highest** 41:17
**highlighted** 114:16
242:24
**highlighting** 172:19
172:19,20
**Hill** 2:6
**hire** 24:6 34:14
203:7
**hired** 76:13 202:16
**hires** 114:16
**hiring** 18:8,8 20:11
20:13,18 21:4,11
22:23 32:9,11
35:5,7 40:24 41:4
202:15
**Hispanic** 38:3
39:17 50:9 214:4
**Hispanics** 19:18
25:2
**historical** 227:10
**historically** 236:14
**history** 11:7 138:2
228:19 235:19,21
236:6,16 237:19

**hmm-hmm** 6:18
**hoc** 27:8 28:2
**Hold** 41:12
**holds** 132:16
**Holt** 115:15,17
118:18,22 123:16
128:16,20 129:13
163:8,13
**Holz's** 117:14
**home** 265:3
**honest** 31:23
231:14
**honestly** 101:19
248:18 278:12
**hope** 183:18
**hoping** 167:19
211:14
**hospital** 138:16
**hostile** 84:7,8,12
97:15 109:6 136:2
136:6,13 156:17
172:10 189:9
191:3 228:1,5
256:8
**hostility** 159:3
**hotline** 77:18,19,22
79:15,16,16
**hour** 201:1 206:7
216:18 217:20,22
223:21 227:4
**hours** 10:3,4
**house** 91:23
**hover** 199:18
**HR** 241:18,21,22
242:6
**huge** 77:21
**huh** 41:20 108:2
119:9 163:4 183:9
222:23 242:17
**human** 186:10
187:7,10 241:23
241:24 242:3
**hurt** 259:3
**husband** 11:10,14

——————————
**I**
——————————

**I-N-O-U-E** 141:13
**idea** 49:11 151:16
237:24
**ideas** 45:12 93:2
127:1 152:3,23,24
170:10 173:18
191:1 193:7
**identification** 25:22
26:16 37:12 42:20
46:13 83:11 98:14
107:4 113:18
128:13 130:4
134:1 157:8 158:1
159:21 162:4
166:9 182:9
185:20 240:13
241:6 243:7 250:8
252:1 254:11
260:2 265:20
267:9 269:22
**identified** 34:6
222:12
**identify** 9:2,18 12:3
21:1 33:3,3 62:23
63:1,2,4 97:6
100:14 102:11,18
185:2 218:16
257:20
**identifying** 122:8
**identity** 102:12
**ignore** 121:17
193:11
**illegal** 174:1 196:17
196:18 210:2
234:15 247:1
248:6,12 249:17
**illness** 7:4
**imagine** 177:15
**immediate** 17:13
**immediately** 80:1
219:24 231:22
**immigrant** 227:15
**implement** 149:24
**implementing** 18:3
18:7 29:24 30:13
40:13,18 150:4

**implicit** 88:14
**implicitly** 88:6,8
90:16
**implied** 58:16
88:16
**implying** 88:20
**importance** 23:6
**important** 34:14,19
34:21 42:1,3
67:17 95:4 161:20
**imposition** 145:9
**impossible** 37:22
**impression** 149:18
177:3,4 197:21,24
198:15
**improper** 154:5
185:13
**improve** 263:13
**inaccurate** 159:1
224:14,15,16
225:3 228:2
**inappropriate**
46:16 47:5 123:15
124:13 153:4,5,20
154:10 174:15,16
195:3 208:16
**incapable** 250:4
**incident** 54:13,13
57:19 84:17,19,22
102:14 106:11
107:12 109:20
119:9 138:8
163:13 164:20
168:11 171:17
203:1,4,10 205:3
205:24 206:1
208:10,10 255:21
**incidentally** 25:24
30:12 31:22 41:15
51:3 95:10 126:12
130:8 137:6
155:11 163:19
183:6 236:16
**incidents** 84:3 86:5
89:2
**include** 49:16,21

Carmen Borges

57:7 73:19 85:14
151:5 273:12
**included** 85:6 163:3
163:11
**includes** 31:10
**including** 49:1
50:14 52:9 53:12
85:4,7,23 123:1
154:11 177:11
206:17
**inclusion** 27:9 28:3
97:14,24 98:6,10
99:4 114:22
181:20 182:1
**inconsistent** 252:13
**incorrect** 176:19
**increase** 79:23
81:10,11 82:13,13
**increased** 80:15
81:22
**increases** 130:15
**Indian** 39:17
**indicate** 67:5 132:2
136:10 153:20
200:24
**indicated** 10:10,21
154:4 161:6
**indicates** 153:22
**indicating** 55:4
132:5 144:3
186:16 212:8
**indication** 66:10
110:8 129:13
153:14
**individual** 48:3
65:23 83:22 95:8
147:9 183:4 231:1
237:20 273:7
**individual's** 48:6
49:3 59:10
**individually** 147:5
237:18,22
**individuals** 50:17
50:19 173:18
**ineffective** 36:14,18
**inequality** 184:24

**inequities** 173:9
192:13
**inexact** 214:17
**inflammatory**
173:24 174:22
175:1
**influence** 262:16
263:2
**influenced** 262:19
**inform** 56:9
**information** 20:24
22:5,7,11 23:8
37:2 47:8 66:24
70:20 71:7,19,22
72:22,23 85:18
86:17 103:15,17
153:10 162:20
167:14 186:21
193:4 205:4
267:16 273:14
**initial** 225:22
255:11,14
**initially** 75:1,2
255:22
**initials** 211:6
**initiative** 13:14
**initiatives** 34:22
98:7
**injecting** 154:13
**Inoue** 140:4,4,11
141:12 149:19
150:15,24 152:17
159:7 229:15,16
229:18
**input** 145:7 169:7
**inquiry** 45:11 55:16
**inquisitive** 222:8
**insincere** 248:9
**insist** 154:18
217:18
**insisting** 154:15
190:22
**instance** 6:11 16:12
**instances** 7:12
44:21
**Institute** 67:14

**institution** 55:7
**institutional** 46:2
121:18
**institutions** 33:5
120:3
**instructed** 256:15
256:23
**instruction** 67:4
**instructors** 166:13
181:16 185:2
**insulting** 212:9,10
**insults** 51:5 89:5
**integration** 181:19
**integrity** 243:24
245:3,5 246:1
247:24
**intellectual** 123:18
124:10,11 189:6
198:10 239:5
**intelligence** 16:14
**intend** 238:15
**intended** 198:10
**intending** 92:20
93:13
**intention** 262:9
**intentionally** 197:3
**interact** 210:11
**interactions** 193:5
262:4
**interchangeably**
55:2
**interest** 223:22
268:11
**interested** 101:19
129:14 173:22
**interesting** 65:14
129:13 153:13,19
189:1,17 191:12
223:12,14
**interestingly**
162:21
**interfere** 6:23
**interferes** 49:3
52:10,12 59:10
**interim** 134:9,14,16
134:18,23

**interject** 204:6
**internal** 255:24
**internships** 96:21
**interpret** 190:7
**interpretation**
87:22
**interpreted** 88:20
115:4
**interpreting** 89:4
**interrupt** 8:7,10
26:5 81:6 107:14
224:21 258:8
267:17
**interrupted** 231:11
**intervene** 175:13
**intervened** 222:2
**intervenes** 224:6
**intervening** 13:4
**intervention** 212:4
215:12 218:5
222:4 223:3
**interview** 9:4 68:2
154:8 165:13
177:7 188:14
189:15 201:19
202:7 206:8 208:8
218:19 232:17
262:20 274:19
275:1 278:5
**interviewed** 278:18
**interviews** 9:4,5
275:10
**intimating** 173:24
**intimidated** 218:12
222:16 250:2
**intimidating**
173:24
**introduce** 25:20
37:1 42:18 46:11
128:11 130:2
239:6 240:19
243:9 265:14
**introduced** 13:21
13:23 14:8,9
108:24 113:11
114:16 137:7

210:21 211:5
239:12,23 240:7
267:20 275:13
277:2
**introducing** 137:9
240:21
**introduction** 135:9
163:7 169:14
**introductions** 118:7
131:12 163:14,17
**intuitive** 141:12
**invades** 91:21
**investigate** 57:14
57:22 61:14 73:3
136:17,21 156:14
186:13 247:18,19
**investigated** 61:7
100:23 101:5
112:24 113:13
180:3,6 206:19
**investigating** 60:21
73:19 247:14
**investigation** 82:11
154:8 155:10,21
162:11,13 165:10
171:4,12 177:3
180:8 187:23
202:5 238:16
252:10,11 259:1
262:16 263:2
274:12 277:8
**investigations** 72:1
73:1
**invited** 181:16
223:24
**involve** 206:13
210:19
**involved** 22:2,22,24
23:4 32:7 50:17
50:19 79:2 116:17
174:1 187:9,14
197:18
**involvement** 115:15
148:20
**involving** 97:13,24
162:14 163:13

Carmen Borges

**issue** 7:14 44:7
  56:18 100:6
  101:17 104:13
  116:20 163:4
  173:12 226:13
  233:10 234:15
  235:24 268:2
  276:19
**issues** 5:22 11:2,5,6
  66:3 78:4,24
  82:10 83:15 97:13
  97:24 109:5 110:2
  110:3 135:2
  138:18 142:13
  143:16 172:16
  184:23 202:13
  206:12,17 209:20
  260:14,22 261:1
  275:11 279:16,22
**it'd** 223:13
**it'll** 168:4
**item** 66:2
**items** 63:10

**J**

**J** 137:2
**January** 239:8
  240:23 241:8,9
  250:11 251:1
  252:20,22,23
  253:9,18,20 255:1
  255:7 257:3
  259:11,15
**Jewish** 237:2
**Jews** 50:2
**Jim** 114:10
**job** 10:9 12:5,17
  16:20 21:13 57:13
  57:21 83:1 100:24
  101:2 136:17,21
  137:17 263:9,10
  263:21 264:7,11
  264:12,14,14
**jobs** 93:6
**join** 181:16
**Joseph** 135:12

**judge** 211:22,23
  227:15,23
**judging** 117:19
**jump** 52:3 190:24
**Jumping** 201:9
**June** 1:16

**K**

**Karina** 121:8
**keep** 107:15 117:3
  126:1 127:10,23
  127:23 197:1
  265:12 278:4
**Keller** 114:10
**kept** 196:16
**Kevin** 117:23,24
  119:2 120:10
  131:20 132:6,6,19
**key** 83:15 122:1
**killed** 139:4
**killing** 119:4
**kind** 22:14 25:2
  35:1 52:16 53:7
  64:11 66:22 77:3
  103:7 126:18
  170:21 171:5
  174:8,8 175:16
  190:12 198:6
  199:2 206:22
  228:3 233:12
  276:18
**kinds** 35:4 72:5
  77:21 78:8
**knew** 62:21 78:23
  109:18 113:4,6
  213:18 277:5
**knock** 138:21
**know** 6:6 9:20 12:7
  13:8,10,11,12,16
  13:18 14:2 17:24
  18:9,21 19:3
  20:14,17,22,24
  21:15,22 22:4,6,6
  22:8 23:14,15,15
  23:20 24:4,6,6
  25:12 27:16,21

28:2,24 29:5,14
  30:9 31:20,22
  32:4,4 34:1,3
  35:16,21 36:4,13
  36:17 39:4,22
  40:15 41:15,22
  48:18 49:12 50:21
  50:24 51:24,24
  52:2 53:1,14
  54:17,20 55:15
  57:3 58:14 59:4
  60:24 61:2 62:17
  64:7,8,21 65:8,14
  66:15,19,23 67:8
  68:10,16 69:1
  71:1,4,5 73:24
  75:14 78:20,21
  79:5 80:17 81:6
  81:15 82:5,6,7,23
  84:20 85:15,18
  86:12 87:20 88:13
  89:1,17 90:21,23
  92:11 93:21 95:2
  96:1,2 97:19
  101:20 102:13
  103:4,10,18,22,23
  104:2,6,23 105:1
  105:3 107:24
  110:15,16 111:18
  111:18 112:6,7,14
  115:3,18 116:17
  117:10,11,23
  119:17 122:4
  124:4,21 126:21
  134:7 135:6,7
  139:1,9 140:7,10
  140:15 141:12
  143:15,19,19
  144:5,11 146:11
  147:18,18 148:2
  149:4,8,23 151:3
  152:2,22 156:10
  159:5 161:23
  164:2,22 165:16
  167:23 171:14
  176:23 177:9,10

177:14,16 178:8
  182:13 183:15
  186:4,22,24
  189:12 190:8,10
  190:21,23 195:1
  196:4,7,14 198:13
  198:20 199:4
  200:21 202:3
  203:7,14,18 206:5
  207:5 210:14
  213:3,17 214:6,8
  214:24 216:6,7
  217:4 223:16
  227:18 230:8
  231:19 232:10
  233:10,12,16,22
  233:22 236:10,13
  237:4 241:5,10,14
  242:1,13,15,18
  246:24 247:18
  248:2,4 251:2,21
  252:9 253:17
  254:16 257:18
  259:3 264:10,18
  264:19 270:17
  276:23 278:12
**knowledge** 73:22
  84:10 92:8 95:15
  97:21 124:11
  129:21 137:18,21
  150:3,7 218:18
  242:15 243:21
  244:12,14
**known** 19:4
**Kramlich** 121:20

**L**

**labeled** 85:2,3
  191:24 265:24
  269:20
**labeling** 140:12,14
**labor** 95:23
**Lacey** 120:18
  133:12 137:19
**lacked** 248:17
**lacks** 119:24

**language** 49:18
  51:5 171:5,9,15
  172:3,4,8 173:17
  173:24 174:16,22
  174:23 175:1
  182:19 189:20,23
  190:5 191:16
  194:7
**large** 38:16 39:2,13
**larger** 39:11,12
**lasted** 175:22
**lasts** 212:5
**late** 165:13 178:23
  209:2 241:4
  264:18 275:24
**launched** 278:19
**law** 5:2 16:10 136:1
  237:15 247:8,10
**lawfully** 139:4
**laws** 15:13 186:14
  228:19 236:2
**lawsuit** 9:12 227:17
  234:24 235:17
**lawyers** 114:13
**lead** 81:11 159:20
  166:8,11 185:17
  185:24
**leadership** 135:18
  135:22
**leads** 180:19
**learn** 36:6 90:5,7
  148:5 155:10
  225:11
**learned** 7:7 171:11
  202:12,22
**learning** 67:14 84:8
  84:12 85:8,9
  148:8 149:17
**leave** 11:8 244:24
**leaves** 200:19
**lecture** 128:7
**lectured** 121:4
**lecturing** 143:10
**led** 82:13 234:23
  235:16
**Lee-Amuzie** 28:15

App.0937

29:1 155:18 156:6
165:3 166:23
168:13 169:5,12
172:2 180:16
195:8 197:21
215:22 217:24
235:7,14 238:15
244:16 272:11
**Lee-Amuzie's**
212:13
**left** 243:17
**legal** 15:5,7 16:17
18:18 17:5 53:4
53:21,22 54:6,7
186:6
**legalese** 15:18
**legally** 139:1
**lengthy** 26:2 131:19
**let's** 5:7 22:3 25:2
41:13 46:12 62:8
76:7,9 80:12 83:9
110:12 134:3
137:5 142:9 148:3
148:5 161:8
172:18 178:3
185:24 195:3
201:7 219:20
222:1 229:10
234:3 264:22
**letter** 117:14
242:17,20 250:19
250:21 251:2,5,17
251:23 252:3,5,8
253:18 254:4,6
258:5 259:1
**letters** 49:1
**letting** 112:14
**level** 16:14 19:3
21:4,5,5,6,7 53:21
53:22 54:5 60:22
159:3
**levels** 50:22
**licensed** 186:24
**licenses** 104:16
**lie** 177:6 230:2
232:6

**Likewise** 6:17
**Lila** 28:19 29:5
103:11,12,24
107:18 121:9
126:3 140:8,8
154:15 156:2,5,5
156:6 164:24
165:3 172:19
175:15 176:2
177:14 180:22
181:3 189:10
190:22 191:2,2
192:16,16 193:20
194:14,16 196:16
196:19,24 197:4
198:3,12,16 199:2
201:11 202:7,14
203:2 207:20
212:13 214:6,8,18
214:19 260:11,14
262:4,11 263:14
265:7,8 279:16
280:2,3
**Lila's** 103:11
**Lili** 28:18
**Liliana** 62:14,18
64:2,9 65:22
67:21 68:4 69:4,6
70:5 83:24 88:8
89:19 90:9 93:7
95:5,24 97:11,17
98:23 100:16
101:23 102:2
107:13 110:5,22
111:4,9,13,20
116:11,16,17
118:15,18 119:2
119:20 120:7
126:4,6,17 130:9
131:9 132:18
133:6 141:5
149:23 151:24
152:16,18 155:3
155:18 159:15
160:13 165:23
166:23 169:5,13

172:1 176:3,20
178:21 198:21
199:4 204:13
207:11 215:22
217:24 219:15
230:13 232:18,20
236:18 238:14,24
244:16 247:12
249:10,19 260:11
262:7,17 263:3
266:6,17 268:23
269:6,12 271:4
272:10 274:18
275:1,7,8,16
276:16,22 277:13
277:15 278:17
279:14
**Liliana's** 167:12
266:23
**limited** 49:16 116:2
**line** 46:1 52:5 84:2
93:18 99:3 118:18
119:22 120:2,16
120:17,20,21
121:15 123:19
126:5 127:16
129:17 137:5
172:16 173:12
230:14 254:17
**lines** 196:5,5
**link** 199:3
**links** 129:5
**Lion** 244:21
**Lisa** 241:17,18
253:14,14 254:3
**Lisa's** 241:16
**list** 14:20 15:23
16:8 63:10,10,17
83:15 137:9 277:3
**listed** 28:13,23
243:23 244:2
246:5
**listen** 216:13
217:17 218:4
221:4 223:24
234:3

