UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ZACK DE PIERO, | |
| PLAINTIFF | Civil Case No. 2:23-cv-02281-WB |
| vs. | |
| PENNSYLVANIA STATE UNIVERSITY and MARGO DELLICARPINI in her official capacity, and DAMIAN FERNANDEZ, , LILIANA NAYDAN, CARMEN BORGES, ALINA WONG, LISA MARRANZINI, FRIEDERIKE BAER, and ANEESAH SMITH, in their official and individual capacities, | |
| DEFENDANTS. | |

**PLAINTIFF ZACK DE PIERO'S
RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

i

## TABLE OF CONTENTS

*PLAINTIFF ZACK DE PIERO'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT* _____ *i*

*TABLE OF CONTENTS* _____ *ii*

*TABLE OF AUTHORITIES* _____ *iii*

   **I.     Factual Background** _____ **1**

     A.   De Piero Joins PSU's Writing Program under Supervisor Defendant Naydan _____ 1

     B.   Naydan Was De Piero's Supervisor _____ 2

     C.   Defendant Wong Advocates Neo-Segregation and Promotes Looting _____ 3

     D.   Defendant Aneesah Smith Directs White People to Feel "Terrible" and Naydan Harasses a White Police Officer _____ 5

     E.   Naydan Imposes "Black Linguistic Justice" on the Writing Program _____ 7

     F.   Naydan Promotes Racial Stereotypes in Writing Program Meetings _____ 9

     G.   PSU Ignores De Piero's Complaint of Race Essentialism in the Writing Program __ 11

     H.   De Piero Is Disciplined, Punished, and Suffers Damages _____ 16

  **II.    Argument: Summary Judgment Should Be Denied** _____ **21**

     A.   De Piero's Hostile Environment Claim Should Be Tried _____ 21

       1)   De Piero Has Met This Court's Standard for Severe and Pervasive Harassment __ 21

       2)   No Affirmative Defense for "Voluntary" Discrimination _____ 24

       3)   De Piero's Supervisors Punished Him _____ 25

     B.   PHRA and Title VII Are the Same Except that PHRA Imposes Individual Liability 27

     C.   Defendants Never Moved to Dismiss De Piero's Title VII/PHRA Retaliation Claim, which Should Now Proceed to Trial _____ 28

  **III.    Conclusion** _____ **30**

*CERTIFICATE OF SERVICE* _____ *31*

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ........................................ 26

*Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ........................................ 29

*Barbosa v. Tribune Co.*, No. 01-CV-1262, 2003 U.S. Dist. LEXIS 19483, at *15 (E.D. Pa. Sep. 25, 2003) ................................................................................................................................ 24

*Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262-263 (3 Cir. 2001) ........................... 22

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)) ................................................................................................................................... 30

*Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) .................. 27, 31

*Chislett v. N.Y.C. Dep't of Educ.*, No. 1:21-cv-09650 (JLR), 2024 U.S. Dist. LEXIS 47391, at (S.D.N.Y. Mar. 14, 2024) ...................................................................................................... 24

*Dean v. Phila. Gas Works*, No. 19-4266, 2021 U.S. Dist. LEXIS 120660, at *21 (E.D. Pa. June 28, 2021) ................................................................................................................................ 28

*Devine v. Pittsburgh Bd. of Pub. Educ.*, No. 2:13-cv-220, 2015 U.S. Dist. LEXIS 74988, at *8 (W.D. Pa. June 10, 2015) ....................................................................................................... 22

*Dici v. Pennsylvania*, 91 F.3d 542, 551-553 (3d Cir. 1996) ....................................................... 29

*Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 171, n.2 (3d Cir. 2014) ................................. 22

*Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) .......................................... 26

*Hunter v. Trs. of the Univ. of Pa.*, No. 20-2334, 2021 U.S. Dist. LEXIS 72706, at *2-*3 (E.D. Pa. Apr. 15, 2021) .......................................................................................................................... 23

*Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999) .................................................... 26

*Mandel v. M&Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013) ................................................. 27

*Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 446-47 (3d Cir. 2011) ......................... 31

*N.Y. Times Co. v. N.Y. Com. on Human Rights*, 41 N.Y.2d 345, 347, 393 N.Y.S.2d 312, 314, 361 N.E.2d 963, 965 (1977) ............................................................................................................. 3

*Ocheltree v. Scollon Prods.*, 335 F.3d 325, 332-333 (4th Cir. 2003) .......................................... 27

*Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 607, 610 (E.D. Pa. 2001) ................................. 23

*Roy v. Harrisburg Sch. Dist.*, No. 1:18-CV-2356, 2021 U.S. Dist. LEXIS 165003, at *16 (M.D. Pa. Aug. 31, 2021) .................................................................................................................... 31

*Shannon v. Cherry Creek Sch. Dist.*, 2022 WL 4364151 (D. Colo. Sept. 21, 2022).................... 25

*Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 981 (9th Cir. 2023)........................................... 26

*Skoorka v. Kean Univ.*, No. 17-5484 (KM) (MAH), 2019 U.S. Dist. LEXIS 39024 (D.N.J. Mar. 11, 2019) ...................................................................................................................................... 32

*Stephenson v. City of Phila.*, No. 05-1550, 2006 U.S. Dist. LEXIS 43998, at *33 (E.D. Pa. June 27, 2006) ...................................................................................................................................... 23

*Suero v. Motorworld* Auto. Grp., Inc., No. 3:16-CV-00686, 2017 WL 413005, at *7 (M.D. Pa. Jan. 31, 2017)................................................................................................................................. 27

*Swingle v. Henderson*, 142 F. Supp. 2d 625, 633 (D.N.J. 2001) ................................................ 27

*Tinson v. City of Coatesville*, 2008 U.S. Dist. LEXIS 141499, *3 (E.D.Pa. 2008) ..................... 29

*Vitt v. City of Cincinnati*, 250 F. Supp. 2d 885, 887, 890 (S.D. Ohio 2002), aff'd, 97 F. App'x 634 (6th Cir. 2004).......................................................................................................................... 25

*Washington v. SEPTA*, No. 19-4213, 2021 U.S. Dist. LEXIS 119669, at *19 (E.D. Pa. June 28, 2021) .............................................................................................................................................. 23

*Wiggins v. Lab'y Corp. of Am. Holdings*, No. 24-0648, 2024 U.S. Dist. LEXIS 185859, at *10 (E.D. Pa. Oct. 11, 2024)................................................................................................................. 21

**Statutes**

42 USC § 1981 ................................................................................................................................ 27

Pennsylvania Human Relations Act (PHRA), Pa. Stat. Ann. tit. 43, § 951 et seq....................... 28

Title VII, 42 U.S.C. §§ 2000e , et seq........................................................................................... 28

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................................... 21

Plaintiff Zack De Piero respectfully opposes the Motion for Summary Judgment of Defendants (collectively, "PSU"). The evidence clearly shows that De Piero's direct supervisor, Liliana Naydan, and others subjected De Piero to a constant drumbeat of racially essentialist material that created a racially hostile environment.

## I.   FACTUAL BACKGROUND

### A.   De Piero Joins PSU's Writing Program under Supervisor Defendant Naydan

In 2018, Zack De Piero joined the Writing Program at PSU-Abington, a small campus just short of 3500 students.  (2930; De Piero Dep, App. 0047:9-0048:7)  Defendant Naydan was his immediate supervisor as Writing Program Coordinator and also the Chair of the English Program.  (App. 2439; Naydan Dep, App. 0985:12-13; 0991:2-7.)  At first, Naydan and De Piero's relationship was friendly, even enthusiastic.  "I'm so happy you're working at Penn State Abington," Naydan wrote when he joined (August 17, 2018); De Piero responded, "YOURE [sic.] the best...." (App. 3224.)  Naydan asked for, and De Piero agreed, to endorse her nomination to a campus-wide committee.  (App. 2740.)  "Thanks for that absolutely wonderful nomination!"  Naydan gushed. (Id.)

