**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ZACK K. DE PIERO,

    Plaintiff,

v.

PENNSYLVANIA STATE UNIVERSITY, et al,

    Defendants.

CIVIL ACTION NO:

No. 2:23-cv-02281

## DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants The Pennsylvania State University (the "University"), Liliana Naydan, Carmen Borges, Alina Wong, Friederike Baer, and Aneesah Smith (collectively "Defendants")[1] respectfully submit this notice of supplemental authority in further support of their pending Motion for Summary Judgment (ECF No. 52).

In ruling on Defendants' Motion to Dismiss, this Court favorably cited *Diemert v. City of Seattle*, 2023 WL 5530009 (W.D. Wash. Aug. 28, 2023), as persuasive authority for allowing Plaintiff De Piero's hostile work environment claim to proceed past the pleading stage. (ECF No. 31 at 15-16). This Court observed that although the allegations in *Diemert* "go beyond what De Piero says happened here," the cases were sufficiently similar that De Piero's hostile environment claim could proceed, just as the plaintiff's claim survived a motion to dismiss in *Diemert*. (*Id.* at 15).

---

[1] On September 10, 2024 the parties filed a Stipulation of Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) agreeing to the voluntary dismissal of defendants Damian Fernandez, Margo DelliCarpini, and Lisa Marranzini, with prejudice. *See* ECF No. 49. Judge Beetlestone signed the stipulation on September 13, 2024 and defendants Fernandez, DelliCarpini, and Marranzini were dismissed from this action with prejudice. *See* ECF No. 50.

Defendants provide this Notice of Supplemental Authority because on February 10, 2025, the *Diemert* court granted summary judgment in favor of defendant on plaintiff's hostile environment claim. *See Diemert v. City of Seattle*, No. 2:22-CV-1640, 2025 WL 446753 (W.D. Wash. Feb. 10, 2025). A copy of the opinion is attached as **Exhibit A**.

By way of brief recap, the plaintiff in *Diemert,* a white man, alleged that his employer discriminated against him because of his race, arguing that his employer's Race and Social Justice Initiative ("RSJI") – the employer's D.E.I program – created a hostile-work environment by "infusing race into all [the employer's] functions" and "reduc[ing] [the plaintiff] to an embodiment of his race." *Id*. at *1. The plaintiff also alleged that his employer retaliated against him when he opposed the supposed harassment. *Id*. As mentioned, in the attached opinion, the court granted the employer's motion for summary judgment in its entirety, dismissing the plaintiff's claims for hostile work environment, disparate treatment, retaliation, constructive discharge, and violation of the equal protection clause.

Specifically, the *Diemert* court held that, while it was undisputed that the employer required all employees to complete two RSJI activities per year and the plaintiff found the RSJI messaging incorrect and offensive – including statements by the trainers that "racism is in white people's DNA" and "white people are like the devil" – the RSJI trainings did not create an objectively hostile work environment. *Id*. at *2, 10. The court reasoned that "[c]omparing diversity trainings that use terms like ''racial bias,' 'white man's privilege,' and 'white man's guilt,' and address topics such as systemic racism, oppression, and intersectionality...to true hostile work environments...trivializes the freedom protected by [antidiscrimination laws].'" *Id*. at *10 (quoting *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1171 (N.D. Fla. 2022), *aff'd sub nom. Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024)).

The *Diemert* court further held that comments and actions by other employees in the plaintiff's workplace – including employees expressing their opinion that white people do not experience racism, co-workers confronting the plaintiff for comments he made in response to a post about critical race theory and calling him a "colonist," and the Chief Equity Officer informing the plaintiff that "it can seem as [a D.E.I. email] was a personal attack directed against all white people, but it is not" – fell short of the mark of conduct that amounts to severe or pervasive racial harassment. *Id*. at *4, 11-12.

The facts in *Diemert* "go beyond" those in this case, but are similar. The attached opinion granting the defendant employer's motion for summary judgment and dismissing Diemert's case in its entirety thus stands as persuasive authority regarding Defendants' pending Motion for Summary Judgment.

Defendants respectfully request the Court take notice of this supplemental authority.

Respectfully submitted,

Date: February 20, 2025

**SAUL EWING LLP**

*James A. Keller*
James A. Keller, Esq., ID No. 79855
Matthew J. Smith, Esq., ID No. 314157
Amy L. Piccola, Esq., ID No. 208888
Carolyn M. Toll, Esq. ID No. 326050
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA, 19102-2186

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ZACK K. DE PIERO,<br><br>　　Plaintiff,<br><br>v.<br><br>PENNSYLVANIA STATE UNIVERSITY, et al,<br><br>　　Defendants. | CIVIL ACTION NO:<br><br>No. 2:23-cv-02281 |

### CERTIFICATE OF SERVICE

　　I hereby certify that on February 20, 2025, Defendants' Notice of Supplemental Authority in Further Support of Their Motion for Summary Judgment was filed with the Clerk of the Court by using the CM/ECF system. I certify that the following counsel of record are registered as ECF filers and that they will be served by the CM/ECF system:

**Michael Thad Allen, Esq.**
Allen Harris PLLC
PO Box 404
Quaker Hill, CT 06375
860-325-5001
mallen@allenharrislaw.com

**Samantha K. Harris, Esq.**
Allen Harris PLLC
PO Box 673
Narberth, PA 19072
267-304-4538
sharris@allenharrislaw.com
*Attorneys for Plaintiff*

Dated: February 20, 2025　　　　　　　　*/s/ James A. Keller*＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　James A. Keller, Esq., ID No. 79855

Exhibit A

2025 WL 446753
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington.

JOSHUA A. DIEMERT, Plaintiff,
v.
CITY OF SEATTLE, Defendant.

CASE NO. 2:22-cv-1640
|
02/10/2025

Jamal N. Whitehead, United States District Judge

ORDER

## 1. INTRODUCTION

**\*1**  It is unlawful for an employer to discriminate against any employee because of their race. Recognizing the stubborn and pernicious effect of racism against minorities, many employers have adopted Diversity, Equity, and Inclusion ("D.E.I.") initiatives to combat discrimination and harassment in the workplace.

Plaintiff Joshua Diemert, a white man, alleges that his employer, Defendant City of Seattle ("City"), discriminated against him because of his race. He argues that the City's Race and Social Justice Initiative ("RSJI")—the City's D.E.I. program—created a hostile-work environment by "infusing race into *all* City functions" and "reduc[ing] [him] to an embodiment of his race." Dkt. No. 67 (emphasis in original). He also alleges the City retaliated against him when he opposed the supposed harassment.

Controlling precedent makes clear that the legal protections against workplace discrimination apply with equal force regardless of the plaintiff's race. Yet we must acknowledge what history and common sense tell us: instances of discrimination against the *majority* are rare and unusual. Diemert does not present that rare and unusual case here. Contrary to his claims, D.E.I. programs aimed at addressing racial inequalities against Black people and other minorities are not by their very nature discriminatory against whites. And while it is apparent that Diemert personally rejects the RSJI, as is his right, the details he alleges about its discriminatory effect are not so objectively severe or

pervasive as to create a racially hostile-work environment against white people in general or him in particular. The same is true about the sweeping claims Diemert makes about his co-workers' and supervisors' alleged race-based conduct, which lack specificity and factual support. Put plainly, more is required of Diemert under the law to demonstrate an unlawful hostile-work environment.

Because Diemert's claims do not stack up against the time-honored tests for proving unlawful employment discrimination and retaliation, the Court must grant the City's summary judgment motion and dismiss Diemert's case. Dkt. No. 58.

## 2. BACKGROUND

In January 2013, Diemert began working as a program intake representative for the City of Seattle's Utility Discount Program, a branch within the City's Human Services Department ("HSD"). Dkt. Nos. 60 ¶ 3; 69 ¶ 3. HSD connects people in Seattle with resources and benefits during their times of need. The Utility Discount Program offers financially eligible households steep discounts on their Seattle City Light and Seattle Public Utilities bills. As a program intake representative, Diemert assessed applicants' eligibility for utility discounts, among other things. *See* Dkt. No. 59 at 44.

Although Diemert does not describe his racial background in his complaint, he posits in his declaration that "the City discriminated against [him] as a white male[.]" *See generally* Dkt. No. 11; Dkt. No. 69 ¶ 21; *see also* Dkt. No. 67 at 2 ("[I]t was a near-daily occurrence for Mr. Diemert to hear some pejorative trait about his racial identity as a white man.").

