# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ZACK K. DE PIERO,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **PENNSYLVANIA STATE UNIVERSITY,** *et al*., | **NO. 23-2281** |
| **Defendants.** | |

## OPINION

Plaintiff Zack De Piero, a White man who previously worked as a writing professor at the Abington campus of The Pennsylvania State University ("Penn State" or "Penn State Abington") has sued Penn State and its employees: Liliana Naydan, Friederike Baer, Carmen Borges, Alina Wong, and Aneesah Smith (together, "Defendants"). His claims against them are predicated on a hostile work environment in violation of: (1) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000d *et seq.*; (2) 42 U.S.C. § 1981; and, (3) the Pennsylvania Human Relations Act (the "PHRA"), 43 Pa. C.S. § 951 *et seq.* Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendants' Motion shall be granted, for the reasons that follow.

## I.    FACTS

De Piero worked as an Assistant Teaching Professor of English Composition in the Writing Program at Penn State Abington from August 2018 to August 2022, when he resigned to take a position at another college. His claims are premised on twelve incidents over the course of around three-and-a-half years:

1.   A March 28-29, 2019, e-mail thread which discussed scholarship regarding antiracist writing assessments;

2.   A June 5, 2020, Zoom "Campus Conversation" about racial injustice;

1

3.    A June 19, 2020, e-mail commemorating Juneteenth;

4.    E-mails in August 2020 regarding Penn State Abington's hiring of a White police officer;

5.    E-mails in that same month regarding the academic focus of the 2020-21 Writing Program professional development meetings;

6.    October 2020 e-mails promoting an event on campus regarding the "rhetoric and writing of critical race theory";

7.    A Writing Program professional development meeting held on November 2, 2020, which discussed racism in writing assessments;

8.    An internal complaint filed by Defendant Naydan in March 2021 against De Piero;

9.    Penn State's handling of an internal complaint filed by De Piero in September 2021 which raised concerns about discrimination and harassment on the basis of color;

10.    An October 18, 2021, Writing Program professional development meeting in which antiracist approaches to teaching and learning in writing courses were discussed;

11.    Penn State's handling of an internal complaint filed by Defendant Naydan in October 2021 which accused De Piero of harassment on the basis of sex and political ideology; and,

12.    Subsequent disciplinary actions taken by Penn State against De Piero.

Turning now to the details of De Piero's concerns.

### A.    March 28-29, 2019, E-mail Thread Regarding Asao Inoue's Scholarship

The first incident of which he complains sprang from a discussion that took place on a listserv called "Writing Program Administration"[1] regarding the scholarship of Asao Inoue—a professor at a different university whose work focuses on antiracist and social justice theory and practices in writing assessment.  Following that listserv discussion, De Piero and Defendant

---

[1] De Piero described the "Writing Program Administration" as an "organization of writing researchers and teachers" whose listserv "is open to the public."

Naydan—who served as the Coordinator of the Writing Program during his tenure at Penn State

Abington—engaged in the following e-mail conversation, over a period of two days (March 28-

29, 2019).  De Piero started the conversation with an e-mail he sent to Naydan and two other

colleagues stating in relevant part:

> So check it out: I draw on Inoue's work quite a bit; his scholarship is usually
> there, somewhere, sprinkled into almost all of the stuff I write/think about, and I
> agree with most of what he says—but not *everything* and I think *that's
> OK* . . . .  Inoue's work, along with everyone else's is subject to scrutiny and
> critique—it's part of what scholars do—and to hear some people on that listserv
> viciously attack other people ("take your white sheet and go home because all
> your KKK fuckery isn't going [sic] derail our fields important conversations") for
> any questioning of his work (namely, his "antiracist writing assessment"
> theory/idea) is just so, so out of line.  . . . Like, who have we become as a field—
> or, maybe more technically, a discourse community within a field—when we
> can't try to push against ideas for productive purposes. . . .
>
> Honestly, I very genuinely wonder what, exactly, Inoue means by "antiracist
> writing assessment" (What, *specifically* is/isn't that?  And who, exactly is
> arguing for the opposite of that?!  And is the comp field really the audience who
> needs to hear this—don't we embrace diverse language practices?) but I couldn't
> *DARE* post those questions to the listserv—not even in the spirit of intellectual
> curiosity.  If I did, I would get eaten alive, painted as a racist, etc. . . . .

The following day, Naydan replied, "Zack, I so very much appreciate your message.

Like you, I think the conversation on the listserv has been totally insane."  She then clarified:

> I personally think that racist structures are quite real in assessment and elsewhere
> regardless of the good intentions that teachers and scholars bring to the set-up of
> those structures.  For me, the racism is in the results if the results draw a color
> line.  But that notion didn't always make sense to me.  And there are ways in
> which I still sometimes struggle with it when I hear colleagues of color struggle
> with it because the designation of racism is ideally supposed to do inclusive, anti-
> racism work.  So I get your struggle with the idea Zack, and I think it's frustrating
> that it feels like such a challenging thing to talk about.

Naydan concluded by saying that she "respect[s] and appreciate[s] [De Piero] even if [he] hate[s]

everything" she said.  He responded a few hours later, thanking the group for entertaining his

thoughts and stating, "It seems to me that a common refrain in our exchanges is something to the

tune of: open, respectful dialogue can go a long way towards coming together, alleviating tensions, disrupting preconceptions, bridging misunderstandings, etc." Despite the conciliatory tone in his responsive e-mail, De Piero maintains in this lawsuit that Naydan's correspondence with him "expressed [a] corrosive race-based ideology."

### B.    June 5, 2020 "Campus Conversation"

The next incident of which De Piero complains came on June 4, 2020 (over a year after his e-mail exchange with Naydan about Inoue's work) when Damian Fernandez, Penn State Abington's then-Chancellor, sent the following e-mail to all faculty and staff, entitled "Campus Conversation":

> Please join the campus community in an open dialogue about the current racial justice movement, the tragic death of George Floyd and others, and ongoing actions. The Zoom meeting will be an opportunity to support each other, and to learn from and with each other.[2]

That meeting, which took place the following morning on Zoom, was facilitated by Defendant Alina Wong, Penn State's then-Assistant Vice Provost for Educational Equity. De Piero attended and recorded the meeting.[3] There, Wong provided introductory remarks during which she spoke about Black people who have been killed by police. She talked about some of their

---

[2] Under Federal Rule of Evidence 201, the Court takes judicial notice of the following excerpt from an article about the May 25, 2020, murder of George Floyd: "Floyd, a 46-year-old Black man, was killed in police custody in Minneapolis. A bystander's video showed police officer Derek Chauvin kneeling on Floyd's neck for more than nine minutes as Floyd pleaded for help, saying he couldn't breathe. . . . Floyd's death sparked widespread protests and rekindled the Black Lives Matter movement. It also elevated a national conversation about race, police brutality and social injustice." https://www.cnn.com/2021/05/21/us/gallery/george-floyd-protests-2020-look-back.html; *see also Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (concluding that the district court did not abuse its discretion when it took judicial notice of newspaper articles when they "serve[d] only to indicate what was in the public realm at the time").

[3] Penn State asserts that De Piero's recordings of various meetings and events violate the Pennsylvania Wiretap Act, which prohibits intentional interception of any oral or electronic communication without the consent of all parties involved. *See* 18 Pa. Cons. Stat. §§ 5703, 5704(4). Here, it argues that De Piero intentionally recorded several meetings with Baer, Naydan, Borges, and other Writing Program faculty, without obtaining consent from any of them. However, putting aside the question of whether such conduct violates the Pennsylvania Wiretap Act, Penn State makes no argument as to the inadmissibility of these recordings for purposes of the present Motion, so they will be considered as part of the record.

4

last words: "I can't breathe."  She opined that "breathing has a become a privilege" in our

society.  She continued:

> Like breathing, a privilege, it happens and we benefit from it whether we want it
> or not.  We have to choose to hold our breath and that is what we are doing today
> in honor of George Floyd, Manuel Ellis, and Eric Garner. . . .  We are choosing to
> hold our breaths for those who can no longer breathe.  When we hold our breaths,
> there will come a time when we want to release.  We want the relief.  We need the
> oxygen and the mechanics that go along with breathing.  And I just ask us to think
> about who can exhale?  Who can release and who can find that relief?
>
> It's a challenge for all of us today, and especially for White and non-Black people
> of color, is to hold our breaths just a little bit longer, to not give into our privilege
> to not give in to our ability to release, to exhale.  To give just a bit more air to
> Black communities so that they can have another breath.

To move forward, she asked the participants to "sit in the sadness and pain and anger and

discomfort, and those of us with privileged racialized identities need to sit in it just a bit longer."

By doing so, she said, the meeting participants could "move forward with intention and care and

solidarity."  With that, she said "let us take a breath.  Collectively, together.  Hold it in for as

long as you can."  She further invited "those of us who are White and non-Black people of color

to hold it just a little bit longer to feel the pain just a little bit, knowing that it's nowhere near the

pain, it's metaphorical at best, so let's do that now."