**listened** 216:1
238:23 240:12
245:24 246:14
**lists** 33:7
**listserv** 113:9
115:23 137:9
**little** 27:17 81:7
113:22 120:14
167:19 183:10,13
209:14 218:23
244:21
**live** 246:3
**lives** 116:24 126:11
131:11 185:3
**LLP** 2:9
**location** 40:10
41:20 50:16
**lodged** 237:21
279:15
**logical** 35:12
**long** 8:22 14:20
15:23 25:17 47:20
60:19 63:17
157:10 216:17
228:23 235:21
255:10 264:7
**Lonnie** 186:1,2,17
187:3,7
**look** 37:14 44:4
45:2 47:8 60:24
66:8,14 82:5,17
82:20 92:16
107:10 110:12
113:7 117:13
120:15 131:24
132:1 133:11
166:19 167:9
178:3 182:24
183:2,2,19 192:14
243:13 245:6
274:17,20
**looked** 19:4 82:7,9
115:7 133:16
266:9 268:20
**looking** 40:22 48:16
148:19 199:10

245:11 266:3
268:18 274:9
276:9
**looks** 114:19,20
118:2 120:9
182:22 266:5
270:16
**loosely** 76:9 111:15
**lose** 263:10,20
264:7,14
**lost** 183:14
**lot** 21:22 24:8 32:4
63:10 67:12 72:22
78:1,4,14 103:24
137:16 174:13
177:17 178:5
247:12 255:18
**lots** 6:17 13:12
77:21 78:1
**loud** 211:14
**louder** 8:3
**low** 213:2
**lower** 39:1 64:18
65:24 67:4 243:17
**luck** 46:10
**lying** 97:18 238:15
238:18,19

---

**M**
**Madame** 26:9
47:24
**main** 12:12 30:6
**major** 22:4 78:7
**majority** 33:6,19
**making** 64:10 77:8
78:18 117:8
171:15 173:15,22
194:7 236:2
262:13,13
**male** 93:20,23 94:3
94:9,14 95:2,8
101:14 102:11,18
131:4 197:2,2
223:11
**man** 139:10 263:19
264:6

Carmen Borges

management 22:14
manner 50:6 55:22
  154:10 155:1,11
  170:11 171:1,2,3
  175:17 177:24
  248:3
Marazini 241:19
March 62:13,15
  64:2 68:13,14,17
  80:10 83:16,20
  98:22 100:16
  107:13,15,16
  108:1,7,10,13,14
  108:16 178:23
  179:5,13,23 180:9
  206:17 276:3
Marcus 75:18,20
margin 172:24
Marie 117:17
mark 26:5,13 87:3
  98:12 107:2
  113:15 118:10
  133:22 157:5,23
  159:18 162:1
  166:7 182:5
  185:16 250:7
  251:22 254:13
  265:10,22 267:6
  268:5
marked 25:22 26:9
  26:9,16 27:7
  37:12 42:20 43:14
  46:13 83:11 98:14
  98:15 107:4
  113:18 128:13
  130:4 134:1 157:8
  158:1 159:21
  162:4 166:9 182:9
  185:20 210:20
  211:4 240:3,13,22
  241:6,8 243:7
  250:8 252:1
  254:11 260:2
  265:20 267:9,15
  268:1 269:22
  274:20

markers 76:10
Market 2:11
marking 179:2
  267:24
Marranzini 241:18
  241:20 254:3
married 11:13
  91:16
mask 87:7 276:19
masquerade 117:7
massive 81:10
match 36:14,19
  238:11
material 144:21
  179:4,11 185:11
  189:3
Matt 154:11 166:6
  192:8,14,14 194:5
  194:6,12,13 221:8
matter 64:24 75:6
  116:24 126:11
  131:11 154:1,8
matters 29:22
  72:23 77:17
Matthew 2:10
  239:23
mean 9:10 11:1,6
  13:16 14:20 15:11
  16:4 19:6 20:18
  22:12 25:8,9
  27:21 31:8,9 35:8
  35:12 40:9 41:19
  41:21 46:3 47:8
  51:1,4,20 52:10
  59:2 60:23 63:16
  64:20 65:14 66:16
  66:18 73:4 80:21
  81:16 82:1 85:1
  91:12 97:19 99:19
  100:10,19,20
  104:4,11 105:23
  107:14 110:6
  117:2 119:18
  122:4 124:1,4
  125:24 127:21
  128:18 134:10

139:8 142:23
143:19 146:19
151:1,15 154:16
175:21 182:23
184:6 190:2
192:13 193:14,16
199:18 203:16,16
204:6,19 208:18
211:3 214:3
217:22 218:15
221:15 223:5,13
230:7 233:18
238:8,19 243:19
247:9,9 256:12
258:8 264:3 269:8
270:12 275:23
278:12
meaning 7:19 24:15
  45:10 74:9 92:18
  97:11 111:9
  152:11 169:12
  208:1 260:11
means 11:2 31:6
  88:16 93:13
  143:20 181:11
  221:4
meant 31:13 54:24
  54:24 114:23
  115:1
media 50:1
mediate 82:10
mediated 82:23
mediation 12:9
medications 7:2
meet 68:6 78:21
  79:20 162:19
  164:6 202:19
  271:16
meeting 91:4 96:16
  96:18 98:23 99:1
  102:10 103:22
  109:18 110:6,23
  141:1 142:5,6,12
  143:2 144:9,23
  145:13,20 146:3,4
  146:17 147:3,14

151:2 152:20,22
153:4,18 154:13
154:17 155:12
156:12 160:13,15
160:18,22 163:19
163:24 164:3,20
164:21,22 165:1,5
165:7,11,17,18
166:16 167:2
168:12,14,17
169:4,18 171:8
174:4,9 175:22,23
176:1,24 177:2,11
177:15 181:12,24
182:8,18 183:23
188:7,8,9,9,24
189:16 191:8,12
191:15,18 197:5
198:6,9,11,16
199:22,24 200:24
203:4 206:2,7,13
207:3,6,11 208:5
208:9,11 209:15
211:19 212:19
213:5,9,19 215:17
216:11,17,22
217:1,4,11,22
220:20 221:20
223:4,21 224:7,10
224:10 231:19,19
231:23 232:1
233:23 234:5
235:15 239:20
240:9 244:15
246:1,18 249:6,11
249:12,13,14
252:20 253:24
254:6 256:5,10
260:8,10 261:7
262:20,21 266:15
269:13 270:4
271:1,6,10,14,23
272:1,1,4,6,8,12
272:15,16,20,22
272:24 273:3,4
275:19,20 277:7

278:10,21 279:8
279:12
meeting's 146:6
meetings 68:18,23
139:21 144:13
145:16 148:3,9,12
151:8,23 152:16
153:10,10 158:15
183:19 201:2
233:7 255:23
256:7,16,18
271:18,20
member 28:18,22
28:23 29:2 50:24
56:12 63:11 64:3
64:19 67:21 86:24
87:18 90:9 93:12
93:23 95:2 96:7,8
96:15,19 99:14
109:13,16 111:1
112:3 113:1
114:17 123:23
136:12 153:18
156:23 176:4
230:6 232:7 276:3
member's 73:2
members 28:12
87:1 111:16 123:6
127:4 133:9
153:12 230:3
members' 72:18
memory 7:5 14:2
15:2 47:10 66:7
86:12 160:12
253:21 280:12
men 66:1 196:15
197:13
Mengel 1:18
mental 138:13
mention 73:21
181:9 209:17
mentioned 14:12
15:9,23 39:16
50:9 65:2 79:14
92:19 264:12
mentioning 179:15

Farrell Court Reporting

179:18,18
**mentions** 181:3
**merit** 82:4,18,21,22
83:7 104:23
**meritorious** 80:16
**message** 129:3
144:16 148:4,5,6
148:17,18 149:15
**messages** 117:5,6,7
117:11 128:1,2
**met** 10:3 25:18
104:1 164:9
165:16,22 231:15
265:7 269:6,9
270:8,14,19
**methods** 6:3
**Michael** 2:4 5:5
135:12 137:2
**Michelle** 121:20
**micro** 58:3,22
**microaggression**
57:3,4,11,18 58:4
58:10,11,14,19
59:2,19 60:17,23
61:2,4,17 62:4,6
84:24 85:1,3,21
87:9 90:16 91:1
92:5,18,21 93:8
93:14 94:13,16
95:16 96:24 106:2
106:6,7 112:11
126:12 133:4
151:18
**microaggressions**
57:1,15,22,23,24
58:2 59:15 60:22
61:7,15,20 62:2
84:3,11 86:4,5
109:6 110:22
111:5,8,15,17
179:5,13,24
260:17 262:5
**middle** 43:4 49:10
120:20 133:20
137:14 243:1
**mind** 80:19 120:6

164:18 165:17
191:3,4 199:14
217:18 239:1
269:10
**mine** 172:23 173:2
**minimum** 24:4
**minor** 78:8
**minorities** 33:3
64:18 65:24
**minority** 35:15
150:8
**minors** 96:20
**minute** 5:7 127:15
182:17 222:18
**minutes** 174:4
175:22,22,23,24
200:16 201:1
209:8 211:17
212:6 214:15
215:8 216:3,4
217:23 219:2
220:17,21 221:20
224:2 234:21
236:19
**mirror** 179:9
**misbehavior** 53:6,8
**mischaracterize**
196:13
**mischaracterizing**
258:18
**misinformation**
96:19 97:6
**misleading** 197:3
**misquoted** 173:5
**misreading** 212:16
**misrepresenting**
211:23 259:12
**missing** 223:16
227:9,9,10
**mission** 30:20,20
**misspelled** 69:18
**mistake** 274:16
**mistaken** 113:21
201:8
**mistakes** 212:1
**misunderstand**

19:15
**mix** 46:24
**mocked** 174:5
176:2
**moment** 111:10
136:24 194:11
201:17 249:17
267:5,12
**monitor** 24:5
**month** 144:1,1,9,10
144:11,11,12,13
158:18 159:17
162:9 165:24
277:9
**month's** 158:18,20
**months** 17:21 19:23
179:9
**morning** 5:12 58:21
136:4
**mouth** 77:6 183:15
183:16
**move** 81:7 96:3
124:22 259:9
**moved** 11:11
**moving** 225:13,23
**multicultural** 150:8
**multilingual** 181:19
**multiple** 182:2
**municipality** 41:21
41:23
**murder** 120:4
138:8,24
**murdered** 119:10
138:9
**murdering** 138:3
139:10
**mutual** 127:5
**mystery** 149:16
**myth** 166:12
168:18

_____
**N**
_____
**N** 3:1
**name** 5:5 14:22
17:18,24 20:11
26:18,20 28:20

43:13 69:12,14
83:19 86:20
106:16 113:1
116:19,23 120:10
121:11 126:8,13
126:18 129:6
132:19 133:1,8
140:5,6 141:12,13
241:19 254:17
268:4
**named** 121:19
**names** 21:12 95:11
95:13 126:23
173:21 268:4
**naming** 101:19
**nation** 227:16
**national** 161:21
236:16,23 237:5
**native** 19:18 39:18
39:18,19 50:9
240:3
**natural** 147:21
**nature** 5:19 6:22
10:9 37:9 48:2
50:15 51:1 53:12
54:14 63:9 86:21
115:15 144:21
155:15 157:18
167:3 171:16
194:8 244:24
249:12
**navigate** 211:16
**navigating** 214:16
**Naydan** 28:19 29:5
62:14,19 64:2,9
65:22 68:4,6 70:5
83:24 84:2,11
88:8 89:19 90:9
92:4,17 93:7 95:5
95:24 96:5 97:11
97:17 98:24
100:16 101:23
102:2 107:13
109:7 111:4,9,20
116:11,16 118:15
119:2,20 120:7

124:23 126:4,6,17
127:11 130:9
131:10 132:18
133:6 136:12
141:5 145:3
149:23 151:24
152:16,18 155:3
155:18 156:6
159:15 160:13,23
161:5 165:3,14,23
166:23 169:5,13
172:1 176:3,20
178:21 180:2,22
181:3 198:21
199:2,4 201:11
202:8 207:11
212:13 215:23
217:24 219:16
220:2 230:13
232:18 236:18
238:14,24 244:16
249:19 260:12
262:7,11,18 263:5
265:7 266:17
268:15,23 269:6
271:4 272:10
275:1,7,8,16
276:16,22 277:13
277:15 278:17
279:14,16,23
**Naydan's** 67:21
69:4,6 106:5
110:22 118:18
172:19 204:13
247:12 249:10
274:18
**Nazi** 237:5
**Nazis** 237:4,7
**necessarily** 35:3
147:17 194:19
**necessary** 10:7 72:4
251:16
**need** 8:7,10 21:17
26:1 28:7 34:17
35:13,13 40:2
47:19,19 72:6

Carmen Borges

79:6 80:22,22,23
81:4 82:17 85:15
85:17 103:13
105:11 114:21
117:3 126:1
127:10,22,23
148:5,7,8,8,19
149:7,7,8,8,10,13
149:16 150:9
161:3 182:13
209:3 228:21
229:23 232:16
234:10 247:18,19
247:20 269:18
**needed** 44:4 115:9
115:12 142:4
202:19 229:13
258:10 259:18
**needing** 137:12,15
**needs** 21:16 30:23
71:8
**negatives** 249:4
**neither** 211:22
**neutral** 50:6 117:7
**never** 36:23 37:8
45:15 51:17,17
81:2 89:22,22,23
90:2,3,3 96:7
100:23,23 101:5
106:16 111:22,23
112:20,20,22,24
113:1 134:6 137:2
137:4 138:5
148:23 183:18
189:6,14 209:20
263:9
**nevertheless** 95:20
**new** 14:4,8 24:10
80:13 113:10
114:16 131:18
214:13 253:9
**news** 238:2
**Nigeria** 227:16
**nine** 125:4,5,7
**Nittany** 244:21
**nodding** 6:13

**non-discrimination**
42:10
**non-legal** 52:19,22
52:23
**nonsense** 78:8
**normal** 6:18 7:9
70:13 92:9 141:19
223:5,5,6
**Notary** 1:18
**note** 195:22 267:14
269:24 270:1
277:20 279:11
**notes** 4:4 8:23 9:4,7
9:8,9 47:13 70:2,4
70:9,10 98:13,17
98:21 102:1 107:3
107:8 108:12,14
108:17 109:24
110:2 157:24
158:4 159:1,12
187:22 188:4,4,6
188:12,13,23,23
189:14 191:11
192:8,10 194:6,6
195:19 196:13
197:9,14,16 201:8
201:10,19,19
202:7,10 206:12
207:19 220:2
235:8 254:9
256:17 260:5,7,10
262:2,24 269:9
274:9,11,19,23,23
275:21 278:4,9,16
278:21,21 280:15
**notice** 3:13 26:6
191:13 267:2
**noticed** 191:19
**NT** 31:18
**Nuh-uh** 180:10
241:16
**number** 27:13 35:9
43:3,8,14,15,15
43:24 45:2,5
46:19,21 81:22
83:14 86:10,10,23

90:24 92:16 93:17
93:19 113:16
125:4,5 133:23
157:6 159:19
160:7 162:2 166:8
168:7 169:9,9
180:18 182:7
185:17 195:23
196:2 199:12
205:5,6,21 211:7
239:24 267:13
**numbered** 45:3
**numbers** 27:17,18
27:19,21 40:11,16
40:22 166:18
182:12
**numerous** 144:2

---

## O

**oaths** 7:19
**object** 7:8 11:24
15:15 89:10
256:23 258:13
**objectable** 87:21
**objected** 15:15
257:17,20
**objecting** 257:8
**objection** 7:16
15:14 17:10 20:20
24:17 25:5 31:14
32:10 33:17 35:6
36:9 38:20 39:3
39:24 44:18 46:6
52:21 53:9,23
54:11 56:1,6,13
56:21 58:24 59:16
59:21 60:11 80:4
82:15 84:14 87:15
88:2,23 89:16,21
90:18 93:10 94:5
94:10,17 95:17
97:2 98:2 101:1,9
104:18 105:9,19
112:12 125:12
126:20 127:14
128:9 129:16

131:1 132:13
136:14,19 145:5
145:14,23 146:7
146:18 147:4,16
147:24 150:2,17
151:19 152:10,19
154:20 157:1
169:23 170:5,18
170:22 176:12
177:8,22 192:1
193:13 204:22
207:18,22 210:16
227:19 228:7,13
231:17 232:8,19
235:1,4 236:20
237:11 238:7,17
247:16 248:19
249:24 257:13
258:15,23 259:17
263:22 264:8
278:6 280:20
**objections** 15:19
**objects** 7:13
**obligated** 7:22
55:16
**obligation** 7:10
24:5
**observe** 6:11
**observing** 174:5
**obvious** 203:17
**obviously** 8:8 70:10
119:18 139:2
211:12
**occurred** 168:8
180:19 205:22
**occurs** 50:16
**october** 159:19
160:8 162:3,8,20
163:20 164:12,17
164:22 165:13,24
166:3 168:6,12
178:21 179:8
180:5,16 182:8
188:9,13,18 191:8
206:13 207:9
208:3,5 209:16