Defendants have tried to paint De Piero as a misogynist and racist bent on insulting Asians and women.  To substantiate their argument, Defendants can only dredge up foul language from irrelevant and unremarkable private messages unrelated to Penn State.  (ECF No. 52 at 9-10.)  But even after Naydan and De Piero's relationship soured, De Piero never slurred her at work (or any other colleague) with derogatory names like the so-called "B-word " or "C-word."  (Nayden Dep, App. 1262:22- 1263:8.)  If anything, De Piero's grousing with private friends demonstrates how much PSU's racially hostile environment was getting to him.  It is

otherwise irrelevant under FRE 403. By contrast, De Piero's texts with his PSU colleague, Matt

Rigilano, are critical but do not sink to vulgar name-calling about colleagues. (App. 2241-2283.)

De Piero believes working for racial equality demands actually teaching underprivileged

children from all backgrounds substantive skills and knowledge instead of race essentialist

magical thinking. He rose to teach at the university level after teaching in the inter-city

Philadelphia school system. (App. 2588.) Pictures from that time show him surrounded by

beaming students at an Arthur Ashe Tennis Camp. (De Piero, App.0032:7-0039:5; 3328-3329.)

This is the dedicated teacher that Defendants now insinuate is some sort of racist or misogynist,

and somehow out to get Defendant Wong. (ECF No. 52 at 9-10.) The more obvious and simpler

explanation is the true one: PSU offended De Piero by maintaining a hostile environment based

on pervasive racial dogma and race essentialism.

**B. Naydan Was De Piero's Supervisor**

In 2018, Naydan "hired [De Piero]." (App. 2500.) She checked his references and

reported back (on March 26, 2018), "He's great at working with different kinds of people …

empathetic . . . He's an amazing teacher . . . Hiring him is like having six people." (App.3330-

3331.) Only later did Naydan contradict herself and claim she did not hire him or check his

references; she was only on the search committee; and didn't understand his title or contract.

(Naydan Dep, 0982:18-0984:15;Borges Dep, 0842:11-16, referring to App. 2500.)

This equivocation, as with PSU's denial that Naydan was De Piero's supervisor, relies

only on Defendants' inconsistent say-so after this lawsuit was filed. But contemporaneous

documents do not lie. (Borges Dep. App. 0770.:22-131:1; Baer Dep, App . 1523:9-16.) PSU's

reprimand to De Piero (December 9, 2021) refers to Naydan as his "co-supervisor." (App.

2525.) In 2021, Division Head Friederike Baer told the Affirmative Action Office that "the

faculty in the writing program reports to Lila [Naydan]"; and "Lila coordinates the English

2

writing program.… They report to Lila." (App. 2439.) "Zack De Piero was subordinate to Liliana Naydan in the program . . . As coordinator, she had more [authority]. " (Borges Dep, App. 0770:8-11, 18-21.)

### C. Defendant Wong Advocates Neo-Segregation and Promotes Looting

Defendant Alina Wong was PSU's Assistant Vice Provost of Educational Equity and managed PSU's "bias response process." (App.1857, Wong Decl. ¶¶ 2-3.) But she used her position to amplify her own anti-white bias. She admits to speaking on June 5, 2020 in which she singled out "white and non-black people of color" to hold their breaths:

> It's a challenge for all of us today, and especially for white and non-black people of color, is to hold our breath just a little longer to not give into our privilege to not give into our ability to release to exhale. To give just a bit more air to black communities so that they can have another breath.

(Grammatical errors in original; Wong, App.1858, Wong Decl. ¶ 7.) How this supposed "privilege" manifested itself is never identified. This is not incidental. It reveals PSU's race-essentialist stereotypes. By virtue of their skin color, "blacks" are automatically without privilege; "whites" are automatically privileged; while "non-black POC's" reside in some ill-defined middle, a hierarchy reminiscent of South African apartheid, but in reverse.[1] Wong also promoted neo-segregation. She called for "a white antiracism group so that the white folks at Penn State Abington, are doing your work with, with each other. . ." (App.2028, audio file at 53:38.) In addition, she told "black faculty, staff and students" to segregate in an "institutionally supported" conference group; and ". . . the same thing for other non-black communities of color." (Id.) Despite PSU's preoccupation with "systemic racism," Wong displayed little awareness that segregation is not "metaphoric," it is real racism. (Id.)

---

[1] See e.g., *N.Y. Times Co. v. N.Y. Com. on Human Rights*, 41 N.Y.2d 345, 347, 393 N.Y.S.2d 312, 314, 361 N.E.2d 963, 965 (1977) (noting "official policy of the South African government to classify its people into three separate categories: white, Bantu (native African) and colored. . .").

Wong's contemporaneous notes are even more informative. She proposed to "center black communities without burdening them," that is, promote the differential treatment of black Americans. (App. 2967.) "Our privilege allows us breath, and we must be willing to give up both in [the] name of justice," she lectured, "… and especially white and non-black POC's[2] [emph. in orig.]" had to be singled out. (App. 2968.) Wong's race-based meditation gave "priority to black faculty and staff"— an admission that PSU fully intended to violate Title VII. (2969.) Among Wong's action items: "curriculum & pedagogy" and "University police." (Id.) PSU's euphemism for Wong's campus talk is "a collective, communal exercise with metaphorical aspects." (App.1858, Wong Decl. ¶8.) Wong closed by praising looting:

> … what I'm interested in doing is staying in the disruption and ***actually disrupting more***…. I think, you know, what we call looting, I think of just getting what, getting what you're due, . . . ***especially for black folks***. ***And how do we continue that disruption?***

(emph. added; App. 2028 at 53:38.) De Piero was justifiably offended. He knew the owner of a business destroyed by looting, which also caused black employees to lose work. (De Piero Dep, App. 0120,:17-24; 3626, ¶ 5.)

Finally, Wong turned to so-called "antiracist" pedagogy, a euphemism for the condemnation of substantive disciplines as "founded upon white supremacy":

> … how will you incorporate anti-racism curriculum and pedagogy and practices into your classes, your work environments, your advising? You know, one of the things I hear from faculty sometimes is, I teach calculus, there's no racism in calculus. calculus. Yes, there is. Racism is everywhere. . . . We are founded upon white supremacy, so we can't go back to doing things the way that they were.

(App. 2028 at 53:38.) Wong presented this as if black students pay tuition to participate in some sort of séance on race instead of enrolling to actually learn mathematics. Wong did not say her

---

[2] "POC" and "BIPOC" are beloved bureaucratic acronyms at PSU, meaning "People of Color" and "Black, Indigenous, and People of Color," respectively, to which additional letters are continually added.

calls for looting, race-based pedagogy, or segregation were "metaphorical." Her Declaration is, frankly, a misrepresentation to the Court. (Compare, App. 1859, Wong Decl. ¶ 11.)

### D. Defendant Aneesah Smith Directs White People to Feel "Terrible" and Naydan Harasses a White Police Officer

Shortly after George Floyd's murder (May 2020), Defendant Aneesah Smith emailed all faculty about Juneteenth. (2176.) De Piero would have happily joined the celebration. (3625-3626, ¶¶ 3-4.) But Smith singled out "white people." Smith (who is black) was the Director of PSU's Office of Diversity, Equity, and Inclusion (DEI). (App. 2176.) At PSU, DEI meant, according to Smith, "Black and Brown people" singling out "white people" to "take action." (.Id.) What were "white people" supposed to do? Smith told them: "stop talking and listen" — in other words, shut up. (Id.) She also directed them to "[f]ind an accountability partner and make a list public of what actions you will take" to "giv[e] up privilege" (apparently only held by "white" people); "[s]top being afraid of your own internalized white supremacy"; and "feel terrible." (Id.) Indeed, "Who cares about being comfortable?" she asked. (Id.) No other ethnic or racial group was singled out to "feel terrible." No evidence was presented, then or now, that "white supremacy" was or is a reality at PSU. In fact, the Abington campus has "50 percent of students [who] identify as minorities," a larger percentage of black and Hispanic students than the United States at large. (Borges Dep.: App.0672:23- 0673:9; 2672; 3321-3325.) By any metric, PSU-Abington is more, not less, racially diverse than other American universities.



Nevertheless, as if implementing Smith's and Wong's directives, Naydan and other faculty pivoted to harass a white police officer as PSU announced new additions to its campus security force. They only singled out a middle-aged, white cop. This was clear when PSU introduced a black officer (August 10,

2020) without comment.  (App. 2747-2748.)  The next day (August 11, 2020), PSU announced

Officer William Lacey, who fit every stereotype vilified by PSU's racist dogma.  (App. 2745.)