### 2.1 The City's Race and Social Justice Initiative.

**\*2**  Diemert claims his race became an "albatross around his neck" as a "deliberate outgrowth of the City's Race and Social Justice Initiative ('RSJI')." Dkt. No. 11 ¶ 3. In effect since 2004, the RSJI is a citywide effort to "end institutional racism and race-based disparities in City government." Dkt. Nos. 11-9 at 3; 59 at 117. The RSJI seeks to build a "relational culture"—it acknowledges that "[t]he culture that has been internalized and normalized by...government...was created by white, wealthy, Christian, cis-gender, straight, non-disabled men who came from Europe who wanted to protect their place within hierarchy and empire," and the RSJI seeks to "interrupt these patterns in a holistic way...[to] create a relational culture

that is fertile soil for our collective care, health, wellbeing, creativity, power[,] and coliberation." Dkt. No. 11-7 at 2.

HSD requires employees to complete two RSJI activities per year. Dkt. No. 60 ¶ 7. To fulfill this requirement, employees can complete trainings or attend events offered by the City or participate in outside activities the City approves. *Id.* The activities must be social-justice oriented but can pertain to "issues other than race, such as gender, poverty, Indian affairs, [and] LGBTQ issues[.]" *Id.* Failure to complete these two RSJI activities, however, will not impact an employee's annual review. HSD Human Resources (HR) Director Terry McLellan testified that "[i]f an employee does not attend the two required trainings, or events, or isn't working on a work group to advance racial equity,...they're still able to get a 'meets expectations' or 'fully performing' rating." Dkt. No. 59 at 183.

Diemert's experience in HSD was consistent with this policy. In 2019, Diemert failed to meet the RSJI requirement, but he received a "fully performing" rating on his annual performance evaluation. Dkt. No. 60 at 99–103. In 2020, HSD waived RSJI requirements in light of the COVID-19 pandemic. *Id.* ¶ 13; *id.* at 116. In 2021, Diemert informed Ryan Groce—an HSD Employee & Labor Relations Manager, at that time—that he would no longer participate in RSJI trainings. *Id.* ¶ 14; *id.* at 113–14. In response, the City "did not take any corrective action of any kind[.]" *Id.* at 114.

Before opting out, Diemert attended three required RSJI classes: (1) "Race, the Power of an Illusion," on March 20, 2015; (2) "Equity Lens: Why We Lead With Race," on April 26, 2017; and (3) "Undoing Institutionalized Racism," presented by the People's Institute for Survival and Beyond, on November 19, 2019. Dkt. No. 60 at 10. Diemert testified that during the 2019 Undoing Institutionalized Racism presentation, one of the co-trainers went "off into a rant about...white people, [and] [Christopher] Columbus and being cannibals." Dkt. No. 73-2 at 20. According to Diemert, the co-trainer stated that "there was a lie that Christopher Columbus went to the Caribbean and that [the indigenous people living there] were cannibals" when "the real truth is that all white people are cannibals[.]" *Id.* Diemert also testified in his declaration that the trainers said, "racism is in white people's DNA" and that "white people are like the devil." Dkt. No. 69 ¶ 42. After the training, Diemert heard second-hand from his supervisor that his co-workers called him a "white supremacist" and "racist" in response to his comments during the training. *Id.*

In his declaration, Diemert testified that "[o]n multiple occasions between 2014 and 2020, [he] was forced to play 'privilege bingo' "—an activity in which all employees, notwithstanding their race, identified different "privileges" they may have, including height, religion, and gender. Dkt. Nos. 59 at 45–56; 69 ¶ 38. Diemert also attended meetings where "supervisors forced their employees to identify their race" and "rank themselves on a defined 'continuum of racism.' " Dkt. No. 69 ¶ 43.

## 2.2 The City's affinity groups.

 **\*3** During off-work hours or during work hours with special permission, City "employees meet regularly to organize affinity groups focused on forwarding the City of Seattle's [RSJI] efforts to eliminate racial disparities and achieve racial equity in Seattle." Dkt. No. 60 at 125. Affinity groups include racially aligned caucus groups. Dkt. No. 59 at 125. HSD delegates management of its caucuses to the HSD Change Team—a group of employees who act as RSJI leaders within each department. Dkt. No. 60 at 125. Employees seeking to establish a caucus or affinity group must submit a proposal to the HSD Change Team, which then reviews it to "ensure any new affinity group would support and advance the efforts of the City's [RSJI] and aid in eliminating racial disparities[.]" *Id.* All caucuses are open to any City employee regardless of racial identity. Dkt. No. 59 at 125.

Diemert expressed his opinion to his colleagues that all RSJI affinity groups are "blatantly racist." Dkt. Nos. 69 ¶ 51; 60 at 113. Around 2018, Diemert met with his union representative to discuss signing up for a "[Person of Color]-only training," stating that "the only way to end [segregation] and other discriminatory practices is to...stand up against it." Dkt. No. 59 at 94–95. Diemert compared his proposed attendance to "four black students [who] refused to leave the segregated lunch counter at Woolworth's." *Id.* The union representative told Diemert "they probably would not allow you to participate." *Id.* at 93–94. Based on this conversation, Diemert chose not to attend the training. *Id.* at 94.

On December 4, 2018, an HSD co-worker invited Diemert to attend a "monthly white caucus meeting[.]" Dkt. No. 59 at 248. Diemert asked to be removed from all future email invitations. *Id.* He also wrote, "I find your overt racism offensive and will file harassment charges with the [U.S. Equal Employment Opportunity Commission (EEOC)] if you continue." *Id.*

In July 2021, Diemert emailed Groce about his desire to create "a non-race-based group that advocates for western liberal values and rejects stereotyping people by race." Dkt. No. 60 at 127. Groce told Diemert that Diemert would need to submit a proposal to the HSD Change Team for approval and that Diemert was not "authorized to begin work on an affinity group." *Id.* at 125. Diemert decided not to submit a proposal because he thought it would have been "automatically denied" and that he would "incur additional racial harassment." Dkt. No. 69 ¶ 52.

**2.3 Alleged racial harassment and retaliation.**
According to Diemert, his colleagues subjected him to racial harassment from at least 2015 to 2021. In his declaration, he testified that it was a "daily occurrence" to hear "racially pejorative comment[s] against white people[.]" Dkt. No. 69 ¶ 22.

Diemert testified that in 2015, an HSD manager asked him, "What could you possibly offer our department..., being a straight white male[?]" [1] Dkt. No. 73-2 at 15.

Diemert testified that in 2016, he served in a so-called "lead' role" in HSD. Dkt. No. 69 ¶ 16. According to Diemert, in April 2017, his then-supervisor told him "that [he] should step down because [his] [Family and Medical Leave Act ("FMLA")] needs conflicted with 'business needs.' " *Id.* ¶ 17. Diemert says his supervisor also said that by remaining in his "lead" role, he was preventing a person of color from being promoted. *Id.* Diemert stepped down from this role. [2] *Id.*

**\*4** Diemert testified that in 2017 he participated in a lunchroom conversation in which his coworker stated, "white people are to be blamed for all atrocities" and "the United States was built upon a system of white supremacy." Dkt. No. 73-2 at 19. In his declaration, Diemert claims this same coworker "labeled [him] a 'racist' because [he] favored capitalism." Dkt. No. 69 ¶ 44. When Diemert objected, this coworker said Diemert's "words were violence" and an invasion of "her safe space." Dkt. Nos. 59 at 32–33; 69 ¶ 44.

Diemert testified that in 2019 and 2020 Lead Program Intake Specialist Shamsu Said, one of his supervisors, referred to him as a "colonist." Dkt, No. 69 ¶ 47. According to Diemert, Said also said that Diemert "was to blame for all injustices in the United States." *Id.*

In February 2020, Diemert alleges Said "physically accosted [him and] got in [his] face." [3] Dkt. No. 69 ¶ 47. On February 20, 2020, Diemert filed an ethics complaint with the Seattle Ethics and Elections Commission, claiming that Said pressured him to approve an application made by one of Said's family members who was ineligible for the utility discount program. Dkt. No. 60 ¶ 18. And when Diemert accused Said of fraud, Said claimed that Diemert made the accusation because of his "white privilege." Dkt. Nos. 69 ¶ 48; 73-2 at 28.

HR responded to Diemert's complaint about Said by moving their desks further apart and removing Said as Diemert's lead supervisor. Dkt. No. 59 at 165. Diemert testified that another supervisor, Chaney Kilpatrick-Goodwill, still required him to "report to [Said]." Dkt. Nos. 68-10 at 1; 69 ¶ 48. As proof, Diemert offers an email in which Kilpatrick-Goodwill told him to include Said on a leave request message. Dkt. Nos. 68-10 at 1 ("Remember to include [Said] on you [sic] emails."); 69 ¶ 48.

Diemert also testified that Kilpatrick-Goodwill retaliated against him after he complained about RSJI trainings. Specifically, Diemert testified that Kilpatrick-Goodwill refused to help him with a "technological" issue and cancelled all their meetings together. Dkt. No. 69 ¶ 49. Kilpatrick-Goodwill admitted that she cancelled meetings with Diemert, but she testified that she cancelled no more meetings with Diemert than with any other employee. Dkt. No. 59 at 339. And in his deposition, Diemert acknowledged that Kilpatrick-Goodwill elevated the technological issue to another colleague to assist him. Dkt. No. 59 at 69.