Other presenters also shared comments throughout the meeting.  In response to a Black

colleague's remark that he was "concerned about the looting" and its impact on cities, Wong

stated:

> There has been a disruption, I think, in all of our lives.  Again, what I'm interested
> in doing is staying in the disruption and actually disrupting more because I think
> that's what we haven't seen and that's what we haven't done.  That if after the
> COVID-19 pandemic, if after the protests and things that are happening now, we
> go back to the normal.  We go back to shopping at Target and not thinking about
> the businesses.  And so I think, you know, what we call looting, I think of just as
> getting what, getting what you're due because we as a capitalist country prioritize
> material goods and property over lives, over humanity especially for Black folks.
> And how do we continue that disruption?

Near the end of the conversation, Wong offered to support the creation of affinity groups on campus.  For instance, she asked "[D]o you want to create a White anti-racism group?  So that the White folks at Penn State Abington are doing your work with each other, teaching each other. . . . I can provide some resources."  She made the same offer to "Black faculty and staff" as well as "non-Black communities of color" on campus.  She also challenged faculty to "incorporate antiracism curriculum and pedagogy and practices into" their "classes," "work environments," and "advising."  Specifically, she said:

> One of the things that I hear from faculty sometimes is "I teach calculus.  There's no racism in calculus."  Yes there is.  Racism is everywhere.  The sexism is everywhere. The homophobia is everywhere, the classism is everywhere. Classism is built into our higher education system.  We are founded upon White supremacy.

Following the meeting, De Piero filed a "government fraud" complaint with the Pennsylvania Office of Inspector General ("OIG") alleging that he was "concerned" that Wong's "looting" comment represented a "possible call to engage in illegal activity."  He said that such rhetoric created threats to not only the "safety and security" of the campus, but also to "the security of [his] employment in the Penn State system," since the issue is "intensely politicized" and divergent perspectives do not seem welcome.  OIG subsequently informed De Piero that it had no jurisdiction over his complaint.

De Piero maintains that Wong's presentation demonstrated "her own anti-White bias."  He was offended by her comments—particularly those about breathing and looting—and said that they "reveal[] PSU's race-essentialist stereotypes."

### C.    June 19, 2020, E-mail Commemorating Juneteenth

Two weeks after the Zoom "Campus Conversation," on June 19, 2020, Defendant Aneesah Smith, Penn State Abington's then-Director of Diversity, Equity, and Inclusion, sent an e-mail to the campus listserv commemorating Juneteenth—a federal holiday marking the ending

of slavery in the United States.  After describing the origins of the holiday, Smith stated that

"[t]oday more than ever, Black and Brown people are calling on white people to stand with them

and take action.  We've been fighting too hard and too long."  She then provided "a few ways

you can celebrate Juneteenth and continue to fight for racial justice beyond today," which

included:

1. Stop talking and listen to what needs to be done.

2. Find an accountability partner and make the list public of what actions you will take.  You CAN do this on social media.  A lot of those actions will be giving up privilege and making room for folks who you may not have noticed have no room at all.

3. Spend time in spaces with folks who are not like you.

4. Stop being afraid of your own internalized white supremacy.  Search and look within at hard facts of thought and deed.  Who cares about being comfortable?  What about being true, brave and real instead.

5. Hold other White people accountable not on social media, instead with measured voices that call folks in to look and wrestle—to change.  Engage in courageous conversations, in hearing folks out and in allowing yourselves to feel terrible and to let that feeling be a crucible for change.

Fernandez later responded to "add just one essential caveat to" the message—namely, that "[a]ll

Americans and all peoples of good will should acknowledge, honor, and celebrate Juneteenth.

Coming together on this day will help heal our nation."

De Piero avers that he "would have happily joined the celebration," but felt "singled out"

because of his race and the insinuation that "white supremacy was or is a reality" at Penn State.

### D.    August 2020 E-mails Regarding the Hiring of a White Police Officer

During the summer of 2020, on August 10-11, Penn State e-mailed the "Abington

listserv" to introduce two police officers to the campus community: Officer Badie, a Black man,

and Officer Lacey, a White man.  In response to the e-mail regarding Office Lacey, a faculty

member replied to the entire listserv, stating:

7

Welcome to Office [sic] Lacey.  He sounds like exactly the background who could benefit from a serious anti-racism program at the Police Department.  I'm not imputing anything to him personally.  But I hope you can see that, in hiring experienced officers of his caliber, you do emphasize the need for in-place, up-front anti-racism training.

After a different faculty member responded to admonish his colleague for the tone of her e-mail, Naydan wrote: "I respect you very much, but Black Lives Matter.  That's not always a comfortable or easy thing to say if you're a white person trying to say it right."  She continued, "I think it's ok to feel uncomfortable by a string of email messages from our police because those messages are political . . . . The messages from our police have been making me uncomfortable."  After a third faculty member asked Naydan to give Officer Lacey "a fair chance to be a part of our community," Naydan wrote back, "The problem for me is that our country is in a state of crisis because the police are killing Black people.  This doesn't mean that I look at an individual police officer and feel hostility toward that individual."  Rather, she explained, "I look at the police and see a systemic problem."  Eventually, Andrew August, Penn State Abington's then-Interim Chancellor, wrote to the listserv expressing his concern about the comments made about Officer Lacey.  He wrote that "[i]t is important that we all approach one another and all members of our community with sensitivity and recognize our biases and assumptions.  I would also encourage us all to maintain civility and promote a culture of mutual respect and collegiality."

De Piero claims that he viewed this e-mail chain as Penn State's endorsement of the notion that "Whites are automatically oppressors" while "Blacks [are] automatically the oppressed."  He echoed the sentiment of a staff member, who at some point during the conversation opined that the situation was "dangerously close to the textbook definition of a 'Hostile' and 'Toxic' work environment."

**E.    August 2020 E-mails Regarding the Focus of the 2020-21 Writing Program Meetings**

In preparation for the fall semester, on August 3, 2020, Naydan shared with the Writing Program faculty a statement from the Conference on College Composition and Communication ("CCCC")—an organization regarded by the parties as the "major professional organization for writing studies."  This, according to Naydan, was not unusual: she regularly circulated statements and documents from CCCC "in case anyone isn't a member and they wouldn't get it then and I want[ed] them to see it."

But De Piero complains about the one she shared on August 3 because it focused on a demand for "Black linguistic justice"—in essence, a call for the academic community to "stop teaching Black students to code-switch" and instead inform "Black students about anti-Black linguistic racism and white linguistic supremacy" through "political discussions and praxis that center Black language."  In her e-mail, Naydan noted that CCCC's statement "calls on all of us to engage in antiracist work through the thorny process of reviewing and revising our teaching materials and our perspectives."  Naydan then expressed her "hope" that the faculty would "join [her] in this important work to assure that Black students can find success in our classrooms and to assure that all students see that white supremacy manifests itself in language and in writing pedagogy."

Days later, Naydan, along with two Professors who were also in the Writing Program— Stephen Cohen and Grace Lee-Amuzie—engaged in an e-mail conversation about putting together a grant application to "support some kind of dialogue about Black linguistic justice" for the Writing Program faculty.  Naydan suggested using the grant money to bring in speakers who would focus on race and racism in the classroom and composition field to present at the Program's monthly professional development meetings.  Specifically, she said, "[t]here's no way

I would be ok with not talking about racism right now as a Writing Program.  We need to talk about what's happening in our historical moment and how it pertains to our teaching."  Cohen, for his part, floated the idea of Inoue as a potential speaker and continued to brainstorm topics for the meetings.  He also remarked, "I'd like to see you (Lila)[4] channel communication about" the initiative "so that it seems 'official' and sanctioned by the English program (rather than just the community of practice)."  The three were ultimately awarded the grant from Penn State's Schreyer Institute for Teaching Excellence.

De Piero alleges that Naydan's e-mail amounted to an instruction from the Coordinator of the Writing Program for the faculty to "teach that white supremacy exists in language itself, and therefore, that the English language itself is racist . . . and white supremacy exists in the teaching of writing, and therefore writing teachers are themselves racist white supremacists."

### F.    October 2020 Promotion of Aja Martinez's Presentation

Once the fall 2020 academic semester was underway, on October 22, 2020, Penn State's Interim Division Head for Arts and Humanities, David Ruth, e-mailed all faculty inviting them to several upcoming events in the "Arts and Humanities as Activism series."  One of the events, scheduled for November 13, 2020, was "a faculty discussion with Aja Y. Martinez," an Assistant Professor of Writing and Rhetoric at the University of North Texas who was to present on "the rhetoric and writing of critical race theory."  Later in the semester, Naydan forwarded Ruth's e-mail to the Writing Program faculty to amplify the invitation.  De Piero replied to her e-mail saying that while he would not be able to attend the presentation, he was "interested in Dr. Martinez's ideas, though, so if a recording is made available, please send it my way."  Although it was not ultimately recorded, De Piero was able to find and watch a similar presentation

---

[4] Naydan's first name is Liliana—but is referred to at various points in the record as "Lila".

delivered by Martinez through the National Council of Teachers of English.