223:3 239:20
245:24 256:10
265:24 266:5
268:20 270:1,5,8
272:12,17,23
275:2,3,8 277:7
277:22 278:9,17
279:13,16
**OEOA** 20:7,8
22:21 29:19 39:21
**offended** 8:12
89:20 147:15
**offending** 49:23
**offensive** 51:5,5,8
51:10,16,17,18
52:11,17 53:16
57:4,5,6,6,10
58:11,16 60:1
172:4 195:2
**offers** 163:23
**office** 12:6,12 13:9
17:18,23 18:3,12
18:16,20 19:3,22
20:1,1,6,16 22:1,2
22:20 29:20 32:8
32:17 33:11 35:1
35:4 39:7,20,21
39:21 40:4,7,13
40:18 41:3 42:2
43:20,22 44:13,16
44:23,24 46:5
57:14,22 60:21
61:6 62:6 67:18
68:24 70:22,22
71:2,2,20,24
72:18 74:5,6,8,12
74:13,14,15,17,18
74:23 75:2,7,11
75:12,16,23 77:4
77:9,10,24 79:7
79:12,13,15,16,18
80:12,12,13 83:5
86:8 87:10 102:24
103:1 104:1
109:19 111:21
112:18 113:8,13

114:20 123:2,5,6
134:14,20 135:4
136:17,21,24
139:17 143:6,12
157:20 167:17,18
186:2 190:7
209:20 210:10
212:12 223:8
230:21 231:16
232:15 247:4,5
256:1 264:1
266:12,12
**officer** 61:5 114:20
115:6 118:23
120:18 123:5
124:18 128:24
133:12 137:8,12
137:19 138:3,9,22
139:10 143:5
163:4,7,13,17
190:6 212:12
223:8 263:24
**officers** 113:10
118:22 128:2
129:24 131:12
**officers'** 118:7
135:9
**offices** 78:16 79:14
79:19,22 210:11
230:21
**officially** 20:24
**oh** 16:6,18 26:8
28:20 32:14 42:10
43:3 46:22,22,22
48:15 69:24 72:22
73:4 92:1 97:3
99:7 101:15 109:1
113:23 119:8,14
120:22 129:4
134:15,20 181:5,5
183:11 184:18
198:23 199:1
201:21 204:8,21
205:11 207:13,21
232:23 241:16
251:5,7 253:6

254:19 258:22
274:22,24 276:11
280:2
**okay** 7:7,19 10:5
14:7 27:5,23 28:9
28:11 29:1 31:11
31:17 35:13 37:14
37:23 41:6 43:16
44:15 47:9 48:2
48:21 52:15 55:5
55:8 60:19 65:11
66:6 67:20 68:17
73:5,7 76:4 86:10
97:6,22 98:21
99:23 101:15
102:13 103:3
105:15 106:18
108:1,7,17 109:2
109:4,4 113:3
115:20,23 116:8
117:5 119:18 125:4
125:7,19,21 126:6
126:10 127:23,24
128:4,7 129:1
132:3,8 134:15,15
135:21 146:5,9
147:2 155:21
160:21 164:7
168:3 169:19
175:18 176:4,8
177:12 179:3,3
184:11,18 188:12
190:8 196:8 197:7
197:8 199:1
200:10,12 201:21
202:1,11 205:8,14
206:7 211:11
213:13 215:9
216:14,19 219:18
221:10 229:9
232:6 233:14
234:3 240:18
242:21 243:11
245:21 249:2
251:7,8 253:6,8,8
253:12,16 254:24

256:22,24 258:6
259:8,22 263:5
264:6,17 265:1
274:22 275:15,18
278:1 280:14
**older** 104:4,5
204:11
**once** 18:20 40:17
82:7,9,20 92:19
113:21 158:18
185:2 205:3
**ones** 8:24 15:2 71:2
76:4,5 163:3
225:22 243:21,22
255:22 262:21
**ongoing** 34:17
181:20 216:7
234:23
**online** 21:22,23
48:16 70:21
124:18 157:21
**onlines** 13:10
**open** 118:17 135:23
152:3 163:7 183:7
238:16
**openly** 58:15 203:3
**operate** 20:19
**operates** 185:3,4
**opinions** 45:12
91:13 152:24
**opportunities** 30:22
49:5
**opportunity** 17:23
20:3,4,6 48:3
143:21 166:19
173:20 211:21
**oppose** 151:14
**opposed** 53:4
150:23
**opposing** 108:5
150:20
**opposite** 153:22
**oppress** 120:3
**oppressed** 121:23
**oppressor** 121:22
**option** 148:13

**options** 76:2
**order** 19:11 83:16
134:4 172:18
240:11 250:23
265:13 267:15
**organize** 208:4
**organized** 151:24
152:16 181:17
198:4
**organizer** 192:21
**organizers** 194:19
215:17
**organizing** 165:12
**oriented** 12:18
**origin** 38:3
**original** 92:10
179:13 276:2
**originally** 10:12
**outbreak** 14:3
**outcome** 251:3
**outdated** 18:1
**outlined** 111:1
**Outlook** 114:11
**outreach** 18:13
**outside** 187:19
**outward** 117:20
**overall** 242:3
**oversee** 93:22
**overt** 58:21 88:18
**overweight** 137:15
**Owens** 120:14

---

**P**

**p.m** 200:22 243:14
266:19,24 268:21
280:24
**P.O.** 2:5
**pack** 202:21
**packet** 166:7
168:21 205:9,13
**pads** 214:17
**page** 3:3 27:13,19
29:15 38:5 46:19
48:8,10,13,20
96:3 97:10,11
124:17,24 125:2

125:13,16,17,18
125:19 130:6
131:9,18 135:19
135:19 157:6
158:13 166:12,18
167:9 168:22
178:4,21,24
180:12,18 191:5
195:9,22 199:8,9
199:10,12,15
205:6,17 243:1,10
243:16 244:20
245:6,10,13,15
250:23 251:6
252:18 255:3,11
266:4 267:11
269:20
**pages** 63:18,21 66:3
183:6 201:10,23
244:24
**paper** 22:5 144:17
170:7 191:21
192:4
**papers** 166:22
**paragraph** 28:13
34:8 96:4,6 97:9
109:22 117:21
121:22 135:17,20
178:20 242:24
255:10 279:6
**paragraphs** 45:3
**parenthesis** 31:17
32:24 83:16,17
**park** 30:8,9 138:7
**part** 7:9 36:23
57:13 68:23 97:12
101:8 110:10
128:16,21,22
129:24 141:19
144:23,24 171:4
180:8 181:19,24
197:5,6,10 224:24
228:19 231:6
238:3 239:2 245:7
277:7
**partial** 239:21

Carmen Borges

**Participants** 196:18
**participate** 48:3
    145:17 242:10
    253:24 254:7
**participated** 251:18
**participating** 120:8
    136:12
**participation** 145:7
**particular** 34:3
    50:14 53:12 55:11
    81:1 147:9 172:16
    173:12 225:6
**particularly** 156:23
**parties** 73:15,17,20
    78:24 100:12
**party** 79:2
**pass** 263:6
**passage** 173:13,17
    276:17
**passed** 68:19
    186:22 263:16
**path** 270:21
**patience** 5:12
    211:15
**pattern** 54:14 57:16
    57:24 58:17,18
    59:5 61:16 89:1,2
    89:4,5,8 144:1
**pay** 130:15 258:9
**paying** 80:3 228:11
**pedagogy** 180:24
    203:5
**pen** 179:2
**pending** 264:15
**Penn** 4:12 5:24
    9:11,14 10:9
    11:10,11,13,17,24
    12:5 13:14 15:24
    16:8 17:2,12 18:4
    18:7 19:9 20:18
    21:4 28:3 29:6,13
    29:20,24 30:1,3,6
    30:6,10,13,19
    31:17 35:2,5 36:5
    36:17 38:12 39:8
    40:8 42:7,9 43:5

44:20 45:17 53:2
54:22 55:3 56:20
61:6 67:2,8,11,13
72:19 76:13 79:13
85:13 86:16 87:10
87:13,24 88:19
91:7 93:5 94:13
95:1,10 98:1,5
99:12 105:14
113:11 115:24
116:2,6,9 118:2
120:19 122:4,19
122:22 136:13
138:2 139:10
141:22 143:11
146:9,13 156:18
161:21 169:17
176:4,21 180:24
186:6 191:20
192:5,18 193:8,10
210:13 225:4
226:8,18 227:12
227:24 228:11
230:1 243:3,5,10
245:15,18 247:5,6
264:1 271:18
273:8,18,21
**Pennsylvania** 1:2,7
2:12 9:13 80:2
186:10,14 187:1
202:14 210:2
**people** 13:7,8 19:1
23:18 24:8 25:12
25:12,12 49:22
50:2,10 59:3
70:17,20 78:1,2
78:15,23 80:6
91:12 95:11
104:11,11,12,15
104:20 111:14
112:14 119:5
122:22 126:22
129:9,10,15
132:22,22 136:10
137:20,24 140:15
140:19 142:19,20

142:21,22,23
143:7,11 145:16
146:5 152:3 154:9
154:14,17 165:11
170:17 171:22
174:2 188:7
190:16,16,17
191:14,24 192:4
200:21 208:13
226:21,22,23,24
228:4 231:1 232:4
234:18 235:23
236:1,6,11,11
238:4 247:19,19
262:20 264:7
**people's** 88:1 92:10
104:16
**perceived** 100:11
**percent** 33:2,3,7,7
33:15,19 35:14
38:8,12 39:1
**percentage** 35:10
35:11,17,23 36:7
36:18,19 38:7,11
39:1,7,11,13 40:6
**perception** 100:18
232:9,11
**perfect** 152:13
278:14
**perfectly** 31:23
**Perfecto** 10:20
**performance** 5:22
**period** 28:5 76:7
77:24 78:12 137:7
**permissible** 170:10
**permission** 72:21
73:3 90:4 209:19
**persistent** 60:5,6
**person** 32:2 49:6
50:24 59:24 60:1
63:7 66:3,21
68:18,23 70:17
71:6 78:19 101:20
105:13,20,23
112:14 117:1,16
124:12,21 125:9

125:23 127:20
128:23 134:12
140:20 145:21
147:6,7 186:2
191:22,22 192:3
196:21 206:23
230:7 270:19
273:9
**personal** 120:18
218:18
**personally** 142:16
147:15
**personnel** 72:23
73:9
**perspective** 143:21
149:2 233:9
**perspectives** 34:12
34:18,19
**pertain** 71:2
**pertained** 84:16
**pervasive** 49:2 52:9
59:9 60:6,8,9,12
60:13,13,17,18
61:8,15 62:2
**Ph.D** 159:9,13
**Philadelphia** 2:12
**PHR** 186:9
**phrase** 10:17,18,19
36:4 260:17
**phrased** 142:22
154:1,3
**PHRC** 186:3,21
187:20 255:22
**physical** 48:24
49:16 52:6,14
53:16
**physically** 190:17
**pick** 140:8
**picked** 211:14
**picking** 229:20
**picks** 131:8
**picture** 79:4 133:13
183:9 198:23
199:13 227:11
228:15
**pictures** 182:22

183:3 198:19
**piece** 266:10
**pieces** 198:17
223:15
**Piero** 1:4 5:6,13
10:22 43:3,6,7
90:6,22 92:18,24
95:23 105:17
109:21 114:4
130:9,19 139:17
141:6,16 143:17
144:8 145:4
148:11 149:18
150:14 151:7,22
155:22 158:11
162:14 165:4
166:24 168:11
173:6,14 182:22
184:2 187:15
204:14 206:2
207:12 210:21
211:5,19 212:17
222:2 223:2 228:3
230:12 239:22
240:8 251:3 252:5
252:20 255:4
260:21 261:2,8
262:17 263:2
270:9 271:1,5,9
271:14,23 272:1,4
272:5,9,10,11,16
272:20,22 273:1,4
273:15 278:19
279:15
**Piero's** 9:6,8,10
110:18 257:21
258:13 269:6
276:8,16 277:8
**place** 27:17 70:24
142:6 231:15
**plagued** 214:16
**plaintiff** 1:5 2:7
240:5
**plan** 39:10 40:2,11
40:13,15,17,19,20
40:21 135:3

**planned** 168:14
**planning** 135:1,4
  254:5
**play** 101:20 211:10
  215:8 217:12,18
  218:4 219:24
**played** 216:17
**playing** 215:2 240:9
**plays** 212:2 213:14
  215:4,10 218:6
  219:4,22 220:5,23
  221:5,22 222:20
  224:4 234:7
**pleasant** 37:22
**please** 14:22 32:22
  59:19 62:8 70:8
  70:14 83:9 139:13
  192:10 225:21
  236:22 268:16
  276:17
**plenty** 61:23 81:8
**PLLC** 2:3
**plus** 11:12 93:2
  121:18
**Plymouth** 41:12
**point** 41:7 62:11
  65:16 75:2 76:1
  93:18 94:8 95:7
  127:7 169:8 174:6
  174:20 175:21
  176:10,13 182:18
  188:22 189:11
  190:21 191:1
  199:11 203:8
  208:4 211:21
  214:12 217:3
  247:2 251:12
  256:18 258:11
  265:18 268:16
  276:14 277:13
**pointing** 94:3 179:1
**points** 179:12,22
  274:4
**police** 113:10,11
  115:6 117:6,8,11
  118:21,23 119:4

119:20 121:4
123:10,17 124:17
128:2 129:24
135:9 137:7,11,18
138:3,9,20,22
139:9 163:4,7,13
163:17
**policies** 18:6 20:11
  30:13 35:1,5,8
  42:7,8,8,11,15
  44:13,16,23 45:17
  46:4 87:10 105:14
  146:13
**policy** 13:20 14:8
  18:4 29:24 43:8
  43:17,18,19,21
  44:2,4,8,12,17,21
  45:2,3 47:2,22,22
  48:12 49:13,15
  50:10 52:17,19
  53:7,20 54:7,9,17
  54:19 55:8,12,15
  56:24 57:1,1
  58:18 59:8,13
  93:5 95:10 210:7
  210:9 224:17
  225:3 226:8,19
  230:1,22 233:24
  247:21
**political** 117:6
  128:3
**pool** 18:10,14,15,19
  18:21,24 19:4,5
  20:15,22 21:1
  23:7 25:15,15
  42:4,4
**pools** 40:24 41:4
**population** 33:2
  36:3 38:1,8,11,15
  39:2,13 40:8
  41:10,15,22 42:5
  150:10
**portions** 268:1
**posed** 8:9 155:24
  190:23 193:11
  194:12,14

**position** 11:10
  17:12,15 18:14
  21:17 25:19 29:6
  29:13,18 75:10
  99:12 105:2 123:2
  145:9 169:17
  187:2 208:23
**positions** 29:9 51:2
  80:7 122:21
**possible** 18:14,15
  130:22 177:5
**post** 183:23 200:18
**posting** 184:7
  198:21
**posts** 136:3 199:4
**potentially** 84:7
  87:13 109:7 228:5
**power** 119:23
  121:18 122:6,6,11
  130:12,16,16
  131:4 132:15,16
  132:22 236:2,8,9
  236:11,14 237:12
  237:13,13,16
  256:14 257:1
**powers** 122:21
**practice** 70:13,13
  186:24 273:9,20
**practices** 173:11
  185:1
**practicing** 186:4,5
**precariously**
  121:13,17
**preference** 12:8
**prejudice** 121:18
**premarked** 83:13
**preoccupation**
  110:22 111:4
**preparation** 9:15
  9:21 63:24
**prepare** 8:20
  103:14
**prepared** 257:11
**preparing** 10:2
  258:20
**preposterous** 227:6

**present** 170:2
**presentation**
  139:21,22 140:7
  140:11,13 143:7
  169:2 249:16
  266:13
**presented** 27:23
  34:9 140:23
  225:10
**presenting** 223:15
**president** 17:16
**president's** 21:6
**presumably** 118:14
  123:20
**pretty** 70:23 152:22
  156:11,13
**previous** 7:8 14:12
  268:15
**previously** 202:13
  267:19
**printed** 26:3 45:5
**printouts** 243:10
**prior** 267:22
**private** 71:19,19,19
  71:22 73:14
  271:18 272:1
**privately** 271:21
  272:24
**privilege** 91:22
  122:2,5,6,11,19
  122:20,24 123:2,4
  123:7,10,17,18
  124:1,10,10,11
  155:14 158:21
  166:14 185:4
**probably** 7:7 57:24
  60:17 63:16 67:5
  85:19 101:15
  143:13 165:7
  199:3 200:17
  274:15
**problem** 12:13 67:6
  97:12 119:3,21,23
  140:15,19,21
  142:14,20 143:7
  143:11,15 144:4