Officer Lacey's credentials were impeccable.  (Id..)  No evidence suggested he ever

discriminated against black people in any way.  (Borges Dep., App. 0777:18- 0778:5.)  That

didn't matter; he was a chubby white guy.  "He sounds like exactly the background [i.e., white]

who could benefit from a serious anti-racism program," sounded off one professor.  (App. 2745.)

Naydan declared to the PSU listserv that "Black Lives Matter"; but also, "That's not

always a comfortable or easy thing to say if you're a white person trying to say it right" (how to

"say it right" was not clear, although it was clear that Naydan ascribed to all "white" people

(other than herself) some sort of feeblemindedness).  (App. 2699.)  Naydan embraced

"uncomfortable" conversations about race, but "messages from our police have been making me

uncomfortable."  (Id.)  It was okay for Naydan to castigate "a white person" to feel

"uncomfortable"; but it was never okay to challenge Naydan's race essentialism.  This made *her*

"uncomfortable" and was not permitted.

Naydan informed PSU which racial stereotypes were and were not acceptable.  "The

problem for me is that our country is in a state of crisis because the police are killing black

people…"  (App. 2698-2699.)  No evidence suggests that black students were oppressed or being

"killed" at Abington, certainly not by Officer Lacey.  But Naydan pressed on, "I don't think

reverse racism exists since black people don't have power over white people in the US."  (App.

2698.)  Her colleague chimed in, "Please remember the work of our non-white colleagues and

students do <u>every time</u> they give white people the benefit of the doubt" (emph. in orig.).  (App.

2695.)  Whatever this "benefit of the doubt," Officer Lacey got none.  Another link circulated on

the listserv proclaimed: "Schools . . .  were created to uphold white supremacy" and "Blackness

is coded for punishment, just as whiteness is for privilege and power." (App. 3347, linked to App. 2695.)  A PSU colleague added: "The oppressor, by definition, cannot be the oppressed.  Remembering that is key, especially for those of us who benefit from white privilege."  (App. 2599.)  Naydan endorsed this explanation as "brilliant."  (App. 2600.)  At PSU, "whites" are automatically "oppressors", "blacks" automatically the oppressed.  This email traffic became so harassing that one PSU staff member complained it was "dangerously close to the textbook definition of a 'Hostile and Toxic' work environment."  (App. 2701-2702.)

### E.  Naydan Imposes "Black Linguistic Justice" on the Writing Program

While harassing Officer Lacey, Naydan announced her agenda to remake the Writing Program as "antiracist":

> . . . to focus on race this semester--and all year, really. . . . There's no way I would be ok with not talking about racism right now as a Writing Program. . . . I like the idea of . . . pushing harder for Writing Program incorporation.

(App. 2215-2216; 2660; 3252-3253;[3] Naydan Dep. 1147:5-15.)  For Naydan, this meant "Black Linguistic Justice," a demand for race essentialism she circulated to the Writing Program.  (Naydan Dep, App. 1127:5-24; 2215-2219.)  This was a manifesto from the Conference on College Composition and Communication ("CCCC") and exuded stereotypes about "Ebonics," "white linguistic supremacy," and "white Mainstream English."  (App. 3360-3361.)[4]

Similarly, the CCCC condemns the following as white: individualism, objectivity, a rational, controlled self, contractual relationships, clarity, and order—as if melanin renders people wild, obscurantist, irrational, disordered, and incapable of modern business transactions.

---

[3] Defendant Naydan equivocated as to whether this email started the program-wide discussion of "black linguistic justice" as a writing program project, but App. 2352-3253 shows that she embedded the announcement of "black linguistic justice" in the email kicking off this initiative.  (Compare Naydan Dep, App. 1151:17-1152:3.)
[4] By mistake, the first page is missing from the Joint Record Appendix.  The complete CCCC "Demand for Black Linguistic Justice" is now included at App. 3361-3367.

(App. 2880.)  CCCC's manifesto went beyond the appreciation of black vernacular (also called

African-American English or "AAE").  "Black Linguistic Justice" called for race-based teaching.

The CCCC manifesto "demanded" black students to speak AAE:

- ". . . teachers stop using academic language and standard English as the accepted communicative norm, which reflects White Mainstream English!

- … teachers stop teaching Black students to code-switch[5] and teach Black students about anti-black linguistic racism and white linguistic supremacy instead

(Id.)  Naydan attributed this assault on supposed white English to "Professor Asao Inoue," her

guru.  (Naydan Dep., App. 1136:20-24.)  Naydan even reported De Piero for a "micro-

aggression" because he called this "very famous scholar of color . . . unoriginal /derivative."

(App. 2382.)  Inoue peddles race essentialism such as: "[White colleagues have] been paid off

too many times to even recognize the bribes"; "White people can perpetuate white supremacy by

being present"; and "You perpetuate white language supremacy in your classrooms because you

are white and stand in front of students." (App. 2859; 2861.)  In Naydan's words, Inoue argues

that "American English promotes or . . . enables white people to retain or maintain power."

(Naydan Dep., App. 1136:20-24.)

    In reality, Inoue berates black students who want to learn standard English.   (App.3625

¶¶ 6-7, App. 3571.)  Inoue has lectured to the CCCC, ". . .  my attempts to encourage students to

use their home dialects in writing, black students in particular, often resist …"; but to Inoue, this

is "capitalist-inflicted bullshit" that shows "how ingrained they are in a system that is inherently

racist. . . "  (Id. at 3572.)  To Inoue (who is *not* black (App. 2885)), listening to what black

students actually want is "inherently racist" and "bullshit"; silencing them is not.  (Id.)  This is

---

[5] "Code-switching," Naydan explained, "refers to [switching between] Black vernacular or Black English . . . and standard edited English or standard edited American English." (App. 1134; Naydan Dep, App. 1134:16-22.)  That is, PSU presents the normal linguistic practice of switching between dialects as somehow "white supremacist."

another example of how PSU's stereotypes are anti-black **and** anti-white.  Naydan looped in Professors Stephen Cohen and Grace Lee-Amuzie in her "Black Linguistic Justice" campaign, each of whom would eventually lie about De Piero to the Affirmative Action Office when he dissented from this brand of race essentialism.  (App. 2663-2664.)

PSU funded these efforts with a grant: "*Writing Teachers for Linguistic Justice*."  (App. 2233; App. 2663-2664.)  Cohen wanted the initiative to "seem[] 'official' and sanctioned by the English Program (rather than just the community of practice . . .)"  (App. 2663.)  Naydan was "interested in making this work Writing Program work."  (App. 2662.)  This soon resulted in revamped "professional development events," as Cohen called the monthly Writing Program Meetings (which PSU now denies are "training").  (App. 2661; compare ECF No. 52 at 18.)

### F.  Naydan Promotes Racial Stereotypes in Writing Program Meetings

In 2019-2020, Naydan's Writing Program Meetings were typical faculty meetings.  She focused on running a program for all students: e.g., addressing topics like "start-of-semester business"; "critical thinking in the writing classroom"; and "encouraging and assessing class participation."  (App. 2645.)  Her enthusiasm for "Black Linguistic Justice" changed everything.

But 2020-2021 headlined, "Asao Inoue's *Labor-Based Grading Contracts*."  (App. 2240.) Naydan and PSU repeatedly pelted the faculty with announcements about Inoue's work on "white language supremacy."  (See e.g., App. 3376 (August 20, 2020); 3387 (August 21, 2020); 2742 Aug. 21, 2020; App. 3632 (11 announcements in De Piero's inbox.); Nayden Dep., App. 1156: 7-13.)  "Grading contracts," an otherwise legitimate method calculated to inspire student buy-in on mastering the subject matter, became for Inoue a wrapper for a polemic against "white language supremacy."  This is perhaps best expressed through an incomplete sentence from his first page: "Because all grading and assessment exist within systems that uphold singular, dominant standards that are racist, and white supremacist when used uniformly."  (App. 3577.)

Naydan circulated a link to yet another publication ("The Rambling") which likewise argued, "we must center the expertise of Indigenous and Black knowledge communities" and inveighed against "the institutional consolidation of white authority." (App. 3383.)