On December 23, 2020, Diemert filed an EEOC charge. Dkt. No. 69 ¶ 50. According to Diemert, Kilpatrick-Goodwill subjected him to scrutiny in January 2021 that "no similarly situated coworker experienced[,]" referring to an email Kilpatrick-Goodwill sent to Diemert and an administrative assistant asking about delays in processing applications assigned to Diemert. Dkt. Nos. 59 at 340; 68-12 at 2–3; 69 ¶ 50. Kilpatrick-Goodwill testified that she sent the email after Diemert complained about delays in receiving discount applications to process in his role as program intake representative, and she only wanted to investigate whether applications were in fact being delayed—she did not single him out as a punishment. Dkt. No. 59 at 343–344.

Diemert also asserts that he was racially harassed by HSD's Race and Social Justice Lead/Chief Equity Officer. Diemert

says the Chief Equity Officer shared an article regarding Critical Race Theory ("CRT") on the HSD SharePoint page, an internal website. Dkt. No. 69 ¶ 46. Diemert commented on the post, and the Chief Equity Officer sent Diemert a private email. *Id.* Diemert characterizes this email as a "further attack[ ]" *Id.* But he fails to point to any portion of the email that was racially abusive towards him. Indeed, in the email itself, the Chief Equity Officer wrote, "I get it—it can seem as it was a personal attack directed against all white people, but it is not. It is about accurately telling the stories [like the Tulsa Race Massacre] that have been buried for years." Dkt. No. 68-38 at 11.

**\*5** In 2021, Diemert's FMLA reduced-work schedule was set to expire, and he needed to renew his leave certification. Dkt. Nos. 60 ¶ 19; 68-15 (sealed exhibit) at 2. Diemert submitted new paperwork, but HR representative Tina Ng-Rudell denied his request because his medical certification was incomplete. Dkt. No. 68-15 at 2. Diemert kept working reduced hours nonetheless, and filed a complaint with the Department of Labor, which found that Diemert's request had been denied in error. *Id.* The City retroactively reclassified the leave and re-issued a written notice to Diemert approving his intermittent leave. Dkt. No. 60 ¶ 19.

Diemert began working fully remotely in April 2020. Dkt. No. 60 ¶ 22. In June 2021, the Governor's proclamation regarding high-risk employees (i.e., workers unable to return to the workplace with or without an accommodation because of the COVID-19 pandemic) expired. *Id.* Groce advised Diemert that permanent remote work would not be available to someone in his job category because of his in-office duties. *Id.* Before the City determined Diemert's eligibility to work remotely, perhaps as an accommodation, he resigned on September 7, 2021. *Id.*

## 2.4 The City's investigation into Diemert's complaints.

In response to Diemert's December 23, 2020, EEOC charge, the City's HR Investigation Unit opened an investigation into his discrimination claims. Dkt. No. 60 ¶ 16. The Unit assigned Brandon Kuykendall and Christy Kuna to handle the investigation. *Id.* ¶¶ 16–17. Kuykendall investigated Diemert's claims of racial harassment, while Kuna investigated whether the RSJI trainings were discriminatory. Dkt. No. 59 at 294. They bifurcated the investigation after Diemert expressed concerns that Kuykendall would be biased if investigating RSJI trainings given that Kuykendall had worked at the Office of Civil Rights and staff there had provided some of the

trainings. *Id.* at 295. Diemert concedes that he purposefully "did not give the City much" for their investigation because he perceived the investigators to be biased. Dkt. No. 59 at 108. Ultimately, neither Kuykendall's nor Kuna's investigation found that Diemert had faced unlawful harassment. Dkt. No. 60 at 135, 140.

## 3. DISCUSSION

### 3.1 Legal standard.

"[S]ummary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.,* 979 F.3d 639, 643 (9th Cir. 2020) (citation omitted). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When considering a summary judgment motion, courts must view the evidence "in the light most favorable to the non-moving party." *Barnes v. Chase Home Fin., LLC,* 934 F.3d 901, 906 (9th Cir. 2019) (internal citation omitted).

In an employment discrimination case, the plaintiff "need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.' " *Chuang v. Univ. of Cal. Davis, Bd. of Trustees,* 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v. Columbia Mach., Inc.,* 80 F.3d 1406, 1410 (9th Cir.1996)).

But even in employment discrimination cases, summary judgment must be granted when there is a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The nonmoving party may not rely on the mere allegations in the pleadings to show a "genuine issue for trial," but must instead "set forth specific facts[.]" *Porter v. Cal. Dep't of Corr.,* 419 F.3d 885, 891 (9th Cir.2005) (quoting *Liberty Lobby,* 477 U.S. at 256). This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (footnote omitted). Thus, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a

JOSHUA A. DIEMERT, Plaintiff, v. CITY OF SEATTLE, Defendant., Slip Copy (2025)
Case 2:23-cv-02281-WB    Document 58    Filed 02/20/25    Page 10 of 21

2025 WL 446753

verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

**3.2 The City's motion to strike.**

**\*6** As a threshold issue, the City moves to strike several of Diemert's exhibits as unauthenticated and inadmissible hearsay. Diemert didn't respond to the motion to strike or file a surreply. *See* LCR 7(g). The admissibility of evidence at the summary judgment stage is governed by the rules of admissibility at trial. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").

Under Rule of Evidence 901, authentication of an exhibit is a condition precedent to admissibility and is satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Unauthenticated documents should not be considered on a motion for summary judgment. *Orr*, 285 F.3d at 773.

"[H]earsay evidence in Rule 56 affidavits is entitled to no weight." *Scosche Indus., Inc. v. Visor Gear Inc.*, 121 F.3d 675, 681 (9th Cir. 1997) (internal quotes and brackets omitted). Hearsay is any out-of-court statement offered into evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Whether courts can consider proffered evidence depends on the purpose for which it is offered. For example, an out-of-court statement can be used to show an employer's stated rationale is pretext. *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001) (The out-of-court statement was a threat by the plaintiff's supervisor and the "threat alone tends to show that [the supervisor's] claimed rationale for denying [the plaintiff] the promotion was a pretext for retaliation.").

First, the City moves to strike Exhibit 6 of the D'Agostino declaration. Dkt. No. 81 at 9. The D'Agostino declaration identifies Exhibit 6 as "a true and correct copy of the types of materials regularly disseminated within the workplace." Dkt. No. 68 ¶ 7. The format of the "materials" in Exhibit 6 varies from printed text to pictures of whiteboards and flipboards with handwritten text. The materials are mostly undated, and all are unsigned. Moreover, on the face of the materials, there is no reference to the RSJI or HSD. Diemert's opposition brief does not cite Exhibit 6, and he provides no other information about it in his declaration. Thus, Diemert has provided the Court no evidence from which to conclude that the materials are what he claims them to be. And with no further foundation

or context, the Court cannot say that the contents of Exhibit 6 would be admissible regardless of the form presented here. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."). Accordingly, the Court agrees that Exhibit 6 is not properly authenticated and thus STRIKES it, Dkt. No. 68-5 at 1–26; *see Orr*, 285 F.3d at 773 ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment.").

Next, the City moves to strike Exhibits 19, 20, 21, 22, and 34 of the D'Agostino declaration as hearsay. Dkt. No. 81 at 9–10. Exhibits 19, 20, and 21 are emails sent by City employees in various contexts. Dkt. No. 68 ¶¶ 20–22. Diemert does not cite Exhibits 19, 20, or 21 in his opposition brief, and he offers no evidence or explanation to show that these out-of-court statements are not hearsay or that they fall within some hearsay exception. *See generally* Dkt. No. 74-1. But emails are often admissible under the business records hearsay exception. *See Monotype Corp. PLC v. Int'l Typeface Corp.*, 43 F.3d 443, 451–451 (9th Cir.1994); Fed. R. Civ. P. 803(6). And statements by opposing parties, if made in certain contexts, are also admissible as substantive evidence. Fed. R. Civ. P. 801(d)(2). The Court finds that while Diemert has presented these exhibits perhaps in an inadmissible form, the exhibits and the underlying information contained within them could be presented in an admissible form at trial, such as live testimony. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony."). As a result, the Court DENIES the City's motion to strike Exhibits 19, 20, and 21.