De Piero alleges that Martinez's work framed objectivity, race neutrality, and merit around a White "master narrative." He also took issue with her description of Ward Connerly, a Black scholar opposed to affirmative action, as telling a "white story," and Penn State's framing of the event as a "faculty discussion," since his objections to its content later resulted in disciplinary action.

### G.    November 2, 2020, Writing Program Meeting

On October 6, 2020, Cohen sent an e-mail to Writing Program faculty to remind them about a Writing Program professional development meeting scheduled for November 2, 2020, about "racism and writing assessments." The associated materials for that meeting were several chapters from Inoue's book, *Labor-Based Grading Contracts*, and a video interview titled "White Teachers are a Problem | A Conversation with Asao Inoue." De Piero attended the meeting, having reviewed both materials ahead of time.

The title of the Inoue interview, according to its moderator, was an homage to the "famous passage in *The Souls of Black Folk* where W.E.B. Du Bois describes being or feeling constantly asked as a Black man, 'How does it feel to be a problem?'" Of relevance to De Piero's claim, the moderator and Inoue engaged in the following dialogue:

> MODERATOR:  Probably the most difficult passage in your talk is this one: You say to your colleagues:  I'm going to quote several sentences here—"You perpetuate white language supremacy in your classrooms because you are white and stand in front of your students as many white teachers have before you, judging, assessing, grading, professing on the same kinds of language standards, standards that come from your group of people.  It's the truth.  It ain't fair but it's the truth.  Your body perpetuates racism." And I see two things running together here.  One is white actions, specifically the action of judging by white standards. And then the other is white bodies, simply being in the room as a white person. And now I know I can change my actions, but I can't change my body.  I can change what I do but not who I am, and if both are bad then I'm wondering, where does that leave us?

11

INOUE:  Yeah.  Great question, and again, another one that I'm really thankful and humbled that you brought up.  . . .  So, I think this passage that was part of the address came out of me needing to tell my white colleagues, most of whom I love and care about, that it fucking sucks and hurts and is hard to be the problem.  So it's a paradox, and a paradox cannot be solved.  Both sides are equally true, or all sides are equally true or have some truth to them.  So yeah, I'm not offering a way out of this paradox.  It's a paradox, one of those white supremacist structures that have been created historically and maintained and cultivated and nurtured throughout history, right?  So it's a situation that we didn't create but we're in.  So I'm not blaming people for being white.  Being white is not a problem.  It is the conditions within which white people live that is the problem.  So the problem is the condition of being white in a white supremacist world that gives favor and privileges to white bodies, and then those bodies get read differently.  So that same issue or that same dynamic works in a different direction when you're a body of color, when you're Black, or you're Latinx, and so forth.  So for me it's really more about the conditions in which we do this . . . .  We should be questioning and thinking about it.  We should be finding ways.  I think this is an absolutely vital question for every writing teacher to think about when they teach language and then judge that language or grade that language in a classroom, which, when we know what that means for our students, it means doling out opportunities and prizes to folks.

The Writing Program featured Inoue's work on at least two additional occasions during the 2020-21 academic year.  Its members met on March 29, 2021, to discuss "racism and writing assessments," reading additional chapters of Inoue's book.  And the following month, with funding from Penn State's Center for Intercultural Leadership & Communication, Naydan and her colleagues arranged for Inoue to speak with the Writing Program faculty.  The title of Inoue's presentation was "Understanding and Addressing White Language Supremacy in Antiracist Writing Assessments Ecologies."  In advance of the talk, De Piero reached out to Naydan to ask whether his students could attend the lecture.  He suggested that "Inoue's talk . . . could present an interesting opportunity for students to dig further into the various concepts we've been studying throughout the semester."  Naydan replied that "sadly" the presentation was only open to faculty but thanked De Piero "for always thinking about professional experiences for your students."

12

As set forth in greater detail below, De Piero alleges that he was deeply offended by

Inoue's scholarship—particularly the notion that "white teachers are a problem." He claims that

such discourse "enforce[d] a raft of other stereotypes" about the White race and disturbed him.

**H.      March 2021 Bias Report Filed by Naydan**

In March 2021, Naydan submitted an internal "Bias Report" with Penn State's

Affirmative Action Office ("AAO") accusing an unnamed faculty member of harassment on the

basis of "[g]ender or gender identity." She alleged that this faculty member had been creating a

hostile environment by, among other charges: (1) flippantly dismissing his colleagues' concerns

about resistance to mask wearing on campus by White students; (2) frequently objecting to the

Writing Program's yearlong focus on "antiracist writing pedagogy"; and, (3) circumventing her

administrative responsibilities and, in particular, her role advising students. Naydan later

confirmed that the report was about De Piero. She said that she did not pursue this course of

action to get him "into any trouble," but instead to find strategies to better manage the situation

and ultimately help "dissipate" the hostility between them.

After Naydan shared some of her concerns with Defendant Friederike Baer, Abington's

Division Head of Arts and Sciences, Baer requested a meeting with De Piero, which took place

via Zoom on April 15, 2021. Although Baer and De Piero both took notes during the meeting,

De Piero told a friend that he also "recorded it just in case this gets legal." To that end, the

recording indicates that Baer said that Naydan is very committed to antiracist pedagogy, to

which De Piero replied, "I am too." De Piero also told Baer that some of Naydan's approaches

to antiracist pedagogy were "needlessly divisive, and there are better ways of achieving the same

end goal, which is getting the most out of every student, treating them fairly, respecting their

individuality." He said that he wanted "a much more inclusive framing of how we tackle some

of this stuff" and asked Baer to "try[] to remind [Naydan] that some of these conversations and

13

strategies might be counterproductive at times, or possibly even demeaning, borderline on harassment."

### I.    September 2021 Bias Report Filed by De Piero

On September 1, 2021, De Piero received an e-mail from Penn State's "Office of the President" which stated that "Penn State encourages the reporting of misconduct.  If you see something, say something."  The e-mail also included links to various mechanisms for reporting misconduct.  Relying on these resources, De Piero filed a Bias Report with the AAO on September 13, 2021, in which he complained of discrimination and harassment on the basis of "race and color."  Citing Naydan and another faculty member in the Writing Program, De Piero alleged, in relevant part, that "[o]ver the past year—and on multiple occasions—some members of my department (English) have made discriminatory/biased remarks against White students and White faculty (not specific ones, but in general terms)."  The "most egregious example," he explained, was when he was asked to view the interview with Inoue titled "White Teachers Are a Problem" in advance of the November 2020 Writing Program meeting.

Within three days of receiving the complaint, Defendant Carmen Borges, an AAO Officer, met with Baer to discuss De Piero's allegations.  Borges took handwritten notes during this meeting, which included the following statements: "Lila very committed to diversity issues. Sometimes too much;" and, "[Baer] agreed that Lila does easily puts things/interactions in the microaggression category."  When asked if Borges' notes accurately reflected her impressions of Naydan—namely, that "she was too preoccupied with microaggressions—Baer testified: "[n]o, that's not how I would explain this.  I think that what I meant to say is the first part, Lila is very committed to diversity issues."  Regarding the second quote—that Naydan's commitment was "sometimes too much"—Baer declared that what she meant to convey was that it was "Zack's perception that it's too much . . . I personally don't think it's too much, so that's I think what

14

Carmen meant or at least that's what I meant."

On September 20, 2021, Borges e-mailed De Piero to request his availability for a Zoom meeting.  The meeting took place two days later.  Unbeknownst to Borges at the time, De Piero recorded it.  During the conversation, De Piero recounted how Naydan repeatedly asked the Writing Program faculty to engage and reckon with offensive scholarship, including works by Inoue and an article titled: "The Myth of the Colorblind Writing Classroom: White Instructors Confront White Privilege in Their Classrooms."  Because of the constant focus on antiracism, De Piero bemoaned that, "I feel awful every single day.  I wake up and think to myself, I'm a white teacher, I'm a problem.  I go to bed, I think to myself, white teachers are a problem.  My colleagues think I'm a problem."

In response, Borges reassured him, "No.  It's not about you, it's about a group of people.  It's about a historical problem that involves a group of people.  It's not about you."  Borges also noted that while Naydan's conduct was perhaps "too much" and "too focused" at times, she may not have been aware that the antiracist rhetoric did not "fall well with some people."  In that vein, she asked whether De Piero had considered not attending Writing Program meetings, to which De Piero responded:

> I didn't attend yesterday's meeting for the pretty much the first time since I've been here.  I asked my supervisor when I met with her, Friederike Baer, two weeks back.  She asked me how what she could do to support me, and I said, I didn't want anything more to do with [Naydan] moving forward in the future except bare necessities. . . .  And she said, fine.  So she you're your suggestion you just offered it sounds like [Baer] is okay with that.  The unfortunate thing is, I'm no longer able to participate in my programmatic meetings.  I can't help to think, this might be unfavorable to me in future teaching evaluations which are usually conducted by my colleagues.

To this, Borges told De Piero that she understood his concerns but stressed that this type of discourse—whether it be published by Inoue or shared by Naydan—likely fell under the

umbrella of academic freedom.  Borges said that De Piero should try, as a professor and scholar,

to "be open-minded to different perspectives."