147:1,2,13,19
158:16 161:20
170:12 191:21,24
192:4 226:11,13
227:5,7 228:4,22
234:18 237:19
256:9 264:7
**problems** 206:23
  275:23
**procedures** 18:8
**proceed** 227:17
**process** 12:18 17:3
  18:8 21:3 22:19
  22:23 44:11 77:7
  80:11 258:24
**processes** 12:19
  13:3 79:7
**processing** 79:20
**produce** 178:12
**produced** 27:20
  47:14 224:1
**production** 166:18
**productive** 196:19
  197:1 198:9
**professional** 42:23
  44:17,22 55:15,19
  55:23 56:5,11
  66:13,15 85:12
  93:5 172:15
  173:20 177:19
  218:2 222:10
  232:2
**professionalism**
  42:8
**professionals** 148:7
  148:17
**professor** 11:11,14
  84:2,11 92:4,17
  95:4 96:5 100:3
  106:5 115:16,17
  115:18 118:2
  124:22 127:11
  136:11 143:19
  144:8 145:3,11,20
  145:21,22 146:1
  146:24 147:1

148:11 151:22
160:23 161:5
165:13 177:20
180:2 195:12
220:2,8 222:12,15
279:23
**professors** 45:10
67:4 85:13 141:6
155:14 176:20
177:5 203:11
223:11
**program** 22:14
29:7 48:4 85:24
98:1,10 99:19
130:10,19 139:21
139:24 140:1,2,7
141:3,4 149:12
150:1,21 153:14
153:15 158:15,15
158:18,20 168:12
177:6 180:24
181:15,18,24
182:8 192:20
194:20 195:12,17
198:4 203:5 206:2
223:3 224:7
225:14 230:2
231:4,5,16 232:3
245:24 255:21
256:10 266:13,19
**programming**
144:3
**programs** 34:18
49:4 59:11 130:17
144:5 181:21
182:2
**prohibited** 50:13
50:20 53:11
**project** 36:22 37:9
67:15 226:12
231:3 249:16
**prominent** 136:12
**promise** 259:24
**promote** 35:4
**promoting** 35:2
39:22

**promulgated** 40:18
42:9
**promulgating**
230:22
**pronounce** 26:18
26:19
**pronounced** 241:19
**proper** 152:5,8,15
152:15,18 154:4
230:10
**PROSECUTING**
204:23
**protect** 174:2
**protected** 136:1
**protection** 14:21
16:11
**protective** 267:15
**protects** 86:16
**prove** 202:21
203:13,23
**proven** 16:23 83:4
104:13
**provide** 23:9 30:21
35:16 72:7,8,11
73:16,17 113:1
153:16 216:5,12
217:16 254:5
271:13 272:19
**provided** 8:24 9:1
17:6 53:2 70:6
96:19 97:7 152:18
185:11
**provides** 169:13
**providing** 78:1
273:14
**provost** 44:6
**PSU** 3:16,17,18,19
3:20,23 4:3,5,7,9
4:11,15,16,17,18
4:19 43:6,14
46:19 48:9 83:14
96:4 98:15 107:5
130:6 131:9 157:6
159:19 160:7
166:8 167:9
185:17 195:23

196:2 205:6 208:2
239:7 240:22
250:23,24 251:1
254:14 255:24
260:1 265:24
267:13 269:20
274:20 278:2
**PSU's** 224:16
**PSU-De** 43:3,6,7
**psychiatrist** 138:17
**public** 1:18 37:1,18
**published** 21:18,20
37:18
**Puerto** 10:12 11:8
11:11 122:12,17
147:13
**pull** 72:18 182:16
235:12
**pulled** 160:5 235:9
**purpose** 6:8 51:23
134:19 148:2,3,9
163:24 216:16
224:9,18 239:19
249:13,14 252:8
**purposefully** 58:15
**purposes** 23:12
212:24
**push** 270:11 279:17
280:7
**pushing** 260:22
261:1
**put** 26:12 27:6 37:4
37:6,15 46:12
64:19 76:9 77:6
81:5 95:23 101:23
124:18 130:2
137:1,8 151:2
202:2 203:6
207:23 219:1
229:19 233:12
237:3 239:4 267:5
269:18 278:22
**puts** 111:8 220:7
262:4
**putting** 59:24
112:19 198:2,3

**Q**

**Quaker** 2:6
**qualifications** 10:9
25:18 115:7
**qualified** 24:7
33:15 104:10,12
**qualify** 238:24
**quality** 67:3
**question** 6:14 7:16
8:9,13,16,16
11:22,23 12:20,24
13:3 14:24 15:16
16:16 17:5 18:23
22:18,19 24:9
37:6 40:5,17 41:2
41:2,13 44:1
47:23 48:1 50:15
53:19 54:1 57:20
57:20 62:12 66:11
66:13,17 80:9
81:9,20 82:12
87:3,14 88:1
91:21 93:21 98:17
100:14 118:10
127:8 129:1,20
143:15 145:19
146:14,22 148:18
150:13 152:13,15
152:16 153:6
154:16,19,19
155:24 166:20
167:9,24 171:2,23
173:14,21 174:10
174:14 177:19,21
179:20 190:24
192:11,21 193:11
194:12,12,14
196:16 197:12
215:17 216:2,5
217:24 218:14
219:6 223:6,7,12
225:2 226:3,14
228:2 229:2,5,24
246:16 248:14,20
248:23 249:1
253:23 259:7

261:4 262:1,24
263:17 264:2,15
273:6,24 275:19
276:6 277:6,18
278:20 279:16
**question's** 216:24
**questioned** 65:16
65:23 87:1,18
251:15 261:10
**questioning** 66:21
137:5 175:7
224:12 230:14
239:3 242:14
**questions** 6:21,24
7:11 10:8 28:8
39:23 55:21 93:21
93:24 147:22
151:5,8,17,23
153:7,11,12,19,23
154:1,6 155:3
167:2 170:20
172:17 186:1
189:1,16 190:22
191:12 194:22
208:3 216:21
218:9 221:2
225:22 228:24
230:15 233:13,17
233:19,20 246:20
248:3 258:12
264:23 265:3
270:22 274:1
277:12 280:21
**quick** 265:2
**quickly** 202:10
209:6
**quite** 37:17 189:13
212:22 223:13
**quote** 30:21 84:6,24
88:13 90:16 92:19
95:23,24 104:23
118:8 121:13
135:23,24 136:1,6
136:6 137:12
149:24 152:6
155:22 158:21

172:9,18 173:5
189:5 256:16,17
260:22,23
**quote-unquote**
71:23
**quotes** 166:12
185:10,12
**quoting** 152:9

**R**

**race** 12:3 14:23
34:6 35:5,7,19,20
35:22 36:7,8,18
36:19 38:1,3
39:22 40:6 41:4
41:16,23 50:5
103:20 105:8,18
105:22 127:13
129:11,15 136:11
142:24 143:4
144:3 147:8
161:22 169:19
170:3,17 176:5
189:8 196:18
202:24 203:16
204:5 228:18,19
235:19 237:9
263:20
**racial** 11:5,6,7,19
11:24 19:20 36:14
50:8 99:24 101:8
128:17 169:19
235:19,20 263:19
**racially** 33:1
**racism** 110:4,9
114:18 115:19
117:21 121:17,18
122:17 123:16
131:20 132:9,21
**racist** 120:3 121:5
137:19 173:10
184:24 192:13
202:22 203:23
237:8
**raise** 151:23
**raised** 156:15

218:10 236:7
279:20
**raising** 151:17
248:9
**random** 38:24
203:22
**range** 24:6 261:13
**rare** 68:22,24
**rate** 261:22
**ratings** 64:18
110:19
**Rational** 31:2
**Rationale** 29:16
30:19
**re-notice** 26:14
27:2
**reach** 18:9,17
150:10
**reached** 37:21
137:2 207:7
**reaching** 18:19
23:7
**react** 258:2
**reaction** 102:14
113:24 118:22
259:4
**read** 12:22,24 26:1
30:24 34:23 42:23
45:13 46:16,20
47:23 48:1 49:6
49:19 50:17 53:2
86:2 87:3,18,21
88:11 92:21 93:24
96:13,21 97:10,15
100:3 102:20
117:9 118:10
121:1,14 125:20
126:1 136:8
152:17 153:3,4,6
160:5 166:14
168:18 172:6,9
173:14 174:14,18
179:12 181:21
182:3,15 184:8,9
185:6,9 189:19
196:9 197:9

204:12,24 256:1
256:10,12,18
257:17,17,18,18
259:2 260:15,18
267:2 269:3
279:18
**reading** 30:18
127:7 155:5 156:7
172:11,13 173:19
177:21 181:23
184:20 185:10,13
256:20
**reads** 66:22
**real** 80:20 117:4
**really** 18:1 26:22
66:17,20 82:4,5
82:12 100:12
111:6 131:15
176:24 182:3
189:11 196:13
198:20 202:10
209:6 264:13
**realm** 43:23
**rear-view** 179:9
**reason** 18:1 25:14
25:17 31:5 49:9
75:3 77:20 87:20
97:17 133:7
240:15 245:5
248:8,16 249:4
**reasonable** 49:5
190:6 230:11
**reasonably** 105:21
**reasons** 34:11 217:6
**recall** 10:6,10 17:20
39:14 62:13 69:7
70:3,7 74:5 85:20
110:11,21 111:6,7
111:11 124:22
133:16 143:17,22
143:24 160:24,24
165:21 176:3
239:12 265:6
269:12 273:14
**receive** 58:1 133:6
**received** 142:3

254:22 257:6
266:13
**receiver** 89:7
**receiving** 269:12
**recipient** 254:17
**recognize** 26:23
28:12 34:11 114:1
114:5,6 157:10
160:10 162:6
185:22 241:10,11
252:3 254:14
266:1
**recollection** 269:5
270:7,13
**recommend** 151:22
**recommendation**
251:12
**recommendations**
34:9
**record** 5:7,8 6:7,20
7:9 14:7 25:20
27:12 46:23 47:12
51:23 62:8,9
65:13 83:9,14
96:13 101:24
107:16 108:4,21
111:20 112:17
114:3 133:18,22
139:13 141:11
146:10 158:4
160:6 163:12
168:4 178:17,18
179:1 189:15
194:6 200:15
201:9 202:5
209:15,19,23
210:14,14,20
211:24 220:21
226:6 239:6,14,16
239:18 240:1,20
252:12 254:8,13
258:13 259:16
260:1 261:10,13
264:22 267:14
268:12 269:19
270:13 271:6,10

271:14 272:16,20
275:13 277:2
**recorded** 102:24
197:14 210:1,15
215:24 216:6,8
217:9 239:13
260:10
**recording** 102:2
209:15,20,21
210:19 211:2,3,9
213:5,11 216:7,10
218:1 223:14
224:1 232:11
240:8 272:6 273:4
**recordings** 240:6
**records** 30:18
279:10
**recruit** 19:5 21:21
**recruiting** 32:18
**rectify** 182:13
**refer** 27:20 43:5,13
50:2 75:8 99:16
106:15,17,19,19
118:21 143:3
163:12
**reference** 49:18,21
74:4
**references** 202:15
**referencing** 255:15
**referred** 47:13 90:5
106:11 188:4
193:8 244:17
**referring** 13:4
43:15 54:21 58:9
74:5 95:11 126:6
128:21 178:22
181:12 192:12
197:3 202:14
205:1 211:9
**refers** 31:20
**reflect** 34:14 179:1
188:24 191:11
197:16 206:12
270:4 275:21
277:11
**reflected** 36:7

Carmen Borges

110:16 220:2
**reflecting** 262:24
275:17 279:11
**reflection** 276:7
**reflects** 276:15
277:14
**refresh** 160:12
269:5 270:7,13
**regard** 49:22 59:7
203:23
**regarding** 44:7
110:16 111:1
271:4,17 273:15
273:16
**regardless** 67:3
**regime** 237:8
**regional** 30:3 42:12
**regular** 51:8,11,12
51:14 104:5
**regulation** 23:12
**related** 44:8 46:16
47:5 49:23,24
76:4,5 225:23
229:24 230:15
236:9
**relating** 269:6
270:14 272:9
**relation** 187:7
265:7 269:13
270:9 271:2
**relations** 186:10
237:10
**relationship** 74:14
203:1,8 263:13
**relatively** 209:6
**relatives** 237:3
**relevant** 74:1,3
**relied** 47:17
**relies** 49:13
**relieve** 7:10
**rely** 73:17
**remain** 173:9
**remarks** 87:2,23
173:22
**remember** 15:24
16:1,2 38:12

63:15,17 64:1,1
64:15 66:5,18
68:10 84:21 86:2
91:1 111:3 115:7
124:19 132:15
134:5 137:6
139:16 140:1,18
141:9 142:8 144:8
159:17,17 189:2
204:15 212:14
236:13 261:14
262:13 265:8
274:12 279:1
**remembering** 122:1
**remind** 279:7
**reminder** 246:6,8
273:18
**remote** 1:13 5:20
68:20,21 69:3
71:4
**remotely** 5:21,23
78:13
**renamed** 22:20
**reorganization** 77:7
**repeat** 179:23
**repeatedly** 173:20
**repeating** 179:17
**rephrase** 53:19
261:6
**replied** 96:7
**reply** 118:17 163:8
**report** 27:10 31:12
34:9 37:8 65:17
65:18 67:21 77:1
103:7,10,12,19
105:5,16 106:9,9
107:13,24 168:10
171:17 178:22
205:5 206:1 242:7
255:24
**reported** 138:19
154:9 155:7
171:10,21 179:19
202:13 235:7
255:22
**reporter** 1:18 8:1

12:10,20,24 14:24
26:9,10 27:7
47:24 48:1 69:23
94:20 125:9
248:22 261:3
**reporting** 1:22
75:21 76:8 77:19
79:18 81:10 82:13
136:1
**represent** 37:19
43:2 114:3 166:17
182:6 185:9
210:14 211:19
213:18 216:9
221:8,19 223:19
250:11,22
**representation** 36:7
**represented** 42:5
234:4
**representing** 2:7,13
5:6 97:23 213:6
**represents** 184:2
**reprimanded**
233:21
**reproduce** 173:10
184:24
**request** 186:20
217:16 271:5,9
272:16
**require** 187:2
**required** 7:16 18:13
45:17 181:16
**requirements** 19:7
19:9 24:2
**requires** 118:9
**research** 36:22
64:24 67:12,13,15
115:19 123:19
124:2 129:18
225:5 226:12
231:2
**researcher** 114:18
139:22 144:16,17
229:18
**researchers** 231:12
**reserve** 15:19

**residence** 138:23
**resistance** 159:4
**resolution** 12:13
82:24 112:2
124:14
**resource** 241:24
**resources** 129:2
241:23 242:3
**respect** 45:10,12
55:16 116:23
126:10 131:10
156:21 157:3
208:18 243:24
244:2,22 245:8
246:2,4,10 247:2
248:1,2
**respectful** 55:22
156:22,24 170:11
171:2 248:3
**respecting** 63:14
**respond** 156:5
187:8 192:16
194:17 196:4,6,14
258:2
**responded** 196:15
196:19 197:13
222:12
**respondent** 63:4
65:23 66:10 71:13
72:3,7 84:23
113:4
**respondents** 71:11
72:10
**responding** 186:20
187:5,9,14 188:1
220:1 250:18
266:23
**responds** 132:18
186:3,9 187:7
266:18
**response** 27:2 67:20
117:14 196:20
197:19 220:11
249:19
**responsibility**
33:10 39:21

243:24 244:6,22
**responsible** 18:3
29:20,23 30:12
32:8,16,18 40:12
40:14,16 43:20
54:8 77:14 208:15
246:12
**responsive** 30:23
**rest** 102:20 145:8
154:8 217:1 254:6
**result** 12:14 119:8
242:23 252:9,11
**results** 67:16,17
**retain** 187:22
**retire** 11:15,16
**retired** 11:14
**retract** 101:13
208:3
**return** 28:11
**returning** 202:23
204:10
**reveal** 155:22
**reverse** 121:15,16
132:21
**review** 8:23 9:7
153:8 182:18
195:18 202:10
**reviewed** 9:8
212:12 238:1
252:18
**reviewing** 8:21 15:9
67:2
**rhetoric** 228:5
**Ricans** 147:13
**Rico** 10:12 11:8,12
122:12,17
**ridiculous** 147:23
**right** 5:22 11:4
14:13 16:14,17
20:2 24:23 25:10
26:22 30:4 33:13
33:24 35:19 41:11
43:10,17 52:13
55:17,18,24 58:13
63:5 67:6 69:16
70:11 74:21 77:10

83:24 84:4 85:17
85:18 86:4,5,8
87:9,17 88:16,18
89:6,15 90:9,11
91:16,24 92:5,6
93:7,8,14,15 97:1
99:5,21,24 102:3
102:15 104:15,17
104:21 105:4
107:22 108:19
109:2,7,10,22,23
111:21 116:11
117:2,9 118:12,13
118:15 119:5,11
119:24 120:19
121:9,11,19,23
122:2,9 123:21
125:23 127:2,21
128:5,16 129:2,8
129:10,24 130:12
131:11,13,19,20
132:6,10,19,23
133:2,9,16 136:18
136:22 137:3
138:23 139:5
141:6 146:3,17
148:12,22 149:7
149:11 151:7,13
151:14,18 153:22
156:7 158:8,16,21
158:24 159:10,13
161:7,13 162:9,11
162:21 163:8,14
165:5,14,20 166:1
166:4,6,14 168:15
169:15 170:17
171:12 174:18,24
175:8 176:6,6,17
177:2 179:6,9
180:3,20,21 181:1
181:2,21 182:2
183:7 192:8
194:19 195:6,23
196:3,5,9 197:13
197:17 198:4,19
198:24 199:10,24