To Inoue and fellow travelers, grading subject-matter mastery is nothing more than "white supremacy." By contrast, graduating minority students with participation grades somehow "undermines the racist and white supremacist grading systems ..." (Id.) This is exactly what Naydan meant when she instructed De Piero: "For me, the racism is in the results if the results draw a color line." (App., 2001.) Naydan wanted results to fit preferred racial outcomes. This "help[s] teachers," so her guru Inoue, "confront their whiteness and stay in the discomfort . . . with our grading practices, . . . with our bodies." (App. 3579.) Faculty member Thomas Heise also plopped in a meeting chat: "all grading and assessment . . . are racist and white supremacist." (App.3391.) Of course, when De Piero refused to teach grading contracts as "antiracism" because Inoue "rewrapped" "pedagogy . . . in a lot of provocative talk about race," it was yet another "microaggression" to Naydan. (App. 2382, ¶ 3; 2447; 3394.)

Naydan's 2020-2021 Writing Program Meetings featured Inoue in no fewer than half of six total meetings. Inoue's topics included, "White Teachers Are a Problem." (App. 2240.) Every PSU deponent has testified that any topic deriding "black people" as "a problem," or deriding "black privilege," etc. would be unacceptable, has never been assigned, and would likely result in a civil-rights complaint. (Naydan Dep., App. 1032:15-24; Borges Dep., 0783:5-13; Rigilano Dep., App. 0488:15-0489:10; Baer Dep., 1461:9-22.) In fact, Naydan "would be very upset if that were assigned at Penn State." (Naydan Dep., App. 1033:4-9.)

It is also clear this was not a "discussion" on race. This was a state-sponsored, state-enforced monologue. Colleen Mills, a professor of criminal Justice, presented an "analysis of

white supremacist mobilization." (App.3399.) And it was invariably "white" instructors used to illustrate cartoonish examples of bigotry. (App.3401.) An "advocacy alert" circulated by Naydan provided materials suggesting that "the white supremacist movement often interprets COVID as a type of 'racial cleansing'"—as some sort of basis of medieval history. (App. 3597 (circulated by Naydan 3595).) A collection of essays circulated by Naydan introduced "forms of race privilege that accrue to white teachers." (App.3436.) A PSU webpage on "antiracist resources" offered one-sided pabulum on "white rage," "white fragility," "white immunity," and "white people, enough." (App.3535) Another Naydan circular linked an "advocacy alert," "expos[ing]" the "scourge of white supremacy." (App. 3405.) And Naydan also featured Aja Martinez. (App.3235, 3537-3546.) By way of example, Martinez's showcases the scholar Ward Connerly who, though black and "working-class," opposes "affirmative action" and denies "racial inequities." (App. 3548). Because Connerly's views diverge from racial stereotypes, Martinez declares him to be telling a "white" story. (Id.) Blacks who disagree with her are not black. Another work of Martinez' that was sent around addressed "'master narratives' of white privilege." (3261.) Martinez declared "objectivity," "race neutrality," and "merit," *inter alia*, to be part of a white "master narrative," as if black Americans are incapable of or do not value these traits. (App.2942, 2946.) In this way, PSU remade as "antiracism" the ugliest 19th Century trope of childlike black people, incapable of objective thought.

PSU characterizes this as a "discussion" but no other perspective was permitted. As soon became clear, when De Piero objected, PSU swiftly punished him.

### G. PSU Ignores De Piero's Complaint of Race Essentialism in the Writing Program

By the fall of 2021, De Piero had enough of PSU's constant, state-sponsored racism. He submitted (September 13, 2021) a complaint to the Office of Affirmative Action, handled by Defendant Borges. (Borges Dep, App. 0781:15-21; 0797:5-16; App. 2434.) De Piero

complained that "under the direction of Liliana Naydan (the Writing Program Coordinator and English Department Chair), who is my most immediate supervisor," his department purveyed multiple discriminatory and biased remarks against white students and white faculty.  (App. 2435.)  He emphasized, *inter alia*, Inoue's "White Teachers Are a Problem."  (Id.)

It took Borges three days to raise De Piero's complaint with Division Head Baer (on September 16, 2021).  (App. 2439.)  In line with PSU's obsession over "white" people, Borges noted that a "majority of faculty in progr. are young white males . . . They report to Lila [Naydan]."  (Id.)  Borges' focus was immediately on De Piero's race, rather than Naydan's racial stereotypes.  Borges documented that Baer, who wrote up De Piero's annual evaluations, had affirmative knowledge that Naydan was taking things too far.  (App. 2439-2440; Borges Dep, 1228:10-20.)  Baer shared with Borges: "Lila [Naydan] very committed to diversity issues. Sometimes too much.  Uses the frase [sic.] microaggressions too frequently."  (App.2439.)

De Piero had also spoken to Baer near the close of the 2021 Spring Semester (on April 15, 2021).  (App. 2440; 2415-2416; Baer Dep, App. 1453:8-14; 1459:16-1460:16.)  The context: Naydan's subjective feelings were hurt.  (App. 2382-2383.)  She identified "implicit[] critique[s]," and "questioning the value of discussing [anti-racism] where faculty members of color are present [apparently presumed too fragile to discuss such things]," and copying a "woman student" on correspondence.[6]  (App. 2382-2283; 2447; Nayden Dep. 1099:14-1100:24.)  Naydan was also upset that De Piero defended himself against a claim of discrimination by a black student by arguing "he [De Piero] isn't a racist."[7]  (Id.)  These "many incidents," Naydan complained, were "***all microaggressions***…" (emph. added).  (App. 2382.)  In their April 2021

---

[6] This was particularly ridiculous because PSU's racist stereotypes and hostile environment also alienated this student. De Piero remains on friendly terms with her.  (App. 3633.)
[7] De Piero was never found responsible for anything.  (App. 0117, De Piero Dep., 117:11-13.)

meeting, De Piero also discussed with Baer the escalating racial harassment under Naydan.  They discussed the "White Teachers Are a Problem" talk, exercises in which the "white male instructor did this wrong," and De Piero's frustration with Naydan's "focus on issue like identity + power."  (App. 2415.)  Thus, as early as April 15, 2021, Baer had affirmative knowledge of the derogatory racial stereotypes imposed on white (and black) people in the Writing Program.

In September/October 2021, however, rather than investigate De Piero's legitimate grievance, Borges instructed De Piero, "So maybe you should go and question what is the message. What do I need to be considering or looking at differently?"  (Borges Dep, App. 0788:11-20.)  Borges recalled telling him that he should do so "until you – you get your answers." (Id. 21-24.)  A recorded transcript of their meeting captures Borges' exact words: ". . . it's not about you.  It's about the white race.  Yes, it's about the white race. . ."  (App. 2444 at 30:54.)  Borges is specifically referring to "White Teachers Are a Problem."  (Id.)  Thus, De Piero's characterization that Borges said, "there is a problem with the white race" is hardly inaccurate.  (Id.; Borges Dep., App. 0782:16- 0783:4; compare ECF No.52 at 22, n. 7.)  It is true that Borges said De Piero did not have to attend the program meetings.  (See e.g. App. 2444 at 31:14; Borges Dep. App. 0788: 17-24; 0791:7-16.)  However, she could not articulate why this made them any less discriminatory.  (Id.)  She also said De Piero had the right to disagree.  (Id.) PSU's actions proved this to be false.  No one was allowed to disagree.

Meanwhile, almost a month went by before Borges contacted Naydan (October 12, 2021).  (App. 2446.)  By the time she did, Borges had already predetermined the outcome, telling Naydan, "No need to worry." (Id.)  Borges did not even take notes of their conversation. (Borges Dep, App.0918:16- 0919:13.)  In fact, nothing suggests they discussed De Piero's complaint at all.  (Borges Dep,  App. 0915:13- 0916:5.)  Instead, Naydan reprised her catalogue

of "microaggressions, telling Borges that De Piero questioned "anti-racist pedagogy in faculty meetings" and refused to "frame[] contract grading as an anti-racist practice."  (App. 2447.)  So much for the right to disagree.