**\*7** As for Exhibit 22, the D'Agostino declaration identifies it as "a true and accurate copy of Terry McLellan's October 26, 2018, memorandum in which she provides demographic data to different caucuses to show that fewer white people are being employed across different occupations in the City." Dkt. No. 68 ¶ 23. The City argues the memo is inadmissible hearsay, but the City does not challenge its authenticity or that it is anything other than what Diemert purports it to be. *See* Dkt. No. 81 at 9–10. Diemert does not cite this document in his opposition brief, so its relevance is unclear. *See generally* Dkt. No. 74-1. But assuming for argument's sake that it possesses some relevance, the Exhibit may be admissible as a business record since it was prepared by the City's HR

Director, Terry McLellan, following her investigation into complaints about "ADS Hiring Practices." Fed. R. Evid. 803(6); Dkt. No. 68-21 at 2. Accordingly, the Court DENIES the City's motion to strike Exhibit 22.

Exhibit 34 is less clear-cut. Exhibit 34 includes a declaration by former HSD employee Jennifer Yost and an email that she sent resigning her position in 2018. Dkt. No. 68-32. The City asks the Court to strike it in its entirety as hearsay without identifying any inadmissible portions, which leaves the Court in the untenable position of having to crawl through the entire document searching for objectionable content. Dkt. No. 81 at 9–10; see Cherewick v. State Farm Fire & Cas., 578 F. Supp. 3d 1136, 1157 (S.D. Cal. 2022) ("[W]here a defendant only generally objects to a document by arguing that it contains hearsay, the Court is not required to comb through these documents, identify potential hearsay, and determine if an exception applies—all without guidance from the parties." (internal quotation marks omitted)).

Diemert cites two sections of Yost's declaration in his opposition brief: a paragraph discussing a time between 2017 and 2018 when Yost overhead a fellow employee call another employee a "stupid white bitch"; and a paragraph in which Yost claimed the Undoing Institutional Racism trainings between 2017-2018 "openly discriminated against white employees by utilizing degrading stereotypes and emphasizing that white employees will always be inherently racist no matter their intentions or actions." Dkt. No. 74-1 at 3–4, 13, 21.

Yost may attest to matters about which she has personal knowledge, but her declaration may not be used as a vehicle for inadmissible hearsay. The Court will consider those portions of Yost's declaration recounting events she experienced first-hand, and it will disregard the many instances of double-hearsay and other inadmissible statements found in her declaration. See Fed. R. Civ. P. 56(c)(4). Striking her declaration entirely, however, is unwarranted. Accordingly, the Court DENIES the City's motion to strike Exhibit 34.

Finally, the City moves to strike Exhibit 36 to the D'Agostino declaration, arguing the documents "purporting to be 'complaints of discrimination occurring within HSD'...are not authenticated and are also offered for the truth of the matter asserted." Dkt. No. 81 at 10; see Dkt. No. 72 (sealed). Diemert cites Exhibit 36 to support his argument that "[t]he factual record is clear—the Human Services Department was

replete with complaints of discrimination, employees being denied access to trainings because of their race, and racially discriminatory conduct abounding throughout the entirety of [Diemert's] employment." Dkt. No. 74-1 at 8.

Exhibit 36 comprises discrimination complaints and interview summaries from various employees from 2018 and 2019. The statements are unsworn and it is unclear sometimes who purportedly prepared them, yet Diemert offers them for the truth of the matter asserted to prove "racially discriminatory conduct abounding" in HSD. Thus, the statements are hearsay and do not readily fall within a hearsay exception. The Court will consider Exhibit 36 insofar as it shows that discrimination complaints were filed, but it does not rely on it otherwise in resolving the pending motion. The Court DENIES the City's motion to strike Exhibit 36.

### 3.3 The City is entitled to summary judgment on Diemert's claim for a hostile-work environment based on race.

**\*8** Title VII of the 1964 Civil Rights Act and the Washington Law Against Discrimination (WLAD) prohibit discrimination on the basis of race, including racially hostile-work environments. The law places "racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites[.]" McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279, (1976) (Marshall, J.).

To succeed on a hostile-work-environment claim, the plaintiff must show (1) that he was "subjected to verbal or physical conduct because of [his] race," (2) that the conduct was "unwelcome," and (3) that "the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." Manatt v. Bank of Am., NA, 339 F.3d 792, 798 (9th Cir. 2003) (internal quotation marks omitted). "'The working environment must both subjectively and objectively be perceived as abusive.' " Id. at 800 n.6 (quoting Brooks v. City of San Mateo, 229 F.3d 917, 923 (9th Cir. 2000)). The WLAD's formula for a hostile-work environment claim is largely the same as Title VII's. Glasgow v. Georgia-Pacific Corp., 693 P.2d 708, 712 (Wash. 1985); see Sangster v. Albertson's, Inc., 991 P.2d 674, 679 (Wash. Ct. App. 2000) ("The Glasgow formulation of the elements of sexual harassment is taken from federal cases interpreting Title VII."); Fisher v. Tacoma Sch. Dist. No. 10, 769 P.2d 318, 320 (Wash. Ct. App. 1989) (holding the hostile-work environment standard in Glasgow applied to race-based hostile work environment claims).

Under both Title VII and the WLAD, courts must consider all the circumstances in determining whether an environment is sufficiently hostile to violate the law, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 687 (9th Cir. 2017); *Blackburn v. State of Wash. Dep't of Soc. & Health Servs. & W. State Hosp.*, 375 P.3d 1076, 1082 n.4 (Wash. 2016). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005); *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000). To prevail on a hostile-work-environment claim, the plaintiff must show that the workplace was so "permeated with discriminatory intimidation, ridicule, and insult … that [it] was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).

Diemert alleges that he faced "severe racial harassment" through (1) the RSJI training materials and messaging, and (2) various comments made by his co-workers during and outside the RSJI training events. The Court analyzes each claim in turn.

### 3.3.1 The RSJI trainings were neither per se discriminatory nor harassing in effect on Diemert.

Diemert argues that the "City's [RSJI] … la[id] the foundation for all the racial harassment...[he] would face." Dkt. No. 74-1 at 3. It's clear that Diemert found RSJI messaging incorrect and offensive: he testified that he believes white privilege does not exist and is an "incorrect stereotype"; that it is offensive to state that the United States was built on a system of white supremacy; and that it is offensive to state that it is not appropriate to be color-blind when it comes to race. *See* Dkt. Nos. 59 at 20, 30, 38. But the Court rejects the notion that the RSJI and programs like it are inherently racist, as Diemert suggests.

**\*9** The claim that efforts to address racism in the workplace—such as D.E.I. initiatives—are themselves racist presents a striking paradox. According to their proponents, these programs aim to promote fairness and inclusion by acknowledging and addressing racial disparities—they are designed to ensure that all individuals have access to

opportunities. Critics, however, argue that explicitly focusing on race or addressing racial inequalities perpetuates division and unfairness. For them, the cure is worse than the disease. The tension between these views underscores the complexity employers face when talking about race and equity.

While such conversations may prompt discomfort or spark debate, they do not necessarily violate anti-discrimination laws. Multiple courts in recent years have reached the same conclusion. *See, e.g.*, *Norgren v. Minnesota Dep't of Hum. Servs.*, No. CV 22-489 ADM/TNL, 2023 WL 35903, at *4 (D. Minn. Jan. 4, 2023), *aff'd*, 96 F.4th 1048 (8th Cir. 2024) ("Requiring all employees to undergo diversity training does not amount to abusive working conditions, and does not plausibly show that [the employer] imposed across-the-board training with the intention of forcing [the plaintiff] to quit."); *Young v. Colo. Dep't of Corr.*, No. 22-CV-00145-NYW-KLM, 2023 WL 1437894, at *7 (D. Colo. Feb. 1, 2023), *aff'd*, 94 F.4th 1242 (10th Cir. 2024) (finding plaintiff's claims "that the [employer's] mandatory trainings 'created a racially hostile environment,'...[were] unaccompanied by supporting factual allegations[,]" where the employee failed to refer to specific materials beyond alleging that the trainings "were based upon a glossary of terms stating that all whites are racist, that white individuals created the concept of race in order to justify the oppression of people of color, and that 'whiteness' and 'white supremacy' affect all 'people of color within a U.S. context.' "); *De Piero v. Pennsylvania State Univ.*, 711 F. Supp. 3d 410, 424 (E.D. Pa. 2024) ("To be clear, discussing in an educational environment the influence of racism on our society does not necessarily violate federal law," noting that discussing and providing trainings on "implicit bias," particularly "in the aftermath of very real instances of racialized violence like the murder of George Floyd[,] does not violate Title VII[.]").