De Piero rejected this notion and instead asked her whether he should willingly subject

himself to what he deemed university-sanctioned harassment and discrimination.  The two then

engaged in the following dialogue:

> BORGES:  As an academician . . .  it's not about you.  It's not an attack on your
> person as a White person.  It's not about you.  We don't carry the burden of our
> race, of our people.  We don't carry it individually.  We don't.  That's . . . you
> know, that's a broad thing in society.  You're not responsible.  You are a White
> person, but you're not responsible for everything that has happened or what White
> people have done or not done.  But the important thing is to have . . . the ability to
> look at it from a broader perspective, not from an individual perspective.  And
> then you adopt from there what you what makes sense to you. . . . [O]r you see
> what doesn't make sense you don't have to agree.  But start by opening up and
> listening to what it is that's happening without seeing it as an attack on your
> person.  This is not about you, at all.  This agenda is going on and it's not about
> any race.  It's about people understanding each other and participating and
> including each other.
>
> DE PIERO:  "White Teachers are a Problem" is about just one race.  One color of
> skin that I have no control over.
>
> BORGES:  But it's not about you.  It's about the White race, yes, it's about the
> White race, but it's not about you.
>
> DE PIERO:  Even though I'm a member of the White race, it's not about me?
>
> BORGES:  No.  It's not about you at all.

Borges met with Naydan shortly thereafter.  Following their conversation, Naydan sent

her an e-mail summarizing "a snapshot of what [she saw] as the beginning" of her issues with De

Piero.

On November 12, 2021, Borges sent De Piero a letter informing him that the AAO did

not "find sufficient evidence to substantiate [his] allegation of discrimination."  She explained

that "[t]he particular topic for academic discussion, while it may be offensive to [him], does not

constitute discrimination towards [him] as an individual and does not rise to a violation of the

16

University's Non-Discrimination policy."  Borges noted that Naydan, as the Coordinator of the Writing Program, had an ongoing "responsibility to identify topics of current interest beneficial for discussion and professional development for the faculty in the English Writing Program." Further, the decision to select Inoue's research for a presentation and as a topic for discussion was "made in collaboration with [Writing] Program faculty and Campus administration in line with the Campus Strategic Plan."  And in any event, attendance at any "monthly discussion meetings is voluntary."  Borges concluded by acknowledging that De Piero "may disagree" with this outcome but "trust[s] that [he] will appreciate that [it] was made in a neutral and objective fashion with respect for the rights of all parties involved."

De Piero viewed the AAO's letter—specifically the reference to the "Campus Strategic Plan"—and an endorsement of Naydan's "race-essentialist pedagogy."

### J.    October 18, 2021, Writing Program Meeting

In advance of the October 18, 2021 Writing Program meeting, Naydan sent an e-mail to the faculty informing them that she and Lee-Amuzie planned to facilitate a discussion about Octavio Pimentel, Charise Pimentel, and John Dean's article, "The Myth of the Colorblind Writing Classroom: White Instructors Confront White Privilege in Their Classrooms."[5]  She asked that the faculty to "please read and come prepared to discuss" the piece.  Naydan also circulated an agenda for the meeting, which included plans for a discussion of four quotes selected by her and Lee-Amuzie.

The meeting took place via Zoom as scheduled.  De Piero attended and recorded the discussion.  Naydan started the meeting with a disclaimer that "anybody who doesn't feel comfortable talking about any of this does not have to be here by any means."  De Piero later

---

[5] All the authors are professors at other universities.

testified that while he was not comfortable with the content of the meeting, he stayed because he "want[ed]" and "deserve[d] to be an active member" of the Writing Program and thought his annual "service evaluation[]" might be negatively impacted by not participating.  Naydan next provided the group a set of guidelines to steer the meeting, including "listening actively with an ear to understanding others' views, criticize ideas not individuals, commit to learning, not debating, avoid blame, speculation and inflammatory language, and allow everyone the chance to speak."

With that, the group started its discussion of the first quote, which read as follows:

The practice of not labeling White European American texts as cultural texts serves to keep them as the unstated cultural norm, the norm to which all other texts can be differentiated from.  Thus, despite its inclusive qualities, the diversity approach to teaching writing, in many ways, reinforces the status quo.

The other critique of the diversity approach is its inability to deconstruct race.  In its insistence that we are all equal because we are all different, the diversity approach, or what Gilyard refers to as the "formulaic polycultural curriculum" neglects to examine how race indeed shapes different life experiences and opportunities for people.  Nieto and Bode critique the diversity approach by stating, "To be effective, multicultural education needs to move beyond diversity as a passing fad.  It needs to take into account our history of immigration as well as the social, political, and economic inequality and exclusion that have characterized our past and present, particularly our educational history."  Without attending to issues of inequity and particularly the role race [plays] in constructing social inequities, we remain unaware of and thereby unwittingly reproduce racist discourses and practices in our classrooms.

The diversity approach, without the deconstruction of race and white privilege, can do more harm than good in classrooms.

Following several minutes of discussion, De Piero chimed in and stated, "It's a pretty extreme charge to suggest that teachers are reproducing racist discourses and practices in their classrooms, uh especially with I guess I took the one I modified it by removing unwittingly, which is also maybe even heightens that extreme charge."  He then asked what the authors meant by "attending to issues of inequity," because "if I'm not doing that, then I open myself up to

18

accusations that I am quote reproducing racist discourses and practices." After no one responded, De Piero clarified that his question specifically was for Naydan and Lee-Amuzie since, to his knowledge, they assigned the piece. After some brief discussion by other faculty members, De Piero expressed his dissatisfaction with the lack of "concrete" answers, immediately after which Naydan called upon Lee-Amuzie, stating, "I don't, I don't know how to respond to this because it's your segment of the meeting. I also feel very uncomfortable right now, and I just wanted to say that." De Piero then remarked: "I couldn't agree more. I felt uncomfortable the last year and a half at these meetings. I did think, though, that uncomfortable conversations were a part of, were an explicit goal for some of these. So I'm a little confused about that, too." Lee-Amuzie and Naydan then attempted to answer De Piero's question with examples from their personal and professional lives.

Lee-Amuzie subsequently transitioned to the second excerpted quote for discussion, which read:

> Once [White European Americans] recognize instances of whiteness and how they benefit from it, whiteness begins to lose its invisibility and its power to influence. To redesign social systems we need first to acknowledge their colossal unseen dimensions. The silences and denials surrounding privilege are the key political tools here. Once white instructors begin to identify how whiteness operates in their own lives, they can begin to deconstruct how white privilege operates within their writing classrooms.

After another faculty member shared his reaction to the quote, De Piero asked why White teachers were the sole focus of the article. He said that this quote reminded him of the "White Teachers Are a Problem" interview and sought specific suggestions as to how he and other White teachers should behave in the classroom. In response, Lee-Amuzie clarified that this concept is "not about individual instructors" and spoke about the history of structural racism in the country by analogy to the dynamics of an ecosystem. But De Piero was again dissatisfied

with her response and asked: "If it's not about the individual then who is it about?"  A different faculty member tried to provide him with another analogy to explain the concept, to which De Piero stated "There are legal um descriptions for what falls under discrimination and harassment. And it's when it's you attribute negative characteristics to certain protected groups based on thing outside out of their control.  All forms of discrimination and harassment are a problem. And in many cases, they're illegal."  Naydan and others provided additional thoughts to relate the scholarly texts to their personal lives, and the meeting concluded shortly thereafter.

### K.    October 2021 Bias Reports Filed by Naydan and Lee-Amuzie

Naydan e-mailed Baer a few hours after the meeting ended to inform her that she felt as though De Piero "bullied and harassed her" throughout the conversation.  Baer met with Naydan shortly thereafter and sent an e-mail to Borges summarizing their exchange.  She noted that Naydan seemed reluctant to file a Bias Report, as Naydan was "worried that [De Piero] may see this as retaliation" for his complaint against her.  And indeed, De Piero now alleges that Naydan "could not tolerate anyone who called antiracist work into question" and therefore "retaliated by submitting a formal grievance against [him]."

To that end, Naydan ultimately filed a Bias Report accusing De Piero of harassment on the basis of "sex" and "political ideas" based on his conduct at the meeting as well as several other incidents from 2019-21—many of which she had previously detailed in her March 2021 complaint.  In her view, De Piero's Bias Report was "a form of harassment" against her.  In the days that followed, Borges spoke with the other attendees at the October 18, 2021, Writing Program meeting to hear their perspectives.  She also spoke with De Piero, who again told her that "it's very difficult to talk about race . . . and, on my behalf, it's been very, very difficult to be asked to see videos titled 'White Teachers Are a Problem.'"  Borges immediately responded that De Piero should "get beyond that."  She continued:

> When I saw it, I had the same impression initially. . . . It takes a little thing to get beyond that. What is this all about? What are they trying to say here? It takes a while . . . you can't get stuck with first impression. Going beyond that, you begin to see, ok, this is what they mean. You know, we put it in historical context, this is a lot of abstract material, and this is what . . . the discussions need to go around with.