200:5,11,17,22
202:8 204:16
205:10 206:2,9,14
207:4,15,21
208:12,19 213:9
214:4 218:10
223:12 225:1
228:12 229:17
230:23 231:23
232:24 233:13,16
233:17,19 237:5
238:1,22 240:23
243:13,23 244:6
246:5 247:13,24
251:7 253:1,1
255:4,18 256:1
257:4 260:12,15
260:23 264:16
276:4,22 277:6
278:10
**Rights** 187:10
**Rigilano** 154:11
 192:8 194:5,6
 221:8 239:23
**rise** 53:22
**rises** 53:20 54:5
**rising** 54:6
**risk** 263:9
**road** 5:15 199:5
**rogue** 236:2
**role** 40:18,23 41:3
 101:20
**room** 114:10 227:1
**rooted** 88:10
**rose** 60:22
**roughly** 29:10
**route** 46:2
**rude** 173:15 174:16
 194:7
**rule** 95:1,3 195:3
 229:24 230:5
**ruled** 227:16,23
**rules** 5:14 87:13,24
 88:3,19,21 91:7
 94:19 98:5 156:12
 156:19 191:20

192:18,23 199:5
**run** 156:22 254:5
**running** 56:4,7

----

**S**

**S** 3:11 4:1 117:14
**safe** 78:5
**sake** 173:23 228:2
**SAUL** 2:9
**save** 177:12
**saw** 116:18,18
 134:6 212:11
 233:3 258:4
**saying** 5:12 32:17
 59:3,24 64:21
 73:3 87:2 95:6
 97:4 102:3 105:17
 105:20,21 106:7
 117:3 124:23
 125:9 126:1 127:8
 127:10,10,23,24
 132:9 143:22
 144:19 147:13,18
 147:19 173:21
 190:5 195:1
 196:16,21 200:2
 203:15 208:14
 216:8 225:12
 226:20 248:13
 278:14
**says** 29:16 30:19
 31:17 32:24 45:9
 45:9 50:12 52:5
 59:13 61:2 84:2,9
 86:3,24 87:1,17
 87:22 88:6 90:19
 90:24 93:12,17
 96:23 97:11 98:3
 98:22 99:1,15
 102:1,15 109:12
 117:13,19,21
 118:6,17 119:3,21
 121:6,22 122:1
 126:8 131:20,21
 132:5,6 134:13,20
 135:22 158:20,23

160:17 167:11,14
 168:7,8,17 169:12
 171:14 173:12
 174:23 180:22
 184:23 185:2
 189:14 191:5
 192:17 196:3
 205:21 241:1
 243:13 244:21
 250:14 255:18
 261:6 268:24
 275:23
**scale** 261:16,18,19
**scenario** 61:9
**schedule** 160:15,18
 162:10 163:19
 207:3,11 266:15
**scheduled** 142:4
 160:13 163:24
 201:3
**scholar** 90:13 91:3
 91:9 140:5,6
 159:7
**scholars** 91:11,23
 91:24 92:9
**scholars'** 91:19
**scholarship** 91:2
**Schriner** 67:14
**scratchy** 188:4,6
 278:4,9,16,21
**screen** 184:16
**screenshots** 182:6,7
**se** 57:23
**search** 18:10,12,17
 18:22 19:2 22:6
 24:5
**second** 8:10 26:12
 28:13 34:16 38:5
 45:9 96:4 101:8
 115:5 116:10
 117:21 119:7
 120:16,17,20,23
 121:22 125:15,20
 135:16,19,20
 173:14 178:17,20
 185:1,19 195:22

199:8,12 215:12
 218:5 219:6 223:7
 255:10 267:17
 268:14 272:8
 274:21
**seconds** 211:18
 212:6 214:15
 215:9,20 216:3,4
 217:23 219:2
 220:18,22 221:20
 222:19 224:3
**section** 31:2 106:10
**see** 13:15,20 14:8
 22:3 26:6 27:10
 28:15,20,24 29:15
 31:4,17,18 32:21
 32:23 37:16 38:3
 38:8,10,21 40:2
 40:22 43:24 45:3
 45:7 48:9,22 52:5
 52:7 58:12 62:24
 69:24 73:24 83:1
 83:22 84:5 86:24
 88:6 90:24 91:5
 93:2 96:6,9 97:10
 99:2 101:3 106:8
 115:5 116:12,22
 117:14,21 118:4,6
 118:19 120:19
 124:18 126:4
 131:9,21 134:13
 135:2,12,18,23
 136:4,15 142:9
 143:21 151:3
 159:5 160:9 161:8
 162:22 167:11
 168:7 173:1 178:5
 178:20 183:7
 184:2,18 185:19
 191:6 195:9
 198:20 199:2,6,7
 200:4 201:7,12
 205:21 213:4
 215:9 226:10
 230:20,22 236:3
 241:2 243:1,12,18

244:21 247:20 249:12 250:13 251:5,7,16 254:16 254:17 255:11 265:23 266:6,20 268:18,21 274:13 279:11

**seeing** 38:13 121:15 121:16 178:14 255:20

**seeking** 96:6

**seeks** 30:20

**seen** 131:9 135:14 135:15 136:3 137:4 241:13

**selected** 20:15 169:3,6,9

**selecting** 173:19

**selections** 168:24

**self-evident** 11:23

**semantics** 190:2

**semester** 144:7

**senate** 44:7,9,9 45:22,24,24

**send** 75:6 76:4 141:17 250:16 254:4 264:20 267:1

**sending** 75:5 120:18 187:3

**sends** 135:22 162:19

**sense** 35:15 41:5 146:14 157:3

**sensitive** 262:8,12

**sent** 62:20 77:9,23 88:9 250:11,13 252:5 257:3 275:8

**sentence** 31:2 32:23 37:2 45:9 49:10 86:3,24 91:2 93:18 96:9 97:11 109:10 119:7,21 120:16 121:14 127:7 262:2

**sentences** 88:6 96:8

**separate** 44:11 56:17,18 60:5 255:23

**September** 139:16 142:9,10 144:9 157:6,15 158:3,8 162:16,17 232:22 255:20 260:4,8 263:1 271:1,7,11 271:24 272:5

**series** 140:24 143:6 166:18 180:12 182:5 265:15,19 273:24

**serious** 225:14

**seriously** 81:17 83:4

**seriousness** 176:23

**serve** 33:1

**service** 22:10 95:23

**services** 273:10,12 273:15,16

**set** 133:19 182:17 198:6 201:8,10 280:23

**sets** 19:9

**setting** 277:7

**seven** 110:19 179:9 261:15,24

**seventh** 245:10

**severe** 49:2 52:9 59:9,15,20 60:2 60:10,13,13,13,16 60:18,22

**shaken** 197:4

**shaking** 6:12

**share** 22:10 71:10 71:20 152:24,24 153:10,11 250:19 260:24

**shared** 249:21 260:20,21

**sharing** 193:4,7 250:6

**Sharon** 114:17 115:15,17 116:20

116:20,21 118:8 118:12,18,22 121:9 123:12,13 123:16 124:19 128:15,20 129:4 129:13 131:13 136:24 137:1 163:8,13

**shocking** 148:6,16

**short** 79:8

**shortly** 14:3,5,9 77:6

**shot** 138:22

**show** 5:21 45:12 199:13,22 246:22

**showed** 96:8,15 202:21 207:7

**showing** 223:20

**shows** 223:16 243:17 251:18

**sick** 161:9,10 165:17

**side** 37:6 71:14 183:7,20

**sidebar** 198:24

**sided** 26:4 45:5

**significant** 34:10

**signing** 134:7 200:3

**silence** 177:17 196:4,15

**silencing** 198:1,2

**silly** 82:2

**similar** 255:22 272:15

**Similarly** 55:8

**simple** 82:12 174:11 226:15 259:7,9

**simplest** 238:5

**simply** 223:22 240:9 257:16 263:19

**sincere** 110:9 249:5 249:7

**sincerity** 248:17

**single** 115:8

**sit** 70:19 103:13 191:23 280:11

**situation** 45:1,20 46:8 53:14 55:11 72:6 73:22 85:13 91:20 120:5 147:6 147:22 177:12 237:20

**six** 93:17,19 196:5 234:21

**skills** 214:15

**skip** 29:15 34:8 48:8 86:18,23 88:5 96:7 119:1 180:11 216:20 219:20 220:17 222:18 244:20 245:7

**skipped** 240:10

**slap** 52:3

**slash** 119:13

**slavery** 235:20 236:17

**Slightly** 248:16

**slur** 50:4

**slurs** 49:17,22,23

**small** 37:17,20 185:7 198:20

**smaller** 39:11,12

**Smith** 2:10 3:8 5:7 15:14,21 17:10 20:20 24:17 25:5 26:5 28:22 29:12 31:14 32:10 33:17 35:6 36:9 37:4 38:20 39:3,24 44:18 46:6 47:10 47:21 52:21 53:9 53:23 54:11 56:1 56:6,13,21 58:24 59:16,21 60:11 76:18 80:4 82:15 84:14 87:15 88:2 88:23 89:10,16,21 90:18 93:10 94:5 94:10,17 95:17

97:2 98:2 101:1,9 104:18 105:9,19 107:14,20 108:22 112:12 125:12 126:20 127:14 128:9 129:16 131:1 132:13 136:14,19 145:5 145:14,23 146:7 146:18 147:4,16 147:24 150:2,17 151:19 152:10,19 154:20 157:1 159:24 169:23 170:5,18,22 176:12,14 177:8 177:22 178:12,15 192:1 193:13 195:24 199:8,15 201:15,17,19 204:22 205:10 207:16,18 209:8 210:16 214:12,21 216:23 227:19 228:7,13 231:17 232:8,19 235:1,4 236:20 237:11 238:7,17 239:9,14 245:3,13 247:16 248:19 249:24 253:3 257:13 258:15,23 259:17 263:22 264:8,15 264:17,22,24 265:16,21 267:10 267:18,21 268:3,9 268:13,17 269:23 270:21,23 273:23 278:6 280:20,23

**snip** 223:15

**social** 161:20 173:9 225:14,14 226:13 226:13 237:19,19

**socialism** 236:17,23

**socialists** 237:5

**solely** 19:20

solicit 21:13
soliloquize 234:20
soliloquy 235:8
solo 186:5
solution 12:9
  110:23
solutions 82:10
solving 12:13
somebody 14:16
  45:23 49:23,24
  57:5 59:3 70:24
  138:13 150:7
  155:24
somebody's 50:21
  50:21 58:12 87:14
someone's 112:9
something's 58:15
Soon 172:9
sorry 5:10 8:1
  12:10,21,21 15:14
  15:17,23 26:18
  43:3 48:13,16
  54:24 76:20 94:20
  109:2 159:22
  161:17 175:20
  188:18 193:16
  195:24 200:3,6
  202:4 204:8 206:4
  207:22 220:20
  231:11 252:23
  258:8 261:3
  263:15 264:16
  267:11 274:8
  280:15
sort 5:14 20:14
  23:16 77:23 80:22
  81:17 96:24 131:8
  198:20 237:4
sorted 78:10
sorting 70:24 77:12
  77:13
sound 212:23 214:8
  218:12 219:17
  222:16 225:15
  249:22 250:2,4
sounded 248:2

250:6 280:3
sounds 79:14
  118:16,24 158:12
  160:14 171:18
  175:21 214:3
  218:22 225:16,16
  243:21 276:24
  280:6,18
source 37:18
sources 13:10,12
  21:23
Spanish 10:15,17
  10:18,19
speak 8:3 9:23
  10:15 15:15 69:4
  221:20 222:15
  249:7,8 273:7
speaking 24:2
  213:15 234:12
  250:5 263:16
speaks 211:19
  219:3,21 220:19
  223:20 224:2
  234:5
special 49:12
  182:23
specific 36:22 44:20
  63:15 64:1 71:10
  71:12,15 115:3
  147:7,8,9 152:21
  225:19 226:10
  242:1 272:1
specifically 9:3 64:8
  64:15 89:24
  111:11,12 113:4
  173:19 174:20
  188:23 216:24
  236:14
specifics 64:22
  80:10
speech 51:7,8,11,12
  51:15,15,18 52:4
  52:13,16 149:6
spell 69:23 141:11
spelling 69:21
spend 65:13

spent 206:11
spoke 70:1 173:23
  174:3,22,22 175:1
  196:20 246:17
spoken 9:15,20
spot 198:3
spousal 91:22
spring 110:4
  179:12,15
SR 65:9
SRTE 65:3,8,24
  110:14
SRTEs 64:15
  110:16,18
SS 65:2
staff 21:10 28:22
  32:12 33:6,7,11
  33:20 34:5,12,14
  35:10,17 123:8
staffed 79:8
stake 264:11
stamp 125:6 128:12
  211:8 212:5 219:2
  239:7 240:22
  250:10 251:23
  254:14 260:1
stamped 43:6 107:5
  125:16 130:6
  210:24 278:2
stamps 43:6 125:8
stand 80:19 99:2
standard 273:9,20
standards 42:23
  235:11
Standing 241:23
stands 65:8 237:5
start 73:10 114:11
  114:12 134:3
  214:12 215:3
  220:18,18 251:6
  274:19
started 43:4 75:3
  75:21 76:14,20
  77:1 110:2,3
  147:13 200:12
  208:9 214:15

starting 136:2
  200:17
starts 34:9 43:4
  83:14 118:19
  120:16 125:6
  135:17 168:21
  172:6 199:24
state 1:7 4:12 6:1
  9:11,14 10:9
  11:10,11,13,17,24
  12:5 13:14 15:24
  16:9 17:2,12 18:4
  18:7 19:9 20:19
  21:4 28:3 29:6,13
  29:20,24 30:1,3,6
  30:6,10,13,19
  31:18 35:2,5 36:5
  36:18 38:12 39:8
  40:8 42:7,9 43:5
  44:21 45:18 53:2
  54:22 55:3 56:20
  61:6 67:2,8,11,13
  72:19 76:13 85:14
  86:16 87:11,13
  88:1,19 91:7 93:5
  94:13 95:1,10
  98:1,5 99:12
  105:14 113:11
  115:24 116:2,6,9
  118:3 119:4
  120:19 122:4,19
  122:22 136:13
  138:2 139:10
  141:22 143:11
  146:9,13 161:21
  176:4,21 180:24
  186:7,11 187:1
  192:5 193:8,10,19
  193:19 210:13
  225:4 227:12,24
  228:11 230:1
  243:3,5,10 245:15
  247:5,6 264:1
  271:18 273:9,21
  273:21
State's 79:13

156:19 169:17
  191:20 192:18
  226:8,18 245:18
statement 48:12
  57:5,7 87:5 121:3
  147:23 197:13
  212:17,18 234:22
  243:5 252:15,16
statements 49:17
  49:18 53:17
States 1:1 11:9,20
  37:2,19 38:1,8
  236:18 237:10,16
static 34:21
status 50:16,19,23
  51:1
stays 77:9
step 194:15 197:19
Steve 116:22,23
  117:22 120:16
  126:6,6,7,8,9
  131:10
Steven 183:14
  188:14,22,24
  198:2 200:7
stickered 267:12
stipulate 15:18
stipulated 268:8
stop 23:1
stops 234:12
story 71:14 250:6
straight 239:10
stream 27:19
Street 2:11
stretch 87:2
stretched 80:5
strike 32:21 40:5
  41:13 44:1 62:12
  91:21 152:13
  179:20 196:2
  235:11 239:11
  246:16 248:20
striking 240:20
string 113:7 117:5
  117:13 128:1
struck 218:14

**structured** 12:18
  152:22 156:11,13
**struggle** 20:7 47:9
**student** 16:20,22
  17:6 30:21 31:6,9
  32:19 34:15 36:1
  36:8,15,20 50:23
  51:1 64:18 65:6,6
  65:9,9,10,10,17
  65:18 67:1 75:21
  75:23 76:5 84:17
  84:20,24 85:4,5
  85:15 86:12,20
  96:5 101:14,17,18
  102:5 103:4,7,13
  103:16,20 104:2,4
  104:5,9 105:3,7
  105:16 106:16,17
  106:19,21,23
  109:19,21 110:3
  110:17 138:4,9
  181:19 202:18,23
  203:10,12,16,20
  203:24 204:11,17
  268:1 276:19
**student's** 96:16
  268:4
**students** 17:3 30:10
  32:12 33:2,4
  34:12 35:11,15,15
  35:16,22 36:5
  74:18 75:21 77:2
  77:9 84:8,13 85:5
  85:7,14,17 109:7
  120:4 123:8 150:8
  150:8 153:1
  204:11 261:11
**students'** 30:23
  36:11 85:8
**studies** 169:15
**stuff** 144:10 178:5
  223:22
**subject** 118:17,18
  180:20 267:15
**subjected** 144:2
  158:14

**subjective** 100:21
  232:14 247:13
**submit** 56:5,8
  70:21 271:17
**submitted** 9:11,14
  62:21,22 71:16
  74:20 83:24 86:8
  100:16 107:18
  112:19 139:17
  157:21 162:9,18
  166:4 207:14
  268:15 270:9
  271:2 272:11
  273:7 276:3 277:4
**submitting** 89:8
  112:10 141:20
  156:22 230:5
  235:11
**subordinate** 130:9
**substance** 88:13
  103:5 114:6
**substantially** 49:3
  52:10
**substantively** 59:10
**success** 181:19
**suddenly** 23:21,21
  24:10 80:20
  206:21 218:14
**sued** 227:12 229:14
**suffering** 7:4
**sufficient** 234:10
**sufficiently** 49:2
  52:9 60:16,16,18
**suggest** 38:18
  219:11
**suggests** 38:22
**summarize** 77:5
  103:3 144:19
  170:12 252:12
**summarized** 13:15
**summarizing**
  206:15
**summary** 224:16
  224:16 226:7
  276:18
**summer** 119:15