Less than a week later, Naydan retaliated by submitting a formal grievance against De Piero after another race-based Writing Program Meeting (October 18, 2021).  (App. 2449.)  This featured, "White Instructors Confront White Privilege in Their Classrooms" (the "White Privilege Meeting").  (Id.)  Naydan's copy of the reading underscored passages stereotyping "White European Americans."  (App. 2450-2463.)  The main point was that evaluating merit, regardless of race, somehow "marginalize[s] people of color and give[s] unfair advantages to White European Americans in our society."  (Naydan Dep at App. 1218:13-15.)  "White instructors must see how whiteness operates," Naydan wrote in the margin; and "you can never work outside the logic of white privilege and racism."  (App. 2454; 2458.)

De Piero politely asked critical questions during the meeting.  (App. 2464 (complete recording).)  Yet his contributions accounted for only 8% of the discussion.  (App.3627, ¶¶ 15-17, 3633.)  Defendant Naydan took up 23% of the meeting; her co-organizer Grace Lee-Amuzie took up 30%.  (Id.)  Only one participant spoke less than De Piero (Esposito, 6%).  (Id.)  In fact, De Piero used only 601 words, roughly 1 for every 3 spoken by Naydan; 1 to 4 spoken by Lee-Amuzie.  De Piero did not even speak until 18 minutes had passed:

> So, … I'd like to jump in here. It's a pretty extreme charge to suggest that teachers are reproducing racist discourses and practices in their classrooms.  . . . What does it mean to "attend to issues of inequity"?

(App. 2464 at 18:19.)  De Piero rephrased his question after about 30 seconds of silence:

> I think really that question is for Lila or Grace since you two assigned it [the reading] to my knowledge.  So what does that mean: "attending to issues of inequity"?  What if we can do a side by side comparison:  An instructor who is attending, an instructor who is not attending, can you help me understand what the difference is?

14

(App. 2464 at 19:44.)  Again there was just crickets.  (Id.)  Although Lee-Amuzie and Naydan selected the readings, neither could answer De Piero's straightforward question, which even Borges testified was not professional.  (Id.; Borges Dep., App. 00857:22- 00858-3.)  At deposition, witnesses could not identify what about De Piero's tone in the meeting was harassing, insulting, aggressive, or unprofessional.  (Borges Dep., App. 0852:4-10; 0855:12-18; 0859:6-14; 0859:20- 0860:16; 0860:17-0861:118; 0862:1-0863:10; Rigilano Dep, App. 0570:11- 14; 0573::3-4; 0576:21- 0578:8; 0580:1-16; 0583:24-0584:12; 0587:8-19; 0588:5-11; 0589:22- 1570:4; 0590:10-0591:7; 0594:16-0595:6; 0595:15-0596:4.)  Borges identified only De Piero's last question as "deviating from the purpose of the meeting," although even she admitted that he "d[id]n't sound disrespectful."  (App. 2464 at 51:34; Borges Dep.,  App. 0864:19-0865:15.)  Importantly, De Piero's last question raised the issue that targeting people by race could be a civil rights violation.  (App. 2464 at 51:34; Borges Dep, App. 0868:2- 0869:9.)  That is, he complained that PSU risked violating Title VII—a law Borges was supposed to enforce.  It was exactly this that Borges found unacceptable.  (Id.)

Naydan evaded answering straightforward questions about what De Piero supposedly said that was "hostile."  When asked, "tell me how his (De Piero's) tone expressed anger and being upset," Naydan responded, "I'm not sure how to answer that question."  (Nayden Dep. App. 0994:22- 0995:2.)  She could not give any coherent answer, except to complain that his "persistent" questions somehow made her "uncomfortable."  (Naydan Dep, App. 0999:15-21; 1000:24- 1011:23; 1004:24-1007:8-18; 1010:16-22; 1011:17- 1112:9; 1013:20-1016:24; 1018:3- 1120:6; 1021:5-17; 1022:12-1023:13-24; 1031:16-1037:15; 1037:21-1040:11; 1041:12-1045:20.)  At deposition, Naydan was consistent in continuing to lie about De Piero.  For example, she testified that he "mischaracterized the reading [assignment]."  (Nayden Dep. App.1044:3-23.)

Defendants can identify no passage that De Piero "mischaracterized," because he did not. (App.2464.)  She also testified that she never instructed anyone to feel "uncomfortable"—also obviously false.  (Naydan Depp, App. 1021:18-1022:6; compare App. 2699.)

### H.  De Piero Is Disciplined, Punished, and Suffers Damages

Immediately after the October 18, 2021 meeting, Naydan reported De Piero for "an egregious incident of bullying."  (App. 2481.)  Her official grievance misrepresents the White Privilege Meeting unrecognizably.  (App. 2482.)  She accused him of a "hostile" tone and "dominat[ing] the discussion and speak[ing] more than anyone else."  (Id.; App.3627, ¶¶ 15-17, 3633.)  She accused him of "criticiz[ing] individuals instead of ideas."  (App. 2482.)  She also complained that De Piero "repeatedly called out our names."  (Id..)  De Piero called Naydan by name exactly once.  (App. 2464 at 19:44.)  And Naydan claimed De Piero "mocked me," for which no evidence exists.  (App. 2482.)  Unsurprisingly, she nowhere complained of "persistence," which was all she could come up at deposition after an audio file showed her original allegations to be false. (App. 2481-2487.)  Naydan's lies simply indicate she could not tolerate anyone who "call[ed] antiracist [i.e. race essentialism] work into question" or challenged her constant protestations of "white privilege," *inter alia*.  (Id.)

In addition, Naydan's formal grievance reprised the alleged "microaggressions" she had imagined since March 2020, and which she interpreted as De Piero's "coded way of saying I am not qualified to be his Coordinator."  (App.2483.)  Ironically, this included De Piero's participation in a previous English Program Meeting, in which he had "nothing to say." (App. 2484.) De Piero was guilty of "hostility" when he said something; and somehow also guilty when he did not say something. Basically, he was white and guilty of questioning PSU's race-essentialist dogma.  Naydan also admitted that she was retaliating because "Zack reported me for bias against him as a white man, which I view as a form of harassment."  (App. 2484.)  Lee-

16

Amuzie submitted her complaint the next day, equally filled with misrepresentations.  (App. 2488.)  Lee-Amuzie also emphasized that the Writing Program Meeting was part of PSU's official "ongoing efforts for Diversity, Equity, and Inclusion…"  (App. 2489.)

When De Piero complained of a hostile environment, Division Head Baer did nothing, and Borges sat on his complaint for a month, then prejudged the outcome.  (See § I.G, *supra*; App. 2446.)  Now, PSU sprang into action over false allegations.  Less than an hour after the White Privilege Meeting, Naydan wrote to Baer about the "worst work environment of her life." (App. 2475.)  Within minutes, Baer alerted Borges, "this . . . needs to be addressed ASAP." (App. 2469; App. 2475.)  They also escalated the complaint to the highest levels of PSU's administration.  (App. 2985-2986.)  Before the day was out, Borges contacted Naydan to "sen[d] her a Complaint form" and encouraged Naydan to "file a report" that evening.  (App. 2473-2474.)  Borges and Naydan discussed the complaint the next morning, and Borges interviewed everyone from the White Privilege Meeting within three days, whereas De Piero's complaint had languished for weeks.  (App. 2473; App. 2480; App. 2492-2501.)

Borges' notes show that De Piero's colleagues continued to lie. (App. 2496; App. 2498.) Naydan now brought up "issues with the woman he reported to previously at University of PA," for which there is no evidence, and reprised yet again her catalog of "microaggressions."  (App. 2500.)  Professor Stephen Cohen said De Piero's questions were "interesting" during the meeting; but he now declared De Piero "very angry," "aggressive," and "<u>combative</u>" (emph. in orig.).  (App. 2492; App. 2464 at 50:18.)  Lee-Amuzie re-emphasized that Naydan's initiative was part of "DEI - included in the strategic planning" and that "Lila & her decided to include <u>antiracist</u> pedagogy . . . – to implement in writing pedagogy" (emph. in orig.).  (App. 2497.) Lying about a colleague was now repackaged as high priority DEI business.

17

Borges then interviewed De Piero (on October 27, 2021). It was a sign of her bias that she too invented falsehoods without evidence, telling De Piero, "The body language is the aggressiveness."[8]  (App. 2505 at 31:09.)