Quite the opposite, many courts have held that anti-discrimination trainings play a vital role in preventing workplace discrimination. The Supreme Court has held that Title VII's "primary objective was a prophylactic one." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 317 (2023) (Kavanaugh, J., concurring) ("Federal and state civil rights laws serve to deter and provide remedies for current acts of racial discrimination."); *Faragher v. City of Boca Raton*, 524 U.S. 775, 805–06 (1998) (holding that Title VII's primary goal "is not to provide redress but to avoid harm"); *Christian v. Umpqua Bank*, 984 F.3d 801, 814 (9th Cir. 2020) ("The

purpose of Title VII is…through law to liberate the workplace from the demeaning influence of discrimination, and…to implement the goals of human dignity and economic equality in employment."). Trainings, courts have recognized, further Title VII's primary goal. *See, e.g., Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1177 (9th Cir. 2023) (finding an employer exercised reasonable care in light of its anti-harassment policy and employee trainings); *Erickson v. Wisc. Dep't of Corrs.*, 469 F.3d 600, 605–06 (7th Cir. 2006) (noting that employers should prevent harassment with "proactive steps such as … training employees"); *see also* Chai R. Feldblum & Victoria A. Lipnic, EEOC, *Select Task Force on the Study of Harassment in the Workplace*, at 44–54 (June 2016) (finding that regular trainings have proven effective in preventing and addressing harassment) (available at https://www.eeoc.gov/select-task-force-study-harassment-workplace#_ftnref170). Indeed, in line with Title VII's "basic policies of encouraging forethought by employers," the Supreme Court crafted the *Faragher-Ellerth* affirmative defense, allowing employers to avoid liability for supervisory harassment by taking a proactive approach to harassment prevention, including by training employees. *Faragher*, 524 U.S. at 807; *Burlington Ind. Inc., v. Ellerth*, 524 U.S. 742, 764–65 (1998); *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 877 (9th Cir. 2001) (finding defendant exercised reasonable care to prevent sexual harassment in its workplace by maintaining an anti-harassment policy and a "company-wide [anti-harassment] training program.").

**\*10** These training programs are needed because racial discrimination and inequality are present-day problems, not problems of the distant past. *See SFFA*, 600 U.S. at 317 (Kavanaugh, J., concurring) ("[R]acial discrimination still occurs and the effects of past racial discrimination still persist."); *Id.* at 393 (Jackson, J. dissenting) ("The race-based gaps that first developed centuries ago are echoes from the past that still exist today."). Against this backdrop, the real threat to equality in the workplace is not the effort to expose and address racial inequalities, but a resistance to doing so.

Because the Court finds that D.E.I. and anti-discrimination trainings are not per se unlawful, Diemert's belief that such trainings constitute an illegal employment practice is viable only if he shows that the RSJI trainings—in content, implementation, or context—harassed him personally on account of his race. Diemert makes sweeping allegations about the effect of the RSJI, but as explained below, he is short on details about how it transformed his workplace into a racially hostile environment for him and other white people.

For instance, Diemert argues, "[t]he City designed the RSJI as a policy and system that would 'lead with race,' 'center People of Color,' 'de-center whiteness,' and 'prioritize the leadership of Black, Indigenous, and People of Color.' " Dkt. No. 67 at 11. He takes issue with a definition of "white supremacy" culture provided in RSJI materials, which states among other things that "[t]he culture of white supremacy perpetuates the belief and legitimizes the practice of treating people of color as inferior and white people as superior." Dkt. No. 68-14 at 2. He argues that he was not the only white employee who found the RSJI trainings to be "divisive" to the extent they "focus on our differences vs. on our similarities[.]" Dkt. No. 68-18 at 2; *see* Dkt. No. 86 ¶ 20. Beyond these general critiques, he provides no other details about the *content* of the RSJI trainings. (The Court addresses comments made during the trainings below in Section 3.3.2.)

RSJI trainings no doubt contained statements about race. But exposure to material that discusses race does not by itself create an unlawful hostile-work environment. "Training on concepts such as 'white privilege,' 'white fragility,' implicit bias, or critical race theory can contribute positively to nuanced, important conversations about how to form a healthy and inclusive working environment." *De Piero*, 711 F. Supp. 3d at 424. But Diemert equates acknowledgement of institutionalized racism and implicit bias—concepts recognized by many courts [4] — with personal attacks. Not so. Passive exposure to these concepts cannot reasonably be construed as a threat to Diemert's safety or well-being or an impediment to his job. Put differently, these trainings in no way interfered with the terms and conditions of Diemert's employment. Comparing diversity trainings that use terms like " 'racial bias,' 'white man's privilege,' and 'white man's guilt,' and address topics such as systemic racism, oppression, and intersectionality…to true hostile work environments…trivializes the freedom protected by [antidiscrimination laws]." *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1171 (N.D. Fla. 2022), *aff'd sub nom. Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) (citations and internal quotations omitted).

**\*11** On this record, a reasonable juror could not find that the RSJI created an objectively hostile-work environment. Whether comments made by Diemert's co-workers and supervisors created an actionable hostile-work environment is a different inquiry that the Court explores below.

### 3.3.2 Diemert has not set forth facts from which a jury could find severe or pervasive racial hostility.

Diemert alleges that comments made by his co-workers during the RSJI trainings and at other times subjected him to a hostile-work environment. Diemert points to a collection of statements over the years:

• HSD employees expressed their opinion that white people do not experience racism. Dkt. Nos. 68-33 at 4; 69 ¶¶ 27, 32.

• During a training in 2019, an RSJI trainer stated, "the real truth is that all white people are cannibals[,]" "racism is in white people's DNA[,]" and "white people are like the devil." Dkt. Nos. 69 ¶ 42; 73-2 at 20.

• Co-workers "attacked" him about a comment he made in response to a post about CRT on the HSD SharePoint page. Dkt. Nos. 68-38 at 11; 69 ¶ 46.

• In 2019 and 2020, Said referred to Diemert as a "colonist" and claimed he was to "blame for all injustices in the United States." Dkt, No. 69 ¶ 47.

• In February 2020, Said "physically accosted [Diemert and] got in [his] face," and Said accused Diemert of reporting him for fraud because of "white privilege." Dkt. Nos. 60 ¶ 18; 69 ¶ 47.

Whether this conduct amounts to severe or pervasive racial harassment from which a reasonable juror could conclude Diemert's work environment was objectively hostile depends on the circumstances. *Okonowsky v. Garland*, 109 F.4th 1166, 1179 (9th Cir. 2024) ("In analyzing the objective hostility of a working environment, we must look to the totality of the circumstances surrounding the plaintiff's claim."). This is because " '[n]ot every insult or harassing comment will constitute a hostile work environment.' " *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 648 (9th Cir. 2021) (quoting *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000). " " [S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' will not trigger Title VII's protections." *Okonowsky*, 109 F.4th at 1179 (quoting *Faragher*, 524 U.S. at 778). "The standard for judging hostility is meant to 'ensure that Title VII does not become a 'general civility code.' " *Fried*, 18 F.4th at 648 (quoting *Faragher*, 524 U.S. at 788). And "properly applied, this standard 'will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language,

gender-related jokes, and occasional teasing.' " *Id.* (quoting *Faragher*, 524 U.S. at 788).

Diemert's allegations fall short of the mark. The Ninth Circuit has deemed much harsher comments and conduct *not enough* to create a hostile-work environment. *See e.g.*, *id.* (no hostile-work environment when employer told male plaintiff that he was "in a female job related environment," suggested plaintiff should "look for other employment in cooking in the future," and told plaintiff he "might want to do something with cooking for work."); *Henry v. Regents of the Univ. of Cal.*, 644 F. App'x 787, 788–89 (9th Cir. 2016) (no hostile-work environment when "noose incident" was deemed an "isolated incident[ ]" and when plaintiff failed to show "racial motive behind the noose...or that the noose was directed at him personally."); *Harris v. Sutton Motor Sales & RV Consignments Corp.*, 406 F. App'x 181, 182–83 (9th Cir. 2010) (no hostile-work environment when plaintiff was called a "nigger" two or three times in the same year); *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 638 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (no hostile-work environment when plaintiff was accused of having a "typical Hispanic macho attitude" and told he should take a job in the field because "Hispanics do good in the field."); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 795 (9th Cir. 2003) (no hostile-work environment when Asian plaintiff overheard her coworkers laughing and saying "China Man," pulling "their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians," and referring to plaintiff as "China woman."); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1107 (9th Cir. 2000) (no hostile-work environment when a supervisor called female employees "bitches," "castrating bitches," "Madonnas," "histrionics," and "Regina" in the plaintiff's presence.); *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1031–36 (9th Cir. 1990) (no hostile-work environment when employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino). The objective severity of the comments alleged by Diemert pales in comparison to that of the statements and conduct in these cases.

**\*12** The context in which statements are made also matters. At least some of the comments that Diemert takes issue with were made during RSJI trainings. Racially charged comments made in this setting, while still potentially harmful, are better framed as attempts to express perspectives or

JOSHUA A. DIEMERT, Plaintiff, v. CITY OF SEATTLE, Defendant., Slip Copy (2025)
Case 2:23-cv-02281-WB    Document 58    Filed 02/20/25    Page 15 of 21

2025 WL 446753

challenge ideas within the training's scope. Such comments made in the presence of a skilled facilitator can be addressed constructively, turning the moment into a learning opportunity, not a personal attack. This is very different than comments made, for example, on a production room floor that serve no educational purpose.