After De Piero asked Borges whether the video also bothered her the first time she saw it, Borges acknowledged that it did "shock" her when she viewed it. But she eventually came to understand that it was about a "broader . . . historical context."

Later in the conversation, De Piero confronted Borges with her suggestion from their initial meeting in September 2021 wherein Borges said that he should consider continuing to attend the Writing Program meetings to better understand the other participants' perspectives. To that Borges said:

> Well, I may have [said that] because I told you that you are entitled to engage and find out. The issue is the manner in which you did it. The problem was the manner. It came across hostile, aggressive, intimidating. And, and that's consensus among others that I have spoken to that were in the meeting. . . . It's not what you're trying to clarify for yourself. It's not how you tried to ask the question. It's the manner in which it was done. The tone, the body language is the aggressiveness [and] the insistency . . . .

Ultimately, on December 8, 2021, Borges sent Naydan a letter regarding the outcome of her Bias Report, which provided the AAO's conclusion that "De Piero's conduct was unprofessional and contrary to the University Values Statement." The AAO could not, however, "conclude that the conduct meets the definition of unlawful harassment and constitutes a violation of University Policy." That was because the AAO found "professional and programmatic disagreements at play here, and that De Piero's conduct is more appropriately categorized as unprofessional and not respectful of your role as the supervisor." The letter further noted that "[c]onversations with the Division Head and Human Resources will take place to discuss appropriate mechanisms to address this faculty member's conduct."

De Piero received a similar letter from the AAO the next day, which noted that "[i]nformation gathered during the investigation indicated that your behavior during the meeting was aggressive and disruptive, in large part due to your frustration of not receiving answers to your questions about the topic under discussion."

De Piero maintains that this outcome demonstrates that "[a]t Penn State, it is perfectly acceptable to harangue faculty (as well as students and staff) on the basis of race for being white, but it is 'bullying' to ask questions about it at a meeting."

L.    **January 2022-June 2022 Disciplinary Actions Against De Piero**

Baer and Lisa Marranzini, Penn State's Regional HR Strategic Partner, scheduled a meeting with De Piero for January 13, 2022, to set expectations for his interactions with colleagues going forward.  The meeting went forward as planned.  On January 20, 2022, Baer sent De Piero a memorandum titled "Performance Expectations," to summarize their meeting, a copy of which was placed in his personnel file.  Among other things, Baer "reviewed with [him] some of the University values that are germane to this incident including respect, responsibility, excellence, and community."  De Piero was also advised that he "need[s] to be mindful of how [his] behavior impacts others," and that "it is an expectation that [he] will be respectful to [his] colleagues."  This included avoiding actions that "circumvent [Naydan's] authority" as Writing Program coordinator.  De Piero asked for an opportunity to "tell [his] side of what happened at the meeting in October," but Baer informed him that he had already done so during the AAO's investigation, which they would not be reopening.  Baer concluded by informing him that "[w]e will be continuing to monitor your performance to ensure you are taking appropriate steps to address the[se] concerns."

On May 27, 2022, Baer reached out to August, who by then had returned to his role as Dean of Academic Affairs, to request his "help in formulating language for Zack De Piero's

[Faculty Annual Review] letter." He replied a few days letter, stating: "Perhaps in the service section- something like—This year also saw significant challenges in your interactions with colleagues . . . . ?" To that end, when De Piero finally received his review from Baer in June 2022, he was rated "Very Good" in the "Scholarship of Teaching and Learning" category, which was consistent with his prior evaluations. But he was downgraded to "Fair to Good" in the "Service and the Scholarship of Service to the University, Society and the Profession" category, which De Piero now submits was "clearly retaliation . . . for his complaints of racial harassment." The evaluation read, in relevant part:

> Thanks for your service as an Abington Faculty Senator (concluded Spring 21), your membership on the Academic Integrity Committee, and your participation in the Fall 2021 Commonwealth Connections Instructor Days.
>
> As you know, an investigation into your conduct during a meeting with colleagues on October 18, 2021 by the AAO concluded that it was "aggressive, disruptive, unprofessional, and in opposition to the University's Values Statement." Civility and mutual respect are essential requirements for meaningful and effective service contributions designed to fostering an inclusive, welcoming and intellectually rich academic community. I would like to reiterate the expectation that I included in the summary of our meeting in January 2022: that you will be respectful to your colleagues and that you will conduct yourself professionally in all communications and behaviors. I rate your performance in the area of Service and the Scholarship of Service as Fair to Good.

Meanwhile, De Piero applied for and got a position as a full-time Assistant Professor of English at another college. He resigned from Penn State Abington on August 2, 2022.[6]

## II.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[6] Following his resignation, Penn State asked him to return $3,386.47 of his July 2022 paycheck pursuant to a requirement in his contract that he "refund the university any part of [his] annual salary that has not been earned but paid to [him] when [his] service with the University terminates." De Piero argued that Penn State's attempt to recoup his paycheck was unwarranted because he had performed work over the summer before he resigned— namely, helping a student advisee register for courses at the request of the Acting Chair of the English Department. But he ultimately abandoned this effort and returned the funds to Penn State.

56(a).  "By its very terms, this standard provides that the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Inferences to be drawn from the underlying

facts contained in the evidential sources must be viewed in the light most favorable to the party

opposing the motion."  *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co*., 833 F.2d 32, 34

(3d Cir. 1987).

      "A genuine issue is present when a reasonable trier of fact, viewing all of the record

evidence, could rationally find in favor of the non-moving party in light of his burden of proof."

*Doe v. Abington Friends Sch*., 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  "The non-moving party may not

merely deny the allegations in the moving party's pleadings; instead, he must show where in the

record there exists a genuine dispute over a material fact."  *Id*. (citation omitted).  A moving

party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she has the burden

of proof."  *Celotex*, 477 U.S. at 323.

      "As to materiality, the substantive law will identify which facts are material.  Only

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment. . . .  More important . . . summary judgment

will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

## III.   DISCUSSION

      As stated previously, De Piero alleges that Defendants violated Title VII, the PHRA, and

Section 1981 by "creat[ing] a racially hostile environment" at Penn State Abington.  Title VII

makes it illegal to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The PHRA makes it unlawful "[f]or any employer because of the [employee's] race" to "discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract . . . ."  43 Pa. C.S. § 955(a).  And, Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts."  42 U.S.C. § 1981(a).

Title VII, along with the PHRA and Section 1981, renders employers liable for workplace harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *see also Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009).  Because the same framework is used to evaluate employment discrimination claims brought under Title VII, the PHRA, and Section 1981, *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999); *Branch v. Temple Univ.*, 554 F. Supp.3d 642, 648 (E.D. Pa. 2021), De Piero's claims will be addressed together.

To succeed on his hostile work environment claim, De Piero must show that: (1) he suffered intentional discrimination because of his protected status; (2) "the discrimination was severe or pervasive;" (3) it "detrimentally affected" him; and, (4) it "would detrimentally affect a reasonable person in like circumstances."  *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).  To determine employer liability, the plaintiff also must show that *respondeat superior* liability exists.  *Mandel*, 706 F.3d at 167.

A.    **Severe or Pervasive Harassment**

i.    *Legal Standard*

Defendants argue that its Motion should be granted because De Piero has not presented sufficient evidence on any of the elements.  The question of whether the complained-of discriminatory harassment was "severe or pervasive" is dispositive here.  So only that element will be discussed below.

"[S]evere" harassment and "pervasive" harassment are not the same thing.  The terms represent two distinct types of hostile work environment claims.  *Castleberry*, 863 F.3d at 264. "[S]ome harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Id.* Thus, in certain circumstances, a single incident can support a hostile work environment claim. *Id.* at 265.  But in other cases, plaintiffs seek to remedy "the cumulative effect of a thousand cuts," and acts "which are not individually actionable" but "may be aggregated to make out a . . . claim." *O'Connor v. City of Newark*, 440 F.3d 125, 127-28 (3d Cir. 2006).