**supervision** 64:4
**supervisor** 17:13
  50:22 69:4,6
  92:11,15 112:6
**support** 65:18
  273:10,15
**suppose** 23:24
  40:10 124:7
**supposed** 15:5,12
  16:9 47:5 50:5
  93:6
**sure** 29:4 34:22
  41:8 46:23 47:21
  70:18 73:11
  101:11 114:9
  115:2 116:22
  125:15 127:18
  128:20 129:22
  152:13 171:19
  172:13 186:23
  194:24 195:16,22
  196:22 198:4
  214:19 219:18,19
  231:14 239:9
  263:8 267:18,21
  276:21,23
**surrounding**
  107:12
**Susan** 120:13
**suspect** 240:15
**sustained** 34:22
**Suzanne** 17:14
**switch** 42:6
**sworn** 5:2
**system** 13:6,7 72:19
  75:15 116:4
  121:18 142:1
  242:3
**systematically** 67:2
**systemic** 119:21
**systemically** 121:5
**systems** 79:7

---
**T**
---
**T** 3:11 4:1 65:9
**table** 23:16,18,22

24:20 25:11 31:10
**tail** 119:22
**take** 66:20 80:21
  81:15,16 98:21
  101:2 104:15
  113:24 142:6
  172:18 194:12
  209:5 217:20
  231:14 251:10
  269:9 278:20
  280:15
**taken** 100:15 109:9
  188:13
**takes** 211:15 260:4
**talents** 30:23
**talk** 42:6 68:4 71:12
  72:3,4 73:22 76:7
  80:12 81:8,24
  93:2 124:1,19
  125:10 135:8
  136:24 143:3
  174:20 177:6
  189:10 209:23,24
  210:12
**talked** 109:20
  116:13 165:10
  247:12 269:11
**talking** 16:1 34:2
  52:13 57:7 58:12
  73:8 81:1 85:17
  112:10 119:17
  133:11 140:1,2
  142:18 143:16
  149:9 155:11
  167:22 205:2
  225:5,6,6,10
  229:21 230:17,18
  230:24,24 231:1,2
  234:18 235:18,22
  235:24 236:3,24
  237:1,7 239:2
  255:14 269:2
**talks** 119:20 120:2
  121:13 208:18
  269:17
**target** 169:18

**targeted** 115:12
**targeting** 147:5,7
**taught** 35:23
**taxpayers** 80:2
**teach** 11:17 34:19
**teacher** 65:19
  143:10 261:8
**teachers** 65:9 67:2
  227:5,6 256:9
**teaching** 36:13,17
  65:7 67:5,14
  261:12,14,22
**Teams** 267:1,2
**technical** 5:10,11
**technology** 22:8
  23:2
**telephone** 68:7,8
**tell** 7:22 26:3,4 52:3
  52:23 66:14 83:6
  89:19 92:8 111:16
  142:24 171:8
  185:7 212:22
  248:5 257:2 264:6
**telling** 16:2 124:20
  143:17 176:3
  177:12 186:9
  231:1
**tenor** 234:11
**tense** 154:13 191:18
  194:14
**tension** 191:13
  238:10
**term** 30:15 48:5
**terms** 23:5 34:18
  58:8,9,20 64:14
  179:15
**terrific** 264:23
**testified** 5:3 25:9
  51:14 82:3 83:23
  90:8 106:23
  129:22 145:3
  180:2 194:18
  195:11 221:9
  247:23 265:6
  270:24
**testify** 163:10

213:18
**testifying** 31:8
129:23 146:10,12
214:20,23
**testimony** 31:11
33:14,23 45:15
59:7 112:22 164:9
170:4,24 186:17
192:22 234:4
235:3 237:17
**text** 152:5,8,17
153:3,4,6,6 197:3
212:17
**textbook** 136:5
**THAD** 2:4
**Thank** 7:7 30:9
42:18 54:4 108:17
168:4 262:1
268:24
**Thanks** 5:12
**theory** 249:16
**Theresa** 117:17
**thing** 5:20 8:6,8,10
28:7 35:12 41:6
57:7 59:4 63:10
71:5 76:8 77:12
77:21 92:17 93:16
110:13 112:6,6
117:1 125:22
127:9,20 151:15
161:23 166:15
203:14 205:2
208:14,17,20
216:13 217:17,18
232:2 233:4
242:22 251:21
262:19,22 263:8
265:5 278:12
**things** 6:17,18,21
15:23 32:5 53:2
60:1 64:13 65:21
67:22 71:4 73:10
73:19 78:8,11
80:23 84:15 89:2
89:20 91:13
104:12 131:15

140:24 145:6
150:6 152:4
158:16 171:19
176:1,24 180:3
183:23 190:13,14
194:2,13 198:5
202:2 205:2
206:24 210:14
224:11 226:1
230:20 234:1
238:10 262:4
265:4,11 275:22
276:1,18 277:3
**think** 6:5 9:9 11:21
12:1 14:5,17
19:19 24:13,18
26:7,8 30:14
32:17 35:12 37:5
38:21,24 41:9,11
42:18 43:3 45:1
45:19,19,21 46:7
46:10 48:13,13
50:9 53:13 55:13
58:19 67:1 68:20
69:12,18 77:1
80:17 81:7,9,12
83:23 84:15,16
85:2,22 86:2
91:14,20 92:13
94:3 104:4 107:15
107:16,20,22,22
108:4 113:5,5
117:3,4 123:16
124:19 126:1
127:10,22,24
128:20 130:20
131:16 132:21
133:13,15 137:16
143:9 144:12
150:23 158:17
159:1 161:8,9
166:6 174:8 177:2
177:5 183:20
185:19 194:11
198:18 201:2,19
204:7 205:1,17

207:21,22,22
209:5 213:17
214:11,15 216:23
216:24 219:13
225:24 226:24
227:7 228:14,14
230:11,15 232:2
241:13 246:2,22
247:1,8,24 248:6
251:16,22 253:14
253:20 258:10
259:18 260:4
261:13 264:12
265:18 266:4,9
268:3 269:21
270:24 272:14
273:6,23 280:22
**thinking** 22:3 30:16
35:9 148:3 157:3
219:17 233:14
**thinks** 128:4 171:19
184:20
**third** 34:18 38:4
78:24 79:2 93:18
99:2 119:22
205:17 251:6
**thought** 41:10
51:17 73:8 100:6
106:22 233:16
268:14
**thread** 121:17
131:7,18 159:18
162:1,6,22 198:22
199:3,23
**threads** 131:19
**threat** 248:7
**threats** 49:17
**three** 17:21 19:23
39:16 63:20 90:24
96:18 141:10
164:17,18 207:2
207:14
**throwing** 198:5
**time** 1:17 6:4 7:9,9
8:7,22 10:1,6,7,7
12:17 13:4,23,24

15:19 21:24 22:1
22:19,22 24:1
26:1 28:5 29:9
34:23 43:7 44:20
45:19 59:3 65:13
66:20 68:20,21
74:7,9 76:7 80:21
80:23 81:8 83:5
83:20 91:14,15
99:9 104:3,15
109:15 111:14
113:22 116:19
134:11,17 135:23
137:7,22 139:8
144:9 156:9 161:9
162:8,10,13 163:1
163:16 167:23
179:8 180:5 188:2
194:1 201:3
206:11 211:15,18
212:5 215:6 219:6
220:4,19 222:3
223:22 224:2,6
228:23 231:18,19
232:4 236:2
242:12 244:13,15
251:10 257:18,22
258:13 259:5,10
259:14 260:5
264:11 271:5,13
271:23 272:4,15
272:19,22 273:3
278:18 279:2,10
**times** 8:2 79:9
107:17 162:19
163:22 234:5
246:17
**timing** 206:6
**tiny** 182:13
**title** 99:8 242:1,2
**titled** 158:15
168:18 256:9
**titles** 148:6,7,16
**today** 6:24 8:20
9:16,21 10:2
15:10 27:2 31:8

31:11 33:14,23
45:15 112:22
164:9 186:17
192:22 222:9
237:17 257:9
266:19 269:1
278:3 280:11
**told** 64:24 66:8
92:11,12,13
103:11 161:10
202:18 227:4
246:3 260:11
262:3
**tolerate** 238:6
**tolerating** 263:19
**tone** 154:10 155:1,2
155:22,23 156:3
156:16 167:2
170:21 171:1,3
172:10 175:8,9
176:22,23 177:23
177:24 192:24
194:23 195:2
198:6,14,15 212:7
212:9 215:13
219:7 220:10
221:11,16 222:9
238:11 246:18
**tones** 223:17
**tools** 24:7
**top** 40:1 48:10,19
78:12 83:15 97:10
107:6 118:19
134:4 167:11
184:14,21 195:9
250:16
**topic** 45:23 113:8
115:18 139:20,20
139:24 140:9,13
141:1,2 142:14
144:6 146:20
148:15 150:20
151:1 152:2
158:24 159:3
167:4 169:21,24
170:6 172:10

181:7 188:11
189:4 191:23
193:22 195:20
198:11 225:5,23
225:24 226:10,21
226:22,23,24
229:13,18,20
230:15 233:4
235:15,17 236:9
248:11
**topics** 111:1 125:10
140:16 141:1
149:16 152:23
156:13 224:11
231:1 236:7
**total** 56:18
**totality** 50:14 53:11
**totally** 113:5
149:11 224:12
225:9,12,24
230:19
**touch** 214:17 265:5
**tough** 126:17
**Town** 41:12
**toxic** 136:2,6
**track** 39:7
**tracked** 38:1 40:4,7
40:9
**tragedy** 139:2
**training** 34:18
36:23 114:21,22
114:24 115:9,12
118:9 137:12,15
**transcript** 4:20
6:13,20 240:1
**trauma** 128:18
**traumatized** 249:22
**treated** 14:16
**treating** 153:1
**trial** 6:9 7:10 15:20
**tried** 177:12 189:7
192:14 194:15
203:23
**triggered** 118:7
131:13
**true** 100:4,15 101:3

**truly** 167:8
**truth** 7:23 212:22
216:12 232:16
**truthfully** 6:24
**try** 21:21 28:10
51:24 71:5 77:5
182:16 203:12
213:13 221:21
224:21 261:9
265:2
**trying** 15:8,10 16:7
21:3 40:23 51:22
66:5 76:9 77:5,22
93:1 112:17 117:1
117:7 125:23
127:21 146:11,14
149:24 195:5
196:11,18 197:7
197:19 204:9
208:4 214:23
216:20 217:14
219:19 229:12
230:16 239:9
254:20
**turn** 188:12 205:17
274:3
**turned** 103:19
213:3 230:19,20
233:23
**turning** 249:12
**twice** 95:8 226:4
**two** 10:3,3 54:13
63:17,20 66:3
79:14 85:6 86:10
86:23 88:5 89:2
96:8 100:5 166:21
172:17 181:7
201:23 202:12
203:2 206:24
244:13 255:23
267:11 274:5
279:4 280:17
**type** 114:20 150:11
228:5
**typical** 22:22
**typically** 12:14

105:22 278:22

___

**U**

**U.S** 37:17 39:2
132:22
**Uh** 226:16
**uh-huh** 6:18 13:19
14:14 16:6 19:24
27:11,22 31:19
32:15 38:2,6,14
39:18 43:11 45:4
46:22 49:8 51:19
51:20 61:11,22,24
63:8,23 65:20
68:9 69:11,20
73:18 75:9 80:14
86:22 87:4,8 88:7
88:12,17 91:6
93:3 96:10 99:11
99:20 100:1 102:4
102:9 109:8,11
110:1,19 117:16
117:16,18 118:5
118:11,20,24
120:1,6,12 121:10
121:12,21,24
122:3,10 126:10
127:3 128:6,17
129:12 131:14,17
132:11,20 133:3
133:21 135:3,13
138:10 139:6
140:17 141:14
146:23 156:4
157:22 158:9
159:14 160:20
161:2 162:12,17
163:9 164:8,16
165:5,21,21 166:5
166:15 167:10,15
168:9,16,23
169:16 171:24
174:12 176:18
178:7 179:7
180:14,17 181:14
181:22 184:1,4,15

184:22 185:8
188:17,21 191:7
192:9,11 195:13
195:17 197:15
200:1,8,20 202:6
202:9 205:19
206:3 207:10
208:6,24,24
212:15 213:8
214:10 218:11,20
220:9 223:1,23
226:5 243:2,15,19
244:3,23 245:20
245:22 248:15
250:12 251:20
253:10 255:5,8,13
256:2,4 257:5,10
258:7 259:13
260:6 261:24
265:9 266:8 270:3
270:20 271:3
275:2,4,18 276:1
276:5 278:15
**uh-uh** 6:18 104:8
118:1 215:18
218:13,15
**Ukraine** 234:22
**ultimately** 80:2
**um** 10:3 12:6 13:6
23:20 35:3 39:9
85:2 138:12 161:8
278:22
**un** 176:2
**unaware** 108:6
173:10
**uncomfortable**
117:5,8 123:14
127:12 128:1,4,8
136:3 144:24
174:5,6 175:24
176:5,9,15 177:16
189:11 192:17
220:8
**underlining** 172:21
**undermining** 63:12
63:12 64:6,9

**understand** 6:15
7:19,22 8:13 11:2
15:10 21:3 29:23
32:3,14 37:17,20
37:24 43:5,14
70:8 106:4 121:3
127:11 144:15,16
144:17 148:14,14
148:15 149:8,10
149:19 150:15,24
158:24 159:2
171:19 182:16
183:21 184:5,7,10
185:7 202:5 209:2
213:1 233:9
246:11 255:15
262:7,11
**understanding**
24:19 29:2 86:17
115:11 128:23
150:6,14 181:23
210:11 217:2
242:8 262:14
278:3
**understood** 8:16
27:16 142:23
148:21,23
**unendingly** 114:12
**unfortunately**
125:8 184:16
**unhappy** 280:12,18
**unintelligible** 41:8
100:12 122:15
189:18
**unique** 183:4
**unit** 21:7,8,10,11
40:21 63:11 67:12
77:24
**United** 1:1 11:9,20
37:2,19 38:1,8
236:17 237:10,16
**units** 23:6 40:20
69:1
**universities** 16:13
**university** 1:7 6:1
13:6 22:14 29:6

Carmen Borges

29:13 30:8,9 32:5
41:18 42:15 48:4
49:4 51:2 53:3
54:20 55:3 59:11
68:21 72:19 76:14
93:5 94:13 98:5
105:14 113:9
135:18,22 138:7
143:18 176:4
186:6 202:14
204:2 210:9,10
225:4 227:24
229:20 230:1
233:24 242:4
247:6 252:14
264:1
**university-wide**
40:9 42:14
**unoriginal** 91:3,10
91:11,19 92:2,3
**unpack** 148:6
249:15
**unpacking** 235:22
**unprofessional**
64:22 66:16 98:9
170:14,16,20
189:10 193:11,17
193:18,21 194:19
215:16 220:15
252:14
**unprofessionalism**
55:12 193:1,2
**unredacted** 178:12
178:16
**untrue** 211:21
**unusual** 69:21
185:18
**unwittingly** 173:10
**upper** 243:13
**upset** 155:8 191:14
191:19,20,23
192:4 193:21
**upsetting** 120:18
**upside** 52:3
**URL** 243:17
**use** 6:18 49:17

65:15,15 80:6
140:9
**uses** 260:17

_____

**V**

**vacancy** 18:18
**vaguely** 137:10
**validate** 100:24
**validated** 232:15
**validating** 83:1,3
**value** 55:7 246:10
252:16
**values** 4:12 54:22
54:22,24 55:3
193:8,10 243:3,5
243:19,23 244:12
244:17 245:15
246:5,6,8 252:14
**Vardo** 121:8
**various** 42:7 166:8
179:12 199:5
246:17
**vast** 81:11
**venting** 258:4
**venue** 21:18,20
**venues** 78:1
**verbal** 48:24 49:16
51:3,10,14,16,18
52:4,6,8,14,15,16
57:8,9
**verdict** 139:12
**verify** 180:15
**versa** 130:23
**versions** 178:12
**vice** 17:16 44:6
130:23
**Vicki** 1:18
**victim** 11:19
**video** 6:12 240:11
256:9
**VIDEOTAPED**
1:13
**view** 96:17,17
124:2 153:19
190:6 246:14
256:18

**viewpoints** 231:7
**views** 151:3
**violate** 88:21
**violating** 247:8,10
**violation** 87:24
88:19 239:4
247:21
**visible** 268:4
**visibly** 197:4
**vision** 30:20
**voice** 156:3,15
214:11 219:16
246:19
**volume** 8:1 80:15
81:18
**voluntary** 144:22
145:16 146:3,4,6
146:17,19 147:2
151:10 169:20
**vs-** 1:6