Borges also confirmed that Naydan's initiative—identifying "white people" as the "problem"; condemning "white privilege" etc.— was "embraced in [PSU's] strategic planning." (Id.at 11:05.)  This last assertion is undeniable.  Naydan, Lee-Amuzie, and several other English and writing program faculty had drafted an "Anti-Racism Resolution," passed by the faculty Senate (March 4, 2021). (2924-2933; 3034-3035.)  The resolution decried "the white male model of authority"; stereotyped the existing curriculum as "focus[ed] exclusively on the works, lives, and experiences of white, Western culture" (clearly false); and also singled out "black students" for special favoritism. (App. 2924-2933; App. 3034-3035.)  Lee-Amuzie co-chaired, and Naydan also served on, a "DEI Committee." (App. 2646.)  The committee endorsed illegal race-based hiring[9] and lamented that "Abington still has a majority white staff (59%) and faculty (64%)." (App. 2648-2649.)  These percentages fall far below the national average (75.5%), and below the general "white" population of Abington, Pennsylvania (74.2%)— evidence of disparate treatment in and of itself. (3321-3325.)

Borges ended her interview with De Piero by telling him that she had to resolve the complaints against him in the next few days. (App. 2505 at 1:25:41.)  De Piero's own complaint was still (officially) unresolved, but Borges rushed to resolve Naydan and Lee-Amuzie's bad-faith, retaliatory complaints.  Borges did send a letter dismissing De Piero's complaint shortly

---

[8] There is absolutely no record evidence of this in the record, and Borges could identify none. (Borges, 0811:14-0812:16; 0813:9-16; 0814:13-0816:2; 0831:16-19; 0834:4-9; 2481-2490 (Naydan and Lee-Amuzie complaints); 2492-2499 (Borges interview notes).)

[9] This is euphemistically called "support for meeting a baseline for full-time hiring goals based on historically and continuously marginalized intersectional identities, most notably race and ethnicity. . ." (App. 2649.)

thereafter (November 12, 2021), and again reminded De Piero that Naydan's race-essentialist pedagogy was "in line with the Campus Strategic Plan." (App. 2515.) On December 8, 2021, Borges sent letters to Naydan and Lee-Amuzie indicating that De Piero had been found responsible for "unprofessional" conduct, "contrary to the University Values Statement"; "a pattern of insubordination and undermining behavior towards you as the director of the English Writing Program **and his supervisor**"; and "not respectful of your [Naydan's] role **as the supervisor**" (emph. added). (App. 2521-2522; see also App. 2524 (Lee-Amuzie letter).) Borges communicated the same to "Dr., De Piero [sic.]" the next day. (App. 2525.)

The "University Values Statement" is posted to the PSU website. (App. 2516- 2520.) It promotes lofty aspirations of "Integrity, Responsibility, Excellence, Respect, Discovery, Community." (Id.) Division Head Baer "d[id] n[o]t think the value statement is a policy" of PSU; but without anything else to pin on De Piero for dissenting from PSU's race-essentialism, PSU found him guilty for violating this "values statement." (App. 2525; Baer Dep, App. 1378:18-24; 1562:11-16; 1563:9-14; 1564:9-14.) Although Baer testified that it would be "disrespectful to lie about your colleagues"—thus presumably also a violation—no one at PSU has ever been held accountable for lying about De Piero. (App.1564:24-1565:1; 3628, ¶ 22.)

Defendant Baer called De Piero to a meeting early in the new year (January 13, 2022). (App. 2996.) She handed him a formal "Performance Expectations" letter, which went into his permanent personnel file. (App. 2996-2997.) According to PSU's policies, such a notice to the personnel file is a "sanction." (Id.; 2684.) Baer raised the vague "University Values Statement" with De Piero but could not specify what De Piero said that was "abrasive" or "what specific words [De Piero] used, that prompted the [Affirmative Action Office] to draw its conclusions."

(App. 2997.)  De Piero signed the disciplinary letter only under an objection, written by hand, that the disciplinary process was retaliatory.  (Id.)

In March, the Dean of Academic Affairs Andrew August further directed Baer to note the sanction in De Piero's Faculty Annual Review, which Baer did.  (App.1990-1991; 2765-2767; 2987.)  De Piero's "service" evaluation was downgraded from "very good" (2018-2020) to "fair to good."  (Id.)  But before the ink was dry on De Piero's reprimand, Naydan proceeded to submit new bogus complaints, claiming he was "going around me as I am his Program Coordinator," and yet again invoking "a very long string of incidents with him," i.e. her ever-expanding catalogue of "microaggressions."  (App. 3286.)

For De Piero, the writing was on the wall.  He applied and finally got a job offer on July 18, 2022 from Northampton Community College.  (App. 2550-2551.)  He had been trying to get out of the toxic environment at PSU since the race-based dogma reached a fever pitch after the murder of George Floyd in 2020.  (App. 2151-2154.)  Teaching at a community college involved significantly more work and far less prestige than teaching at the university level.  (De Piero. App. 0311:20-0312:22.)  De Piero resigned from PSU on August 2, 2022.  (App.2553-2554.)

This prompted PSU to demand De Piero return his July 2022 paycheck.  (App.3606; 3610-3614; 3615-3618; 3619-3620.)   PSU alleges it paid De Piero for anticipated service during the academic year 2022-2023.  (App.3605.)  In all likelihood, clawing back this one month of De Piero's pay cost the institution more in administrative time than it was worth, but this didn't matter to PSU.  It was another way of punishing him for dissenting from institutionalized race-essentialist dogma.  There is ample documentation that De Piero continued to work for the benefit of PSU through July 2022.  On July 20, 2022, Acting English Department Chair Thomas Heise instructed him via email to reach out to a student to discuss his fall semester courses.

20

(App.3621.)  As instructed, De Piero worked with the student and also prepared for fall semester

courses, also in the service of PSU.  (App.3608.)  De Piero is entitled to payment for the summer

work he performed, even if the contract specified a period from August to May, because the

work he did was specifically requested by PSU and directly benefited PSU.  Do you think you

would have time to read the De Piero brief.?  You're very busy As a result, PSU should make De

Piero whole by paying him $3,386.47.  (App.3606.)

## II.   Argument: Summary Judgment Should Be Denied

Summary judgment must be denied unless "there is no genuine dispute as to any material

fact."  *Wiggins v. Lab'y Corp. of Am. Holdings*, No. 24-0648, 2024 U.S. Dist. LEXIS 185859, at

*10 (E.D. Pa. Oct. 11, 2024) (quoting Fed. R. Civ. P. 56(a)).  "A genuine issue is present when a

reasonable trier of fact, viewing all record evidence, could rationally find in favor of the non-

moving party in light of his burden of proof."  *Id*. at *11.  "[T]he court must view the facts and

draw all reasonable inferences in the light most favorable to" De Piero, the non-movant.  *Id*.

### A.  De Piero's Hostile Environment Claim Should Be Tried

As the foregoing factual section demonstrates, De Piero has met the standard established

by this Court's Order on the Motion to Dismiss.  (ECF No. 31.)  PSU subjected De Piero to "a

constant drumbeat of essentialist, deterministic, and negative language."  (*Id*. at 17.)  As

Defendant Borges emphasized, these demeaning stereotypes were "about the white race.  Yes,

it's about the white race. . ."—and part of PSU's strategic plan.  (App.  2444 at 30:54; 2497.)

#### 1)  *De Piero Has Met This Court's Standard for Severe and Pervasive Harassment*

De Piero was not subjected to "offhand" comments or isolated incidents, but a state-

sponsored campaign to denigrate white (and black) employees.  This was not only offensive to

him but also to other PSU faculty and staff.  (App. 2701-2702.)  Even his colleague Rigilano

complained about PSU's "orthodoxy."  (App. 2244, 2257.)  The evidence shows that De Piero's

"harasser's conduct was motivated by a belief that the victim [De Piero] did not conform to the stereotypes" of race pushed by Naydan and others. *Bibby v. Phila. Coca Cola Bottling Co*., 260 F.3d 257, 262-263 (3 Cir. 2001) (same-sex discrimination case, holding enforcement of stereotypes constitutes proof of sexual harassment). It proves nothing that ideological partisans among PSU faculty (who lied about De Piero constantly) did not subjectively feel insulted by dogma about "white privilege," "white people" as the "problem," etc. *Cf. Devine v. Pittsburgh Bd. of Pub. Educ.*, No. 2:13-cv-220, 2015 U.S. Dist. LEXIS 74988, at *8 (W.D. Pa. June 10, 2015) (denying summary judgment on "Plaintiff's same-race discrimination theory, i.e., that Caucasian principal . . . applied a different standard to Caucasian teachers . . . associated with 'white privilege'").