Even viewed cumulatively, comments about Diemert being a "colonist" or "white people being cannibals" were too infrequent to surpass the type of "joking or teasing [the Ninth Circuit] [has] held to be part of the ordinary tribulations of the workplace." *See Fried*, 18 F.4th at 649 (citing *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010)).

When it comes to Diemert's claim that he was attacked online by his co-workers, it is clear that Diemert instigated the dynamic that unfolded. In response to an article posted to the City's internal SharePoint page about the Tulsa Massacre of 1921,[5] Diemert responded in a post visible to all:

> In the case of slavery or the Tulsa Massacre, we should not stereotype the blame on white people because not all white people were party to or support the institutions behind the horrific events. … Over 600,000 Americans died so that African Americas could be free. Saying it was "white people who enslaved black people" is very bigoted because it makes no sense to use skin color as the quantifier [sic] since most of both groups in the war were white. Also, in the atrocious Tulsa Massacre, the Tulsa County Democratic Party admitted what we know from history, that their party members were responsible for the act. In 1921, the Klu Klux Klan in Tulsa County was led by Democrats. How about we stop racially stereotyping each other and stop racially scapegoating people as if their skin color makes them a representative of any race or represented by any race?

Dkt. No. 59 at 261. In response, one of Diemert's co-workers posted an excerpt from Octavia Butler's novel *The Parable of the Talents*. *Id.* at 262. Diemert's rejoinder was to call her a "bigot[ ]," and to offer the following non-apology: "I am sorry if my rejection of racial stereotypes upsets you. I am against people attempting to racially scapegoat others because of their skin color which is why I stand against CRT." *Id.* at 263. Another co-worker emailed Diemert directly to address historical inaccuracies in his post, but in a long response, Diemert told him to "leave your political disinformation out of the story because your public support of racism does not belong in the workplace no matter how you dress it up."

*Id.* at 278–79. Contrary to Diemert's claim, his co-worker's email cannot reasonably and objectively be construed as an "attack." More than anything, these exchanges show that Diemert gave as good as he got, and that far from being unwelcome interactions, Diemert relished the opportunity to express a contrarian view. *See Vasquez*, 349 F.3d at 642 (to find a racially hostile-work environment, the conduct must be "unwelcome").

**\*13** Not surprisingly, others outside HSD heard about this incident. Diemert points to an email exchange between two City employees unfolding that same day in which one called Diemert an "asshole," among other disparaging remarks. Dkt. Nos. 68 ¶ 42; 68-39 at 1–22. Diemert says that the exchange is proof of a racially hostile-work environment, but the Court disagrees. The two email participants were clearly vexed by Diemert's conduct, not his race—indeed, they made no statements that can reasonably be construed as showing racial animus. In any event, Diemert never suggests he was aware of this email thread before this litigation, and he does not allege that these two employees harassed him—in fact, there's no indication in the record that Diemert ever interacted with them personally. To be sure, an employee need not be present when abusive comments are made to find a hostile-work environment, but they must know about the harassing conduct in some way to be impacted by it. *Cf. Carter v. Chrysler Corp.*, 173 F.3d 693, 701 n.7 (8th Cir. 1999) (employee knew of offensive graffiti about her "only through hearsay, but there is no dispute that she heard about its existence during the time in which she experienced harassment...thus [it is] relevant on whether a hostile environment existed.").

This cyber conduct stands in stark contrast to the harassing conduct found in other cases. For example, in *Okonowsky v. Garland*, the plaintiff alleged that her co-worker's online posts about her created a sexually hostile-work environment, and the district court granted summary judgment for the defendant. 109 F.4th at 1173. In reversing the district court, the Ninth Circuit found among other things that online posts by her co-worker about " ' gang banging' her; … describ[ing] her in vulgar sexual terms; … humiliat[ing] and intimidat[ing] her for reporting his conduct to management; and … call[ing] for his 'soldiers' to rally in support of him after [the plaintiff] complained to management" raised a genuine dispute about a hostile-work environment and precluded summary judgment. *Id.* at 1183–84. The conduct Diemert alleges is far from this.

Diemert's claims about a confrontation with Said are more compelling, but fare no better. In his declaration, Diemert

testified that one time, "[Said] physically accosted me, got in my face, said I had 'white privilege' and proceeded to say that me and 'my race' were to blame for the atrocities in the world like slavery and segregation." Dkt. No. 69 ¶ 47. In a contemporaneously drafted email, however, Diemert described the interaction in starkly different terms—he made no mention of race and did not allege that Said acted in a physically threatening manner. Dkt. No. 68-9 at 2. Diemert admitted in the email that the tone of his discussion with Said was "not normal office etiquette talking and had elevated to confrontational tones from both of us at this point." *Id.* But most importantly, it is clear from Diemert's email that his dispute with Said stemmed from Diemert reporting Said for having family members on the Utility Discount Program, not anything owing to racial animus. *Id.* No juror could overlook the inconsistencies between Diemert's declaration and the email *he drafted the same day* as his interaction with Said, and Diemert has failed to explain what prompted his new account of the underlying events. Thus, his declaration alone is not enough to create a question of fact on this score. *See Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 498 (9th Cir. 2015) (explaining when a "self-serving" and "uncorroborated" affidavit creates a genuine dispute of material fact); *Yeager v. Bowlin,* 693 F.3d 1076, 1080 (9th Cir. 2012) (explaining when inconsistencies in the record can prevent a declaration from creating an issue of fact); *see also Oravec v. Sunny Isles Luxury Ventures,* 469 F. Supp. 2d 1148, 1178 (S.D. Fla. 2006) (self-serving declaration inconsistent with contemporaneous letter indicating an intention to abandon copyright protection could not defeat a properly supported summary judgment motion).

### 3.4 Diemert's claims for disparate treatment and retaliation cannot survive summary judgment.

The *McDonnell Douglas* analytical framework applies in disparate treatment cases. Under this test, the plaintiff must allege "(1) [they] belon[g] to a protected class, (2) [they were] performing according to [their] employer's legitimate expectations, (3) [they] suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." [6] *Reynaga,* 847 F.3d at 690–91; *see Cornwell v. Microsoft Corp.,* 430 P.3d 229, 234 (Wash. 2018) ("When evaluating the merits of cases brought under WLAD, we employ the *McDonnell Douglas* [framework]."). If this test is met, the burden shifts to the defendant to "provide a legitimate, non-discriminatory reason for the

adverse employment action." *Reynaga,* 847 F.3d at 691. "If the defendant meets this burden, then the plaintiff 'must then raise a triable issue of material fact as to whether the defendant's proffered reasons are mere pretext for unlawful discrimination.' " *Id.* (quoting *Hawn v. Exec. Jet Mgmt., Inc.,* 615 F.3d 1151, 1155 (9th Cir. 2010)).

**\*14** "[I]t is unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' " *Muldrow v. City of St. Louis, Missouri,* 601 U.S. 346, 354 (2024) (quoting 42 U.S.C. § 2000e–2(a)(1)). In other words, a plaintiff must show "some 'disadvantageous' change in an employment term or condition" to make out a prima facie case of discrimination— the harm incurred need not be "significant." *Id.* at 354–55.

The standard for Diemert's retaliation claim is similar—he must show (1) he participated in a protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the employer's adverse action. *Nilsson v. City of Mesa,* 503 F.3d 947, 954 (9th Cir. 2007) (Title VII); *Tyner v. State,* 154 P.3d 920, 928 (2007) (WLAD). A retaliation claim "need not be supported by an adverse action that materially altered the terms or conditions of the plaintiff's employment"; instead, a plaintiff must allege that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Campbell v. Hawaii Dep't of Educ.,* 892 F.3d 1005, 1021 (9th Cir. 2018).

The events Diemert posits as adverse actions fail under both standards. Diemert argues he experienced three adverse actions: (1) the City treated Diemert's discrimination complaints "unfavorabl[y]" in comparison to its treatment of the Chief Equity Officer's complaint and their fraud investigation into Said; (2) the City denied his FMLA rights; and (3) Kilpatrick-Goodwill "scrutinized...Diemert's work more than his colleagues," denied him software assistance, and cancelled her meetings with him. Dkt. No. 67 at 16–19.

Diemert's first argument about the City's allegedly inadequate investigations into his complaints is incoherent. Diemert argues the City failed to conduct an independent investigation when he filed his complaint, but it's not clear what "complaint" he is referring to and what action he wishes the

JOSHUA A. DIEMERT, Plaintiff, v. CITY OF SEATTLE, Defendant., Slip Copy (2025)
Case 2:23-cv-02281-WB    Document 58    Filed 02/20/25    Page 17 of 21

2025 WL 446753

City had taken. And if he is referring to the City's investigation following his EEOC charge, his point is undercut by the fact that he refused to help the City's investigators. *See* Dkt. No. 59 at 108.