In analyzing De Piero's claims of "severe" or "pervasive" harassment, the "totality of the circumstances" must be considered "rather than pars[ing] out the individual incidents." *Mandel*, 706 F.3d at 168; *see also Qin v. Vertex, Inc.*, 100 F.4th 458, 471 (3d Cir. 2024) (directing courts to "concentrate not on individual incidents, but on the overall scenario" (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005)).  In so doing, several factors are to be balanced, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

ii.    *Severity*

Starting first with the question of whether the complained-of events in this case, taken as

26

a whole, constitute severe harassment.  The Third Circuit has vindicated severe harassment

hostile work environment claims only when they are predicated on "extremely serious"

misconduct, *Caver*, 420 F.3d at 262, such as the use of racial slurs accompanied by threats of

termination, or sexual harassment and assault.  *See, e.g.*, *Castleberry*, 863 F.3d at 265-66

("Plaintiffs alleged that their supervisor used a racially charged slur in front of them and their

non-African-American coworkers.  Within the same breath, the use of this word was

accompanied by threats of termination (which ultimately occurred).  This constitutes severe

conduct that could create a hostile work environment."); *Starnes v. Butler Cnty. Ct. of Com. Pl.,*

*50th Jud. Dist.*, 971 F.3d 416, 428 (3d Cir. 2020) (finding severe harassment where the

plaintiff's supervisor "coerced her into engaging in sexual relations, shared pornography with

her, asked her to film herself performing sexual acts, engaged in a pattern of flirtatious behavior,

scolded her for speaking with male colleagues, assigned her duties forcing her to be close to him,

and treated her differently than her male colleagues"); *Moody v. Atl. City Bd. of Educ.*, 870 F.3d

206, 215 (3d Cir. 2017) (finding severe harassment where the plaintiff's employer "made

sexually charged comments to her"; "grabbed her" and "attempted to take her shirt off"; "called

her into his office, and when she entered" encountered him "sitting naked on a chair"; and, "sent

her a text message stating 'am I getting all three holes' and thereafter showed up at her house

uninvited and pressured her into having sex with him by threatening her job"); *Durham Life Ins.*

*Co. v. Evans*, 166 F.3d 139, 146-47 (3d Cir. 1999) (finding severe harassment where a supervisor

told the plaintiff that she "made too much money" for a woman, belittled her, and "grabbed [her]

buttocks from behind while she was bending over her files and told her that she smelled good").

      The events underlying De Piero's claim, while unpleasant to him, share little in common

with these cases.  No rational trier of fact could view occurrences such as receiving campus-wide

e-mails about the murder of George Floyd, Juneteenth, and the hiring of police officers; being invited to review scholarly materials and engage in conversations about antiracist approaches to teaching and learning; and, discussing allegations of harassment levied by and against him as sufficiently "extreme" to sustain his charge of "severe" harassment. *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 97 (3d Cir. 2020).

To the contrary, several courts have granted summary judgment on claims predicated on similar comments made to White plaintiffs, finding that the conduct was insufficiently severe as a matter of law—even when such comments were accompanied by downgraded performance reviews, altered work responsibilities, or threats of retaliation. *See, e.g., Vitt v. City of Cincinnati*, 250 F. Supp.2d 885, 890 (S.D. Ohio 2002), *aff'd*, 97 F. App'x 634 (6th Cir. 2004) (granting summary judgment where the plaintiff, a White woman, alleged her Black supervisor "singled [her] out" and "gave her less than satisfactory performance evaluations" because of her race, finding that the allegations did not amount to "severe or pervasive" harassment);[7] *Mufti v. Aarsand & Co.*, 667 F. Supp.2d 535, 550 (W.D. Pa. 2009) (granting summary judgment on a hostile work environment claim brought by a White woman who "was taken off the schedule, or terminated, in retaliation for complaining" about severe harassment where co-workers "made comments to the effect" that they "hated White people"); *Diemert v. City of Seattle*, 2025 WL 446753 (W.D. Wash. Feb. 10, 2025) (granting summary judgment on a hostile work environment claim brought by a White male alleging severe harassment and retaliation where presenters at mandatory trainings remarked: "racism is in white people's DNA" and "white people are like the devil").

---

[7] De Piero contends that "this Court has already considered and rejected" *Vitt* as "unpersuasive." *See De Piero v. Pennsylvania State Univ.*, 711 F. Supp.3d 410, 422 (E.D. Pa. 2024). Indeed, the Court found *Vitt* unpersuasive at the motion to dismiss stage only because it was "resolved after discovery on motions for summary judgment." *Id.* Such concerns are not present here when the Motion before the Court requests summary judgment.

Defendants' Motion shall accordingly be granted as it concerns the theory that Plaintiff's

hostile work environment claims are premised on the severity of the incidents he describes.

### iii.    Pervasiveness

De Piero's remaining hostile work environment claims therefore rest on a theory of

pervasive harassment.  Pervasive harassment is demonstrated by "a continuous period" of

misconduct.  *Drinkwater v. Union Carbide Corp*., 904 F.2d 853, 863 (3d Cir. 1990).  When the

complained-of conduct involves "racist comments, slurs, and jokes," there must be "more than a

few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must

be a steady barrage of opprobrious racial comments."  *Al-Salem v. Bucks Cnty. Water & Sewer

Auth*., 1999 WL 167729, at *5 (E.D. Pa. Mar. 25, 1999) (citing *Schwapp v. Town of Avon*, 118

F.3d 106, 110-11 (2d Cir. 1997)); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)

(stating that most "offhand comments" and "isolated incidents" are insufficient as a matter of law

to make out a hostile work environment claim).  That is because "a lack of racial sensitivity does

not, alone, amount to actionable harassment," and the "[m]ere utterance of an ethnic or racial

epithet which engenders offensive feelings in an employee' would not sufficiently alter [the]

terms and conditions of employment to violate Title VII."  *Id.* at 787.  Further, when the claim

pertains to conversations about "the influence of racism" at colleges and universities, this Court

previously explained:

> [D]iscussing in an educational environment the influence of racism on our society
> does not necessarily violate federal law.  In allowing De Piero's hostile work
> environment claim to proceed, the Court does not contemplate that it is, or should
> be, the norm to maintain a workplace dogmatically committed to race-blindness at
> all costs.  To do so would "blink [at] both history and reality in ways too
> numerous to count."  *Students for Fair Admissions, Inc. v. President and Fellows
> of Harvard Coll*., 600 U.S. 181, 385 (2023) (Jackson, J., dissenting).  Training on
> concepts such as "white privilege," "white fragility," implicit bias, or critical race
> theory can contribute positively to nuanced, important conversations about how to

form a healthy and inclusive working environment.  Indeed, this is particularly so
in an educational institution.  And placing an added emphasis on these issues in
the aftermath of very real instances of racialized violence like the murder of
George Floyd does not violate Title VII, Section 1981, or the PHRA.

*De Piero*, 711 F. Supp.3d at 424.

Although "courts may look to conduct directed at individuals other than the plaintiff"
when determining the viability of a given claim, *Nitkin v. Main Line Health*, 67 F.4th 565, 572
n.4 (3d Cir. 2023), "comment[s] not made directly" to the plaintiff are less likely to cause a court
to deem such conduct sufficiently pervasive, as they are more akin to "offhand comments."
*Watkins v. Pennsylvania Dep't of Corr.*, 2023 WL 5925896, at *4 (3d Cir. Sept. 12, 2023)
(quoting *Caver*, 420 F.3d at 263); *cf. Lamb v. Montgomery Twp.*, 734 F. App'x 106, 112 n.8 (3d
Cir. 2018) ("[O]ccasional derogatory comments not intentionally directed at a plaintiff, but
simply overheard by a plaintiff, are not sufficient to establish a hostile work environment.").

*Frequency of the Conduct.*  Looking initially at the frequency of the complained-of
conduct, no reasonable jury could determine that Defendants' conduct, when viewed as a whole
as is required, constituted pervasive harassment.  Even when drawing all inferences in De Piero's
favor, the record demonstrates that he was not continuously harassed "on a daily or even a
weekly basis" over the three-and-a-half-year period at issue.  *Deans v. Kennedy House, Inc.*, 998
F. Supp.2d 393, 416 (E.D. Pa.), *aff'd*, 587 F. App'x 731 (3d Cir. 2014).  Instead, the incidents
were more "sporadic" in nature, as they were "separated in time by months" in many cases.  *Id.*

Moreover, although the sheer "number of incidents" should not be examined "in a
vacuum," *Nitkin*, 67 F.4th at 571, hostile work environment claims involving a similar frequency
of allegedly discriminatory actions to those at issue here have been rejected as not sufficiently
pervasive.  *See, e.g.*, *Hamera v. County of Berks*, 248 F. App'x 422, 425-26 (3d Cir. 2007)
(affirming district court's conclusion that the plaintiff failed to show that the allegedly harassing

30

comments were pervasive as a matter of law where his coworkers "made nine comments over a year and four months"); *Nitkin*, 67 F.4th at 571 ("[T]he seven comments [Plaintiff] identified were spread out over a span of over three-and-a-half years. The relative infrequency of [Defendant's] remarks—reflecting one or two statements in a given six-month period—indicates that his actions were not severe or pervasive harassment."); *Stephenson v. City of Philadelphia*, 2006 WL 1804570, at *11 (E.D. Pa. June 28, 2006), *aff'd*, 293 F. App'x 123 (3d Cir. 2008) ("[Plaintiff] presents nine specific occurrences over nineteen months in support of her claim of a hostile work environment. However, these incidents collectively lack the frequency to constitute a hostile work environment claim."); *Cooper-Nicholas v. City of Chester, Pa.*, 1997 WL 799443, at *3 (E.D. Pa. Dec. 30, 1997) (regarding eight alleged incidents of unwelcome comments over nineteen months as neither "frequent or chronic"); *Piety Foley v. Drexel Univ.*, 2024 WL 3540445, at *10 (E.D. Pa. July 25, 2024) ("Although [Plaintiff's] Department was far from a model workplace, a rational factfinder could not conclude that these incidents, which took place over the course of more than a decade, amounted to the sort of steady barrage of opprobrious . . . comments that characterize claims of pervasive harassment." (citations and quotations omitted)).