_____

**W**

**wait** 28:7,10 127:15
264:23
**waiting** 97:3 154:14
**wanna** 10:8 32:1
52:2 72:11 76:18
76:18 93:19
122:13 131:15
146:20 147:17
149:5,20,21
150:19 156:1
172:8 178:3
179:20 183:20
188:12 194:10
199:19,22 206:4
209:5 225:1 229:4
237:13 239:15
264:17 265:14
**want** 9:18 26:18,21
31:23 41:9 43:12
58:10 66:23 67:23
67:24 81:6 101:23
102:11,23 103:2
106:18 113:7
150:19,20 153:15

156:5 167:8 180:3
180:6,11 191:2
194:19 206:19
209:14 210:13
211:23 215:8
219:24 225:1,19
226:3 255:9
258:12 265:5,10
266:24 271:4
272:8 280:22
**wanted** 8:6 41:7
67:24 69:21 93:16
111:22 112:20,24
113:1 124:20
127:8 128:23
129:1 135:11
140:8 141:11
154:15 178:15
180:15 189:11
194:12 209:12,17
214:14 219:14
240:18 251:21
268:13 274:3
275:21
**wanting** 111:23
**wants** 72:7 93:21
102:12,12,15,17
102:18,22,24
**wasn't** 24:4,4,11
32:6,6,6,6 40:17
41:2 61:19 79:2
88:18 110:9 116:4
145:8 159:8
161:18,18 163:1
167:4 172:13
173:22,22 187:21
190:23 197:18
198:9,9 200:16
203:22,23 204:3,4
204:4,4 212:18
214:19 226:22
237:22,24 264:14
**watch** 256:9
**way** 8:12 20:23
31:6 38:4 87:21
88:22 95:7 107:10

137:8 154:3
170:12 182:21
188:5 189:9 190:6
194:13 198:5
209:17 213:3
219:1 220:15
233:14,15 238:4,9
238:10 248:17
256:21
**ways** 20:21 96:20
150:5 152:24
154:5 198:12
**we'll** 15:9 46:10
69:18 81:7,7 90:8
107:2 115:2 201:9
201:24 209:5
217:18 218:4
220:18,19 245:6,7
**we're** 6:7 15:17
20:7 40:16 42:18
58:12 70:12 79:6
80:5,5 86:18
113:22 162:20
166:6 178:8 190:2
195:8 202:3
209:12 211:13
217:4,12 220:17
220:21 223:16
224:21 225:5,5,6
227:9,9,10 230:17
230:18,24,24
231:1,2 239:9
280:23
**we've** 32:24 53:2
57:7 107:17 131:8
176:20
**wearing** 87:7
**web** 124:17,17
243:10 244:24
252:18
**website** 114:17,19
244:18,20 245:18
**Wednesday** 124:23
**week** 108:18 275:9
275:20
**weeks** 245:21 279:4

Farrell Court Reporting

welcomed 127:22
welcoming 117:3
  120:19 125:24
Wendy 227:15,23
went 23:3 68:20,21
  70:22 138:20
  176:24 200:24
  201:3,3 206:15
  235:8 249:17,18
  262:22 270:22
weren't 32:16
  78:15 154:4 213:9
  248:7
whiplash 206:5
whistleblower
  136:1
white 10:22 12:4
  33:6,7,11,12,15
  33:19 34:5,5 38:7
  38:12,19 39:1
  50:10 66:1 93:20
  93:23 94:4,14
  95:2,8 117:1
  122:2,5,8,19,20
  122:22 123:2,4,7
  123:10,17 124:4,6
  124:8,9 125:23
  127:20 129:9,10
  132:22 133:19
  137:15,18 140:15
  140:19,20 142:18
  142:18,20,21,22
  142:23,24 143:4
  144:3 155:13,14
  158:16,21 166:13
  166:13 170:16
  174:2 185:2,4
  191:22 199:5
  226:24 228:4
  234:18 235:12
  236:11 256:9
Whitehurst 75:18
  75:20
whiteness 185:3
wide 42:16
wider 18:10

wildly 219:12
wind 200:22
window 183:7
wish 102:18 184:17
withdraw 91:22
withdrew 5:22
withstand 126:18
witness 3:3 5:1 8:3
  12:12 15:1 20:21
  24:18 31:15 32:11
  33:18 35:7 36:10
  38:21 39:4 40:1
  46:7 47:11,12,15
  47:24 48:2 52:22
  53:10 54:12 56:2
  56:7,14,22 59:1
  59:17,22 60:12
  80:5 82:16 84:15
  88:3,24 89:11,17
  89:22 90:19 94:6
  94:11,22,23 95:18
  97:3 98:3 101:2
  105:10,20 107:19
  108:1 112:13
  125:13 126:21
  127:15 128:10
  129:17 131:2
  132:6,14 136:15
  145:6,15,24
  146:19 147:5,17
  148:1 150:3,18
  151:20 152:11,20
  154:12,21 157:2
  160:3 169:24
  170:6 176:13,15
  177:9,23 193:14
  195:5,6 199:13,20
  201:16,18,21
  205:11 210:17
  213:15 214:18
  217:3 221:6,23
  228:14 231:18
  232:9,20 234:8
  235:5 237:12
  238:8,18 240:10
  247:17 248:21

  257:14 258:16,24
  259:18 263:7,8,15
  263:16 264:9,16
  264:19,23 278:7
witness's 12:23
witnesses 72:4
  78:24 156:4,16
  175:5,11,12
woman 90:11
  168:14 202:13
  219:15
women 64:17 65:24
  87:5 198:1,2
  214:6
wonder 208:6,6
wondering 218:9
Wong 75:8,19
  77:16
word 58:3 62:4
  82:2,2 91:5
  111:10,14 115:4
  142:19 204:16
  256:23
words 24:20 61:19
  71:22 77:6 83:8
  86:6,7 88:18
  176:6 179:4
  190:22 195:14
  242:24
work 5:20,23 12:6
  16:23 17:1,8
  18:22 25:7 43:19
  66:19 68:23 74:16
  91:19,24 92:10,10
  110:13 123:19
  129:4,8 136:2,7
  159:6 169:14
  170:7 186:6
  234:19 247:11
worked 60:20 75:19
  103:11 139:1
working 5:21,24
  73:10 78:13 84:7
  102:22 109:6
  138:2 203:1,8
  268:6

workplace 12:14
  186:15
works 21:4 124:3
workshop 55:21
  192:21 193:22
World 96:20
worried 87:6
worry 161:3,6
worse 107:11
worth 247:14
  258:10
wouldn't 16:12
  20:14 58:22 67:17
  85:1 96:1 123:4
  177:9 191:22
wrap 209:6 263:6
wrath 102:11
write 176:20
writes 123:22,24
  135:1 168:10
  180:18 205:6
  266:18
writing 29:7 31:12
  99:19 132:3,3
  148:7,17,17
  149:12 150:1,21
  158:15,18,20
  159:7,9 166:13
  168:10,12 169:15
  177:6,20 180:24
  181:15,18,24
  182:8 185:5 203:5
  206:1,2 223:3
  231:4,4 255:21
  256:10
written 49:17 53:17
  262:2,24
wrong 41:14,14
  48:10 87:18
  107:11 131:20
  132:9 154:18
  159:22 160:2,5,7
  176:1 184:20
  228:9,10 229:13
  229:19 234:1
  235:21 236:3

  240:24 249:18
wrote 92:5 93:1
  144:17 262:14

        X
X 3:1,11 4:1 211:3

        Y
Y 211:3
yeah 5:23 10:6
  13:16,24 14:5,11
  16:6,6,11 17:17
  19:16,21 20:17
  22:13,15 28:21
  32:12 33:20 38:10
  39:9,18 40:10
  43:8 45:8,14
  46:22,22,22 48:15
  48:18 49:23,24
  52:14 55:11 56:17
  57:12 58:16 59:1
  59:1 60:13 63:13
  63:18 64:15 65:12
  65:12 68:12 69:3
  71:12,24 72:6,8
  72:22,23 73:16
  74:3,10,10,13
  76:23,24 77:2,11
  79:8,16 80:17,18
  81:17,18 84:22
  91:17 92:15 96:12
  99:4 101:17
  104:22 107:1
  112:19 119:8,14
  119:16,19 120:5
  120:22,24 121:7
  124:11 129:6,9
  131:2 132:3,14,24
  134:23 135:3
  138:15 140:21
  141:18,21 143:1,3
  149:21 150:19
  153:11 155:16
  156:8,9 159:11
  160:3,14 161:4,10
  163:4,6,15 164:14
  165:15,15 167:7

167:21 169:1
173:2,4 174:7,8
177:12,17 178:10
179:3 183:13
188:11 189:12
191:14,15 192:17
193:7 195:7,10
203:6 204:19
206:7,18,20,22
207:8,13,13
212:15 214:2
215:7 217:13,21
218:17,20 219:17
219:19 221:4
224:23 225:15,20
225:22 226:23
227:3 228:10
230:4 231:8,12
235:10 237:6
242:19 243:4
245:2,9 247:17
251:9,11,14
253:12 255:7
260:19 261:1
269:8 274:13
276:5,19,24
278:11 279:3,5,7
280:3,10,19
**year** 27:9 99:24
102:5 253:1,9
**years** 5:18 11:12,16
12:7 13:22 22:4
202:12 203:2
206:24 244:13
**Yep** 267:8
**yesterday** 203:4

**Z**

**Z** 211:3
**Zack** 1:4 5:6,13 9:6
9:8,10 90:6,21
92:18,24 95:23
105:17 109:21
110:18 114:4
130:8,18,23
139:17 141:5,15

143:17 145:4
149:18 150:14
151:7 154:13
155:22 156:14
158:10 162:9,14
164:3 165:4
166:24 168:11
171:5,8,15 172:2
172:9 173:5,14
177:12,13 178:22
182:22 184:2
187:6,15,17,23
188:24 189:5,9,20
189:21 190:19
191:19 192:12,15
194:6,16 196:16
197:4,5,24 202:11
202:12,21 203:2
204:14 206:2,16
207:12,15,19
210:21 211:5,18
212:17,21 215:3
215:19 216:8
218:5,9 219:6
222:2 223:2
225:12 226:17
228:3 230:11
231:19 234:12
237:21 239:22
240:7 242:17
244:15 246:17
247:9,24 248:8,17
250:20,22 251:3
252:20 254:5
255:4,7 257:21
258:13 259:11
260:21 261:2,7
262:16 263:2
265:8 268:15
269:6 270:9
274:12 275:24
276:8,15 277:5,8
278:19 279:15
280:10,16
**Zack's** 103:21
153:19 157:14

161:12 165:14,19
165:22 166:1
167:1 189:16
191:12,16 207:3
212:4,7,9 217:24
218:14 220:10
232:18,20 234:14
234:22 235:15
237:15 245:23
249:5 263:8
270:14
**ZDP** 3:14,21,22,24
4:6,14 27:13
29:15 113:17
118:3,19 128:12
133:23 162:2
199:12 207:17
210:20 211:1,4,4
239:13,22 240:3
251:23
**Zoom** 98:23 99:1
168:13 181:17
183:19,21 188:9
188:20 201:11
267:1,1

**0**

**0022632** 43:3
**01281** 4:11 239:7
240:22
**0138** 3:21 113:17
118:19 125:6,18
**0140** 119:1
**0181** 3:24 133:23
**02247** 3:14 27:13
**02281-WB** 1:5
**02416** 131:9,9
**02623** 48:9
**02658** 3:18 83:14
**03154** 4:9 185:17
**03236** 4:5 159:19
208:2
**03347** 4:13 250:10
250:24
**03827** 240:4
**03930** 251:1

**04137** 4:16 260:1
**055** 162:2 207:17
**0612** 4:15 254:14
**06320** 2:6
**088** 4:14 251:23

**1**

**1** 3:13 26:9,14,16
26:23 265:16
270:1,5,8 277:22
278:10
**1:14** 200:11,22
**1:15** 168:13 200:9
206:6
**1:19** 200:12
**1:30** 266:18
**10** 3:22 5:18 11:16
128:11,13 209:8
220:17 255:1
257:3 259:11,15
261:18,19,21
**10/12** 276:13
**10/12/2021** 275:16
276:12
**10/19/2021** 201:8
201:11 202:8
206:9
**10/20/2021** 195:8
**10/21/2021** 192:7
**10/22/21** 191:5
**10:06** 131:22
**107** 3:20
**10th** 255:7
**11** 3:23 39:1 130:3
130:4 180:12
**11:03** 266:5
**11:06** 266:17
**11:14** 1:17
**11:16** 266:23
**113** 3:21
**12** 3:24 113:16,21
124:24 130:7
131:21 133:22,24
134:1,10 160:8
165:13,24 208:4,5
268:20 275:8

278:17
**12:00** 200:14,14,17
**12:15** 168:13 206:6
**12:18** 198:21 199:3
199:24 200:18
**12:19** 199:5
**128** 3:22
**12th** 266:5 275:20
277:7 279:13
**13** 4:3 157:5,7,8,15
232:22 239:8
241:9 253:20
**130** 3:23
**134** 3:24
**139** 118:3
**14** 4:4 157:23 158:1
158:4 219:2
240:23
**140** 125:17
**15** 4:5 159:18,19,21
162:3,8 164:12
165:12,24 174:4
175:22,22,22,24
200:16 201:1
207:9 208:2 209:9
**1500** 2:11
**1546** 4:8 182:7
**1547** 199:12,12
**157** 4:3
**158** 4:4
**159** 4:5
**15th** 163:20
**16** 4:6 162:1,4
207:7,16,17
221:20 260:8
263:1
**162** 4:6
**163** 274:20
**166** 4:7
**17** 4:7 166:6,7,9
201:18 204:13
205:5,7,8 212:16
274:5,6
**175** 3:22 128:12
**18** 4:8 164:17,23
168:6,13 178:22

Carmen Borges

182:5,8,9 183:8
191:8 198:18
206:13 209:16
211:17 214:15
216:3 223:3
239:20 245:24
**18:19** 212:5 217:23
**182** 4:8
**185** 4:9
**18th** 155:12 165:7
166:3 188:9
208:11
**19** 4:9 77:3 180:16
185:16,20 201:9
201:14 211:17
212:6 215:8 216:3
274:16,17 275:3
**19:04** 212:6
**19102** 2:12
**19th** 275:2,20

**2**

**2** 3:14 25:21,22
27:8 37:5,10 48:8
255:12 265:16
**2:00** 266:24
**2:23-cv** 1:5
**20** 4:10 76:12
188:13 209:16
216:4 217:23
239:6,11 240:4,13
250:11 251:1
265:24
**2018** 76:18,21,22
76:24 77:2,3
**2019** 76:14,15,16
275:24
**2020** 13:23 27:8
29:10 31:18 58:2
62:13,15 64:2
68:13,14,17 74:9
83:16,20 100:17
107:6,16 110:4
113:10,16,22,23
119:11 124:24
130:8 131:21

133:24 134:18
256:10 275:24
276:19
**2020-2021** 31:12
**2020-2022** 30:15
**2021** 27:8 107:13
107:16,17,20
108:7,10,11,12,15
108:16,18 109:4
139:16 144:9
157:7,15 158:3,8
159:19 160:8
162:3,8 164:12,18
164:23 165:13,24
168:6,13 178:22
178:23 179:6,13
180:9,16 182:8
188:13 191:9
206:13 207:9
208:4,5 209:18
223:3 232:22
239:20 245:24
251:24 252:6
253:7 260:5,8
263:1 266:1,5
268:20 270:1,5,8
271:1,11,24 272:5
272:12,17,23
275:3,9 276:4,23
277:22 278:10,17
**2022** 29:10 58:2
74:9 241:9 250:11
251:1 252:23
253:11,20 255:1
257:3 259:11,15
**2024** 1:16 239:8
240:23
**20th** 188:18
**21** 4:11 98:22
104:20 108:1
109:4 240:19,21
241:6 244:17
246:7 252:24
253:2,3
**215-513-7278** 1:23
**22** 4:12 158:3,8

241:1,2 243:7,9
244:4 253:18
271:1,11 272:5
**2249** 29:15
**23** 4:13 219:2 250:7
250:8
**23:14** 218:23
**24** 1:16 4:14 251:23
252:1
**24:05** 219:20
**240** 4:10
**241** 4:11
**2415** 3:23 130:7
131:19
**243** 4:12
**25** 3:14 4:15 254:11
254:13
**250** 4:13
**251** 4:14
**2533** 195:23
**2537** 4:7 166:8
**2539** 167:9 205:7
**254** 4:15
**2541** 178:5
**2547** 180:11
**2548** 180:18
**2572** 4:3 157:6
**26** 3:13 4:16 260:1
260:2 265:12,14
**260** 4:16
**2622** 3:17 46:20,20
**2624** 48:13,22
**2631** 3:16 43:4
**264** 3:8
**265** 4:17
**2661** 96:3,4
**267** 4:18
**269** 4:19
**27** 4:17 259:24
265:11,20,23
272:12,17,23
**28** 4:18 265:12
267:7,9 274:3,17
275:7,12,13 276:6
**29** 4:19 269:21,22
277:19 279:16

**3**

**3** 3:15 37:1,12,14
48:14 244:20
265:16
**3:00** 266:19
**3:05** 268:21
**30** 11:12,12
**31** 108:14,16
**3161** 196:2
**31st** 98:22 179:5,23
**3236** 160:7
**3278** 4:17 265:24
**34** 224:3
**36** 12:7
**37** 3:15
**38th** 2:11

**4**

**4** 3:16 42:19,20
55:14 93:4 212:6
215:8
**4/24/2023** 185:18
**4:46** 243:14
**40** 33:3 35:14
220:21
**404** 2:5
**41** 220:17
**412** 3:20 107:5
**4123** 3:19 98:15
**4134** 4:19 269:20
278:2
**42** 3:16
**43** 210:20,23 211:5
211:7 239:13,22
**43:55** 220:18
**44** 220:18
**45** 215:20 221:20
**46** 3:17
**47** 42:22
**49** 222:18
**4934** 4:18 267:13
**4935** 267:13
**49th** 222:18

**5**

**5** 3:7,17 46:11,13

46:15,24 56:24
59:8 214:15
261:20
**5:00** 209:2
**50** 33:2
**51** 224:2
**55** 4:6
**58** 220:22
**59** 33:7

**6**

**6** 3:18 83:11,13
106:10,14 108:8
**6/12/24** 243:13
**64** 33:7,14,19 38:12

**7**

**7** 3:19 98:12,14
108:14 261:18,20
**7/13/2021** 255:15
**7:02** 280:24
**75.5** 38:8

**8**

**8** 3:20 107:2,4,6
108:17,18,20,21
216:4 217:23
**808** 255:8
**83** 3:18

**9**

**9** 3:21 113:15,18
125:3,5,18 251:24
252:6 253:7
**9:12** 124:24
**91** 46:15 47:1,4
57:1 59:8
**98** 3:19

# *Farrell Court Reporting, LLC*

Phone: 215-513-7278

**DATE:**   *August 20, 2024*

**REF:** *Zack De Piero vs. Pennsylvania State University, et al*

**Date of Deposition:**   June 24, 2024

**Witness:**   Carmen Borges

Enclosed is a copy of your Oral Deposition Transcript, along with the original Witness Signature Page and Deposition Correct Sheet.