Defendants urge this Court to equate PSU's treatment of De Piero to cases where plaintiffs inferred discriminatory animus from Naydan-style "microaggressions." In *Greer v. Mondelez Glob., Inc*., 590 F. App'x 170, 171, n.2 (3d Cir. 2014),[10] a plaintiff alleged racial discrimination because she was told "she did not have a boyfriend … because she was hardheaded," without reference to race. Or Defendants rely on *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 607, 610 (E.D. Pa. 2001), where the plaintiff "offered only conjecture" and "unsupported allegations." Or in *Washington v. SEPTA*, No. 19-4213, 2021 U.S. Dist. LEXIS 119669, at *19 (E.D. Pa. June 28, 2021), a plaintiff claimed racial discrimination due to "eye rolling, teeth sucking, loud sighs, and being ignored when [he] talk[ed]." Similarly, Defendants invoke *Hunter v. Trs. of the Univ. of Pa.*, No. 20-2334, 2021 U.S. Dist. LEXIS 72706, at *2-*3 (E.D. Pa. Apr. 15, 2021), where an employee subjectively inferred the utterance, "angry," to

---

[10] Defendants characterize this case as "granting summary judgment . . . holding that name-calling in a meeting was not severe conduct"; but *Greer* nowhere states such a factual finding. *Greer* refers to a single email, in which the plaintiff subjectively inferred offensive conduct was reported, but not "name-calling in a meeting." *Id*. at 174; ECF No. 52 at 24.

mean, "angry black woman," although her race was not mentioned.  See also *Stephenson v. City of Phila.*, No. 05-1550, 2006 U.S. Dist. LEXIS 43998, at *33 (E.D. Pa. June 27, 2006) (finding no inference of sexual harassment, despite plaintiff's subjective interpretation of gift of Disney Betty Boop souvenir or saying Plaintiff could "go far if she played her cards right").

These cases are inapposite.  Here, Naydan, among others, with affirmative knowledge of Division Head Baer, resolved to "focus on race this semester--and all year, really"—meaning vilifying "white teachers" as the "problem," witch hunting "white privilege in the classroom," and enforcing a raft of other stereotypes.  This was not "sporadic or part of casual conversation [that] do[es] not violate Title VII."  *Barbosa v. Tribune Co.*, No. 01-CV-1262, 2003 U.S. Dist. LEXIS 19483, at *15 (E.D. Pa. Sep. 25, 2003).  It was PSU's strategic plan.  When De Piero dared to dissent, his coworkers and supervisor lied about him to Affirmative Action investigator, Borges, who emphasized (twice), "it's about the white race. . ."  (App. 2444 at 30:54.)

Defendants' out-of-jurisdiction cases are also unavailing.  In *Chislett v. N.Y.C. Dep't of Educ.*, No. 1:21-cv-09650 (JLR), 2024 U.S. Dist. LEXIS 47391, at (S.D.N.Y. Mar. 14, 2024) (on appeal), the plaintiff, a school administrator, was subjected to so-called anti-bias training, which the court found "provided a forum to talk about race." Id. at *30.  However, in the training, discussion of "white fragility" came, unlike here, from "comments made by her colleagues."  Id.  Here, PSU enforced its race essentialist dogma and Naydan brooked no dissent.  Furthermore, *Chislett* identified only one "antibias training," which is not comparable to Naydan's multiyear, monthly Writing Program Meetings, let alone her campaign for "Black Linguistic Justice."  In addition, this Court has already considered and rejected as unpersuasive *Shannon v. Cherry Creek Sch. Dist.*, 2022 WL 4364151 (D. Colo. Sept. 21, 2022) and *Vitt v. City of Cincinnati*, 250

F. Supp. 2d 885, 887, 890 (S.D. Ohio 2002), aff'd, 97 F. App'x 634 (6th Cir. 2004).(see ECF No. 31 at 13-14.)

### 2)  No Affirmative Defense for "Voluntary" Discrimination

PSU asks the Court to fashion some sort of "voluntariness" defense because various meetings that De Piero attended were "voluntary."  First, it is disputed that Defendants' imposed their race-essentialist dogma "voluntarily."  For example, when Naydan recruited De Piero to present contract-based grading policies as "antiracism," that is, in line with her race-essentialism, he declined.  She reported this as a "microaggression."  (App. 2382.)  She also insulted the white police officer Lacey through the PSU listserv, sent to the entire school.  (App. 2698-2699.)  And, obviously, as "Program Coordinator," Naydan made a pet project of training focused on "Black Linguistic Justice," "White Teachers Are a Problem," and "White Privilege."  De Piero could ignore this only at his peril.  (3628-3629, ¶ 25.)

Second, no authority supports the proposition that "voluntariness" somehow makes discrimination okay.  Clearly a state actor, like PSU, could not endorse Ku Klux Klan rallies, make attendance "voluntary," and then tut-tut black faculty who took offense.  Every deponent has testified to the opposite.  No Defendant would tolerate PSU's discrimination if it ridiculed "black" people in the same way – and rightly so.  (See § I.E, supra.)

Hostile environment claims emphasize the ***environment***.  Courts evaluate them based on the totality of circumstances.  See *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("analysis must concentrate not on individual incidents, but on the overall scenario"); *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999)) ("employer may create a hostile environment . . .  Even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself").

24

For example, the Ninth Circuit in *Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 981 (9th Cir. 2023) held that playing sexist music in the background constituted "persistent exposure to derogatory, gender-specific words broadcast throughout the workplace." "[E]ven if the ubiquitous music was not (and need not have been) targeted toward any particular woman, … [w]hether sung, shouted, or whispered, blasted over speakers or relayed face-to-face, sexist epithets can offend and may transform a workplace into a hostile environment." *Id*. One plaintiff in *Sharp* was also male, indicating that "the music's alleged offensiveness to both male and female employees is no obstacle" and the "same principle holds true in the context of race discrimination." *Id*. at 982. Although *Sharp* was decided under 12(b)(6), the Fourth Circuit Court of Appeals reached the same conclusion through jury verdict. See *Ocheltree v. Scollon Prods*., 335 F.3d 325, 332-333 (4th Cir. 2003) (denying motion for judgment notwithstanding the verdict, where losing party protested that its discrimination was not directed at the plaintiff).

### 3) *De Piero's Supervisors Punished Him*

PSU challenges *respondeat superior* liability and disputes that De Piero was detrimentally affected. (ECF No.52 at 23-24, 28.) First, "Hostile-work-environment claims do not require a showing of an adverse employment action or consequence." *Swingle v. Henderson*, 142 F. Supp. 2d 625, 633 (D.N.J. 2001)). In *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013), the Third Circuit reversed a District Court's summary judgment decision that erroneously found no evidence that the plaintiff was detrimentally affected by sex discrimination. Evidence showed the plaintiff had only complained to other employees but not to supervisors and no evidence showed psychological distress or the impairment of the employee's ability to do her job. Id. at 168. Here De Piero complained to his Division Head and was clearly impaired when his colleagues' lied about him to get him disciplined and punished. But despite a far lesser showing in *Mandel,* the Third Circuit reversed, emphasizing "the

inherently subjective question of whether particular conduct was unwelcome presents difficult problems of proof and turns on credibility determinations." Id. at 169.  De Piero easily clears this hurdle and should be allowed in to make his argument to the jury.

Similarly, as PSU's own authority indicates, *respondeat superior* liability is not necessary to prove a hostile environment.  Even where a mere "co-worker is responsible for harassing conduct," an employer is still liable if "(1) the employer failed to provide a reasonable avenue for complaint or (2) the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."  *Dean v. Phila. Gas Works*, No. 19-4266, 2021 U.S. Dist. LEXIS 120660, at *21 (E.D. Pa. June 28, 2021) (internal quotations omitted).