As for the second claimed adverse action, it appears the City did mischaracterize Diemert's reduced work schedule, but Diemert continued to take FMLA leave uninterrupted and did not face repercussions for doing so. Even if the Court considered this error as rising to the level of an adverse action, Diemert fails to show that the City's explanation is pretextual. *See Reynaga*, 847 F.3d at 691. Diemert provides no evidence, direct or circumstantial, raising a genuine question about a discriminatory motive on the part of the HR representative who denied his FMLA designation. So there is no causal link between the action and the protected activity. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362–63 (2013) (rejecting motivating factor test in retaliation claim; holding "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer").

Next, Diemert's own testimony contradicts his allegations against Kilpatrick-Goodwill. During his deposition, he admitted he knew nothing about whether Kilpatrick-Goodwill cancelled more meetings with him than with his co-workers, and Kilpatrick-Goodwill denied doing so in her deposition. Diemert also acknowledged that he could not recall whether Kilpatrick-Goodwill elevated the technological issue he complained about, even though he accused her of doing so in his declaration. These are not minor contradictions, as the differences between Diemert's declaration and his previous sworn testimony are clear and unambiguous. Thus, the Court finds that Diemert's declaration is not enough to create a question of fact on this issue.

**\*15** Finally, to support his claim that Kilpatrick-Goodwill subjected him to more harsh scrutiny at work, Diemert points to an email in which Kilpatrick-Goodwill asked about delays in Diemert's processing of Utility Discount Program applications. But this occurred after Diemert raised the subject of such delays to Kilpatrick-Goodwill. Accordingly, Kilpatrick-Goodwill's inquiry cannot reasonably be viewed as punishment. Even if Kilpatrick-Goodwill had "[y]ell[ed] at or otherwise us[ed] a harsh tone" towards Diemert, courts have found this insufficient to find an adverse employment action in a discrimination claim. *Hubbard v. Del Toro*, No. 3:22-CV-05357-TMC, 2024 WL 3358742, at \*7 (W.D. Wash.

July 10, 2024) (quoting *Peña v. Clark Cnty.*, No. 21-5411-DGE, 2023 WL 3160157, at \*11 (W.D. Wash. Apr. 28, 2023)).

Because Diemert has not shown a question of fact about an adverse employment action—let alone one causally linked to protected activity—his discrimination and retaliation claims cannot survive summary judgment. **3.5 Diemert's other allegations are untimely.**

To bring a claim under Title VII, a Washington employee must file a charge with the EEOC within 300 days of the alleged wrongful conduct. 42 U.S.C. § 2000e-5(e)(1). The statute of limitations under WLAD is three years. *Antonius v. King Cnty.*, 103 P.3d 729, 732 (Wash. 2004) (citing RCW 4.16.080(2)). For discrete acts— acts that " 'occurred' on the day that it 'happened' "—the statute of limitations begins to run from the date of the alleged wrongful act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002); *Antonius*, 103 P.3d at 733.

The Court has already ruled that because "Diemert filed his complaint on November 16, 2022,...the oldest discrete act his WLAD claims could reach would have occurred on or after November 16, 2019." Dkt. No. 28 at 13. And "because Diemert filed his initial EEOC charge on December 23, 2020, only unlawful acts occurring on or after February 2020, are timely under Title VII unless they are premised upon an ongoing hostile-work environment." *Id.* The Court left open, however, the prospect of a hostile-work environment claim that could reach past these limits if it was based on a continuing violation.

Hostile-work environment claims "are different in kind from discrete acts," as "[t]heir very nature involves repeated conduct" that "occurs over a series of days or perhaps years" and "are based on the cumulative effect of individual acts"; "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' " *Morgan*, 536 U.S. at 115, 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). Thus, hostile work environment claims can encompass a "continuing violation" if "the plaintiff can establish that at least one act contributing to the claim occurred during the charge-filing period[.]" B. Lindemann & P. Grossman, Employment Discrimination Law § 27.II.B.3.b. (6th ed. 2020); *see Morgan*, 536 U.S. at 118–120; *Antonius*, 103 P.3d at 736–737. That said, the acts must have "some relationship to each other to constitute part of the same hostile work environment claim[.]" *Morgan*, 536 U.S. at 118.

Now, considering Diemert's claims with a complete record, the Court also dismisses his hostile-work environment claims under Title VII and WLAD to the extent they are based on conduct occurring before November 16, 2019.[7] The harassing comments Diemert reports in 2015, 2016, and 2017 all involve different people than his allegations in 2019 and thereafter, and there are no connecting elements spanning the intervening years. Diemert claims the RSJI provides a throughline, but this is not supported by the record—the isolated comments from 2015, 2016, and 2017 did not occur during RSJI trainings and reflect the views of the individual speakers. *See McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1113 (9th Cir. 2004) ("Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII.").

**\*16** Diemert also tries to connect these isolated incidents from years past by claiming that it was a "daily occurrence" to hear "racially pejorative comment[s] against white people." But this is a conclusory statement, devoid of any details, as Diemert fails to specify what was said to him, by whom, or when. Diemert's only evidence to support these claims is his own declaration. The Court does not disregard his testimony as "self-serving" or as concocted, but it does require more specificity from Diemert to find a genuine issue of material fact able to save his otherwise untimely claims from summary judgment. *See United States v. Shumway,* 199 F.3d 1093, 1104 (9th Cir. 1999) ("That an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact. If the affidavit stated only conclusions, and not 'such facts as would be admissible in evidence,' then it would be too conclusory to be cognizable[.]"). Simply lumping unnamed actors together to make generalized allegations against the City will not suffice. *See Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir. 1988) (generalized or conclusory allegations will not suffice to prevent summary judgment).

At bottom, a hostile-work environment claim needs more than scattered offensive comments by unnamed actors over the years. It requires a real pattern or severe conduct—and Diemert hasn't shown either.

**3.6 Summary judgment of Diemert's constructive discharge claim is appropriate.**
Diemert says that he made the "reasonable decision" to resign because of the hostile-work environment and adverse

employment actions he allegedly suffered at work. To prove constructive discharge, a plaintiff "must show that the abusive working environment became so intolerable that [their] resignation qualified as a fitting response." *Penn. State Police v. Suders,* 542 U.S. 129, 134 (2004). Employees asserting constructive discharge must establish that their working conditions were "intolerable at the time of the employee's resignation." *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir.1994).

Because Diemert has failed to demonstrate an issue of fact that his working conditions were objectively hostile or that he faced an adverse employment action of any kind, it follows that he has also failed to establish a jury question about whether his working conditions were so intolerable that any reasonable person in his position would have had no choice but to resign. Moreover, by the time Diemert had resigned, months had passed since any of the allegedly harassing behavior or adverse employment actions had occurred—years, in fact, in the case of RSJI trainings. This lapse in time defeats any causal connection between those acts and Diemert's resignation. *See Montero v. AGCO Corp.,* 192 F.3d 856, 861 (9th Cir. 1999) ("[N]o reasonable person in Plaintiff's position would have felt forced to quit when she did" given that "harassing behavior had ceased three to four months before she left[.]"). Finally, to the extent Diemert argues that the potential end to his remote work arrangement forced him to resign, the prospect (or even the reality) of this change alone would not sustain a finding of constructive discharge. *See Poland,* 494 F.3d at 1185 (" '[C]onstructive discharge cannot be based upon the employee's subjective preference for one position over another.' ") (quoting *Jett v. Dallas Indep. Sch. Dist.,* 798 F.2d 748, 755 (5th Cir. 1986)); *Barrett v. Weyerhaeuser Co. Severance Pay Plan,* 700 P.2d 338, 343 (Wash. Ct. App. 1985) (mere dissatisfaction with working conditions does not negate the voluntariness of a resignation).

While Diemert may have viewed his workplace as unpleasant at times, the evidence he has proffered does not meet the standard under the law that his conditions were so "extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland v. Chertoff,* 494 F.3d 1174, 1184 (9th Cir. 2007).