This is especially the case given, of the twelve incidents at issue, only a few involved actions that were personally "directed" at De Piero by name. *See Lamb*, 734 F. App'x at 112 n.8; *Watkins*, 2023 WL 5925896, at *4. To be sure, none of the parties dispute that De Piero received the following e-mails: (1) the March 28-29, 2019 e-mail thread discussing Inoue's scholarship regarding "antiracist writing assessments"; (2) Smith's June 19, 2020 e-mail commemorating Juneteenth; (3) Naydan's August 2020 e-mails regarding the hiring of a White police officer and the academic focus of the 2020-21 Writing Program meetings; and, (4) Naydan's October 2020 emails promoting a presentation about the "rhetoric and writing of critical race theory." Or that

31

he attended the following meetings: (1) the June 5, 2020 "Campus Conversation"; (2) the

November 2, 2020, Writing Program meeting discussing racism in writing assessments and

Inoue's scholarship; and, (3) the October 18, 2021, Writing Program meeting discussing "The

Myth of the Colorblind Writing Classroom: White Instructors Confront White Privilege in Their

Classrooms."  But "no racist comment, written or spoken, was ever directed at [the plaintiff]

*himself*" during those incidents.  *Caver*, 420 F.3d at 263 (emphasis added); *see also Washington*

*v. S.E. Pennsylvania Transportation Auth*., 2021 WL 2649146, at *25-26 (E.D. Pa. June 28,

2021) (concluding that the plaintiff failed to establish that the complained-of conduct cleared the

requisite threshold of pervasiveness where, of the thirteen incidents that allegedly took place

over a seventeen-month period, only eight were specifically directed at the plaintiff).[8]  Rather,

the conversation was about racial injustice and antiracism more generally.

   *Whether the Conduct was Physically Threatening or Humiliating, or Merely an Offensive*

*Utterance.*  Moving to the question of whether the complained-of conduct was "physically

threatening or humiliating, or a mere offensive utterance," *Mandel*, 706 F.3d at 168—the

surrounding "context is . . .  crucial because courts must distinguish between the non-actionable

mere utterance of an epithet and actionable uses of epithets" or other discriminatory language.

*Riley v. Borough of Eddystone*, 2024 WL 4844794, at *3 (E.D. Pa. Nov. 20, 2024) (cleaned up);

*see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) ("Context matters.

The real social impact of workplace behavior often depends on a constellation of surrounding

circumstances, expectations, and relationships which are not fully captured by a simple recitation

of the words used or the physical acts performed." (citation omitted)).

---

[8] De Piero contends that several of the cases cited in this section, including *Washington* and *Stephenson*, are "inapposite," because far from being "sporadic incidents," the complained-of incidents represented Penn State's "strategic plan."  However, he has not pointed to any evidence in the record that Penn State had such a plan.

As an initial matter, no reasonable jury could determine that the incidents at issue here were "physically threatening," as De Piero levies no allegations of the sort. De Piero does submit, however, that he was repeatedly "singled out for ridicule and humiliation because of the color of his skin" as a result of "Penn State's race-based dogma" and "essentialist stereotypes." For instance, when discussing with Borges the impact that the "White Teachers are a Problem" interview had on him, he said: "I feel awful every single day. I wake up and think to myself, I'm a white teacher, I'm a problem. I go to bed, I think to myself, white teachers are a problem. My colleagues think I'm a problem." Likewise, when Wong said that "[i]t's a challenge for all of us today, and especially for white and non-black people of color, . . . to hold our breath just a little longer to not give into our privilege," De Piero experienced "discomfort" at the notion that he should feel more pain simply because of his skin color. And in Smith's e-mail commemorating Juneteenth, "no other ethnic or racial group" aside from the White race was asked to "feel terrible." Moments like these, argues De Piero, demonstrate that he was not subjected to mere "offhand comments or isolated incidents," but rather a highly offensive "state-sponsored campaign to denigrate white . . . employees."

But Penn State counters that the circumstances surrounding these incidents are critical to the analysis and ultimately carry the day. It argues that "most of these messages and meetings occurred in the aftermath of George Floyd's murder during a time when, contextually, these discussions were happening all across the country." And, in any event, it stresses that De Piero "opt[ed] in" to the discussions of race, as Penn State neither "required [him] to do anything in response to the emails he received" nor engage with any of the materials or events circulated by Naydan and others.

In support of its argument, Penn State draws attention to *Diemert v. City of Seattle*, 2025

33

WL 446753 (W.D. Wash. Feb. 10, 2025), a case concerning allegations that this Court

previously examined and subsequently noted "go beyond what De Piero says happened here."

*De Piero*, 711 F. Supp.3d at 423-24 (citing 689 F.Supp.3d 956, 959-64 (W.D. Wash. Aug. 28,

2023). In that case, a White man alleged that his employer, the City of Seattle, created a hostile

work environment through its mandatory "Race and Social Justice Initiative"—"a citywide effort

to end institutional racism and race-based disparities in City government." 2025 WL 446753, at

*2. During one of the initiative's training sessions, which the plaintiff attended, a presenter

made essentialist statements that the plaintiff found to be highly offensive, including "racism is

in white people's DNA" and "white people are like the devil." *Id.* He also had to participate in a

"privilege bingo"—an activity "in which all employees, notwithstanding their race, identified

different 'privileges' they may have, including height, religion, and gender"—and attend

meetings where "supervisors forced their employees to identify their race" and "rank themselves

on a defined 'continuum of racism.'" *Id.*

　　　　Ultimately, the *Diemert* Court granted summary judgment and found that the

complained-of conduct did not rise to the level of "severe or pervasive harassment" in large part

due to "the context in which" the offensive "statements [were] made." *Id.* at *11-13. It noted

that "[a]t least some of the comments that [the plaintiff] takes issue with were made during . . .

trainings," and determined that "[r]acially charged comments made in this setting, while still

potentially harmful, are better framed as attempts to express perspectives or challenge ideas

within the training's scope." *Id.* at *12. This is because "[s]uch comments made in the presence

of a skilled facilitator can be addressed constructively, turning the moment into a learning

opportunity, not a personal attack." *Id.*

　　　　*Diemert*, though not binding on this Court, is however instructive. Here, the record

similarly establishes that several of the allegedly discriminatory comments made by Penn State employees were done in the context of scholarly discussions—whether it be at a professional development meeting, a campus-wide town hall, or a presentation from a guest lecturer. Although De Piero expressed his discomfort with certain statements like "White Teachers Are a Problem," individuals like Borges repeatedly reminded him that such discourse was "not an attack" on him personally. She reassured him that he does not "carry the burden of" the White race and is "not responsible for everything that has happened or what white people have done or not done."

De Piero nonetheless contends that "every [Penn State] deponent has testified that any topic deriding Black people" or "Black privilege . . . would be unacceptable . . . and would likely result in a civil-rights complaint." But even if that were the case, precedent is clear that equally offensive comments directed at Black employees have been found to be insufficiently pervasive. *See, e.g.*, *Sherrod v. Phila. Gas Works*, 57 F. App'x 68, 75-77 (3d Cir. 2003) (finding derogatory comments referring to the "culture" of African American employees; a manager's statement that he was "going to sit at [their] desks with a whip"; placing their desks "directly in front of their white supervisor's office windows"; excluding certain employees from meetings; turning away from certain employees to "snub" them; and screaming at an employee all were insufficiently "pervasive" to establish a hostile work environment claim); *Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 354 (3d Cir. 2010) (affirming summary judgment for defendant on a hostile work environment claim because the use of "unpalatable and inappropriate" racial epithets was not "pervasive"); *Woodard v. PHB Die Casting*, 255 F. App'x 608, 609-10 (3d Cir. 2007) (affirming summary judgment on a hostile work environment claim because a Black plaintiff being "asked questions using the phrase 'you people'" and whether "he intended to

complete a drug deal during a bathroom break" are the type of "offhand comments that are insufficient to support a hostile work environment claim"); *Russo v. Bryn Mawr Tr. Co.*, 2022 WL 15535045, at *12 (E.D. Pa. Oct. 27, 2022), *aff'd*, 2024 WL 3738643 (3d Cir. Aug. 9, 2024) (collecting cases).

Therefore, while the complained-of conduct undoubtedly "engender[ed] offensive feelings" in De Piero, *Faragher*, 524 U.S. at 787, no rational trier of fact could determine that he was subjected to the "steady barrage of opprobrious racial comments" required to sustain his pervasive harassment claim. *Al-Salem*, 1999 WL 167729, at *5.