Please make any necessary corrections or changes in form or substance, with your reasons therefore, on the Deposition Correction sheet provided within 30 days.  Please also sign the original signature page.

Please return the Deposition Correction Sheet and signed original Witness Signature Page to:

Farrell Court Reporting
215 West Lynnwood Street
Allentown, PA 18103

You may also e-mail it to farrellreporting@verizon.net

Best Regards,
Farrell Court Reporting

*ERRATA SHEET*

| *PAGE* | *LINE* | *FROM* | *TO* | *REASON* |
|---|---|---|---|---|
| 5 | 23 | and so it --yeah | yes | Typo. |
| 9 | 4 | Notes of interviews, interviews | Notes of interviews | Typo. |
| 9 | 22 | Yes, I did. I was | Yes, I did. | Typo. |
| 10 | 3 | Um, we met for two hours. No, not even two hours. | We met for a while. | Did not recall amount of time I met with my attorneys during the deposition; recalled upon reviewing the transcript that it was longer than two hours. |
| 10 | 6 | Yeah, I can't recall exactly the amount of time, but it was enough time, the necessary time to-- | I can't recall exactly the amount of time, but it was enough to review my notes. | More complete answer. |
| 10 | 14-16 | Good, I'm glad to hear that from you. And I heard—you should speak Spanish now. I hear your daughter was- | I'm glad to hear you know that.  Do you speak Spanish? | Typo. |
| 11 | 10-12 | My husband got a position at Penn State. He was a professor at Penn State, so we moved here from Puerto Rico about 30 some years ago, 30 plus | My husband was hired by Penn State in a faculty position, and we moved here from Puerto Rico some 40 years ago. I come from a military family. My father fought in World War II and in the Korean conflict.  He was later stationed in several military forts in the US where we lived for several years. | More complete answer. Upon review of the transcript, I recalled that I was in the United States prior to moving here for my husband's job. |

| 12 | 7 | I've been there 36 years. Mostly, you know, in complaints | I've been here for 36 years in my position at Penn State and have held several roles in the office including twice interim director positions managing all functions of the office. | |
|----|----|----|----|----|
| 12 | 8-9 | my focus or my preference or my-- | my focus or my preference is to mediate resolution of complaints. | More complete answer. |
| 13 | 6-7 | Um, the university has established a system, a broader, bigger system for people to file complaints | The university has implemented a broader system to file complaints. | More complete answer. |
| 13 | 8-9 | Before, people would, you know, on their own decide to file a complaint and go to our office | Previously complaints were filed in person. | Answer stated more clearly. |
| 13 | 10 | You know, online, bias. They have different sources | Now, there are different online options to file a complaint. | More complete answer. |
| 13 | 11 | to file a complaint. So we are getting, you know | We now receive | Typo. |
| 13 | 12-13 | complaints from very different sources, you know, and lots | complaints from various sources, and more complaints. | Typo. |
| 13 | 16 | Yeah. That's what —– you know, I mean | Yes, that is what I mean | Typo. |
| 13 | 17 | what-- that's what's created so much more awareness | that created more awareness for filing complaints. | More complete answer. |
| 13 | 18 | and-and-and you know more | and more complaints | Typo. |
| 17 | 16-17 | Assistant –assistance vice president | Assistant Vice President for Affirmative Action. | Typo. |
| 18 | 11 | That-- was an enforcement or that we-- | that is an executive order mandate that we comply with. | More complete answer. |
| 18 | 21 | then, you know, | then the | Typo. |
| 18 | 22 | have--can work with that | work with that | Typo. |
| 19 | 12 | more so the focus | the focus | Typo. |
| 19 | 16 | yeah | Yes, for the purpose of monitoring compliance with the executive order | More complete answer. |

| 21 | 12 | faculty | committee | At the deposition, I meant to say the word "committee." |
|----|----|---------|-----------|-------------------------------|
| 21 | 15 | It's---it's also an academic – you know, | It is also an academic issue. | More complete answer. |
| 21 | 16-17 | based –the faculty does that based on their needs | based on the needs for the position. | Typo. |
| 21 | 23 | so…. | Remove so | Typo. |
| 22 | 4 | major change since, you know, we-a | changes since a few years ago. | More complete answer. |
| 22 | 5 | gets | get | Typo. |
| 22 | 6 | by about, you know, the search committee | from the search committee | Answer stated more clearly. |
| 22 | 7-8 | all the information, now it's - it's it's on | The information is now centralized. | More complete answer. |
| 22 | 10 | There is now share services, is what they call this. | It is now under the Share Services unit in HR. | More complete answer. |
| 22 | 24 | We don't get involved at all | We don't get involved. | Typo. |
| 23 | 2-3 | With all the –all the technology, | With technology, everything is now centralized | More complete answer. |
| 23 | 12-13 | For affirmative action regulations, the purpose of that, those are the categories, Now they are broader | For affirmative action regulation, those are the categories. | Answer stated more clearly. |
| 23 | 14-16 | you know, now with—now, they're broader because, you know | the concept now is broader in that everyone contributes to the diversity of the workplace. | More complete answer. |
| 23 | 20 | Um, well, everybody | Everyone brings diversity | More complete answer. |
| 24 | 3 | affirmative action, where the four categories.  But that | Affirmative Action's four categories are | Typo. |
| 24 | 4-5 | wasn't—that was the minimum, you know. That wasn't -- that was our obligation to -- to monitor. | was our obligation to monitor. | Answer stated more clearly. |
| 24 | 6 | committees you know…you know, had free range to hire | committees have free range to select candidates for interview and recommend for hiring | More complete answer. |
| 24 | 7-8 | the best qualified applicant. And there, you have tools with a lot of diverse people | Diversifying the applicant pool increases the opportunity to diversify the work unit. | More complete answer. |

| 24 | 13 | I think now, it's defined like everyone has | It's defined as everyone brings a diverse perspective. | More complete answer. |
|----|----|----|----|----|
| 25 | 18-19 | --for the-- for the position | for the position | Typo. |
| 64 | 6 | was not --you | was not respecting her | More complete answer. |
| 64 | 7 | know | Remove word | Typo. |
| 79 | 24 | Not – gradually. Gradually, it has | Gradually, it has | Typo. |
| 85 | 12 | No, it does, its-- | It is not professional | More complete answer. |
| 91 | 20 | but it's nothing | but it's possible | Typo. |
| 97 | 8 | No | No, that was not part of my investigation. | More complete answer. |
| 97 | 19 | I mean | Remove-I mean | Typo. |
| 100 | 5 | and -- | between two faculty. | More complete answer. |
| 100 | 5-6 | or disagreeing | Remove words | Typo. |
| 100 | 18-19 | I mean | Remove I mean | Typo. |
| 104 | 8 | Uh-uh | Yes. I know it is 40 years. | As I read the transcript, I realized this was a typo and I knew the answer to be 40 years. |
| 105 | 20-24 | If the person is not saying on what basis, is not saying— well it could reasonably be assumed that it would be – typically it's about race | If the person is not saying what the basis is, it should not be assumed what it is. But if the person is Black or another race it may be assumed that race is the reason for the complaint. | More complete answer. |
| 106 | 19 | ----it may refer to the student | It may refer to another student | Typo. |
| 107 | 1 | Yeah. No. No. | Yes | Typo. |
| 108 | 1 | Okay. The anonymous was March '21. | The anonymous was March 2021 | Typo. |
| 108 | 2 | The anonymous, Huh? | Remove words | Typo. |
| 110 | 13, 14 | So one thing I did was in her work about the faculty SRTE. | So, one thing I recommended was to review the faculty's SRTE's (teaching evaluations from students) | More complete answer. |
| 114 | 8 | I have very familiar with that, yes | I am familiar with that, yes | Typo. |
| 114 | 16-21 | The new hires were highlighted or introduced in the website. And Sharon, who is a faculty member, | New hires were introduced on the Campus website. Sharon H, a faculty member who does research in areas of racism | More complete answer. |

|  |  | researcher in these areas of racism and other, she made a comment in the website something about it looks like this office -- or this officer looks like the type that would need training, something like that. | and has study the Fraternal Order of Police organization,   made a comment on the website that a new officer hired looked like he would need diversity training. |  |
|---|---|---|---|---|
| 122 | 13-14 | I wanna say that it certainly was easier for me to get ahead than if I were – had been Black. | No, though I wanna say that it certainly was easier for me to get ahead than if I were – had been Black. I understand the racial history of the country. | More complete answer. |
| 122 | 16 | Yes. Believe it or not there— there is racism in Puerto Rico | Yes. Believe it or not there is  racism in Puerto Rico. | Typo. |
| 122 | 21 | all the positions of power and all the decisions are made by white people at Penn State | all positions of power and all decisions have historically been made by white people at Penn State | More complete answer. |
| 123 | 12 | about –about—about her | about her comment | More complete answer. |
| 123 | 19 | she—she---- that's her line of -- of research and work | That is her line of research work | Answer stated more clearly. |
| 123 | 23 | She is a member | She is a faculty member | More complete answer. |
| 124 | 15 | apologize | apologize to the police officer | More complete answer. |
| 130 | 16-17 | The others, she was coordinating the programs | She was the coordinator of the program. | Typo. |
| 131 | 2-5 | Yeah. That would be that's what she would also be arguing that she's a female an he's a  male and there's a power dynamic with also | Yes, that could be, and she believes there is a power issue with gender also. | More complete answer. |
| 136 | 23-24 | I guess it should  be, but I don't –the only moment in our office was to deal with Sharon, talk to | It is. Our office was addressing the complaint about the comment made by a faculty member about the police officer that was reported to our office. | More complete answer. |
| 138 | 12 | They were going to detail him for, um, what do you call this about taking somebody for care, mental care. | Police went to check on him for a mental health care follow-up. | More complete answer. |

| 138 | 21-22 | He came out aggressively, and a police officer shot him in the hall | He answered the door and came out to the hall of this apartment building and something     went wrong in the interaction and the officer shot at him and kill him in the hall. | More complete answer. |
|---|---|---|---|---|
| 141 | 17 | He filled out a form, completed a form and send the form, yeah | He sent a written complaint form. | Answer stated more clearly. |
| 142 | 22 | Well, it's phased white people, so it can be understood to mean all white people, | but it refers to the white race in general, not to a specific person. | More complete answer. |
| 143 | 15 | You know, question what's the problem. What are you talking about? What issues do you have? | Investigate if the lecture is related to the subject matter of the class. | More complete answer. |
| 145 | 8-9 | It wasn't her only imposition or position. | It wasn't her imposition. | Typo. |
| 145 | 15 | Nobody has to go to this. | No one had to attend. | More complete answer. |
| 145-146 | 145:24-146:1 | Whose decision would it be for the Black professor to be there or not? Not the other -- | The decision would be for the Black faculty. But, if the discussion is not directed specifically at the Black professor, as an individual, it's different than discussing the Black race in general. | More complete answer. |
| 146 | 11 | You know, I am trying to--- | I am trying to explain that it is a different situation | More complete answer. |
| 146 | 20 | faculty that wanna go discuss that topic | faculty that want to go have an academic discussion on the topic. | More complete answer. |
| 147 | 17-19 | Not necessarily. I would wanna know what –why are you saying that ………………… | Not necessarily. I would like to know your reasons for saying that. | More complete answer |
| 148 | 1-2 | And that was –exactly---And that would have been the purpose of what I was, you know thinking is if that's the purpose of those meetings, let's get to the what is -- what's the message here and what do we need to learn | And that was the purpose of the meetings that I was discussing with him. Beyond the shocking title, one would want to know, discuss and debate societal issues that can impact teaching and | Answer stated more clearly. |

| | | from this. What is the message? Let's unpack this message. Beyond the titles, the shocking titles, what is it that we as writing professionals need to -- need to -- need to be discussing and learning. That was the purpose of those meetings. | learning. That was the purpose of those meetings. | |
|---|---|---|---|---|
| 149 | 21-22 | He – he -- He didn't agree and didn't wanna go beyond that, yeah. He didn't wanna go beyond an academic discussion. | He didn't agree with having an academic discussion on this topic. | Answer stated more clearly. |
| 150 | 18-21 | Not because he didn't agree. He didn't wanna – he didn't wanna go beyond. Yeah. He didn't want – he was opposing that topic within the writing program.. | He didn't seem to agree with the topic being discuss within the writing program | Answer stated more clearly. |
| 151 | 1 | He—the topic was—I mean, if you go to the meeting and engage in conversation and put your —your views across and see what comes out of it, you know, and -- | Maybe. We talked about the value of participating in meetings and engaging in academic discussions to have a better understanding of the issues that may impact students learning | More complete answer. |
| 153 | 1 | Treating students or whatever. | Teaching students. | Typo. |
| 156 | 1 | would wanna make a comment | Would want to make a comment | Typo. |
| 156 | 8-12 | It was distributed. Yeah, it was distributed ahead of time, but they were, , yeah. I guess—I don't know if it was an agreement amongst all of the faculty there whether they agree, but it was a pretty structured meeting. There was some – some rules of behavior of all that. It was pretty structured, and the topics. | It was distributed. Yes, it was distributed ahead of time. It was a structured meeting. There was some – some rules of behavior of all that. It was pretty structured, and the topics. | Answer stated more clearly. |
| 166 | 15-16 | The thing was considered in that meeting. | The things to be discussed in the meeting. | Typo. |
| 170 | 8 | gonna be discussed | going to be discussed | Typo. |

| 170 | 11-14 | The only--the problem here to summarize it is that the way he—he—he was expressing himself that came across as disruptive and unprofessional. | The problem was how he expressed himself that came across as disruptive and unprofessional. | Answer stated more clearly. |
|---|---|---|---|---|
| 186 | 3 | They file complaints. | Remove | Typo. |
| 186 | 13 | They investigate complaints against--- | The State agency that investigates complaints of discrimination. | More complete answer. |
| 186 | 16 | (indicating) | Yes | Typo. |
| 187 | 6 | of the agency | from the agency | Typo. |
| 189 | 2 | One remember | One member | Typo. |
| 190 | 1-2 | No, it doesn't, but it's expressions, facial expressions. I mean, we're talking semantics here, But--- | No, it doesn't, but his expressions, facial expressions. I mean we're talking semantics here. | Typo. |
| 190 | 8 | Very angry. Okay…………….. | That is how his participation in the meeting was described. | More complete answer. |
| 190, 191 | 190: 21-191: 1 | Well, at the point when – you know, not using those words, but insisting that Lila answer his questions, yes. He did – it wasn't like, you know, he posed a question and – and others could jump in and give him – give him some ideas or some answers. | Well, not using those words, but insisting that Lila answer his questions. It wasn't like he posed a question, and others jumped in to give him an answer or some examples. | Answer stated more clearly. |
| 191 | 13-15 | Tension when she arrive. Notice one faculty seem upset. Campus what – people different. Yeah. Article in the meeting. There is a faculty on the – yeah. | She noticed tensions when she arrived at the meeting. She noticed that one faculty member seemed upset. Explained that at the Abington campus composition of the students is different than other campuses.   Many more students are from lower socioeconomic backgrounds and lack experiences outside their neighborhoods.  The meeting was to discuss approaches to teaching to help students learn. . | More complete answer. |

| 225 | 14 | serious social—social program. | serious social issue. | Typo. |
|---|---|---|---|---|

## SIGNATURE PAGE

*I have read the foregoing transcript and the answers given by me are true, correct and complete, to the best of my knowledge, information and belief, except for the corrections noted hereon and/or list of corrections, if any, attached on a separate sheet herewith.*



_____
                                    Signature

_____9/9/24_____
                                    Date

*Case Name: Zack De Piero vs. Pennsylvania State University, et al*
*Witness: Carmen Borges*
*Date: June 24, 2024*