As a threshold matter, contemporary documents show again and again that Naydan was De Piero's immediate supervisor.  (App. 2525; 2439.)  However, even if the Court credits PSU's *post hoc* protestations to the contrary, PSU's argument still fails.  PSU may only escape liability "by establishing, as an affirmative defense, that (1) the employer [PSU] exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  Id.

Baer had affirmative knowledge of Naydan and others' harassment of De Piero as early as April 15, 2021.  (App. 2440; 2415-2416; Baer Dep, App. 1453:8-14; 1459:16-1560:16.)  Baer ultimately presided over Borges' selective enforcement of PSU's anti-discrimination policies.  PSU's disciplinary process was not available to De Piero.  When he submitted a grievance, Defendant Borges prejudged the outcome, informing Naydan there was "[n]o need to worry."  (App. 2446.)  By contrast, PSU's disciplinary system was easily manipulated by Naydan and her fellow race enthusiasts.  She (and others) lied about him after he criticized their racial stereotypes (e.g., in the meeting of October 18, 2021), and PSU's disciplinary apparatus cracked down ***on***

*him*.  (App. 2996.)  PSU did so despite Baer admitting to Borges that Naydan was overreacting to "things/interactions in the microaggressions category"; used the phrase "microaggressions too frequently"; and was "too much" committed to "diversity issues."  (App. 2439-2440.)

PSU's argument concerning supervisor liability as well as the detrimental impact of its official policy of racial stereotypes therefore must fail.

## B.  PHRA and Title VII Are the Same Except that PHRA Imposes Individual Liability

The analysis of PHRA and Title VII claims is the same. *Tinson v. City of Coatesville*, 2008 U.S. Dist. LEXIS 141499, *3 (E.D.Pa. 2008)) (citing *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).  The argument that De Piero has "not pursued" his PHRA claims therefore makes no sense.  The difference is that individual employees may be found liable under the PHRA, but not under Title VII, for aiding and abetting discrimination.  *Dici v. Pennsylvania*, 91 F.3d 542, 551-553 (3d Cir. 1996)) (explaining individual liability under PHRA).  The same holds for De Piero's 42 USC § 1981 claim.  "The substantive elements . . . are generally identical to the elements of an employment discrimination claim under Title VII." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 256 (3d Cir. 2017).

Because PSU is liable under Title VII and there is ample evidence that the Individual Defendants aided and abetted and "intentionally caused [the infringement of plaintiff's] section 1981 rights" as well as "authorized, directed, or participated in the alleged discriminatory conduct", Naydan, Borges, Baer, Wong, and Smith are liable under the PHRA and § 1981. *Id.* and *Suero v. Motorworld* Auto. Grp., Inc., No. 3:16-CV-00686, 2017 WL 413005, at *7 (M.D. Pa. Jan. 31, 2017)..

**C. Defendants Never Moved to Dismiss De Piero's Title VII/PHRA Retaliation Claim, which Should Now Proceed to Trial**

De Piero pleaded Title VII and PHRA retaliation in Counts 1 and Count 5.  (ECF No. 1, ¶¶ 172, 206; 1888, ¶ 172; 1892, ¶ 206.)  Defendants never moved to dismiss these claims.  (ECF No. 23, 52.)  The Court dismissed only First Amendment retaliation.  (ECF No. 32, ¶ 4.)

The PHRA and "Title VII's anti-retaliation provision[11] protects employees from employer actions that are serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)).  To prove unlawful retaliation, De Piero must show "(1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).  De Piero "must show that a reasonable employee would have found the challenged action materially adverse" and PSU "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.,* at 68 (internal quotation omitted).  The Supreme Court has instructed not only that "context matters" but also "excluding an employee from a weekly training lunch that contributed significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.*  At 69.

As to the first element, it is undisputed that De Piero engaged in protected activity by submitting a Title VII complaint both to the EEOC and a PSU grievance.  (See e.g., 2434-2436.)  As to the second and third elements, although written reprimands, without more, may not constitute an adverse employment action; De Piero's written reprimand does demonstrate

---

[11] Analyses of Title VII and PHRA violations are "identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 104 n.2 (3d Cir. 2009)

retaliation in context with other evidence.  See *Roy v. Harrisburg Sch. Dist.*, No. 1:18-CV-2356,

2021 U.S. Dist. LEXIS 165003, at *16 (M.D. Pa. Aug. 31, 2021) (holding plaintiff bears burden

to "establish how a written reprimand altered … terms or conditions of employment") (citing

*Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 446-47 (3d Cir. 2011)).  An employer's

endorsement of false disciplinary measures can constitute adverse employment action.  See e.g.,

*Skoorka v. Kean Univ.*, No. 17-5484 (KM) (MAH), 2019 U.S. Dist. LEXIS 39024 (D.N.J. Mar.

11, 2019).

 In *Skoorka* (at the 12(b)(6) stage),[12] the plaintiff alleged not only a (baseless) written

reprimand but also that the university "wrongfully brought unfounded disciplinary actions

against him."  *Id.* at *12,*27.  The court held that, "the disciplinary actions, assuming they are

unwarranted, may be severe enough to qualify as potential retaliatory action."  *Id*. at*19.

Although *Shoorka* was decided on a motion to dismiss; here, the evidence shows exactly what

*Shoorka* merely pled.  (Compare, App. 2464.)

 Discovery has shown De Piero's immediate supervisor Naydan lied about De Piero to get

him disciplined and punished.  In addition, Defendant Borges selectively enforced nearly

identical claims of discrimination raised by De Piero against Naydan.  Borges prejudged De

Piero's complaint and did not even bother taking notes on her investigative interview with

Naydan.  Borges' merely provided another sounding board for Naydan's catalogue of "micro

aggressions" in a pretextual "investigative interview" Naydan.  (App. 2447.)  Naydan expressly

cited De Piero's report of ***her*** discrimination against ***him*** as justification for her grievance (less

than a week after she learned that De Piero had named her in ***his*** complaint).  (App. 2484.)

---

[12] Although summary judgment later entered on Skoorka's claims, including alternative theories of Title VII retaliation, the issue of Skoorka's claim for retaliation based on bogus disciplinary proceedings was not addressed by the court in that decision.  *Skoorka v. Kean Univ.*, Civil Action No. 09-3428, 2023 U.S. Dist. LEXIS 27533 (D.N.J. Feb. 16, 2023).

Borges then substantiated Naydan's bogus complaint and, *sua sponte*, fabricated allegations never raised by anyone, e.g., that De Piero made threatening gestures. (App. 2505 at 31:09.) De Piero received a "performance expectations" reprimand in his personnel file for supposedly violating a "University Values" statement, which Baer admitted is not even a university policy. (App. 2996-2997.) On Dean of Academic Affairs Andrew August's instructions, Baer then downgraded De Piero's annual performance reviews and told De Piero not to attend Naydan's "antiracist" meetings. (App. 2533.) Importantly, in the October 18, 2021 White Privilege Meeting, it was exactly De Piero's objections to discrimination and racial harassment that Borges found objectionable. (Borges Dep, 0868:2-0869:9.) Then, when De Piero understandably left PSU's toxic environment to get a new job, PSU insisted on clawing back his pay. De Piero therefore had to work on behalf of PSU without compensation during July 2022.

De Piero's retaliation claim under Title VII and the PHRA should proceed to trial.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

DATE: November 27, 2024

Michael Thad Allen (435762)
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT  06320
(860) 772-4738
mallen@allenharrislaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date appearing in this document, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system. I certify that the following counsel of record are registered as ECF filers and that they will be served by the CM/ECF system:

James A. Keller, Esq. (ID No. 79855)
Joseph F. O'Dea, Jr., Esq. (ID No. 48370)
Ashley E. Miller, Esq. (pro hac vice
admission forthcoming)
Matthew J. Smith, Esq. (ID No. 314157)
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA, 19102-2186
T: (215) 972-1964
James.Keller@saul.com
Joseph.Odea@saul.com
Ashley.Miller@saul.com
Matthew.Smith@saul.com

*Attorneys for Defendants Pennsylvania
State University, Damian Fernandez,
Margo DelliCarpini, Liliana Naydan,
Carmen Borges, Alina Wong, Lisa
Marranzini, Friederike Baer, and Aneesah
Smith*

*/s/Michael Thad Allen*
Michael Thad Allen, Esq.