**3.7 Diemert's equal protection claim also fails.**

**\*17** The City offers affinity groups—it calls them "caucuses"—organized around racial and other identities. Diemert's pleadings allege that these groups were mandatory and closed to out-group employees, that the City classified employees across racial lines, and that employees faced penalties for bucking the program. The Court denied the City's earlier motion to dismiss based on these factual allegations, finding that Diemert had stated a plausible Equal Protection claim. But now, with the benefit of a full record, it is clear that Diemert's Equal Protection claim fails. Like his broader arguments about D.E.I., Diemert starts from the premise that recognizing race in the workplace or establishing affinity groups inherently violates the law. He is wrong and provides no factual indications showing that the Equal Protection Clause has been violated here.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Sampson v. Cnty. of Los Angeles by & through Los Angeles Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1022 (9th Cir. 2020) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To maintain an Equal Protection claim, plaintiffs must show "intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998). Municipalities can be held liable under Section 1983 for violating the Equal Protection Clause, but only when a municipality's own customs or policies caused the violation. *Bell v. Williams*, 108 F.4th 809, 824 (9th Cir. 2024) (citing *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 662 (1978)). One way to satisfy this requirement is to show that the municipality acted "pursuant to an expressly adopted official policy." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). "Establishing municipal liability based on a *Monell* theory of liability is difficult"—the plaintiff must show "a direct causal link between the policy and the alleged constitutional deprivation." *Id.*

Racial affinity groups—sometimes called racial caucuses or employee resource groups—have become a familiar presence in today's workplaces. *See Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 540 (7th Cir. 2005). These groups don't all operate alike, so it would be wrongheaded to declare that they *all* violate the Equal Protection Clause. When properly structured, they are voluntary and open to all who share

the group's goals, and can foster a sense of belonging and respect that advances equity in the workplace and improves the bottom-line. *See Flood v. Bank of Am. Corp.*, 780 F.3d 1, 12–13 (1st Cir. 2015) (the fact that plaintiff was not permitted to attend LGBT affinity-group meetings, "even though other employees were allowed to attend similar types of meetings" was a relevant factor in proving existence of a hostile work environment); *Moranski*, 433 F.3d at 541–42 (approving of defendant employer's Affinity Group Guidelines, which stated among other things that membership in employer-recognized affinity groups was "voluntary and must be open to all current, salaried, full-time employees who share a group's goals."); *Cf. Sinio v. McDonald's Corp.*, No. 04-C-4161, 2007 WL 869553, \*7 –9 (N.D. Ill. Mar. 19, 2007) (plaintiff's racial discrimination claim survived summary judgment when there was a question of fact about whether members of employer's "African-American networking organization" received preferential treatment as compared to non-members).

But there's a flipside: when such groups endorse exclusionary practices— whether through restricted membership, segregated spaces, or disparate access to professional opportunities—they risk transgressing fundamental equal protection principles and other civil rights laws. These distinctions matter enormously, as even well-intentioned employers may find themselves on legally shaky ground if their programs are not carefully tailored. *See SFFA*, 600 U.S. at 206 ("Any exception to the Constitution's demand for equal protection must survive a daunting two-step examination known in our cases as 'strict scrutiny.' ").

**\*18** Here, the record shows that the City's caucuses were "open to any City employee, regardless of their race or how they identify or choose not to identify." Dkt. No. 59 at 125–26. Whether to participate—or not—in the caucuses is entirely voluntary. Dkt. No. 67 at 15; *see* Dkt. No. 59 at 125–26. Those who chose to participate received no additional employment benefits; those who chose *not* to participate faced no consequences. On this record, no reasonable juror could find that the City acted with a discriminatory purpose in sponsoring the caucuses or that a discriminatory policy was nested within them. *See Navarro v. Block*, 72 F.3d 712, 716 n. 5 (9th Cir.1995) (" 'Discriminatory purpose'...implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker...selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable

group." (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979))).

Diemert may point to a conversation he had with his union representative in 2018 to raise a triable issue of fact about whether the City excluded him from a group meeting because of his race. Diemert told his union representative that he planned to sign up for a "[Person of Color]-only training"—stating, "the only way to end [segregation] and other discriminatory practices is to...stand up against it." Dkt. No. 59 at 94–95. Diemert compared his proposed attendance to the "four black students [who] refused to leave the segregated lunch counter at Woolworth's." *Id.* In response, his union representative allegedly told Diemert "they probably would not allow you to participate." *Id.* at 93–94. Diemert did not attend the meeting or attempt to attend beyond this interaction with his union representative. *Id.*

Even if the Court were to accept, without resolving the matter, that the union representative could speak for the City, *see Agosto v. Corr. Officers Benev. Ass'n*, 107 F. Supp. 2d 294, 308 (S.D.N.Y. 2000) (analyzing when a union representative's discriminatory conduct is attributable to a union employer), the record makes plain that his warning to Diemert stemmed from Diemert's stated intention to protest the training. *See* Dkt. No. 59 at 94–95. The representative's admonishment bore no relation to Diemert's race, nor did it reflect any formal municipal policy.[8] This isolated incident is not enough to show a "longstanding practice or custom" of exclusion—for *Monell* liability purposes, "[t]he custom must be so 'persistent and widespread' that it constitutes a

'permanent and well settled city policy.' " *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citing *Monell*, 436 at 691). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be found upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.*

Because Diemert has failed to show a genuine issue of material fact about some City custom or policy that violated his Equal Protection rights, summary dismissal of his claim is appropriate.

### 4. CONCLUSION

In sum, the Court GRANTS the City's motion for summary judgment and DISMISSES Diemert's case. The Court STRIKES the pending motions at Dkt. Nos. 55, 56, as moot.

**\*19** Dated this 10th day of February, 2025.

A

Jamal N. Whitehead

United States District Judge

**All Citations**

Slip Copy, 2025 WL 446753

---

## Footnotes

1    Diemert cites his deposition at page 159, lines 4–11 (Dkt. No. 73-2 at 15). Dkt. No. 74-1 at 7. However, this excerpt does not identify the speaker or the date. The Court draws on Diemert's amended complaint to deduce that this comment was allegedly spoken by an HSD Youth and Family Empowerment Division Manager in August 2015. Dkt. No. 11 ¶ 48.

2    Diemert claims he "experienced discrimination when [he] sought back pay for performing out of class work." Dkt. No. 69 ¶ 20. Specifically, in his declaration, Diemert testified that "[w]hen he requested back pay, he was told that while the City acknowledged that [he] performed out of class work, and that [he] could note this experience on [his] resume, [he] would have to hire a lawyer and file a lawsuit to obtain any back pay." *Id.* Diemert offers no details about when this occurred or who denied his claim. Without these details, the Court cannot evaluate whether these allegations are timely or racially motivated. The Court therefore does not consider these conclusory allegations in its analysis. *See United States v. Shumway*, 199 F.3d 1093,

1104 (9th Cir. 1999) ("If the affidavit stated only conclusions, and not 'such facts as would be admissible in evidence,' then it would be too conclusory to be cognizable[.]").

3    In his briefing, Diemert writes that Said "chest bumped" him, *see* Dkt. Nos. 22 at 7; 74-1 at 3, but nowhere in Diemert's declaration or deposition transcript does he allege that Said "chest bumped" him. *See generally* Dkt. Nos. 69, 73-2.

4    *See, e.g., Advance Oral Instruction—Beginning of Proceedings,*6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 1.01 (7th ed.) (pattern jury instruction cautioning jurors against conscious and unconscious bias in their decision-making).

5    "On the night of May 31, 1921, a violent attack by as many as 10,000 white Tulsans destroyed the thriving Black community of Greenwood, Oklahoma—a prosperous area often referred to as 'Black Wall Street.' The attack, which lasted into the afternoon of June 1, was so systematic and coordinated that it transcended mere mob violence." *Review and Evaluation, Tulsa Race Massacre,* DOJ Report, Civil Rights Division (Jan. 17, 2025) (available at https://www.justice.gov/crt/media/ 1383756/dl).

6    Some courts modify the requirements of the *McDonnell Douglas* test in so-called "reverse discrimination" cases, requiring the plaintiff to demonstrate "background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Parker v. Baltimore & Ohio R.R.,* 652 F.2d 1012, 1017 (D.C. Cir. 1981); *Teehee v. Bd. of Educ.,* 116 F.3d 486 n.2 (9th Cir. 1997) (recognizing circuit split). The Ninth Circuit has not taken a position on this inter-circuit dispute. *See Zottola v. City of Oakland,* 32 F. App'x 307, 311 (9th Cir. 2002). Because Diemert falls to meet the traditional *McDonnell Douglas* standard, the Court need not decide whether an extra showing is needed here.

7    Because of the overlapping nature of Diemert's Title VII and WLAD claims, the Court considers the earlier of the two cutoffs for Diemert's discrimination claims to analyze whether there is a continuing violation.

8    The warning may have staved off a more consequential outcome for all involved if Diemert viewed his actions on par with the "Greensboro Four." *See Greensboro Lunch Counter Sit-In,* Library of Congress, https:// www.loc.gov/exhibits/odyssey/ educate/lunch.html (last visited Feb. 3, 2025). The Greensboro Four risked their safety and freedom to sit at a whites-only lunch counter in 1960—their actions are fundamentally different in character than attending a workplace training. To conflate these acts is to misunderstand both history and the meaning of courage in the face of injustice.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.