*Whether the Conduct Unreasonably Interfered with De Piero's Work Performance.* Context is also important in understanding whether the conduct at issue here "unreasonably interfere[d]" with De Piero's work performance. *Castleberry*, 863 F.3d at 264. Here, the record reveals that several of the complained-of incidents involved meetings or events that were optional in nature, which suggest that De Piero took it upon himself to engage with the antiracist materials. For instance, De Piero voluntarily engaged with Naydan regarding the contentious conversation that took place on the "Writing Program Administration" listserv by asking questions about what "Inoue mean[t] by 'antiracist writing assessment.'" Far from expressing a "corrosive race-based ideology" based on essentialist stereotypes, the record reveals that Naydan politely responded to De Piero to clarify her understanding of the piece, stating that she "personally thinks that racist structures are quite real in assessment and elsewhere regardless of the good intentions that teachers and scholars bring to the set-up of those structures." And she concluded her e-mail by saying that she "respect[s] and appreciate[s] [De Piero] even if [he] hate[s] everything" she had just said. Although Naydan did remark that, for her, "the racism is in the results if the results draw a color line," she later testified that she has never instructed, asked,

or pressured any faculty member to grade students based in any way on their race, nor has she done so herself.

Similarly, De Piero voluntarily attended the various Writing Program meetings discussing antiracist teaching and learning practices—even when he was told by multiple individuals that attendance was optional. At the start of the October 18, 2021, meeting, Naydan explicitly stated that "anybody who doesn't feel comfortable talking about any of this does not have to be here by any means." Baer and Borges shared similar suggestions with De Piero after he complained to them about the content of those meetings, which was reiterated in the AAO's November 2021 conclusion letter regarding De Piero's Bias Report. There, Borges explicitly wrote that attendance at any "monthly discussion meetings is voluntary." And in at least two other instances—namely, the November 2020 event about "the rhetoric and writing of critical race theory" featuring Martinez and the April 2021 presentation from Inoue—De Piero appears to have specifically sought out opportunities to engage with the content that he found so deeply offensive. For instance, regarding the former, he asked Naydan for a copy of the recording since he was unable to attend the lecture and later viewed a similar presentation through the National Council of Teachers of English. And with respect to the latter, he inquired if his students could attend Inoue's talk, as, in his words, it "could present an interesting opportunity for [them] to dig further into the various concepts we've been studying throughout the semester."

To be sure, De Piero disputes the notion that his attendance at these types of events was not required. As he told Borges, he feared that his lack of professional engagement might result in an "unfavorable . . . future teaching evaluation which are usually conducted by my colleagues." And according to De Piero's 2022 annual review, his behavior at the October 18, 2021, Writing Program meeting in opposing the discourse surrounding antiracism contributed to

the downgrade in the service component.  But even crediting that argument and drawing all inferences in his favor as the non-moving party, as is required on summary judgment, De Piero was not terminated as a result of his opposition to antiracist discourse.  Nor did Penn State impose any changes to his job responsibilities or benefits thereafter.  To the contrary, Penn State renewed his contract for the 2022 academic year, and he received a pay raise.  Considering these circumstances, no rational trier of fact could determine that the conduct at issue here unreasonably interfered with De Piero's work performance.  *See, e.g.*, *McCullough v. Gateway Health LLC*, 2021 WL 4284582, at *17 (D. Del. Sept. 21, 2021) (determining that the conditions of the plaintiff's employment were not unreasonably altered because, among other things, "[s]he received a raise and bonus" during the years in question); *Vitt*, 250 F. Supp.2d at 890 (finding that the plaintiff, a White woman who brought a hostile work environment claim based on accusations that her Black supervisor "singled [her] out" because of race, "was subjected to, at most, mere offensive utterances, and the facts show that her work performance did not suffer unreasonably.  Her performance evaluations were not materially affected, and she continued to receive raises and step-up in pay for meeting expectations.").

Contemporaneous text messages between De Piero and his friends also indicate that he appeared to seek out opportunities to rustle up disharmony amongst his colleagues, which further suggests that the alleged harassment did not "so pervade[]" Penn State Abington so as to alter the conditions of his employment.  *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013).  To take just a few examples, following Wong's June 5, 2020, "campus conversation" about racial injustice, De Piero informed a friend about the OIG complaint that he intended to file regarding the presentation, writing, in relevant part:

> A PSU Main Park administrator who co-facilitated this healing meeting said . . . I want us to stay in this state of disruption.  In fact, I want us to be more disruptive.

> And now I qupte [sic] "What some people call looting . . . I call it getting their
> due."  So you know what I'm doing now?

> About to call PA's "Office of State Inspector General" to call that cunt out and
> get whistleblower protection.

And, after he filed a Bias Report against Naydan in September 2021, he wrote to another friend:

"I have some pretty massive news . . . So even after I reported it to my top supervisor twice, my

other supe—this department chair crazy woke cunt— just won't stop."  He went on to tell this

friend about his meeting with Borges, stating that "the jokes on her: [I] recorded it.  And sent it

to my new lawyer, who is taking me on as a 'public interest' case[.]"

A similar situation unfolded in *Diemert*.  There, certain "offensive" incidents raised by

the plaintiff were not characterized as unwelcome for the purposes of pervasive harassment, as

the record suggested that he was the actor who "instigated the dynamic that unfolded."  2025 WL

446753, at *11.  For instance, the plaintiff argued that "he was attacked online by his co-

workers" in response to a provocative comment he made on the "City's Internal SharePoint page

about the Tulsa Massacre of 1921."  *Id.*   But contrary to his claim, the exchanges between him

and his co-workers "show that [the plaintiff] gave as good as he got, and that far from being

unwelcome interactions, [the plaintiff] relished the opportunity to express a contrarian view."  *Id.*

Thus, no rational trier of fact could find that the complained-of conduct unreasonably interfered

with De Piero's work performance.[9]

---

[9] Because De Piero's claim of "severe or pervasive" harassment fails under Title VII, Section 1981, and the PHRA,
there is no need to consider the remaining elements of his hostile work environment claims.  That said, De Piero
contends that Defendants Naydan, Borges, Baer, Wong, and Smith still face individual liability under the PHRA,
which makes it unlawful "[f]or any person, employer, employment agency, labor organization or employe, [sic] to
aid, abet, incite, compel or coerce the doing of . . . an unlawful discriminatory practice."  43 Pa. Stat. Ann. § 955(e);
*Dici v. Commonwealth of Pa.*, 91 F.3d 542, 551-53 (3d Cir. 1996).  He makes the same argument for individual
liability under Section 1981.

But De Piero's argument is unavailing because "[f]or liability to be imposed" under the PHRA "on an aiding and
abetting theory, there must be a cognizable predicate offense, *i.e.*, a violation by the employer of the PHRA."

For the reasons set forth above, no reasonable jury could determine that the twelve incidents at issue here constitute "a constant drumbeat of essentialist, deterministic, and negative language" that warrants his hostile work environment claims to go to trial. *De Piero*, 711 F. Supp.3d at 424. Thus, summary judgment shall be granted in Defendants' favor on Plaintiff's hostile work environment claims.[10]

An appropriate order follows.

BY THE COURT:

*S/* **WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, J.**

---

*Williams v. Aramark Campus LLC*, 2020 WL 1182564, at *10 (E.D. Pa. Mar. 12, 2020) (collecting cases). Having just determined that Penn State has not violated the PHRA at the institutional level, his claim of individual liability under that statute necessarily fails. Further, De Piero has failed to marshal any evidence in his argument to demonstrate an "affirmative link to causally connect the actor with the discriminatory action," which is required to maintain Section 1981 claims against individual defendants at summary judgment. *Suero v. Motorworld Auto. Grp., Inc.*, 2017 WL 413005, at *6 (M.D. Pa. Jan. 31, 2017) (citation omitted); *Abington Friends Sch.*, 480 F.3d at 256 (3d Cir. 2007) (citations omitted).

[10] De Piero asserts that Penn State never moved to dismiss the Title VII and PHRA retaliation claims as pleaded in the Amended Complaint. As a result, he submits that those claims should proceed to trial. Penn State counters that it previously moved to dismiss the Amended Complaint in its entirety, and this Court's Opinion and Order made it clear that De Piero's only remaining cause of action pursuant to Title VII, Section 1981, and the PHRA was for hostile work environment.

But the Opinion and Order made no such pronouncements. *See De Piero*, 711 F. Supp.3d at 418-24; ECF No. 32. Nevertheless, "authority has developed to allow a court to grant summary judgment" *sua sponte* even in the absence of any motion filed by a party. *Chambers Dev. Co. v. Passaic Cty. Utils. Auth.*, 62 F.3d 582, 584 n.5 (3d Cir. 1995); *see also DL Res., Inc. v. FirstEnergy Sols. Corp.*, 506 F.3d 209, 223 (3d Cir. 2007) ("District courts may grant summary judgment *sua sponte* in appropriate circumstances."). In such cases, courts are required to provide notice to the party against whom summary judgment would be granted that a *sua sponte* decision is under consideration and provide that party "with an opportunity to present relevant evidence in opposition." *Chambers Dev. Co.*, 62 F.3d at 584 n.5. Accordingly, De Piero is hereby on notice that this Court is considering granting summary judgment *sua sponte* in Penn State's favor on the Title VII and PHRA retaliation claims pleaded in the Amended Complaint. As the adverse party, De Piero may "present relevant evidence" and arguments "in opposition." *See id.*